ACCEPTED
03-15-00409-CV
8019009
THIRD COURT OF APPEALS
AUSTIN, TEXAS
11/30/2015 4:14:06 PM
JEFFREY D. KYLE
CLERK

No. 03-15-00409-CV

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
11/30/2015 4:14:06 PM
JEFFREY D. KYLE
Clerk

# In the Third Court of Appeals
## Austin, Texas

**SUSAN ENGLAND (LEE)**
*Appellant*

**v.**

**JANICE KOLBE, AS GUARDIAN OF THE ESTATE OF EDNA MOON**
*Appellee*

**APPEAL FROM CAUSE NO. 12-0361
207TH JUDICIAL DISTRICT COURT OF HAYS COUNTY, TEXAS
THE HONORABLE JUDGE GARY STEEL, PRESIDING**

**APPELLANT'S BRIEF**

David Junkin
State Bar No. 11058020
Law Office of David Junkin
P.O. Box 2910
Wimberley, TX 78676
512/847-8600
512/847-8604
david@junkinlawoffice.com

Attorney for Appellant

**ORAL ARGUMENT (CONDITIONALLY) REQUESTED**

**STATEMENT REGARDING ORAL ARGUMENT**

Appellant believes that the Appellant's Brief, Appellee's Brief, Clerk's Record, and Reporter's Record will adequately present the facts and legal arguments involved in this appeal and that oral argument would not significantly aid the decisional process of this Court. *See* Tex. R. App. P. 39.1. However, should the Court conclude that oral argument would be helpful, Appellant stands ready and requests the opportunity to participate.

# TABLE OF CONTENTS

## IDENTITY OF PARTIES AND COUNSEL

The following is a complete list of all parties to the trial court's final judgment, as well as the names and addresses of all trial and appellate counsel.

| Defendant /Appellant: | Counsel for Appellant: |
|---|---|
| Susan England, now Susan Lee | David Junkin P.O. Box 2910 Wimberley, Texas 78676 |
| Plaintiff /Appellee: | Counsel for Appellee: |
| Janice Kolbe as Guardian of the Estate Of Edna Moon | Jonathan Hull c/o Reagan Burris PLLC 401 Main Plaza, Suite 200 New Braunfels, TX  78130 |

# TABLE OF CONTENTS

**Index of Authorities** ................................................................................. vii

**Statement of the Case** .................................................................................1

**Issues Presented**

## *THE SANCTIONS ORDER*

A.     Did the Trial Court Err in Entering Death Penalty
Sanctions Against Appellant Because There Was
No Direct Relationship Between the Offensive
Conduct and the Sanction Imposed? ...........................................3

B.     Did the Trial Court Err in Entering Death Penalty
Sanctions Against Appellant Because Scope of the
Sanction Order Resulted in an Excessive Penalty? ...................3

C.     Did the Trial Court Err in Entering Death Penalty
Sanctions Against Appellant Because the Scope of
The Sanction Order violated Appellant's Constitutional
Due Process Rights? ...................................................................3

D.     In Light of the General Standards for Review of
Death Penalty Sanctions, Did Section 10.001 of
the Texas Civil Practice and Remedies Code Provide
an Additional Appropriate Basis for Death Penalty
Sanctions Against Appellant? .....................................................3

E.     In Light of General Standards for Review of Death
Penalty Sanctions, Did Rule 13 TRCP Provide
an Additional Appropriate Basis for Death Penalty
Sanctions Against Appellant? .....................................................3

F.     In Light of the General Standards for Review of
Death Penalty Sanctions, Did Rule 215.5 TRCP
Provide an Additional Appropriate Basis for
Death Penalty Sanctions Against Appellant? ............................4

## THE FINAL JUDGMENT

G.      As to the La Playa, Park Place, RR 12, and
Rest Haven (Lake McQueeney) Properties,
Did the Final Judgment Violate the "One-
Satisfaction" Rule by Granting Appellee a Double
or Even Triple Recovery for Actual Damages,
the Property Itself, and a Constructive Trust? ...........................4

H.      Did the Trial Court Err in Imposing a "Constructive
Trust Lien" Against Appellant's Homestead and
Vehicle Because There Was No Election of Remedies
by Appellee and There is No Evidence or Insufficient
Evidence to Support the Amount of the Constructive
Trusts Set Out in the Final Judgment? .......................................4

I.       Does the Final Judgment Improperly Place a Claim
on Appellant's Homestead? ........................................................4

J.      Did the Trial Court Err in Failing to Take Into
Consideration the Specific Allocation of Ownership
in the Joint Account Agreements? ...............................................4

K.      Did the Trial Court Err in "Setting Aside" and
Declaring "Void and Without Effect" the Gift Deeds
Because There is No or Insufficient Evidence of
Fraudulent Inducement of Those Deeds by Appellant
and the Final Judgment Improperly Clouds Title
of Non-Parties? ..........................................................................4

L.      Is the $1,000,000 Punitive Damages Award Excessive
in Light of the Facts and Sanctions Order? ................................4

M.     Does the Final Judgment Refer to an Improper
Authority for Assessment of Pre- and Post-
Judgement Interest? ...................................................................4

**General Statement of Facts**...........................................................................5

**Summary of the Argument** ............................................................................7

iv

**Standard of Review**................................................................8

**Argument**

*THE SANCTIONS ORDER*

A.    The Trial Court Erred in Entering Death Penalty Sanctions Against Appellant Because There is Not a Direct Relationship Between the Offensive Conduct and the Sanction Imposed........................... 11

B.    The Trial Court Erred in Entering Death Penalty Sanctions Against Appellant Because the Sanction Order was an Excessive Penalty. ............................... 16

C.    The Trial Court Erred in Entering Death Penalty Sanctions Against Appellant Because the Scope of the Sanction Order Violated Appellant's Constitutional Due Process Rights........................... 22

D.    In Light of the General Standards for Review of Death Penalty Sanctions, Section 10.001 of the Texas Civil Practice and Remedies Code Does Not Provide an Appropriate Basis for Death Penalty Sanctions Against Appellant. .......................... 25

E.    In Light of the General Standards for Review of Death Penalty Sanctions, Rule 13 TRCP Does Not Provide an Appropriate Basis for Death Penalty Sanctions Against Appellant. .......................... 27

F.    In Light of the Foregoing General Standards for Review of Death Penalty Sanctions, Rule 215.5 Does Not Provide an Appropriate Basis for Death Penalty Sanctions Against Appellant. ............................................................... 31

## THE FINAL JUDGMENT

G.  The Final Judgment Violated the "One-Satisfaction"
    Rule by Granting Appellee a "Double Recovery"
    for Actual Damages and the Property Itself............................ 32

        As to the La Playa and Park Place
          Properties........................................................................ 33

        As to the RR 12 and Rest Haven
        (Lake McQueeney) Properties  ...................................... 34

H.  The Trial Court Erred in Imposing a "Constructive
    Trust Lien" Against Appellant's Homestead
    and Vehicle Because it is Not the Proper
    Remedy and There is No Evidence or Insufficient
    Evidence to Support the Amount of the
    Constructive Trusts Set Out in the Final Judgment. ................ 35

        The Constructive Trust on Appellant's
        Homestead for $306,000 is Improper............................. 37

        The Constructive Trust on the Mercedes
        Benz for $12,182.36 is Improper ................................... 39

I.  The Final Judgment Improperly Places a Claim
    on Appellant's Homestead. ...................................................... 41

J.  The Trial Court Erred in Using the Improper
    Measure of Damages When the Joint Account
    Agreements Specifically Identified the
    Allocation of Ownership of Such Joint
    Accounts and the Court Did Not Take Into
    Consideration the Appellant's Contractual
    Ownership Interest in Those Joint Accounts............................ 42

K.  The Trial Court Erred in "Setting Aside" and
    Declaring "Void and Without Effect" the
    Gift Deeds Because There is No or Insufficient
    Evidence of Fraudulent Inducement of Those
    Deeds by Appellant and the Final Judgment
    Improperly Clouds Title of Non-Parties ................................. 44

        There is Insufficient Evidence of Fraudulent
        Inducement of a Contract ............................................... 44

        The Final Judgment Improperly Clouded
        Title of Non-Parties ....................................................... 45

L.  The $1,000,000 Punitive Damages Award is
    Excessive in Light of the Facts and Sanctions Order ............... 47

M.  The Final Judgment Refers to an Improper
    Authority for Assessment of Pre- and Post-
    Judgement Interest ...................................................................... 48

**Conclusion and Prayer** ............................................................... 48

**Certification Regarding Length of Brief** ................................. 49

**Certificate of Service** ................................................................. 49

**Appendix**

    Sanctions Order .......................................................... Tab 1

    Final Judgment ........................................................... Tab 2

    Statutes & Rules ......................................................... Tab 3

    Cases ........................................................................... Tab 4

# INDEX OF AUTHORITIES

**Authority**                                                              **Page(s)**

## Case Law

*Alejandro v. Robstown ISD*,
131 S.W.3d 663 (Tex. App.--Corpus Christi 2004, no pet.) .............. 27

*American Flood Research, Inc. v. Jones*,
192 S.W.3d 581 (Tex. 2006) ....................................................... 9, 10

*Batmanis v. Batmanis*,
600 S.W.2d 887 (Tex. Civ. App.—Houston [14th Dist.] 1980,
writ ref'd n.r.e.) ................................................................... 38

*Bennett v. Grant*,
460 S.W.3d 220 (Tex. App.—Austin 2015, pet. filed) ...................... 47

*Birchfield v. Texarkana Memorial Hosp.*,
747 S.W.2d 361 (Tex.1987) ............................................................. 32

*Brooks v. Northglen Ass'n*,
141 S.W.3d 158 (Tex. 2004) ........................................................... 46

*Brozynski v. Kerney*,
(Tex. App.-Waco Aug. 2, 2006, pet. denied) [unpublished].............. 26

*Chrysler Corp. v. Blackmon*,
841 S.W.2d 844 (Tex. 1992) ...................................................... 15, 16

*Cunningham v. Parkdale Bank*,
660 S.W.2d 810 (Tex. 1983) ........................................................... 45

*Fairfield Financial Group, Inc. v. Synott*,
300 S.W.3d 316 (Tex. App.—Austin 2009, no pet) .......................... 41

*General Ass'n of Davidian S.D.A. v. General Ass'n, Etc.*,
410 S.W.2d 256 (Tex. Civ. App.—Waco 1966,
writ ref'd n.r.e.) ................................................................... 38

*GTE Communications Sys. Corp. v. Tanner*,
856 S.W.2d 725 (Tex. 1993) ....................................................... 21, 27

*Haase v. Glazner*,
62 S.W.3d 795 (Tex. 2001) ...................................................... 44

*In re Guardianship of Patlan,*
350 S.W.2d 189 (Tex. App.—San Antonio 2011, no pet.)................ 44

*Jim Walter Homes, Inc. v. Reed*,
711 S.W.2d 617 (Tex. 1986) ....................................................... 42

*Karagounis v. Property Co. of Am.*,
970 S.W.2d 761 (Tex. App.-Amarillo 1998, pet. denied)................... 28

*Lanfear v. Blackmon*,
827 S.W.2d 87 (Tex. Civ. - Corpus Christi 1992,
orig. proceeding)................................................................ 29

*LAN/STV v. Martin K. Eby Constr. Co.*,
435 S.W.3d 234 (Tex. 2014) ........................................................ 43

*Lone Star Gas Co. v. Childress*,
187 S.W.2d 936 (Tex. Civ. App.—Waco 1945, no writ) ................. 46

*LTTS Charter School, Inc. v. Palasota*,
362 S.W.3d 202 (Tex. App.—Dallas 2012, no pet.)......................... 35

*Mattly v. Spiegel, Inc.*,
19 S.W.3d 890 (Tex. App.-Houston [14th Dist.] 2002, no pet.)......... 26

*Mid-South Telecommunications, Co. v. Best*,
184 S.W.3d 386 (Tex. App.—Austin 2006, no pet.) ........................ 17

*Moody v. Pitts*,
708 S.W.2d 930 (Tex. Civ. App.—Corpus Christi 1986,
no writ) ................................................................................ 37

*Moreno v. Sterling Drug, Inc.*,
    787 S.W.2d 348 (Tex. 1990) ................................................................. 17

*Norfolk Southern Railway Co. v. Bailey*,
    92 S.W.3d 577 (Tex. App.—Austin 2002, no pet.)........................... 14

*Overman v. Baker*,
    26 S.W.3d 506 (Tex. App.--Tyler 2000, no pet.).............................. 28

*R.M. Dudley Constr. Co., Inc. v. Dawson*,
    258 S.W.3d 694 (Tex. App.—Waco 2008, pet. denied) ................... 26

*Saden v. Smith*,
    415 S.W.3d 450 (Tex. App.--Houston [1st Dist.] 2013,
    pet. denied) ...................................................................................... 32

*Southern County Mut. Ins. Co. v. First Bank & Trust of Groves*,
    750 S.W.2d 170 (Tex. 1988) ............................................................. 32

*State v. Target Corp.*,
    194 S.W.3d 46 (Tex. App.—Waco 2006, no pet )............................ 31

*Stevenson v. Koutzarov*,
    795 S.W.2d 313 (Tex. App.--Houston [1st Dist.] 1990,
    writ denied)....................................................................................... 32

*Sw. Bell Tel. Co. v. DeLanney*,
    809 S.W.2d 493 (Tex. 1991) .........................................................42-43

*TransAmerican Natural Gas Corp. v., Powell*,
    811 S.W.2d 913 (Tex. 1991) ........................................... 10, 22, 23, 31

*Wielgosz v. Millard*,
    679 S.W.2d 163 (Tex. App.—Houston [14th Dist.]
    1984, no writ) ................................................................................... 45

*Williams v. Akzo Chemicals*,
    999 S.W.2d 836 (Tex. App.—Tyler 1999, no pet.)...................... 22, 29

*Willis v. Donnelly,*
   118 S.W.3d 10 (Tex. App.—Houston [14th Dist.] 2003),
   *aff'd in part and rev'd in part on other grounds,*
   199 S.W.3d 262 (Tex. 2006) .......................................................... 36, 37

*W.O. Bankston Nissan v. Walters,*
   754 S.W.2d 127 (Tex. 1988) .......................................................... 42

**Statutes**

TEX. BUS. ORG. CODE § 152.101 ..................................................... 30

TEX. CIV. PRAC. & REM. CODE § 10.001 ........................................... 10, 25, 26

TEX. CIV. PRAC. & REM. CODE § 10.005 ............................................. 10, 26

TEX. CIV. PRAC. & REM. CODE § 37.006 ............................................. 46

TEX. FIN. CODE § 304.003 ............................................................... 48

TEX. FIN. CODE § 304.103 ............................................................... 48

TEX. PROP. CODE § 41.001 .............................................................. 41

**Other**

TEX. R. CIV. P. 13 ......................................................................... 8, 10, 27, 28

TEX. R. CIV. P. 39 ......................................................................... 4, 6, 47

TEX. R. CIV. P. 56 ......................................................................... 46

TEX. R. CIV. P. 97 ......................................................................... 47

TEX. R. CIV. P. 215 ....................................................................... 8, 10, 28

W. Miller, NON-MONETARY RELIEF, EQUITABLE RELIEF .......................... 37

TO THE HONORABLE THIRTEENTH COURT OF APPEALS:

Appellant, Susan England, now Susan Lee, ("Appellant" or "Susan England") files this brief asking the Court to reverse the trial court's entry of death penalty sanctions against her and reverse the judgment awarding Janice Kolbe, as Guardian of the Estate of Edna Moon ("Appellee" or "Janice Kolbe") $1,458,251 in actual damages and $1,000,000 in punitive damages and imposing constructive trusts. Appellant respectfully shows:

## STATEMENT OF THE CASE

*Judgment signed by:*  The Honorable Gary Steel

*Trial Court:*  207th Judicial District Court, Hays County, Texas.

*The Appellant:*  Susan England (now Susan Lee)

*The Appellee:*  Janice Kolbe as Guardian of the Estate of Edna Moon

*Nature of the Case:*  Appellant, Susan England (Lee), and Appellee, Janice Kolbe, are the surviving daughters of Edna and Howard Moon.[1]  The underlying nature of the case is the question of whether or not Appellant misused funds of her mother, Edna Moon.

*Course of Proceedings:*  The suit was filed on February 23, 2012 by Appellee under power of attorney.  C.R. at 8.  On March 12, 2013, Appellee and Barbara McHale were appointed guardians

---

[1] Another sister, Barbara McHale, died during the course of this proceeding and a fourth sister, Betty Jane Grossman Bish, died several years before suit was filed and left a son, Patrick Grossman, who is an heir under Edna Moon's will.

of the estate and person, respectively, of Edna Moon. On October 7, 2014, the trial court granted Appellee's first motion for sanctions for discovery abuse – primarily for failing to identify bank account/real property information – awarding Appellee monetary sanctions of $15,000 plus an additional $3,000 in attorney's fees (the "First Sanction Order"). C.R. at 544 and R.R. Vol. 8 at 54-55. The trial court also entered an Amended Docket Control Order setting out various pretrial deadline and setting the matter for jury trial on January 26, 2015.

In compliance with the Amended Docket Control Order, on December 19, 2014 the Appellant filed her First Supplemental Answer and Counterclaim. C.R. at 558. Appellee sought additional discovery. The trial court was unable to hear the case on January 26, 2015 and it was reset for trial on March 9, 2015. C.R. at 846. The trial court set new deadlines for filing amended pleadings. *Id.* Appellant's expert witness, Michael Turner, was deposed on January 13, 2015 and Appellant was deposed a second time on February 4, 2015. C.R. at 928 and 1067.

On February 20, 2015, Appellee filed a second Motion for Sanctions based primarily on alleged inconsistencies in Appellant's testimony and allegations Appellant was asserting "new" theories or claims. C.R. at 987. This motion for sanctions was ultimately heard by the trial court on March 2, 2015.

*Trial Court's Disposition:* On March 10, 2015 the trial court signed the Order Granting Plaintiff's Motion for Sanctions (the "Sanctions Order") entering "death penalty" sanctions against Appellant including denying the Appellant the right to a jury trial on the damages issue. C.R. at 1621. The trial court made it clear the sanctions were entered as a result of false testimony and not based on Appellee's allegations

of Appellant asserting a new theory. R.R. Vol. 12 at 116, lines 14-20.

Also on March 10, 2015, the trial court heard evidence on Appellee's claims for damages and entered judgment in favor of Appellee for, among other things, $1,458,251 in actual damages, $1,000,000 in punitive damages, and imposed constructive trusts on accounts, a vehicle, and Appellant's homestead ("Final Judgment"). C.R. at 1640.

## ISSUES PRESENTED

### *THE SANCTIONS ORDER*

A. **Did the Trial Court Err in Entering Death Penalty Sanctions Against Appellant Because There Was No Direct Relationship Between the Offensive Conduct and the Sanction Imposed?**

B. **Did the Trial Court Err in Entering Death Penalty Sanctions Against Appellant Because Scope of the Sanction Order Resulted in an Excessive Penalty?**

C. **Did the Trial Court Err in Entering Death Penalty Sanctions Against Appellant Because the Scope of the Sanction Order violated Appellant's Constitutional Due Process Rights?**

D. **In Light of the General Standards for Review of Death Penalty Sanctions, Did Section 10.001 of the Texas Civil Practice and Remedies Code Provide an Additional Appropriate Basis for Death Penalty Sanctions Against Appellant?**

E. **In Light of General Standards for Review of Death Penalty Sanctions, Did Rule 13 TRCP Provide an Additional Appropriate Basis for Death Penalty Sanctions Against Appellant?**

**F.** In Light of the General Standards for Review of Death Penalty Sanctions, Did Rule 215.5 TRCP Provide an Additional Appropriate Basis for Death Penalty Sanctions Against Appellant?

THE FINAL JUDGMENT

**G.** As to the La Playa, Park Place, RR 12, and Rest Haven (Lake McQueeney) Properties, Did the Final Judgment Violate the "One-Satisfaction" Rule by Granting Appellee a Double or Even Triple Recovery for Actual Damages, the Property Itself, and a Constructive Trust?

**H.** Did the Trial Court Err in Imposing a "Constructive Trust Lien" Against Appellant's Homestead and Vehicle Because There Was No Election of Remedies by Appellee and There is No Evidence or Insufficient Evidence to Support the Amount of the Constructive Trusts Set Out in the Final Judgment?

**I.** Does the Final Judgment Improperly Place a Claim on Appellant's Homestead?

**J.** Did the Trial Court Err in Failing to Take Into Consideration the Specific Allocation of Ownership in the Joint Account Agreements?

**K.** Did the Trial Court Err in "Setting Aside" and Declaring "Void and Without Effect" the Gift Deeds Because There is No or Insufficient Evidence of Fraudulent Inducement of Those Deeds by Appellant and the Final Judgment Improperly Clouds Title of Non-Parties?

**L.** Is the $1,000,000 Punitive Damages Award Excessive in Light of the Facts and Sanctions Order?

**M.** Does the Final Judgment Refer to an Improper Authority for Assessment of Pre- and Post-Judgement Interest?

## GENERAL STATEMENT OF FACTS

1.      Beginning as early as March of 2000, Howard and Edna Moon gifted real property to Appellant.  By way of a gift deed dated March 3, 2000, Howard and Edna Moon deeded a lot in the Hunter's Glen subdivision in Hays County to Appellant (the "Hunter's Glen" property).  C.R. at 1400.  Similarly, by way of a Gift Deeds dated May 4, 2006, Howard and Edna Moon deeded a property on Ranch Road 12 in Hays County to Appellant (the "RR 12" property) and property in Guadalupe County, Texas (the "Rest Haven" property or "Lake McQueeney" property).  *Id*. at 1434 and 1439 and RR Vol. 15 at 805-12.  The RR 12 and Rest Haven deeds are together referred to herein as the "Gift Deeds."[2]  Edna Moon actively participated in the acquisition of Rest Haven property executing purchase related documents.  *Id.* at 1409-32.  Beginning no later than April 12 of 2000, Howard Moon, Edna Moon, and Appellant also entered into multi-party bank accounts with rights of survivorship and allocating ownership of the account in proportion to net contributions to the account.  *Id*. at 1407; *see also id*. at 1406 (similar account for Appellant and Edna Moon).

---

[2] The "RR 12" property description is recorded in Vol. 2916, Page 759 of the Official Public Records of Hays County, Texas and the "Rest Haven" property is described as Lot 140 and part of 139, Treasure Island Unit 1 in Guadalupe County, Texas.

2.  After Howard Moon died, Edna Moon revised her will leaving her estate to her then living daughters (Appellant, Appellee, and Barbara McHale) and to the son of her deceased daughter, Patrick Grossman, and acknowledging the debt owed to her by Appellee. C.R. at 1444 (dated February 27, 2007). Appellant continued to assisted her mother in the acquisition and disposition of other real property interests and which have been described in this litigation as the "La Playa" property and the "Park Place" property. *Id*. at 1460 and 1475.

3.  By September 2008, the Appellee (and Barbara McHale) were making complaints about the alleged misuse of Edna Moon's estate to Mr. H.C. Kyle who was the attorney for Howard and Edna Moon. *Id.* at 1467. A complaint was made to Adult Protective Services in the summer of 2009. APS investigated and spoke to, among others, Edna Moon, Mr. Kyle, and Edna Moon's caregivers and ruled out claims of exploitation of Edna Moon by Appellant as "invalid." *Id.* at 1488 and R.R. Vol. 15 at 128. Edna Moon then revised her will which included admonishments against similar complaints against Appellant by Appellee and Barbara McHale. C.R. at 1501 (will dated August 12, 2009). Appellee was notified of the change in the will and the reasons for it by Mr. Kyle. *Id*. at 1514. Appellee responded to Mr. Kyle in August 2009 again complaining of Appellant. *Id*. at 1516.

4.  Upon Edna Moon's return from an extended stay out of state, in October of 2011 Appellee and Barbara McHale took Edna Moon to another attorney

to "discuss taking over our mother's financial affairs" and had Edna Moon change her will and execute a statutory durable power of attorney naming Appellee as the agent. RR Vol. 15 at 18 and 22. The Appellee then filed this suit in February 2012 alleging assorted causes of action based on alleged misuse of Edna Moon's funds by Appellant. In March of 2012, Appellee and Barbara McHale and Edna Moon opened a multi-party account with rights of survivorship and with ownership in proportion to net contributions similar to the accounts Edna Moon (and Howard Moon) opened with Appellant. C.R. at 1521.

5. During the proceeding, the Appellee complained that Appellant would not provide appropriate information and documents. C.R. at 306, 987. Ultimately, the trial court agreed and entered the Sanctions Order striking all of Appellant's claims and defenses and prohibiting a jury trial. *Id.* at 1621 [Appendix 1]. The trial court then held a bench trial solely on the issue of damages without allowing Appellant to assert any defenses. The trial court then entered the Final Judgment. *Id.* at 1640 [Appendix 2]. The trial court also entered its findings of fact and conclusions of law in support of the Sanctions Order and the Final Judgment. *Id.* at 1678.

## SUMMARY OF THE ARGUMENT

6. The Appellant appeals the Sanctions Order [C.R. at 1621 and Appendix 1] and Final Judgment [C.R. at 1640 and Appendix 2] arising out of the

Sanctions Order. The Appellant appeals the Sanctions Order as "unjust" because the Sanctions Order imposed death penalty sanctions against Appellant when there was no direct relationship between the alleged offensive conduct by the Appellant and the ultimate scope of the Sanctions Order. The Appellant also appeals the Sanctions Order because the scope of the Sanctions Order was excessive and violated Appellant's constitutional rights in striking **_all_** of Appellant's claims and defenses. Further, Rules 13 and 215 of the Texas Rules of Civil Procedure and Chapter 10 of the Civil Practice & Remedies Code do not expand the analysis of whether the Sanctions Order is "just."

7_. If this Court upholds the Sanctions Order, the Appellant also appeals the Final Judgment it is based on the overly broad Sanctions Order and because it improperly purports to award the Appellee a double or even triple recovery in violation of the one satisfaction rule. There was no allocation requested or made by the trial court among multiple causes of action asserted by Appellee and the award of Appellee's actual/economic damages. However, with respect to some properties at issue, the Final Judgment awarded Appellee not only the value of the property, but also the property itself and, in one case the additional remedy of a constructive trust against Appellant's homestead for more than $300,000, resulting in a double or even triple recovery by Appellee. Further, the damages calculations used for the constructive trust in the Final Judgment also improperly fail to acknowledge the rule

whereby the first funds taken from a co-mingled accounts are presumed to belong to the person holding the trust funds.

8. There is insufficient evidence to support setting aside the "Gift Deeds" from Howard and Edna Moon to Appellant, and by doing so, the Final Judgment improperly clouds the title of third-parties who were not before the trial court. The Final Judgment and damages awarded do not take into consideration the contractual agreement and specific allocation of ownership of funds in, at least some, of the joint accounts at issue. The punitive damages award in the Final Judgment is also excessive in light of the facts and the impact of the Sanctions Order.

## STANDARD OF REVIEW

9. A trial court's ruling on a motion for sanctions is reviewed under an abuse of discretion standard. *See e.g., American Flood Research, Inc. v. Jones,* 192 S.W.3d 581, 583 (Tex. 2006). The trial court entered findings of fact in support of the Sanctions Order and Final Judgment. C.R. at 1678. However, in reviewing sanctions orders, the appellate courts are not bound by a trial court's findings of fact and conclusions of law and must independently review the entire record to determine whether the trial court abused its discretion. *Id.* This Court should review the appealed portions of the trial court's judgment under an abuse of discretion standard. The findings of fact by the trial court should be reviewed on a factual sufficiency basis – is there sufficient evidence in the record to support the finding.

## ARGUMENT

10.     Appellant, Susan England (Lee) requests that the Court reverse, reform and/or render the trial court's Sanction Order and Final Judgment based on the following:

### *THE SANCTIONS ORDER*

11.     On March 10, 2015 the trial court entered the Order Granting Plaintiff's Motion for Sanctions (the "Sanctions Order"). C.R. at 1621 [Appendix 1]. The Sanctions Order was entered pursuant to Rules 13 and 215 Tex. R. Civ. P., Chapter 10 of the Tex. Civ. Prac. & Rem. Code, and the Court's inherent power to sanction. *Id.* The Court made findings in connection with the Sanctions Order and entered "death penalty" type sanctions including, striking Appellant's pleadings, granting a default judgment on issues of liability to Appellee and on all claims and defenses – with all facts determined in favor of Appellee, and denying Appellant's right to a jury trial. *Id.* at 1628 [Appendix 1, page 8].

12.     While the imposition of sanctions is left to the sound discretion of the trial court, any sanctions imposed must be "just." *TransAmerican Natural Gas Corp. v., Powell*, 811 S.W.2d 913, 917 (Tex. 1991). There are two general standards for measuring whether the sanction is "just" -- there must be a direct relationship between the offensive conduct and the sanction imposed and the sanction must not be excessive. *Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006).

The imposition of very severe sanctions, like the "death penalty" sanctions entered in this case, is limited, not only by these two overriding standards, but by constitutional due process. *Id*. In this case, the trial court erred in entering the death penalty sanctions against Appellant because: a) there was no direct relationship between the offensive conduct alleged and the scope of the Sanctions Order, b) the scope of the Sanctions Order was excessive, and c) the scope of the Sanctions Order improperly invaded Appellant's constitutional rights.

**A.    The Trial Court Erred in Entering Death Penalty Sanctions Against Appellant Because There is Not a Direct Relationship Between the Offensive Conduct and the Sanction Imposed.**

13.    In order to meet her burden of proof in justifying the death penalty sanctions in this case, the Appellee must show that the conduct of the Appellant is directly related to the scope of the sanction imposed. In this case, the Appellee complains primarily of the Appellant's failure to provide financial information and her alleged changes in testimony/position. However, the Appellee did not offer any evidence, and there was no finding by the Court, that anything the Appellant did effectively prevented the Appellee's from preparing for trial. On the contrary, the Appellant, through her expert witness, accountant Mike Turner, accounted for all expenditures of Edna Moon's money from 2007 forward until Appellee took over Edna Moon's estate. Mr. Turner testified at the sanctions hearing:

Q. (BY MR. JUNKIN) Mr. Turner, were you hired as an expert witness in this case?

A. Yes.

Q. Approximately when?

A. January or February of 2014.

Q. And did you prepare an initial report in this case on or about September the 11th of 2014?

A. That is correct.

Q. And is your report primarily responsive to the report prepared by expert witnesses for the Plaintiff?

A. Yes, that part was primarily responsive.

Q. And that report, as you understand it, was provided to opposing counsel?

A. I believe so by Mr. Morris and Mr. Wise.

Q. And did you prepare a supplemental report on or about December 26th of 2014?

A. Yes, I did.

Q. What was the purpose of that supplemental report?

A. It was to go into more depth about the actual use of the funds. Not just the transfer of the funds but the use.

Q. Was that supplemental report a change of your original opinion?

A. No, it was just expounding on the information that had not been provided.

. . .

Q. (BY MR. JUNKIN) Did your supplemental report basically expand on your original report?

A. To be as clear as possible, the original report was not comprehensive from Sol Schwartz, so I took and corrected and, in fact, added amounts to their report that had been transferred to Mrs. Moon and then continued forward with the use and the proceeds of those funds, which I guess could -- could technically be considered supplementing where it went to a conclusion.

Q. Were you able, in connection with the supplemental report, to be able to account for the estate of Edna Moon from back as far as 2007?

A. Yes. I was able to track all of the money that had come out of the joint account and -- or joint accounts and

where they went into the four categories that I created for the use of funds and then to ultimately where they were spent.

Q. Are you aware of the implication that that report had been prepared and was ready as of the date the case was mediated?

A. Yes, I was.

Q. Are you aware of and participated some in that mediation; is that correct?

A. Yes, I was there.

Q. And is it true that the report was prepared in advance of the mediation?

A. No, not at all. I had to work eight-and-a-half hours Christmas Eve, which was the 24th; I worked about nine hours on Christmas Day; and then another seven hours to finally finish it on Friday.

Q. And subsequent to the preparation of that supplemental report were you deposed?

A. Yes.

Q. And are you aware of any limitations on opposing counsels' ability to ask you questions?

A. I don't think there was any limitation, no.

Q. And did you explain to them the nature and purpose of that supplemental report during that deposition?

A. Yes, I did.

RR, Vol. 12, Page 35, line 8 trough Page 36, Line 6; Page 37, Line 11 through Page 38, Line 23.  Mr. Turner further testified:

Q. And I think you may have testified to this at the hearing last week, but have you been able to account for -- going back as far as 2007, have you been able to account for all of Edna Moon's financial assets as a result of a careful review of the documentation?

A. Yes. I've been able to ascertain the dollar amounts, yes.

RR Vol. 14, Page 123, lines 10 – 16.[3]  In other words, it was Appellant's expert, Mr. Turner, who accounted for all of Edna Moon's estate from approximately 2007 forward and expanded on the scope of the estate described by Appellee's expert witness (Sol Schwartz).  There was no evidence presented that any record or records that might identify the scope of Mrs. Moon's estate was/were not provided.

14.    The significance of this is that Appellee never argued or suggested that she was not able to properly prepare for trial when all of Edna Moon's estate had been accounted for as early as September, 2014.[4]  There was also no evidence of additional information on the scope of Edna Moon's estate that Appellee could produce.  As the Texas Supreme Court found:

> We do not doubt that a failure to produce documents can prejudice a party's efforts to assert or defend a claim.  But here, there has simply been no showing that the Garcias are unable to prepare for trial without the additional crash-test reports they seek.  Furthermore, the record fails to demonstrate Chrysler's ability to produce the missing crash-test reports. There is no evidence in the record that the missing tests exist or are within Chrysler's possession, custody,

---

[3] *See also*, R.R. Vol. 15 at 847, 850 -- Defendant's Exhibit 2 where Mr. Turner outlined the corrections/changes from his September 11, 2014 report.  The trial court did not exclude this report and relied upon it in determining Appellee's damages. *See generally, Norfolk Southern Railway Co. v. Bailey*, 92 S.W.3d 577, 581 (Tex. App.—Austin 2002, no pet.) ("In some instances, the change in an expert's opinion does not require supplementation.  For example, an expert may refine calculations or perfect a report up until the time of trial.  An expert also may change an opinion without supplementation if the opinion is an 'expansion of an already disclosed subject.'")  (citations omitted).

[4] Mr. Turner's initial report was provided to Appellee's counsel on September 12, 2014 in a supplemental response to request for disclosure.  C.R. at 576, 579.

or control, either actual or constructive. A party cannot be penalized for failure to produce documents under such circumstances.

*Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 849-50 (Tex. 1992) ("there was no direct relationship between the offensive conduct and the sanction imposed, as the plaintiffs did not show that they were unable to prepare for trial without the test reports, and the record did not demonstrate Chrysler's ability to produce the test reports"). There was no showing that all of the available records showing the expenditures from the accounts at issue were not provided and no argument that the Appellee could not properly prepare for trial with the information that had been presented.

15. Further, to the extent that the testimony of Appellee was inconsistent or even evasive with respect to the use of the funds in the accounts by Appellant *vis a vis* Appellee, the Sanctions Order, in striking ___**all**___ of Appellant's defenses, removed defenses/claims (limitations, contractual, parol evidence, etc.) that were not contingent on or did not factually depend on disputes as to the use of the funds. As discussed in more detail in, for example, paragraphs 17-21, 36 and 37 below, the scope of the Sanction Order was so broad in striking all of Appellant's defenses/claims that there was not a direct relationship between the offensive conduct alleged and the defenses/claims impacted by the Sanctions Order.

**B.** **The Trial Court Erred in Entering Death Penalty Sanctions Against Appellant Because the Sanction Order was an Excessive Penalty.**

16.     "Death penalty sanctions should not be used to deny a trial on the merits unless the court finds that the sanctioned party's conduct "justifies a presumption that its claims or defenses lack merit" and that "it would be unjust to permit the party to present the substance of that position [which is the subject of the withheld discovery] before the court." *Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 850 (Tex. 1992).  The trial court found that Appellant was not truthful and changed her testimony through the course of the proceeding.  Rather than exclude Appellant's testimony or allow Appellant's "changes" in testimony to be used for impeachment or even strike those defenses directly correlated with the changes in testimony, the trial court entered death penalty sanctions striking ***all*** of Appellant's claims and defenses.

17.     For example, Appellant has a statute of limitations defense.  Many of the allegedly wrongful transactions on which Appellee's damages were based took place well over four (4) years before suit was filed in February 23, 2012.  C.R. at 8.[5]

---

[5] For example, the Hunter's Glen property was gifted to Appellant in March of 2000, (C.R. at 1400), the Rest Haven property was purchased in April, 2005 (C.R. at 1427), the RR 12 property was gifted to Appellant in May 2006 (R.R. Vol. 15 at 805), the Rest Haven Property was gifted to Appellant in May 2006 (R.R. Vol. 15 at 809), the La Playa property was purchased in October 2007 (C.R. at 1457), and the Hilliard Road property was purchased in November 2007 (C.R. at 1462).  *See also*, R.R. Vol. 15 at 862 (timeline in Mr. Turner's report).

The accrual of Appellee's causes of action is a question of law, to be determined by the court and Appellant's testimony does not turn the question of the accrual of any asserted claims for limitations purposes into a fact question. *See Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 351 (Tex. 1990) ("[T]he question when a cause of action accrues is a judicial one . . . ."); *Mid-South Telecommunications, Co. v. Best,* 184 S.W.3d 386, 390 (Tex. App.—Austin 2006, no pet.) ("When a cause of action accrues is a question of law. A cause of action generally accrues at the time when facts come into existence that authorize a claimant to seek a judicial remedy.") (citations omitted). There was no evidence that any action or inaction by Appellant justifies a presumption that her limitations defenses lack merit. There was no evidence or insufficient evidence of a direct correlation between the conduct of Appellant resulting in the sanction prohibiting, for example, her limitations defense.[6]

18. Similarly, there were original contractual agreements with respect to the use of the "joint accounts." *See* C.R. 1403 (deposition on written questions of Rosemary Petry, Frost Bank representative).[7] The Frost Bank accounts ending in

---

[6] The parol evidence rule and statute of frauds would also tend to prohibit testimony that contradicts evidence in the recorded gift deeds or the purpose for them. Both the Gift Deeds to Appellant provide for the consideration for those deeds and describe the nature of those conveyances.

[7] *See* RR, Vol 14 at 47, Line 17 through page 50, line 8 (admitting into evidence the documents attached to Appellant's Summary Response to Plaintiff's Motion for Sanctions).

8650 and 9898 were created as multi-party accounts with right of survivorship and provided that:

> The parties to the account own the account in proportion to the parties' net contributions to the account. The financial institution may pay any sum in the account to a party at any time. On the death of a party, the party's ownership of the account passes to the surviving parties.

*Id*. at 1406 and 1407. This agreement was signed by Edna Moon and Appellant for the account ending in 8650 and initialed by Edna Moon, Howard Moon, and Appellant with respect to the account ending in 9898. *Id*.[8] The agreement governed the use and ownership of the account and there is insufficient evidence to change those terms. The Appellee made no specific claim that those agreements were fraudulently induced.

19. There also was an Adult Protective Services investigation in July-August of 2009 that contains evidence rebutting any presumption that may have been raised by the conduct of Appellant. *See* C.R. 1485 and R.R. Vol. 15 at 125 (the "APS Report"). In the APS Report, it is alleged that Appellant was "misusing" Edna Moon's funds. *Id.* at 1489. However, the APS investigator interviewed attorney H.C. Kyle in August 2009 and noted:

> Mr. Kyle explained he has been Howard Moon (deceased) and Edna Moon's attorney for years. Mr. Kyle is familiar with Deed of Gift of Lake McQueeney

---

[8] It is interesting to note that the Frost Bank accounts ending in 8381 and 4607 naming Edna Moon and/or Appellee or Barbara McHale and Kolbe were created as the same kind of account with rights of survivorship. C.R. at 1522.

property, Deed of Gift of Ranch Road 12 property, and Edna Moon's Last Will and Testament. Mr. Kyle reports that Barbara and Janice have complained to him about Ms. England's mis-management of the client's money. Mr. Kyle reports Ms. Moon has not complained about Susan England's management of her resources or reported financial abuse.

*Id.* at 1495. There is no evidence or insufficient evidence that Edna Moon[9] was not aware of what she was doing with respect to signing deeds, prepared by her lawyer, and in gifting the RR 12 and Rest Haven properties to Appellant. C.R. 1434-42.

20.     Further, the investigator reported that: "Client [Edna Moon] states that Cw should stop harassing Susan England. Client states Susan has always managed the client's financial affairs fairly and legally." *Id.* at 1497. The allegation of exploitation of Mrs. Moon by Appellant was found to be "invalid." Shortly, thereafter, Mrs. Moon amended her will, again naming Susan England as Executor, and adding a provision:

> In the event my situation is ever again investigated by Texas Adult Protective Services or similar governmental agency, or in the event charges are ever filed against my daughter, SUSAN K. ENGLAND, in connection with her handling of my affairs and which charges do not result in a conviction, or in the even a civil suit is ever brought by either BARBARA JEANNE McHALE or JANICE LYNN KOLBE against SUSAN KAY ENGLAND for any reason, then the disposition and administration of my estate shall be as if BARBARA JEANNE McHALE AND JANIS LYNN KOLBE had both predeceased me without issue."

---

[9] Or, for that matter, that Mr. Moon did not intend to gift the RR 12 and Rest Haven property to Susan England.

*Id.* at 1502-03 (Last Will and Testament of Edna Brackett Moon dated Aug. 12, 2009). At the request of Edna Moon, Mr. Kyle also notified Appellee of the change in the will. C.R. at 1514.

21. There is additional evidence that Edna Moon was aware of what was happening with respect to purchases of real property. For example, Mrs. Moon signed closing documents for the purchase of the Rest Haven property. *See e.g.*, CR 1418, 1419, and 1421. Even Tom Huth testified that:

> Q. When we took your deposition, you mentioned
> that you thought that Susan was a nice person but that
> she had done some things wrong, that she needed to
> correct that. Could you elaborate on what you think it
> is that she has done wrong.
> A. I -- I feel that she's just taken advantage of
> her mother and all her money on there. I think that she
> just needs to, you know, fess up and say, "Okay. Let's
> settle this all out. Let's give all this money back.
> It's all supposed to be split up four ways." And that
> was Morn's -- and her dad's plan. And that's the way --
> that's the way it should be.
> And I think that she's used up a -- these
> assets of her morn and her dad, and she used them for her
> own personal use or for buying her houses and stuff, or
> used them under the guise that Mom is really, you know,
> the owner of these things. And without Mom's money or
> -- and her dad's money, none of this would have -- could
> have occurred. So -- and she needs to -- you know, I
> said, "Mom intended" -- whenever Mom gave her any of
> this money, she -- Mom -- in fact, Edna always had told
> me this too, she said, "All this money that's going into
> all this stuff that I've invested in with Susan is
> basically for the" -- and it wasn't so much an
> investment with -- with Susan, it was an investment for

Edna, and it was supposed to be split up four ways to
all the heirs after Mom's death, if she didn't spend it
first.

CR 1542 at 1544-45.

22. There is no evidence or insufficient evidence that conduct complained of by the Appellee justified a presumption that Appellant's claims or defenses relating to Mrs. Moon's knowledge of the uses of funds in issue lack merit. At a minimum, if such a presumption could arise, there is ample evidence outside of Appellant's testimony to rebut any such presumption.

23. The Appellant acknowledges that the trial court was not required to actually impose lesser sanctions[10] and that the Sanctions Order includes findings indicating that the trial court did consider lesser sanctions and imposed a lesser sanction in the First Sanction Order. However, there is no or insufficient evidence that the sanction entered in the First Sanction Order was not effective. There was sufficient information from Appellant to allow for a full accounting of all of the

---

[10] As the Texas Supreme Court explained in *GTE Communications Sys. Corp. v. Tanner*, 856 S.W.2d 725 (Tex. 1993):

> We reaffirmed our *TransAmerican* holding in *GTE*, specifically noting that a trial court was required to consider the availability of lesser sanctions before imposing death penalty sanctions. Under this standard, the trial court need not test the effectiveness of each available lesser sanction by actually imposing the lesser sanction on the party before issuing the death penalty; rather, the trial court must analyze the available sanctions and offer a reasoned explanation as to the appropriateness of the sanction imposed.

accounts in issue by Mr. Turner after the First Sanctions Order. While the Sanctions Order does make specific findings/references to prior "admonitions" from the trial court to Appellant and attaches some significance to them in connection with attempts at lesser sanctions,[11] admonitions are not sanctions. *Williams v. Akzo Chemicals*, 999 S.W.2d 836, 843 (Tex. App.—Tyler 1999, no pet.) ("Although the CMO [case management order] included a warning that noncompliance would result in dismissal, neither a threat to sanction, without more, nor the intent to sanction, is a sanction. . . . The CMO is not a sanction. It is an order and a threat."). Any alleged failure to comply with admonitions from the Court is no evidence or insufficient evidence of an unwillingness to comply with a sanctions order. There is no or insufficient evidence that Appellant failed to comply with the First Sanction Order.

C. **The Trial Court Erred in Entering Death Penalty Sanctions Against Appellant Because the Scope of the Sanction Order Violated Appellant's Constitutional Due Process Rights.**

24. The entry of death penalty sanctions also implicates the sanctioned party's constitutional due process rights. As the Texas Supreme Court discussed in *TransAmerican*: "When a trial court strikes a party's pleadings and dismisses its action or renders a default judgment against it for abuse of the discovery process, the court adjudicates the party's claims without regard to their merits but based

_____

[11] *See e.g.,* C.R. at 1621 (paragraph 2) and 1627 (paragraph 48); *see also* RR Vol. 12, page 116, lines 21-23.

instead upon the parties' conduct of discovery." *TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 918 (Tex. 1991). Because of that, the Texas Supreme Court noted:

> [T]here are constitutional limitations upon the power of courts, even in aid of their own valid processes, to dismiss an action without affording a party the opportunity for a hearing on the merits of his cause.

*Id*. (citations omitted). Because of the underlying due process issues, "[d]iscovery sanctions cannot be used to adjudicate the merits of a party's claims or defenses unless a party's hindrance of the discovery process justifies a presumption that its claims or defenses lack merit." *Id*. However, if a party refuses to produce material evidence, despite the imposition of lesser sanctions, the court may presume that an asserted claim or defense lacks merit and dispose of it. *Id.*

25. As discussed above, Appellee did present evidence sufficient to allow for an accounting of all the accounts in issue from 2007 until the Appellee took over Edna Moon's accounts. While punishment and deterrence are legitimate purposes for sanctions, they do not justify trial by sanctions. *TransAmerican,* 811 S.W.2d at 918. Sanctions which are so severe as to preclude presentation of the merits of the case should not be assessed absent a party's flagrant bad faith or counsel's callous disregard for the responsibilities of discovery under the rules. *Id.* As further discussed above, there is ample evidence supporting claims and defenses of the Appellant and such claims are not meritless.

26.     The Appellee did not establish that any evidence with respect to the accounts was withheld by Appellant sufficient to justify a presumption that ***all*** of her claims and defenses lacked merit.  The Appellee did not produce any evidence of information about the accounts that was withheld after the trial court's First Sanctions Order.  There is insufficient evidence that the alleged misconduct of the Appellant justifies a presumption that ***all*** of her claims and defenses are without merit and death penalty sanctions should not have been used to deny the Appellant a trial on the merits.

27.     There are references in the Sanctions Order to selling property and using money to pay fees and for Appellant's own purposes.  *See e.g.*, CR 1624 and 1626, paragraphs 20, 21, 22, 23, and 36).   There are also references to Appellant providing false deposition testimony.  *Id.* at 1623, paragraph 12.  However, there is no legal basis – no order, statute, rule, etc. – to authorize the trial court's imposition of sanctions for this conduct and it should not have been taken into consideration in connection with entering the Sanctions Order.[12]  It was a violation of Appellant's due process rights for the trial court to have relied on this conduct as a basis for the Sanctions Order.

---

[12] *See e.g.,* paragraph 23 above.

28.     Accordingly, in striking all of the Appellant's claims and defenses and prohibiting a jury trial, the scope of the Sanctions Order violates the Appellant's due process right to presentation of the merits of her claims and defenses.

**D.     In Light of the Foregoing General Standards for Review of Death Penalty Sanctions, Section 10.001 of the Texas Civil Practice and Remedies Code Does Not Provide an Appropriate Basis for Death Penalty Sanctions Against Appellant.**

29.     Section 10.001 of the Texas Civil Practice & Remedies Code provides for imposition of sanctions in connection with the signing of pleadings and motions. Section 10.001 provides:

> The signing of a pleading or motion as required by the Texas Rules of Civil Procedure constitutes a certificate by the signatory that to the signatory's best knowledge, information, and belief, formed after reasonable inquiry:
> (1)  the pleading or motion is not being presented for any improper purpose, including to harass or to cause unnecessary delay or needless increase in the cost of litigation;
> (2)  each claim, defense, or other legal contention in the pleading or motion is warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
> (3) each allegation or other factual contention in the pleading or motion has evidentiary support or, for a specifically identified allegation or factual contention, is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and
> (4)  each denial in the pleading or motion of a factual contention is warranted on the evidence or, for a specifically identified denial, is reasonably based on a lack of information or belief.

TEX. CIV. PRAC. & REM. CODE §10.001.

30.     In connection with the imposition of sanctions under Chapter 10, the party moving for sanctions must prove the pleading party's subjective state of mind. *Brozynski v. Kerney*, (Tex. App.--Waco Aug. 2, 2006, pet. denied), *citing*, *Mattly v. Spiegel, Inc.*, 19 S.W.3d 890, 896 (Tex. App.--Houston [14th Dist.] 2002, no pet.). The movant must show, and the court must describe and explain, that the pleading was filed for the improper purpose of harassment. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 10.001(1); § 10.005 ("A court shall describe in an order imposing a sanction under this chapter the conduct the court has determined violated Section 10.001 and explain the basis for the sanction imposed."). The Appellee, as the movant for sanctions, had the burden of proving violations of sections 10.001(1) and 10.001(3). *R.M. Dudley Constr. Co., Inc. v. Dawson*, 258 S.W.3d 694, 709 (Tex. App.—Waco 2008, pet. denied).

31.     Under § 10.001(3), the applicable standard is whether, to the signatory's best knowledge, information, and belief, formed after reasonable inquiry, each allegation or other factual contention in a pleading has evidentiary support or, for a specifically identified allegation or factual contention, is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery. TEX. CIV. PRAC. & REM.CODE ANN. § 10.001(3).

32.     The Sanctions Order in this case does not identify with particularity the specific motion or pleading the trial court found violated §10.001 or the Appellant's

role in the filing of such pleading or motion. There is insufficient evidence that Appellant caused any pleading or motion to be filed for the purpose of harassment.[13] As discussed in detail *infra*, there is evidence of factual support for Appellant's claims and defenses.

**E.      In Light of the Foregoing General Standards for Review of Death Penalty Sanctions, Rule 13 TRCP Does Not Provide an Appropriate Basis for Death Penalty Sanctions Against Appellant.**

33.      Rule 13 directs a trial court to presume that a pleading was filed in good faith. TEX. R. CIV. P. 13; *GTE Communications Systems Corp. v. Tanner*, 856 S.W.2d 725, 731 (Tex. 1993). "Thus, the burden is on the party moving for sanctions to overcome this presumption." *Id*. Rule 13 provides:

> The signatures of attorneys or parties constitute a certificate by them that they have read the pleading, motion, or other paper; that to the best of their knowledge, information, and belief formed after reasonable inquiry the instrument is not groundless and brought in bad faith or groundless and brought for the purpose of harassment. Attorneys or parties who shall bring a fictitious suit as an experiment to get an opinion of the court, or who shall file any fictitious pleading in a cause for such a purpose, or shall make statements in pleading which they know to be groundless and false, for the purpose of securing a delay of the trial of the cause, shall be held guilty of a contempt. If a pleading, motion or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, after notice and hearing, shall impose

---

[13] A trial court must hold an evidentiary hearing to make the necessary factual determinations about the party's or attorney's motives and credibility. *Alejandro v. Robstown ISD*, 131 S.W.3d 663, 670 (Tex. App.--Corpus Christi 2004, no pet.). The pleading alone cannot establish that the represented party or its attorney brought their case in bad faith or to harass.

an appropriate sanction available under Rule 215-2b, upon the person who signed it, a represented party, or both.

Courts shall presume that pleadings, motions, and other papers are filed in good faith. No sanctions under this rule may be imposed except for good cause, the particulars of which must be stated in the sanction order. "Groundless" for purposes of this rule means no basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law. A general denial does not constitute a violation of this rule. The amount requested for damages does not constitute a violation of this rule.

TEX. R. CIV. P. 13.

34.     In determining whether a party conducted a reasonable inquiry, the facts and evidence available to the party and the circumstances existing when the party filed the pleading must be examined. *See Karagounis v. Property Co. of Am.*, 970 S.W.2d 761, 764 (Tex. App.--Amarillo 1998, pet. denied) ("the circumstances pivotal to the determination of whether sanctions should issue are those in existence at the time the pleading in question was signed and filed. Sanctions for frivolous or groundless pleadings do not apply to the pursuit of an action later determined to be groundless after pleadings were filed. *Overman v. Baker*, 26 S.W.3d 506, 509 (Tex. App.--Tyler 2000, no pet.); *Karagounis*, 970 S.W.2d at 764 (Rule 13 "says nothing about levying sanctions if one pursues an action or pleading thought legitimate when filed but subsequently found baseless.").

35.     The Sanctions Order in this case does not specifically identify the motion or pleading the trial court found violated Rule 13 or the Appellant's role in

the filing of such an improper motion or pleading. As discussed herein, there are sufficient facts to support Appellant's claims/defenses. However, the Sanctions Order refers to discovery responses and an affidavit filed in support of removing a lis pendens claim as documents signed by Appellant and forming part of the basis of the Sanctions Order.

36. As to the discovery responses, the trial court found the responses were unreasonably frivolous, made for the purpose of delay, groundless, brought in bad faith, and evasive. However, those findings alone are not necessarily sufficient to support a finding that Appellant's claims and defenses lacked merit or to justify entry of death penalty sanctions. *See Lanfear v. Blackmon*, 827 S.W.2d 87, 90-91 (Tex. Civ. App.--Corpus Christi 1992, orig. proceeding) ("That the answers were incomplete or intentionally evasive is not such an obstruction of discovery to justify the conclusion that the claim or defense lacked merit without more. The 'crime' did not justify the punishment. The trial court abused its discretion by striking Lanfear's pleadings in its first sanction order."); *see also Williams v. Akzo Chemicals*, 999 S.W.2d 836, 843 (Tex. App.—Tyler 1999, no pet.) ("That their original answers were incomplete or even intentionally evasive is not such an obstruction of discovery to justify the conclusion that their claims lacked merit without more."). No specific discovery responses were identified in the Sanctions Order as lacking merit.

37.    As to the affidavit made in connection with lifting the Lis Pendens, Appellant testified that Edna Moon "has never had any ownership interest" in the La Playa property or the Hilliard Road property.  CR at 58.  The Sanctions Order makes a finding that Appellant lied in making that statement.  CR at 1623 (paragraph 11).  Both of these properties were, at one time, held in the name of Appellant.  *See* CR 1457 and 1462.  There is no evidence that either of these properties was ever deeded to, or otherwise titled in the name of, Edna Moon.   Additionally, part of Appellee's argument for sanctions was that Appellant "changed" her story to allege a "silent partnership."  While Appellant denies there was a partnership relating to these two (2) properties, if there was, Appellant would be correct that Appellee (and Appellant) had no ownership interest in these properties.  *See* TEX. BUS. ORG. CODE §152.101 ("Partnership property is not the property of the partners.").   While Appellant's intent behind the statement may differ from its technical legal veracity, it is clear that the trial court did not rely on that statement in expunging the Lis Pendens.  *See* CR at 67 (the court struck out two findings relating to Appellee's claim to the real property but went ahead and expunged the lis pendens because Appellee did not provide proper service of the required notice).  The intent behind Rule 13 does not justify the imposition of death penalty sanctions for the statement in the affidavit, particularly when it was disregarded by the trial court in expunging the lis pendens.

**F.** **In Light of the Foregoing General Standards for Review of Death Penalty Sanctions, Rule 215.5 Does Not Provide an Appropriate Basis for Death Penalty Sanctions Against Appellant.**

38.     Before a court may deprive a party of its right to present the merits of its case because of discovery abuse, it must determine that a party's hindrance of the discovery process justifies a presumption that the party's claims lack merit. *TransAmerican*, 811 S.W.2d at 918. As discussed above, there was no direct correlation made between any conduct by Appellant in connection with responding to discovery that would lead to a presumption that all of Appellant's claims and defenses lacked merit.

39.     For all the reasons set out hereinabove, the trial court erred in striking all of Appellant's claims and defenses because:  a) there was no direct relationship between the allegedly offensive conduct by Appellant and the scope of the Sanctions Order, b) the scope of the Sanctions Order was excessive, and c) the scope of the Sanctions Order improperly invaded Appellant's constitutional rights. *See State v. Target Corp.*, 194 S.W.3d 46, 52 n.6 (Tex. App.—Waco 2006, no pet.) ("We do note, however, that authority supports the State's position that a due process analysis under *TransAmerican Nat. Gas Corp. v. Powell*, 811 S.W.2d 913 (Tex. 1991), is appropriate when application of the discovery rules results in merits-preclusive or death-penalty sanctions").

**G.     The Final Judgment Violated the "One-Satisfaction" Rule by Granting Appellee a "Double Recovery" for Actual Damages and the Property Itself.**

40.     It is well-established law that a plaintiff may not recover the same actual damages twice under alternative causes of action or remedies.  *See e.g., Southern County Mut. Ins. Co. v. First Bank & Trust of Groves*, 750 S.W.2d 170, 173-74 (Tex. 1988); *Birchfield v. Texarkana Memorial Hosp.*, 747 S.W.2d 361, 367 (Tex. 1987); *Stevenson v. Koutzarov*, 795 S.W.2d 313, 322 (Tex. App.--Houston [1st Dist.] 1990, writ denied).  The plaintiff is required to segregate or allocate economic damages among any of the different causes of action asserted to avoid violation of the one satisfaction rule.  *See e.g., Saden v. Smith*, 415 S.W.3d 450, 469 (Tex. App.--Houston [1st Dist.] 2013, pet. denied) ("In sum, Smith demonstrated his entitlement to a unified recovery for one broadly described injury with one damages model sponsored by accountant Shields.  Accordingly, Smith failed to justify separate awards for alternate theories of liability, as the theories as presented at trial did not depend on separate and distinct injuries resulting in separate and distinct damages.

---

[14] For the reasons set out above, the Appellant also appeals the entry of the Final Judgment based on the striking of Appellant's pleadings, claims, and defenses in the Sanctions Order.  However, if this Court finds the Sanctions Order is proper, the Appellant appeals the Final Judgment for the reasons set out below.

Under such circumstances, allowing the recovery of actual damages for both breach of contract and breach of fiduciary duty violates the one-satisfaction rule, and is therefore error.") (citations omitted).

41.    The trial court entered judgment based on calculations and accounting information primarily presented by Appellant's expert witness, Michael Turner, CPA.  See C.R. 1699 (the trial court's actual damages calculations) and R.R., Vol. 15 at 312-17 (portions of Mr. Turner's revised supplemental report [2/5/15]).  Those actual economic damage calculations do not segregate or allocate economic damages among any of the different causes of action asserted by Appellee and preclude Appellee from now allocating damages among her causes of action.  Because of that, those damages calculations also reflect violations of the one satisfaction rule and an improper double/triple recovery for Appellee.

<u>La Playa and Park Place Properties</u>

42.    The first entry on the trial court's damages calculations (C.R. at 1699) reflects an amount of $683,394 (less $5,410) as "Funds from Edna spent by England."  C.R. at 1699.  That amount includes the funds for the purchase of the "La Playa" ("LP") and "Park Place" ("PP") properties.  See R.R., Vol. 15 at 313 and 315.  However, the next entry on the judgment calculation sheet includes additional actual damages of sale proceeds from the sale of those two properties – described as the "Cash Out at Sale" on Mr. Tuner's report.  *Id.* at 315.  Both of these properties sold

at a net loss. So, the Final Judgment awarded the Appellee not only the money used to purchase the properties, but also the proceeds from the sale of the properties which necessarily would have included the funds to purchase the properties – especially when the properties sold at a loss. There was no evidence or insufficient evidence of the market value of the properties at the time they were sold and no evidence that more than market value was paid at the time of the purchase of those properties. Awarding the Appellee all of the fund used to purchase the property ***and*** the sale proceeds, when the properties sold at a loss, is not a proper measure of damages and amounts to an improper double recovery.

RR 12 and Rest Haven (Lake McQueeney) Properties

43. The Final Judgment also includes an award of actual damages of $338,631 for the sale proceeds from the RR 12 property and $96,524 for the sale proceed from the Rest Haven property. C.R. 1699. However, the Final Judgement went on to award Appellee the properties themselves by declaring the Gift Deeds "set aside . . . void and without effect." C.R. 1641. There was no showing by the Appellee that the sales price for the properties was under or less than market value. The Final Judgment awards the Appellee not only the market value of the properties, but also the properties themselves. Accordingly, in awarding both the sales price and voiding the Gift Deeds, the Final Judgment improperly grants the Plaintiff a double recovery and violates the one satisfaction rule.

44. Despite the plain language of the Gift Deeds and the statute of frauds and parol evidence rule that would tend to prohibit testimony that the deeds of these properties were not "gifts" to Appellant, the Appellee pled that Appellant represented that she would "hold title in a nominee/agency capacity for the benefit of . . . [Edna Moon's] other daughters and grandson Patrick." C.R. 1588 (page 8 of Plaintiff's Fifth Amended Original Petition). However, to the extent that the Appellant was holding these assets in trust for beneficiaries (including herself) there was no evidence of any limits placed on Appellant's management of such trust assets or that she not would have all rights and powers granted to a trustee under the Texas Property Code (Texas Trust Code).[15] If there was no trust relationship created, but the transfer was not intended as a gift, the Appellee, in her representative capacity, lacks standing to bring an action for recovery of property held for the purported benefit of other persons.

**H.    The Trial Court Erred in Imposing a "Constructive Trust Lien" Against Appellant's Homestead and Vehicle Because it is Not the Proper Remedy and There is No Evidence or Insufficient Evidence to Support the Amount of the Constructive Trusts Set Out in the Final Judgment.**

45. "Imposition of a constructive trust is not a cause of action, but rather an equitable remedy." *LTTS Charter School, Inc. v. Palasota*, 362 S.W.3d 202, 209 (Tex. App.—Dallas 2012, no pet.). Effectively, the Final Judgment awards the

---

[15] *See* Chapters 112, 113, 114, and 115 of the Texas Property Code.

Appellee a double recovery for the La Playa property and triple recovery for the RR 12 property – the sales proceeds from the sale of the RR 12 and La Playa properties, the RR 12 property itself, and a constructive trust for the RR 12 sale proceeds. The Final Judgment does not allocate actual damages for any particular cause of action and there was no election of remedies. Appellee is not entitled to a combined recovery of actual economic damages under each of her alleged claims

46. For example, in *Willis v. Donnelly*, the 14th Court of Appeals was faced with the impact of a constructive trust remedy when actual damages were awarded. The *Willis* court found:

> Lastly, appellants argue that the constructive trust triples Donnelly's recovery. Donnelly concedes that the constructive trust duplicates the money judgment and seeks remand for an election of remedies. "A party who seeks redress under two or more theories of recovery for a single wrong must elect, before the judgment is rendered, under which remedy he wishes the court to enter judgment." If the prevailing party fails to elect a remedy, the trial court should render a judgment affording the greater recovery. If the trial court fails to do so, generally, we will reform the judgment to effect such an election. *See id*.

> However, appellate courts sometimes remand a case for an election of remedies. We remand the constructive trust in this case for two reasons. First, the portion of the constructive trust imposed upon 50% of URB stock and 10% of WHE stock duplicates recovery for breach of contract, which we have reversed and remanded. Thus, the constructive trust on the URB and WHE stock is also reversed and remanded. Second, we are unable to determine which remedy for breach of fiduciary duty (the money damages or the constructive trust on the realty) provides a greater recovery. Accordingly, we remand for an election of remedies for breach of fiduciary duty.

*Willis v. Donnelly*, 118 S.W.3d 10, 43-44 (Tex. App.—Houston [14th Dist.] 2003), *aff'd in part and rev'd in part on other grounds*, 199 S.W.3d 262 (Tex. 2006) (citations omitted). In this case the Final Judgment does not reflect an election of remedies by the Appellee and improperly purports to allow for the recovery of actual damages in addition to a constructive trust.[16]

The Constructive Trust on Appellant's Homestead for $306,000 is Improper

47.    If this Court finds a constructive trust is the proper remedy, the Final Judgement purports to impose a constructive trust in the specific amount of $306,000 on Appellant's homestead at 4919 West Frances Place in Austin. C.R. 1641 (page 2 of Final Judgment) and C.R. 1685 (findings of fact, paragraph 53). Based on the evidence before the court, the amount of the constructive trust is incorrect and therefore there is insufficient evidence to support it.

48.    When "trust" funds are commingled with personal funds and funds are drawn out, it is presumed that the first funds drawn out were personal funds. *See e.g., Moody v. Pitts*, 708 S.W.2d 930, 937 (Tex. Civ. App.—Corpus Christi 1986,

---

[16] *See generally* W. Miller, NON-MONETARY RELIEF, EQUITABLE RELIEF, Article for State Bar of Texas 7th Annual Damages in Civil Litigation, page 2 (February 26-27, 2015) ("Where multiple causes of action are asserted at trial, if the verdict is returned favorably to the plaintiff, they must elect their remedy. Often the imposition of the constructive trust can be a viable option, but the plaintiff will usually have to forgo any damages that may be awarded. Counsel will have to evaluate both the benefits and consequences of electing the most favorable remedy.").

no writ) ("When a trustee has commingled funds and has expended funds, the money expended is presumed to be the trustee's own."); *Batmanis v. Batmanis*, 600 S.W.2d 887, 890 (Tex. Civ. App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.) ("And where, as here, the trustee comingles trust money with his own and money is expended, it will be presumed that his own money is expended first"); *General Ass'n of Davidian S.D.A. v. General Ass'n, Etc.*, 410 S.W.2d 256, 259 (Tex. Civ. App.—Waco 1966, writ ref'd n.r.e.). The Final Judgment does not take into account this rule of law and the presumption was not rebutted by Appellee.

49. The evidence from Appellee suggests that $100,452.53 was deposited into account 8533 from the sale of the La Playa property and then, the next day, $100,000 was transferred into the 8739 account. R.R. 15 at 748-49. The balance of the 8533 account just before the transfer was $103,994.76 of which $100,452.53 was from the sale of the La Playa property and the balance, $3,542.23, were Appellant's funds. Because of the foregoing rule, the first $3,542.23 transferred to the 8739 account was Appellant's and only the balance of $96,457.77 in the $100,000 transfer could be attributable to the La Playa sale. As to the 8739 account, there is insufficient evidence to support the trial court's finding that a "[c]onstructive trust of $100,000 results [sic] at this time. July 2013." C.R. at 1685.

50. Several months later, $188,244.59 was transferred into the 8533 account from the sale of Appellant's former homestead at 331 Hunter's Glen in San

Marcos, Texas – the Hunter's Glen property – and the next day, $188,000 was transferred to the 8739 account. *Id.* at 752-53. The trial court's findings acknowledge that the $188,000 was proceeds from the sale of Appellant's property. When the $201,000 was transferred out of the 8739 account for the purchase of Appellant's home at 4919 West Frances Place in Austin, the balance in the 8739 account was $278,008.89. Id. at 760 (balance on July 2 was $77,008.89 after the $201,000 withdrawal). Using the rule referred to above, of the $201,000 paid for the West Frances Place home, $188,000 was Appellant's and only $13,000 could be attributable to the sale of the La Playa property.

51.     Even if the court were to find that the RR 12 property was not a gift and that a constructive trust should be applied to the proceeds from the sale of that property, the $206,007.09 that could be attributable to the sale of the RR 12 property taken together with the $13,000 traceable as proceeds from the sale of the La Playa property – a total of $219,007.09 – does not support a constructive trust in the amount of $306,007.09.

The Constructive Trust on the Mercedes Benz for $12,182.36 is Improper

52.     As discussed in paragraph 48 above, with respect to "commingled" accounts, it is presumed that the first funds drawn out were personal funds. The trial court found that in September 2012, a deposit of $55,752.81 was made into account 8533. C.R. at 1685. From the evidence this appears to be a typographical error

because on August 31, 2012 $50,752.81 was deposited into account 8533. RR Vol. 15 at 739. The trial court found this deposit was attributable to the sale of the Park Place property. *Id.* The records do reflect a transfer of $55,000 to account 8739 on September 4, 2012. *Id.* at 740-41. However, after the transfer of the $55,000 on September 4, the balance of the 8533 account was $7,567.94, meaning that under the first out rule, the most of the $50,752.81 proceeds from the sale of the Park Place property that could have been transferred to the 8739 account was $43,184.87[17] and therefore remaining $11,815.13 out of the $55,000 was attributable to Appellant's funds. *Id.* at 739.

53. The balance in the 8739 account just before the time of the $55,000 deposit was $10,421.53 [Id. at 741 (September 4, 2012 daily balance of $65,421.53 less $55,000 transferred)] and after the deposit the amount in that account attributable to Appellant was $22,236.66.[18] The evidence shows that between the deposit on September 4, 2012 and the payment made to Mercedes Benz Financial on September 9, 2012 in the amount of $12,182.36, the balance in the 8739 account exceeded the amount attributable to the proceeds from the sale of the Park Place property by more than the payment to Mercedes Benz Financial and, under the first

---

[17] $50,752.81 - $7,567.94.

[18] The sum of $11,815.13 and $10,421.53.

out presumption, establishes that funds separately attributable to Appellant were used to make the payment to Mercedes Benz.

54. There is insufficient evidence to support the trial court's finding that a "[c]onstructive trust of $12,182.36 [was] created" or that there was "no evidence by [Appellant] that funds other than Edna Moon's funds were used for this payoff." C.R. at 1685-86. The record itself establishes that the imposition of such constructive trust in the Final Judgment is improper under the first out rule.

## I. The Final Judgment Improperly Places a Claim on Appellant's Homestead.

55. "Constitutional homestead rights protect citizens from losing their homes, and statutes relating to homestead rights are liberally construed to protect the homestead." *Fairfield Financial Group, Inc. v. Synott*, 300 S.W.3d 316, 320 (Tex. App.—Austin 2009, no pet). A homestead is exempt from seizure for the claims of creditors except for encumbrances properly fixed on homestead property. TEX. PROP. CODE § 41.001(a). As this Court has further noted in *Fairfield*, the Property Code lists the types of encumbrances that may be properly fixed upon homestead property, which includes purchase money liens. *Id.* § 41.001(b)(1). Based on the foregoing, even if there is evidence in this case warranting imposition of a constructive trust based on a purchase money type lien, the scope of the purchase money used for the Appellant's homestead has not been properly established and therefore the

"constructive trust lien" imposed on Appellant's homestead in the Final Judgment is improper.

56. In addition, the RR 12 property was a gift to Appellant and there is insufficient proper evidence to set that conveyance aside and to impose a constructive trust on the proceeds from the sale of that property. Accordingly, for this additional reason the constructive trust of $206,007.09 against Appellant's homestead is improper.

**J.    The Trial Court Erred in Using the Improper Measure of Damages When the Joint Account Agreements Specifically Identified the Allocation of Ownership of Such Joint Accounts and the Court Did Not Take Into Consideration the Appellant's Contractual Ownership Interest in Those Joint Accounts.**

57. The Appellee had the burden to establish the proper measure of damages. *See generally, W.O. Bankston Nissan v. Walters*, 754 S.W.2d 127, 128 (Tex. 1988) ("Walters' burden of proof in this case was to show either the difference between the fair market value of the pickup as delivered and the value of the truck as it was represented; or the difference in value between that with which he parted and that which he received. He did neither. Walters had the burden of requesting jury issues on the proper measure of damages. Having failed to do so, his cause of action must fail."). Further, "[w]hen the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone." *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986); *see also Sw. Bell Tel. Co. v.*

*DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991) ("When the only loss or damage is to the subject matter of the contract, the plaintiff's action is ordinarily on the contract."). The Texas Supreme Court has "repeatedly reaffirmed this rule." *LAN/STV v. Martin K. Eby Constr. Co.*, 435 S.W.3d 234, 242 n.35 (Tex. 2014).

58.    As discussed above,[19] Howard Moon, Edna Moon, and Appellant entered into contractual joint account agreements governing the use and ownership of the Frost Bank joint accounts ending in 8650 and 9898. *See* C.R. 1406 and 1407. These accounts were created as multi-party accounts with right of survivorship whereby the parties agreed they owned the accounts in proportion to their contributions to the account, that Frost Bank could pay any sum in the account to a party at any time, and on the death of a party, the deceased party's ownership of the account passes to the surviving parties. *Id*. The subject matter of the Appellee's claims was, in large part, for economic losses arising out of alleged misuse of funds in these accounts (in particular the account ending in 9898). Appellee and the Final Judgment made no attempt to allocate damages based on the parties' contractual agreements[20] and violated the economic loss rule by attempting to convert such actual damages arising out of contract into tort damages/claims.

---

[19] *See* paragraph 18.

[20] For example, the Appellee has taken the position that none of the funds in the joint accounts was Appellant's. However, even if Appellant made no contributions to the

**K.** **The Trial Court Erred in "Setting Aside" and Declaring "Void and Without Effect" the Gift Deeds Because There is No or Insufficient Evidence of Fraudulent Inducement of Those Deeds by Appellant and the Final Judgment Improperly Clouds Title of Non-Parties.**

Insufficient Evidence of Fraudulent Inducement of a Contract

59.    The Appellee asserted an untimely claim for fraudulent inducement. The trial court overruled Appellant's special exception to the claim seeking to require Appellee to identify the contractual agreement. *See* C.R. 1609 (special exception) and 1638 (order). However, in order to make a claim for fraudulent inducement, Appellee needed to prove the existence of a contractual agreement. It has been held that:

> In order to bring a claim for fraud in the inducement, a plaintiff must show the elements of fraud and must show that she has been fraudulently induced to enter into a binding agreement.

*In re Guardianship of Patlan*, 350 S.W.2d 189, 198 (Tex. App.—San Antonio 2011, no pet.), *citing*, *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001) ("Without a binding agreement, there is no detrimental reliance, and thus no fraudulent inducement claim. That is, when a party has not incurred a contractual obligation, it has not been induced to do anything."). In this case the trial court should not have allowed the untimely filing and should not have overruled the Appellant's special

---

9898 account, on Howard Moon's death, his interest in the account would have passed 50% to Edna Moon and 50% to Appellant.

exception. The only "contracts" referred to by the Appellant as the Gift Deeds. There was no pleading identifying the joint account agreements as being fraudulently induced. There was no specific "contract" identified and there is no evidence or insufficient evidence of any contract that Edna Moon was induced to sign by Appellant.

60. There also is insufficient evidence of a fiduciary relationship to support any presumption of fraudulent intent. Further, as noted above, the parol evidence rule and statute of frauds would also tend to prohibit testimony that contradicts evidence in the recorded gift deeds or the purpose for them. In this case, both the Gift Deeds to Appellant provide for the consideration as love and affection for Appellant and there was no evidence or insufficient evidence to set aside the stated consideration.

## The Final Judgment Improperly Clouded Title of Non-Parties

61. A party should not be granted relief in the absence of pleadings that support that relief. *See Cunningham v. Parkdale Bank*, 660 S.W.2d 810, 813 (Tex. 1983). Hence, a judgment after a trial on the merits that is not supported by the pleadings is improper. *See Wielgosz v. Millard*, 679 S.W.2d 163, 166 (Tex. App.—Houston [14th Dist.] 1984, no writ).

62. Despite there being no specific request for such relief,[21] the Final Judgment orders that the Gift Deeds of the RR 12 property and the Rest Haven property are set aside, void, and without effect. C.R. 1640, 1641. However, the Plaintiff did not join the current owners of these properties whose rights were are issue and whose title is now clouded. Rule 39, like the Declaratory Judgment Act, mandates joinder of persons whose interests would be affected by the judgment. *See Brooks v. Northglen Ass'n,* 141 S.W.3d 158, 162 (Tex. 2004), *citing,* Tex. Civ. Prac. & Rem. Code § 37.006 ("When declaratory relief is sought, all persons who have or claim any interest that would be affected by the declaration must be made parties.") (emphasis added); TEX. R. CIV. P. 39(a) ("A person who is subject to service of process shall be joined as a party in the action if ... he claims an interest relating to the subject of the action ....") (emphasis added). Because Plaintiff had not pled for this specific relief, the trial court should not have rendered the Gift Deeds void. *See* Tex. R. Civ. P. 56 ("When items of special damages are claimed, they shall be specifically stated"); *see also, Lone Star Gas Co. v. Childress*, 187 S.W.2d 936, 939 (Tex. Civ. App.—Waco 1945, no writ) ("We think the rule in Texas is 'that in order to warrant a court of equity to grant injunctive relief, the petitioner must specify the precise relief sought and a court is without jurisdiction to grant relief beyond and in

---

[21] *See* Plaintiff's Fifth Amended Petition, at 9 ("Damages and Relief Requested").

addition to that particularly specified.") (citations omitted). The Appellee's prayer controlled the nature of the relief the trial court could grant and the Final Judgment cannot properly grant relief not prayed for by Appellee.

63. The Trial Court erred in entering a Final Judgment that exceeded the scope of relief prayed for by Plaintiff. Based on the relief entered by the trial court, the current owners of the RR 12 and Rest Haven properties (the Gift Deed properties) were necessary parties needed for a just adjudication. *See generally Bennett v. Grant*, 460 S.W.3d 220, 239 (Tex. App.—Austin 2015, pet. filed) ("Thus, non-parties must be joined as additional defendants to a counterclaim if in their absence complete relief cannot be afforded among the parties."); *see also*, TEX. R. CIV. P. 39 and 97.

**L.    The $1,000,000 Punitive Damages Award is Excessive in Light of the Facts and Sanctions Order.**

64. Given the contractual nature of the underlying issues in this case discussed in paragraphs 18 and 58 above, and the double recovery issues addressed in paragraphs 40-46 above, there is insufficient evidence to support the imposition of punitive damages. Because of that, the award of punitive damages is excessive and an unconstitutional and unreasonable penalty and punishment in light of the facts of this case, particularly when taken in consideration of the extreme scope of the sanctions imposed against Appellant by way of the Sanctions Order.

**M.     The Final Judgment Refers to an Improper Authority for Assessment of Pre- and Post-Judgement Interest.**

65.     The Final Judgment incorrectly bases its award of $229.856.82 in pre-judgment interest based on §304.003 of the Texas Finance Code because which is a post-judgement interest rate provision and incorrectly bases its award of post-judgment interest based on §304.103 of the Texas Finance Code which is a pre-judgement interest provision.  C.R. at 1643.  However, the similarities in the actual pre- and post- judgment rates, makes complaint more technical than substantive.

<b>CONCLUSION AND PRAYER</b>

The trial court erred in awarding Appellee the full scope of the death penalty sanctions and the damages set out in the Final Judgment.  Accordingly, this Court should reverse the Sanctions Order and Final Judgment for the reasons set out above. Appellant requests all such other and further relief to which she might be entitled.

Respectfully submitted,

_____
David Junkin
State Bar No. 11058020
P.O. Box 2910
Wimberley, Texas 78676
512/847-8600
512/847-8604 (fax)
david@junkinlawoffice.com
Attorney for Appellant,
Susan England (Lee)

## CERTIFICATION REGARDING LENGTH OF BRIEF

Counsel for Appellant, Susan England (Lee), hereby certifies that the length of this Brief as indicated by the word processing system used to generate it, excluding appendices, is 7,439 words. While not required, this word count includes the caption, table of contents, index of authorities, statement of the case and issues presented, signature block, this certificate, and the certificate of service.

_____
David Junkin

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this brief was served on the following counsel of record and in the manner indicated on November 30, 2015.

**ESERVE AND/OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED #7013 3020 0001 5964 7437**

Jonathan Hull
c/o Reagan Burris PLLC
401 Main Plaza, Suite 200
New Braunfels, TX 78130

_____
David Junkin

CAUSE NO. 12-0361

| | | |
|---|---|---|
| JANICE KOLBE AS GUARDIAN OF THE ESTATE OF EDNA MOON | § § § | IN THE DISTRICT COURT |
| vs. | § § | 207th JUDICIAL DISTRICT |
| | § § | |
| SUSAN ENGLAND AND CASEY LEE | § | HAYS COUNTY, TEXAS |

## ORDER GRANTING PLAINTIFF'S MOTION FOR SANCTIONS

On February 24 and March 2, 2014, the Court heard and considered Plaintiff JANICE KOLBE'S, AS GUARDIAN OF THE ESTATE OF EDNA MOON, Motion for Sanctions filed with this court on or about February 19, 2015. The Plaintiff was present and was represented by counsel. Defendant Susan England was present and represented by counsel. The Court considered the Motion, Susan England's response, the evidence and arguments of counsel, and after granting Defendant additional time to present evidence and argument on the Motion, the Court is of the opinion that the Motion should be GRANTED under Texas Rules of Civil Procedure Rules 13, 215, Texas Civil Practice and Remedies Code Section 10.001, *et seq.* and the inherent powers of the court against Defendant Susan England, individually and denied as to her attorney.

### FINDINGS IN SUPPORT OF SANCTIONS

The Court makes the following findings in support of the sanctions this Court herein imposes:

1. The court previously held hearings on March 11, 2014 and July 15, 2014 on Plaintiff's original Motion to Compel Discovery, Sanctions, and for Appointment of Master and the court relies upon those proceedings as part of the support for the sanctions imposed herein;

2. The court previously admonished Susan England in March of 2014 to not "hide behind the log" and provide documents responsive to discovery;

3. The court previously ordered monetary sanctions against Susan England in July of 2014 and the court made the following findings at that time:

001621

a. That Susan England had engaged in a pattern of discovery abuse so as to justify sanctions against her, individually;

b. That Susan England had actively frustrated Plaintiff's legitimate attempts to investigate claims in this litigation;

c. That Plaintiff had incurred attorneys' fees and expenses in excess of $30,000.00 directly as a result of Susan England's actions;

d. That the sanctions ordered therein were imposed against Susan England individually and not against her attorneys at the time or any other party.

4. The court previously ordered Susan England pay to Plaintiff, Janice Kolbe, as Guardian of the Estate of Edna Moon, $15,000.00 as a sanction and an additional $3,000.00 in attorneys' fees incurred in appearing and presenting the original Motion for Sanctions.

The Court makes the following additional findings:

1. In making these findings, the court takes into consideration all of the hearings in this matter in 2014 and 2015;

2. That Susan England had adequate notice regarding the allegations set forth in the Motion for Sanctions and had a reasonable opportunity to respond to the allegations;

3. That Susan England has been dishonest in presenting the facts in this case;

4. That Susan England has changed the facts that she has presented to the court and Plaintiff in this case on multiple occasions;

5. That Susan England has consistently misled this Court under oath in this case;

6. That Susan England's truth is whatever is convenient to Susan England at the time and has changed her testimony when Plaintiff found new information;

7. That Susan England's misrepresentations to this Court are a fraud on the Court;

8. That Susan England's misconduct had significantly interfered with the core functions of this court including but not limited to its hearing evidence and deciding issues of fact or questions of law;

9. That Susan England's misconduct in this case has been willful and vindictive;

10. That, based on her own testimony, Susan England's defenses and claims in this case are

groundless, meritless and false;

11. That Susan England lied in her Affidavit to expunge lis pendens which she signed in November 2012 when she claimed that Edna Moon had no ownership interest in two properties commonly referred to by the parties as La Playa and Hilliard;

12. That Susan England lied in her depositions in November 2013 and in February 2015;

13. That Susan England has lied to this court regarding the following, which is not an exhaustive list:

    a. That she was not a fiduciary to Edna Moon;
    b. That she did not manage Edna Moon's money and other assets;
    c. Edna Moon's assets by failing to reveal their existence and location;
    d. The character of Edna Moon's assets by failing to reveal ownership interests of Edna Moon in property titled in the name of Susan England, including but not limited to bank accounts, real properties including properties referred to as Rest Haven, Ranch Road 12, Hilliard Road, La Playa and Park Place;
    e. The existence and location of bank accounts owned by Edna Moon;
    f. The existence and location of bank accounts owned by Susan England;
    g. The existence and location of other assets owned by Susan England;
    h. That she did not participate in the sale of stock owned by Edna Moon;
    i. That she did not receive documents regarding Edna Moon's Charles Schwab account, Vanguard account and tax information at any time up to and including during the pendency of this litigation;
    j. That she forgot about accounts through which approximately $500,000 flowed; and
    k. In signing the affidavit attached to the Motion to Expunge Lis Pendens stating that Edna Moon had no interest in the La Playa property and the Hilliard Road property.

14. That Susan England spoliated evidence including Edna Moon's financial records, including but not limited to, Edna Moon's records which were sent to various addresses for Susan England and records related to stock transactions.

15. That Susan England's testimony has continually changed when Plaintiff discovered new information;

16. That Susan England's testimony changed when her accounting expert developed a theory that might apply to the facts as she presented them to him;

17. That Susan England's testimony has been inconsistent and flexible, rising to the level of falsehood;

18. That Susan England's testimony was an intentional fraud on the Court;

19. That Susan England's testimony was contrived from the beginning of the litigation and throughout the litigation;

20. That Susan England has sold assets during the pendency of this litigation that she only recently revealed were assets purchased and/or owned by Edna Moon;

21. That Susan England paid the $18,000.00 in sanctions previously ordered against her by this Court with funds of Edna Moon;

22. That Susan England paid attorneys' fees to her attorneys in this litigation and in the guardianship proceeding with Edna Moon's money, to assert her position that was in opposition to the positions Edna Moon has taken in those cases and to prevent the disclosure to Edna Moon of the location, amount and existence of Edna Moon's funds and the use of those funds (this is not a finding related to the attorneys' conduct in those cases but only as to Susan England's conduct therein);

23. That Susan England paid attorneys' fees to her attorneys in the *England v. Huth* litigation with Edna Moon's money (this is not a finding related to the attorney's conduct in that case but only as to Susan England's conduct therein);

24. That Susan England abused the discovery process in resisting discovery in this case and such conduct warrants sanctions;

25. That Susan England's discovery responses were unreasonably frivolous and made for purposes of delay and such conduct warrants sanctions;

26. That Susan England's discovery responses, including the following:

   a. Defendant Susan England's Responses to Plaintiff's Request for Disclosure signed on her behalf on or about August 2, 2012 and Supplemental Responses signed September 12, 2014 and December 26, 2014;
   b. Responses to Edna Moon's Interrogatories and Request for Production to Susan England dated on or about September 21, 2012 and Amended Responses signed June 17, 2014;
   c. Responses to Edna Moon's Amended Second Set of Interrogatories and Request for Production to Susan England signed on or about October 26, 2012 and Amended Responses signed on or about June 17, 2014;
   d. Responses to Edna Moon's Fourth Interrogatories and Request for Production to Susan England signed on or about January 10, 2013 and Supplemental Responses

ORDER GRANTING MOTION FOR SANCTIONS

signed on June 17, 2014

 e. Responses to Edna Moon's Sixth Interrogatories and Request for Production to Susan England signed on or about February 5, 2014 and Supplemental Responses signed on June 17, 2014;

 f. Responses to Request for Admissions signed on her behalf on or about July 10, 2014;

 g. Defendant's Responses to "Edna Moon's" [sic] Seventh Set of Interrogatories and Requests for Production signed on or about November 7, 2014;

 h. Susan England's Responses to Defendant's Second Set of Requests for Admission signed on her behalf on or about December 10, 2014; and

 i. Defendant's Responses to Plaintiff Janice Kolbe's Eighth Set of Interrogatories and Requests for Production signed on or about January 8, 2015

were signed in violation of Rule 13, Rule 215.3 and/or Section 10.001 *et seq.*;

27. Susan England's deposition taken in November 2013, and changes thereto, were signed in violation of Rule 13;

28. The affidavit signed by Susan England to expunge the lis pendens and filed in this litigation was signed in violation of Rule 13 and Section 10.001 *et seq.*;

29. The discovery responses enumerated in No. 26, above, signed by Susan England, were groundless and were brought in bad faith;

30. The deposition enumerated in Nos. 27, above, signed by Susan England, were groundless and were brought in bad faith;

31. The affidavit to expunge the lis pendens enumerated in No. 28, above, signed by Susan England, was groundless and brought in bad faith;

32. In discovery responses, depositions and in presentations to this court, Susan misrepresented her involvement in handling Edna Moon's assets and/or finances, what assets existed, and that items responsive to discovery existed, including but not limited to bank accounts;

33. That allegations and factual contentions in Susan England's pleadings have no evidentiary support and were not likely to have evidentiary support after a reasonable opportunity for further investigation or discovery;

34. The affidavit to expunge lis pendens signed by Susan England was filed in this court so that

Susan England could sell property she later admitted was purchased with Edna Moon's money; that Susan England received money from those transactions and, during the pendency of this litigation, used that money for her own personal benefit and to litigate against Edna Moon;

35. That Susan England made statements in pleadings on multiple occasions which she knew to be groundless and false, for the purpose of securing delay of the trial in this cause;

36. That Susan England used Edna Moon's money for her own purposes, and not for the benefit of Edna Moon;

37. That Susan England failed to account to Edna Moon for her finances;

38. That good cause exists to impose sanctions against Susan England;

39. That Susan England's statements in this case were groundless in that they had no basis in law or fact and were not warranted by a good faith argument for an extension, modification or reversal of existing law;

40. Susan England's pleadings and motions were presented for an improper purpose including to cause unnecessary delay and needless increase in the cost of the litigation; factual contentions did not have evidentiary support or was likely to have evidentiary support after a reasonable opportunity for further investigation and discovery and the factual denials were not warranted on the evidence or reasonably based on a lack of information or belief;

41. That Susan England violated Section 10.001 for the reasons stated herein and the sanction is limited to what is sufficient to deter repetition of the conduct or comparable conduct by others similarly situated;

42. The conduct of the Susan England was outrageous;

43. Susan England's offensive conduct supports the inference that her claims and defenses are without merit;

44. Susan England repeatedly committed fraud on this Court, an act so egregious that the only just punishment is to strike her pleadings, grant Plaintiff a default judgment, and find all

liability facts in favor of the Plaintiff;

45. Susan England's repeated misconduct goes to the heart of her defenses and counter-claims against Plaintiff;

46. There is a direct relationship between these sanction and the offensive conduct of Susan England;

47. These sanctions are not excessive, and are no more severe than necessary. Susan England's actions are so reprehensible that justice requires that she be placed in a worse position than before suit was initiated;

48. That admonishments and lesser sanctions were previously imposed on Susan England in this litigation and appear to have had been no deterrent to Ms. England as her misconduct has only escalated since those admonishments were given and sanctions imposed;

49. That lesser sanctions at this time are inappropriate given the egregiousness of her conduct. Lesser sanctions would fail to adequately punish Ms. England for her actions, in light of the fact that justice requires that she be placed in a worse position than before suit was filed and because her offensive conduct supports the inference that her claims and defenses are without merit. Lesser sanctions would also fail to deter those who might be similarly tempted to provide false evidence and testimony and tip the scales of justice in their favor;

50. Striking Susan England's pleadings and granting a default judgment in favor of plaintiff with all liability facts determined in Plaintiff's favor will appropriately deter other potential litigants who might be tempted to submit false testimony and evidence to this Court;

51. That this is an exceptional case warranting striking pleadings and granting default judgment because lesser sanctions have been and would continue to be ineffective in i) addressing or punishing Susan England's misconduct and ii) promoting her compliance with the rules;

52. The striking of Susan England's pleadings and granting a default judgment in the Plaintiff's favor as sanctions against Susan England are reasonable and were necessarily incurred as a result of the offensive conduct; and

001627

53. A jury trial on damages would be impractical, confusing to the jury, and would impede the handling of the Court's business.

IT IS THEREFORE ORDERED that the Court imposes the following sanctions against Susan England, individually:

1.    All pleadings filed by Susan England are stricken from the court's record;

2.    A default judgment is granted hereto to Plaintiff of all issues of liability on Plaintiff's claims and all Susan England's counterclaims and defenses with all facts determined in Plaintiff's favor;

3.    A trial on damages shall be begin on or about March 10, 2015 and shall continue to proceed according to the Court's docket;

4.    As a sanction, Susan England is not entitled to a jury trial.

SIGNED on the _10_ day of March, 2015.

The Honorable Gary Steel

Respectfully submitted,

REAGAN BURRUS PLLC
401 Main Plaza, Suite 200
New Braunfels, Texas 78130
General: 830.625.8026
Direct Line: 830.358.7499
Facsimile: 830.625.4433
Email: jhull@reaganburrus.com

JONATHAN H. HULL
State Bar No. 10253350
JASON LEACH
State Bar No. 24074582
ASHLEY B. BOWEN
State Bar No. 24086926

ORDER GRANTING MOTION FOR SANCTIONS

\*\*\* AND \*\*\*

By: _____
Stephanie S. Bascon
State Bar No. 19356850
LAW OFFICE OF STEPHANIE S. BASCON PLLC
297 W. San Antonio St.
New Braunfels, Texas 78130
Telephone: (830) 625-2940
Facsimile: (830) 221-3441

Email: sbascon@att.net

ATTORNEYS FOR PLAINTIFF
JANICE KOLBE AS GUARDIAN OF THE ESTATE OF EDNA MOON


APPROVED AS TO FORM ONLY:


BY: _____
DAVID JUNKIN
SBN 11058020

15401 RR 12, Suite 105
Wimberley, Texas 78676
(512) 847-8600
(512) 847-8604 fax
david@junkinlawoffice.com
ATTORNEY FOR DEFENDANT SUSAN ENGLAND

CAUSE NO. 12-0361

FILED ᵗᴹ

| | | |
|---|---|---|
| JANICE KOLBE AS GUARDIAN OF | § | IN THE DISTRICT COURT |
| THE ESTATE OF EDNA MOON | § | |
| | § | *Beverly Crumley* |
| vs. | § | 207ᵗʰ JUDICIAL DISTRICT CLERK |
| | § | HAYS COUNTY, TEXAS |
| | § | |
| SUSAN ENGLAND ~~AND CASEY LEE~~ | § | HAYS COUNTY, TEXAS |

## FINAL JUDGMENT

On March 10, 2015, this case was called for trial. Plaintiff JANICE KOLBE AS GUARDIAN OF THE ESTATE OF EDNA MOON appeared and through her attorneys announced ready for trial. Defendant SUSAN ENGLAND ("Defendant") appeared and through her attorney announced ready for trial.

Following this Court's ruling on Plaintiff's Motion for Sanctions on or about March 2, 2015, the Court entered orders granting Plaintiff's Motion, striking Defendant's pleadings and granting a default judgment to Plaintiff, finding all liability facts in Plaintiff's favor. As further sanction, a jury request by Defendant was denied.

Therefore, the case proceeded to trial before the Court on Plaintiff's damages and remedies. Plaintiff then put on evidence in support of her claims for damages and remedies with Defendant participating in the trial and putting on evidence in response to same.

The Court having heard evidence and argument of counsel, and having reviewed pleadings and applicable authority, is of the opinion that judgment for Plaintiff should be, and hereby is, GRANTED; and,

IT IS THEREFORE ORDERED that Janice Kolbe as Guardian of the Estate of Edna Moon, the Plaintiff, recover from Susan England, Defendant, the sum of $1,458,251.00 as actual damages;

IT IS FURTHER ORDERED that Plaintiff recover from Defendant an additional $1,000,000.00 as exemplary damages.

IT IS FURTHER ORDERED that the purported Gift Deed recorded in Volume 2916, Page 759, Official Public Records of Hays County, Texas from Howard and Edna Moon to Susan K. England dated May 4, 2006, purporting to convey the real property located on Ranch Road 12 in San Marcos, Texas 78666 and more specifically identified as a "tract or parcel of land consisting of 1.43 acres of land in the Lydia Glasgow Survey, Abstract Number 188, Hays County, Texas;" and the purported Gift Deed from Howard and Edna Moon to Susan England dated May 4, 2006, purporting to convey the real property commonly referred to as Rest Haven and more specifically identified as "0.421 acres of land, more or less being all of Lot 140 and part of Lot 139, TREASURE ISLAND UNIT 1, A. Reuss Survey, Guadalupe County, Texas, according to map or plat recorded in Volume 2, Page 72, Guadalupe County, Texas, Map and Plat Records" are HEREBY SET AISDE, DECLARED VOID AND WITHOUT EFFECT.

IT IS FURTHER ORDERED that Plaintiff is entitled to and this court hereby imposes a constructive trust lien against the following assets/property of Susan England:

1. The sum of $306,000 as to the real property of Susan England located at 4914 West Frances Place, Austin, Travis County, Texas 78731, and more fully described as: Lot 1, Block K, Highland Village Section Two, Part One,

According to the Map or Plat thereof, Recorded in Volume 6, Page 1, Plat Records, Travis County, Texas;

2. The sum of $12,182.36 as to that certain motor vehicle described as a Mercedes Benz owned by Susan England;

3. The sum of $90,000 as to the lien or mortgage held by Defendant pursuant to the judgment in Cause No. 11-0050, styled Susan Kay England v. Charles Thomas Huth, in the 274th Judicial District Court of Hays County, Texas secured by property described as 10.0955 Acres of Elijah Clark Survey, Hays County, Texas located at 304 Hilliard Road, San Marcos, Texas;

4. The following accounts or funds from such if transferred:

   a. Frost Brokerage Account ending in 1601 which received a transfer of $35,000 on or about December 23, 2014 from Frost account ending in 8739; and

   b. The following accounts in Susan England's name:

      i. Frost Bank accounts ending in 7538, 8533, 8739, 1863, 5861, 4538 and 2160;

      ii. First State Bank of Central Texas accounts ending in 1218; and

      iii. Wells Fargo Accounts ending in 4666, 8827, 8751;

IT IS FURTHER ORDERED ORDERED AND DETERMINED that Susan England's claim of homestead on the property located at 4914 West Frances Place, Austin, Travis County, Texas 78731, and more fully described as: Lot 1, Block K, Highland Village Section Two, Part One, According to the Map or Plat thereof, Recorded

in Volume 6, Page 1, Plat Records, Travis County, Texas, is inferior to Plaintiff's constructive trust lien

IT IS FURTHER ORDERED that all actual damages sums awarded herein bear pre-judgment interest at the rate of 5% per annum beginning February 12, 2012 to the date of this Judgment is signed by the Honorable Court, as set forth in the Texas Finance Code § 304.003 such pre-judgment interest being in the amount of $229,856.82.

IT IS FURTHER ORDERED that actual damages, pre-judgment interest and exemplary damages bear post-judgment interest at the rate of 5% per annum from the date judgment is entered in this case until payment in full is made to Plaintiffs as set forth in the Texas Finance Code § 304.103.

IT IS HEREBY ORDERED that Plaintiffs are entitled to enforce this Default Judgment through abstract, execution and any other process necessary.

IT IS FURTHER ORDERED that the temporary restraining order, is made a temporary injunction herein and shall remain in effect through the period of this Court's plenary power and then expire. The previous bond posted by Plaintiff in connection with the temporary restraining order is deemed applied to the bond required for the temporary injunction, that being the sum of $100.00.

IT IS FURTHER ORDERED that all costs of court are taxed against Susan England, Defendant.

All other relief not expressly granted in this judgment is denied.

SIGNED this _2_ day of ~~March~~ April, 2015.

_____
THE HONORABLE GARY STEEL

SUBMITTED AND APPROVED AS
TO FORM AND SUBSTANCE:

REAGAN BURRUS PLLC
401 Main Plaza, Suite 200
New Braunfels, Texas 78130
General: 830.625.8026
Direct Line: 830.358.7499
Facsimile: 830.625.4433

/s/ Jonathan H. Hull
JONATHAN H. HULL
State Bar No. 10253350
jhull@reaganburrus.com
JASON LEACH
State Bar No. 24074582
ASHLEY B. BOWEN
State Bar No. 24086926
abowen@reaganburrus.com

***AND***
By: /s/ Stephanie S. Bascon
Stephanie S. Bascon
State Bar No. 19356850
LAW OFFICE OF STEPHANIE S. BASCON PLLC
297 W. San Antonio St.
New Braunfels, Texas 78130
Telephone: (830) 625-2940
Facsimile: (830) 221-3441
sbascon@att.net
ATTORNEYS FOR PLAINTIFF
JANICE KOLBE AS GUARDIAN OF THE ESTATE OF EDNA MOON


APPROVED AS TO FORM ONLY:

By: _____
David C. Junkin
State Bar No. 11058020
15401 RR 12, Suite 105
Wimberley, TX 78676
State Bar No. 11058020
david@junkinlawoffice.com
ATTORNEY FOR DEFENDANT SUSAN ENGLAND

**BUSINESS ORGANIZATIONS CODE**

**TITLE 4. PARTNERSHIPS**

**CHAPTER 152. GENERAL PARTNERSHIPS**

**SUBCHAPTER C. PARTNERSHIP PROPERTY**

Sec. 152.101.  NATURE OF PARTNERSHIP PROPERTY.  Partnership property is not property of the partners.  A partner or a partner's spouse does not have an interest in partnership property.

Acts 2003, 78th Leg., ch. 182, Sec. 1, eff. Jan. 1, 2006.

# CIVIL PRACTICE AND REMEDIES CODE

## TITLE 2. TRIAL, JUDGMENT, AND APPEAL

## SUBTITLE A. GENERAL PROVISIONS

## CHAPTER 10. SANCTIONS FOR FRIVOLOUS PLEADINGS AND MOTIONS

Sec. 10.001. SIGNING OF PLEADINGS AND MOTIONS. The signing of a pleading or motion as required by the Texas Rules of Civil Procedure constitutes a certificate by the signatory that to the signatory's best knowledge, information, and belief, formed after reasonable inquiry:

(1) the pleading or motion is not being presented for any improper purpose, including to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) each claim, defense, or other legal contention in the pleading or motion is warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) each allegation or other factual contention in the pleading or motion has evidentiary support or, for a specifically identified allegation or factual contention, is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) each denial in the pleading or motion of a factual contention is warranted on the evidence or, for a specifically identified denial, is reasonably based on a lack of information or belief.

Added by Acts 1995, 74th Leg., ch. 137, Sec. 1, eff. Sept. 1, 1995.

Sec. 10.002. MOTION FOR SANCTIONS. (a) A party may make a motion for sanctions, describing the specific conduct violating Section 10.001.

(b)  The court on its own initiative may enter an order describing the specific conduct that appears to violate Section 10.001 and direct the alleged violator to show cause why the conduct has not violated that section.

(c)  The court may award to a party prevailing on a motion under this section the reasonable expenses and attorney's fees incurred in presenting or opposing the motion, and if no due diligence is shown the court may award to the prevailing party all costs for inconvenience, harassment, and out-of-pocket expenses incurred or caused by the subject litigation.

Added by Acts 1995, 74th Leg., ch. 137, Sec. 1, eff. Sept. 1, 1995.

Sec. 10.003.  NOTICE AND OPPORTUNITY TO RESPOND.  The court shall provide a party who is the subject of a motion for sanctions under Section 10.002 notice of the allegations and a reasonable opportunity to respond to the allegations.

Added by Acts 1995, 74th Leg., ch. 137, Sec. 1, eff. Sept. 1, 1995.

Sec. 10.004.  VIOLATION;  SANCTION.  (a)  A court that determines that a person has signed a pleading or motion in violation of Section 10.001 may impose a sanction on the person, a party represented by the person, or both.

(b)  The sanction must be limited to what is sufficient to deter repetition of the conduct or comparable conduct by others similarly situated.

(c)  A sanction may include any of the following:

(1)  a directive to the violator to perform, or refrain from performing, an act;

(2)  an order to pay a penalty into court; and

(3)  an order to pay to the other party the amount of the reasonable expenses incurred by the other party because of the filing of the pleading or motion, including reasonable attorney's fees.

(d)  The court may not award monetary sanctions against a represented party for a violation of Section 10.001(2).

(e)  The court may not award monetary sanctions on its own initiative unless the court issues its order to show cause before a voluntary dismissal or settlement of the claims made by or against the party or the party's attorney who is to be sanctioned.

(f)  The filing of a general denial under Rule 92, Texas Rules of Civil Procedure, shall not be deemed a violation of this chapter.

Added by Acts 1995, 74th Leg., ch. 137, Sec. 1, eff. Sept. 1, 1995.


Sec. 10.005.  ORDER.  A court shall describe in an order imposing a sanction under this chapter the conduct the court has determined violated Section 10.001 and explain the basis for the sanction imposed.

Added by Acts 1995, 74th Leg., ch. 137, Sec. 1, eff. Sept. 1, 1995.


Sec. 10.006.  CONFLICT.  Notwithstanding Section 22.004, Government Code, the supreme court may not amend or adopt rules in conflict with this chapter.

Added by Acts 1995, 74th Leg., ch. 137, Sec. 1, eff. Sept. 1, 1995.

# CIVIL PRACTICE AND REMEDIES CODE

# TITLE 2. TRIAL, JUDGMENT, AND APPEAL

# SUBTITLE C. JUDGMENTS

# CHAPTER 37. DECLARATORY JUDGMENTS

Sec. 37.006.  PARTIES.  (a)  When declaratory relief is sought, all persons who have or claim any interest that would be affected by the declaration must be made parties.  A declaration does not prejudice the rights of a person not a party to the proceeding.

(b)  In any proceeding that involves the validity of a municipal ordinance or franchise, the municipality must be made a party and is entitled to be heard, and if the statute, ordinance, or franchise is alleged to be unconstitutional, the attorney general of the state must also be served with a copy of the proceeding and is entitled to be heard.

Acts 1985, 69th Leg., ch. 959, Sec. 1, eff. Sept. 1, 1985.

# FINANCE CODE

## TITLE 4. REGULATION OF INTEREST, LOANS, AND FINANCED TRANSACTIONS

## SUBTITLE A. INTEREST

## CHAPTER 304. JUDGMENT INTEREST

## SUBCHAPTER A. GENERAL PROVISIONS

Sec. 304.003.  JUDGMENT INTEREST RATE:  INTEREST RATE OR TIME PRICE DIFFERENTIAL NOT IN CONTRACT.  (a)  A money judgment of a court of this state to which Section 304.002 does not apply, including court costs awarded in the judgment and prejudgment interest, if any, earns postjudgment interest at the rate determined under this section.

(b)  On the 15th day of each month, the consumer credit commissioner shall determine the postjudgment interest rate to be applied to a money judgment rendered during the succeeding calendar month.

(c)  The postjudgment interest rate is:

  (1)  the prime rate as published by the Board of Governors of the Federal Reserve System on the date of computation;

  (2)  five percent a year if the prime rate as published by the Board of Governors of the Federal Reserve System described by Subdivision (1) is less than five percent; or

  (3)  15 percent a year if the prime rate as published by the Board of Governors of the Federal Reserve System described by Subdivision (1) is more than 15 percent.

Amended by Acts 1999, 76th Leg., ch. 62, Sec. 7.18(a), eff. Sept. 1, 1999;  Acts 2003, 78th Leg., ch. 204, Sec. 6.01, eff. Sept. 1, 2003;  Acts 2003, 78th Leg., ch. 676, Sec. 1, eff. June 20, 2003. Amended by:

  Acts 2005, 79th Leg., Ch. 387 (S.B. 1450), Sec. 1, eff. September 1, 2005.

  Acts 2005, 79th Leg., Ch. 1018 (H.B. 955), Sec. 7.01, eff. September 1, 2005.

Sec. 304.103.  PREJUDGMENT INTEREST RATE FOR WRONGFUL DEATH, PERSONAL INJURY, OR PROPERTY DAMAGE CASE.  The prejudgment interest rate is equal to the postjudgment interest rate applicable at the time of judgment.

Amended by Acts 1999, 76th Leg., ch. 62, Sec. 7.18(a), eff. Sept. 1, 1999.

# PROPERTY CODE

## TITLE 5. EXEMPT PROPERTY AND LIENS

## SUBTITLE A. PROPERTY EXEMPT FROM CREDITORS' CLAIMS

## CHAPTER 41. INTERESTS IN LAND

## SUBCHAPTER A. EXEMPTIONS IN LAND DEFINED

Sec. 41.001.  INTERESTS IN LAND EXEMPT FROM SEIZURE.  (a)  A homestead and one or more lots used for a place of burial of the dead are exempt from seizure for the claims of creditors except for encumbrances properly fixed on homestead property.

(b)  Encumbrances may be properly fixed on homestead property for:
(1)  purchase money;

(2)  taxes on the property;

(3)  work and material used in constructing improvements on the property if contracted for in writing as provided by Sections 53.254(a), (b), and (c);

(4)  an owelty of partition imposed against the entirety of the property by a court order or by a written agreement of the parties to the partition, including a debt of one spouse in favor of the other spouse resulting from a division or an award of a family homestead in a divorce proceeding;

(5)  the refinance of a lien against a homestead, including a federal tax lien resulting from the tax debt of both spouses, if the homestead is a family homestead, or from the tax debt of the owner;

(6)  an extension of credit that meets the requirements of Section 50(a)(6), Article XVI, Texas Constitution;  or

(7)  a reverse mortgage that meets the requirements of Sections 50(k)-(p), Article XVI, Texas Constitution.

(c)  The homestead claimant's proceeds of a sale of a homestead are not subject to seizure for a creditor's claim for six months after the date of sale.

Amended by Acts 1985, 69th Leg., ch. 840, Sec. 1, eff. June 15, 1985;  Acts 1993, 73rd Leg., ch. 48, Sec. 2, eff. Sept. 1, 1993;  Acts 1995, 74th Leg., ch. 121, Sec. 1.01, eff. May 17, 1995;  Acts 1995, 74th Leg., ch. 121, Sec. 2.01;  Acts 1997, 75th Leg., ch. 526, Sec. 1, eff. Sept. 1, 1997;  Acts 2001, 77th Leg., ch. 516, Sec. 1, eff. Sept. 1, 2001.

## RULE 13. EFFECT OF SIGNING PLEADINGS, MOTIONS AND OTHER PAPERS; SANCTIONS

The signatures of attorneys or parties constitute a certificate by them that they have read the pleading, motion, or other paper; that to the best of their knowledge, information, and belief formed after reasonable inquiry the instrument is not groundless and brought in bad faith or groundless and brought for the purpose of harassment. Attorneys or parties who shall bring a fictitious suit as an experiment to get an opinion of the court, or who shall file any fictitious pleading in a cause for such a purpose, or shall make statements in pleading which they know to be groundless and false, for the purpose of securing a delay of the trial of the cause, shall be held guilty of a contempt. If a pleading, motion or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, after notice and hearing, shall impose an appropriate sanction available under Rule 215-2b, upon the person who signed it, a represented party, or both.

Courts shall presume that pleadings, motions, and other papers are filed in good faith. No sanctions under this rule may be imposed except for good cause, the particulars of which must be stated in the sanction order. "Groundless" for purposes of this rule means no basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law. A general denial does not constitute a violation of this rule. The amount requested for damages does not constitute a violation of this rule.

### Notes and Comments

Comment to 1990 change: To require notice and hearing before a court determines to impose sanctions, to specify that any sanction imposed be appropriate, and to eliminate the 90-day "grace" period provided in the former version of the rule.

**RULE 39. JOINDER OF PERSONS NEEDED FOR JUST ADJUDICATION**

(a) **Persons to Be Joined If Feasible.** A person who is subject to service of process shall be joined as a party in the action if

(1) in his absence complete relief cannot be accorded among those already parties, or

(2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may

(i) as a practical matter impair or impede his ability to protect that interest or

(ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff.

(b) **Determination by Court Whenever Joinder Not Feasible.** If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for non-joinder.

(c) **Pleading Reasons for Nonjoinder.** A pleading asserting a claim for relief shall state the names, if known to the pleader, of any persons as described in subdivision (a)(1)-(2) hereof who are not joined, and the reasons why they are not joined.

(d) **Exception of Class Actions.** This rule is subject to the provisions of Rule 42.

## RULE 56. SPECIAL DAMAGE

When items of special damage are claimed, they shall be specifically stated.

## RULE 97. COUNTERCLAIM AND CROSS-CLAIM

(a) **Compulsory Counterclaims.** A pleading shall state as a counterclaim any claim within the jurisdiction of the court, not the subject of a pending action, which at the time of filing the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction; provided, however, that a judgment based upon a settlement or compromise of a claim of one party to the transaction or occurrence prior to a disposition on the merits shall not operate as a bar to the continuation or assertion of the claims of any other party to the transaction or occurrence unless the latter has consented in writing that said judgment shall operate as a bar.

(b) **Permissive Counterclaims.** A pleading may state as a counterclaim any claim against an opposing party whether or not arising out of the transaction or occurrence that is the subject matter of the opposing party's claim.

(c) **Counterclaim Exceeding Opposing Claim.** A counterclaim may or may not diminish or defeat the recovery sought by the opposing party. It may claim relief exceeding in amount or different in kind from that sought in the pleading of the opposing party, so long as the subject matter is within the jurisdiction of the court.

(d) **Counterclaim Maturing or Acquired After Pleading.** A claim which either matured or was acquired by the pleader after filing his pleading may be presented as a counterclaim by amended pleading.

(e) **Cross-Claim Against Co-Party.** A pleading may state as a cross-claim any claim by one party against a co-party arising out of the transaction or occurrence that is the subject matter either of the original action or of a counterclaim therein. Such cross-claim may include a claim that the party against whom it is asserted is or may be liable to the cross-claimant for all or part of a claim asserted in the action against the cross-claimant.

(f) **Additional Parties.** Persons other than those made parties to the original action may be made parties to a third party action, counterclaim or cross-claim in accordance with the provisions of Rules 38, 39 and 40.

(g) Tort shall not be the subject of set-off or counterclaim against a contractual demand nor a contractual demand against tort unless it arises out of or is incident to or is connected with same.

(h) **Separate Trials; Separate Judgments.** If the court orders separate trials as provided in Rule 174, judgment on a counterclaim or cross-claim may be rendered when the court has jurisdiction so to do, even if the claims of the opposing party have been dismissed or otherwise disposed of.

**215.1 Motion for Sanctions or Order Compelling Discovery.**

A party, upon reasonable notice to other parties and all other persons affected thereby, may apply for sanctions or an order compelling discovery as follows:

(a) **Appropriate court.** On matters relating to a deposition, an application for an order to a party may be made to the court in which the action is pending, or to any district court in the district where the deposition is being taken. An application for an order to a deponent who is not a party shall be made to the court in the district where the deposition is being taken. As to all other discovery matters, an application for an order will be made to the court in which the action is pending.

(b) **Motion.**

(1) If a party or other deponent which is a corporation or other entity fails to make a designation under Rules 199.2(b)(1) or 200.1(b); or

(2) if a party, or other deponent, or a person designated to testify on behalf of a party or other deponent fails:

(A) to appear before the officer who is to take his deposition, after being served with a proper notice; or

(B) to answer a question propounded or submitted upon oral examination or upon written questions; or

(3) if a party fails:

(A) to serve answers or objections to interrogatories submitted under Rule 197, after proper service of the interrogatories; or

(B) to answer an interrogatory submitted under Rule 197; or

(C) to serve a written response to a request for inspection submitted under Rule 196, after proper service of the request; or

(D) to respond that discovery will be permitted as requested or fails to permit discovery as requested in response to a request for inspection submitted under Rule 196; the discovering party may move for an order compelling a designation, an appearance, an answer or answers, or

inspection or production in accordance with the request, or apply to the court in which the action is pending for the imposition of any sanction authorized by Rule 215.2(b) without the necessity of first having obtained a court order compelling such discovery.

When taking a deposition on oral examination, the proponent of the question may complete or adjourn the examination before he applies for an order.  If the court denies the motion in whole or in part, it may make such protective order as it would have been empowered to make on a motion pursuant to Rule 192.6.

(c) **Evasive or incomplete answer.** For purposes of this subdivision an evasive or incomplete answer is to be treated as a failure to answer.

(d) **Disposition of motion to compel: award of expenses.** If the motion is granted, the court shall, after opportunity for hearing, require a party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay, at such time as ordered by the court, the moving party the reasonable expenses incurred in obtaining the order, including attorney fees, unless the court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust. Such an order shall be subject to review on appeal from the final judgment.

If the motion is denied, the court may, after opportunity for hearing, require the moving party or attorney advising such motion to pay to the party or deponent who opposed the motion the reasonable expenses incurred in opposing the motion, including attorney fees, unless the court finds that the making of the motion was substantially justified or that other circumstances make an award of expenses unjust. If the motion is granted in part and denied in part, the court may apportion the reasonable expenses incurred in relation to the motion among the parties and persons in a just manner.

In determining the amount of reasonable expenses, including attorney fees, to be awarded in connection with a motion, the trial court shall award expenses which are reasonable in relation to the amount of work reasonably expended in obtaining an order compelling compliance or in opposing a motion which is denied.

(e) **Providing person's own statement.** If a party fails to comply with any person's written request for the person's own statement as provided in Rule 192.3(h), the person who made the request may move for an order compelling compliance. If the

motion is granted, the movant may recover the expenses incurred in obtaining the order, including attorney fees, which are reasonable in relation to the amount of work reasonably expended in obtaining the order.

**215.2 Failure to Comply with Order or with Discovery Request.**

(a) **Sanctions by court in district where deposition is taken.** If a deponent fails to appear or to be sworn or to answer a question after being directed to do so by a district court in the district in which the deposition is being taken, the failure may be considered a contempt of that court.

(b) **Sanctions by court in which action is pending.** If a party or an officer, director, or managing agent of a party or a person designated under Rules 199.2(b)(1) or 200.1(b) to testify on behalf of a party fails to comply with proper discovery requests or to obey an order to provide or permit discovery, including an order made under Rules 204 or 215.1, the court in which the action is pending may, after notice and hearing, make such orders in regard to the failure as are just, and among others the following:

> (1) an order disallowing any further discovery of any kind or of a particular kind by the disobedient party;
>
> (2) an order charging all or any portion of the expenses of discovery or taxable court costs or both against the disobedient party or the attorney advising him;
>
> (3) an order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;
>
> (4) an order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence;
>
> (5) an order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing with or without prejudice the action or proceedings or any part thereof, or rendering a judgment by default against the disobedient party;

(6) in lieu of any of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders except an order to submit to a physical or mental examination;

(7) when a party has failed to comply with an order under Rule 204 requiring him to appear or produce another for examination, such orders as are listed in paragraphs (1), (2), (3), (4) or (5) of this subdivision, unless the person failing to comply shows that he is unable to appear or to produce such person for examination.

(8) In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising him, or both, to pay, at such time as ordered by the court, the reasonable expenses, including attorney fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust. Such an order shall be subject to review on appeal from the final judgment.

(c) **Sanction against nonparty for violation of Rules 196.7 or 205.3.** If a nonparty fails to comply with an order under Rules 196.7 or 205.3, the court which made the order may treat the failure to obey as contempt of court.

## 215.3 Abuse of Discovery Process in Seeking, Making, or Resisting Discovery.

If the court finds a party is abusing the discovery process in seeking, making or resisting discovery or if the court finds that any interrogatory or request for inspection or production is unreasonably frivolous, oppressive, or harassing, or that a response or answer is unreasonably frivolous or made for purposes of delay, then the court in which the action is pending may, after notice and hearing, impose any appropriate sanction authorized by paragraphs (1), (2), (3), (4), (5), and (8) of Rule 215.2(b). Such order of sanction shall be subject to review on appeal from the final judgment.

## 215.4 Failure to Comply with Rule 198

(a) **Motion.** A party who has requested an admission under Rule 198 may move to determine the sufficiency of the answer or objection. For purposes of this subdivision an evasive or incomplete answer may be treated as a failure to answer. Unless the court determines that an objection is justified, it shall order that an answer be served. If the court determines that an answer does not comply with the

requirements of Rule 198, it may order either that the matter is admitted or that an amended answer be served. The provisions of Rule 215.1(d) apply to the award of expenses incurred in relation to the motion.

(b) **Expenses on failure to admit.** If a party fails to admit the genuineness of any document or the truth of any matter as requested under Rule 198 and if the party requesting the admissions thereafter proves the genuineness of the document or the truth of the matter, he may apply to the court for an order requiring the other party to pay him the reasonable expenses incurred in making that proof, including reasonable attorney fees. The court shall make the order unless it finds that (1) the request was held objectionable pursuant to Rule 193, or (2) the admission sought was of no substantial importance, or (3) the party failing to admit had a reasonable ground to believe that he might prevail on the matter, or (4) there was other good reason for the failure to admit.

**215.5 Failure of Party or Witness to Attend to or Serve Subpoena; Expenses.**

(a) **Failure of party giving notice to attend.** If the party giving the notice of the taking of an oral deposition fails to attend and proceed therewith and another party attends in person or by attorney pursuant to the notice, the court may order the party giving the notice to pay such other party the reasonable expenses incurred by him and his attorney in attending, including reasonable attorney fees.

(b) **Failure of witness to attend.** If a party gives notice of the taking of an oral deposition of a witness and the witness does not attend because of the fault of the party giving the notice, if another party attends in person or by attorney because he expects the deposition of that witness to be taken, the court may order the party giving the notice to pay such other party the reasonable expenses incurred by him and his attorney in attending, including reasonable attorney fees.

**215.6 Exhibits to Motions and Responses.**

Motions or responses made under this rule may have exhibits attached including affidavits, discovery pleadings, or any other documents.

# NON-MONETARY RELIEF, EQUITABLE RELIEF

**WILLIAM W. MILLER, JR.,** *Texarkana*
Greer & Miller

State Bar of Texas
**7th ANNUAL**
**DAMAGES IN CIVIL LITIGATION**
February 26-27, 2015
Houston

**CHAPTER 10**

# WILLIAM W. MILLER , JR.



**WILLIAM W. MILLER, JR.**
Born Dallas, Texas, March 28, 1971
Admitted to Texas Bar in 1996 and the Arkansas Bar in 1997
A 2006, 2007, 2008, 2009 & 2011 Super Lawyer: Rising Star

**Practice Areas:**
• Business & Commercial Litigation
• Personal Injury Litigation
• Construction Litigation
• Products Litigation

**Licensed by:**
• Supreme Court of Texas
• Supreme Court of Arkansas
• Admitted to Practice in the United States District Courts for:
  – The Eastern District of Texas
  – The Northern District of Texas
  – The Eastern and Western Districts of Arkansas

Admitted to practice in the Fifth & Eighth Circuit Courts of Appeals

**Education:**
• Vanderbilt University (B.A. 1993)
• Texas Tech School of Law (J.D.,1996),

Board of Barristers, 1995-96
Super Lawyer: Rising Star
2006, 2007, 2008, 2009 & 2011

**Member:**
• State Bar of Texas
  - Board of Directors (2006-2009)
  - SBOT EC (2006-2008)
• Arkansas Bar Association
• Texas Young Lawyers Association
  - President (2007-2008)
  - President-elect (2006-2007)
  - Chair-Elect of the Board of Directors (2004-2005)
  - Chair of the Board of Directors (2005-2006)
  - District 1 Director (2001-2003, 2003-2005)
• Texarkana Young Lawyers Association
  - President 1999-2000
  - Vice President, 1998-1999

- Northeast Texas Bar Association
- Texarkana Bar Association
- American Bar Association
- Defense Research Institute

**Civic/Other:**
- Member, St. James Episcopal Church;
- Texarkana Soccer Association Referee/Coach
- University Interscholastic League (UIL) Soccer Referee
- Arkansas Association of Officials Soccer Referee
- United States Soccer Federation Referee

"Outstanding Director of the Year" 2002-2003 bar year, Texas Young Lawyers Association

"President's Award of Merit" 2001-2002 bar year, Texas Young Lawyers Association.

**TABLE OF CONTENTS**

A.   CONSTRUCTIVE TRUSTS..................................................................................................................1

B.   QUANTUM MERUIT/RESTITUTION AND UNJUST ENRICHMENT..........................................2

C.   RESCISSION AND REFORMATION...............................................................................................3

# NON-MONETARY RELIEF, EQUITABLE RELIEF

## A. CONSTRUCTIVE TRUSTS

Constructive trusts are an equitable remedy that permits a party wronged or damaged by another's fraud, duress, mistake, breach of fiduciary duty or other unconscionable conduct an opportunity to recover as against the property acquired by the wrongdoer as a result of the wrongful conduct. The underlying purpose is to "do equity" and impose a remedy that redresses wrongs and unjust enrichment. *Meadows v. Bierschwale,* 515 S.W.2d 125 (Tex. 1974); *Bocanegra v. Aetna Life Ins. Co.,* 605 S.W.2d 848 (Tex. 1980); *Holmes v. Kent*, 221 S.W.3d 622, n. 21 (Tex. 2007); *Medford v. Medford*, 68 S.W.3d 242, 248 (Tex. App. — Fort Worth 2002, no pet.); *Hubbard v. Shankle*, 138 S.W.3d 474, 485 (Tex. App.—Fort Worth 2004, pet. denied); *Mowbray v. Avery*, 76 S.W.3d 663, 681 n.27 (Tex. App. — Corpus Christi 2002, pet. denied).

It is important to note that a constructive trust is not a cause of action in itself, but merely a remedy that can be sought for wrongful conduct. *Dawson v. Lowrey*, 441 S.W. 3d 825, 837, n. 20 (Tex.App. — Texarkana 2014, no pet.). Often the underlying cause of action arises from claims of fraud or constructive fraud. *See*, *e.g., Thigpen v. Locke*, 363 S.W.2d 247, 250 (Tex. 1962); *Blankenship v. Citizens National Bank of Lubbock*, 449 S.W. 2d 77, 79 (Tex.App.—Amarillo 1969, writ ref'd, n.r.e); *Towne v. Towne*, 707 S.W.2d 745 (Tex.App.—Ft. Worth 1986, no writ).

> "To establish that a constructive trust exists, the proponent must prove (1) breach of a special trust, fiduciary relationship, or actual fraud; (2) unjust enrichment of the wrongdoer; and (3) tracing to an identifiable res." *Hahn v. Love*, 321 S.W.3d 517 (Tex.App. —Houston[1st Dist.] 2009, pet. denied).

Quite often the imposition of a constructive trust arises from the breach of a fiduciary duty or confidential relationship. *See, e.g., Fitz-Gerald v. Hull,* 237 S.W.2d 256 (1951); *Thigpen v. Locke, supra,*; *International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567 (Tex. 1963); *Rankin v. Naftalis*, 557 S.W.2d 940 (Tex. 1977); *Consolidated Bearing v. First Nat. Bank*, 720 S.W.2d 647 (Tex.App.—Amarillo 1986, *no writ); Stout v. Clayton,* 674 S.W.2d 821 (Tex.App.—San Antonio 1984, *writ ref'd n.r.e.*). Whether a confidential relationship exists, that may be the basis for a constructive trust, is often a fact question itself for the jury to decide. *See, Macdonald v. Follen,* 180 S.W.2d

344 (Tex. 19944); *Tuck v. Miller*, 483 S.W.2d 898, 905 (Tex. 1972).

Because a confidential relationship can arise from a number of different situations (including informal moral, social, or purely personal relationships, *see, Thigpen v. Locke, supra,*) a jury's determination of whether the relationship between the parties was a confidential one should be raised as a fact issue when one party seeks a constructive trust. *See, also Andrews v. Andrews*, 677 S.W.2d 171 (Tex.App. — Austin 1984, no writ) (Cohabitation as confidential relationship); *Hatton v. Turner,* 622 S.W.2d 450 (Tex.App. — Tyler 1981, no writ) (Family relationship may support confidential relationship); *Holland v. Lesene*, 350 S.W.2d 859 (Tex.App. — San Antonio 1961, *writ ref'd n.r.e.*) (close personal friendship may constitute fiduciary relationship). From a defense perspective, the defeat of the confidential relationship precludes the imposition of the trust. On the other hand, simply proving a confidential relationship is only the fist step in showing the violation of that relationship before seeking the imposition of the constructive trust.

Constructive trusts can also be imposed on fraudulent transfers or when there is an attempt to defraud creditors by selling property for less than market value. *See, e.g., Wheeler v. Blacklands Production Credit,* 627 S.W.2d 846, Tex.App.—Ft. Worth, 1983 no writ). Constructive trusts have also been imposed as the result of mistakes, *e.g., Cocke v. Pacific Gulf Development Corp.*, 594 S.W.2d 545 (Tex.App. —Houston [1st Dist.] 1980, *no writ*); *Blankenship v. Citizens, supra.*, and to prevent unjust enrichment generally, *e.g., Pope v. Garrett, 211 S.W.2d 559* (Tex. 1948); *Meadows v. Bierschwale, supra,; Omohundro v. Matthews,* 341 S.W.2d 401 (Tex. 1960)*; Bright v. Addison*, 171 S.W.3d 588 (Tex.App.— Dallas 2005, *pet. granted*); *Ellisor v. Ellisor,* 630 s.W.2d 746 (Tex.App.— Houston [1st. Dist.] 1982, *no writ*); Hatton v. Turner, 622 S.W.2d 450 (Tex.App. — Tyler 1981, no writ).

In order to impose a constructive trust there must be identifiable property to impose the trust upon and proven that the trust should be imposed on that particular property to remedy the wrong complained about. *See., e.g., Renfrow v. Lineberry*, 271 S.W.2d 440 (Tex.App.—El Paso 1954, *writ ref'd n.r.e*); *Wheeler v. Backlands, supra,*; *May v. Little*, 473 S.W. 2d 632 (Tex.App.—El Paso, 1971, *writ ref'd n.r.e.*); *Sheldon Petroleum Co. v. Peirce,* 546 S.W. 2d 954 (Tex.App.— Dallas 1977*, no writ*). The property over which the trust is to be imposed, must be clearly traced back to the wrongdoing of the defendant. "The party seeking to impose a constructive trust has the burden of tracing funds to the specific property sought to be recovered." *Wilz v. Flournoy*, 228 S.W.3d 674, 676

(Tex. 2007). Once the fund have been traced to the property, however, the burden shifts to the defendants to show that property was acquired or purchased without wrongdoing (typically through separate funds). *Id.; Eaton v. Husted* 172 S.W.2d 493, 498 (Tex. 1943).

However, even if comingled, a constructive trust can still be imposed on the comingled funds or the proceeds of such. *See, Logan v. Logan*, 156 S.W.2d 507 (Tex. 1941); *Peirce v. Sheldon Petroleum Co.*, 589 S.W.2d 849 (Tex.App. — Amarillo 1979, no writ); *General Ass'n of Davidian Seventh Day Adventists v. General Ass'n of Davidian Seventh Day Adventists*, 410 S.W. 2d 256 (Tex.App.—Waco 1966, *writ ref'd n.r.e.) and Wilz v. Flournoy, supra*. However, if the property that would have been subject to the trust is sold to a bona fide purchaser by the Defendant, but the funds can be traced, the property itself may no longer be the subject of the trust, but the proceeds of the sale, including any profits, can be. *See, Meadows v. Bierschwale*, 516 S.W.2d 125 (Tex. 1974). *See, also, Marineau v. General American Life Insurance Co.*, 898 S.W.2d 397 (Tex.App. — Ft. Worth, writ denied) where the constructive trust was impose on not only the amount of the traced funds, but the also the increase in value. There, the premiums of a policy had been paid with funds wrongfully obtained, but the court imposed the trust on the proceeds of the policy itself, which were greater than the original wrongfully obtained funds.

Where a third party is has knowledge of the plaintiff's wrongful conduct or is on notice of the plaintiff's claimed right, the purchaser of the property can also be declared a constructive trustee for the benefit of the plaintiff. *See, Ginther v. Taub,* 675 S.W.2d 724 (Tex. 1984); *Duncan v. Woolf*, 380 S.W.2d 862 (Tex.App.—Ft. Worth, *writ ref'd n.r.e.*). However, the question will usually turn on whether the new owner of the property is unjustly enriched either because of the reduced value in acquiring the property or because of the use of the knowledge of the wrongdoing. *See, Ginther, supra*.; *Hahn v. Love, supra*.

==Where multiple causes of action are asserted at trial, if the verdict is returned favorably to the plaintiff, they must elect their remedy. Often the imposition of the constructive trust can be a viable option, but the plaintiff will usually have to forgo any damages that may be awarded. Counsel will have to evaluate both the benefits and consequences of electing the most favorable remedy.==

## B. QUANTUM MERUIT/RESTITUTION AND UNJUST ENRICHMENT

Often combined in a plaintiff's pleadings, quantum meruit, restitution and unjust enrichment claims seek enforcement of equity when no written contractual agreement exists. Generally, "quantum meruit is an equitable theory of recovery founded in the principle of unjust enrichment based on an implied agreement to pay for benefits received." *Vortt Exploration Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990); *Bashara v. Baptist Mem'l Hosp. Sys.*, 685 S.W.2d 307, 310 (Tex. 1985). To meet the requirements for recovery, the pleading party must generally prove that "(i) valuable services and/or materials were furnished, (ii) to the party sought to be charged, (iii) which were accepted by the party sought to be charged, and (iv) under such circumstances as reasonably notified the recipient that the plaintiff, in performing, expected to be paid by the recipient." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992).

Likewise, unjust enrichment is a theory applicable where a party has obtained some advantage or benefit, often by fraud, duress, or some other unfair advantage, but in circumstances that give rise to an implied or quasi-contractual obligation to reimburse the proposing party for the benefit incurred by the defendant. *See, e.g., Sherer v. Sherer*, 393 S.W.3d 480, n. 22 (Tex.App. — Texarkana 2013, *pet. denied*); *Christus Health v. Quality Infusion Care*, 359 S.W.3d 719 (Tex.App. — Houston [1st Dist.] 2011, *no pet.); Walker v. Cotter Props, Inc*. 181 S.W.3d 895 (Tex.App. — Dallas 2006, *no pet.*).

Normally, where a contract has been executed between the parties that covers the subject matter of the dispute, claims for unjust enrichment are defeated. *See, e.g., Fortune Production, Co. v. Conoco, Inc*., 52 S.W.3d 671 (Tex. 2000); *Raven Res. V. Legacy Reserves Operating*, 363 S.W.3d 865 (Tex.App. — Eastland 2012, *pet. denied*); *Transamerican Natural Gas v. Finkelstein*, 933 S.W. 2d 591 (Tex.App. — San Antonio 1996, writ denied). However, if the contract is void, not fully performed or otherwise unenforceable, the theory may still be applicable. *See, City of Harker Heights v. Sun Meadows Land, Ltd*., 830 S.W.2d 313 (Tex.App. — Austin 1992, no writ); *McCullough v. Scarbrough, Medlin & Assocs.*, 435 S.W.3d 871 (Tex.App. — Dallas 2014*, pet. denied*); *Sherer v. Sherer, supra.*

Likewise, under quantum meruit, where an express agreement has been executed between the parties on the subject matter, recovery under the theory is denied. See, Truly v. Austin, 744 S.W.2d 934 (Tex. 1988); Woodard v. Southwest States, Inc., 384 S.W.2d 674 (Tex. 1964); concept Gen. Contr. V. Asbestos Maintenance, 346 S.W.3d 172 (Tex.App. — Amarillo 2011, pet. denied). However, exceptions to this rule exist as well. For example, a contractor may recover under quantum meruit despite breach or failure to fully perform under an express contract, for the reasonable value of services or materials. *See, e.g., Murray v.*

*Crest Const., Inc.,* 900 S.W.2d 342 (Tex. 1995); *Chilton Ins. v. Pate & Pate Enterprises*, 930 S.W.2d 877 (Tex.App. — San Antonio 1996, *writ denied*). Also, when the contract is a unilateral contract, the plaintiff who has partially performed may still recover under quantum meruit as no duty is imposed on the other party to the agreement. *See., e.g., Colbert v. Dallas Joint Stock Land Bank of Dallas*, 102 S.W.2d 1031 (Tex. 1937); *Truly v. Austin*, *supra; Benson v. Harrell*, 324 S.W.2d 620 (Tex.App. — Fort Worth 1959, *writ ref'd n.r.e.*)

Under both quantum meruit and unjust enrichment, the party can plead alternative claims compared to the contract and seek recovery under both contractual and equitable theories. *See, Fortune Production Co. v. Conoco, Inc., supra; Fraud-Tech, Inc. v. Choicepoint, Inc*., 102 S.W.3d 366 (Tex.App. — Ft. Worth 2003, *pet denied*).

Quantum meruit is governed by the four year statute of limitations, *Pepsi Corp. v. Galliford,* 254 S.W.3d 457 (Tex.App. — Houston [1st. Dist.] 2007, no pet); *Quigley v. Bennett*, 256 S.W.3d 356 (Tex.App. — San Antonio 2008, *no pet.*); while claims for unjust enrichment appear to be governed by a two-year statute of limitations, *Elledge v. Friberg-Cooper Water Supply Corp.,* 240 S.W.3d 869 (Tex. 2007); *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 737 (Tex. 2001); HECI Exploration Co. v. Neel, 982 S.W.2d 881 (Tex. 1988); *Sherer v. Sherer, supra.; Mobil Producing Texas & N.M. v. Cantor*, 93 S.W.3d 916 (Tex.App. — Corpus Christi 2002, *no pet.*).

> "Money had and received" is quite often claimed under the theory of unjust enrichment. To assert such a claim, the plaintiff need only show that the defendant holds money or the equivalent of money that "in equity and good conscious" belongs to the plaintiff. *Best Buy v. Berrera*, 248 S.W.3d 160 (Tex. 2007); *Stonebridge Life Ins. Co. v. Pitts*, 236 S.W.3d 201 (Tex. 2007); *Staats v. Miller*, 243 S.W.2d 686 (Tex. 1951); *See, also, Stewart Title Guar. Co. v. Mims*, 405 S.W.3d 319 (Tex.App. — Dallas, 2013, *no pet.*); *MGA Ins. Co. v. Charles R. Chesnutt, P.C.*, 358 S.W.3d 808 (Tex.App — Dallas 2012, *no pet.*); *Tri-State Chemicals v. Western Organics*, 83 S.W.3d 189 (Tex.App. — Amarillo 2002, *pet denied*).

Money had and received is distinguished from a conversion claim in that the property need not still be in the possession of the defendant. Moreover, the plaintiff does not have to prove wrongdoing, in particular, the wrongful taking of the property or the wrongful retention of the property. *See, MGA Ins. Co. v. Chesnutt, supra; Doss v. Homecomings Fin. Network, Inc*. 201 S.W.3d 706 (Tex.App. — Corpus Christi, 2006 *pet. denied*); *Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844 (Tex.App. — Fort Worth 2005, *no pet.*). In other words, contrary to a conversion claim, all the plaintiff must show is that the defendant ended up with the money that belonged to the plaintiff, regardless of whether the defendant's acquisition of the money was fraudulent, by mistake or otherwise wrongfully procured. *See, e.g., H.E.B., LLC v. Ardinger*, 369 S.W.3d 496 (Tex.App — Fort Worth 2012, *no pet.*); *Edwards v. Mid-Continent Office*, 252 S.W.3d 833 (Tex.App. — Dallas, pet. denied).

Of course, where the plaintiff can show the wrongful acquisition of the funds, the law should find for the plaintiff. *See, e.g., Briggs v. Rodriguez*, 236 S.W.2d 510 (Tex.App — Dallas 1951, *writ dism'd*); *Wichita County v. Title,* 27 S.W.2d 649 (Tex.App. — Amarillo 1930), *aff'd*, 41 S.W.2d 11 (Tex.Comm.App 1931, *jdgmt adopted*); *Orgain v. Butler*, 478 S.W.2d 610 (Tex.App. — 1972, *no writ*); *Barrett v. Ferrell,* 550 S.W.2d 138 (Tex.App. — Tyler 1977, *writ ref'd n.r.e.*). Nonetheless, wrongdoing is not an element of the equitable claim and, if wrongdoing is asserted, alternative claims based on the wrongdoing (such as conversion or fraud) should also be alleged.

## C. RESCISSION AND REFORMATION

Rescission and reformation are equitable remedies available when the party has a contract action, but seek to either avoid the contractual remedies or modify the agreement to conform to the actual agreement of the parties. Both remedies are most often applicable when there has been either a provable mutual or unilateral mistake in the making of the agreement.

When a party seeks rescission of the contract, the proponent of the remedy must generally show that " (1) the mistake is of so great a consequence that to enforce the contract as made would be unconscionable; (2) the mistake relates to a material feature of the contract; (3) the mistake must have been made regardless of the exercise of ordinary care; and (4) the parties can be placed in status quo in the equity sense, i.e., rescission must not result in prejudice to the other party except for the loss of his bargain.*" James T. Taylor & son, Inc. v. Arlington Independent School Dist*., 335 S.W.2d 371, 373 (Tex. 1960); *Monarch Marking System Co. v. Reed's Photo Mart, Inc.*, 485 S.W.2d 905 (Tex. 1972). Often, the contract is set aside because of fraud, mistake or some other reason to prevent unjust enrichment and is often plead in response to a claim for breach of contract. *See, e.g., Koral Industries v. Security-Connecticut Life Ins. Co.,* 802 S.W.2d 650 (Tex. 1990); *Isaacs v. Bishop*, 249 S.W.3d 100

(Tex.App. — Texarkana 2008, *pet. denied); Scott v. Commercial services of Perry, Inc.,* 121 S.W.3d 26 (Tex.App. — Tyler 2003, *pet. denied); Nelson v. Najm,* 127 S.W. 3d 170 (Tex.App. — Houston [1st Dist.] 2003, *pet. denied); Barker v. Roelke,* 105 S.W.3d 75 (Tex.App. — Eastland 2003, *pet. denied).*

Under the theory that one who seeks equity must do equity, in order to successfully seek the rescission of a contract, a party seeking to rescind a contract must generally give the other party notice that the contract is being rescinded and tender, or offer to tender, any property received under the contract or the value of any benefit it obtained by the contract back to the other party. *See, e.g., Carrow v. Bayliner Marine Corp.,* 781 S.W. 2d 691 (Tex.App. — Austin 1989, no writ); *David McDavid Pontiac, Inc. v. Nix,* 681 S.W.2d 831 (Tex. App. —Dallas 1984, writ ref'd n.r.e). However, *see, e.g., Cruz v. Andrews Restoration, Inc.* 364 S.W.3d 817 (Tex. 2012) and *Morton v. Hung Nguyen,* 412 S.W.3d 506 (Tex. 2013) where the Supreme Court held that under certain statutes, i.e., the DTPA and Chapter 5, Subchapter D of the Texas Property Code, the tender of the benefits many not be necessary "as long as the affirmative relief to the consumer can be reduced by (or made subject to) the consumer's reciprocal obligation of restitution." *Cruz,* at 827 *Morton,* at 512. Presumably, the Supreme Court would extend this requirement to other codes that may appear to codify the common law remedy of rescission. Likewise, the inability to place the parties back in their original positions could be considered as a basis for denying rescission. *See, e.g., Isaacs v. Bishop,* 249 S.W.3d 100 (Tex.App. — Texarkana 2008, ).

A party may also lose the right to rescission if the party sits on their rights or is contributorily responsible for the fraud or mistake. *See, Barker v. Roekle, supra; Nelson v. Najm, supra, Isaacs v. Bishop, supra.*

Like other equitable remedies, the plaintiff must elect their remedy before judgment. Accordingly, if a verdict for damages and rescission are rendered, if rescission is selected as the remedy for judgment, a party may not be awarded damages. *See, e.g., Dallas Farm Mach. Co. v. Reaves,* 307 S.W.2d 233 (Tex. 1957); *Scott v. Sebree,* 986 S.W.2d 364 (Tex.App. — Austin 1999, pet. denied).

Reformation, in contrast to rescission, does not seek to negate the contract, but rather seeks the Court's enforcement of the contract on a "rewritten" basis. This equitable remedy is generally also only available where a party can show the contract is subject to mistake, accident or fraud. *See, Nat'l Resort Communities, Inc. v. Cain,* 526 S.W.2d 510 (Tex. 1975). Generally, a party "must [1.] prove the true agreement of the parties. 2. He must prove that the provision erroneously written into the instrument was there by mutual mistake." *Brown v. Havard,* 593

S.W.2d 939 (Tex. 1980). The successful application of the remedy often includes claims of fraud or other inequitable conduct. *See., e.g., Cherokee Water Co. Forderhause,* 741 S.W.2d 377 (Tex. 1977); *Gail v. Berry,* 343 S.W.3d 520 (Tex.App. — Eastland 2011, *no pet.); Veterans Land Bd. v. Lesley,* 281 S.W.3d 602 (Tex.App. — Eastland 2009, *pet. denied); Givens v. Ward,* 272 S.W.3d 63 (Tex.App. — Waco 2008, *no pet.).* Likewise, if the other party took advantage of the unilateral mistake, even absent fraud, reformation may be appropriate. *See, Hill v. Spencer & Son,* 973 S.W.2d 772 (Tex.App. — Texarkana 1998, no pet.). However, if the reformation sought is the reformation of a deed, transfer of the property to a bona fide purchaser may defeat the proposed reformation. *See., e.g., Richmond v. Wells,* 395 S.W.3d 262 (Tex.App. — Eastland 2012, *no pet.).*

Katarzyna Brozynski, Law offices of Cornel Walker P.C., and Cornel Walker, Appellants

v.

Jared Kerney and Sheila Kerney, Appellees

No. 10-05-00300-CV

Court of Appeals of Texas, Tenth District

August 2, 2006

From the 413th District Court Johnson County, Texas Trial Court No. 2004-00466

Before Chief Justice Gray, Justice Vance, and Justice Reyna.

## MEMORANDUM OPINION

BILL VANCE, Justice

Appellants Katarzyna Brozynski, Cornel Walker, and the Law Offices of Cornel Walker, P.C. appeal the trial court's Rule 13 sanctions ruling that awarded $7,200 in attorney's fees to Jared and Sheila Kerney. Their sole issue asserts that the trial court abused its discretion by imposing sanctions. We will reverse the trial court's sanctions judgment and render a take-nothing judgment.

## Background

Katarzyna (Kathy) and Krzysztof Brozynski sued the Kerneys, their next-door neighbors in Cleburne, initially alleging causes of action for private nuisance, trespass, and assault. The Kerneys filed a counterclaim, asserting that the Brozynskis' suit was groundless and was filed in bad faith and for the purpose of harassment. After the Kerneys moved out of state, the Brozynskis filed a motion to dismiss (*i.e.*, a nonsuit) their own claims without prejudice. The Kerneys then filed a motion for sanctions, asserting that the Brozynskis' suit was frivolous. After a hearing, the trial court granted the motion and sanctioned Kathy (who is an attorney practicing in Dallas) and her attorney of record by making particularized findings and entering a final judgment that awarded the Kerneys their attorney's fees in defending the suit.

## Standard of Review

Imposing Rule 13 sanctions is within the trial court's sound discretion. *Monroe v. Grider,* 884 S.W.2d 811, 816 (Tex. App.—Dallas 1994, writ denied). Accordingly, we review a trial court's order for sanctions under an abuse of discretion standard. *Cire v. Cummings,* 134 S.W.3d 835, 838 (Tex. 2004).

The determination of whether a trial court abused its discretion is a question of law. *Jackson v. Van Winkle*, 660 S.W.2d 807, 810 (Tex. 1983)*, overruled in part on other grounds by Moritz v. Preiss,* 121 S.W.3d 715, 721 (Tex. 2003). A trial court abuses its discretion when it acts arbitrarily and unreasonably, without reference to guiding rules or principles, or when it misapplies the law to the established facts of the case. *Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241 (Tex. 1985). " A trial court has no discretion to determine what the law is or in applying the law to the facts and, consequently, the trial court's failure to analyze or apply the law correctly is an abuse of discretion." *In re American Homestar of Lancaster, Inc.,* 50 S.W.3d 480, 483 (Tex. 2001). A trial court also abuses its discretion in imposing sanctions if it bases the order on a clearly erroneous assessment of the evidence. *Monroe,* 884 S.W.2d at 816.

## The Pleadings and Evidence

The Brozynskis' original petition alleged the following facts:

5. Beginning on or about October 1, 2003, Defendants erected a large wooden play set, which site is directly south of and immediately adjacent to Plaintiffs' property. Defendants had not consulted with Plaintiffs nor had they asked for permission to erect such construction knowing fully well that the play set had been erected in violation of the residential deed and to intentionally harass and disrupt Plaintiffs' life. Specifically, in the course of using this equipment extensively, children who are playing on the play set are constantly screaming and trespassing by looking into the Plaintiffs' entire backyard, and especially the swimming pool area, resulting in constant disruption of life during afternoon and evening hours when Plaintiffs return from work, as well as during the weekend. In an effort to resolve the matter amicably and avoid court proceedings on or about August 17, 2004, Plaintiff, Kathy Brozynski, approached Sheila Kerney and requested the play set be removed permanently or transferred further away from the adjacent property line. Defendant Sheila Kerney used obscene and uncensored language. The particulars of the assault are as follows: Defendant Sheila Kerney stepped very close to Kathy Brozynski and threatened her in front of other neighbors by saying " Now, I'll show you where shits like you belong." Kathy Brozynski felt such apprehension that she immediately retreated to her house in fear of imminent harm. Prior to this event, Defendant Jared Kerney used obscene language

towards Plaintiffs' minor children, Max and Martina, causing the children great distress and nervousness. Defendant Sheila Kerney continues to use obscene language whenever she hears the Brozynski family out in their backyard.

6. Furthermore, immediately adjacent to Plaintiffs' property on Defendants' driveway, the Defendants entertain the entire neighborhood, consuming alcohol, allowing young children to play on the driveway, using obscene language and partying until late night hours. Needless to say, this obnoxious and harassing behavior causes disruption in Plaintiffs' life. Furthermore, the lights which light up the Defendants' driveway are illuminated from early afternoon hours until the next morning and are intentionally and maliciously focused upon Plaintiffs' master bedroom windows causing constant bright glare and preventing Plaintiff from getting a decent night's sleep. The viciousness of Defendants' conduct prevents Plaintiffs from the use and enjoyment of their property.

The Brozynskis' original petition, which was filed on September 29, 2004, requested a temporary injunction that the Kerneys be enjoined from engaging in the conduct and activities at issue and a permanent injunction ordering either the removal of the play set or its movement to at least fifteen feet from the adjacent property line.

On November 2, 2004, Mr. Walker, the Brozynskis' attorney, wrote the court to cancel the hearing on the Brozynskis' request for a temporary injunction, stating: " It is my understanding that the Defendants have removed the play set and, therefore, there is no longer any need for a hearing on the Temporary Injunction since the play set removal issue is moot."

Thereafter, the Kerneys filed a no-evidence motion for summary judgment (which the trial court never ruled on). In response to that motion, the Brozynskis filed their own affidavits. Kathy's affidavit states in pertinent part:

6. Furthermore, Defendants illuminated their driveway with very bright light bulbs that were directed at my bedroom windows. On one occasion, I approached Jared Kerney and asked him to re-direct the light. Not only was the light not re-directed, but the existing bulbs were replaced with higher wattage bulbs that shined throughout the night and sometimes during the day. Prior to their moving, Defendants programmed their light system in such a way that the lights in the driveway stayed on all day, every day. . . .

7. Sometime in 2003, when I came from work, I noticed a wooden construction about 12 feet high protruding over my fence. It had been erected immediately adjacent to our property fence, although Defendants had considerable space to otherwise place this wooden construction. This was a direct breach of the Declaration of Covenants, Conditions, and Restriction for Beckley Heights, Phase 3, subdivision. Defendants never notified me nor asked for permission to assemble the play set in such close proximity to the fence.

8. I observed Defendants' children as well as other children playing on this wooden construction since early October 2003. At times there were 10-15 children playing on this wooden construction, at least 4 times a week between 7 p.m. and 11 p.m. shouting and hollering at each other. I observed them playing during the weekend at different hours. . . .

9. I observed Defendants' child and children of their guests throwing trash and rocks and yelling while standing on the top of the play set.

10. At all times relevant, I was working in Dallas, Texas; I would leave early in the morning and return at about 7 p.m. When I was at home, I was not able to relax or enjoy my home, inside or out. I was frequently disturbed by yelling, screaming and loud music played from the Defendants property. I cried frequently and was not able to sleep. . . .

11. Our neighbors' activities on the play set escalated to the point that during spring, summer and fall of 2004, neither myself, my husband, nor my children were able to use our backyard and swimming pool when Defendants were at home. I was afraid that I would be observed and my privacy violated. I was depressed and withdrew socially. I was unable to invite friends over for fear of being embarrassed or very uncomfortable having to tell them that we are not able to use our backyard and swimming pool. My children were not able to invite their friends over because they feared being observed and laughed at by the children on the play set.

Kathy's affidavit concludes with a reiteration of the alleged assault by Sheila Kerney and with a description of actual damages, including $480 in damage to the Brozynskis' fence caused by hooks of the play set that had been attached to the fence. Krzysztof Brozynski's affidavit sets out nearly identical facts.

The Brozynskis next filed (on March 3, 2005) an amended petition whose facts remained as set out above. It added a cause of action for intentional infliction of emotional distress but no longer sought injunctive relief. At a hearing held on March 14, 2005, the trial court gave the Brozynskis thirty days to amend their petition to plead viable causes of action. Instead of repleading, the Brozynskis filed their motion to dismiss without prejudice on April 11, and two weeks later, the Kerneys filed their motion for sanctions.

**Rule 13 Sanctions**

The trial court's judgment expressly imposed sanctions under Texas Rule of Civil Procedure 13. Appellants first argue that the trial court abused its discretion by imposing sanctions under Rule 13 when the Kerneys' motion for sanctions was brought under chapters 9 and 10 of the Civil Practice and Remedies Code. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 9.011-.014, 10.001-.06 (Vernon 2002). We assume without deciding that the Kerneys' motion and counterclaim for sanctions is a sufficient basis for the imposition of Rule 13 sanctions.

Rule 13 authorizes a trial court to impose sanctions against an attorney, a represented party, or both, who file a groundless pleading brought in bad faith or brought for the purpose of harassment. Tex. R. Civ. P. 13. The rule defines " groundless" as having " no basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law." *Id.* In determining whether sanctions are appropriate, the trial court must examine the facts available to the litigant and the circumstances existing when the litigant filed the pleading. *Alejandro v. Bell,* 84 S.W.3d 383, 392 (Tex. App.—Corpus Christi 2002, no pet.). The trial court uses an objective standard to determine if a pleading was groundless: did the party and counsel make a reasonable inquiry into the legal and factual basis of the claim? *In re United Servs. Auto Ass'n,* 76 S.W.3d 112, 115 (Tex. App.—San Antonio 2002, orig. proceeding).

Rule 13 also provides: " No sanctions under this rule may be imposed except for good cause, the particulars of which must be stated in the sanction order." Tex. R. Civ. P. 13. In reviewing an award of sanctions, we ordinarily look to the particulars of good cause set out in the sanction order. *Woodward v. Jaster,* 933 S.W.2d 777, 782 (Tex. App.—Austin 1996, no writ).

**Analysis**

The trial court's judgment found that the following three allegations in the Brozynskis' original and amended petitions were " not warranted by existing law and not supported by any reasonable request for the extension, modification, or reversal of existing law" : (1) the contention—allegedly made by the Brozynskis—that the Kerneys had a duty to secure the Brozynskis' permission to erect the swing set on the Kerneys' property;[1] (2) the Brozynskis' contention that the act of looking at adjacent property with one's eyes is a physical entry or " airspace invasion" sufficient to constitute trespass; (3) the Brozynskis' contention of an " airspace invasion" by the use of household lighting is a trespass.

Rule 13 directs a trial court to presume that a pleading was filed in good faith. Tex. R. Civ. P. 13; *GTE Comm. Sys. v. Tanner,* 856 S.W.2d 725, 731 (Tex. 1993). " Thus, the burden is on the party moving for sanctions to overcome this presumption." *GTE,* 856 S.W.2d at 731. A groundless pleading is not sanctionable unless it *also* was brought in bad faith or for the purpose of harassment. *Id.* The trial court must hold an evidentiary hearing to make the necessary factual determinations about the party's or attorney's motives and credibility. *Alejandro v. Robstown ISD,* 131 S.W.3d 663, 670 (Tex. App.—Corpus Christi 2004, no pet.). Without such an evidentiary hearing, the trial court has no evidence before it to determine that a pleading was filed in bad faith or to harass. *Id.;accord Karlock v. Schattman,* 894 S.W.2d 517, 523 (Tex. App.—Fort Worth 1994, orig. proceeding) (" Without hearing evidence on the circumstances surrounding the filing of the pleading signer's credibility and motives, a trial court has no evidence to determine that a pleading was filed in bad faith or to harass." ). The party moving for sanctions must prove the pleading party's subjective state of mind: bad faith does not exist when a party exercises bad judgment or negligence; under Rule 13, bad faith exists only for the conscious doing of a wrong for dishonest, discriminatory, or malicious purposes. *SeeMattly v. Spiegel, Inc.,* 19 S.W.3d 890, 896 (Tex. App.—Houston [14th Dist.] 2002, no pet.). Improper motive is an essential element of bad faith for purposes of imposing sanctions for groundless, bad-faith pleadings. *Wallace v. Investment Advisors, Inc.,* 960 S.W.2d 885, 889 (Tex. App.—Texarkana 1997, pet. denied).

On the above three allegedly groundless allegations, the trial court did not make a particular finding of bad faith or harassment. *SeeMcCain v. NME Hosps., Inc.,* 856 S.W.2d 751, 757 (Tex. App.—Dallas 1993, no writ) (" The trial court must find that the pleadings are in fact groundless *and* were brought in bad faith or to harass." ). The trial court's failure to make a particular finding on bad faith or harassment is an abuse of discretion. " Trial courts are not at liberty to ignore the clear and unambiguous language of this rule. When imposing Rule 13 sanctions, the trial court is required to make particularized findings of good cause justifying the sanctions. Failure to comply with this clear directive is an abuse of discretion." *Texas-Ohio Gas, Inc. v. Mecom,* 28 S.W.3d 129, 135-36 (Tex. App.—Texarkana 2000, no pet.).

We recognize that *Mecom* also holds that failure to object to the form of the sanctions order results in the forfeiture of an objection to the absence of a bad faith or harassment finding.[2] *See id.* at 135. Other courts agree.[3] We have found no Texas Supreme Court case addressing the issue.

Nevertheless, because Appellants may have waived that objection to the order, we focus on whether the

evidentiary record supports an implied finding of bad faith or harassment. *See id.* at 136; *McCain,* 856 S.W.2d at 757. No evidence of Appellants' improper motive was adduced at the hearing.[4] At the hearing, the Kerneys' attorney testified on the amount of attorney's fees incurred in defending the suit. He also offered his opinion that the Brozysnkis' pleadings were " groundless, filed in bad faith for the purpose of harassment," but such conclusory opinion testimony is not evidence of Walker's or Kathy Brozynski's motives or credibility. Walker was not present at the hearing, and the Kerneys did not call Kathy (who argued the motion for sanctions for Appellants) as a witness. Evidence must be admitted under the rules of evidence at the evidentiary hearing for a trial court to consider it in a Rule 13 context. *Bell,* 84 S.W.3d at 393; *see McCain,* 856 S.W.2d at 757 (motions and arguments of counsel are not evidence in a Rule 13 context). The pleading alone cannot establish that the represented party or its attorney brought their case in bad faith or to harass. *McCain,* 856 S.W.2d at 757. And the Brozynskis' filing of a motion to dismiss (a nonsuit) is not, by itself, evidence of bad faith. *See Mattly,* 19 S.W.3d at 896-97.

The trial court had no evidence before it to determine Appellants' motives and credibility. Accordingly, we need not address the groundlessness findings, and we hold that the trial court abused its discretion in assessing Rule 13 sanctions against Appellants on the above three allegations in the Brozynskis' petitions. *See Alejandro,* 131 S.W.3d at 670; *Bell,* 84 S.W.3d at 393; *Karlock,* 894 S.W.2d at 523-24; *McCain,* 856 S.W.2d at 757-58.

The only other pleading that the trial court cited in the sanctions judgment was the amended petition's allegations of a continual course of conduct and continuing damages. The trial court faulted these allegations because the amended petition was filed after the play set had been removed and after the Kerneys had moved. The trial court found:

4) On November 9, 2004, Plaintiffs' attorney/co-counsel Cornel W. Walker in a letter to the Court cancelling [sic] the hearing on Plaintiffs' Request for Temporary Injunction acknowledged that the Defendants had removed the swing set.

5) Plaintiffs' First Amended Original Petition seeking continuing damages " of $500.00 per month from October 1, 2003 until the activity made the basis of this action ceases" for Trespass by " airspace invasion" caused by " children who are playing on the play set . . . (who) are constantly screaming and trespassing by looking into the Plaintiffs' entire back yard and especially the swimming pool area . . ." was filed with the Court on March 3, 2005, a date well after the Plaintiffs were aware that the Defendants had removed the swing set, sold their home and

moved out of state.

6) Plaintiffs' filing of the First Amended Petition complaining of a continual course of conduct and seeking continuing damages from their next-door neighbor months after the Kerneys removed the swing set, sold their home, and moved out of state constitutes a bad faith, if not outright fraudulent, pleading filed with the Court.

As we note above, in filing their amended petition, the Brozynskis removed their claim for injunctive relief but added a claim for intentional infliction of emotional distress. Again, we find that the trial court had no evidence before it to determine Appellants' motives and credibility as to these particular allegations.[5] Furthermore, Appellants' failure to amend their petition to reflect that the situation had changed and that they were no longer seeking future damages is only an inadvertent or negligent oversight in the pleading process. *See Mattly,* 19 S.W.3d at 896 (" bad faith does not exist when a party exercises bad judgment or negligence" ). These particular pleading errors were borderline trivial mistakes. The trial court abused its discretion in finding these allegations to have been made in bad faith.

**Conclusion**

We sustain Appellants' sole issue. We reverse the trial court's judgment and render judgment that the Kerneys take nothing on their counterclaim and motion for sanctions.

Reversed and rendered

**DISSENTING OPINION**

TOM GRAY, Chief Justice.

The complaints about frivolous lawsuits or lawsuits that include frivolous claims, bombard us through the media and, as in this case, requests for sanctions. On more than this occasion, this Court has reversed or refused to consider sanction awards for filing a frivolous case or claim.

At this juncture, no useful purpose will be served by picking apart the majority's recitation of the factual or legal development of this appeal or their legal analysis. So I will simply state that, based upon my review of the issues as presented challenging the trial court's judgment for sanctions, I do not find an abuse of discretion. I would affirm the judgment for sanctions. Accordingly, I respectfully dissent.

---------

Notes:

[1] Specifically, the trial court found that " the Brozynskis

requested the Court to enter a Temporary Injunction requiring the removal of a swing set which Defendants erected on Defendants' property on the grounds that the swing set was erected 'without the consent or permission of Plaintiffs.' The contention that Defendants had a duty to secure Plaintiffs' permission to erect a swing set on Defendants' property is not warranted by existing law and not supported by any reasonable request for the extension, modification, or reversal of existing law." This part of the trial court's judgment misquotes and mischaracterizes the Brozynskis' allegations in several respects.

First, nothing in the record refers to the play set as a mere "swing set." The petition refers to it as a "large wooden play set." Kathy's affidavit describes it as a "wooden construction about 12 feet high . . . erected immediately adjacent to our property fence, although Defendants had considerable space to otherwise place this wooden construction." Second, the trial court's quotation from the Brozynskis' petition ('without the consent or permission of Plaintiffs') is inaccurate. The petition alleged: "Defendants had not consulted with Plaintiffs nor had they asked for permission to erect such construction knowing fully well that the play set had been erected in violation of the residential deed and to intentionally harass and disrupt Plaintiffs' life." The Brozyinskis did not allege that the Kerneys had a duty to secure their permission to erect the play set; they alleged (as explained in detail in Kathy's affidavit) that the Kerneys had not received permission to breach the subdivision's deed restrictions by building such a large wooden structure. At the hearing, Appellants argued that this allegation was that the Kerneys were required to obtain the permission of the subdivision's architectural guidelines committee. Finally, as part of the trespass claim, the petition alleged that the play set's hooks had been attached to the Brozynskis' fence and thus was an invasion (*i.e.,* without permission) of the Brozynskis' property, and Kathy's affidavit described that damage that the play set's hooks had caused to the Brozynskis' fence.

[2] We note that Rule 13 uses the obligatory term "must" for the trial court's duty to state the good cause particulars in the sanction order. *See* Tex. R. Civ. P. 13.

[3] *Alexander v. Alexander,* 956 S.W.2d 712, 714 (Tex. App.—Houston [14th Dist.] 1997, pet. denied); *Land v. AT & S Transp., Inc.,* 947 S.W.2d 665, 667 (Tex. App.—Austin 1997, no writ); *Campos v. Ysleta Gen. Hosp., Inc.,* 879 S.W.2d 67, 70 (Tex. App.—El Paso 1994, writ denied); *McCain v. NME Hosps., Inc.,* 856 S.W.2d 751, 755-56 (Tex. App.—Dallas 1993, no writ).

[4] During the hearing, the trial court appeared to believe that the Brozynskis' motive was not one of bad faith or to harass, stating to Kathy:

I think . . . the Motion for Sanctions is well-founded in this case. It's well-founded because the Plaintiffs' case has not stated a cause of action under Texas law. That's not to say that the problems that you felt you incurred living next door to the Kerneys, that's not a comment on the merits of how you felt or how you felt your privacy was invaded or how you felt it was living next to them.

[5] At the March 14 hearing, Kathy acknowledged to the trial court that the Brozynskis were seeking damages for only past conduct.

---------

**118 S.W.3d 10 (Tex.App.—Houston [14th Dist.] 2003)**

**Michael T. WILLIS, Francie Willis, Willis Hite Enterprises, Inc., and Urban Retreat of Houston, Inc., Appellants,**

**v.**

**Dan DONNELLY, Appellee and Cross-Appellant,**

**v.**

**Michael T. Willis, Cross-Appellee.**

**No. 14-00-00569-CV.**

**Court of Appeals of Texas, Fourteenth District, Houston**

**June 19, 2003.**

Rehearing Oct. 30, 2003.

[Copyrighted Material Omitted]

[Copyrighted Material Omitted]

[Copyrighted Material Omitted]

[Copyrighted Material Omitted]

[Copyrighted Material Omitted]

[Copyrighted Material Omitted]

[Copyrighted Material Omitted]

[Copyrighted Material Omitted]

[Copyrighted Material Omitted]

[Copyrighted Material Omitted]

[Copyrighted Material Omitted]

Billy Shepherd, Houston, for appellants.

Jeff Nobles, Michael H. Norman, Houston, for appellees.

Panel consists of Justices YATES, SEYMORE, and GUZMAN.

**OPINION**

CHARLES W. SEYMORE, Justice.

This is a double appeal involving shareholders' ownership of two closely held corporations, breach of fiduciary duty, breach of contract, and attorney's fees.

In the first appeal, consisting of 37 issues (some overlapping and some containing numerous subparts), Michael T. Willis, Francie Willis, Urban Retreat of Houston, Inc., and Willis Hite Enterprises, Inc. seek reversal of a judgment awarding Dan Donnelly $1.7 million for breach of contract, $1.7 million for breach of fiduciary duty, and a constructive trust on Urban Retreat stock and realty. First, we reverse and remand the breach of contract claim as more specifically delineated in this opinion because the trial court submitted an improper measure of damages. Because liability was contested, we may not reverse solely for a new trial on damages. Second, we affirm the judgment for breach of fiduciary duty. However, because the constructive trust partially provides a double recovery for breach of fiduciary duty and partially secures damages for breach of contract, which we are reversing and remanding, we remand for an election of remedies pertaining to breach of fiduciary duty and reverse that portion of the constructive trust relating to breach of contract.

In the second appeal, Dan Donnelly contends that the trial court erroneously awarded $400,000 in attorney's fees in connection with his $26,982.58 default on a loan made to him by Mike Willis. We reverse and remand for a

determination of properly segregated and reasonable attorney's fees incurred in prosecuting the defaulted loan.

## BACKGROUND

### A. Urban Retreat

Urban Retreat, a Houston day spa, had its genesis in 1989 through the planning of its visionary, Mike Willis, a Houston businessman. He and a hired consultant, Richard Hite, located a site for the spa adjacent to an exclusive neighborhood, negotiated a lease for the property, and obtained a loan to renovate the facility. Willis also formed two corporations, Urban Retreat of Houston, Inc. (the day spa, hereinafter "URB") and Willis Hite Enterprises, Inc. (envisioned as a management business for a chain of spas, hereinafter "WHE"). [1]

Having created the shell of Urban Retreat, Willis needed only to find staff and clientele. To this end, Hite approached Dan Donnelly, a popular hairstylist and president of an established local salon. Willis and Hite suggested that Donnelly could transfer his clientele and staff to the soon-to-open day spa. Donnelly would manage the spa, continue his hairstyling business, and strive to increase business.

**Page 23**

In exchange, if certain longevity or gross revenue goals were met, Donnelly would gain ownership in URB and WHE, an increase in salary, and a seat on WHE's board of directors. Willis personally assured Donnelly that he would provide the financial backing for the business.

Donnelly executed a Letter Agreement on July 10, 1989, which set forth the levels of URB and WHE stock ownership and salary he would attain over the years: (1) 25% URB stock and 10% of WHE stock after 12 months' employment or when the spa's gross revenues equaled those made in Donnelly's salon the prior year; (2) annual increases of URB stock, up to 50%, contingent on yearly half-million-dollar gains in gross revenues; (3) $110,000 salary for two years; and (4) five percent of gross revenues as salary in year three and beyond. The Letter Agreement also provided each shareholder the right of first refusal to purchase another shareholder's stock. Further, it set forth the value of Donnelly's shares should his employment terminate: the greater of two times earnings in the prior year or assets minus liabilities.

Donnelly transferred his profitable business to URB, bringing several hairstylists, manicurists, and other salon personnel with him. URB held its grand opening in mid-December 1989. The gross revenues soon surpassed those of Donnelly's previous salon.

However, Urban Retreat's costs were great, and the construction expense had exceeded projections. Further, Willis and one other minimal shareholder had provided only $1,000 as capital contribution. The $800,000 construction loan was in URB's name, although Willis provided a $600,000 certificate of deposit as collateral. Additionally, although Willis personally transferred almost $297,000 to URB, he listed it as a loan instead of capital contribution. [2] Thus, just six weeks after its grand opening, URB was over $1,000,000 in debt.

Willis quickly recognized the need to "stop the bleeding." There is evidence that he proposed suspending Hite's $7,000 a month salary even before the grand opening. He also considered transferring Hite's employment to WHE instead of URB. In early 1990, Hite left Urban Retreat. [3] On January 1, 1990, just two weeks after the spa opening, the minimal shareholder transferred his 100 shares to Willis, leaving Willis the sole shareholder of URB's 1,000 issued shares. [4] In April 1990, Willis hired a second consultant as URB's "non-operating chief financial officer." Willis promised to sell this man 25% of URB stock for $1 after Willis's "capital investment" had been repaid.

Nonetheless, URB continued to lose money. Willis was thus faced with a financial quandary: he had personally guaranteed URB's $14,000 a month lease, pledged his $600,000 CD as collateral for the construction loan, and invested $540,500 of cash by December 31, 1990. If URB did not meet its outside financial obligations, Willis would personally lose a large amount of money. The Letter Agreement with Donnelly added to the financial quagmire. It prevented Willis from firing Donnelly within the first 12 months of business, except for gross misconduct. It also

**Page 24**

guaranteed Donnelly's stock ownership at the 12-month mark because gross revenues were on track. After 12 months, Willis could fire Donnelly and his shares would be worthless under the Termination provision of the Letter Agreement. However, Donnelly was by far the greatest revenue producer in the spa.

In March 1991 (after Donnelly met revenue goals ensuring him 25% URB stock and 10% WHE stock), Willis sought to change Donnelly's status. Willis was no longer willing to provide 100% of the financing unless he was still "100% owner." He wanted Donnelly to "step up" and "act like an owner." Legal documents were prepared, but never signed, capping Donnelly's ownership at 25% of URB stock and rescinding the Letter Agreement. Willis also wanted Donnelly to assume some of the debt, but Donnelly declined to do so.

Certainly, it made good business sense for Willis to

minimize his potential losses and work towards profitability. However, Willis then continued to control Urban Retreat in disregard of Donnelly throughout the years. He rationalized that Donnelly had relinquished ownership when he refused to "act like an owner." When Donnelly asked about stock issuance, Willis would assure him that he intended to live up to the Letter Agreement, but asked to delay until the business "turned the corner." At the same time, Willis continued to use URB as a wholly-owned, sub-chapter S-corporation for tax benefits. Willis also unilaterally cut Donnelly's salary [5] in March 1992, supposedly temporarily, and diminished his management responsibilities. Willis continued to make "loans" to URB although there is no evidence such loans were approved by the board of directors. [6]

Additionally, Willis controlled Urban Retreat through his wife, Francie. He supposedly transferred all of his URB stock to her. A "unanimous consent of the board" was prepared in March 1991, but never signed, reflecting URB's permission for Francie to convey to Willis a beneficial interest in URB's option to buy its realty. Then, on July 30, 1992, Willis and Francie personally purchased the URB realty for $1.6 million. On that day, Francie, acting as president, signed a waiver of URB's option. Included in the waiver was the statement that a "third party" wished to buy the realty and that "said third party has required a release" of URB's option. One week after closing, the Willises amended URB's lease, increasing its total rent over the lease term by $280,000. URB's monthly rent of $14,000 remained the same, though the Willises' monthly note was then only $10,800. Further, in the new lease, the Willises obligated URB to pay the property taxes. Finally, in March 1993, Francie signed a promissory note on behalf of URB, documenting that it owed her husband $1,897,896 in loans. [7]

Over these years, Donnelly's personal hairstyling revenues had increased, as did the overall gross revenues of the spa. In fact, every revenue goal in the Letter Agreement was met. Each time he asked

**Page 25**

about his stock, Willis would assure Donnelly that he would live up to the agreement. Finally, in late November 1994, Francie learned that Donnelly was helping a friend plan a new day spa. When she learned of this, she asked Donnelly to leave Urban Retreat.

### B. Loans to Donnelly

In January 1992, Donnelly asked Willis to borrow $18,000. He signed a promissory note for that amount at eight percent annual interest, to be repaid $500 a month from Donnelly's paychecks. On July 1, 1993, Willis loaned

Donnelly an additional $20,000. He rolled the previous note into the second, for a total principal of $31,183.70, at eight percent annual interest, to be repaid from Donnelly's paychecks. The entire amount would become due if Donnelly's employment at URB terminated. After November 1994, Donnelly stopped paying the loan. Francie sent him a demand letter, wishing him well in his new endeavor and urging him to "honor the trust that Mike [Willis] placed in you."

### C. The Lawsuit

When Donnelly ignored Francie's demand letter, Willis filed suit for the outstanding $26,982.58. Donnelly reciprocated by suing Willis, Francie, URB, and WHE for breach of the Letter Agreement and breach of fiduciary duty, among other claims. The jury ultimately found that URB and WHE breached the Letter Agreement; Willis and Francie ratified it; Donnelly was entitled to 50% of URB stock and 10% of WHE stock; and that contract damages were $1.7 million. The jury further found that Willis had breached his fiduciary duty to Donnelly and that those damages were $1.7 million. The jury rejected limitations questions for both issues. As for the loans to Donnelly, the jury found that he defaulted on the promissory note and owed $26,982.56 to Willis. Finally, the jury awarded both sides $400,000 in attorney's fees.

Under the trial court's judgment, Donnelly was awarded (1) $1.7 million for the fiduciary duty claim; (2) $1.7 million for the contract claim; (3) a constructive trust on the Urban Retreat realty and on 50% of all URB stock and 10% of all WHE stock possessed by the Willises or Urban Retreat; and (4) $400,000 in attorney's fees. The trial court awarded Mike Willis (1) $26,982.56 for the promissory note and (2) $400,000 in attorney's fees.

### BREACH OF CONTRACT

In nine of the Willises' issues and three of Urban Retreat's issues, they attack the judgment against them for breach of contract.

### A. Breach of Contract Jury Findings

In their first, second, and third issues, the Willises argue that Donnelly waived breach of contract because he failed to request jury findings that Willis and Francie breached the Letter Agreement. However, whether a party has breached a contract is a question of law for the court, not a question of fact for the jury. *Meek v. Bishop, Peterson & Sharp, P.C.,* 919 S.W.2d 805, 808 (Tex.App.-Houston [14th Dist.] 1996, writ denied); *Garza v. Southland Corp.,* 836 S.W.2d 214, 219 (Tex.App.-Houston [14th Dist.] 1992, no writ). "The court determines what conduct is required by the parties, and, insofar as a dispute exists concerning the

failure of a party to perform the contract, the court submits the disputed fact questions to the jury." *Meek,* 919 S.W.2d at 808; *see ITT Commercial Fin. Corp. v. Riehn,* 796 S.W.2d 248, 253 n. 3 (Tex.App.-Dallas 1990, no writ). When facts are undisputed or conclusively established, there is no need to submit those issues to the jury.

**Page 26**

*Sullivan v. Barnett,* 471 S.W.2d 39, 44 (Tex.1971); *Meek,* 919 S.W.2d at 808.

Here, the existence of the Letter Agreement was undisputed; it was also undisputed that Donnelly never received the benefits promised in the Letter Agreement. The issues that were disputed, such as whether Donnelly waived enforcement of the contract (Question 6) and whether the Willises ratified it (Question 10), were submitted to the jury. It is uncontroverted that the Willises failed to abide by the Letter Agreement. Thus, it was not necessary to submit the question about their breach to the jury, and Donnelly's failure to request such a question does not result in waiver. Accordingly, we overrule the Willises' first three issues.

### B. Signatories to the Contract

In their fourth and fifth issues, the Willises argue they could not have breached the Letter Agreement because they were not signatories to it. The parties listed in the Letter Agreement were Willis, Hite, URB, WHE, and Donnelly. It was signed by Hite (individually and as president of WHE) and Donnelly. Willis's signature line was crossed out.

The Willises contend their signatures or an authorized agent's signature was required under the statute of frauds. The statute of frauds provides:

(a) A promise or agreement ... is not enforceable unless the promise or agreement, or a memorandum of it, is

(1) in writing; and

(2) signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him.

TEX. BUS. & COM.CODE ANN. § 26.01(a)(2) (Vernon 2002). The Willises argue that they did not sign the contract nor is there evidence that Hite had authority to bind them.

In their argument, the Willises ignore the jury's finding that they ratified the contract. Ratification is the adoption or confirmation by a person with knowledge of all material facts of a prior act that did not then legally bind him and that he had the right to repudiate. *Avary v. Bank of Am., N.A.,* 72 S.W.3d 779, 788 (Tex.App.-Dallas 2002, pet. denied). Such approval can be given through act, word, or

conduct. *K.B. v. N.B.,* 811 S.W.2d 634, 638 (Tex.App.-San Antonio 1991, writ denied); *see Stable Energy, L.P. v. Newberry,* 999 S.W.2d 538, 547 (Tex.App.-Austin 1999, pet. denied) (ratification can occur if one affirmatively acknowledges a contract). Further, whether Hite was the Willises' authorized agent is of no consequence. *See Hays v. Marble,* 213 S.W.2d 329, 333 (Tex.Civ.App.-Amarillo 1948, writ dism'd). "One may ratify the acts or contract of another ... whether the other was his agent and exceeded his authority as such or was not his agent at all." *Id.* Thus, it is the Willises' ratification of the contract that binds them to perform, not their signatures. We overrule the Willises' fourth and fifth issues.

### C. Ratification

In their sixth issue, the Willises contend that their ratification of the contract is insufficient to support recovery for breach of contract. They again urge that a separate jury finding of breach is necessary. We have already overruled this contention in our disposition of issues one through three.

Additionally, in a single sentence in issue six, the Willises argue the evidence is legally and factually insufficient to show that they ratified or breached the Letter Agreement. Bare assertions of error, without citation to the record, present

**Page 27**

nothing for review. TEX.R.APP. P. 38.1(h); *Thedford v. Union Oil Co. of Ca.,* 3 S.W.3d 609, 615 (Tex.App.-Dallas 1999, pet. denied). When a party fails to include citation of authority or discussion of relevant facts to support its sufficiency contention, we will not perform an independent review of the record and applicable law to determine whether the error complained of occurred. *Ryan v. Abdel-Salam,* 39 S.W.3d 332, 336 (Tex.App.-Houston [1st Dist.] 2001, pet. denied). Thus, the Willises' sufficiency challenge is waived. Further, their bald assertion of legally insufficient evidence is readily defeated, given Mike Willis's own testimony that he intended to abide by the Letter Agreement and their admission that Donnelly never received his stock.

### D. Waiver through Pre-Suit Conduct

In the Willises' seventh issue and Urban Retreat's first and third issues, appellants contend that, as a matter of law, Donnelly waived breach of contract by his pre-suit conduct. Waiver is an affirmative defense. TEX.R. CIV. P. 94; *Rogers v. Cont'l Airlines, Inc.,* 41 S.W.3d 196, 198 (Tex.App.-Houston [14th Dist.] 2001, no pet.). "In Texas, waiver occurs when a party intentionally relinquishes a known right or engages in intentional conduct inconsistent

with claiming that right." *Frost Nat'l Bank v. Burge,* 29 S.W.3d 580, 592 (Tex.App.-Houston [14th Dist.] 2000, no pet.) (citing *Tenneco Inc. v. Enter. Prods. Co.,* 925 S.W.2d 640, 643 (Tex.1996)). A party's express renunciation of a known right may establish waiver. *Id.* It is well established that waiver turns on the question of intent. *Ford v. Culbertson,* 158 Tex. 124, 308 S.W.2d 855, 865 (1958). Whether waiver has occurred is therefore ordinarily a question of fact for a jury to decide. *Tenneco,* 925 S.W.2d at 643. In this case, the jury found in Question 6 that Donnelly had not waived breach of contract. [8]

When an appellant attacks the legal sufficiency of an adverse answer to a finding on which it has the burden of proof, the appellant must overcome two hurdles. *Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 940 (Tex.1991). First, the record must be examined for evidence that supports the finding, while ignoring all evidence to the contrary. Second, if no evidence supports the fact finder's answer, then the entire record must be examined to see if the contrary proposition is established as a matter of law. *Id.;Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989).

There is evidence in the record supporting the jury's finding that Donnelly did not intentionally relinquish a known legal right. Donnelly testified, "Mr. Willis ... continually told me that ... once we turned the corner, you know, that he would at some point live up to the Letter Agreement. But until that time, I had to live by whatever compensation changes were enacted by Mr. Willis." According to Donnelly, Willis would tell him that he could "not issue stock at this time." Mike Willis's testimony corroborates Donnelly's account. He stated that he merely delayed issuing the stock and that had he been asked, he would have complied with the Letter Agreement. Because there is evidence supporting the jury's finding, we do not review the record for evidence to the contrary. Accordingly, we overrule

**Page 28**

the Willises' seventh issue and Urban Retreat's first and third issues.

### E. Statute of Limitations

In the Willises' eighth issue and subpart (a) of Urban Retreat's second issue, they contend that Donnelly's breach of contract claim is barred by the statute of limitations. A breach of contract action is subject to a four-year statute of limitations. TEX. CIV. PRAC. & REM.CODE ANN. § 16.004 (Vernon 2002). Donnelly filed his lawsuit in August 1995. The jury found there was no failure to comply before August 24, 1991, making Donnelly's claim timely.

Limitations is an affirmative defense, which the asserting party must prove. *Woods v. William M. Mercer, Inc.,* 769 S.W.2d 515, 517 (Tex.1988). Generally, a cause of action accrues, and the statute of limitations begins to run, when facts come into existence that authorize a claimant to seek a judicial remedy. *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 514 (Tex.1998). The time for accrual of a cause of action is a question of law. *Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 351 (Tex.1990). A breach of contract claim accrues when the contract is breached. *Stine v. Stewart,* 80 S.W.3d 586, 592 (Tex.2002). Appellants argue that when they failed to transfer the first 25% of stock in 1990, the contract was breached and Donnelly's statute of limitations began to run.

In contrast, Donnelly argues that his suit was timely, citing two cases with facts substantially similar to the facts in this case, *Pickett v. Keene,* 47 S.W.3d 67 (Tex.App.-Corpus Christi 2001, pet. dism'd), and *Intermedics, Inc. v. Grady,* 683 S.W.2d 842 (Tex.App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.). Both *Pickett* and *Intermedics* involved contracts in which portions of ownership in businesses were to be transferred to parties working for each business. In each case, deadlines for such transfers were delayed by the parties. In each case, the business ultimately tried to avoid transferring any portion of ownership and fired the worker. And in each case, the business claimed on appeal that because breach had occurred with the first missed deadline many years before, the case was barred by the statute of limitations. In both cases, the appellate court held that the cause of action accrued at the employee's termination (when the employer clearly repudiated the agreement to transfer ownership). *Pickett,* 47 S.W.3d at 77; *Intermedics,* 683 S.W.2d at 847.

In asserting the statute of limitations, appellants disregard the undisputed evidence that deadlines were postponed so the Willises could reap tax benefits and URB could "turn the corner." "Even when an exact date of performance is specified in the contract, this provision can be waived by the parties." *Sieber & Calicutt, Inc. v. La Gloria Oil & Gas Co.,* 66 S.W.3d 340, 347 (Tex.App.-Tyler 2001, pet. denied); *seeIntermedics,* 683 S.W.2d at 846; *see, e.g.,Pickett,* 47 S.W.3d at 77. Further, an extension of time to perform can be express or implied and does not affect the other provisions of the contract. *Intermedics,* 683 S.W.2d at 846. The evidence indicates that appellants intended to honor the agreement "at some point." Donnelly relied on Willis's assurances and accepted the delays. There was no clear intent by appellants to repudiate the Letter Agreement until Donnelly's termination. *SeePickett,* 47 S.W.3d at 77; *Intermedics,* 683 S.W.2d at 847. Thus, the contract claim did not accrue before August 24, 1991, and Donnelly's claims were timely asserted in August 1995. We overrule the Willises' issue eight and Urban Retreat's issue two,

subpart (a).

**Page 29**

### F. Response to Jury Note

In the Willises' ninth issue and Urban Retreat's issue two, subpart (b), appellants contend the trial court improperly responded to the following jury note about the statute of limitations:

Does an answer of yes to question no. 7 [the statute of limitations question] indicate that the failure to comply [with the Letter Agreement] happened before that date and excludes the possibility that it happened on or after that date? [9]

We find that appellants' complaint is waived because (1) the record fails to sufficiently reflect (a) that a supplemental instruction was given to the jury or (b) the contents of such an instruction; and (2) appellants incorrectly and untimely presented their requested supplemental instruction to the trial court.

To show error regarding a supplemental jury instruction, the record must reflect the contents of the instruction and that the instruction was given. *Keene Corp. v. Gardner,* 837 S.W.2d 224, 228-29 (Tex.App.-Dallas 1992, writ denied). In this case, neither the jury's note nor the trial court's written response are included in the clerk's record. [10] Further, while the reporter's record repeats the jury's question word-for-word, it does not contain the trial court's supplemental instruction verbatim. The trial court's response was apparently written, extensively discussed by the parties and the court, and altered throughout the discussion. However, the final wording of the response is not reflected in the reporter's record. Additionally, at the end of discussion about the jury's note, the reporter's record denotes only "jury deliberating," not whether an instruction was actually delivered to the jury. *See id.* (holding court reporter's notation that "whereupon the jury continued to deliberate" was insufficient to show court delivered additional charge). Thus, there is an insufficient record showing either the contents of the supplemental instruction or that the instruction was given to the jury.

Next, appellants argue the trial court should have provided the supplemental question, "What is the earliest of any breach you have found?" in response to the jury's note. However, appellants have waived error because they requested this supplemental question orally during jury deliberations. "To complain of the trial court's omission of a requested instruction on appeal, a party is obliged to make a *written* request to the trial court for a substantially correct instruction." *Jarrin v. Sam White Oldsmobile Co.,* 929 S.W.2d 21, 25 (Tex.App.-Houston [1st Dist.] 1996, writ denied) (emphasis added). Appellants' oral request is thus unsatisfactory. Further, the appellants filed a written request for this question too late, *after* the jury returned its verdict. Waiting until after verdict to file a request for a supplemental jury instruction is untimely. *SeeScott Fetzer Co. v. Read,* 945 S.W.2d 854, 871 (Tex.App.-Austin 1997), *aff'd,* 990 S.W.2d 732 (Tex.1999).

Additionally, appellants have not provided case law that their proposed supplemental question was legally correct, while Question 7 was not. The statute of limitations was their affirmative defense, and they voiced no objection to Question 7 during the charge conference. Lastly, appellants' argument about their proposed supplemental jury question simply reiterates their previous points of error, which

**Page 30**

we have overruled, about accrual of a contract claim.

For the above reasons, we overrule the Willises' issue nine and Urban Retreat's issue two, subpart (b).

### BREACH OF FIDUCIARY DUTY

The Willises' next ten issues address Mike Willis's breach of fiduciary duty.

### A. Existence of Majority Shareholder/Minority Shareholder Relationship

In their tenth, eleventh, and twelfth issues, the Willises argue that there is no evidence of breach of fiduciary duty because, after October 1990, there was never a majority-minority shareholder relationship between Willis and Donnelly. Specifically, Willis argues that Francie became sole shareholder of Urban Retreat in October 1990, and thus he had no majority shareholder's duty after that time. Further, he argues that Donnelly was never a shareholder.

When a party without the burden of proof challenges the legal sufficiency of the evidence to support an adverse jury finding, we construe the issue as a "no evidence" point. *SeeGooch v. Am. Sling Co.,* 902 S.W.2d 181, 183-84 (Tex.App.-Fort Worth 1995, no writ). In determining a "no evidence" point, we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994). If there is more than a scintilla of such evidence to support the finding, the claim is sufficient as a matter of law. *Browning-Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 928 (Tex.1993).

The record includes evidence that Willis transferred stock to Francie as late as October or November 1991.

Additionally, Francie testified that a magazine article in January 1991 identified her husband and Donnelly as the owners of Urban Retreat. This article was written approximately one month after the Letter Agreement contemplated transfer of 25% of URB stock and 10% WHE stock to Donnelly. Further, shortly after March 1991, she was privy to a meeting between her husband and Donnelly in which Willis asked Donnelly to cap his ownership interest in URB at 25%. This is more than a scintilla of evidence showing that both Donnelly and Willis were shareholders in Urban Retreat after October 1990. Accordingly, we overrule issues ten, eleven, and twelve.

### B. Claim Sounds in Contract Only

In issue 13, the Willises contend that a party cannot claim breach of fiduciary duty when the only alleged damages are the subject of a contract. The Willises argue that Donnelly's only alleged damages arise from breach of the Letter Agreement; thus, the claim sounds only in contract. *SeeSouthwestern Bell Tel. v. DeLanney,* 809 S.W.2d 493, 494 (Tex.1991). It is often difficult to determine whether a party's cause of actions sound in contract or tort or both--*i.e.,* a "contort." *Ludlow v. DeBerry,* 959 S.W.2d 265, 275 (Tex.App.-Houston [14th Dist.] 1998, no pet.); *seeJim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617, 617 (Tex.1986). A two-part test, set forth in *DeLanney,* guides this determination. 809 S.W.2d at 494-95.

First, we look to the source of the duty to act. *Id.* at 494. If the conduct in question gives rise to liability only because it breaches an agreement between the parties, the claim ordinarily sounds in contract. *Id.* In this first step, we "must look to the substance of the cause of action and not necessarily the manner in which it was pleaded." *Reed,* 711 S.W.2d at 617-18.

**Page 31**

Second, we consider the nature of the remedy or damages sought by the claimant. *DeLanney,* 809 S.W.2d at 494. "The nature of the injury most often determines which duty or duties are breached. When the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone." *Reed,* 711 S.W.2d at 618.

Additionally, the contract between the parties may create both contract and tort duties. *Id.; seeDeLanney,* 809 S.W.2d at 494 n. 1 ("[S]ome contracts involve special relationships that may give rise to duties enforceable as torts...."). "[A] plaintiff is not precluded from asserting a tort cause of action solely because his damages are analogous to the damages sought in a contractual claim." *Farah v. Mafrige & Kormanik, P.C.,* 927 S.W.2d 663, 674

(Tex.App.-Houston [1st Dist.] 1996, no writ).

In this case, breach of contract arose from failure to transfer shares to Donnelly and failure to compensate him at the rate set forth in the Letter Agreement. Donnelly alleged that breach of fiduciary duty arose from Willis's (1) purchase of the URB realty; (2) lease of the realty to URB for the total debt on the property; (3) treatment of capital contributions as loans; (4) representation that Urban Retreat was worthless; and (5) personal use of Urban Retreat's tax benefits. The damages for breach of contract, more fully addressed below, were the unpaid compensation and fair market value of the Urban Retreat stock. In contrast, the damages for breach of fiduciary duty involved the value of the realty and the benefits personally taken by Willis. Thus, Donnelly's injuries did not arise solely from breach of the Letter Agreement. Accordingly, we do not agree that the damages sought were solely contract damages. We overrule issue thirteen.

### C. Existence of Fiduciary Relationship

In their fourteenth issue, the Willises contend the trial court erred in finding that a fiduciary relationship existed between Willis and Donnelly and in instructing the jury that such a relationship existed. [11] Whether a fiduciary relationship exists is normally a question of fact for the jury. *Procom Energy, L.L.A. v. Roach,* 16 S.W.3d 377, 382 (Tex.App.-Tyler 2000, pet. denied); *Hoggett v. Brown,* 971 S.W.2d 472, 488 (Tex.App.-Houston [14th Dist.] 1997, pet. denied); *Farah,* 927 S.W.2d at 675. "When the issue is one of no evidence or conclusive evidence, the issue is a question of law." *Farah,* 927 S.W.2d at 675. Here, the Willises contend that there was no evidence of a fiduciary relationship or, conversely, the evidence conclusively shows *no* fiduciary relationship exists.

"[A] co-shareholder in a closely held corporation does not as a matter of law owe a fiduciary duty to his co-shareholder." *Hoggett,* 971 S.W.2d at 488. Instead, the existence of such a duty depends on the circumstances. *Pabich v. Kellar,* 71 S.W.3d 500, 504-05 (Tex.App.-Fort Worth 2002, pet. denied). For example, a fiduciary duty exists if a confidential or "informal" relationship exists. *Id.* at 505; *In re Estate of Fawcett,* 55 S.W.3d 214, 220 (Tex.App.-Eastland 2001, pet. denied). Further, fiduciary relationships may be created by contract; through the repurchase of a shareholder's stock in a closely held corporation, *seeFawcett,* 55 S.W.3d at 220; in

**Page 32**

certain circumstances in which a majority shareholder in a closely held corporation dominates control over the business, *Hoggett,* 971 S.W.2d at 488 n. 13; and in closely held corporations in which the shareholders "operate more

as partners than in strict compliance with the corporate form." *DeBord v. Circle Y of Yoakum, Inc.,* 951 S.W.2d 127, 133 (Tex.App.-Corpus Christi 1997), *rev'd on other grounds,* 967 S.W.2d 352 (Tex.1998).

We disagree that there was no evidence of, or alternatively evidence conclusively disproving, a fiduciary relationship. There is evidence tending to show that Mike Willis engaged in oppressive conduct [12] and dominated control over the business. *SeeHoggett,* 971 S.W.2d at 488 n. 13. For instance, Willis alone reaped personal tax advantages by treating URB as a wholly-owned business. Willis, not Urban Retreat or the board of directors, hired a new CEO and promised him ownership in URB if Willis's capital investment was repaid. Further, the evidence shows that although Willis promised to provide cash capital contributions, he continually treated all but $1,000 of such contributions over the years as loans. There is evidence that Willis's promises to provide capital were inducements to Donnelly to join the business. *SeeWillis,* 997 S.W.2d at 801 (defining oppressive conduct as that which defeats the minority shareholder's expectations that were reasonable and central to the decision to join the venture). The evidence shows that Willis kept Urban Retreat thinly capitalized and thus limited its on-going ability to operate. And, if debts always surpassed income and assets, Donnelly's shares would be worth little to nothing under the Termination provision of the Letter Agreement (defining share value as the greater of two times prior year's earnings or assets minus liabilities).

Further, after Willis could not convince Donnelly to cap his ownership interest, he found a way to purchase the spa realty for himself. First, a corporate document was prepared allowing Francie to assign Willis an interest in the spa's option. Later, he bought the realty, having Francie waive URB's option the day of closing. Although URB supposedly could not afford to buy the realty, the Willises then charged the total debt to URB through rent. [13] By purchasing the realty, Willis also ensured that Donnelly's stock value decreased under the Letter Agreement. [14] These could be construed as purposeful actions to dilute the value of shares while employing the business and its assets solely for Willis's own benefit. *See generallyDuncan v. Lichtenberger,* 671 S.W.2d 948, 953 (Tex.App.-Fort Worth 1984, writ ref'd n.r.e.) (citing *Patton v. Nicholas,* 154 Tex. 385, 279 S.W.2d 848 (1955), regarding lowering of minority's share value).

**Page 33**

Additionally, the evidence shows that Willis transferred all the URB stock to Francie as late as November 1991. By that time, Donnelly was a minority owner in the business, and he had a right of first refusal to purchase the shares per the Letter Agreement. Willis did not

extend this opportunity to Donnelly. *SeeThompson v. Hambrick,* 508 S.W.2d 949, 951-54 (Tex.Civ.App.-Dallas 1974, writ ref'd n.r.e.) (fact issue whether majority shareholder's sale of shares without offering right of first refusal to minority shareholder was a breach of fiduciary duty). Further, Willis unilaterally cut Donnelly's salary and tried to cap his ownership interest, after delaying issuance of his stock. Willis's own discovery answers reveal that he decided Donnelly was not acting like an owner, and he justified treating him like a nonowner for that reason. *SeeDavis v. Sheerin,* 754 S.W.2d 375, 382 (Tex.App.-Houston [1st Dist.] 1988, writ denied) (conspiring to deprive one of ownership in a corporation is oppressive conduct). Finally, case law indicates Willis would owe a fiduciary duty to Donnelly in repurchasing his shares. *SeeFawcett,* 55 S.W.3d at 219-20.

These examples defeat the Willises' argument that only legal absolutes existed, *i.e.,* no evidence supported the existence of a fiduciary relationship or that they conclusively disproved the existence of a fiduciary relationship. [15]

Lastly, the Willises contend because it is a question of fact, the trial court erred in instructing the jury that a fiduciary relationship existed. [16] However, the Willises failed to object to Question 22 in the charge on this basis. [17] Instead, they objected as follows:

Plaintiffs would object to Question No. 22 in that there is no evidence to support submission of the issue.

Plaintiffs object to the submission of Question No. 22 because as a matter of law, Mike Willis owes no fiduciary duty to Dan Donnelly.

**Page 34**

These objections were insufficient to alert the trial court that existence of a fiduciary relationship was a fact question for the jury. *SeeState Dept. of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 241 (Tex.1992) (test is whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling); *see, e.g.,McAllister v. Oman,* 2001 WL 870037, at *1 (Tex.App.-Houston [14th Dist.] Aug. 2, 2001, no pet.) (not designated for publication). Instead, the objections raise "no evidence" and "conclusive evidence," which we rejected above. To preserve error, the Willises were required to object that the question was omitted. *See* TEX.R. CIV. P. 278. The record is devoid of the slightest indication from the Willises that existence of a fiduciary relationship was a jury question. Thus, the trial court's error, if any, is not a ground for reversal in this case. *See id.*

Accordingly, we overrule issue 14.

### D. Failure to Obtain Findings

In their fifteenth issue, the Willises argue that Donnelly failed to obtain a jury finding on the existence of a fiduciary relationship. As we addressed in regard to issue 14, the Willises did not preserve error to complain about the lack of a jury finding. In their sixteenth issue, the Willises contend that Donnelly "failed to secure a finding as to ownership of any shares." This point of error is vague, and the Willises offer no argument, citation to the record, nor authority in support of it. They have waived this issue. *Thedford,* 3 S.W.3d at 615; *Casteel-Diebolt v. Diebolt,* 912 S.W.2d 302, 304-05 (Tex.App.-Houston [14th Dist.] 1995, no writ) (an issue not supported by authority is waived). Accordingly, we overrule issues 15 and 16.

### E. Burden of Proof

In issue 17, the Willises complain that the trial court improperly placed the burden of proof for breach of fiduciary duty on Mike Willis. The Willises argue that before the burden of proof could be placed on Mike Willis, Donnelly was first required to establish the existence of a fiduciary relationship. This argument is an attempt to circumvent the Willises' failure to object or to request the missing jury question on the existence of a fiduciary relationship. Further, the profiting fiduciary has the burden to prove questioned transactions were "fair, honest, and equitable." *Estate of Townes v. Townes,* 867 S.W.2d 414, 417 (Tex.App.-Houston [14th Dist.] 1993, writ denied); *Miller v. Miller,* 700 S.W.2d 941, 947 (Tex.App.-Dallas 1985, writ ref'd n.r.e.); *see Tex. Bank & Trust Co. v. Moore,* 595 S.W.2d 502, 508-09 (Tex.1980). The trial court did not misplace the burden of proof. We overrule issue seventeen.

### F. Standing to Sue

In issue 18, the Willises argue that Donnelly was required to bring a shareholder's derivative suit to assert claims on behalf of the corporation for breaches of fiduciary duty. However, from our review of Donnelly's pleadings, we conclude that he did not sue on behalf of the corporation. He only sued in an individual capacity.

To the extent the Willises are actually arguing that no fiduciary duties flowed to Donnelly individually, we refer to our analysis of issue fourteen. As discussed, there are instances in Texas law in which shareholders in closely held corporations owe other shareholders fiduciary duties. As we acknowledged in discussing issue fourteen, the existence of such a fiduciary relationship is a question of fact for the jury. As we further held, the Willises cannot complain on appeal about the absence of a jury finding because they failed to preserve

error. Further, we disagreed with the Willises' two contentions that (1) there was "no evidence" of a fiduciary relationship; or (2) they conclusively proved the nonexistence of such a relationship. We believe the evidence raised a fact issue on the existence of a fiduciary relationship between Willis and Donnelly, individually.

Accordingly, we overrule issue 18.

### G. Statute of Limitations on Breach of Fiduciary Duty

In their nineteenth issue, the Willises contend that Donnelly's claim for breach of fiduciary duty is barred by the statute of limitations. There is a four-year statute of limitations for breach of fiduciary duty. TEX. CIV. PRAC. & REM.CODE ANN. § 16.004 (Vernon 2002). The Willises argue that the only alleged breach of fiduciary duty was Willis's failure to disclose information before Donnelly executed the Letter Agreement on July 10, 1989. Donnelly did not sue until August 25, 1995, more than four years later.

However, Donnelly's petition also alleged Mike Willis's self-dealing, treating capital contributions as loans, failing to keep proper and accurate financial records, and improperly transferring stock to Francie. Evidence shows that (1) Francie received 100% of the URB shares as late as October or November 1991; (2) Mike Willis made numerous "loans" to URB after August 1991; and (3) Mike and Francie bought the URB property and waived the spa's option to purchase it in July 1992. Because these alleged breaches of fiduciary duty occurred within four years of suit, Donnelly's claims are not barred by the statute of limitations. We overrule issue nineteen.

### CONSTRUCTIVE TRUST

In their twentieth, twenty-first, and twenty-second issues, the Willises contend that the trial court erroneously imposed a constructive trust on the URB realty, 50% of URB stock and 10% of WHE stock because (1) a fiduciary relationship did not exist or did not exist apart from the dealings made the basis of the lawsuit; (2) no fraud was established; (3) no pleadings support imposition of equitable relief; (4) there was no commingling; (5) equitable relief is improper to enforce contractual obligations and where the plaintiff gave services; (6) post-verdict evidence was improperly admitted; (7) imposition of the constructive trust violates their right to trial by jury and due process; (8) there was no evidence, insufficient evidence, and no finding upon which to impose a constructive trust; (9) constructive trusts should not be imposed where money damages are available; and (10) a constructive trust is improper because Donnelly had unclean hands. In issues five, six, and seven, Urban Retreat

argues many of these same subissues and also claims that laches prevent imposition of the constructive trust.

### A. Error in Imposing Constructive Trust

We address the first eight subissues, which constitute the Willises' issue 20 and Urban Retreat's issue five and portions of issue six. [18]

Again, appellants contend no fiduciary relationship existed. Accordingly, we refer to our disposition of issue 14. Second, appellants argue that fraud must be shown before a constructive trust is imposed. However, "[a]ctual fraud, as well as breach of a confidential relationship, justifies the imposition of a constructive

### Page 36

trust." *Meadows v. Bierschwale,* 516 S.W.2d 125, 128 (Tex.1974); *seeGaines v. Hamman,* 163 Tex. 618, 358 S.W.2d 557, 560 (1962); *Omohundro v. Matthews,* 161 Tex. 367, 341 S.W.2d 401, 405 (1960); *see alsoDuncan v. Lichtenberger,* 671 S.W.2d 948, 952, 954 (Tex.App.-Fort Worth 1984, writ ref'd n.r.e.) (stating fraud is not required for breach of fiduciary duty; equitable relief is available for such breach).

Third, appellants contend that there are no pleadings to justify imposition of the constructive trust on the realty. They do not cite any authority for the proposition that Donnelly, in seeking a constructive trust, must plead the specific property to which it should attach. In his petition, Donnelly sought a constructive trust because the Willises had been unjustly enriched by retaining all the Urban Retreat stock. His pleadings for a constructive trust also refer to and incorporate pleadings about Willis's self-dealing, false characterization of capital, complete control of the business, and inaccurate record keeping. Further, Donnelly generally sought "all such other damages as [he] may be justly entitled," and all "relief, at law or in equity[,] to which [he] is justly entitled." The appellants did not specially except to the pleadings for equitable relief. "When a party fails to specially except, courts should construe the pleadings liberally in favor of the pleader." *Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d 887, 897 (Tex.2000). We hold that Donnelly's pleadings are sufficient to support a claim for equitable relief, justifying the court's imposition of a constructive trust. Accordingly, we overrule this subissue.

Fourth, appellants argue that a constructive trust was improper because the URB realty was never commingled with Urban Retreat stock. The cases appellants cite show that a constructive trust is proper when a fiduciary commingles assets. *SeeGraham v. Turner,* 472 S.W.2d 831, 840 (Tex.Civ.App.-Waco 1971, no writ) (shareholder in closely held corporation wrongly sold corporate assets and mingled proceeds with his own assets); *Andrews v. Estate of Andrews,* 326 S.W.2d 203, 207 (Tex.Civ.App.-Waco 1971, no writ) (plaintiffs sought percentage of deceased's estate on theory that farm income from their land had been commingled with the estate). However, neither case stands for the proposition that commingling is a prerequisite for imposition of a constructive trust. Further, commingling was not an issue at trial in this case. Appellants' argument is thus inapposite.

Fifth, appellants argue that a constructive trust was improper (1) to enforce contract rights and (2) because Donnelly "parted with services, not property," and the proper remedy for services is payment. As detailed later in this opinion, we are reversing the contract claim because the jury considered the wrong measure of damages. Thus, we are also reversing the portion of the constructive trust that addressed Donnelly's contract remedies. Additionally, we have already held that Donnelly sought damages for breach of fiduciary duty different from and in addition to those for breach of contract. Further, a constructive trust has a "very broad function of redressing wrong or unjust enrichment in keeping with the basic principles of equity and justice." *Ginther v. Taub,* 675 S.W.2d 724, 728 (Tex.1984). To disallow a constructive trust because a party renders services only is "an unduly restrictive view of the remedy of constructive trust." *Meadows,* 516 S.W.2d at 131. We overrule this subissue.

Sixth, appellants protest that the trial court improperly admitted evidence post-verdict, specifically the affidavit of Sal Rodriguez, which was attached to Donnelly's

### Page 37

supplemental motion to enter judgment. Donnelly attached the affidavit as support for his post-verdict request to order amended URB tax returns. Appellants objected to the affidavit, but there is no ruling in the record as required by Rule of Appellate Procedure 33.1(a)(2). Further, the record does not reflect whether the trial court actually considered the affidavit. To the contrary, the trial court did not order amendments to the tax return. We thus overrule this subissue.

Seventh, appellants contend that imposition of the constructive trust violates their right to due process and trial by jury. Specifically, they complain that the trial court entered judgment on claims neither pleaded nor submitted to the jury. We have already addressed these claims as follows: (1) we found Donnelly's pleadings for equitable relief sufficient for imposition of a constructive trust and (2) we also found that appellants failed to preserve error that the existence of a fiduciary relationship was a fact question for the jury. The jury's finding of breach of fiduciary duty

permits imposition of a constructive trust. *SeeCarr v. Weiss,* 984 S.W.2d 753, 767 (Tex.App.-Amarillo 1999, pet. denied).

Eighth, the Willises contend in one sentence, without citation to the record or to authority, that "there was no evidence, no legally sufficient evidence, no factually sufficient evidence, and no finding of any basis upon which to impose a constructive trust on the stock or real property." In the context of the Willises' issue 20, this one sentence is merely a catch-all included at the end of briefing four-and-one-half pages long. Because it is multifarious, lacking in substantive analysis, and devoid of citation to authority and the record, they have waived this eighth subissue. *SeeRyan v. Abdel-Salam,* 39 S.W.3d 332, 336 (Tex.App.-Houston [1st Dist.] 2001, pet. denied); *Interstate Northborough P'ship,* 8 S.W.3d at 7 n. 2; *Keever v. Finlan,* 988 S.W.2d 300, 314 (Tex.App.-Dallas 1999, pet. dism'd).

Accordingly, having addressed these eight subissues, we overrule the Willises' issue 20, Urban Retreat's issue five, and the first portion of Urban Retreat's issue six.

### B. Money Damages Available

We next address the ninth subissue, which comprises the Willises' twenty-first issue and Urban Retreat's seventh issue. Appellants contend that the trial court erred in awarding equitable relief because Donnelly failed to establish that he lacked an adequate remedy at law. In other words, appellants claim that where money damages are available, a constructive trust may not be imposed. [19]

The thrust of appellants' argument is that (1) a constructive trust is an equitable remedy; (2) equitable remedies such as injunctions and specific performance require a lack of an adequate remedy at law; (3) thus, an inadequate remedy at law is a prerequisite to imposition of a constructive trust; (4) money damages are available to compensate any breach of fiduciary duty in this case; and (5) Donnelly is accordingly not entitled to a constructive trust. However, the forms of constructive trusts are "practically without limit" and may be "applied wherever necessary for the obtaining of complete justice, *although the law may also give the remedy of damages against the wrong-doer.*" *Fitz-Gerald v. Hull,* 150 Tex. 39, 237 S.W.2d 256, 263 (1951) (emphasis added); *Wheeler v. Blacklands Prod. Credit Ass'n.,* 627 S.W.2d 846, 849 (Tex.App.-Fort Worth 1982, no writ); *cf.* RESTATEMENT OF RESTITUTION

**Page 38**

§ 160 cmt. e (1937) (constructive trust appropriate for cases involving title to land or where "payment or transfer was procured by an abuse of a fiduciary or confidential

relation."). The trial court was not precluded from imposing a constructive trust. Accordingly, we overrule the Willises' issue 21 and Urban Retreat's issue seven.

### C. Unclean Hands

In the Willises' issue 22 [20] and the second portion of Urban Retreat's issue six, appellants argue that Donnelly's claims for equitable relief are barred by the doctrine of unclean hands. One who seeks a constructive trust must come with clean hands regarding the issue in dispute. *SeeOmohundro,* 341 S.W.2d at 410; *see alsoWynne v. Fischer,* 809 S.W.2d 264, 267 (Tex.App.-Dallas 1991, writ denied). It is within a trial court's sound discretion to determine whether a party has unclean hands and whether the party's alleged fraudulent actions should bar equitable relief. *Thomas v. McNair,* 882 S.W.2d 870, 880 (Tex.App.-Corpus Christi 1994, no writ).

Appellants contend Donnelly's hands are unclean because he breached his contract with them. Specifically, they contend he failed to bring his entire former staff to Urban Retreat, produced less revenue than promised, and attempted to establish a competing business. [21] However, breach of contract is an issue separate from breach of fiduciary duty. To bar equitable relief, a plaintiff's inequitable conduct should arise with regard to the issue in dispute. *Wynne,* 809 S.W.2d at 267. Further, a party complaining of an opponent's unclean hands " 'must show that he himself has been injured by such conduct to justify the application of the principle to the case.' " *Omohundro,* 341 S.W.2d at 410 (quoting 2 Pomeroy's Equity Jurisprudence at 99); *seeThomas,* 882 S.W.2d at 880; *see alsoNorris of Houston, Inc. v. Gafas,* 562 S.W.2d 894, 897 (Tex.Civ.App.-Houston [1st Dist.] 1978, writ ref'd n.r.e.) (hairstylist claimed salon sought equity with unclean hands, but she failed to show harm). Even if we assume Donnelly breached his contract, appellants have neither argued nor shown they were harmed. For instance, they do not set forth the difference in revenue promised by Donnelly versus revenue earned, nor do they show that Urban Retreat's revenue suffered because of Donnelly's assistance in creating a competing salon.

Because (1) Donnelly's alleged unclean hands involve contract--a separate issue--and (2) appellants have not shown harm, the trial court did not abuse its discretion in disregarding appellants' argument of "unclean hands." Accordingly, we overrule issue 22 and the second portion of Urban Retreat's issue six.

### D. Laches

In the remainder of issue six, Urban Retreat argues that Donnelly's claim for equitable relief is barred by laches. There are two essential elements of laches: "(1)

unreasonable delay by one having legal or equitable rights in asserting them; and (2) a good faith change of position by another to his detriment because

Page 39

of the delay." *Rogers v. Ricane Enter., Inc.,* 772 S.W.2d 76, 80 (Tex.1989). Extraordinary circumstances, which would work a grave injustice, must exist before laches bars a suit filed within the limitations period. *Caldwell v. Barnes,* 975 S.W.2d 535, 538 (Tex.1998).

Urban Retreat argues that it has been prejudiced because memories have faded over time. However, fading memory "is one of the policy reasons behind the statute of limitations." *Wakefield v. Bevly,* 704 S.W.2d 339, 345 (Tex.App.-Corpus Christi 1985, no writ). Faded memory does not establish laches in a suit filed before the statute of limitations has expired. *Id.* The case cited by Urban Retreat, *Fazakerly v. Fazakerly,* 996 S.W.2d 260, 265 (Tex.App.-Eastland 1999, pet. denied), is distinguishable. It involved a daughter's challenge to her father and stepmother's antenuptial agreement after expiration of the statute of limitations; 25 years after the agreement was signed; eight years after the father's death; and after the stepmother became incapacitated by Alzheimer's. In contrast, in this case, the statute of limitations did not expire, and the essential parties are alive and competent. Further, Urban Retreat has not identified its good faith but detrimental change in position due to Donnelly's delay in filing suit. *SeeRogers,* 772 S.W.2d at 80. For these two reasons, we overrule Urban Retreat's assertion of laches. We overrule Urban Retreat's issue six.

### DAMAGES

In their twenty-third, twenty-fourth, and twenty-fifth issues, the Willises contend that the trial court improperly instructed the jury about the measure of damages for breach of contract and breach of fiduciary duty and improperly "stacked" the damages, which permitted a triple recovery. Urban Retreat urges these same issues in points of error eight, nine, and ten.

### A. Breach of Contract Damages

First, appellants argue that the trial court submitted the wrong measure of damages for breach of contract to the jury. The jury awarded $1,707,684.30 in damages for unpaid salary and for stock value using the equation found in the Letter Agreement's "Other Matters Relating to Shares." We agree that the jury considered the wrong measure of damages for the stock value, although we disagree with the measure of damages urged by appellants.

"Damages must be measured by a legal standard, and that standard must be used to guide the fact finder in

determining what sum would compensate the injured party." *Allied Vista, Inc. v. Holt,* 987 S.W.2d 138, 141 (Tex.App.-Houston [14th Dist.] 1999, pet. denied). The proper measure of damages is a question of law. *Id.* In the jury charge, the trial court instructed the jury to measure the value of Donnelly's shares under a provision in the Letter Agreement entitled "Other Matters Relating to Shares." The Letter Agreement contains two provisions about share valuation, one under the heading "Termination" and the other under "Other Matters Relating to Shares." The "Termination" provision requires Donnelly to sell his shares back if his employment terminates after 12 months. [22] Under the

Page 40

"Termination" provision, share value equals the greater of (a) assets minus liabilities or (b) two times previous year's earnings. Using this provision, Donnelly's shares are valueless because Urban Retreat's liabilities and costs have always outstripped its tangible assets and revenue. Appellants urge that this provision should be used as the measure of damages because Donnelly was terminated.

In contrast, the shares have value if the provision in "Other Matters Relating to Shares" applies. Under that provision, share value equals the market value of the real estate plus the previous 12 months' gross revenue. [23] Thus, Urban Retreat's debts would not be considered. However, the plain language of the Letter Agreement reveals that "Other Matters Related to Shares" is activated only in two situations: (1) when a shareholder exercises a right of first refusal and (2) in an exchange of stock if multiple "Urban Retreat companies" combine.

The parties simply disagree regarding which of the two provisions should be used to value the shares. However, neither of the two is a liquidated damages provision applicable in the event of breach of contract. *SeeLafarge Corp. v. Wolff, Inc.,* 977 S.W.2d 181, 188 n. 13 (Tex.App.-Austin 1998, pet. denied). Although parties may stipulate the amount of damages to be recovered in the event of breach of contract, "[s]uch an agreement ... must be expressed, and in the absence of an express agreement for liquidated damages the court will not make one for the parties." *Id.; see alsoNewsom v. State,* 922 S.W.2d 274, 281 (Tex.App.-Austin 1996, writ denied) ("Damages become 'liquidated' when the *parties* have agreed to the amount at issue."). In the absence of an express agreement for liquidated damages, courts apply a common-law measure of damages for breach of contract. *SeeGeneral Elec. Supply Co. v. Gulf Electroquip, Inc.,* 857 S.W.2d 591, 599 (Tex.App.-Houston [1st Dist.] 1993, writ denied).

Further, appellants cannot take advantage of provisions favorable to them in the very contract they breached.

*SeeBaker Marine Corp. v. Weatherby Eng'g Co.,* 710 S.W.2d 690, 696 (Tex.App.-Corpus Christi 1986, no writ). One who has broken a contract cannot thereafter enforce the remaining terms. *SeeJoseph v. PPG Indus., Inc.,* 674 S.W.2d 862, 867 (Tex.App.-Austin 1984, writ ref'd n.r.e.); *accordII Deerfield Ltd. P'ship v. Henry Bldg., Inc.,* 41 S.W.3d 259, 265 (Tex.App.-San Antonio 2001, pet. denied); *Interceramic, Inc. v. S. Orient R.R. Co.,* 999 S.W.2d 920, 924 (Tex.App.-Texarkana 1999, pet. denied). Having breached the contract, appellants cannot then enforce the Termination provision as though it were a liquidated damages clause or the common-law measure of damages, which it is not.

In a breach of contract action for failure to transfer shares of a closely held corporation, "[t]he proper measure of damages is the fair market value of the stock...." *SeeBowers Steel, Inc. v. DeBrooke,* 557 S.W.2d 369, 373 (Tex.Civ.App.-San Antonio 1977, no writ) (employee was promised 20% of stock in closely held corporation, but never received it); *see alsoMiga v. Jensen,* 96 S.W.3d 207, 215 (Tex.2003) (in breach of agreement to purchase securities, damages are the difference between the contract price and the fair market value of the asset). Market value of

**Page 41**

closed-corporate stock is what a willing purchaser would pay to a willing seller under no compulsion to sell. *InterFirst Bank Dallas, N.A. v. Risser,* 739 S.W.2d 882, 889 (Tex.App.-Texarkana 1987, no writ); *accordFisher v. Yates,* 953 S.W.2d 370, 378 (Tex.App.-Texarkana 1997), *writ denied per curiam,* 988 S.W.2d 730 (Tex.1998); *see alsoCity of Harlingen v. Estate of Sharboneau,* 48 S.W.3d 177, 182 (Tex.2001) (measure of damages in condemnation). Book value "is entitled to little, if any, weight in determining the value of a corporation's stock, and many other factors must be taken into consideration." *Bendalin v. Delgado,* 406 S.W.2d 897, 900-01 (Tex.1966); *accordPabich v. Kellar,* 71 S.W.3d 500, 509 (Tex.App.-Fort Worth 2002, pet. denied); *McRae Exploration & Prod., Inc. v. Reserve Petroleum Co.,* 962 S.W.2d 676 (Tex.App.-Waco 1998, no pet.). When too few stock sales exist to establish a market price, other factors to assess fair market value include:

(a) The nature of the business and the history of the enterprise from its inception.

(b) The economic outlook in general and the condition and outlook of the specific industry in particular.

(c) The book value of the stock and the financial condition of the business.

(d) The earning capacity of the company.

(e) The dividend paying capacity.

(f) Whether or not the enterprise has good will or other intangible values. [24]

(g) Sales of stock and the size of the block of the stock to be valued.

(h) The market price of stocks of corporations engaged in the same or similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.

*InterFirst Bank Dallas,* 739 S.W.2d at 892 (citing Rev. Rul. 59-60, 1951-1 C.B. 237). If there is no evidence of fair market value, the value of stock in a closely held corporation is predicated upon the market value of the assets of the company after deducting its liabilities. *SeeWilliams v. Gaines,* 943 S.W.2d 185, 193 (Tex.App.-Amarillo 1997, writ denied) (op. on reh'g).

Regardless, the calculation should reflect the value at the time of injury. *SeeBendalin,* 406 S.W.2d at 901; *Pabich,* 71 S.W.3d at 509; *Williams,* 943 S.W.2d at 193-94; *Intermedics, Inc. v. Grady,* 683 S.W.2d 842, 848 (Tex.App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.) (employee entitled to stock's value at time of his termination from employment); *Bowers Steel, Inc.,* 557 S.W.2d at 373 (stock promised to employee as compensation was valued at time of termination); *see alsoMiga,* 96 S.W.3d at 214 (explaining long-standing rule in Texas that contract damages are measured at the time of breach). In this case, appellants clearly repudiated the Letter Agreement in November 1994, which is coincidentally the date of Donnelly's termination. Donnelly is thus entitled to damages because of appellants' wrongful breach of the Letter Agreement, not because he was terminated in accordance with the Termination provision.

We hold that the correct measure of damages is the fair market value of the stock in URB and in WHE at the time of Donnelly's termination in November 1994. Accordingly, the trial court erred in submitting the wrong measure of damages.

**Page 42**

When a trial court erroneously instructs the jury on the measure of damages, the submission is reversible error. *SeeArthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 817 (Tex.1997). When a defective damages question is submitted, the proper remedy is to remand for new trial. *SeeJackson v. Fontaine's Clinics, Inc.,* 499 S.W.2d 87, 90 (Tex.1973). The rules of appellate procedure do not permit a new trial solely on unliquidated damages if

liability is contested. TEX.R.APP. P. 44.1(b). Accordingly, we reverse and remand for a new trial on Donnelly's cause of action for breach of contract. [25]

### B. Breach of Fiduciary Duty Damages

In the Willises' issue 24 and Urban Retreat's issue nine, appellants contend that the trial court erred in omitting a measure of damages in the breach of fiduciary duty question. In Question 25, the court asked the jury, "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Dan Donnelly for his damages, if any, that were proximately caused by such conduct [Mike Willis's breach of fiduciary duty]?" The court, however, did not instruct the jury on what items to consider in assessing damages.

"[W]hen the trial court has erroneously failed to include instructions on the proper measure of damages, it is the complaining party's burden both to object to the charge and to tender such instructions in substantially correct form." *Tex. Commerce Bank v. Lebco Constructors, Inc.,* 865 S.W.2d 68, 75 (Tex.App.-Corpus Christi 1993, writ denied); *see* TEX.R. CIV. P. 278; *accord* *R & R Contractors v. Torres,* 88 S.W.3d 685, 695 (Tex.App.-Corpus Christi 2002, no pet.); *Campbell v. C.D. Payne & Geldermann Sec., Inc.,* 894 S.W.2d 411, 420 (Tex.App.-Amarillo 1995, writ denied); *Gilgon, Inc. v. Hart,* 893 S.W.2d 562, 565 (Tex.App.-Corpus Christi 1994, writ denied). [26]

Although appellants objected, they failed to tender an instruction in substantially correct form. Their proposed measure of damages was the "Termination" provision from the Letter Agreement, which would limit damages for breach of fiduciary duty to stock value calculated at the greater of (1) assets minus liabilities or (2) two times the prior year's earnings. However, Donnelly presented evidence that Willis's purchase of the URB realty and his characterization of capital contributions as loans were breaches of fiduciary duty. Appellants' proposed measure of damages would exclude consideration of realty value and the amount of money mischaracterized as loans. Thus,

### Page 43

assuming that Question 25 was deficient, [27] appellants have waived error by failing to tender an instruction on the correct measure of damages. *See* *Miller v. Kendall,* 804 S.W.2d 933, 942 (Tex.App.-Houston [1st Dist.] 1990, no writ) (complaining party waived error by tendering instruction with incorrect measure of damages). Accordingly, we overrule the Willises' issue 24 and Urban Retreat's issue nine.

### C. Stacking

In the Willises' twenty-fifth issue and Urban Retreat's tenth issue, appellants contend that the trial court erroneously stacked the damages, permitting a triple recovery. First, they contend that the jury awarded the same amount of money for breach of contract and breach of fiduciary duty, which constitute a single injury. They then contend that the trial court tripled the recovery by imposing a constructive trust.

"A double recovery exists when a plaintiff obtains more than one recovery for the same injury." *Waite Hill Servs., Inc. v. World Class Metal Works, Inc.,* 959 S.W.2d 182, 184 (Tex.1998). Here, the jury awarded the same amount of money for both breach of contract and breach of fiduciary duty. Appellants contend that these awards, along with Donnelly's jury arguments, prove that he has suffered but one injury. However, we have reversed and remanded the breach of contract claim. Thus, there is no double recovery of identical amounts for both causes of action. Additionally, when a plaintiff pleads alternate theories of liability, a judgment awarding damages on more than one theory may stand if the theories of liability arise from separate and distinct injuries and separate and distinct damage findings are entered on each theory of liability. *See* *Birchfield v. Texarkana Mem'l Hosp.,* 747 S.W.2d 361, 367 (Tex.1987). There is evidence supporting damages for two "separate and distinct" causes of action in this case: (1) unpaid salary and stock value for breach of the Letter Agreement; and (2) real estate value and capital contributions listed as loans for breach of fiduciary duty. Real estate value and "loans" should not be considered in determining breach of contract damages.

Lastly, appellants argue that the constructive trust triples Donnelly's recovery. Donnelly concedes that the constructive trust duplicates the money judgment and seeks remand for an election of remedies. "A party who seeks redress under two or more theories of recovery for a single wrong must elect, before the judgment is rendered, under which remedy he wishes the court to enter judgment." *Star Houston, Inc. v. Shevack,* 886 S.W.2d 414, 422 (Tex.App.-Houston [1st Dist.] 1994), *writ denied per curiam,* 907 S.W.2d 452 (Tex.1995). If the prevailing party fails to elect a remedy, the trial court should render a judgment affording the greater recovery. *Pitman v. Lightfoot,* 937 S.W.2d 496, 533 (Tex.App.-San Antonio 1996, writ denied). If the trial court fails to do so, generally, we will reform the judgment to effect such an election. *See id.*

However, appellate courts sometimes remand a case for an election of remedies. *See, e.g.,* *Waite Hill Servs.,* 959 S.W.2d at 185; *Gunn Infiniti, Inc. v. O'Byrne,* 18 S.W.3d 715, 718 (Tex.App.-San Antonio 2000, no pet.); *Jim Walter Homes, Inc. v. Samuel,* 701 S.W.2d 351, 354 (Tex.App.-Beaumont 1986, no writ). We remand the

constructive trust in this

**Page 44**

case for two reasons. First, the portion of the constructive trust imposed upon 50% of URB stock and 10% of WHE stock duplicates recovery for breach of contract, which we have reversed and remanded. Thus, the constructive trust on the URB and WHE stock is also reversed and remanded. Second, we are unable to determine which remedy for breach of fiduciary duty (the money damages or the constructive trust on the realty) provides a greater recovery. Accordingly, we remand for an election of remedies for breach of fiduciary duty.

In summary, we overrule the Willises' issue 25 and Urban Retreat's issue ten to the extent appellants contend fiduciary duty damages are the same as contract damages. We partially sustain the issues as follows. First, we reverse and remand the constructive trust imposed on Urban Retreat stock because it duplicates damages for breach of contract, which we have reversed and remanded for a new trial. Second, we remand the constructive trust imposed on the realty for an election of remedies because it duplicates money damages awarded for breach of fiduciary duty.

### ATTORNEY'S FEES

#### A. Fees Awarded to Donnelly

In the Willises' issue 26 and a portion of Urban Retreat's issue four, appellants contend that Donnelly was not entitled to attorney's fees. In the Willises' issue 27 and the remainder of Urban Retreat's issue four, they argue that Donnelly failed to properly present his claim, timely disclose expert opinions regarding the fees, and offer evidence about a reasonable fee.

Donnelly was awarded attorney's fees in conjunction with his breach of contract claim. TEX. CIV. PRAC. & REM.CODE ANN. § 38.001 (Vernon 1997) (permitting attorney's fees for a "valid" claim on a contract). Because we have reversed and remanded the contract claim, Donnelly has no longer proved a "valid" contract claim. *SeeWright Way Const. Co., Inc. v. Harlingen Mall Co.,* 799 S.W.2d 415, 425 (Tex.App.-Corpus Christi 1990, writ denied); *Hartford Cas. Ins. Co. v. Budget Rent-A-Car Sys., Inc.,* 796 S.W.2d 763, 772 (Tex.App.-Dallas 1990, writ denied) (attorney's fees not recoverable for claims on which a party does not prevail). Additionally, Donnelly may not recover attorney's fees for his breach of fiduciary duty claim. *SeeMaeberry v. Gayle,* 955 S.W.2d 875, 881 (Tex.App.-Corpus Christi 1997, no pet.); *Spangler v. Jones,* 861 S.W.2d 392, 397 (Tex.App.-Dallas 1993, writ denied). Accordingly, we sustain the Willises' issue 26 and the first portion of Urban Retreat's issue four. We reverse and

remand the attorney's fees issue. Because of this disposition, we need not address issue 27 or the remainder of Urban Retreat's issue four.

#### B. Fees Awarded to Mike Willis

In his cross-appeal, Donnelly contends in two issues that the trial court erred in awarding Mike Willis $400,000 in attorney's fees for a $26,982.58 defaulted promissory note. Donnelly complains that the attorney's fees were not segregated and thus include the costs of defending his suit against Urban Retreat and the Willises. "One of the thorniest and most frequently litigated issues involved in proof of attorney's fees concerns segregation of recoverable fees." Scott A. Brister, *Proof of Attorney's Fees in Texas,* 24 ST. MARY'S L.J. 313, 342 (1993). We agree that the attorney's fees awarded to Mike Willis were not properly segregated, and we reverse and remand the issue.

In his first cross-issue, Donnelly argues the trial court erred in overruling his objections

**Page 45**

to Question 4, in which the trial court asked the jury to determine Willis's reasonable attorney's fees "in this case." [28] We interpret Donnelly's briefing to contend that the trial court erred in awarding Mike Willis fees for *all* the legal work performed in the lawsuit, including defense of Donnelly's counterclaims involving the Letter Agreement and Urban Retreat, and including fees incurred by Francie and Urban Retreat (who were not parties to the promissory note). In other words, Donnelly argues that Willis failed to segregate the attorney's fees related to his successful recovery on the promissory note, which was the sole basis for his entitlement to an award of attorney's fees. We agree.

We review such a claim of jury charge error for abuse of discretion. *Tex. Dept. of Human Servs. v. E.B.,* 802 S.W.2d 647, 649 (Tex.1990); *KPH Consolidation, Inc. v. Romero,* 102 S.W.3d 135, 156 (Tex.App.-Houston [14th Dist.], 2003, no pet. h.). The trial court has broad discretion in submitting the jury charge; it abuses its discretion only when it acts unreasonably or arbitrarily, or without reference to any guiding principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241-42 (Tex.1985). We may not reverse for jury charge error unless the error, when viewed in light of the totality of the circumstances, amounted to such a denial of the rights of the complaining party as was reasonably calculated and probably did cause rendition of an improper judgment. TEX.R.APP. P. 44.1(a)(1). Our analysis must consider the pleadings of the parties, the evidence presented at trial, and the charge in its entirety. *Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n,* 710 S.W.2d 551, 555 (Tex.1986). Absent a showing of an abuse of discretion, the award or failure to

award fees will not be disturbed on appeal. *See, e.g.,Houston Lighting & Power Co. v. Dickinson Indep. Sch. Dist.,* 641 S.W.2d 302, 311 (Tex.App.-Houston [14th Dist.] 1982, writ ref'd n.r.e.); *Fowler v. Stone,* 600 S.W.2d 351, 353 (Tex.Civ.App.-Houston [14th Dist.] 1980, no writ).

Whether attorney's fees are authorized in a particular case is a question of law to be determined by the court. *Holland v. Wal-Mart Stores,* 1 S.W.3d 91, 94 (Tex.1999); *Leon Ltd. v. Albuquerque Commons P'ship,* 862 S.W.2d 693, 708 (Tex.App.-El Paso 1993, no writ). The Texas Supreme Court has consistently held that "a prevailing party cannot recover attorney's fees from an opposing party unless permitted by statute or by contract between the parties." *Holland,* 1 S.W.3d at 95. A party may not recover attorney's fees for claims on which the party did not prevail. *Budget Rent-A-Car Sys., Inc.,* 796 S.W.2d at 772.

As a general rule, the party seeking to recover attorney's fees carries the burden of proof. *Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 10 (Tex.1991); *Lesikar v. Rappeport,* 33 S.W.3d 282, 317 (Tex.App.-Texarkana 2000, pet. denied). Specifically, when a lawsuit involves multiple claims or multiple parties, the proponent has a duty to segregate non-recoverable fees from recoverable fees, and to segregate the fees owed by different parties. *Sterling,* 822 S.W.2d at 10-11. As a result, the fees incurred for successful prosecution of a breach of contract claim must be segregated from those claims in the case for which attorney's fees may not be recovered. *Id.* at 11 (remanding

## Page 46

for segregation of attorney's fees attributable to recovering policy benefits among various defendants); *Int'l Sec. Life Ins. Co. v. Finck,* 496 S.W.2d 544, 546-47 (Tex.1973) (remanding for segregation of attorney's fees incurred for fraud and deceit claims from recovery on policy claim); *Z.A.O., Inc. v. Yarbrough Drive Ctr. J.V.,* 50 S.W.3d 531, 550-51 (Tex.App.-El Paso 2001, no pet.) (remanding for segregation of attorney's fees for prosecuting trespass and nuisance claims from contract claim).

In the absence of segregation, a trial court may refuse to award attorney's fees. *SeeS. Concrete Co. v. Metrotec Fin., Inc.,* 775 S.W.2d 446, 450 (Tex.App.-Dallas 1989, no writ); *Bullock v. Kehoe,* 678 S.W.2d 558, 560 (Tex.App.-Houston [14th Dist.] 1984, writ ref'd n.r.e.). "But when the claims 'are dependent upon the same set of facts or circumstances and thus are "intertwined to the point of being inseparable," the party suing for attorney's fees may recover the entire amount covering all claims.' " *Stewart Title Guar. Co. v. Aiello,* 941 S.W.2d 68, 73 (Tex.1997) (quoting *Sterling,* 822 S.W.2d at 11); *accordVillage Mobile Homes, Inc. v. Porter,* 716 S.W.2d 543, 552

(Tex.App.-Austin 1986, writ ref'd) (fraud, contract, DTPA, and insurance code claims arose from same set of facts). In other words, segregation of attorney's fees is not required where the services rendered relate to (1) multiple claims arising out of the same facts or transaction and (2) the prosecution or defense entails proof or denial of essentially the same facts, so as to render the attorney's fees inseparable. *SeeSterling,* 822 S.W.2d at 11; *Flint & Assocs. v. Intercont'l Pipe & Steel, Inc.,* 739 S.W.2d 622, 624-25 (Tex.App.-Dallas 1987, writ denied) (claim and counterclaim arose out of same transaction--the sale of pipe). The determination of the amount to be awarded as a reasonable attorney's fee is a question of fact to be determined by the trier of fact and the award, if any, must be supported by competent evidence. *Great Am. Reserve Ins. Co. v. Britton,* 406 S.W.2d 901, 907 (Tex.1966).

Originally, Mike Willis sued Dan Donnelly for the balance owing on a $31,183.70 promissory note. The loan was made between the men in 1993, several years after Urban Retreat opened. The loan proceeds were for Donnelly's personal use; he asserted affirmative defenses to recovery on the note and a usury counterclaim, the facts of which were unrelated to the business of Urban Retreat or the Letter Agreement. Donnelly stopped paying the note when he was terminated from Urban Retreat in 1994. The jury found he owed the balance of $26,982.58. Mike Willis successfully overcame affirmative defenses to the promissory note and the usury counterclaim.

Donnelly's claims for breach of the Letter Agreement, breach of fiduciary duty, fraud in the inducement, and tortious interference against Willis, Francie, WHE, and URB all involved the Urban Retreat business. Most of the copious discovery and trial evidence addressed these claims, not the promissory note. Donnelly's claims against the Willises and Urban Retreat did not involve the creation, execution, and non-payment of the promissory note. The promissory note arose from a separate transaction. Prosecution and defense of the promissory note did not require proof or denial of essentially the same facts. The only similarity of facts is that Willis and Donnelly were parties to both.

Because Mike Willis prevailed at trial to recover the balance of the promissory note, attorney's fees are authorized for prosecuting that claim. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 38.001(8) (Vernon 1997). However, this statute does not authorize

## Page 47

recovery of attorney's fees for a party's *defense* of breach of contract, fraudulent inducement, tortious interference, or breach of fiduciary duty claims. *Id.* There is no authority that entitles Willis to recover attorney's fees for his defense

of Donnelly's breach of the Letter Agreement, breach of fiduciary duty, tortious interference, and fraud in the inducement counterclaims.

Willis relies upon the case of *RepublicBank Dallas v. Shook,* 653 S.W.2d 278 (Tex.1983), in arguing he should be awarded attorney's fees for defending all of Donnelly's claims. He asserts that his defense of them was inseparable from prosecuting his claim against Donnelly on the promissory note. In *RepublicBank,* because the facts were so integrally related, the prevailing party suing on a promissory note was entitled to recover attorney's fees for successfully defending a usury claim and overcoming affirmative defenses to the note's collection. We agree that Willis is entitled to recover those attorney's fees incurred in defeating Donnelly's affirmative defenses to the promissory note and overcoming the usury counterclaim. However, in urging the application *RepublicBank,* Willis glaringly fails to acknowledge the existence of Donnelly's other counterclaims, *i.e.,* the claims relating to Urban Retreat and the Letter Agreement.

At trial, Willis was not seeking to recover only his attorney's fees on the promissory note and the usury counterclaim. Instead, the jury question asked: "What is a reasonable fee for the necessary service of Mike Willis's attorneys *in this case,* stated in dollars and cents?" The question failed to limit recovery only for attorney's fees Mike Willis incurred in prosecuting the note, overcoming defenses to it, and defeating Donnelly's usury counterclaim, which was the sole counterclaim inextricably related to the promissory note. *RepublicBank* is thus not support for Willis's assertion that, as a matter of law, all of Donnelly's counterclaims were so intertwined with the promissory note as to allow recovery of attorney's fees for the whole case.

Willis next argues that the expert testimony of Finis Cowan supports recovery of total attorney's fees. We have reviewed this witness's testimony. Although he testified that he considered *RepublicBank* in arriving at his opinion, this is insufficient to demonstrate that the facts surrounding Willis's recovery on the promissory note were integrally related to Donnelly's other claims against the Willises and Urban Retreat. It was Mike Willis's burden to present evidence segregating the attorney's fees and he failed to do so.

Accordingly, we sustain Donnelly's cross-issue one. Question 4 was erroneous because it did not properly limit recovery and because there was no evidence of segregated fees. [29] Because the determination of reasonable attorney's fees is a question for the trier of fact, we remand the attorney's fees issue for determination of what portion of the $400,000 in attorney's fees is attributable to the successful prosecution of Mike Willis's claim on the promissory note and defense of the usury counterclaim.

*SeeStewart Title,* 822 S.W.2d at 12; *Aetna Cas. & Sur. v. Wild,*

Page 48

944 S.W.2d 37, 41 (Tex.App.-Amarillo 1997, writ denied). The jury cannot award attorney's fees to Mike Willis for fees incurred by WHE, URB, Francie, or Willis in defending Donnelly's claims for breach of fiduciary duty, tortious interference, fraud in the inducement, and breach of the Letter Agreement. Lastly, as a result of our disposition of cross-issue one, we need not address Donnelly's second cross-issue.

## CONCLUSION

In summary, we affirm the judgment against Mike Willis for breach of fiduciary duty. However, the constructive trust awards a double recovery for breach of fiduciary duty. We therefore remand for an election of remedies between the constructive trust on the realty and the $1.7 million awarded by the jury for breach of fiduciary duty.

Next, we overrule the Willises and Urban Retreat's challenges to liability for breach of contract. We further hold that the statute of limitations for breach of contract did not accrue before August 24, 1991. However, the jury charge contained an incorrect measure of damages for breach of contract. Accordingly, we reverse and remand for a new trial on contract damages. Because we are reversing and remanding the damages issue, we also reverse and remand the portion of the constructive trust imposed on URB and WHE stock, which duplicates contract damages. As a consequence of the new trial on contract damages, we must also reverse and remand the contract liability issues, found in Questions 5, 6, 8, 9, and 10. Finally, because Donnelly is no longer a prevailing party, we reverse and remand the attorney's fees awarded to him on his breach of contract claim.

In Donnelly's cross-appeal, we hold that the trial court erred in permitting the jury to consider unsegregated attorney's fees incurred by the Willises and Urban Retreat, instead of those incurred solely by Mike Willis in prosecuting Donnelly for defaulting on a promissory note and prevailing on Donnelly's usury counterclaim.

Accordingly, we affirm the judgment for breach of fiduciary duty, remand for an election of remedies consistent with this opinion, reverse and remand all breach of contract issues, except the limitations question, reverse and remand the award of attorney's fees to Donnelly, and reverse and remand the award of attorney's fees to Mike Willis.

## SUPPLEMENTAL OPINION ON REHEARING

Michael T. Willis, Francie Willis, Willis Hite Enterprises, Inc., and Urban Retreat of Houston, Inc., have filed a motion for rehearing and motion for rehearing en banc from our opinion. While we change nothing in our opinion or disposition of the appeal, we supplement the opinion to address three issues raised in the motion for rehearing. The motion for rehearing is denied.

### RATIFICATION

In issue eight of their motion for rehearing, appellants contend ratification by Michael and Francie Willis must also conform to requirements of the statute of frauds because the Letter Agreement was subject to the statute of frauds. This issue is raised for the first time in the motion for rehearing. An assignment of error raised for the first time in a motion for rehearing is too late to be considered. *Lee v. Lee,* 47 S.W.3d 767, 799 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). Originally, appellants argued in their ratification issue that a jury finding on both ratification and breach of contract was necessary as to Mike and Francie

**Page 49**

Willis. They did not argue statute of frauds under their ratification issue. [1] The sole purpose of a motion for rehearing is to provide the court an opportunity to correct any errors on issues already presented. *Phifer v. Nacogdoches County Cent. Appraisal Dist.,* 45 S.W.3d 159, 166 (Tex.App.-Tyler 2000, pet. denied). Because this issue is raised for the first time in appellant's motion for rehearing, we do not address it.

### STANDING VERSUS CAPACITY

In issue seven of their motion for rehearing, appellants contend that Donnelly lacks standing to sue for Urban Retreat's damages. Appellants confuse "capacity," which has been waived, with "standing," which we addressed in our original opinion.

"A plaintiff has *standing* when it is personally aggrieved, regardless of whether it is acting with legal authority." *Nootsie, Ltd. v. Williamson County Appraisal Dist.,* 925 S.W.2d 659, 661 (Tex.1996). In contrast, "a party has *capacity* when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy." *Id.* Standing is jurisdictional and cannot be waived, but capacity may be waived. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 446 (Tex.1993). Whether a stockholder may recover damages personally for a wrong done to the corporation is an argument about capacity--that is, whether the stockholder has legal authority. *Mackie v. Guthrie,* 78 S.W.3d 462, 465-66

(Tex.App.-Tyler 2001, pet. denied). It is improper for an appellant to couch such an argument in terms of standing. *Id.* at 466.

Further, to challenge capacity, a party must file a verified denial. *See* TEX.R. CIV. P. 93(2); *see alsoPledger v. Schoellkopf,* 762 S.W.2d 145, 146 (Tex.1988). If Rule 93 is not followed, the issue of capacity is waived on appeal. *Nootsie,* 925 S.W.2d at 662. In this case, appellants did not file a verified denial of Donnelly's capacity to recover Urban Retreat's damages.

### REMAND OF LIMITATIONS ISSUE

In their tenth issue, appellants contend we must reverse and remand the limitations issue because we reversed and remanded breach of contract and damages questions. Texas Rule of Appellate Procedure 44.1 permits an appellate court to reverse those portions of a matter in controversy that are affected by the error. The rule prohibits a separate trial solely on unliquidated damages if liability is contested. TEX.R.APP. P. 44.1(b). In this case, the trial court erroneously submitted the wrong measure of damages for breach of contract. Because liability was contested, we reversed and remanded not only the damages question, but also questions about breach of contract, ratification, waiver, and percentages of ownership in the corporations. We did not reverse and remand the contract statute of limitations issue.

Accrual of the statute of limitations is a question of law. *Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 351 (Tex.1990); *Waxler v. Household Credit Servs., Inc.,* 106 S.W.3d 277, 279 (Tex.App.-Dallas 2003, no pet.). Appellants assigned error to the jury's rejection of the statute of limitations, contending that suit was barred as a matter of law. We concluded that the cause of action for breach

**Page 50**

of contract accrued within four years of suit. On remand, questions of law answered by an appellate court are considered law of the case. *SeeBriscoe v. Goodmark, Corp.,* 102 S.W.3d 714, 716 (Tex.2003). As there is no issue to relitigate upon remand, we decline to reverse and remand the limitations issue.

Finding it unnecessary to write regarding the remaining seven points in their motion, we deny appellant's motion for rehearing.

---------

Notes:

[1] Collectively, we refer to URB and WHE as Urban

Retreat.

[2] This "loan" was not approved by resolution of URB's board of directors, as required by the URB by-laws. In contrast, the $800,000 construction loan had been approved by the board (consisting of Willis, the minimal shareholder, and Hite).

[3] By terminating his employment so quickly, Hite never earned 25% of URB stock as contemplated in his own letter agreement with Willis.

[4] URB was authorized to issue up to 100,000 shares.

[5] From 5% of gross revenues to $3,000 per month, 60% of his hair styling, 10% of his product sales, and a 5% commission each month the Hair Department exceeded $100,000 in revenue.

[6] By 1992's end, Willis's cash loans equaled $1,746,643. At 1993's end, this amount had increased to $1,897,896.

[7] Again, no evidence exists that URB's board of directors approved this "evidence of indebtedness ... issued in its name" as required by the by-laws. Supposedly, Willis, Francie, Donnelly, and two others were board members until March 17, 1993, when Francie, as "sole shareholder," made herself sole director.

[8] Question 6: "Was the failure to comply [with the Letter Agreement] excused? Failure to comply with an agreement is excused ... if compliance was waived by Dan Donnelly. A waiver is an intentional surrender of a known right or intentional conduct inconsistent with that right." The jury answered, "No."

[9] Question 7: "Did the failure to comply ... occur prior to August 24, 1991?"

[10] Nine other notes from the jury, and the trial court's responses, do appear in the clerk's record.

[11] In Question 22, the trial court instructed the jury, "Mike Willis owed Dan Donnelly a fiduciary duty."

[12] "Oppressive conduct" is defined as:

1. majority shareholders' conduct that substantially defeats the minority's expectations that, objectively viewed, were both reasonable under the circumstances and central to the minority shareholder's decision to join the venture; or

2. burdensome, harsh, or wrongful conduct; a lack of probity and fair dealing in the company's affairs to the prejudice of some members; or a visible departure from the standards of fair dealing and a violation of fair play on which each shareholder is entitled to rely.

*Willis v. Bydalek,* 997 S.W.2d 798, 801 (Tex.App.-Houston [1st Dist.] 1999, pet. denied).

[13] The Willises argued that URB could not afford to buy the realty, although evidence suggests that Willis's improper characterization of capital as debt helped place the business in its allegedly poor financial condition.

[14] Under the Letter Agreement, Donnelly could sell his stock but first had to offer to sell them to other shareholders using the equation "real estate appraised at market value plus previous twelve months' gross revenue."

[15] The Willises include a catchall, multifarious assertion of error at the end of this portion of their argument, contending there is "no evidence, no legally sufficient evidence, and no factually sufficient evidence that Michael Willis had a fiduciary relationship with Donnelly...." We are not required to address multifarious issues. *SeeState v. Interstate Northborough P'ship,* 8 S.W.3d 4, 7 n. 2 (Tex.App.-Houston [14th Dist.] 1999), *rev'd on other grounds,* 66 S.W.3d 213 (Tex.2001); *Shull v. United Parcel Serv.,* 4 S.W.3d 46, 51 (Tex.App.-San Antonio 1999, pet. denied). Factual sufficiency analysis requires us to detail the evidence relevant to the issue and, if reversing, clearly state in what regard the contrary evidence greatly outweighs the evidence in support of the issue. *SeePool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986) (op. on reh'g). Given the Willises' bare assertion of error, without substantive analysis, legal authority regarding factual insufficiency, and appropriate citation to the record for factual insufficiency, *seeRyan v. Abdel-Salam,* 39 S.W.3d 332, 336 (Tex.App.-Houston [1st Dist.] 2001, pet. denied); *Keever v. Finlan,* 988 S.W.2d 300, 314 (Tex.App.-Dallas 1999, pet. dism'd), we decline to perform a review of the record and law to determine whether there is factually insufficient evidence of a fiduciary relationship.

[16] It is error for a trial court to instruct a jury that shareholders in a closely held corporation owe each other a fiduciary duty as a matter of law. *Pabich,* 71 S.W.3d at 505; *Kaspar v. Thorne,* 755 S.W.2d 151, 155 (Tex.App.-Dallas 1988, no writ).

[17] The Texas Pattern Jury Charges includes a chapter about fiduciary duty. TEX. PATTERN JURY CHARGES PJC 104.1-104.2 (2000). PJC 104.1 asks whether a fiduciary duty exists between parties. In this case, no one requested PJC 104.1 in the charge, and Willis did not object to its omission. PJC 104.2 then asks if one party complied with its fiduciary duty to another. In Question 22, the trial court tracked the language of PJC 104.2 almost word-for-word.

[18] Urban Retreat does not argue subissues three and eight.

[19] The jury awarded $1,707,684.30 for Mike Willis's breach of fiduciary duty.

[20] The Willises fail to brief issue 22. We thus address the argument as presented in Urban Retreat's brief.

[21] The Letter Agreement states that Donnelly agreed to "use his best efforts" to persuade his entire staff and clientele to transfer to Urban Retreat. The Letter Agreement also states that while employed at Urban Retreat, Donnelly may not compete in the Houston area by performing "personal care, beauty, and hair" services or owning an interest in a competing business.

[22] "After twelve (12) months of employment, if Mr. Donnelly is terminated, Mr. Donnelly would likewise be required to sell his shares of the Urban Retreat and Willis/Hite to those companies and would receive book value of such shares or the value of such shares as determined by multiplying two times prior year's earnings ..., whichever is greater. 'Book Value' is defined as the assets minus liabilities...."

[23] "Book Value of Owners' Equity = Real Estate Appraised at Market Value Plus Previous Twelve (12) Months Gross Revenues."

[24] Per the Letter Agreement, WHE owns "all rights to the name 'The Urban Retreat.' " WHE's ownership of the name is confirmed in a "URH/URC Contract." The evidence does not reveal whether WHE had liabilities or other assets when Donnelly's employment terminated.

[25] Under Rule 44.1(b), we remand the portion of the matter in controversy that is affected by the error and that is fairly separable. Accordingly, we remand Question 5 (the breach of contract question), Question 6 (whether the failure to comply was excused), Question 8 (the percentage of URB stock to which Donnelly was entitled), Question 9 (the percentage of WHE stock to which Donnelly was entitled), Question 10 (ratification), and Question 11 (damages incurred for breach of contract).

[26] When a measure of damages is omitted, the complaining party must request the correct measure. TEX.R. CIV. P. 278; *seeFairfield Estates, L.P. v. Griffin,* 986 S.W.2d 719, 724 (Tex.App.-Eastland 1999, no pet.). When an incorrect measure is submitted, *i.e.,* a defective submission, the complaining party need only object. *SeeReligious of the Sacred Heart v. City of Houston,* 836 S.W.2d 606, 613-14 (Tex.1992); *R & R Contractors,* 88 S.W.3d at 695; *see alsoOperation Rescue-Nat'l v. Planned Parenthood of Houston & S.E. Tex., Inc.,* 937 S.W.2d 60, 69 (Tex.App.-Houston [14th Dist.] 1997), *aff'd as modified,* 975 S.W.2d 546 (Tex.1998).

[27] *But seeRowe v. Rowe,* 887 S.W.2d 191, 199 (Tex.App.-Fort Worth 1994, writ denied) (almost identical question held to be proper under Texas law when challenged for improper measure of damages).

[28] Donnelly objected that in answering Question 4, the jury was not limited to assessing attorney's fees incurred solely by Mike Willis for only the promissory note claim. Donnelly also objected that there was no evidence segregating the fees.

[29] Donnelly does not assert points of error for legal or factual insufficiency of the evidence. Even if he had done so, we could not reverse and render. If a party does not properly segregate attorney's fees, it is error to completely deny recovery of attorney's fees on a contract claim, as evidence of unsegregated attorney's fees is more than a scintilla of evidence of segregated fees. *Int'l Sec.Life Ins. Co.,* 496 S.W.2d at 546-47; *Panizo v. Young Men's Christian Ass'n of Greater Houston Area,* 938 S.W.2d 163, 171 (Tex.App.-Houston [1st Dist.] 1996, no writ).

[1] A brief survey of the law after the motion for rehearing was filed uncovered divergence in whether jurisdictions require ratification to conform with the statute of frauds. The case law cited in the motion for rehearing was not urged in the appellate briefing, further demonstrating that the issue is newly raised in the motion for rehearing.

---------

131 S.W.3d 663 (Tex.App.—Corpus Christi 2004)

Jesus ALEJANDRO, Appellant,

v.

ROBSTOWN INDEPENDENT SCHOOL DISTRICT, et al., Appellees.

No. 13-01-00780-CV.

Court of Appeals of Texas, Thirteenth District, Corpus Christi-Edinburg.

April 1, 2004.

Page 664

[Copyrighted Material Omitted]

Page 665

William J. Kolb, Alice, for Appellant.

Angelica E. Rodriguez Barrera, Phillip A. McKinney, Hornblower, Manning & Ward, Corpus Christi, for Appellees.

Before Justices HINOJOSA, YAÑEZ, and CASTILLO.

## OPINION

HINOJOSA, Justice.

Appellant, Jesus Alejandro, was terminated from his position as the Assistant Superintendent for Business and Finance with the Robstown Independent School District ("RISD"). Appellant sued the following appellees: RISD; Leobardo Cano, individually and in his official capacity as RISD's Superintendent of Schools ("Superintendent Cano"); and Adolfo Lopez and Oscar Lopez, individually and in their official capacities as members of the RISD Board of Trustees. Appellant alleged retaliatory discharge under the Texas Whistleblower Act ("the Act").[1] The trial court granted appellees' motion for directed verdict and assessed sanctions against appellant and his attorney in the amount of $23,764.77 for the costs, expenses, and attorneys fees incurred by appellees in defending the suit. By two points of error, appellant contends: (1) the trial court erred in granting a directed verdict; and (2) the evidence is legally insufficient to support the sanctions imposed against him. We affirm the trial court's judgment granting the directed

verdict. We reverse the trial court's sanctions order and render judgment that appellees' motion for Texas Rule of Civil Procedure 13 sanctions be denied.

### A. FACTUAL BACKGROUND

As part of his duties as RISD's Assistant Superintendent for Business and Finance,

Page 666

appellant reviewed and approved purchase orders for travel and related expenses for RISD employees and school board members. In September 1998, RISD school board members Adolfo Lopez and Oscar Lopez went on an RISD business trip accompanied by their spouses. RISD paid the airfare for both board members and their spouses. Appellant reviewed and approved the purchase orders for the travel and authorized the check to be issued to the travel agency. After the trip, Adolfo Lopez and Oscar Lopez reimbursed RISD for their respective spouses' flights.

On December 9, 1998, appellant wrote to Superintendent Cano, alleging that Adolfo Lopez and Oscar Lopez had engaged in the misuse of public funds, abuse of office, and official misconduct. In the letter, appellant claimed that Adolfo Lopez and Oscar Lopez had illegally used RISD funds to pay for their respective spouses' airfare, and that such conduct violated article 3, section 52(a) of the Texas Constitution[2] and section 39.02(a) of the penal code.[3] Appellant further claimed that expenses for a second hotel room,[4] the personal use of a van rented by RISD for the business trip, and $30 in valet parking were unnecessary and unreasonable expenses and, thus, violated section 45.105 of the Texas Education Code.[5] Lastly, appellant alleged that claiming a full per diem reimbursement when receiving a complimentary meal violated section 37.10 of the penal code.[6]

### B. DIRECTED VERDICT

By his first point of error, appellant contends the trial court erred in granting appellees' motion for directed verdict. He asserts there are disputed issues of material fact on each element of his claim that cannot be resolved as a matter of law and require submission to a jury.

A court may direct a verdict when a plaintiff fails to present evidence raising a fact issue essential to the plaintiff's right of recovery. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.,* 29 S.W.3d 74, 77 (Tex.2000). A trial court

Page 667

may also direct a verdict for a defendant if the plaintiff admits or the evidence conclusively establishes a defense to the plaintiff's cause of action. *Reyna v. First Nat'l Bank,* 55 S.W.3d 58, 69 (Tex.App.-Corpus Christi 2001, no pet.).

On review, we examine the evidence in the light most favorable to the party against whom the verdict was rendered and disregard all contrary evidence and inferences. *Qantel Bus. Sys. v. Custom Controls,* 761 S.W.2d 302, 303-04 (Tex.1988). When reasonable minds may differ as to the truth of controlling facts, the issue must go to the jury. *Collora v. Navarro,* 574 S.W.2d 65, 68 (Tex.1978); *Villegas v. Griffin Indus.,* 975 S.W.2d 745, 749 (Tex.App.-Corpus Christi 1998, pet. denied). When no evidence of probative force on an ultimate fact element exists, or when the probative force of testimony is so weak that only a mere surmise or suspicion is raised as to the existence of essential facts, the trial court has a duty to instruct the verdict. *Villarreal v. Art Inst. of Houston, Inc.,* 20 S.W.3d 792, 796 (Tex.App.-Corpus Christi 2000, no pet.). The reviewing court may affirm a directed verdict even if the trial court's rationale for granting the directed verdict is erroneous, provided it can be supported on any other basis. *Id.*

### 1. *Causal Link between Report and Termination*

Appellant asserts he satisfied the elements of a whistleblower claim because he reported, in good faith, the alleged misuse of public funds, abuse of office, and official misconduct by Adolfo Lopez and Oscar Lopez to the County Attorney, District Attorney, and Texas Education Agency ("TEA").

Under the Texas Whistleblower Act, public employees are protected from retaliation for reporting, in good faith, violations of law by the employing governmental entity or another public employee to an appropriate law enforcement authority. TEX. GOV'T CODE ANN. § 554.002(a) (Vernon Supp.2004). To establish causation in a whistleblower action, a public employee must prove that without the report of a violation of law, the employer's prohibited conduct would not have occurred when it did. *Tex. Dep't of Human Servs. v. Hinds,* 904 S.W.2d 629, 636 (Tex.1995). The plaintiff is required to establish a "but for" causal nexus between the report of misconduct and the employer's actions. *Tex. Natural Res. Conservation Comm'n v. McDill,* 914 S.W.2d 718, 723 (Tex.App.-Austin 1996, no writ). A jury may not infer causation without some evidence from the plaintiff to support such a finding. *City of Fort Worth v. Zimlich,* 29 S.W.3d 62, 68 (Tex.2000). The Texas Supreme Court has noted that certain circumstantial evidence may be sufficient to establish a causal link between the adverse employment action and the reporting of illegal conduct. *Id.* at 69. Such evidence includes: (1) knowledge of the report of illegal conduct; (2) expression of a negative attitude toward the employee's report of the conduct; (3) failure to adhere to established company policies regarding employment decisions; (4) discriminatory treatment in comparison to similarly situated employees; and (5) evidence that the stated reason for the adverse employment action was false. *Id.*

The record in this case shows that in February 1999, after appellant's report concerning the actions of Adolfo Lopez and Oscar Lopez, Superintendent Cano conducted appellant's annual performance review. Despite some evidence of weak performance in a few vital areas, appellant's employment continued on the same terms.

On April 1, 1999, TEA issued its final report in an investigation of RISD that

had been initiated prior to appellant's report. TEA revealed several instances of deviations from RISD policy by the business office. For example, on one occasion, the business manager failed to obtain the superintendent's approval before he ordered payment to the district's legal counsel, in violation of local policy. In view of these problems, TEA assigned a monitor to oversee operations at RISD and recommended an audit of RISD's financial practices and procedures.

Effective May 20, 1999, Superintendent Cano reassigned appellant from the business office to a position within RISD with supervision over: (1) the energy conservation program; (2) the records management program; and (3) the workers' compensation and safety program. The letter of reassignment stated, "[n]othing in this reassignment of your duties will cause any change in your compensation, benefits, or contract status. You will continue to have the same pay rate and benefits in your new position." The letter listed the results of the TEA investigation as support for Superintendent Cano's decision. The school board upheld the reassignment.

Concurrently, in compliance with the TEA report and the TEA monitor's request, Superintendent Cano ordered a special audit of the business office. As a result of that audit, TEA uncovered appellant's violation of competitive bidding laws and appellant's own unreimbursed expense for a trip to New York City.

In August 1999, Superintendent Cano and the school board initiated the process to terminate appellant's employment. Superintendent Cano provided appellant with written notice of the reasons for termination, including failure to comply with board policies and TEA regulations, appellant's violation of competitive bidding laws, and

appellant's use of: (1) RISD property for personal business, (2) RISD computer to visit inappropriate internet sites, and (3) unauthorized telephone recording equipment. Finally, on October 25, 1999, appellant's employment was terminated as a result of Superintendent Cano's recommendation and school board vote.

Considering the evidence in the light most favorable to the party against whom the verdict was rendered, we cannot say that the trial court erred in directing a verdict in favor of appellees. Appellant's termination occurred more than ten months after his report. Thus, appellant was not entitled to a presumption that his termination was retaliatory. *See* TEX. GOV'T CODE ANN.§ 554.004(a) (Vernon Supp.2004) (allowing for rebuttable presumption of causal connection if adverse employment action occurs not later than 90 days after employee reports violation of law).

In light of the stated reasons for appellant's termination and the evidence presented in support thereof, we conclude that the evidence fails to establish a "but for" causal nexus between appellant's report and appellant's reassignment and eventual termination. Accordingly, we hold that appellant failed to present any evidence raising a fact issue essential to his right of recovery. *SeePrudential Ins. Co.,* 29 S.W.3d at 77.

### 2. *Personal Liability of the Individual Defendants*

The Act creates a private cause of action against the employing "state or local governmental entity." *See* TEX. GOV'T CODE ANN. § 554.002(a) (Vernon Supp.2004). However, the Act limits personal liability for individual defendants to a civil penalty. *See* TEX. GOV'T CODE ANN. § 554.008(e)

**Page 669**

(Vernon Supp.2004).[7] Thus, under the Act, appellant has no private right of action against any of the appellees in their individual capacities. *SeeAustin v. Healthtrust, Inc.,* 967 S.W.2d 400, 401 (Tex.1998) (declining to create private common-law cause of action). Therefore, the trial court did not err in granting a directed verdict on appellant's claims against appellees in their individual capacities.

We overrule appellant's first point of error.

### C. SANCTIONS

By his second point of error, appellant contends the evidence is legally insufficient to support the sanctions imposed against him. Appellees contend the trial court properly imposed sanctions based entirely on the testimony adduced at trial.

Imposing an available sanction is left to the sound discretion of the trial court. *Koslow's v. Mackie,* 796 S.W.2d 700, 704 (Tex.1990). Thus, we review the trial court's actions under an abuse-of-discretion standard of review. *Rudisell v. Paquette,* 89 S.W.3d 233, 236 (Tex.App.-Corpus Christi 2002, no pet.). The test for determining whether the trial court abused its discretion is whether it acted without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241-42 (Tex.1985). A trial court abuses its discretion in imposing sanctions only if it bases its order on an incorrect view of the law or an erroneous assessment of the evidence. *Randolph v. Jackson Walker, L.L.P.,* 29 S.W.3d 271, 276 (Tex.App.-Houston [14th Dist.] 2000, pet. denied).

Rule 13 authorizes a trial court to impose sanctions against an attorney, a represented party, or both, who file a groundless pleading brought in bad faith or brought for the purpose of harassment. TEX.R. CIV. P. 13. In determining whether sanctions are appropriate, the trial court must examine the facts available to the litigant and the circumstances existing when the litigant filed the pleading. *Rudisell,* 89 S.W.3d at 237.

Courts must presume that pleadings, motions, and other papers are filed in good faith, and the party moving for sanctions bears the burden of overcoming this presumption. TEX.R. CIV. P. 13; *GTE Communications Sys. Corp. v. Tanner,* 856 S.W.2d 725, 731 (Tex.1993) (orig.proceeding). Rule 13 requires that the trial court provide notice and hold an evidentiary hearing to make the necessary factual determinations about the motives and credibility of the person filing the groundless pleading. *N.Y. Underwriters Ins. Co. v. State Farm Mut. Auto. Ins. Co.,* 856 S.W.2d 194, 205 (Tex.App.-Dallas 1993, no writ); *Home Owners Funding Corp. of Am. v. Scheppler,* 815 S.W.2d 884, 888-89 (Tex.App.-Corpus Christi 1991, no writ). Without such a hearing, the trial court has no evidence before it to determine that a pleading was filed in bad faith or to harass. *New York Underwriters,* 856 S.W.2d at 205.

In the instant case, appellees filed a motion for rule 13 sanctions after the trial court granted their motion for directed verdict. After notice, the trial court held an evidentiary hearing. At the hearing, appellees argued that appellant did not file his whistleblower suit in good faith,

**Page 670**

relying on the relevant facts of appellant's conduct introduced at trial. The trial court then stated: "All right. All I've heard from so far are the lawyers. Do we have any evidence on the sanction request?" Appellees then presented evidence regarding the amount of costs and attorneys fees they had incurred in defending the suit. The

trial court found the suit to be groundless and ordered sanctions.

A movant seeking rule 13 sanctions must establish both: (1) the frivolity of the opponent's claim; and (2) the improper motives underlying the decision to file the suit, motion, or document. *Karagounis v. Prop. Co. of Am.,* 970 S.W.2d 761, 765 (Tex.App.-Amarillo 1998, pet. denied). "This in turn makes it imperative for the trial court to convene and conduct an *evidentiary* hearing." *Id.* (Emphasis in original).

While some facts adduced during the trial of this case arguably established appellant's improper motives,[8] appellees never offered or introduced any such evidence at the sanctions hearing. At the hearing, appellees presented evidence only on the amount of costs, expenses, and attorneys fees incurred in defending the suit. They did not ask the trial court to consider or take judicial notice of any evidence heard during the trial. As we have held previously, evidence must be admitted in compliance with the rules of evidence at the evidentiary hearing for a trial court to consider it in a rule 13 context. *Alejandro v. Bell,* 84 S.W.3d 383, 393 (Tex.App.-Corpus Christi 2002, no pet.); *see also McCain v. NME Hosps., Inc.,* 856 S.W.2d 751, 757 (Tex.App.-Dallas 1993, no writ) (reaffirming that motions and arguments of counsel are not evidence in a rule 13 context).

Having failed to receive into evidence the relevant facts regarding the circumstances surrounding the filing of the lawsuit, the trial court had no evidence before it to determine the motives and credibility of the person filing the allegedly groundless pleading or the relevant culpability of appellant or his attorneys. *See New York Underwriters,* 856 S.W.2d at 205. Accordingly, we hold that the trial court abused its discretion in assessing rule 13 sanctions against appellant. Appellant's second point of error is sustained.

We affirm the trial court's judgment granting appellees' motion for directed verdict. We reverse the trial court's sanctions order and render judgment that appellees' motion for sanctions be denied.

---------

Notes:

[1] In his first amended petition, appellant also alleged violations of article 1, sections 8 and 19 of the Texas Constitution. However, he does not pursue these claims on appeal. *See* TEX.R.APP. P. 38.1.

[2] Article three, section 52(a) of the Texas Constitution prohibits the Legislature from authorizing a county, city, town, or subdivision of the State to lend its credit or to grant public money or thing of value to any individual, association, or corporation. TEX. CONST. art. III, § 52(a). This section is intended to prevent the gratuitous grant of public funds for private purposes. *Edgewood Indep. Sch. Dist. v. Meno,* 917 S.W.2d 717, 740 (Tex.1995).

[3] Under section 39.02(a) of the penal code, a public servant commits an offense if, with intent to obtain a benefit or with intent to harm or defraud another, he intentionally or knowingly violates a law relating to his employment, or misuses government property, services, personnel, or any other thing of value belonging to the government that has come into his custody or possession by virtue of his employment. TEX. PEN.CODE ANN. § 39.02(a) (Vernon 2003).

[4] Appellant reasoned that because Oscar Lopez and Adolfo Lopez were traveling together, it was reasonable to expect them to have shared a room. But, because their spouses were traveling with them, the additional cost was tantamount to paying for the spouses' hotel rooms.

[5] Section 45.105 of the education code authorizes the expenditure of local school funds for the purposes listed for state and county available funds and for other purposes necessary in the conduct of the public schools determined by the board of trustees. TEX. EDUC.CODE ANN. § 45.105(c) (Vernon Supp.2004).

[6] A person commits an offense under section 37.10 of the penal code if he knowingly makes a false entry in a governmental record or presents a record with knowledge of its falsity and with intent that it be taken as a genuine governmental record. TEX. PEN.CODE ANN. § 37.10(a)(1)-(2) (Vernon 2003).

[7] The Act limits the personal liability of a supervisor or other individual who violates the Act to a civil penalty not to exceed $15,000, which is to be deposited into the state treasury after prosecution by the attorney general or appropriate prosecuting attorney. TEX. GOV'T CODE ANN. § 554.008 (Vernon Supp.2004).

[8] The evidence included, *inter alia,* testimony from appellant that he probably would have dismissed his claims against Adolfo Lopez and Oscar Lopez if they only had expressed regret to him for voting in favor of his termination. Further, in his brief to TEA on the appeal of his termination, appellant expressly stated it was not his intention to prove retaliation.

---------

141 S.W.3d 158 (Tex. 2004)

Geneva BROOKS, et al, Petitioners,

v.

NORTHGLEN ASSOCIATION, Respondent.

No. 02-0492.

Supreme Court of Texas

June 25, 2004.

Argued Sept. 3, 2003

Rehearing Denied Sept. 3, 2004.

[Copyrighted Material Omitted]

Sue Auclair, Houston, TX, pro se.

David Alfred Kahne, Law Office of David A. Kahne, Robin Rankin Willis, P.C., Houston, for Petitioner.

John Bradley Mitchell, Clayton Rowland Hearn, Marc D. Markel, Stephanie Lee Quade, Roberts Markel Guerry, P.C., Houston, for Respondent.

JEFFERSON, Justice.

This is a declaratory judgment action involving eight property owners' challenge to their homeowners association's attempt to increase and accumulate annual assessments and impose late fees. The trial court held that chapter 204 of the Texas Property Code [1] authorized the Board to raise assessments unilaterally. The court of appeals affirmed the trial court's judgment in part and reversed in part. Both parties petitioned this Court for review. We granted the petitions to review the interplay between Texas Property Code chapter 204 and Northglen Association's deed restrictions. We affirm the court of appeals' judgment in part, vacate in part, and reverse and render judgment in part.

I

Background

Northglen Association ("Northglen") is the homeowners association for six Harris County subdivisions or "sections" encompassing more than 1600 single-family residences. Each section is governed by a separate set of deed restrictions through which every property owner is a member of the Association. The restrictions subject each homeowner to an annual assessment that is deposited into a maintenance fund for such services as maintaining common areas, contracting for garbage disposal, and constructing parks.

In 1994, Northglen's Board of Directors amended the deed restrictions to expand the Board and to assess late fees on unpaid assessments. Geneva Brooks and other Northglen property owners ("Brooks") organized a committee, called the Committee to Remove the Board, to remove certain Board members who, they complained, acted outside the bounds of the deed restrictions by adopting the amendments. Northglen responded by suing for injunctive and declaratory relief. Northglen sought an order enjoining the eight homeowners from conveying the false impression that Brooks's committee was formed pursuant to Northglen's bylaws and from other conduct designed to disrupt the Board's activities. Northglen also sought a judgment declaring that its actions in electing the Board and assessing late fees were valid exercises of its authority. Brooks counterclaimed for a declaratory judgment that Northglen had no authority to raise assessments or charge late fees without a vote of the property owners. Northglen eventually nonsuited its claims, and the case proceeded on Brooks's declaratory judgment action.

The trial court granted summary judgment for Northglen, declaring that, without a vote of the homeowners, Northglen had the authority to: (1) raise the assessment for Sections One, Two, and Three; (2) raise the assessment for Sections Four, Five, and Six by ten percent each year or accumulate and assess the increase after a number of years; and (3) charge delinquent homeowners a $35 late fee. Finding that both parties had pursued legitimate interests, the trial court elected not to award attorney's fees.

The court of appeals affirmed the trial court's judgment in part and reversed in part. 76 S.W.3d 162, 176. It reversed as to Sections One, Two, and Three, holding that the deed restrictions did not permit annual assessments exceeding $120. As to Sections Four, Five, and Six, the court of appeals held that because the deed restrictions contained no language expressly forbidding accumulation, Northglen could accumulate previous assessments under Property Code section 204.010(16). Id. at 167. The court also held that section 204.010(10) gave Northglen the right to assess

a $35 late fee in addition to the interest charge permitted by the deed restrictions. *Id.* at 174. Because the property owners did not have prior notice of the late fee, the court of appeals held that Northglen could not foreclose on any homesteads to collect those fees. *Id.* at 175. The court of appeals affirmed the trial court's denial of attorney's fees. *Id.* at 176.

We hold that Northglen cannot accumulate unassessed fee increases because the language in the deed restrictions prevails over chapter 204, and we reverse that portion of the court of appeals' judgment. We affirm the portion of the court of appeals' judgment restricting increases in assessments to $120 and holding that Northglen has the authority to assess late charges for unpaid fees, in addition to the interest charges described in the deed restrictions. We conclude, however, that Northglen may not foreclose on the property if late charges are not paid. Finally, we affirm the court of appeals' judgment regarding attorney's fees.

## II

### Jurisdiction

We first consider Northglen's contention that the trial court lacked subject matter jurisdiction because Brooks did not join all Northglen property owners as parties. Northglen argues that Brooks was required to join all property owners in each affected section before the trial court could render a declaratory judgment and, alternatively,

**Page 162**

that the trial court was without jurisdiction to render a declaratory judgment interpreting the deed restrictions for Sections Three and Six because property owners from those sections were not represented in the lawsuit.

We do not have the benefit of the lower courts' views on jurisdiction because Northglen did not raise the issue either in the trial court or the court of appeals. Northglen contends that the doctrine of fundamental error excuses it from "the usual requirements of preservation of the error or briefing of the ... argument" because the absence of jurisdiction may be raised for the first time on appeal. We disagree that the absence of parties within the represented sections deprived the court of jurisdiction and therefore reject Northglen's contention as to Sections One, Two, Four and Five; however, because no property owners in Sections Three or Six were joined in the suit, we agree with Northglen that any judgment affecting those sections would be advisory.

### A

No one disputes that the trial court had jurisdiction to declare the "rights, status, and other legal relations" for the

named homeowners, who are "interested under a deed, ... written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute...." Tex. Civ. Prac. & Rem.Code §§ 37.003(a) and 37.004(a). The question, then, is not "whether jurisdiction is lacking," as Northglen asserts, but whether the trial court should have refused to enter a judgment when a subset of the homeowners was not joined in the lawsuit. *SeeCooper v. Tex. Gulf Indus., Inc.,* 513 S.W.2d 200, 204 (Tex.1974) ("[the] concern is less that of the jurisdiction of a court to proceed and is more a question of whether the court ought to proceed with those who are present"). To answer that prudential question, we turn to Rule 39, which governs joinder of persons under the Declaratory Judgment Act. Tex.R. Civ. P. 39; *Clear Lake City Water Auth. v. Clear Lake Util.,* 549 S.W.2d 385, 390 (Tex.1977) (applying Rule 39 to actions under the Declaratory Judgment Act).

Rule 39, like the Declaratory Judgment Act, mandates joinder of persons whose interests would be affected by the judgment. *See* Tex. Civ. Prac. & Rem.Code § 37.006 ("When declaratory relief is sought, *all persons who have or claim any interest that would be affected by the declaration must be made parties.*") (emphasis added); Tex.R. Civ. P. 39(a) ("A person who is subject to service of process *shall be joined as a party* in the action if ... he claims an interest relating to the subject of the action ....") (emphasis added). Rule 39 determines whether a trial court has authority to proceed without joining a person whose presence in the litigation is made mandatory by the Declaratory Judgment Act. *Clear Lake City Water Auth.,* 549 S.W.2d at 390.

Rule 39(a) (1) requires the presence of all persons who have an interest in the litigation so that any relief awarded will effectively and completely adjudicate the dispute. In this case, nothing in the rule precluded the trial court from rendering complete relief among Northglen and the eight homeowners who had sued for a declaration of rights. Although the parties continue to litigate its correctness, the trial court's judgment represents a final and complete adjudication of the dispute for the parties who were before the court. *SeeCaldwell v. Callender Lake Prop. Owners Improvement Ass'n,* 888 S.W.2d 903, 907 (Tex.App.-Texarkana 1994, writ denied). Rule 39(a) (2) relates to situations in which the absent party:

**Page 163**

[C]laims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of

his claimed interest.

Tex.R. Civ. P. 39.

Section 37.006(a) of the Declaratory Judgment Act, which provides that a trial court's declaration does not prejudice the rights of any person not a party to the proceeding, dispenses with the first of these concerns. *See* Tex. Civ. Prac. & Rem.Code § 37.006(a). Any non-joined homeowner would be entitled to pursue individual claims contesting Northglen's authority to raise assessments or impose fees, notwithstanding the trial court's judgment in the current case. [2] *SeeCooper,* 513 S.W.2d at 204 ("[I]t would be rare indeed if there were a person whose presence was so indispensable in the sense that his absence deprives a court of jurisdiction ...").

We appreciate the risk that, unless each homeowner is joined in one suit, Northglen may be subject to inconsistent judgments. Tex.R. Civ. P. 39(a) (2) (ii). Northglen's dilemma, however, is the product of its own inaction. Northglen could have sought relief at trial by urging the court, among other things, to abate the case, join absent homeowners, or grant special exceptions. *See, e.g.,Pirtle v. Gregory,* 629 S.W.2d 919, 920 (Tex.1982); *Dahl v. Hartman,* 14 S.W.3d 434, 436 (Tex.App.-Houston [14th Dist.] 2000, pet. denied); *Adams v. Owens,* 519 S.W.2d 260, 261 (Tex.Civ.App.-Beaumont 1975, writ ref'd n.r.e.); *Pan Am. Petroleum Corp. v. Vines,* 459 S.W.2d 911, 912 (Tex.Civ.App.1970, writ ref'd n.r.e.); *Texaco, Inc. v. Lettermann,* 343 S.W.2d 726, 733 (Tex.Civ.App.-Amarillo, 1961, writ ref'd n.r.e.). Instead, it waited until the case reached this Court to first raise the specter of multiple or inconsistent judgments.

Northglen counters that the doctrine of fundamental error excuses its failure to preserve error. However, when Rule 39 was amended, a young law professor remarked:

Henceforth, it will be rare indeed when an appellate court properly determines that the trial court lacked jurisdiction to adjudicate a dispute when the nonjoining person's absence is raised for the first time on appeal by one of the parties in the trial court, at least insofar as the judgment affects parties who participated in the trial, directly or indirectly, or who purposely bypassed the proceedings. The doctrine of fundamental error should no longer protect persons from the binding force of judgments when they have had an opportunity to raise the absence of the nonjoined person and waived it.

*William V. Dorsaneo, III, Compulsory Joinder of Parties in Texas,* 14 Hous. L.Rev. 345, 369 (1977). We conclude that Northglen "had an opportunity to raise the absence of the nonjoined person and waived it." *Id.;* Tex.R.App. P. 33.1.

**B**

Sections Three and Six present a different question -- does a trial court have jurisdiction to declare the rights of parties who are not before the court? A declaratory judgment requires a justiciable

**Page 164**

controversy as to the rights and status of parties actually before the court for adjudication, and the declaration sought must actually resolve the controversy. *See, e.g.,The M.D. Anderson Cancer Ctr. v. Novak,* 52 S.W.3d 704, 708 (Tex.2001); *Texas Workers' Comp. Comm'n v. Garcia,* 893 S.W.2d 504, 517-18 (Tex.1995). A judicial decision reached without a case or controversy is an advisory opinion, which is barred by the separation of powers provision of the Texas Constitution. Tex. Const. art. II, § 1; *seeSouthwestern Elec. Power Co. v. Grant,* 73 S.W.3d 211 (Tex.2002); *Texas Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 444 (Tex.1993). We must decide, then, whether there is a case or controversy with respect to these sections.

Because there are no "plaintiffs" from Sections Three and Six, there is no person in those sections for whom rights could be declared in this declaratory judgment action. As a consequence, the trial court was without jurisdiction to issue a judgment with respect to those sections, and any opinion interpreting those sections would be purely advisory. Accordingly, we vacate those portions of the lower courts' judgments relating to Sections Three and Six and dismiss those claims for want of jurisdiction.

Having resolved Northglen's appellate pleas to the jurisdiction, we reach the merits for Sections One, Two, Four and Five.

**III**

**Sections One and Two**

We first decide whether the deed restrictions for Sections One and Two, which are identical, allow Northglen to assess additional maintenance fees above the restrictive covenant's express limitation. The restrictions provide:

Each Lot in said Subdivision, when said Lot is certified by the Subdivision Engineer to be a completed building site, is hereby subjected to an annual maintenance charge and assessment not to exceed $10 per month or $120 per annum, for the purpose of creating a fund to be designated and and [sic] known as the "maintenance fund", [sic] which maintenance charge and assessment will be paid by the Owner or Owners of each Lot within said Subdivision, and any annexed areas, to Northglen Association in advance

annually, commencing as to all Lots on the first day of the month following their certification of completion. The rate at which each Lot will be assessed will be determined annually by the Board of Directors of Northglen Association at least thirty (30) days in advance of each annual assessment. Said rate and when same is payable may be adjusted from year to year by said Board of Directors as the needs of the Subdivision may in the judgment of the Directors require.

The restrictions also outline requirements for amendment. Article VIII provides that "... the covenants and restrictions of this Declaration may be amended during the first forty (40) year period by an instrument signed by not less than ninety percent (90%) of the Lot Owners, and thereafter by an instrument signed by not less than seventy-five percent (75%) of the Lot Owners." Therefore, a small number of homeowners may exert enormous influence on the extent to which amendments will be adopted. [3]

**Page 165**

Although there are practical hurdles to persuading seventy-five or ninety percent of homeowners to modify the restrictions or agree to an additional assessment, it is clear that the restrictions provide a mechanism by which Northglen can assess an annual fee greater than $120. The court of appeals agreed, holding that because the deed restriction provided that the annual assessments were "not to exceed" $10 per month or $120 per annum, Northglen did not have the authority to exceed the stated limits without first obtaining the homeowners' consent in accordance with the restrictions. 76 S.W.3d at 174.

Northglen disputes this holding, arguing that the deed restrictions should be read in three steps. First, the restrictions create a maintenance fund, for which the assessment shall not exceed $10 per month or $120 per annum. Second, when the maintenance fund is created, the Board of Directors has discretion to determine the rate at which each lot will be assessed above the $120. Third, the assessment rate and date payable may be adjusted from year to year, as the needs of the subdivision require.

In support of its argument, Northglen cites *Samms v. Autumn Run Cmty. Improvement Ass'n.* 23 S.W.3d 398 (Tex.App.-Houston [1st Dist.] 2000, pet. denied). The *Samms* court held that a deed restriction with language similar to Section One and Two granted the homeowners association the authority, from year to year, to determine the rate at which property owners would be assessed. *Id.* at 402. The court held that the homeowners association had authority to raise the assessment without limitation because a phrase in the deed restriction said "the rate at which each Lot will be assessed ... will be determined annually by the Board of Directors...." *Id.* But the court did not discuss

another provision of that deed restriction which stated explicitly that the assessment was "not to exceed" a particular amount.

The Northglen deed restrictions subject each property owner to "an annual maintenance charge *and assessment* not to exceed $10 per month or $120 per annum, for the purpose of creating ... the 'maintenance fund'...." (Emphasis added.) The restrictions further provide that "[t]he rate at which each Lot will be assessed will be determined annually" by Northglen, and that "[s]aid rate and when same is payable may be adjusted from year to year by [Northglen] as the needs of the Subdivision may in the judgment of [Northglen] require."

Northglen's argument does not survive the restrictions' plain language. First, the annual assessment is *not to exceed* $10 per month or $120 per year. The restrictions do not *require* that Northglen charge the maximum amount. Rather, Northglen may charge any amount so long as the amount does not exceed $120 per year. So, if Northglen had been assessing $50 per year and decided the next year that $120 was necessary, it has the authority to raise the rates unilaterally. Second, the deed restrictions neither contemplate nor permit an additional assessment once the maintenance fund is whole because the language says plainly that the assessment is not to exceed $10 per month or $120 per year. There is no language permitting an additional assessment beyond that which is included in the maintenance fund, aside from the special assessment for capital improvements.

**Page 166**

We hold that the court of appeals correctly concluded that Northglen cannot increase assessments beyond the $120 limitation set forth in the deed restrictions, and we affirm that part of the court of appeals' judgment.

**IV**

**Sections Four and Five**

Northglen argues -- and the court of appeals held -- that the deed restrictions permit accumulation of unassessed increases in maintenance fees for Sections Four and Five. 76 S.W.3d at 167. Northglen contends, specifically, that Property Code section 204.010 allows it to accumulate and assess a $430 single-year increase -- raising the assessment from $120 to $550. That section provides:

§ 204.010. Powers of Property Owners' Association

(a) Unless otherwise provided by the restrictions or the association's articles of incorporation or bylaws, the property owners' association, acting through its board of

directors or trustees, may:

(16) if the restrictions allow for an annual increase in the maximum regular assessment without a vote of the membership, assess the increase annually or accumulate and assess the increase after a number of years.

Tex. Prop.Code § 204.010.

The property owners counter that the trial court properly interpreted Sections Four and Five as to allowable increases. They argue that by limiting the annual assessment increase to ten percent, the deed restrictions "otherwise provide" that accumulation is not permitted. We examine the competing contentions first by analyzing the deed restrictions and then by determining the extent to which they are affected by the Property Code.

**A**

Determining whether the statute applies requires an understanding of the deed restrictions. The deed restrictions for Section Four provide:

Until January 1 of the year immediately following the conveyance of the first Lot to an Owner, the maximum annual assessment shall not exceed Ten ($10.00) Dollars per month, or One Hundred Twenty ($120.00) Dollars per annum, per lot; provided, however, that from and after January 1 immediately following the conveyance of the first Lot to an Owner, the Board of Directors of the Association shall be empowered to increase said rate as the needs of the Association require; except that **if any such increase shall cause the annual assessment to be greater than the aforesaid $120.00 plus the rise, if any, of the Consumer Price Index as published by the United States Department of Labor for the preceding month of July; or more than One Hundred Ten (110%) percent of the amount assessed in the preceding calendar year, whichever is greater, then shall such an increase require the vote of two-thirds (2/3) of each class** of Members of the Association who are voting in person or by proxy, at a meeting duly called for that purpose.

(Emphasis added.)

Section Four thus permits an increase of ten percent more than the previous year's assessment, and a greater increase if the Consumer Price Index is higher. The restriction requires a vote of the homeowners to raise the assessment beyond those amounts.

The restrictions for Section Five are similar to Section Four:

**Page 167**

Until January 1 of the year immediately following the date of commencement of the first annual assessment as determined by the Board of Directors, the maximum annual assessment shall be $120.00 per Lot. From and after the first day of January of the year immediately following the date of commencement of the first annual assessment, the maximum annual assessment may be increased by the Board of Directors of the Association, effective the first day of January of each year, in conformance with the rise, if any, in the *Consumer Price Index for Urban Wage Earners and Clerical Workers* published by the Department of Labor, Washington, D.C., or any successor publication, for the preceding month of July or alternatively, **by an amount equal to a ten percent (10%) increase over the prior years [sic] annual assessment,** whichever is greater, without a vote of the Members of the Association. The maximum annual assessment may be increased above that established by the Consumer Price Index formula or the above-mentioned percentage increase only by approval of two-thirds (2/3rds) of each class of Members in the Association present and voting at a meeting duly called for this purpose. In lieu of notice and a meeting of Members as provided by the By-Laws of the Association, a door to door canvass may be used to secure the written approval of two-thirds (2/3rds) of each class of Members for such increase in the annual assessment or in the special assessment for capital improvements as provided.... After consideration of current maintenance costs and future needs of the Association, the Board of Directors may fix the annual assessment at an amount not in excess of the maximum amount approved by the Members.

(Emphasis added.)

Both Sections Four and Five maintain an initial $120 per annum limit on assessments, followed by discretionary increases of up to ten percent or the rise in the Consumer Price Index, whichever is greater. Those increases are tied to the previous year's assessment.

**B**

We now consider how the Texas Property Code applies to the preceding deed restrictions. One of the stated purposes in chapter 204 is to provide a mechanism "to readily facilitate increases in the amount of the regular or special assessments to allow the property owners' associations to better provide services to the subdivisions." Tex. Prop.Code § 204.001 historical note, [Act of May 27, 1995, 74th Leg., R.S., ch. 1040, § 1, 1995 Tex. Gen. Laws 5170, 5171]. The Legislature observed that severe restrictions on the ability to adjust regular assessments "may result in the inability of an ineffective property owners' association to maintain common area facilities, including swimming pools, tennis courts, clubhouses, greenbelt areas, or jogging trails, or to provide services,

including streetlights, security, architectural control, and deed restriction enforcement." *Id.* Read in isolation, the legislature's preamble to section 204 offers some support for Northglen's argument that it has the authority to accumulate previously unassessed fee increases beyond the maximum stated in the restrictions to maintain common facilities or to provide services. The Legislature, however, inserted a caveat that governs here: the statutory provision permitting accumulation does not apply if the deed restrictions "otherwise provide." Tex. Prop.Code § 204.010.

In this case, the Northglen deed restrictions for Sections Four and Five "otherwise provide" that accumulation is not permitted. Section Four limits the ten

**Page 168**

percent increase to "the amount assessed in the *preceding* calendar year." (Emphasis added.) Section Five also limits the "increase over the *prior years* [sic] annual assessment." (Emphasis added.) The natural consequence of each restriction's language is that if the annual assessment for this year is $120, then next year's assessment may not be raised to the $550 that Northglen seeks. Rather, next year's assessment may be no more than $132. By specifically tying any increase to the previous year's annual assessment, the deed restrictions do not permit accumulation over multiple years.

Additionally, in Section Four, Northglen may increase fees beyond the limits by receiving a "vote of two-thirds (2/3) of each class of Members of the Association who are voting in person or by proxy, at a meeting duly called for that purpose." In Section Five the Board must receive "approval of two-thirds (2/3rds) of each class of Members in the Association present and voting at a meeting duly called for this purpose." Although a two-thirds vote may be difficult to achieve, the deed restrictions offer Northglen a procedure for increasing fee assessments beyond the ten-percent limit other than accumulation. The voting mechanism, combined with the increase being tied to the previous year's assessment, establishes that the deed restrictions "otherwise provide."

Because we conclude that the statute does not permit accumulation or fee increases above the deed restrictions, we need not address Brooks's contention that the statute's accumulation provisions are unconstitutional.

**V**

**Late Fees**

We next consider whether section 204.010(a) (10) authorized Northglen to impose a $35 late charge, in addition to the interest charge included in the deed restrictions, for failure to pay the annual assessments, and if

so, whether such a construction violates the Contract Clause of the U.S. or Texas Constitution. The trial court held that Northglen could charge a late fee under section 204.010(a) (10), and the court of appeals affirmed. Both courts noted that the deed restrictions did not expressly prohibit late fees nor limit penalties to the interest charge. We hold that Northglen may charge a $35 late fee and that such a charge is constitutional.

**A**

The homeowners argue that permitting Northglen to unilaterally assess late charges would defeat the purpose of the deed restrictions, which already impose a six percent interest charge for nonpayment. Additionally, the homeowners argue that by expressly including the interest charge in the restrictions, the homeowners necessarily rejected late charges, under the doctrine of *expressio unius est exclusio alterius* (to include one thing implies the exclusion of the other). Black's Law Dictionary 602 (7th ed.1999).

The court of appeals disagreed with the homeowners' argument and held that Northglen could assess late charges. The court considered the language of section 204.010(a) (10), which provides, in pertinent part:

(a) Unless otherwise provided by the restrictions or the association's articles of incorporation or bylaws, the property owners' association, acting through its board of directors or trustees, may:

(10) impose interest, late charges, and, if applicable, returned check charges for

**Page 169**

late payments of regular assessments or special assessments.

Tex. Prop.Code § 204.010(a) (10). The court held that this statutory language granted Northglen authority to assess the late charge in the absence of specific language to the contrary. Because the deed restrictions do not mention late charges specifically, the court held that silence could not mean "otherwise provide." 76 S.W.3d at 174.

We agree that nothing in the Northglen deed restrictions could be considered "otherwise providing." Each deed restriction contains the same provision for failing to pay assessments:

*Effect of Non-payment of Assessments: Remedies of the Association.* Any assessment not paid within thirty (30) days after the due date shall bear interest from the due date at the rate of six percent (6%) per annum. The Association may bring an action at law against the Owner personally

obligated to pay the same, or foreclose the lien against the property. No Owner may waive or otherwise escape liability for the assessments provided for herein by non-use of any Common Area or abandonment of his Lot.

Contrary to Brooks's argument, the deed restrictions do not say the penalties are the exclusive remedies for late payments, nor do they say that late charges are not permitted. The deed restrictions only set the rate at which Northglen may charge interest on unpaid assessments.

When construing a statute, the Court must presume that every word of the legislation has meaning. *Riverside Nat'l Bank v. Lewis,* 603 S.W.2d 169, 173 (Tex.1980). The statute unequivocally says the Board may impose both interest charges and late charges. That the deed restriction mentions interest charges but not late charges is not sufficient to "otherwise provide."

**B**

Brooks argues that the assessment of a late fee would violate the U.S. [4] and Texas [5] Constitutions' impairment-of-contracts provisions because the deed restrictions do not provide for late fees. The court of appeals examined the constitutionality of the statute and held that Section 204.010 "is not directed to any specific kind of contracts, and it does not directly contradict any contractual provision...." 76 S.W.3d at 168. The court further noted that the statute is a permissible exercise of the State's police power because "it was enacted to promote the public welfare with regard to the property owners associations' ability to better provide services to the homeowners, maintain the common area facilities, and provide for the common security and restriction enforcement." *Id.* at 168-69. We agree and hold that the same rationale applies to the late fees imposed pursuant to chapter 204.

A statute is presumptively constitutional. *Barshop v. Medina Cty. Underground Water Conservation Dist.,* 925 S.W.2d 618, 625 (Tex.1996). As such, we are obligated to avoid constitutional problems if possible. *Id.* In this case, we must consider two factors: first, whether the

**Page 170**

statute substantially impairs the contract; and second, if so, whether the Legislature acted within its police powers in enacting the legislation. *SeeAllied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 244-45, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978).

Section 204.010 does not substantially impair Northglen's deed restrictions. The statute operates only where the deed restrictions do not "otherwise provide." Tex. Prop.Code § 204.010. It does not serve to withdraw or

remove any contractual obligation. If the statute required the assessment of late fees where late fees were expressly prohibited by the deed restrictions, this would likely be a different case. *SeeTravelers' Ins. Co. v. Marshall,* 124 Tex. 45, 76 S.W.2d 1007 (1934) (discussing statutes that declare a complete moratorium on particular contracts). We are not faced with that circumstance here. Thus, applying the statute to authorize a late fee is not unconstitutional.

**VI**

**Foreclosure**

Because we hold that Northglen may charge late fees for unpaid fee assessments, we must address whether it has the authority to foreclose on the homestead if a property owner fails to pay the late fee. This Court has clarified that Texas' homestead laws authorize a homeowners association to foreclose on homesteads for the nonpayment of fee assessments. *Inwood Homeowners' Ass'n v. Harris,* 736 S.W.2d 632, 635-36 (Tex.1987). In *Inwood,* we considered whether the homestead laws of Texas protect a homeowner against foreclosure for failure to pay homeowners association assessments. *Id.* at 633. As a general rule, a homestead is protected against the debts of those who live in the homestead. *Id.* at 634. However, the deed restrictions for the subdivision included a vendor's lien permitting foreclosure on the homestead for failure to pay the fee assessment. *Id.* at 633. Because the property owner had notice when purchasing the property that a lien attached to the land, we held that foreclosure was permissible. *Id.* at 635-36.

The court of appeals, in our case, focused on the notice requirement and held that foreclosure was not a potential remedy against unpaid late charges. 76 S.W.3d at 175. The court noted that the lien to enforce the late charges attached to the property after the homestead was acquired because late charges were not included in the deed restriction. *Id.*

The court cited as authority an Attorney General opinion that said costs imposed upon property owners because of Chapter 204, which were not part of the deed restriction, could not be enforced through foreclosure. *Id.* (citing Tex. Att'y Gen. Op. LO-97-019 (1997)). The Attorney General concluded that, in determining whether foreclosure is a remedy, the issue is "whether the lien for those costs (i) attached to the property prior to the homestead right and (ii) is the result of a restriction that runs with the land." Tex. Att'y Gen. Op. LO-97-019. The court of appeals considered the two elements and held that because late charges were not part of the deed restrictions but rather a function of the statute, Northglen could not foreclose for failure to pay late charges. 76 S.W.3d at 175-76.

Northglen argues that a developer has the authority to create liens to ensure the payment of fee assessments, and under *Inwood,* an appropriate remedy for failure to pay assessments is foreclosure. Northglen also contends that because property

### Page 171

owners were aware that delinquent assessments would be subject to late charges, in the form of an interest charge, the property owners had actual notice sufficient to satisfy *Inwood.* Thus, because the property owners had actual notice, Northglen asserts, the late charge should also run with the land as the interest charge does.

We disagree with Northglen and agree with the court of appeals. Northglen's argument essentially amends the deed restrictions to include both late fees and interest charges. But the restrictions did not provide any notice that a late fee would be imposed in addition to the interest charge. As a result, the property owners did not have notice of the late charge. Therefore, in light of *Inwood* 's notice requirement, foreclosure is not an appropriate remedy for a failure to pay the late charge. [6]

### VII

#### Non-profit Corporation Act

Northglen challenges that portion of the trial court's judgment providing that "the bylaws may only be amended by the members...." Northglen argues that, even absent Property Code chapter 204, it had the authority to increase assessments because it may amend the deed restrictions unilaterally under the Texas Non-Profit Corporation Act. Tex.Rev.Civ. Stat. art. 1396-1.01 *et seq.* That statute provides, among other things, that a board of directors has the authority to amend bylaws unless the articles of incorporation reserve the power exclusively to the members. We cannot reach this issue. Northglen did not file a notice of appeal from the trial court's judgment, did not notice a cross-appeal, and did not petition this court for review on the point. Accordingly, Northglen did not preserve this issue for our review. Tex.R.App. P. 25.1(c) ("[A] party who seeks to alter the trial court's judgment or other appealable order must file a notice of appeal.... The appellate court may not grant a party who does not file a notice of appeal more favorable relief than did the trial court except for just cause."), 53.1 ("A party who seeks to alter the court of appeals' judgment must file a petition for review."); *see alsoDean v. Lafayette Place (Section One) Council of Co-Owners, Inc.,* 999 S.W.2d 814, 818 (Tex.App.-Houston [1st Dist.] 1999, no pet.).

### VIII

#### Attorney's Fees

The final issue is whether the property owners should be awarded attorney's fees. The trial court declined to award attorney fees, finding that "the parties each had legitimate interests to pursue." The court of appeals affirmed, holding that "[i]n the judgment we render, neither side would be considered a prevailing party." 76 S.W.3d at 176. The Declaratory Judgment act permits a court to "award costs and reasonable and necessary attorney's fees as are equitable and just." Tex. Civ. Prac. & Rem.Code §§ 37.009. Although we reverse

### Page 172

part of the court of appeals' judgment, the basis for the trial court's decision for denying fees -- that each side pursued legitimate interests -- has not changed. Accordingly, we will not disturb the trial court's discretionary decision in that regard. We affirm the court of appeals' judgment on attorney's fees.

### IX

#### Conclusion

We (1) affirm the court of appeals' judgment as to the increased assessments in Sections One and Two, the assessment of late fees, and foreclosure; (2) reverse the court of appeals' judgment and render judgment as to accumulation of fee increases under Sections Four and Five; (3) vacate the trial court's and the court of appeals' judgments as to Sections Three and Six and dismiss for want of jurisdiction Brooks's claim as to those sections; and (4) affirm the court of appeals' judgment regarding attorney's fees. Tex.R.App. P. 60.2(a), (c), (e).

---------

Notes:

[1] Chapter 204 applies to residential real estate subdivisions in a county with a population of 2.8 million or more. Tex. Prop.Code § 204.002. According to the 2000 U.S. Census, of the 254 counties in Texas, only Harris County comes within the chapter's purview. 2000 United States Census, available at http://quickfacts.census.gov/qfd/states/48/48201.html.

[2] Despite the notoriety this dispute engendered in the neighborhood, the record does not disclose that any other homeowners filed suit or were otherwise disposed to contest Northglen's actions.

[3] A similar, though less onerous, supermajority is required to charge a special assessment in a given year. The

restrictions provide that Northglen may:

[l]evy, in any assessment year, a special assessment applicable to that year only for the purpose of defraying, in whole or in part, the cost of any acquisition, construction, reconstruction, repair or replacement of a capital improvement ... *provided that* any such assessment shall have the assent of two-thirds (2/3rds) of the votes of each class of members....

(Emphasis in original.)

[4] "No State shall ... pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts...." U.S. Const. art. I, § 10.

[5] "No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts shall be made." Tex. Const. art. I, § 16.

[6] We express no opinion on the court of appeals' holding that "any new type of assessment ... or attorney's fee that is imposed solely through the authority of Chapter 204 of the Texas Property Code cannot be enforced by foreclosure against a homestead." 76 S.W.3d at 175. Inasmuch as we have reversed the court of appeals' judgment regarding accumulation, we need not decide whether foreclosure would be an appropriate remedy for accumulated assessments. Similarly, attorney's fees imposed through Chapter 204 are not at issue in this case.

---------

184 S.W.3d 386 (Tex.App.—Austin 2006)

MID-SOUTH TELECOMMUNICATIONS COMPANY, Appellant,

v.

Norman K. BEST and Philip W. Faris, Jr., Appellees.

No. 03-04-00586-CV.

Court of Appeals of Texas, Third District, Austin.

January 27, 2006

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT NO. GN401565, HONORABLE ROSE SPECTOR, JUDGE PRESIDING

W. Michael Stephens, Thomas W. Stephens, Houston, for appellant.

James G. Ruiz, Winstead Sechrest & Minick, PC, Austin, for appellees.

Before Justices B.A. SMITH, PURYEAR and PEMBERTON.

### OPINION

BOB PEMBERTON, Justice.

This case presents the issue of when a creditor's claim against a guarantor of a debt accrues. Norman K. Best and Philip W. Faris, Jr. were among the guarantors of a loan from Mid-South Telecommunications Company to VidiMedix Corporation. After VidiMedix defaulted on the loan when it came due on December 31, 1999, Mid-South demanded payment from the guarantors. Eventually, in May 2004, Mid-South sued Best and Faris, asserting a breach-of-contract claim for failure to perform under the Guaranty. Mid-South sought summary judgment on that claim. Best and Faris filed both a response and a cross-motion for summary judgment raising the four-year statute of limitations. See Tex. Civ. Prac. & Rem. Code Ann. § 16.004(a)(3) (West 2002). The district court denied Mid-South's motion and granted that of Best and Faris, finding that Mid-South's claims were barred. For the reasons stated below, we will affirm.

### BACKGROUND

The summary judgment record reflects the following. On January 27, 1999, VidiMedix

executed a "Convertible Promissory Note" (the "Note") in favor of Mid-South for $250,000. The Note was made payable on or before December 31, 1999. Paragraph 3 of the Note, titled "Default," provided that VidiMedix "will be deemed in default under this Note if [it] fails to meet its payment obligations hereunder." On the same date, in consideration for the loan and Note, four guarantors, including Faris and Best, [1] executed a guaranty under which

each of the undersigned guarantors. .. hereby severally, unconditionally and irrevocably guarantees the prompt and complete payment of all amounts [VidiMedix] owes to [Mid-South] under the Note, in strict accordance with its terms.

Each guarantor agreed to be liable for a specified pro-rata share of the unpaid debt and accrued interest. Best and Faris's shares were 8.1% and 2.36%, respectively. Further, each guarantor explicitly waived any right to require Mid-South to proceed first against VidiMedix, to exhaust any security held by VidiMedix, or to exercise any other remedy Mid-South might possess before seeking recovery from them.

Paragraph 6 of the Guarantee provided:

One or more of the following shall constitute an Event of Default under the Guaranty[:] if Guarantor purports to revoke or otherwise avoid any obligation under this Guaranty; or if a Guarantor dies, becomes insolvent, commences or has commenced against him an action under the United States Bankruptcy Code, becomes subject to any criminal prosecution, suffers a judgment or judgments for the payment of money individually or in the aggregate in excess of $100,000, or suffers any portion of his assets to be attached, seized or levied upon; or any circumstances arising causing [Mid-South] in good faith, to become insecure as to the satisfaction of any of Guarantors' obligations under this Guaranty.

It is undisputed that VidiMedix defaulted on the Note when it became due on December 31, 1999. On April 26, 2000, Michael Stephens, attorney for Mid-South, sent a letter to VidiMedix (through Faris, its President and CEO) demanding payment of all principal and accrued interest due on the Note. On the same day, Stephens also sent letters to both Faris and Best demanding payment of their respective pro-rata percentages of principal and accrued

interest for which they were each liable under the Guaranty.[2] Subsequently, on June 15, 2000, Michael L. Patrick, Mid-South's Executive Vice-President, wrote Faris, as VidiMedix's president and CEO, "relative to our concerns in how you, on behalf of VidiMedix, have handled our Note." Patrick stated that Mid-South had granted a three-month extension of the note's due date to March 2000, that VidiMedix had still not performed, that Faris had subsequently indicated that VidiMedix was experiencing financial difficulties and would likely file for bankruptcy, and that Faris had advised that the guarantors could not honor the Guaranty. Patrick added that Faris had been furtive and misleading in his communications with Mid-South. Patrick suggested that if the guarantors would restructure the Guaranty, "likely Mid-South will consent to converting the Note into eMedSoft.com shares on the same basis as other Bridge Noteholders."

**Page 389**

The record reflects further negotiations between Mid-South and the guarantors over the ensuing four years. It is undisputed, however, that neither Faris nor Best ever performed their obligations under the Guaranty. Mid-South ultimately filed suit against Faris and Best on May 17, 2004, for breach of contract based on their failure to perform under the Guaranty. Faris and Best answered with a general denial and the affirmative defense that the four-year statute of limitations barred Mid-South's claims. See Tex. Civ. Prac. & Rem. Code Ann. § 16.004(a)(3) (suit on debt must be filed not later than four years after cause of action accrues).

Mid-South moved for summary judgment as to both liability and damages on its claims against Faris and Best. Faris and Best filed a cross-motion for summary judgment and a response to Mid-South's motion, relying on their limitations defense and their affidavits that neither ever made payments in accordance with the Guaranty. Best and Faris contended that, as a matter of law, Mid-South's breach-of-contract claims against them accrued on December 31, 1999, the date that VidiMedix defaulted on the Note. Mid-South countered that, under the terms of the Guaranty, its claims accrued only upon an "Event of Default" defined in paragraph 6 of the agreement and that Best and Faris failed to conclusively establish that such an event occurred earlier than four years before Mid-South filed suit. According to Mid-South, the earliest evidence in the summary judgment record of an Event of Default was its June 15, 2000 letter to Faris, which it characterized as a memorialization of "circumstances arising causing [Mid-South] in good faith, to become insecure as to the satisfaction of any of Guarantors' obligations under this Guaranty."[3]

The district court granted Best and Faris's

cross-motion for summary judgment, finding that Mid-South's claims were barred, denied Mid-South's motion, and rendered a take-nothing judgment in favor of Best and Faris. This appeal followed.

## DISCUSSION

Mid-South presents a single issue on appeal: whether the district court erred in determining that Mid-South's breach-of-contract claim accrued more than four years before it filed suit so as to be barred by limitations. See Tex. Civ. Prac. & Rem. Code Ann. § 16.004(a)(3).

### Standard of review

We review the district court's summary judgment de novo. Valence Operating Co. v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005); Provident Life & Accident Ins. Co. v. Knott, 128 S.W.3d 211, 215 (Tex. 2003). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. Valence Operating Co., 164 S.W.3d at 661; Knott, 128 S.W.3d at 215; Science Spectrum, Inc. v. Martinez, 941 S.W.2d 910, 911 (Tex. 1997). Summary judgment is proper when there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); Shell Oil Co. v. Khan, 138 S.W.3d 288, 291 (Tex. 2004) (citing Knott, 128 S.W.3d at 215-16). When, as here, both parties move for summary judgment and the district court grants one motion and denies the other, we review the summary-judgment evidence presented by both sides, determine all questions presented,

**Page 390**

and render the judgment the district court should have rendered. Texas Workers' Comp. Comm'n v. Patient Advocates of Tex., 136 S.W.3d 643, 648 (Tex. 2004); FM Props. Operating Co. v. City of Austin, 22 S.W.3d 868, 872 (Tex. 2000).

### Best and Faris' summary judgment motion

We will consider first whether the district court erred in granting summary judgment for Best and Faris. Best and Faris sought summary judgment on the ground that "[t]he statute of limitations bars Mid-South's claims."[4] There is no dispute that this case is governed by the four-year statute of limitations for suits on debts, see Tex. Civ. Prac. & Rem. Code Ann. §16.004(a)(3), or that this provision required Mid-South to bring its breach-of-contract action no later than four years after the day its cause of action accrued. The parties' dispute centers on the date on which Mid-South's cause of action accrued. When a cause of action accrues is a question of law. Moreno v. Sterling Drug, 787 S.W.2d 348, 351 (Tex. 1990). A cause of action generally accrues at the

Best and Faris argue that Mid-South's breach-of-contract claim accrued on December 31, 1999, when the Note matured and VidiMedix defaulted on its repayment obligation. Best and Faris do not purport to adopt the date at which Mid-South's claim under the Note against VidiMedix accrued, nor are they attempting to incorporate any limitations defense that VidiMedix might have asserted against such a claim. See, e.g., Beddall v. Reader's Wholesale Distribs., Inc., 408 S.W.2d 237, 240 (Tex. Civ. App.--Austin 1966, no writ) (where guarantor can be sued independently from principal obligor, guarantor cannot invoke principal obligor's limitation's defense); see also Willis v. Chowning, 90 Tex. 617, 40 S.W. 395, 396-97 (1897) (in cases where surety could be sued without joining principal, surety could not assert maker's limitations defense on note); Western Casket Co. v. Estrada, 116 S.W. 113, 113-14 (Tex. Civ. App.--El Paso 1909, no writ) (applying principles announced in Willis to guarantors). Instead, to determine when Mid-South's claim against them accrued, Best and Faris recognize that we must look to the source of their obligations to Mid-South--the terms of the guarantee. See Vastine v. Bank of Dallas, 808 S.W.2d 463, 464 (Tex. 1991); Wiman v. Tomaszewicz, 877 S.W.2d 1, 6 (Tex. App.--Dallas 1994, no writ).

We construe a guaranty as any other contract. The construction of a contract is a question of law for the court. Buys v. Buys, 924 S.W.2d 369, 372 (Tex. 1996). We examine the entire document and consider each part with every other part so that the effect and meaning of one part on any other part may be determined. Heritage Res. v. NationsBank, 939 S.W.2d 118, 121 (Tex. 1996); Steeger v. Beard Drilling, Inc., 371 S.W.2d 684, 688 (Tex. 1963). We interpret the contract by ascertaining the true objective intentions of the parties, based on the contract language. SAS Inst, Inc. v. Breitenfeld, 167 S.W.3d 840, 841 (Tex. 2005). We presume that the parties to a contract intend every clause to have some effect. Heritage Res., 939 S.W.2d at 121; Ogden v. Dickinson State Bank, 662 S.W.2d 330, 331 (Tex. 1983). We

**Page 391**

give words their plain, common, or generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense. Heritage Res., 939 S.W.2d at 121.

Under the Guaranty, Best and Faris "unconditionally and irrevocably" guaranteed "the prompt and complete payment" of VidiMedix's obligations under the Note "in strict accordance with its terms." This type of language

tends to denote an absolute guaranty, or one made contingent solely upon the default of the principal obligor. See Universal Metals & Mach., Inc. v. Bohart, 539 S.W.2d 874, 877-78 (Tex. 1976). Under an absolute guaranty, a guarantor is primarily liable on the underlying obligation; thus, "[t]he terms of the note must be examined to ascertain the guarantor's obligations under his unconditional guarantee, for by that guaranty he agrees to pay the instrument according to its terms if it is not paid when due." Hopkins v. First Nat'l Bank at Brownsville, 551 S.W.2d 343, 345 (Tex. 1977); see Reece v. First State Bank of Denton, 566 S.W.2d 296, 297 (Tex. 1978).

Each guarantor also explicitly waived "all presentments, demands for performance, notices of performance, protest, notices of protest, notices of dishonor, and notices of acceptance of the Guaranty and its existence, creation, or incurring of new or additional indebtedness" and any right to require Mid-South to proceed against VidiMedix, to exhaust any security interest held by VidiMedix, or to seek any other remedy. See, e.g., Ocean Transp., Inc. v. Greycas, Inc., 878 S.W.2d 256, 267-68 (Tex. App.-Corpus Christi 1994, writ denied). Thus, demand was not an integral part of the cause of action or a condition precedent to Mid-South's right to enforce the Guaranty. See id.

Paragraph 6 defines an "Event of Default" under the Guaranty: if a guarantor "purports to revoke or otherwise avoid any obligation under this Guaranty," dies, becomes insolvent, commences bankruptcy or has bankruptcy commenced against him, is criminally prosecuted, incurs a money judgment greater than $100,000, has assets attached, seized, or levied upon; or "any circumstances aris[e] causing [Mid-South] in good faith, to become insecure as to the satisfaction of any of Guarantors' obligations under this Guaranty." Construing paragraph 6 in the context of the Guaranty as a whole, seeColumbia Gas Transmission Corp., 940 S.W.2d at 589, we find that it operates to identify acts and omissions that constitute a failure to perform under the Guaranty, but it does not limit the central promise that Best and Faris made concerning "the prompt and complete payment of all amounts that Borrower owes [Mid-South] under the Note, in strict accordance of its terms." In other words, Best and Faris made themselves bound, when guaranteeing the loan, to the payment obligations of the Note. Paragraph 6, then, adds events that could constitute an event of default on the part of a guarantor that do not arise from the terms of the Note itself. In the end, the guarantors had a payment obligation immediately upon VidiMedix's default and, from that point forward, were in breach of that obligation as long as they failed to perform. Cf.Ocean Transp., 878 S.W.2d at 268.

All parties agree that VidiMedix defaulted on the Note on December 31, 1999. Best and Faris became obligated to

make payment under the terms of their guaranty agreements on that date. Thus, Mid-South's claim against Best and Faris accrued on December 31, 1999. Other than its reliance on paragraph 6, Mid-South did not present any grounds for finding a later accrual date. Accordingly, the district court did not err in granting summary

**Page 392**

judgment for Best and Faris and denying Mid-South's motion.

### CONCLUSION

We affirm the district court's grant of summary judgment in favor of Best and Faris.

---------

Notes:

[1] The record indicates that each guarantor was a principal of VidiMedix. Faris was the company's president and CEO.

[2] The letter indicates that Stephens also enclosed a copy of the demand letter he had sent to VidiMedix.

[3] Alternatively, Mid-South suggested that limitations did not begin to run until it filed its petition on May 17, 2004.

[4] Best and Faris also asserted as a summary judgment ground that a contractual waiver of limitations within the Guaranty was void and unenforceable. Mid-South did not dispute this proposition in the district court, nor has it attempted to invoke the waiver on appeal.

---------

187 S.W.2d 936 (Tex.Civ.App. 1945)

LONE STAR GAS CO.

v.

CHILDRESS et ux.

No. 2638.

Court of Civil Appeals of Texas, Waco.

May 17, 1945

Appeal from District Court, Eastland County; Floyd Jones, Judge.

Action by D. L. Childress and wife against Lone Star Gas Company for damages alleged to have been done by defendant when it removed one of its pipe lines from plaintiff's land, and to enjoin defendant from using any portion of their land not included in right of way deed. The trial court awarded plaintiffs $500 damages and granted the injunction, and defendant appeals.

Judgment granting injunction reversed, and judgment awarding damages affirmed.

Conner & Conner, of Eastland, and Marshall Newcomb, Warren J. Collins, and J. L. Toone, all of Dallas, for appellant.

Turner & Seaberry, of Eastland, for appellee.

TIREY, Justice.

The plaintiffs brought this suit against the defendant to recover certain items of damage alleged to have been done by defendant when it removed one of its pipe lines from their land and to enjoin defendant from using any portion of their land 'not included in defendant's right-of-way and from using any gate or gates owned by the plaintiffs and not located upon the right-of-way, and from using any portion of said premises for any purpose not contemplated by the right-of-way deed or deeds.' A jury failed to reach a verdict and a mistrial resulted. The parties then agreed to submit the case to the trial court upon the record made during the jury trial.

The court rendered judgment in favor of plaintiffs and found in the judgment substantially (1) that plaintiffs should

recover from defendant the sum of $500 for damages; and (2) that 'a strip of land thirty feet wide for each right-of-way grant will be sufficient and reasonable for all use by the defendant under its easements, that plaintiffs have no adequate remedy at law in the premises, and that the writ of injunction prayed for by plaintiffs should issue as herein decreed.' The court awarded the $500 to plaintiffs, with interest and costs, and permanently enjoined defendant from using under its right-of-way grants (and specifically referred to instruments evidencing such grants and the recording thereof) 'a strip of land in excess of thirty feet in width constituting each right-of-way in all of its operations thereon; said defendant, its agents and employees, are further permanently enjoined from using any gate or gates owned by the plaintiffs and not located upon defendant's aforesaid rights-of-way.' No request was made for findings of fact and conclusions of law and none was filed.

Points 1 to 5 inclusive assail the judgment substantially to the effect that the court erred in finding that a strip of land thirty feet wide for each right-of-way granted will be sufficient for all use by the defendant under its easements; that plaintiffs have no adequate remedy at law in the premises, and that the writ of injunction should issue; and in permanently enjoining defendant from using a strip of land in excess of thirty feet in width; and in permanently enjoining defendant from using fence gates located on the lands covered by defendant's right-of-way deeds but not located upon such thirty foot strip; that such decree in effect reforms the right-of-way deeds and that the pleadings do not warrant or support the reformation. We sustain these contentions.

The defendant, by right-of-way deeds, duly recorded, acquired the right to construct, maintain and operate pipe lines as well as telegraph and telephone lines in connection therewith and to build future pipe and telegraph and telephone lines over and through the land in question prior to the time of the purchase of any part of the lands by the plaintiffs. Defendant constructed two pipe lines, one 10 inches and the other twelve inches in diameter, and telephone wires over said property prior to the time plaintiffs acquired the same. The provisions of said right-of-way deeds are identical except as to grantors, consideration and description of the land covered. We quote the pertinent parts of one of the deeds:

'That for and in consideration of Thirty and 50/100 ($30.50) Dollars to the undersigned, J. M. Ray and wife, L. V. Ray (herein styled Grantor, whether one or more) paid, the receipt of which is hereby acknowledged, the said Grantor does hereby Grant, Sell and Convey unto Lone Star Gas Company, a corporation (herein styled Grantee), its

successors and assigns, the right of way and easement to construct, maintain and operate pipe lines and appurtenances thereto, and to construct, maintain and operate telegraph and telephone lines in connection therewith together with the necessary poles, guy wires and anchors, over and through the following described lands situate in Eastland County, State of Texas, to-wit: 670 acres, more or less, out of Section 53, Block 4, H. & T. C. RR. Co., survey and being the same land more fully described in deed from A. F. Bentley to R. W. Higginbotham recorded in Volume 84, page 74, Deed Records of said County, to which reference is here made for further description.

'To have and to hold unto said Grantee, its successors and assigns, so long as such lines and appurtenances thereto shall be maintained, with ingress to and egress from the premises, for the purpose of constructing, inspecting, repairing, maintaining, and replacing the property of Grantee above described, and the removal of such at will, in whole or in part.

## Page 938

'The said Grantor is to fully use and enjoy the said premises except for the purposes hereinbefore granted to the said Grantee, which hereby agrees to bury all pipes to a sufficient depth so as not to interfere with cultivation of soil and to pay any damages which may arise to growing crops or fences from the construction, maintenance and operation of said pipe, telegraph and telephone lines; said damages, if not mutually agreed upon, to be ascertained and determined by three disinterested persons, one thereof to be appointed by the said Grantor, one by the said Grantee, and the third by the two so appointed as aforesaid, and the written award of such three persons shall be final and conclusive. Should more than one pipe line be laid under this grant at any time, the sum of twenty-five cents per lineal rod for each additional line shall be paid, besides the damages above provided for.

'Upon written application to the Grantee at Dallas, Texas, the Grantee will make or cause to be made a tap on any gas pipe line constructed by Grantee on Grantor's premises for the purpose of supplying gas to the Grantor for domestic use only, the cost of meter, saddle and labor to be borne by said Grantee, all other expenses, including fittings to be borne by Grantor, gas to be measured and furnished at the main line of Grantee at the same price and under the same rules and regulations as prevail in the nearest city or town where Grantee is supplying gas.

'The consideration first above recited as being paid to Grantor by Grantee is in full satisfaction of every right hereby granted. All covenants and agreements herein contained shall extend to and be binding upon the respective heirs, legal representatives, successors and assigns of the parties hereto.

'It is hereby understood that the party securing this grant in behalf of Grantee is without authority to make any covenant or agreement not herein expressed.'

In November 1942, defendant began the removal of the twelve inch pipe line. Plaintiffs were living on the ranch from which the pipe line was removed and they had actual notice of the work being done. Mr. Childress testified, in part, as follows:

'A. I saw them down there and I saw they had a Lone Star truck and I drove up and they had cut the wire and he didn't have anything to block it with except an ordinary fence post and he attempted to block it put up a brace post four or five feet from the corner where he cut it.

'Q. Did you have any conversation with that man? A. I said, 'I thought you were going to put in heavy posts to block this fence to keep it from getting loose.' He said they were sorry, they didn't have any posts--I told him I was disappointed in it. I didn't like for them to do it that way. * * *

'Q. These places (where) they cut your fence, did they attempt to build any other gates? A. Temporary wire gates.

'Q. Were those wire gates left open? A. Yes. I had a young fellow, Mr. Lorance's boy. I saw it was looking kind of dangerous, and he worked for me about three weeks guarding the pasture and looking after the cattle and stock. * * * I worked about three weeks.

'Q. How did you manage to do that, Mr. Childress? A. I would get up every morning and jump in my pick-up and look after things, and then at noon I would get off a little early and run out to see how they were.

'Q. That is a twenty-mile trip. A Yes.

'Q. How long did that last? A. About three weeks.'

And he further testified in part:

'* * * I didn't make any objections to anything they did. * * *

'Q. You are not complaining, I believe you said about the Gas Company using its right of ingress and egress on its property there? A. No.

'Q. Whatever rights the Gas Company has under its contracts and easement you recognize them? A. I certainly will.'

After the removal of the pipe line had been completed

plaintiffs made a claim for damages to their land, fences and grass and for other items. The Gas Company refused to pay the damages claimed by plaintiffs and this suit was filed.

Plaintiffs, in their pleadings, among other things, alleged: 'That previous to their purchase of this land, the grantors of these plaintiffs had executed a right-of-way or right-of-way deeds to the defendant, creating an easement in each instrument, and authorizing the defendant to lay and maintain a pipe line across said premises. That plaintiffs' purchase of said land was

**Page 939**

subject to the rights thereby granted. That said deed or deeds granted the right to the defendant to construct, maintain and operate pipe lines and to remove the same from these premises. That it further provided in said deed or deeds that the grantors therein had the right fully to use and enjoy the premises except for the purpose specifically granted. In said deed or deeds the grantee agreed to pay damages which might arise to growing crops or fences from such operations * * *.'

Plaintiffs prayed substantially for (1) $892 for damages sustained and for general and special relief in law or in equity, and (2) 'that * * * the court issue its writ of injunction, permanently restraining the defendant, its agents and employees, from using any portion of the above described premises not included in defendant's right-of-way, and from using any gate or gates owned by the plaintiffs and not located on the right-of-way, and from using any portion of said premises for any purpose not contemplated by the right-of-way deed or deeds.'

After a careful review of this record it is clear to us that plaintiffs are not entitled to any injunctive relief. First of all, the right-of-way deeds are clear, Plaintiffs do not allege any ambiguity in said deeds, nor do they allege any fraud, accident or mistake between the parties in the execution of the grants. In fact, the original grantors were not parties to the action and the deeds were executed and recorded and fixed the rights of the parties before the plaintiffs purchased the property. There is nothing in the pleading of plaintiffs, nor in their prayer for relief, to put defendant on notice that plaintiffs would seek to limit defendant's use of their lands to a strip of land thirty feet wide. We think the rule in Texas is 'that in order to warrant a court of equity to grant injunctive relief, the petitioner must specify the precise relief sought and a court is without jurisdiction to grant relief beyond and in addition to that particularly specified.' *Fletcher v. King, Tex.Civ.App.,* 75 S.W.2d 980, point 1 p. 982 (writ ref.), and cases therein cited. 'The prayer controlled the nature of the relief, and the latter could not be changed so as to cover relief not prayed

for.' *Iford v. Nickel, Tex.Civ.App.,* 1 S.W.2d 751, 753. It is equally as well settled that 'the rules which control the courts in determining the rights under an easement are, in general, the same as those applied to deeds and other written instruments.' *Armstrong v. Skelly Oil Co., Tex.Civ.App.,* 81 S.W.2d 735, 736, writ ref. It necessarily follows that under this rule the right-of-way deeds must be construed most strongly against the grantor, and most favorably to the grantee, so as to confer the largest estate which a fair interpretation will permit. *Stevens v. Galveston, H. & S. F. Ry. Co., Tex.Com.App.,* 212 S.W. 639; *Texas & N. O. Ry. Co. v. Orange County, Tex.Civ.App.,* 206 S.W. 539, writ ref.; *Gladewater County Line Independent School Dist. v. Hughes, Tex.Civ.App.,* 59 S.W.2d 351; *Stanbery v. Wallace, Tex.Com.App.,* 45 S.W.2d 198. 'The language of a deed is the language of the grantor, and, if there be a doubt as to its construction, it should be resolved against him.' *Curdy v. Stafford,* 88 Tex. 120, 30 S.W. 551, 552.

Appellees say that the evidence can be summarized as follows: 'Appellant's employees, once or twice a week, and more often in the winter time, use appellees' private roads and gates, not on the right-of-way; that gates are left open so that cattle and goats go from one pasture to the other; that appellees keep their registered cattle in one pasture and their grade cattle in another; that they are breeders and are engaged in building up a desirable strain of high grade cattle.' Appellees contend substantially that since the Gas Company's district foreman (supervisor of pipe line construction, maintenance, repairs, regulating pressure on main line transmission, all installations relating to pipe line transmission and production) testified substantially to the effect that (1) twenty-five or thirty feet was sufficient width in which to take up the twelve inch line which was removed, as well as take up the ten inch line still in the ground and sufficient width for trucks and cars to go on the ground for maintenance purposes and wide enough for any purpose the Gas Company might have on plaintiffs' property and that the graded thirty foot right-of-way was a more convenient means of ingress and egress and that the Gas Company would stay on this right-of-way if plaintiffs wanted them to do so, the trial court was justified in finding that a right-of-way thirty feet wide was all that defendant's convenience and necessity required. We do not so understand that law. First of all, the right-of-way deeds did not

**Page 940**

stipulate that the defendant should confine its operations to a strip of land thirty feet wide. The deeds, among other things, granted to the defendant 'the right-of-way and easement to construct, maintain and operate pipe lines and appurtenances thereto, and to construct, maintain and operate telegraph and telephone lines in connection

therewith, together with the necessary poles, guy wires and anchors over and through the following described lands * * * so long as such lines and appurtenances thereto shall be maintained, with ingress to and egress from the premises, for the purpose of constructing, inspecting, repairing, maintaining and replacing the property of Grantee, above described, and the removal of such at will, in whole or in part. * * * Should more than one pipe line be laid under this grant at any time, the sum of twenty-five cents per lineal rod for each additional line shall be paid, besides the damages above provided for. * * * It is hereby understood that the party securing this Grant in behalf of Grantee is without authority to make any covenant or agreement not herein expressed.' Since the deeds do not confine the defendant's use to a strip of land thirty feet wide, it is elementary that the court could not re-define the terms of the grant and restrict the use granted by the instruments on the testimony of a district foreman, absent fraud, accident or mistake. 'It is elementary that no agent has any implied authority to surrender the vested rights of his principal, * * *.' *Bell v. Moody,* Tex.Civ.App., 147 S.W.2d 852, writ dism., points 3-4, p. 855. See also: 2 Tex.Jur. p. 446, sec. 51; *Kentucky River Coal Co. v. Williams,* 226 Ky. 93, 10 S.W.2d 617. It is clear to us that the amount of space reasonably needed in the past in any particular operation is a question of fact, and the testimony of the district foreman on such issue would be pertinent. But the defendant is entitled to use in the future as much of the land as each occasion may reasonably demand, and such testimony does not authorize the court to deprive the defendant of what has been legally granted to it by the terms of the right-of-way deeds. 'It is for parties, and not courts, to make deeds of conveyance. Men are presumed to be able among themselves to make deeds expressive of their intentions, and, if they fail to do so, or to furnish the means by which their intention can be determined, it would be an usurpation of authority for courts to undertake to make deeds for them.' *Gorham v. Settegast,* 44 Tex.Civ.App. 254, 98 S.W. 665, 669. See also *Babler v. Shell Pipe Line Corporation, D.C.,* 34 F.Supp. 10; 15 Tex.Jur. 800, sec. 28; *Gulf Pipe Line Co. v. Thomason, Tex.Civ.App.,* 299 S.W. 532; 19 C.J. 907, 908, 909, 975; 28 C.J.S., Easements, §§ 25, 26, 27, 77; *Texas Power & Light Co. v. Casey, Tex.Civ.App.,* 138 S.W.2d 594, writ dis.; 110 A.L.R. 175, 176.

Appellees further contend substantially that they are entitled to injunctive relief because plaintiffs use the premises for a stock ranch; that it is highly improved for stock raising; that plaintiffs are engaged in raising both registered and grade cattle; and that defendant, while engaged in removing said pipe line, failed to close said gates and thereby permitted an indiscriminate mixing of the registered and grade cattle, thereby interfering with breeding purposes; and that such injuries are irreparable and that legal remedies are inadequate and that such conduct would necessarily result in a multiplicity of suits. As before stated, there was no complaint of the use made of plaintiffs' property by defendant until the pipe line was removed. The injunction suit was filed after the defendant refused to pay the damages claimed by plaintiffs. The damages assessed by the trial court are not assailed by plaintiffs as being inadequate to recompense them for damages sustained. We think the rule is: 'An application for injunction is uniformly subjected to a strict construction. * * * Mere uncertainty or mere apprehension of injury is not sufficient.' *Thomas v. Bunch, Tex.Civ.App.,* 41 S.W.2d 359, 362, affirmed 121 Tex. 225, 49 S.W.2d 421. See also *Southern Oil Corporation v. Waggoner, Tex.Civ.App.,* 224 S.W. 230; *Browning v. Hinerman, Tex.Civ.App.,* 224 S.W. 236. Again: 'It is held that an injunction will not lie to prevent an alleged threatened act, the commission of which is speculative and the injury from which is purely conjectural.' *Haden Employees' Ass'n v. Lovett, Tex.Civ.App.,* 122 S.W.2d 230, 232. Moreover 'the court cannot grant an injunction to allay the fears and apprehensions of individuals.' Southern Oil Corporation v. Waggoner, supra [224 S.W. 232]. See also *King's Estate v. School Trustees of Willacy County, Tex.Civ.App.,* 33 S.W.2d 783, writ ref. Under the trial court's judgment the defendant would be required to seek the aid of the

## Page 941

court each time its operations may require the use of a strip of land more than thirty feet wide. We think such action of the court restricts the provisions of the right-of-way deeds and necessarily such decree must fail. Moreover, the contention that defendant's agents and employees will in the future go through the gates on the premises and leave them open and thereby permit the herds to mix has no support in the record. The district foreman, defendant's witness, testified in part:

'* * * if Mr. Childress had told me to go around we would go around.

'Q. If he wanted you to stay on the right-of-way you would. A. We would.'

Appellant further contends that the court erred in finding that plaintiffs should recover from the defendants the sum of $500. As a basis for this contention defendant says 'that there is no evidence, or at least the evidence is insufficient, to support the judgment for damages * * * because of a lack of evidence showing that the alleged damages were personally caused by the negligence of the defendant.' For rule of law, see *Lone Star Gas Co. v. Hutton, Tex.Com.App.,* 58 S.W.2d 19, points 10-11. We overrule this contention. The award was in a lump sum of $500. Appellees sued for various items of damages aggregating $892, the three principal items being (a) injury

to land $250; (b) damage to fences $350; (c) damage to surface tank $75. We have carefully reviewed the evidence on these items and we think that it is sufficient to support the implied finding of the trial court that the damages were caused by the negligence of the Gas Company and sufficient to support the amount awarded. We feel that it would unduly extend this opinion to review the evidence as to damages and we do not believe it would serve any useful purpose to do so. The damages to the land and to the fences and to the water tank are clear and it was a question of fact for the trial court to determine whether or not such damages were due to the negligence of the defendant, as well as to find the amount.

It follows from what we have said that we are of the opinion that the trial court erred in issuing the injunction and that this injunction must be dissolved. It further appearing to us that the cause has been fully developed, there is no occasion to reverse and remand the cause and the judgment with respect to the injunction must be reversed and rendered. It further appears to us that the judgment awarding damages to plaintiffs in the sum of $500 must be sustained and the judgment of the trial court in this respect is affirmed.

Accordingly, the judgment as to the injunction granted is reversed and rendered and the judgment of the trial court awarding damages to the plaintiffs is in all things affirmed.

We are further of the opinion that it would be equitable for the costs incurred in the trial court to be adjudged against the defendant and the costs incurred on this appeal to be adjudged equally against appellant and appellees, and it is so ordered. See Rule 448, T.R.C.P.; *Hake v. Dilworth, Tex.Civ.App.,* 96 S.W.2d 121, point 13, p. 126, writ dism.; *J. I. Case Threshing Machine Co. v. Manes, Tex.Com.App.,* 254 S.W. 929, point 10, p. 932. See also: *Baker Hotel v. Rogers, Tex.Civ.App.,* 157 S.W.2d 940, error refused, 138 Tex. 398, 160 S.W.2d 522; *Wichita Nat. Bank v. United States Fidelity & Guaranty Co., Tex.Civ.App.,* 147 S.W.2d 295; *Parsons v. John Deere Plow Co., Tex.Civ.App.,* 113 S.W.2d 970.

192 S.W.3d 581 (Tex. 2006)

AMERICAN FLOOD RESEARCH, INC., Petitioner

v.

Harry JONES, Respondent.

No. 05-0271.

Supreme Court of Texas

May 5, 2006

On Petition for Review from the Court of Appeals for the Fifth District of Texas

Page 582

Richard M. Abernathy, Charles J. Crawford, Abernathy Roeer, Boyd & Joplin, P.C., McKinney, for Respondent.

John R. Roach Jr., William D. Cramer, Roach LLP, Piano, for Petitioner.

PER CURIAM.

Attorney Harry Jones was sanctioned for discovery abuse committed in the course of representing a group of employees in a suit brought by American Flood Research, Inc. (AFR). Jones appealed the sanctions order, and the court of appeals reversed the judgment, holding that the trial court abused its discretion in imposing sanctions. Because the court of appeals erred in its review of the sanctions order, we reverse and remand the matter to that court for further proceedings.

AFR sued three of its former employees in state district court for trade secret violations and destruction of company property. Concurrently, the employees sued AFR in federal court for employment discrimination. Initially, the employees were represented by attorney Jones in both suits. During the course of discovery, the parties disagreed over which side would be deposed first. AFR first noticed the employees' depositions for mid-December 2002. The employees, through Jones, moved to quash those depositions and requested a hearing. A few weeks later, however, the employees withdrew the motion, and AFR moved to compel the depositions. The state trial court conducted a hearing and ordered the employees' depositions to begin on January 6, 2003. Shortly thereafter, the employees moved for reconsideration of this order and to recuse the trial judge, arguing that he was biased against attorney Jones. A hearing on the motions was scheduled for January 10, 2003. In the meantime, Jones notified AFR that the employees would not appear for depositions until the motions had been ruled upon. As promised, his clients did not appear on January 6. The employees later withdrew their recusal motion and then abandoned their motion for reconsideration.

On January 15, 2003, the employees terminated Jones, who then withdrew as counsel of record. AFR moved for sanctions– pursuant to Texas Rules of Civil Procedure 13 and 215 and Texas Civil Practice and Remedies Code sections 9.012 and 10.012– against both the employees and Jones, alleging discovery abuse. After an evidentiary hearing, the trial court sanctioned only Jones, ordering him to pay AFR $15,000. At Jones's request, the court issued findings of fact and conclusions of law, in which the court found that while the employees did not abuse the discovery process, Jones's conduct was sanctionable under Rule of Civil Procedure 215.3. The trial court granted Jones's motion to sever the sanctions order against him for purposes of appeal.

Page 583

On appeal, Jones argued that his actions did not amount to discovery abuse and, alternatively, that the sanction amount was excessive. Because the trial court found that the attorney, but not the party, abused the discovery process, the court of appeals held that the trial court abused its discretion in imposing sanctions on Jones, since sanctions under Rule 215.3 are reserved for discovery abuse by "a party."[1] 153 S.W.3d 718, 724. AFR now petitions for review, arguing that the court of appeals erred in reversing the sanctions order.

We review a trial court's imposition of sanctions for an abuse of discretion. *Cire v. Cummings,* 134 S.W.3d 835, 838 (Tex. 2004). The ruling will be reversed only if the trial court acted "without reference to any guiding rules and principles," such that its ruling was arbitrary or unreasonable. *Id.* at 839. In determining whether the trial court abused its discretion, the appellate court must ensure that the sanctions were appropriate or just. *TransAmerican Nat. Gas Corp. v. Powell,* 811 S.W.2d 913, 916 (Tex. 1991). We have articulated a two-part inquiry that appellate courts must conduct in making this determination. *Id.* at 917. First, the court must ensure that there is a direct relationship between the improper conduct and the sanction imposed; in other words, the court should examine whether punishment was imposed upon the true offender and tailored to remedy any prejudice discovery abuse caused. *Id.* Thus, the trial court must determine whether sanctions should be imposed

on the party, its counsel, or both. *Id.* Second, the court must make certain that less severe sanctions would not have been sufficient to promote compliance. *Id.*

In this case, the court of appeals reversed the sanctions order after holding that a trial court must specifically find that the party– not just the attorney– abused the discovery process in order to impose sanctions under Texas Rule of Civil Procedure 215.3. 153 S.W.3d at 724. We disagree. A trial court's discretion to impose sanctions does not depend on whether it issues a specific finding that the "party"– in this case, the employees– abused the discovery process. In reviewing sanctions orders, the appellate courts are not bound by a trial court's findings of fact and conclusions of law; rather, appellate courts must independently review the entire record to determine whether the trial court abused its discretion. *See Chrysler Corp. v. Blackmon,* 841 S.W.2d 844, 852 (Tex. 1992)(citing *Rossa v. United States Fidelity & Guar. Co. v. Rossa,* 830 S.W.2d 668, 672 (Tex. App.– Waco 1992, writ denied)). Thus, the court of appeals should have examined the entire record– not merely the trial court's findings of fact and conclusions of law– to determine whether the trial court properly sanctioned Jones.

The order imposing sanctions neither referred to a specific rule nor tracked the language of any particular rule; thus, contrary to the court of appeals' analysis, whether the trial court properly sanctioned Jones is not governed by Rule 215.3 alone. *Contra Metzger v. Sebek,* 892 S.W.2d 20, 51 (Tex.App.– Houston [1st Dist.] 1994, writ denied) (holding that when a sanctions order names a specific rule or tracks a rule's language, the appellate court is confined to determining whether sanctions are proper

**Page 584**

under that rule alone). Here, there is ample evidence to support a sanction against Jones pursuant to Texas Rule of Civil Procedure 215.2, a rule AFR cited in its motion for sanctions. Rule 215.2 provides that the trial court may impose sanctions against the party *or the attorney advising the party* when the party fails to comply with an order to permit discovery. TEX. R. CIV. P. 215.2(b); *see also* TEX. R. CIV. P. 215.1(a) (allowing for court orders compelling depositions).

Our review reveals that the employees did not obey the court's order compelling depositions. On his clients' behalf, Jones moved for reconsideration of the order compelling depositions and also moved to recuse the presiding judge. Neither the employees nor Jones, however, moved to stay the depositions, as the Rules of Civil Procedure allow. *See, e.g.,* TEX. R. CIV. P. 199.4 (motion objecting to time and place of depositions filed within three days of receiving notice of them automatically stays

depositions until motion is heard). Rather, Jones simply informed AFR that the employees would not appear on January 6, in direct violation of the court's order. As soon as the deposition date passed, however, Jones moved to continue the motion to reconsider and withdrew the motion to recuse. The employees never rescheduled a hearing on the motion to reconsider. A week after the employees missed their deposition date, they terminated Jones, and he withdrew as counsel of record.

While there is no direct evidence that the employees knew of the depositions and deliberately failed to attend, in the context of an enduring attorney-client relationship, knowledge acquired by the attorney is imputed to the client. *See Gavenda v. Strata Energy, Inc.,* 705 S.W.2d 690, 693 (Tex. 1986) (noting that the "attorney-client relationship is an agency relationship"). Jones was present when the trial judge ordered in open court that depositions begin January 6, yet neither Jones nor the employees appeared. Thus, a Rule 215.2 prerequisite to imposing sanctions– a party's failure to comply with an order to permit discovery– was satisfied. *See* TEX. R. CIV. P. 215.2(b). Accordingly, the trial court, after serving notice and holding a hearing, had the discretion to impose any "just" sanction authorized by Rule 215.2(b). *Id.* Paragraphs (2) and (8) of Rule 215.2(b) allow the trial court to impose sanctions against the party *or the attorney advising the party,* which may include charging the sanctioned individual for court costs or the reasonable expenses caused by the failure to comply with the discovery order. TEX. R. CIV. P. 215.2(b)(2), (b)(8).

Our holding in *TransAmerican* required the trial court to determine whether sanctions should be imposed on the employees, Jones, or both. *See TransAmerican,* 811 S.W.2d at 917. Sanctions may be visited exclusively on the attorney if the evidence demonstrates that the offensive conduct is attributable to counsel alone. *See id.(* holding that "a party should not be punished for counsel's conduct in which it is not implicated apart from having entrusted to counsel its legal representation"). Here, the employees' noncompliance with the discovery order can be attributed to Jones's advice and conduct during the course of his representation. Specifically, the record supports the trial court's finding that Jones's dilatory tactics and his refusal to produce the employees for examination directly violated the trial court's order. The employees, who required a translator when making court appearances, were particularly dependent on Jones's advice during the course of litigation. Because the record supports a finding that only Jones's conduct

**Page 585**

was sanctionable, the trial court was within its discretion to impose sanctions on him alone and, therefore, the court of appeals erred in reversing the sanctions order.

Jones also complains, however, that the amount of the sanctions imposed– $15,000– was excessive. *See* TEX. R. CIV. P. 215.2, 215.3 (requiring that sanctions be "just" or "appropriate"). As we held in *TransAmerican,* when an appellate court reviews a sanctions order, it must ensure not only that sanctions are visited upon the true offender, but that less severe sanctions would not promote compliance. 811 S.W.2d at 917. Because the court of appeals' holding that the trial court erred in imposing sanctions disposed of the case, it did not complete the two-part *TransAmerican* inquiry. Thus, we remand this matter to the court of appeals for that analysis.

Accordingly, without hearing oral argument, we reverse the court of appeals' judgment and remand to that court for further proceedings consistent with this opinion. *See* TEX. R. APP. P. 59.1, 60.2(d).

---------

Notes:

[1] The rule states, in relevant part:

If the court finds a *party* is abusing the discovery process in seeking, making or resisting discovery . . ., then the court . . . may, after notice and hearing, impose any appropriate sanction authorized by paragraphs (1), (2), (3), (4), (5), and (8) of Rule 215.2(b).

TEX. R. CIV. P. 215.3 (emphasis added).

---------

**194 S.W.3d 46 (Tex.App.—Waco 2006)**

**The STATE of Texas, Appellant,**

**v.**

**TARGET CORPORATION, Appellee.**

**No. 10-04-00326-CV.**

**Court of Appeals of Texas, Tenth District, Waco.**

**May 10, 2006**

Rehearing Overruled June 6, 2006.

From the County Court at Law No. 1 Brazos County, Texas Trial Court No. 419-CC.

Susan Desmerais Bonnen, Office of the Atty. Gen. Transportation Division, Austin, for appellant.

H. Dixon Montague and Charles B. McFarland, Vinson & Elkins LLP, Houston, for appellee.

Before Chief Justice Gray, Justice Vance, and Justice Reyna

**OPINION**

BILL VANCE, Justice.

In its appeal of an adverse judgment in a condemnation case, the State asserts that the trial court erred in excluding the State's expert testimony on Target's damages and the total compensation owed to Target. We agree and will reverse the trial court's judgment and remand the case for a new trial.

The State condemned 0.184 of an acre (8,013 sq. ft.) of a 9.0232 acre tract owned by Target in the city of College Station. The tract is improved with a Target retail store. The acquisition was a fifteen-foot wide strip of land being used by Target for landscaping and parking. The acquisition's purpose was to widen Highway 6, which the strip fronted. Special commissioners awarded Target compensation of $156,812 for the taking, and Target objected. A jury awarded Target $564,290.

The primary dispute at trial was Target's damages for loss of parking. Target's appraisal expert testimony included as much as $472,457 in damages for the loss of 35 parking spaces. The State's appraisal expert determined that Target's loss-of-parking damages were only $72,000 for 24 spaces, but the jury did not hear the State's expert on those damages or on the amount of total compensation owed to Target. On the Friday before the Monday, June 7, 2004 trial, Target filed a motion to exclude the testimony of Steven Lovett, the State's appraiser, and Jack Holford, the State's land planning consultant. After the jury had been impaneled and the parties had made opening statements, a hearing was held on Target's motion. The next day, the trial court granted Target's motion and then later clarified its ruling to prohibit Lovett from testifying about remainder damages (including loss of parking) and total compensation.

Target's motion complained that the State's supplementation of discovery responses—done 31 days before trial—was untimely. This supplementation included the identity of consulting experts or persons with whom the State's testifying experts consulted and the persons with knowledge of relevant facts on whom its testifying experts relied.[1] Although Target did not complain that the experts themselves had not been timely identified or that their reports had not been timely produced, it complained that the State untimely produced Lovett's one page of calculations that supported his opinion that the utilization level of the remote parking spaces lost by Target was 20% and thus

should be discounted by 80%.[2] This analysis, including the 20% utilization factor, was in Lovett's timely produced expert report and was examined by Target in Lovett's first deposition on April 28, 2004. Lovett's working file had been provided to Target's counsel a few days before his deposition, but during Lovett's deposition, he realized that the calculations page was missing.[3] On May 7, the State produced this page, and the State tendered Lovett for a second deposition (on May 28) in which Target was able to question him about the page.

The trial court ruled that Lovett and Holford would not be allowed to testify about opinions that were based on information provided by persons who had not been timely identified: Lovett could not testify to the importance of parking within a 300-foot radius of a business's front door or that Target's parking situation was adequate; and Holford could not testify about his conversations with the City Development Services staff about his site plan, that his plan would be approved if submitted, or about safety issues affecting Target's parking lot. Lastly, the trial court ruled that Lovett could not testify about his 20% utilization factor, which prevented the State from offering Lovett's

opinion testimony on remainder damages and total compensation.

Target's appraisal expert testified at trial that Target was entitled to total compensation of $704,458, including as much as $472,457 in damages for loss of parking. The State estimates that the jury awarded Target as much as $383,081 in loss of parking damages as a part of the total compensation award of $564,290.

The State made an offer of proof that Lovett would have testified that the property suffered remainder damages of $72,000 and that the total compensation amount was $253,209 and that Holford would have testified that the City's Development Services staff had indicated that his plans would be accepted if submitted by Target and that he was of the opinion that Target's parking lot was not unsafe after the State's acquisition.

In its first issue, the State asserts that the trial court abused its discretion in excluding Lovett's and Holford's expert testimony for three reasons: (1) the State's supplementation was timely; (2) the State established good cause if its supplementation was untimely; and (3) Target was not unfairly surprised or prejudiced if the State's supplementation was untimely.

The standard of review of a trial court's ruling to admit or exclude evidence based on the discovery rules is abuse of discretion. *See F & H Investments Inc. v. State,* 55 S.W.3d 663, 668-72 (Tex. App.—Waco 2001, no pet.); *Best Indus. Uniform Supply Co. v. Gulf Coast Alloy Welding, Inc.,* 41 S.W.3d 145, 147-48 (Tex. App.—Amarillo 2000, pet. denied). The test for abuse of discretion is whether, under the circumstances of the particular case, the trial court's action was arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 242 (Tex. 1985).

## Page 50

We will assume without deciding that the State's supplementation—done 31 days before trial—of the additional persons that Lovett and Holford had spoken with and of Lovett's one page of calculations supporting his 20% utilization factor was untimely. *See* Tex. R. Civ. P. 193.5(b); *cf. Snider v.Stanley,* 44 S.W.3d 713, 715-16 (Tex. App.—Beaumont 2001, pet. denied) (trial court did not abuse its discretion in excluding expert whom party identified 31 days before trial after waiting to supplement for over a year). *But see Elhamad v. Quality Oil Trucking Serv., Inc.,* 2003 WL 22211543, at *6-7 (Tex. App.—Fort Worth Sept.25, 2003, no pet.) (mem. op.) (distinguishing complete failure to identify expert from inadequacy in expert disclosure).

The discovery rule requiring disclosure of experts before trial is intended to provide adequate information about the experts' opinions to allow the opposing party the necessary information to prepare to cross-examine the experts and to rebut the testimony with their own experts. *Taylor Foundry Co. v. Wichita Falls Gram Co.,* 51 S.W.3d 766, 773 (Tex. App.—Fort Worth 2001, no pet.). Rule 193.6 governs untimely discovery supplementation:

(a) *Exclusion of Evidence and Exceptions.* A party who fails to make, amend, or supplement a discovery response in a timely manner may not introduce in evidence the material or information that was not timely disclosed, or offer the testimony of a witness (other than a named party) who was not timely identified, unless the court finds that:

(1) there was good cause for the failure to timely make, amend, or supplement the discovery response; or

(2) the failure to timely make, amend, or supplement the discovery response will not unfairly surprise or unfairly prejudice the other parties.

(b) *Burden of Establishing Exception.* The burden of establishing good cause or the lack of unfair surprise or unfair prejudice is on the party seeking to introduce the evidence or call the witness. A finding of good cause or of the lack of unfair surprise or unfair prejudice must be supported by the record.

Tex. R. Civ. P. 193.6(a), (b). This rule provides a less burdensome alternative to the draconian sanction of automatic exclusion under former Rule 215(5), which required a showing of good cause.[4] *Elliott v. Elliott,* 21 S.W.3d 913, 921 n.7 (Tex. App.—Fort Worth 2000, pet. denied).

We conclude that the trial court abused its discretion in excluding the State's expert testimony because the record establishes that Target would not have been unfairly surprised or prejudiced by the State's supplementation. *See, e.g., Best,* 41 S.W.3d at 148-49; *Elliott,* 21 S.W.3d at 921; *Rutledge v. Staner,* 9 S.W.3d 469, 472

## Page 51

(Tex. App.—Tyler 2000, pet. denied). Regarding the May 7 production of Lovett's one-page calculation of his 20% utilization factor, we note first that his timely expert report discussed this factor and that when Target deposed Lovett on April 28, he explained how he determined the factor. Next, after the page was produced, Target again questioned Lovett on it in his second deposition on May 28. The trial court, which was made aware of this history, should have found that Target would not have been unfairly surprised or prejudiced by Lovett's trial testimony on the 20% utilization factor, remainder damages, and the total compensation

amount. *See, e.g., Parker Plaza West, Ltd. v. Boniuk Invs., Ltd.,* 153 S.W.3d 729, 733-34 (Tex. App.—Dallas 2005, no pet.); *Pilgrim's Pride Corp. v. Smoak,* 134 S.W.3d 880, 902-03 (Tex. App.—Texarkana 2004, pet. denied); *Norfolk So. Ry. v. Bailey,* 92 S.W.3d 577, 581 (Tex. App.—Austin 2002, no pet.).

Regarding the belated supplementation of the additional persons (Carson, Cornelius, and Connell) that Lovett had spoken with, Target was able to explore those conversations in Lovett's two depositions. As for the City's Development Services staff (Kee, Reeves, Ruiz, and Hardin) whom Lovett and Holford had spoken with, Holford's timely land planning report disclosed discussions with the staff and specifically identified Reeves, and Target itself had identified Kee as a person with knowledge of relevant facts. Holford was deposed 32 days before trial, and Target was able to explore his discussions with city staff. Target also had the opportunity to explore Lovett's conversations with city staff in his two depositions. The trial court should have found that Target would not have been unfairly surprised or prejudiced by Lovett's and Holford's trial testimony on their opinions that were based in part on these persons.

The trial court's erroneous exclusion of evidence requires reversal if the error was reasonably calculated to cause, and probably did cause, the rendition of an improper judgment. Tex. R. App. P. 44.1(a)(1); *McCraw v. Maris,* 828 S.W.2d 756, 757 (Tex. 1992). In closing argument, Target argued that the State had failed to provide evidence on remainder damages and on the total amount of compensation due, that the jury should award the amount testified to by Target's expert, that Holford had no support for his opinion that his land plan complied with city ordinances, and that Holford and the State did not care whether Target's driveways were safe.

The jury awarded Target $564,290 in total compensation, which was $311,081 more than the State's expert's opinion on total compensation of $253,209, which was erroneously excluded from evidence. We conclude that the error was reasonably calculated to cause and probably did cause the rendition of an improper judgment. [5] *See Crane v. Texas Dep't Transp.,* 880 S.W.2d 55, 59 (Tex. App.—Tyler 1994, writ denied).

**Page 52**

We sustain the State's first issue.[6]

We reverse the trial court's judgment and remand the cause to the trial court for a new trial.

Chief Justice Gray concurs only in the judgment but not in the opinion of the Court.

---------

Notes:

[1] Most of these persons had previously been identified in earlier discovery responses. Specifically, Target complained of the following persons as to Lovett: Bill Carson, B.J. Cornelius, and Clint Connell. Carson and Cornelius are land planners whom Lovett spoke with and relied on (along with Holford) in determining that the lost parking spaces that were more than 300 feet from the store's main entrance should be discounted. Lovett also relied on Connell, a real estate consultant for Wal-Mart, for this determination and for Lovett's determination of Target's peak volume periods and his 80% discount factor for the remote parking spaces. We agree with the State that these three were not "consulting experts" for whom the State owed consulting expert discovery to Target; they were not "consulted, retained, or specially employed by a party." *See* Tex. R. Civ. P. 192.7(d). Instead, they were at most persons having knowledge of relevant facts, and the State additionally identified them as such, as did Target with the persons whom its appraisal expert contacted. If these three persons had in fact been true consulting experts, our analysis below on whether Target was unfairly surprised or prejudiced might be different.

As to both Lovett and Holford, Target principally complained of the State's identification of several City Development Services staff members whom Lovett and Holford had spoken with: Jane Kee, Jennifer Reeves, Natalie Ruiz, and Edwin Hardin.

[2] Lovett calculated remainder damages by determining the net operating income per parking space and by multiplying that number by the 20% utilization factor and then by the number of lost spaces to arrive at a total lost net operating income figure. He then capitalized the lost net operating income to determine a total loss in value attributable to lost parking.

[3] Our review of the parties' dispute over why this page was not produced (in Lovett's working file) before his first deposition leads us to conclude that the failure was an accident or mistake.

[4] The rule further provides:

(c) *Continuance.* Even if the party seeking to introduce the evidence or call the witness fails to carry the burden under paragraph (b), the court may grant a continuance or temporarily postpone the trial to allow a response to be made, amended, or supplemented, and to allow opposing parties to conduct discovery regarding any new information presented by that response.

Tex. R. Civ. P. 193.6(c). The State moved for a continuance

several times during trial, but each time the trial court denied the motion. While the State does not complain of these rulings in this appeal, we note that the obvious purpose of Rule 193.6(c) is to alleviate the harshness of the exclusion of evidence by vesting the trial court with discretion to grant a continuance in situations where a party such as Target files a motion to exclude an opponent's critical evidence on the eve of trial.

[5] Target argues that, irrespective of the Rule 193.6 analysis, any error by the trial court was harmless because the trial court should have granted Target's motion to exclude Lovett's testimony on the 20% utilization factor on the ground that it was unreliable under a *Daubert/Robinson* analysis. We review a trial court's ruling on the admissibility of expert testimony for abuse of discretion. *Exxon Pipeline Co. v. Zwahr,* 88 S.W.3d 623, 629 (Tex. 2002).

Target argued in the trial court that Lovett's methodology behind his 20% utilization factor was flawed because in calculating the loss in net operating income per lost parking space, he did not consider the income attributable to those spaces during peak volume periods, but instead considered the average income per space over the course of a year. Lovett testified that he properly used the average income per space because net operating income was based on rental income that did not vary during the year. He said that he had used this methodology before and had observed other appraisers use it. The State also offered evidence that Target's own appraisal expert had utilized the same methodology in other appraisals. The trial court did not abuse its discretion in denying Target's motion to exclude Lovett's testimony as unreliable.

[6] Because we have sustained the State's first issue, we need not address its second issue, which complains that the trial court abused its discretion because its rulings were tantamount to a death-penalty sanction. We do note, however, that authority supports the State's position that a due process analysis under *TransAmerican Nat. Gas Corp. v. Powell,* 811 S.W.2d 913 (Tex. 1991), is appropriate when application of the discovery rules results in merits-preclusive or death-penalty sanctions. *See, e.g., Wheeler v. Green,* 157 S.W.3d 439, 443 (Tex. 2005); *Best,* 41 S.W.3d at 147-49; *Vaughn v. Ford Motor Co.,* 91 S.W.3d 387, 391-92 (Tex. App.—Eastland 2002, pet. denied); *Crane v. Texas Dep't Transp.,* 880 S.W.2d 55, 59 (Tex. App.—Tyler 1994, writ denied). We also need not address the State's third issue.

---------

19 S.W.3d 890 (Tex.App. —Houston [14 Dist.] 2000) 2000)

Diane S. MATTLY and David Vallance, Appellants,

v.

SPIEGEL, INC. and First Consumers National Bank, Appellees.

No. 14-98-00239-CV.

Court of Appeals of Texas, Fourteenth District, Houston

June 8, 2000

Page 891

[Copyrighted Material Omitted]

Page 892

Lori Massey Cliffe, Houston, for appellants.

Billy Marin Donely, Shari L. Heyen, Houston, for appellees.

Panel consists of Justices YATES, FOWLER and FROST.

## O P I N I O N

WANDA McKEE FOWLER, Justice.

Diane S. Mattly and David Vallance appeal from a sanctions order awarding Spiegel, Inc. and First Consumers National Bank (FCNB) a judgment of $5,000.00, plus interest and taxable court costs. In five points of error, Mattly and Vallance

Page 893

complain of the following: (1) the trial court lacked plenary jurisdiction to enter the sanctions award; (2) the sanctions order was not sufficiently specific; (3) Mattly and Vallance did not bring the claim in bad faith; and (4) Mattly's claim was not groundless. Spiegel and FCNB filed an appeal as well, complaining that the amount of sanctions awarded was so low that it was unjust and against the great weight and preponderance of the evidence. We find that the trial court abused its discretion (1) when it entered a sanctions order that was not sufficiently specific, and (2) when it found that Mattly and Vallance brought this claim in bad faith. Consequently, we reverse the judgment of the trial

court and render judgment that appellees take nothing in their counterclaim for sanctions.

## FACTUAL AND PROCEDURAL HISTORY

Diane Mattly had experienced problems with credit card fraud in the past. In the few years before this lawsuit, imposters had obtained Mattly's name and social security number and obtained approximately eighteen credit cards in her name. Mattly contacted several credit reporting agencies about these problems, and they advised her to place a red flag on her credit report. This "flag" would alert credit agencies that no credit accounts should be opened in Mattly's name unless the credit application was confirmed by calling Mattly at her home telephone number.

Mattly alleged that, after she had put a red flag on her credit report, Spiegel and/or FCNB issued a credit card to an imposter without checking Mattly's credit report. [1] The individual charged over two thousand dollars in merchandise through Spiegel's catalogue. One of Spiegel's employees contacted Mattly about the charges. Mattly explained that she did not apply for the credit card and had placed a red flag on her credit report to prevent unauthorized charges. Spiegel alleges that seven months before a representative contacted Mattly, she knew that Spiegel was listed in her credit report and failed to notify Spiegel of the problem.

Because of Mattly's refusal to pay the charges, Spiegel gave the account to a credit agency that began efforts to collect the debt from Mattly. Mattly ended up hiring both an investigator and an attorney to help her resolve the problem. Even after hiring the investigator and a lawyer, Spiegel and FCNB continued to contact Mattly regarding the debt. At some point, FCNB sent Mattly a document entitled "affidavit of forgery", requesting that she fill it out. Because of her previous problems with credit card fraud, she showed the form to her investigator and asked him if she should fill it out. He gave her several reasons why she should not complete the form. First, he noted that the form asked for confidential information such as her social security number. Next, he told her that the name of the company requesting the information--FCNB--was not listed with Dunn and Bradstreet. And, finally, he said that FCNB was not listed with directory assistance in the city listed on the return address, nor did the fire department or police department in the city recognize the name. The investigator told her that he was worried it was not a request from a legitimate company. Based on this information and advice, Mattly did not return the form. However, she did give FCNB some information; her investigator testified that he spoke with someone representing FCNB and provided that person with the names of the personnel with the various law

enforcement agencies who were investigating the fraudulent use of Mattly's credit and name. However, not having received the affidavit of forgery form, FCNB and Spiegel continued to attempt to collect the account.

**Page 894**

Mattly originally filed this suit against Spiegel and FCNB alleging that they negligently issued credit to an imposter who claimed to be Mattly. She also alleged that they violated the Fair Credit Reporting Act. The sole actual damages requested in the lawsuit were (1) the attorney's fees incurred by Mattly through her California lawyer (who helped her clear up the problem with Spiegel), and (2) the attorney's fees incurred through David Vallance, who represented Mattly in her suit against Spiegel. Spiegel and FCNB denied the charges, and counterclaimed for sanctions, alleging that the pleading was groundless and should be subject to sanctions under rule 13 of the Texas Rules of Civil Procedure. After the suit had been on file for almost one year, Spiegel moved for summary judgment on the merits of Mattly's negligence claim, but it was never heard because Mattly nonsuited her case. The counterclaim for damages was tried to the trial court which awarded Spiegel and FCNB only $5,000 (plus interest and taxable court costs) of the $70,000 they requested.

### DISCUSSION AND HOLDINGS

#### Plenary Jurisdiction

In their first point of error, Mattly and Vallance argue that the trial court did not have jurisdiction to enter the sanctions award against them. They argue that a nonsuit is a final judgment disposing of all claims, and that the trial court's plenary power extended only thirty days after the nonsuit was signed. Because the trial court did not enter its written order awarding sanctions until forty-three days after it granted Mattly's nonsuit, Mattly and Vallance claim it acted outside its plenary power, rendering the sanctions order void. As we explain below, their argument is misplaced.

Mattly and Vallance are correct that, "the plaintiff's right to take a nonsuit is unqualified and absolute as long as the defendant has not made a claim for affirmative relief." *BHP Petroleum Co. Inc. v. Millard,* 800 S.W.2d 838, 840 (Tex.1990); *Georgiades v. Di Ferrante,* 871 S.W.2d 878, 880 (Tex.App.--Houston [14 th Dist.] 1994, writ denied). However, when a defendant has filed a counterclaim seeking affirmative relief, a plaintiff cannot discontinue the suit and preclude the counterclaim from being heard. See TEX.R. CIV. P. 96. A claim for affirmative relief must state a cause of action independent of the plaintiff's claim, that entitles the defendant to relief even if the plaintiff abandons or fails to establish her cause of action. See Georgiades, 871

S.W.2d at 880; *Leon Springs Gas Co. v. Restaurant Equip. Leasing Co.,* 961 S.W.2d 574, 577 (Tex.App.--San Antonio 1997, no pet.). "A claim for frivolous lawsuit damages is a claim for affirmative relief." *Page v. Page,* 780 S.W.2d 1, 3 (Tex.App.--Fort Worth 1989, no writ). A request for rule 13 sanctions under the Texas Rules of Civil Procedure is also a request for affirmative relief. See id.

Here, Spiegel and FCNB filed counterclaims under rule 13, seeking damages for a groundless suit brought in bad faith or for purposes of harassment. Mattly's nonsuit did not affect these claims for affirmative relief; they were still properly before the court after the nonsuit. Therefore, the trial court acted within its jurisdictional power when it granted the order awarding sanctions, and Mattly's and Vallance's first point of error is overruled.

#### Specificity of Sanctions Order

In their second point of error, Mattly and Vallance argue that the trial court's order does not comply with (1) that part of rule 13, which requires the court to state the particularities upon which sanctions were issued and (2) section 10.005 of the Civil Practice and Remedies Code, which requires the court to describe the conduct warranting sanctions. We find nothing in the order reflecting that the judge ruled on the basis of section 10.005; therefore, we will address only rule 13.

**Page 895**

As to that rule, Mattly and Vallance argue that the trial court failed to specify facts showing that Mattly's case was groundless, and brought in bad faith or for purposes of harassment. We agree.

Whether to impose rule 13 sanctions is within the trial court's sound discretion. See *Monroe v. Grider,* 884 S.W.2d 811, 816 (Tex.App.--Dallas 1994, writ denied). We will not set aside a sanctions order under rule 13 unless an abuse of discretion is shown. See Falk & Mayfield L.L.P. v. Molzan, 974 S.W.2d 821, 824 (Tex.App.--Houston [14 th Dist.] 1998, pet. denied). Nonetheless,"rule 13 imposes a duty on the trial court to point out with particularity the acts or omissions on which sanctions are based." *Zarsky v. Zurich Management, Inc.,* 829 S.W.2d 398, 399 (Tex.App.--Houston [14 th Dist.] 1992, no writ). Requiring the trial court to state the particulars of the good cause for imposing sanctions is mandatory. See *GTE Communications Sys. Corp. v. Curry,* 819 S.W.2d 652, 654 (Tex.App.--San Antonio 1991, no writ). A mere statement in the order that good cause was shown is insufficient to sustain the sanctions order. See id.

As we explain below, this judgment ordering sanctions does not meet these mandatory requirements. The

judgment recites only the ultimate conclusions the court is required to make in assessing sanctions, and does not state any facts to support it. The judgment states the following:

1. Plaintiff/Counter-Defendant and her attorney, Mr. David Vallance, filed this lawsuit in bad faith and for improper purposes, including harassment of Defendants/Counter-Plaintiffs.

2. At the time that Plaintiff/Counter-Defendant and her attorney, Mr. David Vallance, filed this lawsuit, they lacked any basis to believe that the contentions that were made against Defendants/Counter-Plaintiffs were warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.

The trial court also entered findings of fact and conclusions of law. The pertinent findings are set out below.

The only damages sought by Plaintiff/Counter-Defendant were attorney's fees. Plaintiff/Counter-Defendant suffered no actual damages as a result of Defendants/Counter-Plaintiffs alleged negligence.

Plaintiff/Counter-Defendant lacked any basis to believe that the contentions that were made against Defendants/Counter-Plaintiffs were warranted by existing law.

Plaintiff/Counter-Defendant lacked any basis to believe that the contentions that were made against Defendants/Counter-Plaintiffs were warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.

Plaintiff/Counter-Defendant's pleadings were groundless and brought in bad faith.

Plaintiff/Counter-Defendant's pleadings were brought for the purpose of harassment.

Plaintiff/Counter-Defendant's pleadings were signed by her attorney, Mr. David Vallance.

Plaintiff/Counter-Defendant's attorney failed to conduct a reasonable investigation of the law and facts before initiating this lawsuit.

The acts that Plaintiff/Counter-Defendant complained of were consistent with the requirements of The Fair Credit Reporting Act.

The vast majority of these findings and conclusions are conclusory; they fail to state any particulars. See

*Murphy v. Friendswood Development Co.,* 965 S.W.2d 708, 710 (Tex.App.--Houston [1 st Dist.] 1998, no pet.); Schexnider v. Scott & White Memorial Hosp., 953 S.W.2d 439, 441 (Tex.App.--Austin 1997, no pet.)

**Page 896**

. One purpose of the particularity requirement is to justify the imposition of sanctions and to show that the trial court properly weighed the sanctions request and imposed sanctions in an appropriate manner when justified by the circumstances. See Murphy 965 S.W.2d at 710.

Neither the sanctions order nor the findings of fact contain any facts justifying the imposition of sanctions. This failure by the court to comply with rule 13 is an abuse of discretion that renders the order unenforceable and warrants a reversal. See *Thomas v. Thomas,* 917 S.W.2d 425, 432 (Tex.App.--Waco 1996, no writ). Mattly's second point of error is sustained. [2]

### The Finding of Bad Faith

In her fifth point of error, Mattly contends that the trial court abused its discretion when it found that her claims were brought in bad faith. As explained below, we find no evidence in the record to support the trial court's finding that Mattly and her attorney brought the suit in bad faith.

A party cannot obtain rule 13 sanctions unless the party proves that the claims are groundless and that the opposing party brought the claim in bad faith or to harass the party. See TEX.R. CIV. P.13. One purpose of rule 13 is to check abuses in the pleading process. See *McCain v. NME Hospitals, Inc.,* 856 S.W.2d 751, 757 (Tex.App.--Dallas 1993, no writ). As previously noted, rule 13 authorizes sanctions, available under rule 215(2)(b) [3] , against an attorney, a represented party, or both, who files a pleading that is groundless and brought in bad faith or groundless and brought for the purpose of harassment. The trial court must examine the circumstances existing when the litigant filed the pleadings to determine whether rule 13 sanctions are proper. See Monroe, 884 S.W.2d at 817. Bad faith does not exist when a party exercises bad judgment or negligence; "it is the conscious doing of a wrong for dishonest, discriminatory, or malicious purposes." Falk, 974 S.W.2d at 828, quoting *Campos v. Ysleta Gen. Hosp., Inc.,* 879 S.W.2d 67, 71 (Tex.App.--El Paso 1994, writ denied). Courts must presume that papers are filed in good faith, and the party moving for sanctions bears the burden of overcoming this presumption. See *Tarrant County v. Chancey,* 942 S.W.2d 151, 154 (Tex.App.--Fort Worth 1997, no pet.). Spiegel and FCNB point to four actions which, they claim, show that Mattly acted in bad faith: (1) Mattly voluntarily nonsuited her claim after it was pending

for a year; (2) Mattly and Vallance did not adequately research the merits of her claims; (3) Mattly failed to respond to FCNB's request to investigate her credit complaint; and (4) Spiegel and FCNB gave Mattly and Vallance notice that Mattly's claims had no legal merit. However, as we explain below, we find no evidence in the record that overcomes the presumption that Mattly and her attorney filed their pleadings in good faith.

First, the record reflects that Mattly did not nonsuit her claims because of bad faith. She testified at the hearing on the motion for sanctions that she could no longer afford to continue her lawsuit. Up until the time of nonsuit, she had accumulated over fourteen thousand dollars in attorney's fees and was waiting for depositions to begin. Moreover, in her motion for nonsuit, she stated that the case had become too expensive for her to continue.

**Page 897**

She specifically stated that she was maintaining the merit of her claims and that she was choosing to pursue a different avenue, one that would procure legislative changes to make credit card fraud more difficult. The record contains no evidence to show that Mattly acted in bad faith by filing a nonsuit, and we are unwilling to find that the filing of a nonsuit is, in and of itself, evidence of bad faith. [4] See e.g. *Delgado v. Methodist Hosp.,* 936 S.W.2d 479, 487 (Tex.App.--Houston [14 th Dist.] 1996, no writ); *Miller v. Armogida,* 877 S.W.2d 361, 365 (Tex.App.--Houston [1 st Dist.] 1994, writ denied)(where plaintiff, who sued guardian ad litem for not prosecuting a case, non-suited after sanctions were filed and then re-filed in county court).

We also do not find evidence that Mattly and her attorney failed to conduct a reasonable pre-filing inquiry into the merits of her claim. "Reasonable inquiry means the amount of examination that is reasonable under the circumstances of the case." Monroe, 884 S.W.2d at 817. Mattly spoke with three attorneys to find out what she could do to recover her expenses incurred in stopping Spiegel and the Bank's collection efforts. In addition, her California attorney suggested she contact a Texas attorney about recovering her fees because Spiegel and the Bank had Texas contacts. In addition, before she hired Vallance, a second attorney, her niece who lives in Texas, advised her that her lawsuit had merit. We find no evidence that Mattly, a lay person, failed to make a reasonable pre-filing inquiry, especially when every lawyer with whom she spoke advised her that she had a legitimate claim.

We reach the same conclusion as to Vallance, who testified that he spent at least twelve hours of research into the merits of Mattly's claim. He spent at least a third of his time researching which statutes were applicable to Mattly's negligence claim. He acknowledged that attorney's fees usually are recoverable only if authorized by contract or statute. However, during his research he located a Texas case recognizing that equity allows recovery of attorney's fees and other litigation expenses "where a party was required to prosecute or defend the previous suit as a consequence of the 'wrongful act' of the defendant." *Baja Energy, Inc. v. Ball,* 669 S.W.2d 836, 838-39 (Tex.App.--Eastland 1984, no writ); see also *Estate of Arlitt v. Paterson,* 995 S.W.2d 713, 721 (Tex.App.--San Antonio 1999, pet. denied) (holding that although attorney's fees are usually not recoverable unless permitted by statute or contract, contractual or statutory authorization was not necessary in a malpractice claim to recover attorney's fees and costs as damages). This led him to believe that Mattly's case was a unique situation, one presenting the exception discussed in Baja Energy. There was no other evidence on the issue of reasonable inquiry as to Vallance. Thus, the only evidence in the record on the issue of reasonable inquiry shows that both Mattly and Vallance made a reasonable inquiry before filing suit.

Next, we find no evidence that Mattly's failure to respond to the FCNB's inquiry into her claim of fraud was the result of bad faith. The FCNB contacted Mattly and asked her to fill out a form entitled "affidavit of forgery" and also requested other information so that it could investigate her claim that the Spiegel credit card was issued fraudulently. Mattly admits she did not fill out these forms, but says she did not fill them out because her investigator advised her not to complete them. The investigator, in turn, testified that, because Mattly had been a victim of credit card fraud in the past, he wanted to insure that the company requesting the data was legitimate. When he could not locate the company with either Dunn and Bradstreet, the local telephone directory of

**Page 898**

the city listed on its return address, or with the police and fire departments in the city, he advised her not to fill out the form. However, he pointed out that, at some point, he gave FCNB the names of several law enforcement personnel in Houston who were investigating the fraudulent use of Mattly's name and credit. This notification, both from Mattly and from her investigator, was sufficient under the regulations to notify the card issuer--FCNB--of unauthorized use of the card. See 12 C.F.R. § 226.12(b)(3). This evidence does not reflect a bad faith motive in refusing to comply with the FCNB's request. [5]

Lastly, we find no evidence that Mattly and Vallance acted in bad faith in refusing to dismiss her case when Spiegel and the FCNB told Vallance that, in their opinion, they thought Mattly's claims were not viable. In this case, we decline to hold that this fact alone establishes bad faith. The disagreement here concerned the interpretation and

application of case law and the Fair Credit Reporting Act. In virtually every case that comes before a judge, the parties disagree on these matters. Our conclusion might be different if Spiegel/FCNB had pointed out an easily verifiable fatal flaw, see *Miller v. Armogida,* 877 S.W.2d 361, 365 (Tex.App.--Houston [1 st Dist.] 1994, writ denied) (where plaintiff, sued minor's guardian ad litem, not his attorney ad litem, for failure to prosecute a claim), or the case clearly had no merit and no argument for an extension of existing law, see e.g. Delgado, 936 S.W.2d at 487-88 (where plaintiff who had arranged for a private room but received only a semi-private room, sued for negligence, intentional infliction of emotional distress, breach of contract by hospital, and tortious interference with a contract, all of which she alleged caused her mental anguish). But, as we discuss below, these situations are not present here.

Spiegel and FCNB alleged that Mattly's lawsuit was patently meritless because (1) Mattly had no actual damages--only attorneys fees--and (2) they owed no duty to Mattly to check her credit report before issuing a pre-approved card. At trial, the parties and the judge did not focus on duty, they focused on actual damages. Defendants claimed, and the trial judge clearly believed, that Mattly could not, based on the extension or modification of existing law or the establishment of new law, recover attorney's fees as damages in a negligence action.

Mattly's petition prayed for Mattly to recover the attorney's fees she incurred (1) in clearing up her credit problems with Spiegel, whom she alleged wrongfully issued the credit card, and (2) in prosecuting the case against Spiegel. However, by the time of the sanctions hearing, Vallance argued only that the expenses (attorney's fees) incurred in resolving the problems created by Spiegel's wrongful act should be recoverable. He relied on a Texas court of appeals opinion that has not been overturned, and has, in fact, been cited by several other courts of appeals. See Baja Energy, Inc., 669 S.W.2d at 838-39. Baja Energy noted that, in certain situations, equity allows the recovery of attorney's fees and other litigation expenses "where a

**Page 899**

party was required to prosecute or defend the previous suit as a consequence of the 'wrongful act' of the defendant." Id. at 839.

In opposition to this theory, Spiegel's counsel argued that the Baja case did not apply because in that case, the fees were recoverable because they were based in contract. However, as mentioned above, three subsequent courts of appeal have noted the same exception to the general rule that attorney's fees are not recoverable unless authorized by contract or statutes. See Estate of Arlitt, 995 S.W.2d at 721 (holding that, although attorney's fees usually are not recoverable unless permitted by statute or contract, statutory or contractual authorization was not necessary in a malpractice claim to recover attorney's fees and costs as damages); *Standard Fire Ins. Co. v. Stephenson,* 963 S.W.2d 81, 90-91 (Tex.App.--Beaumont 1997, no pet.) (holding that, in a bad faith claim, an insured could recover attorney's fees incurred as a result of the insurer's bad faith where those fees were incurred in prior litigation between the insurer and the insured); and *Nationwide Mutual Ins. Co. v. Holmes,* 842 S.W.2d 335, 340-42 (Tex.App.--San Antonio 1992, writ denied) (holding that insured, who incurred unnecessary attorney's fees in order to induce insurer to indemnify him, may recover those fees in a later suit "in the name of equitable principles"). And, even though no statute or contract authorized recovery of attorney's fees to the plaintiff, all three opinions--which have not been overturned--allowed the recovery of attorney's fees. See Arlitt, 995 S.W.2d at 721; Standard Fire Ins. Co., 963 S.W.2d at 90; Nationwide Mutual Ins. Co., 842 S.W.2d at 341-42.

Spiegel and FCNB also rely on the Fair Credit Reporting Act to argue that they owed no duty to Mattly to check her credit report before issuing a pre-approved credit card and, in fact, were precluded from viewing Mattly's credit report. However, Spiegel and FCNB have been unable to demonstrate with any clarity that Mattly's claim was precluded by the Fair Credit Reporting Act. [6] The sections they cite do not directly or indirectly reveal that Mattly had no cause of action; in fact, if anything, they show the opposite. See 15 U.S.C.A. § 1681b(a)(3)(A) (a consumer reporting agency may furnish a consumer report " ... to a person which it has reason to believe intends to use the information in connection with: a credit transaction involving the consumer, a transaction involving the extension of credit to a consumer, reviewing an account of the consumer, or collection of an account of the consumer"); 15 U.S.C.A. § 1681b(c)(1)(B)(i) (a consumer reporting agency may furnish a consumer report relating to any consumer in a transaction not initiated by the consumer only if the transaction consists of a firm offer of credit); 15 U.S.C.A. § 1681b(e) (concerning a consumer's right to be excluded from lists provided by credit reporting agencies); 15 U.S.C.A. § 1681m(d) (requiring persons who use a consumer report on a consumer in connection with a credit transaction not initiated by the customer, to provide the customer with a clear and conspicuous statement that information was used in connection with the transaction, that the consumer received the credit because the consumer satisfied the criteria for credit worthiness ... ); and 15 U.S.C.A. § 1681t (outlining statute's relation to state laws).

Even if we look beyond what Spiegel and FCNB have cited to us, we find nothing to indicate that Mattly's suit was

sanctionable. First, the purpose of the Act is to protect consumers, a point Congress made very clear:

It is the purpose of this Subchapter to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit ... and other information in a manner which is fair and equitable

**Page 900**

to the consumer, with regard to the confidentiality, accuracy, relevancy and proper utilization of such information....

15 U.S.C.A. § 1681(b).

Second, there is no Texas case law holding that a card issuer does, or does not have, a duty to review the cardholder's credit history prior to issuing a credit card. However, other state courts and federal courts have litigated issues between card issuers and victims of identity theft or between card issuers and card holders. See *Andrews v. Trans Union Corp.,* 7 F.Supp.2d 1056 (C.D.Ca.1998) (involving a suit between a victim of identity theft and credit reporting agencies); In re Akins, 235 B.R. 866 (W.D.Tex.1999) (containing an interesting and lively discussion of the credit card industry and the inaccuracies in reporting); *Guzman v. Toyota Motor Credit Corp.,* 745 So.2d 1123-24 (Fla.Dist.Ct.App.1999) (involving a suit between a card issuer and a victim of identity theft). These cases confirm that this is a relatively new area of the law because identity theft is a relatively new crime. See Higgins, Identity Thieves, 84--Oct. A.B.A. J. 42. These cases do not resolve the main issue in contention in this case. However, they do contain some discussions that would lead one to believe that Mattly could sue, and could argue that suit should be allowed as an extension of existing law or as the establishment of new law.

In short, after rather extensive research, much more extensive than either of the parties appear to have done, we cannot say that the Fair Credit Reporting Act precluded the type of claim Mattly brought. Thus, bringing such a claim would not support the imposition of sanctions.

There are two other comments we feel compelled to make, specifically with regard to Spiegel and FCNB's claim that Mattly acted in bad faith by refusing to dismiss her case when told that she had no cause of action and, more generally with regard to Spiegel and FCNB's claim that the claim was frivolous. First, by arguing that the case had no merit, Spiegel and FCNB relied on an extremely complex federal statutory scheme. It is one thing to sanction a party for bringing a non-existent common law claim. Often, one can easily determine if a cause of action exists. See e.g.

Delgado, 936 S.W.2d at 487. The case law supports the imposition of sanctions in such a case. See id.; Miller, 877 S.W.2d at 365. It is a totally different matter to sanction a party on the basis of a complex statute, especially one which does not directly address the matters in issue. We have found no case law imposing sanctions in such an instance, and have been cited to none. This is not to say that, when a complex statute is involved, sanctions can never be imposed. We are merely saying that judges should consider the complexity of the claim and underlying statute.

Second, Spiegel and FCNB's own actions in this case provide some indication that the alleged lack of merit was not as readily apparent as they suggest. We find it noteworthy that, while steadfastly maintaining the frivolousness of Mattly's suit, Appellees incurred nearly $70,000 in attorney's fees. And, this was in a case with minimal discovery and no apparent "Rambo tactics". Again, this is not to say that parties may not incur large legal fees if they are going to allege that a suit is frivolous, [7] but, in this case, this fact weighs against the imposition of sanctions.

Rule 13 "is a tool that must be available to trial courts in those egregious situations where the worst of the bar uses our honored system for ill motive without regard to reason and the guiding principles of the law. The rule, however, cannot become a weapon used to punish those

**Page 901**

with whose intellect or philosophic viewpoint the trial court finds fault." *Tarrant County v. Chancey,* 942 S.W.2d 151, 154 (Tex.App.--Fort Worth 1997, no pet.). We find no evidence that Mattly and her attorney consciously continued the lawsuit for dishonest, discriminatory, or malicious purposes, and we sustain Mattly's fifth point of error.

### CONCLUSION

In summary, the judgment and findings of fact are conclusory and therefore will not support the imposition of sanctions. Moreover, no evidence supports the trial court's finding that Mattly or her attorney acted in bad faith. Therefore, the trial court abused its discretion in imposing sanctions. Because we have held that sanctions were not properly imposed, we need not reach Spiegel's and FCNB's cross-appeal that the sanctions award was too low, nor do we reach Mattly and Vallance's points of error alleging that the suit was not groundless.

The judgment of the trial court is reversed, and we render judgment that appellees, Spiegel, Inc. and First Consumers National FCNB, take nothing in their counterclaim for sanctions.

---------

Notes:

[1] Spiegel asserted that it issued the credit card in response to a pre-approved application that it mailed directly to Mattly.

[2] Although our disposition of this point alone requires that we reverse the case, it would be only a reversal and remand of the case to the trial court. The appellate rules require us to reverse the court's judgment and render the judgment the trial court should have rendered, unless we must remand for further proceedings or must remand in the interests of justice. See TEX.R.APP. P. 43.3. Because the fifth point of error presents an issue that requires us to reverse and render, we address it, as well.

[3] Texas Rule of Civil Procedure 215 governs sanctions for discovery abuse.

[4] However, in a patently meritless suit, some courts have held that failing to nonsuit may constitute some evidence supporting sanctions. See Delgado, 936 S.W.2d at 487.

[5] Spiegel/FCNB argue that the Official Staff Commentary to the regulations permits a card issuer to request information in written form from a cardholder. See 12 C.F.R. § 226.12(b)-2,3 (1995). To begin with, we do not find any language in the Commentary remotely resembling Speigel/FCNB's contention, much less requiring a cardholder to return a form sent to it by the card issuer. But, beyond this fundamental problem with the argument, the issue here is not whether the card issuer could obtain written information from Mattly. The issue is whether Mattly, someone who had been the victim of credit card abuse on numerous occasions, acted in bad faith when she refused to return a form (which requested confidential information) to a company her investigator could not locate through normal investigative channels. Citing to the same commentary, Spiegel/FCNB also argue that if the cardholder fails to comply with these requests from a card issuer, the card issuer can terminate its investigation and "seek payment from the cardholder." Our reading of the Commentary does not reveal any explicit support for this statement.

[6] Spiegel and FCNB did not raise preemption.

[7] Mattly took no action to cause Spiegel and FCNB's legal fees to reach nearly $70,000, unlike some frivolous actions in which a party will file numerous motions and discovery requests that inflate the fees.

---------

258 S.W.3d 694 (Tex.App.-Waco 2008)

R.M. DUDLEY CONSTRUCTION COMPANY, INC., Appellant

v.

Dan DAWSON, William W. Dawson, Jr. (Dan Dawson's Dad), Rudy Briner, Steven Clark Hays and James K. Ashlock, Appellees.

No. 10-06-00228-CV.

Court of Appeals of Texas, Tenth District, Waco

May 28, 2008

Rehearing Overruled July 29, 2008.

Page 695

[Copyrighted Material Omitted]

Page 696

[Copyrighted Material Omitted]

Page 697

[Copyrighted Material Omitted]

Page 698

[Copyrighted Material Omitted]

Page 699

[Copyrighted Material Omitted]

Page 700

Robert A. Swearingen, Peterson & Swearingen LLP, College Station, TX, for Appellant.

Billy M. Payne, Payne, Watson, Miller, Malecheck & Scherr PC, Bryan, TX, for Appellees.

Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.

**OPINION**

BILL VANCE, Justice.

Carlos Martinez was a concrete supervisor for Appellant R.M. Dudley Construction Company (Dudley Construction), which is owned by Mark Dudley (Dudley). Dudley Construction did some work for Appellee Dan Dawson, and Martinez supervised the concrete crew on that job. Dawson subsequently hired Martinez to do some more construction work " on the side," and in doing so, Martinez used Dudley Construction's equipment, supplies, and employees who were being paid by Dudley Construction while doing the work on the side. Martinez was thus able to charge Dawson significantly less than the going rate for such work.

The other Appellees in this case-William W. Dawson, Jr. (Dan Dawson's Dad), Rudy Briner, Steven Clark Hays, and James K. Ashlock-all learned about Martinez's discounted, on-the-side construction work from each other and had Martinez do similarly discounted construction work for them. Dudley learned that Martinez had done work for the Appellees using Dudley Construction's equipment, supplies, and employees, and he filed constitutional and mechanic's and materialman's lien affidavits on the Appellees' properties where Martinez had done the concrete work on the side.

The Appellees filed a summary motion to remove Dudley Construction's liens under section 53.160 of the Property Code, claiming that the liens were invalid because they were filed on the Appellees' homestead properties and no written contracts were executed before the construction work commenced, as required by Property Code section 53.254.[1]*See* TEX. PROP.CODE ANN. § § 53.160, 53.254 (Vernon 2007). The Appellees requested the trial court to remove the liens and to award them their attorney's fees under section 53.156. *See id.* § § 53.156, 53.160. Dudley Construction answered, filing a general denial. It also filed a counterclaim entitled " Original Counterclaim and Suit to Foreclose Lien" and alleging claims for unjust enrichment, fraud, theft liability act, conversion, conspiracy, tortious interference with contractual relations, and quantum meruit.

Page 701

The trial court issued an order finding that the liens are invalid and should be removed and instructing the county clerk of Brazos County to file the order to show that the liens are invalid and are to be removed so as not to be a cloud on the Appellees' property titles. A hearing on attorney's fees incurred to have the liens removed took place, but the trial court deferred ruling on the Appellees' request for attorney's fees until all issues in the case had been determined.

About ten months later, the Appellees answered Dudley Construction's counterclaim, asserting a general

denial and their own counterclaim in which they claimed that Dudley Construction's counterclaim was "groundless in fact or brought in bad faith or brought for the purpose of harassment." The Appellees also sought to recover their attorney's fees in defending Dudley Construction's counterclaim.

A jury trial was held, and after Dudley Construction had rested, the trial court granted the Appellees' motion for directed verdict on all of Dudley Construction's claims except for its conspiracy-to-breach-fiduciary-duty claim against Appellees Dan Dawson and Rudy Briner. The jury found against Dudley Construction on that claim, and Dudley Construction thus took nothing on its counterclaim. The trial court did not submit any jury issues on the Appellees' remaining claims or on attorney's fees.

### Continuance

We begin with Dudley Construction's second issue, which asserts that the trial court erred by denying its first and only motion for continuance. We review a ruling on a motion for continuance for abuse of discretion. *Villegas v. Carter,* 711 S.W.2d 624, 626 (Tex.1986).

On August 12, 2005, this case was set for jury trial on December 5, 2005, with a final pretrial on December 2. The "notice of setting" states: "Conflicting settings of counsel will not be a reasonable ground [for a continuance] unless the conflicting setting was given prior in time to this notice, ..." At the December 2 final pretrial, the trial court *sua sponte* moved the trial to December 7. On December 6, Dudley Construction filed a motion for continuance, alleging that its attorney had received notice on November 30 that two of his clients in another legal proceeding had just been added to a NASD arbitration that was scheduled to begin on December 6. The trial court denied the motion, and another attorney from the law firm of Dudley Construction's attorney tried the case for Dudley Construction.

In general, absence of counsel is not good cause for a continuance, but the trial court has the discretion to allow a continuance if good cause is shown. TEX.R. CIV. P. 253; *see Rehabilitation Facility at Austin, Inc. v. Cooper,* 962 S.W.2d 151, 155 (Tex.App.-Austin 1998, no pet.)(citing *State v. Crank,* 666 S.W.2d 91, 94 (Tex.1984)). The record does not show the efforts, if any, taken by Dudley Construction's attorney to have the conflicting arbitration proceeding reset, nor does it adequately explain the arbitration's precedence over the December 5 jury trial setting for which notice was given on August 12. Furthermore, there is no explanation why the motion for continuance was filed after the pretrial and on the day before trial.

Nothing in the record suggests that the new attorney was incapable of rendering adequate representation or did not render adequate representation. *See Rehabilitation Facility,* 962 S.W.2d at 156 (citing *Echols v. Brewer,* 524 S.W.2d 731, 734 (Tex.Civ.App.-Houston [14th Dist.] 1975, no writ)). Dudley Construction points to

**Page 702**

the trial court's exclusion of some telephone records because they had not been timely produced, but the record does not reflect that a different ruling would have been made if Dudley Construction's original attorney had been present or that the records' exclusion prejudiced Dudley Construction.

Based on the circumstances in the record before us, we cannot say that the trial court abused its discretion. *See id.* at 155-56 (trial court did not abuse its discretion by denying continuance on ground that lead counsel for hospital was in trial for another client in another city where attorney from same law firm represented hospital at trial, and record did not indicate lead counsel had tried to avoid scheduling conflict or had demonstrated why other case took precedence over hospital's case). We overrule Dudley Construction's second issue.

### Directed Verdict

The trial court directed a verdict and rendered judgment in favor Appellees William W. Dawson, Jr. (Dan Dawson's Dad), Hays, and Ashlock on *all* of Dudley Construction's claims (unjust enrichment, fraud, theft liability act, conversion, conspiracy, tortious interference with contractual relations, and quantum meruit) against them. It also directed a verdict in favor of Appellees Dan Dawson and Briner on Dudley Construction's claims for unjust enrichment, fraud, theft liability act, conversion, tortious interference with contractual relations, and quantum meruit, but not on the conspiracy claim. The only claim of Dudley Construction that the trial court submitted to the jury was its claim for conspiracy to breach fiduciary duty against Appellees Dan Dawson and Briner (*i.e.,* that they conspired with Martinez to breach his fiduciary duty to Dudley Construction), and the jury found against Dudley Construction on that claim.

Dudley Construction's third issue complains that the trial court erred by entering a directed verdict on Dudley Construction's claims for quantum meruit and unjust enrichment against all the Appellees. Dudley Construction is not appealing the directed verdict in favor of Appellees William W. Dawson, Jr. (Dan Dawson's Dad), Hays, and Ashlock on its claims for fraud, theft liability act, conversion, conspiracy, and tortious interference with contractual relations. Dudley Construction is not appealing

the directed verdict in favor of Appellees Dan Dawson and Rudy Briner on its claims for fraud, theft liability act, conversion, and tortious interference with contractual relations, nor is it appealing the adverse jury finding on its conspiracy claim against Appellees Dan Dawson and Briner.

In reviewing the granting of a motion for directed verdict, we follow the standards for assessing the legal sufficiency of the evidence. *City of Keller v. Wilson,* 168 S.W.3d 802, 809-28 (Tex.2005). There is legally insufficient evidence or " no evidence" of a vital fact when (a) there is a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact. *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997); *see also Prudential Ins. Co. v. Fin. Review Servs., Inc.,* 29 S.W.3d 74, 77 (Tex.2000) (directed verdict proper only when evidence conclusively establishes right of movant to judgment or negates right of opponent or evidence is insufficient to raise material fact issue);

## Page 703

*Cain v. Pruett,* 938 S.W.2d 152, 160 (Tex.App.-Dallas 1996, no writ) (directed verdict proper when evidence reflects no other verdict can be rendered and moving party is entitled to judgment as matter of law).

### Quantum Meruit

Quantum meruit is an equitable theory of recovery intended to prevent unjust enrichment when there is an implied agreement to pay for goods or services provided. *In re Kellogg Brown & Root,* 166 S.W.3d 732, 740 (Tex.2005); *Vortt Exploration Co. v. Chevron U.S.A., Inc.,* 787 S.W.2d 942, 944 (Tex.1990). " Generally, a party may recover under quantum meruit only when there is no express contract covering the services or materials furnished." *Vortt Exploration,* 787 S.W.2d at 944. Stated another way, a party generally cannot recover under quantum meruit when there is a valid contract covering the services or materials furnished. *Murray v. Crest Constr., Inc.,* 900 S.W.2d 342, 345 (Tex.1995). In this case, it in undisputed that each of the Appellees had an express oral contract with Martinez on their respective side jobs with him and that they paid him under those oral contracts. That precludes recovery under quantum meruit as a matter of law, and Dudley Construction makes no contrary argument. The trial court did not err in entering a directed verdict on Dudley Construction's quantum meruit claims.

### Unjust Enrichment

Unjust enrichment, itself, is not an independent cause of action but rather " characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances that give rise to an implied or quasi-contractual obligation to repay." *Friberg-Cooper Water Supply Corp. v. Elledge,* 197 S.W.3d 826, 832 (Tex.App.-Fort Worth 2006, pet. filed) (quoting *Walker v. Cotter Props., Inc.,* 181 S.W.3d 895, 900 (Tex.App.-Dallas 2006, no pet.)), [*rev'd on other grounds,* 240 S.W.3d 869 (Tex.2007)]; *Mowbray v. Avery,* 76 S.W.3d 663, 679 (Tex.App.-Corpus Christi 2002, pet. denied); *see Best Buy Co. v. Barrera,* 214 S.W.3d 66, 73 (Tex.App.-Corpus Christi 2006, pet. filed), [*rev'd on other grounds,* 248 S.W.3d 160 (Tex.2007)]. The doctrine applies the principles of restitution to disputes where there is no actual contract, based on the equitable principle that one who receives benefits that would be unjust for him to retain ought to make restitution. *Friberg-Cooper,* 197 S.W.3d at 832; *Mowbray,* 76 S.W.3d at 679. Unjust enrichment is not a proper remedy " merely because it ' might appear expedient or generally fair that some recompense be afforded for an unfortunate loss' to the claimant, or because the benefits to the person sought to be charged amount to a windfall." *Heldenfels Bros. Inc. v. City of Corpus Christi,* 832 S.W.2d 39, 42 (Tex.1992) (quoting *Austin v. Duval,* 735 S.W.2d 647, 649 (Tex.App.-Austin 1987, writ denied)); *Mowbray,* 76 S.W.3d at 679. To recover under an unjust enrichment theory, the benefits to the other party must be actually unjust under the principles of equity. *Mowbray,* 76 S.W.3d at 679; *Burlington N. R.R. v. Sw. Elec. Power Co.,* 925 S.W.2d 92, 97 (Tex.App.-Texarkana 1996), *aff'd,* 966 S.W.2d 467 (Tex.1998).

*Argyle ISD v. Wolf,* 234 S.W.3d 229, 246-47 (Tex.App.-Fort Worth 2007, no pet. h.).

Unjust enrichment is also found under circumstances in which one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage. *Heldenfels Bros.,* 832 S.W.2d at 41. In its brief, Dudley Construction points to its allegations that the Appellees

## Page 704

had obtained the benefit of Dudley Construction's labor and materials through fraud and taking undue advantage of Dudley Construction in their transactions with Martinez, which includes the same factual matters as the alleged conspiracy with him to breach his fiduciary duty to Dudley Construction by diverting concrete jobs.

As with our disposition of Dudley Construction's quantum meruit claim, we note that on Dudley Construction's unjust enrichment claim, each of the

Appellees had an express oral contract with Martinez on their respective side jobs and they paid him under those contracts. Thus, the equitable remedy of unjust enrichment is not applicable. *See Argyle ISD,* 234 S.W.3d at 246-47 (unjust enrichment doctrine applies principles of restitution to disputes where there is no actual contract).

Additionally, the availability of an adequate legal remedy may render equitable claims like unjust enrichment unavailable. *See Best Buy Co. v. Barrera,* 248 S.W.3d 160, 161 n. 1 (Tex.2007) (citing and quoting *BMG Direct Mktg., Inc. v. Peake,* 178 S.W.3d 763, 770 (Tex.2005) (" Like other equitable claims and defenses, an adequate legal remedy may render equitable claims of unjust enrichment and equitable defenses of voluntary-payment unavailable." )). In this case, the trial court submitted Dudley Construction's common-law cause of action of conspiracy to breach fiduciary duty, and the jury found against Dudley Construction. That adequate legal remedy was available to Dudley Construction in its case against Appellees. Moreover, the record shows that Dudley Construction had yet another available legal remedy-a separate lawsuit pending against Martinez for his liability to Dudley Construction over the same side jobs.

Finally, unjust enrichment based on the Appellees' alleged fraudulent conduct was subsumed within, or was a close version in equity of, Dudley Construction's conspiracy claim, which was submitted to the jury. Submitting a separate jury question on unjust enrichment would have been superfluous and confusing. *See Hyundai Motor Co. v. Rodriguez,* 995 S.W.2d 661, 665-66 (Tex.1999) (trial court should not submit differently worded questions that call for same factual finding " to avoid confusing the jury and the possibility of inconsistent findings" ); *Texas Genco, LP v. Valence Operating Co.,* 187 S.W.3d 118, 125 (Tex.App-Waco 2006, pet. denied). For these reasons, the trial court did not err in directing a verdict on Dudley Construction's unjust enrichment claims. We overrule Dudley Construction's third issue.

### Attorney's Fees and Sanctions

We now turn to Dudley Construction's first issue, which complains that the trial court erred in awarding attorney's fees to the Appellees as sanctions. As noted above, after the trial court ordered the removal of the liens, a hearing took place on the Appellees' claim for attorney's fees and costs incurred to have the liens removed. *See* TEX. PROP.CODE ANN. § 53.156. The Appellees' attorney testified to attorney's fees and costs in the amount of $7,377.70 at that point in the litigation. The trial court deferred ruling on the Appellees' request for attorney's fees at that time.

After the jury trial on Dudley Construction's counterclaim, the Appellees filed a post-trial " motion to assess attorney's fees." It first recited the history of their motion to remove the liens and their request for attorney's fees in that motion, then it asserted that Dudley Construction's conspiracy claim " was groundless, was brought in bad faith and for the purpose of harassment." The motion sought recovery of all of the Appellees' attorney's fees. After Dudley Construction filed a response

**Page 705**

complaining that the Appellees' motion did not cite any rules or statutes, the Appellees filed an amended motion that cited section 53.126 [*sic* ] for their request for attorney's fees to remove the liens and that cited for their frivolous pleading claim section 53.156 " and/or" Rule of Civil Procedure 13 " and/or" chapter 10 of the Civil Practice and Remedies Code.

Because the trial judge recused himself, an assigned judge presided over the Appellees' motion to assess attorney's fees. After a hearing, the assigned judge granted the motion, and an award of attorney's fees on the Appellees' motion was incorporated in the judgment " based on Section 53.156 of the Property Code, and/or Chapter 10 of the Civil Practices & Remedies Code, and/or Rule 13, Texas Rules of Civil Procedure." [2] The judgment awarded attorney's fees as follows: $35,259.93 through entry of judgment; $12,500 in the event of an unsuccessful appeal; $10,000 in the event of an unsuccessful petition for review, and $7,500 in the event oral argument is presented on an unsuccessful petition for review.

The assigned judge issued findings of fact and conclusions of law, and the judgment closely tracked the language of the findings and conclusions. The summarized findings or conclusions are:

1. The Appellees filed the case to invalidate the liens wrongfully filed by Dudley Construction on their homesteads.

2. Dudley Construction's counterclaim sought to establish and foreclose liens on the Appellees' homesteads.

3. The liens were invalid and ordered stricken.

4. The entire case was " of the type" referenced in section 53.156 of the Property Code.

5. [Actual amounts of attorney's fees awarded, as noted above].

6. The amounts are both equitable and just.

7. Dudley Construction's filing liens against the Appellees'

homesteads intended to harass them [as follows: [3]]

8. Dudley Construction's filing liens against the Appellees' homesteads without written and signed contracts is contrary to Texas law.

9. Dudley Construction's liens were fraudulent under section 51.901 of the Government Code.

10. Dudley Construction refused to release the liens after receiving written demand delivered to it under section 32.49 of the Penal Code.

11. The specific dollar amounts claimed as due in the liens were not supported by systematically kept records.

12. The specific dollar amounts in a sworn affidavit in the separate case against Martinez were for substantially different amounts than the amounts sworn to in the liens.

13. The amounts claimed in a sworn affidavit in the separate case against Martinez were merely estimates of the amounts that Dudley Construction would have charged had it done the jobs at issue.

**Page 706**

14. As to Appellees Hays, Ashlock, and William W. Dawson (Dan Dawson's Dad), no credible evidence was introduced showing that they conspired to defraud Dudley Construction.

### Property Code Section 53.156

Section 53.156 of the Property Code provides: " In any proceeding to foreclose a lien ... or in any proceeding to declare that any lien or claim is invalid or unenforceable in whole or in part, the court may award costs and reasonable attorney's fees as are equitable and just." TEX. PROP.CODE ANN. § 53.156. We review an award of attorney's fees under a statute such as section 53.156 for an abuse of discretion. *See, e.g., Bocquet v. Herring,* 972 S.W.2d 19, 21 (Tex.1998); *cf.* TEX. CIV. PRAC. & REM.CODE ANN. § 37.009 (Vernon 1997) (under Declaratory Judgments Act, trial court may award " reasonable and necessary attorney's fees as are equitable and just" ). " Whether to award attorney's fees, and to which party, is a decision that is solely within the trial court's discretion and will not be reversed absent a clear abuse of that discretion." *Sammons v. Elder,* 940 S.W.2d 276, 284 (Tex.App.-Waco 1997, writ denied).

The determination of whether a trial court abused its discretion is a question of law. *Jackson v. Van Winkle,* 660 S.W.2d 807, 810 (Tex.1983), *overruled in part on other grounds by Moritz v. Preiss,* 121 S.W.3d 715, 721 (Tex.2003). A trial court abuses its discretion when it acts arbitrarily and unreasonably, without reference to guiding rules or principles, or when it misapplies the law to the established facts of the case. *Beaumont Bank, N.A. v. Buller,* 806 S.W.2d 223, 226 (Tex.1991). " A trial court has no discretion to determine what the law is or in applying the law to the facts and, consequently, the trial court's failure to analyze or apply the law correctly is an abuse of discretion." *In re American Homestar of Lancaster, Inc.,* 50 S.W.3d 480, 483 (Tex.2001).

Dudley Construction asserts that the assigned judge abused his discretion in awarding attorney's fees and costs under section 53.156 for fees and costs incurred after the trial court found the liens invalid and ordered them stricken on March 10, 2004. We agree. On March 24, 2004, the trial court held a hearing on the Appellees' request for attorney's fees and costs under section 53.156, and the Appellees' attorney testified to attorney's fees and costs in the amount of $7,377.70. In its brief, Dudley Construction does not dispute that the " Appellees were entitled to reasonable attorney's fees in their efforts to remove the liens on their respective properties." (Appellant's Brief at 21).

Dudley Construction argues that once the trial court found the liens invalid and ordered them stricken in the Appellees' section 53.160 summary-motion proceeding, no proceeding to foreclose on a lien or to declare a lien invalid was pending and the Appellees could not recover attorney's fees under section 53.156 in defending Dudley Construction's common-law and equitable counterclaims. We agree, as did the trial court before recusal occurred: At a January 23, 2006 hearing on the Appellees' motion for attorney's fees, the trial court stated that, upon the liens being held unenforceable, " The way I view it at that point in time, I basically took it [the lien issue in the case] out of the Property Code...."

The Appellees argued then and argue now that because Dudley Construction left language seeking to establish liens on the Appellees' properties in its counterclaim, the lien issue remained in the case. The trial court did not necessarily agree with the Appellees, but the assigned judge apparently

**Page 707**

did with his conclusion that the entire case was " of the type" referenced in section 53.156 of the Property Code. The language in Dudley Construction's pleading was an alternative request for the imposition of and foreclosure on a judicial equitable lien and a constructive trust to enable Dudley Construction to recover damages. That pleading language, however, even if construed as a " proceeding to foreclose a lien" as required by section 53.156, does not fall within the ambit of section 53.156 because judicial or equitable liens are not governed by Title 5, Subtitle B of the

Property Code, which section 53.156 is a part of. *See* TEX. PROP.CODE ANN. § 51.001(2) (Vernon 2007) (" this subtitle does not affect ... a lien that is not treated in this subtitle, include a lien arising under common law, in equity" ).

In conclusion, because the trial court ruled that Dudley Construction's liens were invalid and ordered them stricken, thus taking them out of the case, and because the request for the imposition of and foreclosure on a judicial equitable lien is not governed by section 53.156, the assigned judge abused his discretion by misapplying the law in his conclusion that the *entire* proceeding was of the type referenced in section 53.156. We hold that the Appellees cannot recover attorney's fees and costs under section 53.156 for the litigation that continued after the trial court's March 10, 2004 order declaring the liens invalid and ordering their removal. But because the trial court held a hearing and received evidence of attorney's fees and costs at the conclusion of the section 53.160 summary-motion proceeding, we hold that the Appellees are entitled to recover attorney's fees and costs in the amount of $7,377.70 under section 53.156.

### Rule 13 Sanctions

Imposing Rule 13 sanctions is within the trial court's sound discretion. *Monroe v. Grider,* 884 S.W.2d 811, 816 (Tex.App.-Dallas 1994, writ denied). Accordingly, we review a trial court's order for Rule 13 sanctions under an abuse of discretion standard. *Cire v. Cummings,* 134 S.W.3d 835, 838 (Tex.2004).

Rule 13 authorizes a trial court to impose sanctions against an attorney, a represented party, or both, who file a groundless pleading brought in bad faith or brought for the purpose of harassment. TEX.R. CIV. P. 13. " The imposition of Rule 13 sanctions involves the satisfaction of a two-part test. First, the party moving for sanctions must demonstrate that the opposing party's filings are groundless, and second, it must be shown that the pleadings were filed either in bad faith or for the purposes of harassment." *Estate of Davis v. Cook,* 9 S.W.3d 288, 297 (Tex.App.-San Antonio 1999, no pet.).

Rule 13 directs a trial court to presume that a pleading was filed in good faith. TEX.R. CIV. P. 13; *GTE Comm. Sys. v. Tanner,* 856 S.W.2d 725, 731 (Tex.1993). " Thus, the burden is on the party moving for sanctions to overcome this presumption." *Tanner,* 856 S.W.2d at 731. A groundless pleading is not sanctionable unless it *also* was brought in bad faith or for the purpose of harassment. *Id.*

Rule 13 also provides: " No sanctions under this rule may be imposed except for good cause, the particulars of which must be stated in the sanction order." TEX.R. CIV. P.

13; *see Appleton v. Appleton,* 76 S.W.3d 78, 86 (Tex.App.-Houston [14th Dist.] 2002, no pet.)(" the trial court is required to make particularized findings of good cause justifying the sanctions" ). In reviewing an award of sanctions, we ordinarily look to the particulars of good cause set out in the sanction order. *Woodward v. Jaster,* 933 S.W.2d 777, 782 (Tex.App.-Austin 1996, no writ).

### Page 708

Dudley Construction asserts that because the assigned judge did not make a specific finding that Dudley Construction's counterclaims were groundless, the assigned judge abused his discretion in imposing sanctions under Rule 13. We partially agree. In setting out its good cause findings with particularity, the trial court must find the pleading groundless as part of the two-part test. *See Tanner,* 856 S.W.2d at 731 (to be sanctionable, pleading must be groundless and *also* brought in bad faith or for the purpose of harassment); *Estate of Davis,* 9 S.W.3d at 297 (" First, the party moving for sanctions must demonstrate that the opposing party's filings are groundless, ..." ); *Karlock v. Schattman,* 894 S.W.2d 517, 522 (Tex.App.-Fort Worth 1994, orig. proceeding) (" The trial court must find that the pleadings are in fact groundless and brought in bad faith or to harass." ); *McCain v. NME Hosps., Inc.,* 856 S.W.2d 751, 757 (Tex.App.-Dallas 1993, no writ) (" The trial court must find that the pleadings are in fact groundless *and* were brought in bad faith or to harass." ).

In their amended motion to assess attorney's fees, the Appellees identified Dudley Construction's conspiracy claim as the pleading in question, and in his findings and conclusions, the assigned judge found or concluded: " As to Steven Clark Hays, James K. Ashlock, and William W. Dawson (Dan Dawson's Dad), no credible evidence was introduced showing that they conspired to defraud R.M. Dudley Construction Company, Inc." It is therefore clear that, if the assigned judge found a claim groundless and sanctionable under Rule 13, it was Dudley Construction's conspiracy claim. We will therefore apply Rule 13's groundlessness test to the pleading of that claim.

Rule 13 defines " groundless" as having " no basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law." *Id.* In determining whether sanctions are appropriate, the trial court must examine the facts available to the litigant and the circumstances existing when the litigant filed the pleading. *Alejandro v. Bell,* 84 S.W.3d 383, 392 (Tex.App.-Corpus Christi 2002, no pet.). The trial court uses an objective standard to determine if a pleading was groundless: did the party and counsel make a reasonable inquiry into the legal and factual basis of the claim? *In re United Servs. Auto Ass'n,* 76 S.W.3d 112, 115 (Tex.App.-San Antonio 2002,

orig. proceeding).

Because of the assigned judge's finding or conclusion that Dudley Construction did not introduce any credible evidence that Hays, Ashlock, and William W. Dawson (Dan Dawson's Dad) conspired to defraud Dudley Construction, we know that the assigned judge plainly did not apply Rule 13's groundlessness test.[4] This misapplication of the law is an abuse of discretion. *See In re American Homestar,* 50 S.W.3d at 483 (" trial court's failure to analyze or apply the law correctly is an abuse of discretion" ). Without a proper groundlessness finding under Rule 13, the Appellees cannot recover attorney's fees as sanctions under Rule 13, and any recovery under Rule 13 would be an abuse of discretion.

### Civil Practice and Remedies Code Chapter 10 Sanctions

Sanctions can be ordered for a violation of section 10.001.

**Page 709**

TEX. CIV. PRAC. & REM.CODE ANN. § 10.002(a) (Vernon 2002). The assigned judge's findings and the judgment reflect that sanctions were ordered under sections 10.001(1) and 10.001(3). Under section 10.001, signing a pleading or motion constitutes a certificate by the signatory that to the signatory's best knowledge, information, and belief, formed after reasonable inquiry:

(1) the *pleading or motion* is not being presented for any improper purpose, including to harass or to cause unnecessary delay or needless increase in the cost of litigation;

...

(3) each allegation or other factual contention in the *pleading or motion* has evidentiary support or, for a specifically identified allegation or factual contention, is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

*Id.* § 10.001(1), (3) (emphases added).

Sanctions under chapter 10 are reviewed for abuse of discretion. *Low v. Henry,* 221 S.W.3d 609, 614 (Tex.2007). Rule 13 directs a trial court to presume that a pleading was filed in good faith. TEX.R. CIV. P. 13; *Tanner,* 856 S.W.2d at 731. " Thus, the burden is on the party moving for sanctions to overcome this presumption." *Tanner,* 856 S.W.2d at 731. The Appellees, as the movants for sanctions, had the burden of proving violations of sections 10.001(1) and 10.001(3).

Chapter 10, by its own terms, is limited to frivolous

pleadings and motions: " The signing of a pleading or motion...." TEX. CIV. PRAC. & REM.CODE ANN. § 10.001; *see Low,* 221 S.W.3d at 614. The affidavits claiming liens that Dudley Construction filed with the county clerk of Brazos County are not pleadings or motions.

It is unclear whether the assigned judge imposed sanctions for a violation of section 10.001(1) with respect to Dudley Construction's counterclaim to establish and foreclose on the liens, or with respect to Dudley Construction's filing of affidavits claiming liens. The findings and conclusions refer to the counterclaim and then to the liens, and the judgment's principal references to the liens are to highlight how they played a role in Dudley Construction's intent to harass the Appellees. The findings and the judgment do not expressly find or conclude that Dudley Construction's counterclaim was intended to harass the Appellees. To the contrary, the judgment, after reciting the case's procedural history, " concludes and finds that R.M. Dudley Construction Company, Inc. intended to harass the Plaintiffs/Counter-Defendants for any one of the following reasons: ..." Those following reasons are Findings 8 to 14, set forth above. Therefore, to the extent that the assigned judge's findings and judgment assessed chapter 10 sanctions for the filing of the lien affidavits because their filing by Dudley Construction was intended to harass the Appellees, in violation of section 10.001(1), the assigned judge abused his discretion by not correctly applying the law.

Regardless, if Dudley Construction's counterclaim was the offending pleading, sanctions under section 10.001(1) fail for another reason. A trial court must hold an evidentiary hearing to make the necessary factual determinations about the party's or attorney's motives and credibility. *Alejandro v. Robstown ISD,* 131 S.W.3d 663, 670 (Tex.App.-Corpus Christi 2004, no pet.); *see, e.g., Low,* 221 S.W.3d at 613, 617 (referring to trial court's evidentiary hearing on motion for chapter 10 sanctions); *Trantham v. Isaacks,* 218 S.W.3d 750, 752, 755-56 (Tex.App.-Fort Worth 2007, pet. denied) (same), *cert. denied,*

**Page 710**

__ U.S. __, 128 S.Ct. 340, 169 L.Ed.2d 155 (2007); *Law Offices of Windle Turley, P.C. v. French,* 164 S.W.3d 487, 491-92 (Tex.App.-Dallas 2005, no pet.)(same). Without such an evidentiary hearing, the trial court has no evidence before it to determine that a pleading was filed in bad faith or to harass. *Robstown ISD,* 131 S.W.3d at 670; *Karlock,* 894 S.W.2d at 523. The party moving for sanctions must prove the pleading party's subjective state of mind. *Brozynski v. Kerney,* 2006 WL 2160841, at *4 (Tex.App.-Waco Aug. 2, 2006, pet. denied) (citing *Mattly v. Spiegel, Inc.,* 19 S.W.3d 890, 896 (Tex.App.-Houston [14th

Dist.] 2002, no pet.)). In the case of section 10.001(1), the movant must show, and the court must describe and explain, that the pleading was filed for the improper purpose of harassment. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 10.001(1); *id.* § 10.005 (" A court shall describe in an order imposing a sanction under this chapter the conduct the court has determined violated Section 10.001 and explain the basis for the sanction imposed." ).

Evidence must be admitted under the rules of evidence at the evidentiary hearing for a trial court to consider it in a sanctions context. *Bell,* 84 S.W.3d at 393; *see McCain,* 856 S.W.2d at 757 (motions and arguments of counsel are not evidence in a sanctions hearing context). The pleading alone cannot establish that the represented party or its attorney brought their case in bad faith or to harass. *McCain,* 856 S.W.2d at 757.

At the hearing on the Appellees' motion to assess attorney's fees as sanctions, the Appellees requested that the assigned judge take judicial notice of the file and include the evidence from the jury trial as a part of the record of the hearing. The assigned judge, however, presided over only this one hearing, and the only evidence filed for the Appellees' motion was Dudley's affidavit that detailed his pre-suit investigation.

In some circumstances, a trial court may take judicial notice of the case file for purposes of ruling on a sanctions motion. *Elkins v. Stotts-Brown,* 103 S.W.3d 664, 667 (Tex.App.-Dallas 2003, no pet.)(citing *Tex.-Ohio Gas, Inc. v. Mecom,* 28 S.W.3d 129, 139 (Tex.App.-Texarkana 2000, no pet.)(noting that, under some circumstances, trial court may be able to make determination regarding motives and credibility of person signing petition by taking judicial notice of items in case file)); *see also Walston v. Lockhart,* 2005 WL 428433, at *3 (Tex.App.-Waco Feb. 23, 2005, pet. denied); *cf. Emmons v. Purser,* 973 S.W.2d 696, 701 (Tex.App.-Austin 1998, no pet.)(reversing sanctions order and noting that parties were present at hearing but weren't called to testify, and although court took judicial notice of case file, nothing in case file proved bad faith or harassment). But this case is not a circumstance where the assigned judge could take judicial notice of the case file and include the trial evidence-which the assigned judge heard none of-as a part of the evidentiary record on the Appellees' motion for attorney's fees as sanctions.

Except for Dudley's uncontroverted affidavit,[5] the assigned judge had no evidence before him to determine Dudley's motives and credibility in filing Dudley Construction's counterclaim. With no evidence that Dudley Construction's counterclaim was filed to harass the Appellees, the assigned judge's award of attorney's fees as

sanctions

**Page 711**

under section 10.001(1) is an abuse of discretion.

The only other finding that could support the imposition of chapter 10 sanctions is Finding 14, which states that, as to Appellees Hays, Ashlock, and William W. Dawson (Dan Dawson's Dad), " no credible evidence was introduced showing that they conspired to defraud" Dudley Construction. The applicable standard in section 10.001(3) is that, to the signatory's best knowledge, information, and belief, formed after reasonable inquiry, each allegation or other factual contention in a pleading has evidentiary support or, for a specifically identified allegation or factual contention, is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery. TEX. CIV. PRAC. & REM.CODE ANN. § 10.001(3). Case law under Rule 13 is instructive in interpreting section 10.001(3). *Griffin Indus. v. Grimes,* 2003 WL 1911993, at *4-6 (Tex.App.-San Antonio April 23, 2003, no pet.).

In determining whether a party conducted a reasonable inquiry, the facts and evidence available to the party and the circumstances existing when the party filed the pleading must be examined. *See Estate of Davis,* 9 S.W.3d at 297; *Karagounis v. Property Co. of Am.,* 970 S.W.2d 761, 764 (Tex.App.-Amarillo 1998, pet. denied) (" the circumstances pivotal to the determination of whether sanctions should issue are those in existence at the time the pleading in question was signed and filed" ); *see, e.g., Low,* 221 S.W.3d at 616-17 (court evaluated attorney's inquiry and knowledge as of time of lawsuit's filing). Sanctions for frivolous or groundless pleadings do not apply to the pursuit of an action later determined to be groundless after pleadings were filed. *Overman v. Baker,* 26 S.W.3d 506, 509 (Tex.App.-Tyler 2000, no pet.); *Karagounis,* 970 S.W.2d at 764 (Rule 13" says nothing about levying sanctions if one pursues an action or pleading thought legitimate when filed but subsequently found baseless" ).

On Dudley Construction's conspiracy claim against Appellees Hays, Ashlock, and William W. Dawson (Dan Dawson's Dad), the assigned judge's finding fails to apply section 10.001(3)'s standard, and it also does not provide the proper temporal link to the offending pleading. Therefore, any sanction under section 10.001(3) is an abuse of discretion.

We sustain Dudley Construction's first issue in part and overrule it in part. To the extent the assigned judge sanctioned Dudley Construction under Rule 13 or chapter 10 or awarded attorney's fees under section 53.156 for the litigation that continued after the trial court's March 10,

2004 order declaring the liens invalid and ordering their removal, he abused his discretion. And because this appeal is part of the litigation that continued after March 10, 2004 and Dudley Construction has not appealed the trial court's order finding the liens invalid and ordering their removal, the Appellees cannot recover additional attorney's fees for this appeal under section 53.156.

The Appellees are only entitled to recover attorney's fees and costs in the amount of $7,377.70 under section 53.156, and we modify the judgment to provide that the Appellees shall recover that sum from Dudley Construction.

**Conclusion**

We modify the judgment to find that the Appellees shall recover from Dudley Construction $7,377.70 as attorney's fees and court costs. As modified, the judgment is affirmed.

**Page 712**

Chief Justice GRAY dissents. A separate opinion will not issue.

---------

Notes:

[1] What the Appellees term a " lien" was actually Dudley Construction's " Affidavit Claiming Constitutional and Mechanic's and Materialman's Lien," all of which included this notice: " Notice: This is not a Lien. This is only an affidavit claiming a Lien."

[2] Trial courts should eschew " and/or" language like that used in the judgment to identify the legal bases for a sanctions award. For notice purposes and for more efficient appellate review, trial courts should precisely specify the legal basis for sanctions, rather than providing a " shotgun" or " cover-all-the bases" approach.

[3] In the judgment, the assigned judge identified findings 8 to 14 as evidence of Dudley Construction's intent to harass.

[4] In response to the motion to assess attorney's fees, Dudley Construction filed Mark Dudley's affidavit detailing his factual investigation that formed the basis of Dudley Construction's claims.

[5] Dudley's affidavit details his thorough pre-suit investigation and includes alleged admissions of wrongdoing by all five Appellees, three of whom allegedly admitted wrongdoing to Dudley. Dudley's affidavit contains no evidence of an intent to harass.

---------

**26 S.W.3d 506 (Tex.App. —Tyler 2000)**

**Olive OVERMAN, Appellant,**

**v.**

**Grace Edna BAKER, Appellee.**

**No. 12-99-00362-CV.**

**Court of Appeals of Texas, Twelfth District, Tyler**

**June 28, 2000**

[Copyrighted Material Omitted]

Richard W. White, Henderson, for Ad Litem.

John F. Berry, Tyler, for Appellant.

J.R. Phenix, Henderson, for Appellee.

Panel consists of RAMEY, C.J., HADDEN, J., and WORTHEN, J.

ROBY HADDEN, Justice.

This is an appeal of a judgment which imposed Rule 13 [1] sanctions upon the applicant in a temporary guardianship proceeding. Because we hold that the trial court abused its discretion in imposing sanctions, we will reverse and render.

On January 29, 1999, Olive Overman ("Overman"), filed an application to be appointed temporary guardian of the person and estate of her 93 year old aunt, Grace Edna Baker ("Baker"). In her application, Overman alleged that Baker was incapacitated, that she suffered from dementia or senility, and was making decisions regarding her residence, care, and use of her funds to her detriment. She alleged that without a temporary guardian, Baker would face immediate danger that her physical well being would be impaired and her estate wasted.

In accordance with the mandate in Section 646(a) of the Texas Probate Code, the trial court immediately appointed Richard W. White ("White") as Baker's attorney ad litem who filed an answer on behalf of Baker. In addition, Baker filed an original answer through her private attorney, J.R. Phenix ("Phenix"). In her answers and subsequent motions filed through White and Phenix, Baker requested security and costs including attorney ad litem fees, contested the application as being groundless, requested that the application be dismissed, and that sanctions be imposed on Overman for initiating the proceeding. In her Motion to Dismiss and for Sanctions filed April 29, 1999, Baker alleged that Overman was disqualified because Baker, in accordance with Section 679 of the Probate Code, had expressly designated Louise Broussard ("Broussard"), to serve as guardian of her person and estate and had also disqualified Overman. Baker attached to her motion her Declaration Of Guardian In The Event Of Later Incapacity Or Need Of Guardian, which was executed by Baker on December 28, 1998, and which designated Broussard as her guardian and disqualified Overman. Because of Baker's declaration of guardianship, Overman, on May 7, 1999, filed her motion seeking to withdraw her application. However, Baker pursued her motion for sanctions. After a hearing, the trial court granted Overman's motion to withdraw and dismiss her application but entered judgment that Baker recover from Overman, as sanctions, her personal attorney's fees of $2,300.00 and the attorney ad litem fee of $2,651.71 which had been taxed as costs.

On appeal, Overman brings three points of error asserting: 1) that the trial court abused its discretion in awarding Rule 13 sanctions against Overman, 2) that the trial court erred in awarding ad litem fees after Baker obtained her own attorney, and 3) that the trial court erred in awarding

the attorney's ad litem fees as costs of court against Overman, the applicant.

### SANCTIONS UNDER RULE 13

We review a trial court's Rule 13 sanctions order under an abuse of discretion standard. *Tarrant County v. Chancey,* 942 S.W.2d 151, 154 (Tex.App.--Fort Worth 1997, no pet.); see also *GTE Communications Sys. Corp. v. Tanner,* 856 S.W.2d 725, 730-32 (Tex.1993) (original proceeding in which abuse of discretion standard for review of Rule 13 sanctions was applied). To determine whether the trial court abused its discretion we examine whether it acted without reference to any guiding rules or principles. *Stites v. Gillum,* 872 S.W.2d 786, 788 (Tex.App.--Fort Worth 1994, writ denied). We should, however, only overturn a trial court's discretionary ruling when it is based on an erroneous view of the law or a clearly erroneous assessment of the evidence. Stites, 872 S.W.2d at 788.

Rule 13 of the Texas Rules of Civil Procedure provides, in pertinent part, as follows:

The signatures of attorneys or parties constitute a certificate by them that they have read the pleading, motion, or other paper; that to the best of their knowledge, information, and belief formed after reasonable inquiry the instrument is not groundless and brought in bad faith or groundless and brought for the purpose of harassment.

...

Courts shall presume that pleadings, motions, and other papers are filed in good faith. No sanctions under this rule may be imposed except for good cause, the particulars of which must be stated in the sanction order. 'Groundless' for purposes of this rule means no basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law....

TEX.R.CIV.P. 13.

Rule 13 is designed to check abuses in the pleading process, i.e. to ensure that at the time the challenged pleading was filed, the litigant's position was factually well grounded and legally tenable. *Home Owners Funding Corp. v. Scheppler,* 815 S.W.2d 884, 889 (Tex.App.--Corpus Christi 1991, no writ). A court may impose sanctions against a party if it files a pleading that is groundless and either brought in bad faith or for the purpose of harassment. *McCain v. NME Hospitals, Inc.,* 856 S.W.2d 751, 757 (Tex.App.--Dallas 1993, no writ). Rule 13 dictates that courts shall presume that pleadings are filed in good faith, and therefore, the party moving for sanctions bears the burden of overcoming this presumption. GTE, 856 S.W.2d at 731. The rule does not apply to the pursuit of an action which is later determined to be groundless after pleadings were filed. *Karagounis v. Property Company of America,* 970 S.W.2d 761, 764 (Tex.App.--Amarillo 1998, pet. denied). In deciding whether a pleading meets the two pronged test of being both groundless and either brought in bad faith or for the purpose of harassment, a trial court must examine the facts and circumstances existing at the time the pleading was filed. Tarrant County, 942 S.W.2d at 155; Home Owners Funding Corp. of America, 815 S.W.2d at 889.

The purpose of a temporary guardianship of an incapacitated person is to promote and protect the well-being of the person. TEX. PROB.CODE ANN. § 602 (Vernon Supp.2000); see also *Valdes-Fuerte v. State,* 892 S.W.2d 103, 107 (Tex.App.--San Antonio 1994, no pet.). The Probate Code further provides that "if a court is presented with substantial evidence that a person may be ... a [n] incapacitated person, and the court has probable cause to believe that the person or person's estate, or both,

requires the immediate appointment of a guardian, the court shall appoint a temporary guardian...." TEX. PROB.CODE ANN. § 875(a) (Vernon Supp.2000).

We will now examine the facts and circumstances existing at the time Overman

**Page 510**

prepared and filed her application to be appointed temporary guardian over Baker. For over twenty five years Overman took care of Baker who was her aunt and who lived alone. Overman gave Baker the land next door to her dwelling to build a house and live there. During this time she took her to the doctor, the hospital, grocery shopping, to the bank, on vacation and helped take care of her. Overman and Baker were apparently very close and Overman knew Baker well. Baker's physician, Dr. Sanford Ladage ("Ladage"), testified that Overman seemed to always act with Baker's best interest in mind. In recent years, as Baker became older and could not drive, it was necessary for Overman to give her more attention and care and during these recent years required a minimum of a bi-monthly visit to her doctor and periodic hospitalizations. Overman, or someone at Overman's request, brought Baker her mail so that she would not fall while going out to her mailbox and back.

Overman began to notice changes in the personality of Baker in the last half of 1998. She testified that Baker was not as mentally alert as in prior years. She seemed to be very distant and began forgetting things. Baker accused Overman of bugging her residence, of trying to kill or hurt her and of being a thief and liar. At the same time, Baker would accept favors from Overman, such as buying groceries and running errands. They were together as a family on Christmas Day, which was Baker's birthday, in Overman's home in December 1998. Overman discussed Baker's inconsistency and actions with other family members who confirmed that they noticed such changes as well. Baker began to not recognize family members in family photos.

It appears that during 1998, Baker became acquainted with a friend, Louise Broussard, and began to rely upon her for counsel and advice to the exclusion of Overman. Baker began lying to Overman and covering up her plans, especially visits by Broussard. Overman discovered that Baker had made statements to others that she was going to leave her residence and move to a location closer to Broussard. Baker also made significant changes to her banking arrangements, removed Overman from her bank account and appointed Broussard as a signatory of and ultimate beneficiary under her account. Furthermore, Baker instructed her postal carrier to no longer deliver mail to her residence but instead deliver it to Broussard, who lived

several miles away. Baker withheld from Overman these changes in her habits and did not tell Overman of the mail delivery change. Their relationship began to deteriorate.

Overman argues that these statements, along with Baker's changes of habits, her withholding of these changes from Overman, Broussard's involvement in the changes of Baker's behavior and lifestyle, and the persuasion and control by Broussard over Baker justified filing the application for temporary guardianship. Overman asserts that she was justified in fearing that Baker was being strongly influenced by Broussard, that this influence would lead to bad decisions in her living and financial arrangements which would have a disastrous effect on Baker. Baker's physician, Ladage, agreed with Overman that Baker had been making some bad decisions.

In her testimony, Baker agreed that she had built a home on property adjacent to her niece, Overman, and that Overman had helped take care of her for twenty five years. However, she testified that she began to experience problems with Overman in 1998 when she was ninety two years of age. Baker testified that Overman began to dictate things to her and tell her what to do. Baker also testified that Overman transferred $8,000.00 from Baker's account into her own account. Although the purpose of the transfer was disputed, it was eventually transferred back to Baker so that it was solely in her own name. Through her Sunday School

## Page 511

she had met a friend, Broussard. Baker testified that Overman began to resent her relationship with Broussard and testified to several conversations and a confrontation in Baker's home which Baker observed as demonstrating Overman's hostility toward Broussard and their friendship. Baker testified to other conduct on the part of Overman which she interpreted as Overman's efforts to gain control of her, all of which caused their relationship to deteriorate. Baker presented evidence which she believed showed that she was a competent person. However, the burden on Baker was to show that there was no basis in law or fact for filing the application.

In assessing sanctions, the trial court acted under an erroneous assessment of the law and the evidence. From the record before us, Baker did not succeed in establishing that there was no arguable basis for Overman's cause of action as Rule 13 requires. The record speaks to the contrary. Overman had taken care of Baker for many years and had established a close relationship as Baker's primary care giver. Baker was 93 years old when Overman filed the application. Changes in Baker's behavior regarding finances, mail delivery, living conditions and friendships, as described in the record would reasonably alarm the care

giver, especially if the communication between the two deteriorated. Although there was evidence that Baker enjoyed a certain competence for her age, there was substantial evidence that she was becoming incapacitated. Thus, we conclude that Baker has failed to establish that there is no basis in law or fact for Overman's pleadings and has, therefore, failed to meet her burden under Rule 13.

Baker asserts that Overman did not present a physician's certificate of incapacity with the application as required by Section 687 and without such evidence, the application is groundless. We do not agree. The Texas Probate Code contains a separate section covering the appointment and procedure to be followed in temporary guardianships. TEX. PROB.CODE ANN. § 875 (Vernon Supp.2000). The requirements for the filing of an application for appointment of a temporary guardian as found in this section of the Probate Code do not expressly require a physician's certificate but simply require that a court be presented with substantial evidence that a person may be an incapacitated person. Furthermore, Section 875(b) provides that a person for whom a temporary guardian has been appointed may not be presumed to be incapacitated. TEX. PROB.CODE ANN. § 875(b) (Vernon Supp.2000). We conclude, therefore, that it was not necessary that Overman file a physician's certificate of incapacity with her application. In as much as Baker has failed to meet the first prong that the application was groundless, it will not be necessary for us to address the second prong of bad faith or harassment.

It is also required by Rule 13 that the trial court must state with particularity the good cause for finding that pleadings upon which sanctions are based are groundless and frivolous and brought for purposes of harassment. *Gorman v. Gorman,* 966 S.W.2d 858, 867-68 (Tex.App.--Houston [1st Dist.] 1998, pet. denied). In other words, the court is required to properly predicate its award of sanctions against Overman under Rule 13 by stating the specific acts or omissions on which the sanctions are based. *Jimenez v. Transwestern Property Co,* 999 S.W.2d 125, 130 (Tex.App.--Houston [14th Dist.] 1999, no pet.); *Alexander v. Alexander,* 956 S.W.2d 712, 714 (Tex.App.--Houston [14th Dist.] 1997, pet. denied). The failure to state the particulars of good cause amounts to noncompliance with the sanction rule and, therefore, is an abuse of discretion rendering the order unenforceable. *Thomas v. Thomas,* 917 S.W.2d 425, 432 (Tex.App.--Waco 1996, no writ).

In the instant case, the trial court simply stated that the "application filed herein by Olive Overman was

## Page 512

groundless," that "the application ... was brought in bad faith and for the purpose of harassment," that "good cause

exists for the imposition of sanctions against Olive Overman ...," that the application "was brought for an improper purpose and caused needless increase in the costs of litigation" and that the allegations had no evidentiary support nor would likely have evidentiary support after a reasonable opportunity for further investigation or discovery. Such general findings are insufficient to satisfy the particularity requirements of Rule 13. Tarrant County, 942 S.W.2d at 155. The court must specify in its order the particular acts or omissions on which the sanctions are based. Accordingly, we also conclude that Baker has failed to meet the Rule 13 requirement regarding the particulars of good cause. We hold that the trial court abused its discretion by imposing sanctions against Overman under Rule 13. Overman's first issue is sustained.

### AD LITEM FEES

In issue number two, Overman asserts that the trial court erroneously awarded the ad litem attorney's fees after the proposed ward obtained her own attorney. It appears to be a reasonable argument that Baker did not need the services of an attorney ad litem after she retained her private attorney. However, there is no evidence in the record to support the conclusion that the attorney's fees assessed for the attorney ad litem were for services beyond the date Baker retained her private attorney. Furthermore, if the fees awarded included such later services, there is nothing in the record which would enable the trial court or this Court to determine what percentage of the fee was incurred after Baker retained her private attorney. The record does show that White was Baker's court appointed attorney for 10 days and that during this time he spent considerable time counseling with Baker, filed two motions, and obtained one order from the court. Overman's second issue is overruled.

### ASSESSMENT OF COSTS

In her issue number three, Overman asserts that the trial court erroneously awarded the ad litem attorney's fees as costs and then assessed the costs against Overman. Overman argues that there were two options available to the court for assessment of the attorney ad litem fees; either the fees are assessed against the proposed ward's estate or the county in the case of insolvency. Overman argues that the trial court circumvented the clear provisions of the Texas Probate Code in assessing the fees as costs and in ordering that costs be paid by Overman.

Section 646(a) of the Probate Code provides that in a proceeding for the appointment of a guardian, the court shall appoint an attorney ad litem to represent the interests of the proposed ward. TEX. PROB.CODE ANN. § 646(a) (Vernon Supp.2000). It further provides that the attorney ad litem shall interview the proposed ward, discuss with the

proposed ward the law and facts of the case, the proposed ward's legal options regarding the disposition of the case and the grounds on which guardianship is sought. TEX. PROB.CODE ANN. § 647 (Vernon Supp.2000). The Code further provides that the court shall order the payment of a fee set by the court as compensation to the attorney ad litem to be taxed as costs. TEX. PROB.CODE ANN. § 665A (Vernon Supp.2000). Thus, it appears that the trial court was correct in appointing White and assessing White's fee as costs of the proceeding.

Further, Section 669 of the Probate Code provides that "in a guardianship matter, the costs of the proceeding, ... shall be paid out of the guardianship estate or if the estate is insufficient to pay for the cost of the proceeding, the cost of the proceeding shall be paid out of the county treasurer and the judgment of the court shall be issued accordingly." TEX. PROB.CODE ANN. § 669 (Vernon Supp.2000). It is not clear whether Section 669 is intended to apply to

**Page 513**

a temporary guardianship application which has been successfully contested as in the instant case, but from the reading of Section 665A of the Code, the clear implication is that the attorney ad litem's fee which is assessed as costs is to be paid out of the proposed ward's assets unless the court determines that the proposed ward is unable to pay for such services in which case the county is to be responsible for such costs.

Thus, we conclude that under the construction of the Probate Code cited above the court was correct in assessing the attorney ad litem fees as costs in the case, but was in error in ordering such costs be paid by Overman. The costs are to be paid by the proposed ward and if the ward is unable to pay only then is the county responsible. See *E. Simmons v. Harris County,* 917 S.W.2d 376, 378 (Tex.App.--Houston [14th Dist.] 1996, writ denied) (dicta). Overman's third issue is sustained.

### CONCLUSION

Accordingly, the judgment of the trial court dated August 5, 1999, granting Overman's motion to withdraw her application for appointment of temporary guardian of the person and estate of Baker and dismissing said application for appointment of temporary guardian is affirmed. In all other respects the judgment of the trial court is reversed and rendered that Baker and White take nothing as against Overman and that the attorney ad litem fee in favor of White be assessed against Baker.

---------

Notes:

[1] All references to Rule 13 refer to the Texas Rules of Civil Procedure Rule 13.

---------

300 S.W.3d 316 (Tex.App.-Austin 2009)

FAIRFIELD FINANCIAL GROUP, INC., Appellant,

v.

Connie SYNNOTT, Individually and as Trustee of the Connie Synnott Revocable Living Trust, Appellee.

No. 03-06-00429-CV.

Court of Appeals of Texas, Third District, Austin.

August 5, 2009

[Copyrighted Material Omitted]

Stephen Sakonchick II, Stephen Sakonchick II, P.C., Austin, TX, for appellant.

Molly J. Mitchell, Akin & Almanza, Austin, TX, for appellee.

Before Justices PURYEAR, WALDROP and HENSON.

## OPINION

G. ALAN WALDROP, Justice.

Fairfield Financial Group, Inc. appeals from a judgment declaring that Connie Synnott's homestead is not subject to a judgment lien in connection with a separate judgment rendered solely against Glenn Synnott, her ex-husband. While married, the Synnotts bought the property in question and designated it as their homestead. Fairfield later obtained and abstracted a judgment against Glenn Synnott, individually. Although Glenn Synnott conveyed his interest to appellee pursuant to their divorce decree, Fairfield contends that his former ownership share in the form of a community interest in the property remains subject to Fairfield's judgment lien. Fairfield also contends that the trial court erred by denying its objection to the admissibility of Glenn Synnott's assertion in his affidavit that he continued to claim the property as his homestead during the pendency of the divorce action. Fairfield also asserts that the trial court erred by awarding attorneys' fees to appellee because this suit was essentially a suit to quiet title rather than a true declaratory judgment action. We

affirm.

The Synnotts purchased the house in Travis County in 1984. Fairfield obtained a judgment against Glenn Synnott and filed an abstract of that judgment in 1992. Appellee asserted without contradiction that the judgment debt is owed solely by Glenn Synnott. In the fall of 1997, Glenn Synnott moved out of the house to Hays County and filed for divorce. In late October 1997, his attorney drafted an Agreement Incident to Divorce that included the agreement that Glenn Synnott would convey his interest in the house to appellee. Although the contents of the draft agreement evolved over the next few months, the agreement regarding the house never changed. In January 1998, Glenn Synnott executed an Agreement Incident to Divorce, the court signed the decree, and then Glenn Synnott signed a special warranty deed conveying his interest in the property to appellee. By special warranty deed dated September 15, 1999, appellee conveyed the house to the Connie L. Synnott Revocable Trust. She lives in the house and claims it as her homestead.

Appellee filed this suit seeking a declaration that Fairfield has no interest in the property through a lien or otherwise. She also sought sanctions and attorneys' fees. The court declared that the property is " the homestead of Connie Synnott and ... not subject to the judgment lien asserted by [Fairfield] arising out of the judgment obtained by it in Cause No. 91-13310." The court awarded $15,915.82 for trial attorneys' fees, plus additional fees in the event of appellate procedures.[1] It did not award sanctions.

Fairfield asserts that the following portion of Glenn Synnott's affidavit should have been struck as improper summary judgment evidence: " [A]t all times prior to January 21, 1998, I considered the property as my homestead and continued to claim it as such, including with the local taxing authorities." Fairfield contends that this was inadmissible as a statement from an interested witness that was no more than an opinion, expression of belief, and a conclusion, citing *Ryland Group, Inc. v. Hood,* 924 S.W.2d 120, 122 (Tex.1996); *Brownlee v. Brownlee,* 665 S.W.2d 111, 112 (Tex.1984); and *Harley-Davidson Motor Co. v. Young,* 720 S.W.2d 211, 216 (Tex.App.-Houston [14th Dist.] 1986, no writ).

We review a trial court's rulings concerning the admission of summary judgment evidence under an abuse of discretion standard. *Wolfe v. C.S.P.H., Inc.,* 24 S.W.3d 641, 646 (Tex.App.-Dallas 2000, no pet.). Affidavits in support of summary judgment motions must be made on

personal knowledge, set forth such facts as would be admissible in evidence, and show affirmatively that the affiant is competent to testify to the matters stated. Tex.R. Civ. P. 166a(f). The challenged statements by Glenn Synnott are statements of fact, not mere belief or opinion. In the challenged portion, he states that he considered the house his homestead and continued to claim it as such. He does not assert in the affidavit that he was correct to consider the house his homestead or to claim it as such. Whether he actually considered it his homestead and whether the underlying belief was well-founded and his actions proper and effective is a question for the courts. The trial court did not abuse its discretion by overruling this objection to this portion of his affidavit.

The core of Fairfield's appeal is its assertion that the summary judgment is erroneous because there is a genuine issue of

**Page 320**

material fact regarding whether Glenn Synnott abandoned the homestead, thereby allowing Fairfield's judgment lien to attach to his share of the community ownership of the house. To prevail, a summary-judgment movant must demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c). We review the summary judgment de novo. *Joe v. Two Thirty Nine Joint Venture,* 145 S.W.3d 150, 156 (Tex.2004). We take all evidence favorable to the non-movant as true while deciding whether a disputed issue of material fact exists that would preclude summary judgment, and we indulge every reasonable inference and resolve any doubts in favor of the non-movant. *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548-49 (Tex.1985).

Under Texas law, judgment liens that have been properly abstracted cannot attach to a homestead while that property remains a homestead. *Wilcox v. Marriott,* 103 S.W.3d 469, 473 (Tex.App.-San Antonio 2003, pet. denied); *see also Cadle Co. v. Harvey,* 46 S.W.3d 282, 285 (Tex.App.-Fort Worth 2001, pet. denied); *Barrera v. State,* No. 14-04-01030-CR, 2005 WL 1691037, at *6, 2005 Tex.App. LEXIS 5634, at *18-19 (Tex.App.-Houston [14th Dist.] July 21, 2005, pet. ref'd). This statement of the law differs from a previous interpretation by this Court. *See Exocet Inc. v. Cordes,* 815 S.W.2d 350, 352 (Tex.App.-Austin 1991, no writ) (concluding that recording and indexing of abstract of judgment perfected lien attached to homestead, although homestead remained exempt from foreclosure while homestead exemption remained in place). On reviewing the relevant statutory and case law, however, we are compelled to revisit our previous interpretation. Constitutional homestead rights protect citizens from losing their homes, and statutes relating to homestead rights are liberally construed to protect the homestead. *Kendall*

*Builders, Inc. v. Chesson,* 149 S.W.3d 796, 807 (Tex.App.-Austin 2004, pet. denied). Homestead rights have historically enjoyed great protection in our jurisprudence. *See id.* (citing *Mills v. Von Boskirk,* 32 Tex. 360, 362 (1869)). The property code states that a homestead is " exempt from seizure for the claims of creditors except for encumbrances properly fixed on homestead property." Tex. Prop.Code Ann. § 41.001(a) (West Supp.2008). The code then lists the types of encumbrances that may be " properly fixed" upon homestead property, including those for mortgage financing for the property, taxes on the property, and improvements to the property. *Id.* § 41.001(b). The implication is that types of encumbrances not listed may not be " properly fixed" on homestead property. This interpretation is consistent with the holdings of other courts of appeals regarding the effect of the homestead exemption on most liens and provides greater protection to the homestead. *See Wilcox,* 103 S.W.3d at 473; *Harvey,* 46 S.W.3d at 285; *Barrera,* 2005 WL 1691037, at *6, 2005 Tex.App. LEXIS 5634, at *18-19. We join these courts of appeals in holding that, other than the types listed in property code section 41.001(b), judgment liens that have been properly abstracted nevertheless cannot attach to a homestead while that property remains a homestead. Under this rule, a judgment debtor may sell property claimed as homestead and pass title free of any judgment lien, and the purchaser may assert that title against the judgment creditor. *Harvey,* 46 S.W.3d at 285. A judgment lien may attach to the judgment debtor's interest, however, if he abandons the property as his homestead while he owns it and while there is a properly abstracted judgment lien against him. *Id.*

**Page 321**

Fairfield contends that Glenn Synnott abandoned his homestead interest and that Fairfield's lien attached to his ownership interest in the home before he transferred his ownership interest to appellee. Fairfield contends that there is at least a fact question regarding when Glenn Synnott abandoned his homestead interest. Thus, Fairfield contends, the trial court erred by granting summary judgment that appellee owns the property free from Fairfield's liens based on its judgment against Glenn Synnott.

We conclude, however, that the timing and effect of Glenn Synnott's actions are irrelevant because the property remained at all relevant times protected by appellee's undivided homestead interest in the property. Fairfield argues, correctly, that one spouse may abandon his homestead interest while his spouse retains her homestead interest. *See Taylor v. Mosty Bros. Nursery, Inc.,* 777 S.W.2d 568, 569 (Tex.App.-San Antonio 1989, no writ); *Julian v. Andrews,* 491 S.W.2d 721, 727 (Tex.Civ.App.-Fort Worth 1973, writ ref'd n.r.e.); *Sakowitz Bros. v. McCord,* 162 S.W.2d 437, 438-39

(Tex.Civ.App.-Galveston 1942, writ ref'd). The United States Supreme Court wrote that the Texas constitution gives:

each spouse in a marriage a separate and undivided possessory interest in the homestead, which is only lost by death or abandonment, and which may not be compromised either by the other spouse or by his or her heirs. It bears emphasis that the rights accorded by the homestead laws vest independently in each spouse regardless of whether one spouse, or both, actually owns the fee interest in the homestead.

*United States v. Rodgers,* 461 U.S. 677, 685, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1983) (footnote omitted). Although a lien attaches to property when it loses its homestead character,[2] the *Julian* and *Sakowitz* courts held that the property is wholly exempt from the attachment of liens (other than those listed in property code section 41.001(b)) so long as the remaining spouse retains her homestead interest. *Julian,* 491 S.W.2d at 727; [3] *Sakowitz,* 162 S.W.2d at 438-39.[4] Therefore, because appellee

**Page 322**

retained her homestead interest in the home, the trial court did not err by granting summary judgment and declaring that Fairfield's lien based on its judgment against Glenn Synnott has not attached to the property at issue.

Fairfield relies heavily on the *Taylor* case for the contrary proposition. 777 S.W.2d at 569. In that case, after a nursery obtained a judgment against a husband, the husband abandoned his interest in the homestead by conveying it to his wife and leaving the state.[5] *Id.* While not ordering a sale of the property, the trial court placed a constructive trust on that part of any sale proceeds represented by the husband's interest conveyed to his wife. *Id.* The court of appeals modified the trial court's order by invoking the property code's homestead protections and declaring that, if the owner sold the property, she would have six months thereafter during which the proceeds would be exempt from execution by the nursery, and that she could reinvest the entire proceeds in a new homestead. *Id.* at 570; *see also* Tex. Prop.Code Ann. § 41.001(c) (West Supp.2008). Fairfield argues that this holding shows that the proceeds would be subject to seizure thereafter, and that the property therefore was encumbered by the lien.

We do not share Fairfield's interpretation of the *Taylor* opinion. The court of appeals did not state that the creditor's lien attached to the property. Rather, the contrary is indicated. By statute, the proceeds from the sale of homestead property retain their exempt status for six months after a homestead is sold or transferred. *See* Tex. Prop.Code Ann. § 41.001(c). The proceeds will continue to

have exempt status if reinvested in a new homestead within the statutory time frame. *See id.* § 41.001. This suggests that a judgment lien does not attach to homestead property or its proceeds until it ceases being a homestead and the statutory time frame runs if it is sold. The court's judgment forbidding the creditor from pursuing the proceeds for six months and holding that the wife may invest all of the proceeds in a new homestead within six months under section 41.001(c) also strongly implies that a homestead exemption protected the entire property. Whether the creditor could seek to seize her underinvested cash proceeds after six months does not bear on whether a lien attached to the real property. After six months, the cash is a non-exempt personal asset subject to execution by creditors of the cash's owner. We conclude that the court of appeals's application in *Taylor* of homestead protections to the wife and the entire proceeds from her sale of the property supports the view that

**Page 323**

the judgment lien against the husband did not attach to the homestead property.

Whether Glenn Synnott abandoned his homestead interest before divesting his ownership interest, it is undisputed that appellee had a homestead interest in the property. Her homestead interest protected the entire property, and the judgment liens did not attach to any portion of the property. The trial court did not err by granting appellee's motion for summary judgment and declaring that ownership of the property is unencumbered by Fairfield's lien.

Fairfield contends finally that the trial court erred by awarding attorneys' fees to appellee. Attorneys' fees are recoverable in declaratory judgment actions. *See* Tex. Civ. Prac. & Rem.Code Ann. § 37.009 (West 2008). This suit was filed and adjudicated as a declaratory judgment action. Fairfield asserts that this suit is instead a suit to quiet title, to remove a cloud on title, or for trespass to try title in which attorneys' fees are not recoverable, citing cases such as *John G. & Marie Stella Kenedy Mem'l Found. v. Dewhurst,* 90 S.W.3d 268, 289 (Tex.2002), and *Sani v. Powell,* 153 S.W.3d 736 (Tex.App.-Dallas 2005, no pet.). The *Kenedy Foundation* case is distinguishable because it found attorneys' fees inappropriate because the declaratory relief requested was merely incidental to a dispute over title and those circumstances did not justify an award of attorneys' fees against the State. *Kenedy Foundation,* 90 S.W.3d at 289. This Court has previously distinguished *Sani* and similar cases, concluding that attorneys' fees are recoverable under the declaratory judgment act even when the effect of a declaration is to quiet title. *Florey v. Estate of Linda McConnell,* 212 S.W.3d 439, 449 (Tex.App.-Austin 2006, pet. denied). The central issue in *Florey* was whether

the homestead interest was abandoned, thereby allowing a judgment lien to attach. *Id.* at 442-43. The trial court concluded that the homestead interest was in place when the owner executed a promissory note for attorneys' fees secured by a deed of trust on the homestead property, that such a note and deed of trust were not among the encumbrances that can be properly affixed to homestead property, and that the lien based on the deed of trust was invalid. *Id.* at 443. This Court affirmed that decision and further concluded that, even though the judgment had an effect similar to that of a suit to quiet title, the use of the declaratory judgment act was permissible as was the awarding of attorneys' fees based thereon. *Id.* at 448-49. This Court opined that the " ban" on awards of attorneys' fees in suits to quiet title might be limited to cases that were essentially trespass to try title suits. In this suit, the central question is whether the homestead had been abandoned such that an encumbrance other than one of those listed in property code section 41.001(b) could properly be affixed on or attach to the property at issue. We conclude that this suit is substantially similar to *Florey* and, therefore, that attorneys' fees could properly be awarded in this suit. Fairfield has not demonstrated error in the trial court's award of attorneys' fees.[6]

    Affirmed.

---------

Notes:

[1] Judge Stephen Yelenosky ruled on the merits of the petition. Judge William E. Bender ruled on the attorneys' fees issue.

[2] *See Posey v. Commercial Nat'l Bank,* 55 S.W.2d 515 (Tex. Comm'n App.1932, judgm't adopted).

[3] In *Julian,* a husband abandoned his homestead interest in property while judgment liens were pending against him. *Julian v. Andrews,* 491 S.W.2d 721, 724 (Tex.Civ.App.-Texarkana 1973, writ ref'd n.r.e.). His wife retained her interest in the property and filed for divorce. *Id.* While the divorce was pending, a third party foreclosed on a mechanic's and materialman's lien on the property. *Id.* The mechanic's and materialman's lienholder then sold the property, after which the property was subdivided and one lot was sold to Eddie Julian. *Id.* at 724-25. At this point, the ex-husband notified Julian that liens based on judgments against him had attached to the property. *Id.* at 725. Ultimately, the court concluded that the husband's abandonment of the homestead had not allowed the third-party judgment liens to attach to the property while the wife still held her homestead interest. *Id.* at 727. Accordingly, title passed from the wife to the foreclosing lienholder and subsequent buyers unencumbered by the

interest of those who held liens based on judgments against the husband. *Id.*

[4] In *Sakowitz,* a wife's action in barring her husband from their homestead as prelude to divorce deprived him of his homestead rights, but did not expose his share of the property to liens based on the couple's personal debts. *Sakowitz Bros. v. McCord,* 162 S.W.2d 437, 438-39 (Tex.Civ.App.-Galveston 1942, writ ref'd). While the divorce action was pending, two creditors took judgments against the couple, and the couple sold the homestead to A.H. McCord. *Id.* at 438. McCord sued to have the couple's creditors' liens removed. *Id.* The court of appeals expressly rejected the proposition that the liens attached to the husband's non-homestead half interest, holding instead that the property retained its homestead character because the wife continued to live on the property as her homestead. *Id.* at 438-39. The wife's undivided homestead interest protected the entire property from forced sale for personal debts. *Id.* (citing *Crow v. First Nat'l Bank,* 64 S.W.2d 377, 379-80 (Tex.Civ.App.-Waco 1933, writ ref'd) (widow's homestead exemption was undivided and served to protect all of a 300-acre tract, even though she could only spare 200 acres from personal creditors)). The court of appeals concluded that McCord held title to the property and that the creditors did not have an interest in the property. *Id.* at 439.

[5] Although the court found that the husband abandoned his homestead interest, the facts indicate not mere abandonment but divestment of all interest. *Taylor v. Mosty Bros. Nursery, Inc.,* 777 S.W.2d 568, 569 (Tex.App.-San Antonio 1989, no writ). The opinion states, " Sidney abandoned his interest in the homestead by conveying his interest to Mary by deed dated April 17, 1987 and by leaving the State of Texas." Absent a fraudulent conveyance that can be set aside-not mentioned as an issue in the opinion-there is no ownership interest by the husband in the property to which the creditor's lien could properly attach.

[6] Fairfield does not challenge the amount of fees awarded, but merely whether attorneys' fees are permitted by law to be awarded in this suit.

---------

**Page 189**

**350 S.W.3d 189 (Tex.App.-San Antonio 2011)**

**In the GUARDIANSHIP OF Otilia PATLAN, an incapacitated person.**

**No. 04-10-00616-CV.**

**Court of Appeals of Texas, Fourth District, San Antonio**

**May 11, 2011**

**Page 190**

[Copyrighted Material Omitted]

**Page 191**

Daniel O. Kustoff, Kustoff & Phipps, L.L.P., San Antonio, TX, for Appellant.

Clayton G. Mansker, Mark Stanton Smith, Heard & Smith, L.L.P., San Antonio, TX, for Appellee.

Sitting: CATHERINE STONE, Chief Justice, KAREN ANGELINI, Justice, MARIALYN BARNARD, Justice.

### OPINION

KAREN ANGELINI, Justice.

Appellant Mary Pena, Otilia Patlan's guardian, appeals the trial court's granting of Appellee Jesus Patlan Jr.'s no-evidence and traditional motion for summary judgment. The main issue in this appeal is whether the time period a previous lawsuit is pending before being dismissed for want of prosecution, when that lawsuit is between the same parties and contains the same allegations, should be considered in determining whether an adequate time for discovery has passed in the subsequent suit pursuant to Texas Rule of Civil Procedure 166a(i). Because we hold such time can be considered in determining whether an adequate time for discovery has passed under Rule 166a(i), we find the trial court did not abuse its discretion in denying Mary Pena's motion to continue the summary judgment hearing. Further, because Mary Pena did not produce sufficient evidence in response to the no-evidence motion for summary judgment, we hold the trial court did not err in granting the no-evidence motion for summary judgment. Thus, we affirm the judgment of the trial court. [1]

### BACKGROUND

Otilia Patlan is a ninety-six-year-old woman who suffers from senile dementia.

**Page 192**

Otilia and her husband, Jesus Patlan Sr., married in 1971, but had no children together. However, they each had children from previous marriages. Appellant Mary Pena (" Mary" ), who was appointed Otilia's guardian on June 20, 2007, is Otilia's daughter.

At the time of Otilia and Jesus Sr.'s marriage, Appellee Jesus Patlan Jr. (" Jesus Jr." ) was the youngest in this blended family and considered Otilia to be his mother, not a step-mother. He lived with his parents until his mid-twenties, and as his parents grew older, he began taking care of them and managing their affairs. He and his father even had a joint bank account set up so that Jesus Jr. could pay his father's bills. When his father died in 2005, he took over the same role for his mother. Thus, Jesus Jr., who was an employee of Broadway National Bank, had a joint account set up in his and his mother's names. Otilia signed all the necessary documents to set up the joint account. The funds from his father's pension, which now belonged to his mother as survivorship benefits, were deposited into that joint account. Also deposited were proceeds from his father's life insurance policy under which Otilia was the beneficiary.

In January 2007, Otilia's condition deteriorated to such an extent that she had to be admitted to a hospital. She was later transferred to a nursing home for rehabilitation. On June 20, 2007, her daughter Mary was appointed her guardian. In looking at Otilia's personal affairs, Mary became suspicious that Jesus Jr. was using Otilia's funds for his own personal benefit, and not for Otilia's. Mary hired an attorney who, on January 31, 2008, filed an original petition and application for a temporary restraining order. That same day, the trial court signed the temporary restraining order and set the cause for a temporary injunction hearing. In response Jesus Jr. filed an answer to the lawsuit.

At the temporary injunction hearing on March 4, 2008, Jesus Jr. took the stand and testified. He testified that the culture of his family was such that everyone helped whoever needed the help. He testified that before his father's death, his wife had lost her job, and his father had been helping them through a tough period. After his father died, he testified that his mother also wanted to help them. Jesus Jr. admitted that some of his mother's money was used for the benefit of his own family, but he claimed that these were gifts from his parents. He further testified his mother knew he was taking money out of the joint account

and wanted him to do so because of his family's situation.

According to Jesus Jr., he was not aware his mother suffered from dementia. He testified that Mary, who worked for Otilia's treating doctor, took care of Otilia's medical care and that Mary never told him about Otilia's condition. He also testified that in 2007, at some point before Mary was appointed Otilia's guardian, Adult Protective Services got involved in Otilia's case, and the case worker told him that he was not keeping a proper accounting of Otilia's bank account. The caseworker told him that he needed to be more " formal" and should not commingle funds. Jesus Jr. also testified that Mary had taken the approximate $6,000 left in Otilia's bank account and that he had nothing left of Otilia's money.

Jesus Jr. further testified about the family home. According to Jesus Jr., his father had owned the family home before his marriage to Otilia and thus, the family

**Page 193**

home was his father's separate property. And, because his father did not have a will, he and his four siblings now owned the house as his father's heirs. He testified that Otilia signed a deed transferring all her interest in the family home to him. However, under Texas intestate laws, Otilia had only a life-estate interest in the home and no longer lived there, as she was living with Mary. Jesus Jr. also testified that in keeping with his family's " culture," one of his step-sisters (the youngest of Otilia's daughters) now lived in the family home with her son and paid only $250 per month in rent, which was below the rental value of the house in the open market. Finally, according to Jesus Jr., his parents would not want him to pay back the money he took because it was not part of their family culture to require repayment. At the hearing, copies of the bank statements from the joint bank account were not available. At the end of the injunction hearing, the trial court dissolved the TRO and denied the temporary injunction.

A month later, on April 8, 2008, Jesus Jr.'s attorney sent Mary's attorney copies of the bank statements related to Jesus Jr. and Otilia's joint bank account. Then, there was no activity in the case for almost a year.

On March 4, 2009, Mary's current attorneys [2] filed in probate court an " Application for Authority to Retain Counsel and to Enter into a Contingent Fee Contract." On May 8, 2009, the trial court granted the application. Then, on July 15, 2009, Mary's current attorneys filed in district court, not probate court, a " Verified Petition to Take a Deposition Before Suit," requesting authority to take presuit depositions of Jesus Jr. and Broadway National Bank. [3] On July 23, 2009, Jesus Jr. filed in the district court a motion to transfer the case to the probate court, and on

August 21, 2009, the cause was transferred to the probate court. On September 18, 2009, the trial court signed an order allowing Mary to take the oral deposition of the corporate representative of Broadway National Bank. The trial court also ordered that Mary was allowed to take the oral deposition of Jesus Jr., but limited the scope of such deposition to the facts and circumstances surrounding the signature cards relating to the joint account made the basis of the suit. Mary's current attorneys took the deposition of a representative from Broadway National Bank.[4] However, they never deposed Jesus Jr.

On February 16, 2010, even though she had already filed a petition against Jesus Jr., Mary filed another " original" petition against Jesus Jr., alleging conversion, theft, fraud, constructive trust, and rescission. On March 12, 2010, Jesus Jr. filed an answer and a motion to dismiss for want of prosecution. In his motion, Jesus Jr. emphasized that there had been no action on the case for a year and a half, that Mary's second " original" petition contained the same allegations as her first

**Page 194**

one, and that Mary had made no attempt to depose him. On April 1, 2010, Mary responded to the motion to dismiss for want of prosecution, arguing that neither she nor her attorneys were aware of what discovery had been conducted or what pleadings were filed between January 2008 and January 2009 because Mary's former attorney had failed to provide any of the documents. Mary's response also stated that her current attorneys had been unaware of the previous lawsuit and that " accident and mistake" had led to the filing of the second " Original" Petition, which they admitted should have been titled " First Amended Petition." On April 26, 2010, the trial court granted Jesus Jr.'s motion and dismissed Mary's case for want of prosecution without prejudice, specifically stating that " [a]ll litigation in this cause filed on or prior to April 1, 2010, is dismissed without prejudice to refiling."

On April 5, 2010,[5] Mary filed another original petition, alleging common law fraud, statutory fraud, fraud by nondisclosure, and fraud in the inducement. In response, Jesus Jr. filed an answer, which alleged the affirmative defense of limitations, and a motion for no-evidence and traditional summary judgment. On May 12, 2010, Mary filed a motion to continue the summary judgment hearing. She later also filed a response to the summary judgment motion.[6] On May 20, 2010, the trial court denied Mary's motion for continuance. On July 22, 2010, the trial court granted Jesus Jr.'s motion for no-evidence and traditional summary judgment. Mary now appeals.

**MOTION FOR CONTINUANCE**

In her motion for continuance, Mary argued that the trial court should continue the summary judgment hearing because an adequate time for discovery had not yet passed. She emphasized in her motion that the case had been on file for only one month and that no discovery had been conducted in the case. Mary argued that since filing the lawsuit on April 5, 2010, she had not had the opportunity to depose Jesus Jr. or to send him discovery requests. Mary also argued that in order to respond to Jesus Jr.'s summary judgment motion, she needed to " confer with and obtain affidavits from Plaintiff's expert, Julian R. Cantu, M.D.[7] and Mary Pena." [8]

On May 19, 2010, at the hearing on the motion for continuance, Mary's attorney argued that additional time was needed to obtain testimony from Dr. Cantu about whether Otilia was capable of transferring her interest in the family home to Jesus Jr. at the time she signed the deed or whether she was capable of consenting to Jesus Jr. withdrawing money from their joint bank account. Mary's attorney then stated that she had requested the bank documents regarding the joint account from Broadway Bank, but had not yet

**Page 195**

received anything.[9] The trial court did not rule at the hearing, but the next day signed an order denying Mary's motion to continue the summary judgment hearing.

In her first issue on appeal, Mary argues that the trial court abused its discretion in denying her motion to continue the summary judgment hearing because an adequate time for discovery had not passed as required under Texas Rule of Civil Procedure 166a(i). When a party contends that it has not had an adequate opportunity for discovery before a summary judgment hearing, it must file either an affidavit explaining the need for further discovery or a verified motion for continuance. *Tenneco Inc. v. Enter. Prods. Co.,* 925 S.W.2d 640, 647 (Tex.1996). Here, Mary's motion for continuance was verified by her attorney.

We review the trial court's decision to grant or deny a motion for continuance for abuse of discretion. *Villegas v. Carter,* 711 S.W.2d 624, 626 (Tex.1986); *see also Tenneco,* 925 S.W.2d at 647. A trial court abuses its discretion only when it acts in an unreasonable and arbitrary manner, or when it acts without reference to any guiding rules and principles. *Beaumont Bank, N.A. v. Buller,* 806 S.W.2d 223, 226 (Tex.1991). Thus, we may not reverse a trial court's ruling for an abuse of discretion merely because we may disagree with that decision. *Id.*

The function of summary judgment is not the deprivation of a party's right to a full hearing on the merits of any real issue of fact, but rather to " eliminate patently unmeritorious claims and untenable defenses." *Casso v. Brand,* 776 S.W.2d 551, 555 (Tex.1989) (quotation omitted). Thus, under Texas Rule of Civil Procedure 166a(i), a party may not move for a no-evidence summary judgment until after an adequate time for discovery has passed. TEX.R. CIV. P. 166a(i). Notably, Rule 166a(i) does not require that discovery must have been completed, but rather that there was " adequate time." *McInnis v. Mallia,* 261 S.W.3d 197, 200 (Tex.App.-Houston [14th Dist.] 2008, no pet.). The comment to rule 166a(i) provides that " [a] discovery period set by pretrial order should be adequate opportunity for discovery unless there is a showing to the contrary, and ordinarily a motion under paragraph (i) [a no-evidence motion] would be permitted after the period but not before." TEX.R. CIV. P. 166a(i) cmt. Unlike other notes and comments in the rules of civil procedure, this comment was specifically " intended to inform the construction and application of the rule." TEX.R. CIV. P. 166a(i) cmt.

Pointing to this language, Mary emphasizes she filed her lawsuit on April 5, 2010, and Jesus Jr. filed his no-evidence motion for summary judgment soon thereafter on April 22, 2010. She argues that a time period of seventeen days from when the lawsuit is filed does not constitute adequate time. However, in so arguing, Mary completely disregards the time period the previous lawsuit had been on file before it was dismissed for want of prosecution. Thus, the issue in this case is whether the time period a previous lawsuit is pending before being dismissed for want of prosecution, when that lawsuit is between the same parties and contains the same allegations, should be considered in determining whether an adequate time for discovery has passed in the subsequent lawsuit. We

**Page 196**

have found no case addressing this issue, and the parties have not directed us to such a case.

Generally, in considering whether the trial court permitted an adequate time for discovery, we consider the following factors: (1) the nature of the case, (2) the nature of the evidence necessary to controvert the no-evidence motion, (3) the length of time the case was active, (4) the amount of time the no-evidence motion was on file, (5) whether the movant had requested stricter deadlines for discovery, (6) the amount of discovery that already had taken place, and (7) whether the discovery deadlines in place were specific or vague. *McInnis,* 261 S.W.3d at 201. We review a trial court's determination that there has been an adequate time for discovery on a case-by-case basis, under an abuse-of-discretion standard. *Id.*

1. *The Nature of the Case and Evidence Needed to*

*Defeat Motion*

This case is not of a nature that would seem to require extensive or complex discovery. *See Rest. Teams Int'l, Inc. v. MG Sec. Corp.,* 95 S.W.3d 336, 340 (Tex.App.-Dallas 2002, no pet.). None of Mary's claims would require more than minimal discovery to defeat a no-evidence motion for summary judgment. *See id.* In fact, in her motion for continuance and at the hearing on the motion, all Mary argued she needed to do to respond to the motion for summary judgment was to take Jesus Jr.'s deposition, obtain an affidavit from Otilia's doctor about Otilia's medical condition, authenticate the bank records from the joint bank account, and authenticate the deed transferring Otilia's interest in the family home to Jesus Jr.

### 2. *The Length of Time the Case was Active*

This factor, of course, depends on whether the time the previous case had been pending should be considered in determining whether an adequate time for discovery had passed. Mary argues that the time the previous case had been on file should not be considered, as the previous case was dismissed without prejudice. However, whether a case is dismissed with or without prejudice does not really go to the issue of whether there has been an adequate time for discovery. A dismissal with prejudice is a final determination on the merits and prevents a party from re-filing a case under the doctrines of res judicata or collateral-estoppel. *Mossler v. Shields,* 818 S.W.2d 752, 754 (Tex.1991). Thus, the plaintiff can appeal the dismissal but cannot re-file the same lawsuit unless the dismissal is reversed on appeal. *See id.* In contrast, a dismissal without prejudice is not a final determination on the merits. Thus, if the statute of limitations has not run, a case may be re-filed without appealing the order of dismissal. *Webb v. Jorns,* 488 S.W.2d 407, 409 (Tex.1972). Here, however, whether a party has had an adequate time for discovery is not related to the question of whether a case may be re-filed.

Looking at the language of Rule 166a(i), the rule states that " [a]fter an adequate time for discovery," a party may move for a no-evidence motion for summary judgment. TEX.R. CIV. P. 166a(i). The rule does not explicitly state whether " adequate time" refers to only the instant suit or whether it can refer to a previous lawsuit, between the same parties and involving the same allegations, that has been dismissed for want of prosecution. Instead, it refers only to " adequate time." And, in this case, Mary clearly had " adequate time" to conduct discovery. Mary filed her original petition in her original lawsuit on January 31, 2008. At the time Jesus Jr. moved to dismiss her original lawsuit for want of prosecution, she had over two

years to conduct discovery. And, at the time the trial court granted Jesus Jr.'s no-evidence motion for summary judgment, Mary had almost two-and-a-half years to conduct discovery.

Mary argues that most of the time her previous lawsuit was pending should not count because her previous attorney was derelict in his duty to prosecute her case. However, the actions of an attorney, as his client's agent, necessarily binds the client. *See Gracey v. West,* 422 S.W.2d 913, 916 (Tex.1968) (holding that attorney's negligence in failing to prosecute lawsuit was not ground for setting aside judgment dismissing cause for want of prosecution because " as long as the attorney-client relationship endures, with its corresponding legal effect of principal and agent, the acts of one must necessarily bind the other as a general rule" ).[10] Therefore, the actions of her previous attorney are not considered in looking at how long her case was active. And, Mary's case was active for an extended period of time.

### 3. *The Length of Time the No-Evidence Motion was on File*

Jesus Jr. filed the no-evidence motion for summary judgment on April 22, 2010. The summary judgment hearing occurred on July 20, 2010. Thus, the no-evidence motion for summary judgment was on file for almost ninety days at the time of the summary judgment hearing. Further, we note that Rule 166a(i) does not mandate a minimum period of time a case must be pending before a motion may be filed, as long as there was adequate time for discovery. *Rest. Teams,* 95 S.W.3d at 340; *see* TEX.R. CIV. P. 166a(i).

### 4. *Status of Discovery*

Mary argued in her motion for continuance that she needed time to depose Jesus Jr., retrieve bank records, prepare an affidavit from Otilia's treating doctor, and prepare her own affidavit. As noted above, because the time period Mary's previous case was on file should be considered in determining whether an adequate time for discovery had passed, Mary had more than sufficient time to accomplish these tasks.

Looking at the above factors, we hold that the trial court did not abuse its discretion in denying Mary's motion for continuance.

### NO-EVIDENCE MOTION FOR SUMMARY JUDGMENT

Under Rule 166a(i), a party may move for a no-evidence summary judgment on the ground that there is no evidence of one or more essential elements of a claim or

defense on which an adverse party would have the burden of proof at trial. TEX.R. CIV. P. 166a(i). The trial court must grant the motion unless the respondent produces summary judgment evidence raising a genuine issue of material fact. *Id.* The respondent is " not required to marshal its proof; its response need only point out evidence that raises a fact issue on the challenged elements." TEX.R. CIV. P. 166a(i) cmt. In reviewing a trial court's order granting a no-evidence summary

**Page 198**

judgment, we consider the evidence in the light most favorable to the respondent and disregard all contrary evidence and inferences. *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 750-51 (Tex.2003). Thus, a no-evidence summary judgment is improperly granted if the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact. *Id.* at 751; *see* TEX.R. CIV. P. 166a(i). In determining if the respondent has brought forth more than a scintilla of evidence, we consider whether the evidence would enable reasonable and fair-minded jurors to differ in their conclusions. *Hamilton v. Wilson,* 249 S.W.3d 425, 426 (Tex.2008).

In her live petition, Mary brought the following claims against Jesus Jr.: common law fraud, fraud in the inducement, fraud by nondisclosure, and statutory fraud. She also requested the creation of a constructive trust based on fraud. In his no-evidence motion for summary judgment, Jesus Jr. argued that Mary had no-evidence to support specific elements of these claims.

1. *Common Law Fraud, Fraud in the Inducement, and Fraud by Nondisclosure*

To bring a claim for common law fraud, a plaintiff must show the following: (1) a material misrepresentation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *In re FirstMerit Bank, N.A.,* 52 S.W.3d 749, 758 (Tex.2001) (orig. proceeding). To bring a claim for fraud in the inducement, a plaintiff must show the elements of fraud, *see Balogh v. Ramos,* 978 S.W.2d 696, 701 (Tex.App.-Corpus Christi 1998, pet. denied), and must show that she has been fraudulently induced to enter into a binding agreement. *Haase v. Glazner,* 62 S.W.3d 795, 798 (Tex.2001) (" Without a binding agreement, there is no detrimental reliance, and thus no fraudulent inducement claim. That is, when a party has not incurred a contractual obligation, it has not been induced to do anything." ).

In his no-evidence motion for summary judgment, Jesus Jr. argued that Mary had no evidence that (1) he made any sort of material misrepresentation to Otilia; (2) any representation made by Jesus Jr. was false; (3) when any alleged misrepresentation was made, he knew it was false; (4) he made any representation with the intent that Otilia act on it; (5) Otilia reasonably relied on a representation made by Jesus Jr.; and (6) Otilia entered into a binding agreement based on the false misrepresentation. With respect to fraud by nondisclosure, Jesus Jr. argued in his no-evidence motion that Mary cannot show he concealed from or failed to disclose material facts to Otilia. He emphasizes in his appellate brief that Otilia was aware of their financial arrangements and that she had signed signature cards and account designation documents at the bank.

In her brief, Mary argues that she did present some evidence that Jesus Jr. concealed or failed to disclose certain facts to Otilia. She points to Jesus Jr.'s testimony during the injunction hearing where he testified that he used some of the money from the joint bank account for his personal expenses because his wife was unemployed. However, Jesus Jr. also testified that his mother consented to these withdrawals. Mary argues that Jesus Jr. should have known that Otilia was unable to approve such withdrawals as she had been diagnosed with senile dementia. For this proposition, Mary points to her own

**Page 199**

affidavit in which she affirms that " [i]n early 2002, Dr. Julian R. Cantu diagnosed Mrs. Patlan with senile dementia." [11] However, while this statement is evidence that Dr. Cantu diagnosed Otilia with senile dementia, it is not evidence that *Jesus Jr. knew* Otilia had been diagnosed with senile dementia. And, at the injunction hearing, Jesus Jr. testified that he believed Otilia was capable of giving consent and that he did not know she had been diagnosed with dementia. According to Jesus Jr., although he sometimes took Otilia to doctor's appointments, the only thing he knew " at the time was that, you know, she was under medications as far as for blood pressure. Trying to think of— she was taking a lot of medications but we were never told what everything was for. We were never told what the situation was." According to Jesus Jr., " Mary was the one [who] worked at the doctor's office, so she would oversee whatever Dr. Cantu said. So we relied on her to fill us in on whatever situation was wrong with [Otilia]." When asked whether Mary had told him that Otilia had been diagnosed with senile dementia, Jesus Jr. replied, " [S]he never told us." As evidence that Jesus Jr. knew his mother had senile dementia, Mary also points to Jesus Jr.'s testimony at the injunction hearing that a case worker from Adult Protective Services told him that he needed to be "

more formal" with the joint bank account. However, Jesus Jr. testified that Adult Protective Services became involved with his mother's case right before Mary was appointed his mother's guardian in 2007. This is not evidence that relates to the time period at issue— 2005.

With respect to her claim for fraud by nondisclosure, Mary also argues that Jesus Jr. had a fiduciary duty to disclose material facts to Otilia and that by not disclosing all the money transactions made by him for his own personal use, he committed fraud. In support of this statement, Mary points to the copies of the bank records from the joint account. However, while the bank records are evidence that transactions occurred; they are not evidence that Jesus Jr. failed to disclose those transactions to Otilia. Jesus Jr. testified at the injunction hearing that Otilia knew about the transactions. According to Jesus Jr., he was just handling the family finances, like he had for his father, and his mother knew about it. Mary, once again, points to Otilia having senile dementia, but as noted above, there is no evidence Jesus Jr. knew about her senile dementia. Therefore, we hold that Mary did not bring forth more than a scintilla of probative evidence to raise a genuine issue of material fact with respect to her claims for common law fraud, fraud in the inducement, and fraud by nondisclosure.

### 2. *Statutory Fraud*

**Page 200**

To bring a claim for statutory fraud, Mary must show the following: (1) the transaction involved real estate; (2) Jesus Jr. made a false representation of a material fact or made a false promise to do an act to Otilia, or benefited by not disclosing that a third party's representation or promise was false; (3) the false representation was made for the purpose of inducing Otilia to enter into a contract; (4) Otilia relied on the false representation or promise in entering into the contract; and (5) the reliance caused Otilia injury. *See* TEX. BUS. & COM.CODE ANN. § 27.01 (West 2009) (titled " Fraud in Real Estate and Stock Transactions" ); *Fletcher v. Edwards,* 26 S.W.3d 66, 77 (Tex.App.-Waco 2000, pet. denied) (" A plaintiff establishes a statutory fraudulent inducement claim under section 27.01 of the Business and Commerce Code by showing: a false representation of a material fact; made to induce a person to enter a contract; and relied on by that person in entering the contract." ). The statutory cause of action differs from the common law only in that to recover actual damages, it does not require proof that the defendant made a material false representation knowing it to be false or made it recklessly as a positive assertion without any knowledge of its truth. *Fletcher,* 26 S.W.3d at 77.

In his no-evidence motion, Jesus Jr. argued that Mary cannot prove that he made a false misrepresentation of fact to Otilia, or benefited by not disclosing a third party's representation or promise was false. Similarly, he argued that Mary cannot show that any representation made by him was made for the purpose of inducing Otilia to enter into a real estate contract. He also argued that Mary cannot show that Otilia relied on the false representation or promise by entering into the contract. And, Jesus Jr. argued that Mary cannot show that Otilia reasonably relied on a representation made by him, and that therefore there is no evidence that such reliance caused injury. As evidence, Jesus Jr. attached the original warranty deed showing that the family home was his father's separate property. Thus, Jesus Jr. argued that in executing the deed to him, all Otilia conveyed was a life estate interest, which she abandoned when she moved out of the family home.

As evidence of the above elements, Mary once again points to Jesus Jr.'s testimony at the temporary injunction hearing and her own affidavit. The issue again is whether Jesus Jr. knew his mother was suffering from senile dementia and was thus somehow taking advantage of her because he knew his mother was incapable of giving her consent. However, as noted above, Mary failed to produce any evidence that at the time these transactions occurred, Jesus Jr. had any knowledge that his mother suffered from senile dementia.

### CONCLUSION

Because the trial court did not abuse its discretion in denying Mary's motion to continue the summary judgment hearing and because Mary failed to bring forth more than a scintilla of probative evidence to raise a genuine issue of material fact, we affirm the judgment of the trial court.

---------

Notes:

[1] Because we hold the trial court did not err in granting Jesus Patlan Jr.'s no-evidence motion for summary judgment, we need not reach the issue of whether the trial court should have granted the traditional motion for summary judgment.

[2] The record does not reflect why Mary's former attorney was no longer an attorney in this case.

[3] The record does not reflect why Mary's current attorneys filed a petition in district court to take a " presuit" deposition of Jesus Jr. when Mary had already filed a lawsuit in probate court against Jesus Jr. At oral argument, one of Mary's current attorneys admitted that she had been aware of the previous lawsuit filed by Mary against Jesus Jr. in the probate court and the injunction hearing in that lawsuit. However, Mary's current attorney claimed to have been unaware of what specific documents had been filed or

exchanged in that lawsuit because Mary's previous attorney had not given Mary his file.

[4] After taking the deposition, Mary's attorneys determined that Otilia did not have a claim against the bank.

[5] A hearing was held on April 1st on the motion to dismiss, but there is no reporter's record of the hearing. At the motion to continue the summary judgment hearing, Mary's attorney makes reference to the trial court dismissing Mary's case on April 1st. Thus, it appears the trial court orally granted Jesus Jr.'s motion to dismiss on April 1st, but did not sign the order dismissing the case for want of prosecution until April 26, 2010, at which point the trial court was aware that Mary had filed a new petition on April 5th.

[6] Although there is a reporter's record of the hearing on the motion for continuance, there is no reporter's record of the summary judgment hearing, which was held much later.

[7] Dr. Cantu was Otilia's treating doctor and Mary's employer.

[8] Mary's attorneys did not indicate in Mary's motion for continuance why they would need additional time to obtain their client's affidavit.

[9] The hearing on the motion for continuance was held on May 19, 2010. The record request to Broadway Bank was filed in the district clerk's office on May 20, 2010. And, the request indicates that it was sent to Broadway Bank on May 18th, the day before the hearing.

[10] We further note that although not briefed, Mary's attorney raised the issue during oral argument that she was prevented from fully deposing Jesus Jr. by the trial court's presuit deposition order of September 18, 2009, which limited the scope of any deposition of Jesus Jr. to the facts and circumstances surrounding the signature cards relating to the account made the basis of the suit. However, there is nothing in the record to reflect that Mary was prevented from fully taking Jesus Jr.'s deposition before the trial court's order of September 18, 2009, nor is there any indication that Mary ever went back to the trial court after September 18, 2009, to request that the scope of Jesus Jr.'s deposition be expanded.

[11] We note that Jesus Jr. filed written objections to Mary's affidavit, arguing that it was based on hearsay and speculation, and constituted improper expert testimony. However, there is nothing in the record to reflect that Jesus Jr. obtained a ruling on his objections. Nevertheless, we note that Jesus Jr. did not need to object or obtain a ruling on any conclusory statements contained in Mary's affidavit because conclusory statements are insufficient to raise a fact issue. *See Ryland Group, Inc. v. Hood,* 924 S.W.2d 120, 122 (Tex.1996); *see also Selz v. Friendly Chevrolet, Ltd.,* 152 S.W.3d 833, 837 (Tex.App.-Dallas 2005, no pet.) (holding affidavit that is nothing more than a sworn statement of allegations in a pleading is conclusory and insufficient to create a fact issue); *Old Republic Sur. Co. v. Bonham State Bank,* 172 S.W.3d 210, 217 (Tex.App.-Texarkana 2005, no pet.) (explaining that " statements of legal conclusions amount to little more than the witness choosing sides on the outcome of the case" and " affidavits containing conclusory statements unsupported by facts are not competent summary judgment proof" ).

---------

Page 202

362 S.W.3d 202 (Tex.App.-Dallas 2012)

LTTS CHARTER SCHOOL, INC. d/b/a Universal Academy, Appellant,

v.

Jimmy PALASOTA d/b/a Palasota Property Company, Appellee.

No. 05-08-01039-CV.

Court of Appeals of Texas, Fifth District, Dallas

February 28, 2012

Page 203

[Copyrighted Material Omitted]

Page 204

Thomas Anthony Fuller, The Fuller Law Group, Arlington, TX, for Appellant.

Scott A. Scher, Law Offices of Scott A. Scher, P.C., Prosper, TX, Michael L. Jones, Henry & Jones, L.L.P., Dallas, TX, for Appellee.

Before Justices RICHTER, LANG, and MURPHY.

Page 205

OPINION ON REMAND

LANG, Justice.

In this interlocutory appeal, appellant LTTS Charter School, Inc. d/b/a Universal Academy (" Universal Academy" ) appeals the trial court's denial of its plea to the jurisdiction based on immunity from suit. On original submission, this Court concluded it did not have jurisdiction over the interlocutory appeal because Universal Academy, which is an open-enrollment charter school, was not a " governmental unit" for purposes of an interlocutory appeal under section 51.014(a)(8) of the Texas Civil Practice and Remedies Code. *See LTTS Charter Sch., Inc. v. Palasota,* 293 S.W.3d 830 (Tex.App.-Dallas 2009), *rev'd,* 344 S.W.3d 378 (Tex.2011); *see also* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(8) (West Supp.2011). The Texas Supreme Court reversed this Court's judgment and remanded the case to this Court for further proceedings. *LTTS Charter Sch.,* 344 S.W.3d at 378.

In five issues on appeal, Universal Academy asserts (1) the trial court erred by denying its plea to the jurisdiction; (2) Universal Academy is a " local governmental entity" for purposes of the application of Texas Local Government Code sections 271.151 through 271.160, which provide for waiver of immunity from suit as to certain contract claims, *see* TEX. LOC. GOV'T CODE ANN.. §§ 271.151-.160 (West 2005 & Supp.2011); (3) Universal Academy is a " governmental unit" for purposes of application of the Texas Tort Claims Act (" TTCA" ), which provides a limited waiver of immunity from suit on tort claims, *see* TEX. CIV. PRAC. & REM.CODE ANN. §§ 101.001-.109 (West 2011 & Supp.2011); (4) Universal Academy is immune from suit on the breach of contract claims of appellee Jimmy Palasota d/b/a Palasota Property Company (" Palasota" ); and (5) Universal Academy is immune from suit on Palasota's tort claims.[1]

We reverse the trial court's order denying Universal Academy's plea to the jurisdiction and render judgment granting the plea to the jurisdiction and dismissing Palasota's claims.

**I.    FACTUAL    AND    PROCEDURAL BACKGROUND**

Palasota, a commercial real estate broker, filed this lawsuit on September 29, 2005. In his live petition at the time of the challenged order, Palasota alleged that in approximately April 2004, Universal Academy approached him regarding the possibility of having him " list" for sale its campus located in Flower Mound, Texas (the " Property" ), which Universal Academy desired to sell. Palasota asserted he and Universal Academy subsequently executed an exclusive listing agreement (the " Listing Agreement" ). According to Palasota, under the terms of the Listing Agreement, Universal Academy agreed to provide him with an exclusive listing on the Property commencing on April 26, 2004, and continuing through at least October 26, 2004. Palasota alleged that in exchange for his services under the Listing Agreement, he was to receive a commission " defined by the Listing Agreement" as " six percent of the first $1 million and three percent of all amounts over $1 million and up to $10 million." The commission was " due and payable at the closing of any sale of the Property." Further, Palasota asserted,

Page 206

the Listing Agreement provided for payment of the commission to him " [i]f said property is sold prior to the termination of this agreement, whether by [Palasota], by [Universal Academy], or by any other person."

Palasota stated that in late October 2004, he notified Universal Academy that he was expecting to receive offers for the acquisition of all or portions of the Property. At that time, Palasota alleged, Universal Academy disclosed to him for the first time that it had sold the Property in August 2004. Palasota alleged Universal Academy notified him that it would not " honor the Listing Agreement" or pay him " a commission based upon the Sale." Palasota asserted " causes of action" against Universal Academy for breach of contract, fraud, fraudulent concealment, statutory fraud, and imposition of constructive trust.[2]

Universal Academy filed an answer and asserted affirmative defenses that included immunity from suit and " [i]llegality as to some or all of the portions of the contract upon which Plaintiff makes its claim." Additionally, in a verified denial, Universal Academy denied that the Listing Agreement was signed by " a person authorized to sign such a contract on behalf of Universal Academy."

Universal Academy filed a plea to the jurisdiction of the trial court asserting (1) it is immune from suit on Palasota's claims based on the doctrine of sovereign immunity and (2) Palasota's claims do not fall within any legislative waiver of sovereign immunity. Specifically, Universal Academy contended the TTCA limits tort claims against charter schools to those involving the operation of a motor vehicle, thus precluding Palasota's tort claims. With respect to Palasota's contract claim, Universal Academy contended the waiver of immunity from suit in section 271.152 of the local government code does not apply in this case because (1) the transaction pursuant to which Palasota seeks to recover a commission consisted of " Universal Academy deeding the Property to its lender in lieu of foreclosure," which was not a " sale" of the Property, and thus the essential terms of the Listing Agreement do not expose Universal Academy to any liability for paying a commission to Palasota and (2) Universal Academy's board of directors never authorized the signatory of the Listing Agreement to sign that agreement, and thus the Listing Agreement was not properly executed by a party having authority to bind Universal Academy. Evidence attached to the plea to the jurisdiction included, in relevant part, the Listing Agreement and a February 20, 2008 affidavit of Janice Blackmon, Universal Academy's director of administrative services and a member of its board of directors, whose signature appears on the Listing Agreement.

Palasota filed no response to Universal Academy's plea to the jurisdiction. At the hearing on the plea to the jurisdiction, Universal Academy presented arguments respecting the grounds asserted in its plea to the jurisdiction. Additionally, Universal Academy contended the Listing Agreement does not state the amount of the commission Palasota was to be paid and is therefore missing an " essential term" required by the waiver provision of section 271.152. Palasota asserted, *inter alia,* that (1) Universal Academy's argument respecting the missing term constituted a " statute of frauds claim" that was not

**Page 207**

pleaded and " can't be pled" because " it's too late" ; (2) Universal Academy " can point to nothing that says that [the Listing Agreement] has to be submitted to, approved by, and/or ratified by the board of the school in order to be a properly executed contract" ; and (3) the transaction at issue constituted a " sale."

Following the trial court's denial of the plea to the jurisdiction, Universal Academy appealed to this Court pursuant to section 51.014(a)(8). *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(8) (providing for appeal of an interlocutory order that " denies a plea to the jurisdiction by a governmental unit as that term is defined in [the TTCA]" ). This Court dismissed Universal Academy's interlocutory appeal, concluding Universal Academy was not a " governmental unit" as that term is defined in the TTCA. *See id.* § 101.001.

The Texas Supreme Court granted Universal Academy's petition for review. While this case was pending in the supreme court, that court issued its opinion in *LTTS Charter School, Inc. v. C2 Construction, Inc.,* 342 S.W.3d 73 (Tex.2011) (" *C2 Construction I* " ). In that case, the supreme court concluded Universal Academy was a " governmental unit" under the TTCA and thus entitled to take an interlocutory appeal pursuant to section 51.014(a)(8). *Id.* at 78. In light of its opinion in *C2 Construction I,* the supreme court reversed this Court's judgment in this case and remanded this case to us for consideration of the issues raised in the interlocutory appeal. *LTTS Charter Sch.,* 344 S.W.3d at 378.

## II. DENIAL OF UNIVERSAL ACADEMY'S PLEA TO THE JURISDICTION

### *A. Standard of Review and Applicable Law*

Whether a trial court has subject matter jurisdiction is a matter of law that is reviewed de novo. *See Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 226, 228 (Tex.2004); *Tex. Natural Res. Conservation Comm'n v. IT-Davy,* 74 S.W.3d 849, 855 (Tex.2002); *Robinson v. Neeley,* 192 S.W.3d 904, 907 (Tex.App.-Dallas 2006, no pet.). A party may challenge the trial court's subject matter jurisdiction by filing a plea to the jurisdiction. *Miranda,* 133 S.W.3d at 225-26. In deciding a plea to the jurisdiction, a court may not weigh the claims' merits, but must consider only the plaintiff's pleadings and the evidence pertinent to

the jurisdictional inquiry. *Cnty. of Cameron v. Brown,* 80 S.W.3d 549, 555 (Tex.2002).

" When we consider a trial court's order on a plea to the jurisdiction, we construe the pleadings in the plaintiff's favor and look to the pleader's intent." *Id.; see also City of Elsa v. Gonzalez,* 325 S.W.3d 622, 625 (Tex.2010); TEX.R. CIV. P. 45 (" All pleadings shall be construed so as to do substantial justice." ). " When a plaintiff fails to plead facts that establish jurisdiction, but the petition does not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and the plaintiff should be afforded the opportunity to amend." *Brown,* 80 S.W.3d at 555; *accord Miranda,* 133 S.W.3d at 226-27; *Clifton v. Walters,* 308 S.W.3d 94, 98 (Tex.App.-Fort Worth 2010, pet. denied); *City of Austin v. Leggett,* 257 S.W.3d 456, 461 (Tex.App.-Austin 2008, pet. denied). " On the other hand, if the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiff an opportunity to amend." *Brown,* 80 S.W.3d at 555; *see Miranda,* 133 S.W.3d at 227; *Leggett,* 257 S.W.3d at 461.

When a plea to the jurisdiction challenges the existence of jurisdictional

**Page 208**

facts, the trial court must consider the relevant evidence submitted by the parties when necessary to resolve the jurisdictional issue. *See City of Waco v. Kirwan,* 298 S.W.3d 618, 622 (Tex.2009); *Miranda,* 133 S.W.3d at 227; *Clifton,* 308 S.W.3d at 98. This standard generally mirrors that of a traditional summary judgment. *See Miranda,* 133 S.W.3d at 228. We " take as true all evidence favorable to the nonmovant" and " indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Id.* " If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the fact-finder." *Id.* at 227-28. " However, if the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law." *Id.* at 228.

Under the common-law doctrine of sovereign immunity, the state cannot be sued without its consent. *City of Houston v. Williams,* 353 S.W.3d 128, 134 (Tex.2011) (citing *Tooke v. City of Mexia,* 197 S.W.3d 325, 331 (Tex.2006)); *City of Galveston v. State,* 217 S.W.3d 466, 471 (Tex.2007). Governmental immunity operates like sovereign immunity to afford similar protection to subdivisions of the state, including counties, cities, and school districts.[3] *Harris Cnty. v. Sykes,* 136 S.W.3d 635, 638 (Tex.2004) (citing *Wichita Falls State Hosp. v. Taylor,* 106 S.W.3d 692, 694 n. 3 (Tex.2003)); *Learners Online,*

*Inc. v. Dallas Indep. Sch. Dist.,* 333 S.W.3d 636, 641-42 (Tex.App.-Dallas 2009, no pet.). Like sovereign immunity, governmental immunity has two components: immunity from liability, which bars enforcement of a judgment against a governmental entity, and immunity from suit, which bars suit against the entity altogether. *Tooke,* 197 S.W.3d at 332. Governmental immunity from suit deprives a trial court of subject matter jurisdiction and is properly asserted in a plea to the jurisdiction. *See Miranda,* 133 S.W.3d at 225-26.

" [E]ven if the State acknowledges liability on a claim, immunity from suit bars a remedy until the Legislature consents to suit." *Learners Online,* 333 S.W.3d at 642 (quoting *Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist. v. Tex. Political Subdivisions Prop./Cas. Joint Self-Ins. Fund,* 212 S.W.3d 320, 324 (Tex.2006)). The plaintiff bears the burden of pleading facts affirmatively demonstrating waiver of immunity from suit and must also raise a fact question on the jurisdictional facts if a jurisdictional plea is supported with evidence. *City of Irving v. Seppy,* 301 S.W.3d 435, 443 (Tex.App.-Dallas 2009, no pet.). As this Court recently concluded, open enrollment charter schools enjoy governmental immunity from suit. *LTTS Charter Sch., Inc. v. C2 Constr., Inc.,* 358 S.W.3d 725, 735 (Tex.App.-Dallas 2011, no pet. h.) (" *C2 Construction II* " ).

### B. Analysis

1. Waiver of Immunity as to Palasota's Tort Claims

We begin with Universal Academy's third and fifth issues, which relate to Palasota's tort claims. In its third issue, Universal Academy contends it is a " governmental unit" for purposes of the TTCA, which provides only a limited waiver of immunity from suit on tort claims. In its fifth issue, Universal Academy asserts it is immune from suit on Palasota's tort

**Page 209**

claims. According to Universal Academy, Palasota's tort claims include his claims for fraud, fraudulent concealment, and statutory fraud, as well as any claims for punitive damages, attorney's fees, and costs of court " resulting therefrom." Further, Universal Academy asserts that to the extent Palasota's constructive trust claim is " tort-based," the TTCA precludes waiver of immunity as to that claim as well.

We address Universal Academy's third issue by referring to *C2 Construction I.* In that case, the supreme court concluded " [a]n open-enrollment charter school qualifies as a ' governmental unit' under the [TTCA]." *C2 Constr. I,* 342 S.W.3d at 76. That conclusion is dispositive

of Universal Academy's third issue.

Next, we address Universal Academy's fifth issue. The TTCA, which is contained in chapter 101 of the Texas Civil Practice and Remedies Code, provides, *inter alia,* a limited waiver of immunity from suit and from liability for certain suits against " governmental units." *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 101.021, 101.025. However, the TTCA expressly excludes any " intentional tort." *Id.* § 101.057. Fraud is an " intentional tort" for which the TTCA provides no waiver of immunity. *See Seureau v. ExxonMobil Corp.,* 274 S.W.3d 206, 219 (Tex.App.-Houston [14th Dist.] 2008, no pet.) (" the Legislature has not waived immunity with respect to the intentional tort of fraud" ); *Sanders v. City of Grapevine,* 218 S.W.3d 772, 779 (Tex.App.-Fort Worth 2007, pet. denied). Accordingly, we conclude governmental immunity from suit has not been waived as to Palasota's claims for fraud, fraudulent concealment, and statutory fraud.

In addition to his fraud claims, Palasota asserted a " cause of action" for imposition of a constructive trust " as a result of the fraud practiced by [Universal Academy] with respect to the commission due and owing on the Property." Imposition of a constructive trust is not a cause of action, but rather an equitable remedy. *See Garcia v. Garza,* 311 S.W.3d 28, 40 (Tex.App.-San Antonio 2010, pet. denied); *In re Estate of Arrendell,* 213 S.W.3d 496, 504 (Tex.App.-Texarkana 2006, no pet.); *see also Bright v. Addison,* 171 S.W.3d 588, 601 (Tex.App.-Dallas 2005, pet. denied) (constructive trust can be imposed when party commits fraud or breaches fiduciary relationship). Palasota's alleged entitlement to a constructive trust is based on his fraud claims that we concluded above are barred by governmental immunity. Therefore, we conclude governmental immunity from suit has not been waived as to Palasota's constructive trust " cause of action" allegedly arising from fraud.

We decide in favor of Universal Academy on its third and fifth issues.

2. Waiver of Immunity as to Palasota's Breach of Contract Claim

Now, we address together Universal Academy's second and fourth issues. In its second issue, Universal Academy asserts it is a " local governmental entity" for purposes of the application of chapter 271, subchapter I, of the Texas Local Government Code. *See* TEX. LOC. GOV'T CODE ANN.. §§ 271.151-.160 (titled " Adjudication of Claims Arising Under Written Contracts With Local Government Entities" ). In its fourth issue, Universal Academy contends it is immune from suit on Palasota's breach of contract claim.

Under section 271.152 of chapter 271, " [a] local governmental entity that is authorized by statute or the constitution to enter into a contract and that enters into a contract subject to this subchapter waives sovereign immunity to suit for the purpose

**Page 210**

of adjudicating a claim for breach of contract." *Id.* § 271.152; *Learners Online,* 333 S.W.3d at 642. " Contract subject to this subchapter" is defined as " a written contract stating the essential terms of the agreement for providing goods or services to the local governmental entity that is properly executed on behalf of the local governmental entity." TEX. LOCAL GOV'T CODE ANN. § 271.151(2); *Learners Online,* 333 S.W.3d at 642. " Essential terms" have been characterized as, *inter alia,* " ' the time of performance, the price to be paid, ... [and] the service to be rendered.' " *See Williams,* 353 S.W.3d at 138-39 (quoting *Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.,* 320 S.W.3d 829, 838 (Tex.2010)).

We concluded in *C2 Construction II* that an open-enrollment charter school is a " local governmental entity" for purposes of section 271.152. *C2 Constr. II,* 358 S.W.3d at 742. That conclusion is dispositive of Universal Academy's second issue.

As to its fourth issue, Universal Academy asserts the criteria for waiver pursuant to section 271.152 have not been satisfied and Palasota is therefore precluded from proceeding with his breach of contract action. Specifically, Universal Academy asserts in part that " [t]he undisputed evidence before the trial court conclusively showed that the Listing Agreement did not contain an essential term to that contract— the amount and/or method of calculating the commission."

The record shows Palasota asserted in his petition that in exchange for his services under the Listing Agreement, he was to receive a commission " defined by the Listing Agreement" as " six percent of the first $1 million and three percent of all amounts over $1 million and up to $10 million." However, Blackmon testified in relevant part in her February 20, 2008 affidavit

I signed an Exclusive Listing Agreement with Palasota which purported to give him the exclusive right to sell the Flower Mound Campus for Universal Academy in exchange for a commission based upon a percentage of the sales price, to be paid at the closing of a sale (the " Listing Agreement" ). A true and correct copy of the Listing Agreement is attached hereto as Exhibit " A-1."

Attached to Blackmon's affidavit as " Exhibit ' A-1' " is a one-page document titled " Exclusive Listing

Agreement." That document states in part that in the event of a sale of the Property, Palasota will be paid " a commission in cash ... equal to the following percent of the total sales (~~rental~~) price of the property computed as follows: *See attached Addendum.* " (emphasis original).

Blackmon's affidavit and the one-page Listing Agreement were attached as exhibits to Universal Academy's plea to the jurisdiction. The record shows Palasota did not file a response to the plea to the jurisdiction, offer controverting evidence as to whether an addendum was part of the Listing Agreement, or object to Universal Academy's evidence. Rather, the undisputed evidence before the trial court showed that the Listing Agreement consisted of a single page that did not contain an addendum, a " price to be paid," or any term stating the amount or method of calculating the commission. *See San Antonio Hous. Auth. Found., Inc. v. Smith,* No. 04-10-00759-CV, 2011 WL 3627699, at *5 (Tex.App.-San Antonio Aug. 17, 2011, no pet.) (mem. op.) (affidavit attached to plea to jurisdiction established jurisdictional fact as matter of law and nonmovant therefore could not prevail absent scintilla of controverting evidence); *cf. Bass v. Bass,* 790 S.W.2d 113, 117-18 (Tex.App.-Fort Worth 1990, no writ) (uncontroverted facts in movant's summary judgment affidavit

**Page 211**

are taken as true for purposes of appeal). Palasota contended in the trial court that Universal Academy's argument that the missing term precluded application of section 271.152's waiver provision constituted a " statute of frauds claim" that was not properly pleaded. However, the statute of frauds pertains to the enforceability of a contract. *See S & I Mgmt., Inc. v. Sungju Choi,* 331 S.W.3d 849, 854 (Tex.App.-Dallas 2011, no pet.) (" Under the statute of frauds, certain contracts are not enforceable unless they are in writing and signed by the person against whom enforcement of the contract is sought." ); *Lathem v. Kruse,* 290 S.W.3d 922, 925 (Tex.App.-Dallas 2009, no pet.) (pursuant to statute of frauds in Real Estate License Act, agreement to pay real estate commission must be in writing or it is not " enforceable" ). Palasota cited no authority to the trial court, and we have found none, supporting the proposition that a plaintiff's failure to satisfy the elements of section 271.152's waiver provision must be pleaded by the defendant. *Cf. Seppy,* 301 S.W.3d at 443 (plaintiff bears burden of pleading facts affirmatively demonstrating waiver of immunity from suit).

On this record, we conclude waiver pursuant to section 271.152 is inapplicable. *See* TEX. LOCAL GOV'T CODE ANN. § 271.151(2) (waiver under section 271.152 requires written contract stating " essential terms" of agreement); *see also Williams,* 353 S.W.3d at 138-39 ("

price to be paid" characterized as essential term). In light of that conclusion, we do not reach Universal Academy's remaining arguments respecting Palasota's breach of contract claim.

We decide in favor of Universal Academy on its second and fourth issues. Additionally, based on our conclusions above, we decide in favor of Universal Academy on its first issue, in which it asserts the trial court erred by denying its plea to the jurisdiction.[4]

### III. CONCLUSION

We decide Universal Academy's five issues in its favor. We reverse the trial court's order denying Universal Academy's plea to the jurisdiction and render judgment granting the plea to the jurisdiction and dismissing Palasota's claims.

---------

Notes:

[1] Palasota did not file a response to Universal Academy's plea to the jurisdiction in the trial court and did not file a brief before this Court when this case was initially submitted on appeal. Following the supreme court's remand, Palasota filed a motion for leave to file a brief on the merits in this Court pursuant to Texas Rule of Appellate Procedure 38.6. *See* TEX.R.APP. P. 38.6. That motion was denied by this Court.

[2] Additionally, Palasota requested attorney's fees in connection with his breach of contract and statutory fraud claims.

[3] To the extent Universal Academy uses the terms " sovereign immunity" and " governmental immunity" interchangeably, we construe the issues in this case to address governmental immunity.

[4] In light of our conclusions herein, we do not reach Universal Academy's arguments respecting Palasota's request for attorney's fees.

---------

410 S.W.2d 256 (Tex.Civ.App. —Waco 1966)

GENERAL ASSOCIATION OF DAVIDIAN SEVENTH DAY ADVENTISTS,

 INC., Appellants,

v.

 GENERAL ASSOCIATION OF DAVIDIAN SEVENTH DAY ADVENTISTS et

 al., Appellees.

No. 4533.

Court of Civil Appeals of Texas, Waco

November 3, 1966

 Rehearing Denied Nov. 23, 1966.

Page 257

 Charles E. Wallace, Carl Anderson, Waco, for appellants.

 David Kultgen, Waco, for appellees.

 OPINION

 McDONALD, Chief Justice.

 This is an appeal from a judgment impressing a trust on assets and properties of the defunct General Association of Davidian Seventh Day Adventists, in favor of all persons living on March 11, 1962, who had contributed to the 'Second Tithe' fund of such association. The judgment appointed Tom Street receiver of the properties; and required him to sell and liquidate the property subject to approval of the Court.

 Plaintiff General Association of Seventh Day Adventists, Inc. brought this suit against the General Association of Seventh Day Adventists and Tom Street, Trustee, to set aside a trust agreement conveying all assets of the General Association of Davidian Seventh Day Adventists to Tom Street, Trustee, for sale and distribution to named members; and for title and possession of such assets. Plaintiff alleged the General Association of Davidian Seventh Day Adventists was a defunct church; that on March 11, 1962 a resolution was passed by a portion of its membership dissolving the organization and appointing Tom Street, Trustee, of all assets for sale and specified

distribution. Plaintiff asserted the conveyance to Street of the properties for distribution unlawful, and that it was the rightful successor to defendant association's properties.

 Defendants General Association of Davidian Seventh Day Adventists and Tom Street answered, alleging that the association was a religious denomination which was dissolved by resolution of its members on March 11, 1962; that prior to dissolution it conveyed the assets of the association to Tom Street, Trustee, for sale and distribution to named members; and prayed for declaratory judgment confirming the dissolution of the association, and of the conveyance of the assets to the Trustee.

 The Davidian Seventh Day Adventist Association (composed of some former members of the old association) intervened, alleging that members of the old association had contributed moneys to a fund called the 'Second Tithe' which funds were represented to be for the purpose of taking care of contributors in old age. Intervenors prayed that they be declared owners of the assets of the defunct association, and alternatively that such assets be impressed with a trust in favor of persons who had contributed to such 'Second Tithe.'

 The General Association of Davidian Seventh Day Adventists was established about 1930 under the leadership of a Brother Houteff. From a small beginning the association grew to some 1000 members. The members paid a 'First Tithe' which was for the spread of the gospel; and many members paid a 'Second Tithe' which was for the purpose of their being cared for in old age. Brother Houteff died; Mrs. Houteff was appointed Vice President of the association, and in early 1962 sent notices

Page 258

calling a meeting of the association to be convened on March 11, 1962. At the March 11, 1962 meeting, dissolution of the association was voted by those present, purporting to act for the association. The group who voted the dissolution conveyed the properties and assets of the association to Tom Street as Trustee for named members of the association. Plaintiff filed this suit to set aside the trust, and to acquire the assets of the defunct association.

 Trial was to a jury which found:

1, 2) The General Association of Seventh Day Adventists is a defunct church; which may not be revived in a reasonable time.

3, 4) The General Association of Seventh Day Adventists, Inc. is a church of like faith as the defunct group; and is a

successor organization of the defunct group.

5, 6) The Davidian Seventh Day Adventists Association is a church of like faith as the defunct group; and is a successor organization of the defunct group.

7) The Executive Council of the old association had authority to appoint Mrs. Houteff Vice President of the old association.

8) Notices of the Session of March 11, 1962 were not sent to all members entitled to receive them.

9) Proxy votes used in the March 11, 1962 session were not actually received.

10) Contributors to the Second Tithe were induced to make such contributions by representations as to the purposes for which such Tithe was to be used.

11) Contributors relied on such representations.

12) Contributors to the 'Second Tithe' would not have contributed if they had not relied on such representations.

13) The assets and property here involved were purchased with 'Second Tithe' funds.

14) The defunct association represented it would hold the assets in trust for the use and benefit of the contributors.

16) There was not a majority of the membership of the defunct association either present or by proxy voting for the resolution on March 11, 1962.

17, 20) Plaintiffs and Intervenors did not wait an unreasonable length of time before bringing this suit, after discovering the assets of the defunct association had been transferred to Tom Street, Trustee.

19) It was not the understanding of the members of Intervenor Association that a contributor had to remain a member of the (defunct) association in order to participate in benefits of the 'Second Tithe.'

22) A majority of those present in person at the meeting of March 11, 1962 voted for the resolution to dissolve.

23) A majority of those present in person or by proxy at the meeting of March 11, 1962 voted for the resolution to dissolve.

The trial court entered judgment that the General Association of Davidian Seventh Day Adventists was owner of the properties involved; was a defunct church; that such properties were acquired with funds contributed to the 'Second Tithe'; that such funds were not for general church purposes but were for the caring for contributors in old age;

that plaintiffs and intervenors are not entitled to the funds; that

**Page 259**

the resolution transferring the properties to Tom Street, Trustee, was ineffective to modify the rights of the parties; that such assets are impressed with a trust of which all contributors who were living on March 11, 1962 are beneficiaries; that defendant association being defunct, is no longer qualified to act as trustee; that it will not be revived within a reasonable time; that the appointment of a Receiver is required to take care of those being cared for at the time the old association became defunct, and to pay bequeathment certificates.

The Court further decreed all persons living on March 11, 1962 who had contributed to the 'Second Tithe' beneficiaries of the trust; required the Receiver to file inventory of the properties; a list of 'Second Tithers' to the best of his ability; to file bond and oath; and further ordered Receiver reimbursed for his expenses and compensated for his services.

Plaintiff appeals on 15 points, contending:

1) There is no evidence, or insufficient evidence, to support the jury's finding (Issue 13) that the assets were purchased with 'Second Tithe' funds; and the undisputed evidence is that the assets and properties were purchased from a common fund which included both 'First Tithe' and 'Second Tithe' funds.

2) The trial court erred in overruling its motion for judgment appointing plaintiff Receiver to take charge of all assets of the defunct association.

3) The trial court erred in failing to apply the doctrine of cy pres.

4) The trial court erred in permitting the trust to fail for want of a trustee.

5) There were no pleadings and no evidence to support the judgment.

6) The trial court erred in appointing a receiver not qualified under Article 2294.

7) The judgment is void because Article 4412a, V.A.T.S. requires the Attorney General to be a party to suits pertaining to a charitable trust.

Contention 1 complains of the jury's finding that the properties here involved were purchased with 'Second Tithe' funds; and asserts the evidence undisputed that such were purchased from a common fund which included 'First Tithe'

and 'Second Tithe' funds.

'First Tithe' funds were funds which had been contributed for gospel work. 'Second Tithe' funds were funds which had been contributed by the members of the association for the purpose of the association caring for the contributors in their old age. Plaintiffs concede in their brief that 'Second Tithe' funds were subject to a trust. While there is evidence that the assets and properties here involved were purchased with 'Second Tithe' funds, if such properties were purchased with commingled 'First' and 'Second' Tithe funds, the cestui's right of recovery is not destroyed by reason of the fact the Trustee commingled the trust property with its own property. The entire commingled fund or property will be treated as subject to the trust. *Eaton v. Husted,* 141 Tex. 349, 172 S.W.2d 493. And if the Trustee invests the trust fund or its proceeds in other property, the cestui que trust may follow the fund into the new investment. *Kennedy v. Baker,* 59 Tex. 150. And where the Trustee mingles the trust money with his own, whenever he pays out * * * he is presumed to have paid out with his own money. *Continental Nat. Bank v. Weems,* 69 Tex. 489, 6 S.W. 802.

Under the authorities cited, the beneficiaries are entitled to follow the trust funds into the assets and properties here involved.

**Page 260**

Plaintiff's 2nd contention is that the trial court erred in not appointing it to take charge of all assets of the defunct association under Articles 2293 et seq., Vernon's Ann .Tex.St. These statutes concern the administration of properties belonging to defunct churches. The property which we are concerned with is property subject to a trust in favor of 'Second Tithe' contributors; and Articles 2293 et seq., V.A.T.S. are inapplicable.

Plaintiff's 3rd contention is that the trial court erred in not applying the cy pres doctrine. The cy pres doctrine applies to a charitable trust, and has no application here. This trust is not charitable. This is a trust, the assets of which were to give old age protection to the contributors.

Plaintiff's 4th contention is that the trial court erred in permitting the trust to fail for want of a trustee. The trial court did not permit the trust to fail for want of a trustee. When the association became defunct and broke up, the accomplishment of the trust became impossible. (Plaintiff has only 6 members; intervenors but few more; some 8 groups claim to be successors to the old association). If the purposes of a valid trust, as here, become impossible of accomplishment, the trust will be terminated. Restatement of Trusts, Sec. 335; Scott Trusts, Sec. 335.

Plaintiff's 5th contention is there are no pleadings and

no evidence to support the judgment. Intervenor's pleadings and the evidence support the judgment. And where a trust fails, the appointment of a Receiver to take charge of and dispose of the trust corpus is proper. Bogert, Trusts & Trustees, Secs. 14 and 861; *O'Dell v. Grubstake Inv. Ass'n, Tex.Civ.App., Er.Dis.,* 38 S.W.2d 151; *Crawford v. Crawford, Tex.Civ.App. (nwh),* 163 S.W. 115; *Hunt v. State, Tex.Civ.App. (nwh),* 48 S.W.2d 466.

Plaintiff's 6th contention is that Article 2294 precludes the appointment of Tom Street as Receiver. Tom Street was not a party, an attorney in the case, or otherwise a person interested in an action for the appointment of a receiver, as precluded by Article 2294.

Contention 7 complains that the judgment is void because Article 4412a, V.A.T.S., requires the Attorney General to be a party to suits pertaining to a charitable trust. The 'Second Tithe' trust is not a charitable trust, and Article 4412a is inapplicable.

Defendants, by counter-point, assert the trial court erred in not confirming title to the property in Tom Street as Trustee.

Plaintiff's points, (and defendants' counter-point) are overruled.

Affirmed.

415 S.W.3d 450 (Tex.App.-Houston [1 Dist.] 2013)

Charles R. SADEN, Appellant

v.

Brian SMITH, Appellee.

No. 01-11-00202-CV.

Court of Appeals of Texas, First District, Houston.

September 26, 2013

[Copyrighted Material Omitted]

[Copyrighted Material Omitted]

Matthew Luke Hoeg, Andrews & Kurth, LLP Houston, TX, for Appellee.

Alan Brandt Daughtry, Houston, TX, for Appellant.

Panel consists of Justices JENNINGS, BLAND, and MASSENGALE.

### OPINION

MICHAEL MASSENGALE, Justice.

Charles R. Saden and Brian Smith were the sole shareholders of POS Card Processing, Inc. Saden appeals from a judgment against him for breach of contract and breach of fiduciary duty arising from actions taken in connection with his management of the company. Smith moved to dismiss this appeal for want of jurisdiction, while Saden raised four appellate issues, alleging: (1) Smith lacked standing to recover damages for injuries to the corporation; (2) the trial court erred by not requiring Smith to elect a remedy; (3) the trial court erred in rendering judgment for breach of fiduciary duty because Saden owed Smith no fiduciary duty individually; and (4) the trial court erred in rendering judgment on claims not submitted to the jury.

We conclude that we have jurisdiction over this appeal. We reverse the trial court's judgment to the extent that it permitted duplicative recovery of damages and included additional unauthorized findings, and we remand to the trial court to allow Smith to elect a remedy and for entry of a new judgment.

### I. Appellate jurisdiction

After the jury's verdict but before the trial court entered judgment, Saden informed the court that he had filed for bankruptcy and that the automatic bankruptcy stay applied to all further matters in the case. The bankruptcy court converted Saden's bankruptcy from a reorganization proceeding under Chapter 11 to a liquidation proceeding under Chapter 7, and it appointed a bankruptcy trustee. The bankruptcy court granted Smith's motion for relief from the automatic stay to continue the state court litigation. The order stated:

[It is] ORDERED that the automatic stay pursuant to 11 U.S.C. § 362 is modified to permit the continuation of the State Court Lawsuit, specifically the automatic stay is modified to allow the state court to enter judgment as to liability and to award damages on of Movant's claims against the Debtor and the Debtor's claims against the Movants and allow the parties to prosecute any appeals of the final judgment, *provided, however,* the automatic stay shall not be modified to allow enforcement of such judgment against the Debtor or pursue any right to collection against the Debtor that may arise out of the State Court Lawsuit....

(Footnote omitted.)

The trial court then rendered judgment on the jury's verdict. On Smith's breach of contract claim, the trial court awarded $941,907, plus prejudgment interest and attorney's fees. For Smith's breach of fiduciary duty claim the trial court awarded an additional $393,000 in actual damages (plus prejudgment interest), as well as $941,907 (plus prejudgment interest) in equitable disgorgement of the profits " found by the jury to have been obtained

by [Saden] as a result of his acts of fraud, defalcation and embezzlement while acting and serving in a fiduciary capacity with respect to [Smith]." Saden filed a motion for new trial, a motion for judgment notwithstanding the verdict, and a motion to modify, correct, or reform the judgment. Saden's motions were overruled by operation of law, and he timely filed a notice of appeal.

Smith filed a motion to dismiss the appeal for lack of appellate jurisdiction, arguing that the bankruptcy trustee had exclusive standing to pursue an appeal of the adverse

judgment, and because the trustee did not file a notice of appeal, this court lacks appellate jurisdiction. In response, Saden pointed out that the bankruptcy court allowed the appeal to proceed by its order that modified the automatic stay to allow the trial court to enter judgment and authorized " the parties to prosecute any appeals of the final judgment." Saden also noted that the bankruptcy court, in the course of declining to discharge the debt, has rejected Smith's argument in a " Judgment of Non-Dischargeability," which provided:

For the reasons set forth on the record of February 10, 2011, Charles R. Saden's liability under the judgment of the 270th Judicial District Court of Harris County, Texas in Cause 2009-00593 is excepted from discharge pursuant to 11 U.S.C. § 523.

If the state court's judgment is reversed or modified on appeal, this Court will reconsider this judgment pursuant to Rule 9024 of the Federal Rules of Bankruptcy Procedure.

Finally, Saden argues that he has standing because a state-court judgment cannot be collaterally attacked in the bankruptcy court, and the bankruptcy court in this case relied on the state-court judgment against him, which recited the trial court's findings that he committed acts of fraud, defalcation, and embezzlement, in holding that the $3 million judgment underlying this appeal is not dischargeable in bankruptcy. He argues that a conclusion that the Bankruptcy Code's automatic stay terminates his standing to challenge the otherwise unreviewable state-court judgment that is the basis of the nondischargeability holding is " circular reasoning and would be a denial of constitutional rights of due process and due course of law."

Meanwhile, after Smith filed his motion to dismiss in this court, Saden filed in the bankruptcy court an emergency motion to confirm his authority to appeal the state-court judgment. The bankruptcy court issued an order which provided:

The Court cannot, should not and will not determine whether the First Court of Appeals has jurisdiction over Saden's notice of appeal. That is a matter left solely to the Texas courts.

The principal case cited by Brian Smith in opposition to the Debtor's motion is *In re Mozer,* 302 B.R. 892 (C.D.Cal.2003). Mozer indeed deals with a similar situation as the present one-but with a major distinction. The state court findings in Mozer were insufficient to establish an exception to discharge:

However, sale of the Defensive Appellate Rights by her Trustee is not literally nor is it tantamount to a waiver of dischargeability by the Trustee. *The underlying judgment against Mozer, even if final, is not prima facie non-dischargeable. Mozer has represented to this Court that " additional facts would need to be established and that the debt would not be non-dischargeable even if the state court judgement were to become final. "* (Appellants' Opposition to Shorten Briefing Schedule and Waive Oral Argument, p. 2).

## Page 455

To be sure, sale of the Defensive Appellate Rights may be unhelpful to her in defeating a non-dischargeability claim, but she is in no worse position than if she were permitted to pursue the state court appeal and lost.

*Id.* (emphasis added).

In this case, the opposite is alleged and the Court has already determined that the state court judgment bars further litigation over whether the claim is excepted from discharge. Accordingly, to the extent that the automatic stay bars Saden from pursuing his appeal for the purposes of challenging findings that adversely affect his discharge, the stay is modified.

By modifying the stay, this Court expresses no view on whether the First Court of Appeals has jurisdiction over Saden's appeal.

Subject-matter jurisdiction is essential to the authority of a court to decide a case and is never presumed. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 443-44 (Tex.1993); *see also Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 553-54 (Tex.2000). Standing is a necessary component of subject-matter jurisdiction and cannot be waived. *Blue,* 34 S.W.3d at 553-54. If a party lacks standing, the trial court does not have jurisdiction to hear the case. *Id.* A party has standing only when he raises " an actual, not merely a hypothetical or generalized grievance." *Brown v. Todd,* 53 S.W.3d 297, 302 (Tex.2001); *see also Texas Ass'n of Bus.,* 852 S.W.2d at 443 (explaining that concept of standing arises from separation of powers and constitutional prohibition on the issuance of advisory opinions).

The filing of a voluntary petition for bankruptcy impacts the issues of standing and jurisdiction due to the creation of the bankruptcy estate and the automatic stay. When a debtor voluntarily files a petition for bankruptcy, an " estate" is created, comprised of " all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541 (2012). This includes causes of action or legal claims that belonged to the debtor before the petition was filed. *Douglas v. Delp,* 987 S.W.2d 879, 882 (Tex.1999); *Hous. Pipeline Co. LP v. Bank of Am.,*

*N.A.,* 213 S.W.3d 418, 424-25 (Tex.App.-Houston [1st Dist.] 2006, no pet.); *Kane v. Nat'l Union Fire Ins. Co.,* 535 F.3d 380, 385 (5th Cir.2008).

The filing of a bankruptcy petition further operates as a stay of the " continuation ... of a judicial ... action or proceeding against the debtor that was ... commenced before the commencement of the [bankruptcy] case." 11 U.S.C. § 362(a)(1). " The automatic stay deprives state courts of jurisdiction over the debtor and his property until the stay is lifted or modified." *Hous. Pipeline Co.,* 213 S.W.3d at 428-29 (internal quotations omitted). Thus a judgment rendered in derogation of the automatic bankruptcy stay is void. *York v. State,* 373 S.W.3d 32, 38-40 (Tex.2012) (approving holding in *Cont'l Casing Corp. v. Samedan Oil Corp.,* 751 S.W.2d 499, 501 (Tex.1988)).

Smith moved to dismiss the appeal for want of jurisdiction based on Saden's alleged lack of standing to initiate an appeal after his bankruptcy filing, which vested exclusive standing in the trustee. In response, Saden argues that he has standing because of the bankruptcy court's non-dischargeability determination and because of the order that modified the automatic bankruptcy stay. Thus, in determining our jurisdiction, we must ascertain whether (1) Saden has standing to appeal the state-court judgment and (2) the assumption of jurisdiction would violate the automatic stay.

**Page 456**

While discharge in bankruptcy under Chapter 7 extinguishes a debtor's personal liability for a debt, *see Johnson v. Home State Bank,* 501 U.S. 78, 82-83, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991), a " debtor remains personally responsible for any debt not discharged in bankruptcy." *In re Cousins,* 209 F.3d 38, 40 (1st Cir.2000). Here, the bankruptcy court's judgment of non-dischargeability— applying bankruptcy law to the state-court judgment— means that despite his bankruptcy filing Saden continues to retain a pecuniary interest in the outcome of this case. He is personally, actually aggrieved by the trial court's judgment, which affects the scope of the discharge of his liabilities in bankruptcy. *See Brown,* 53 S.W.3d at 302. Accordingly we conclude that Saden maintains standing to maintain this appeal despite the pending bankruptcy proceeding.

We also have subject-matter jurisdiction to decide the appeal in light of the bankruptcy court's modification to the automatic stay of bankruptcy to permit the parties to prosecute any appeals of the final judgment. Thus, our assumption of jurisdiction in this case does not violate the stay. *See Hous. Pipeline Co.,* 213 S.W.3d at 428-29; *see also York,* 373 S.W.3d at 38-40. This modification necessarily authorized the filing of postjudgment motions

necessary to preserve issues for appellate review under our procedural rules. *See, e.g.,* TEX.R. CIV. P. 324(b). Saden's timely filed post-judgment motions extended the timeline for filing his notice of appeal, which was also timely filed. *See* TEX.R.APP. P. 26.1(a). Saden's timely filing of a notice of appeal invoked this court's jurisdiction. *See* TEX.R.APP. P. 25.1(b).

We hold that Saden has standing, and we otherwise have jurisdiction over this appeal. Accordingly, we deny Smith's motion to dismiss the appeal.

**II. Saden's appeal on the merits**

Appellee Brian Smith is the owner of Cash Register Sales and Service of Houston, Inc., which does business as CRS, Texas. The company was founded by Smith's father more than 30 years ago to sell cash registers, and in more recent years it sold " point of sale systems" commonly used in restaurants. Appellant Charles Saden worked as a salesman for a company in the business of processing credit card payments. Saden called on CRS, Texas to solicit leads or referrals for customers in 1999, which is when he first met Smith. From 1999 to 2001, Saden and Smith worked together on such deals, but in 2001 Saden resigned from his job and approached Smith about forming a new credit card processing company.

Smith agreed and contributed $10,000 to enable the newly formed company to pay for an affiliation with National Processing, which would allow the company to enter the credit card processing market. Smith testified that he did not mind being the only one to contribute money because he knew that Saden was unemployed.

Smith testified that they agreed that Saden would run the business. " His position would be the president and everything from top to bottom. Obviously, if it's just Chuck and I, I was president of CRS, Texas, and that was my full-time job so Chuck's responsibility would be to run the company and to make it grow." Smith said, " I was to be a silent partner, I was not involved in working there day-to-day." But he also said that he brought expertise and experience in the point-of-sale business to the venture. In particular, Smith's point-of-sale customers needed card processing services, so he brought the potential to generate business by referring customers to the new company. Smith said that Saden was bringing " [h]is experience and knowledge in the credit and processing

**Page 457**

business. This is what he was experienced in so he was going to facilitate in helping to grow the POS Card Processing business."

In 2001, Saden and Smith formed and became

co-owners in POS Card Processing, Inc. POS sold terminals for card processing and facilitated processing agreements between merchants and banks. It generated revenue by receiving a fraction of the fees that the bank charged on each card transaction. POS initially received its share of the fees by check and later by direct deposit into a bank account.

Saden and Smith each owned a 50% share of POS, and both were directors of the company. Smith testified:

From the onset it was a 50/50 deal. We were to be paid equally, the board, me and him, it required us both to agree.

....

I was half owner of the company, and the agreement was we would share equally in the revenues that POS Card Processing generated.

....

We would be paid equally, we were 50 percent owners.

Saden was appointed president of POS and chairman of the board of directors, and Smith was appointed as secretary and treasurer. They agreed in writing that " until further action of the Directors, no Director of the Corporation shall receive a salary in such capacity" and that the directors and officers were authorized to hire and supervise employees and independent contractors to accomplish the goals of the business. However, Smith testified that he understood that they would hire only independent contractors. And the bylaws included the following provision:

**3.01** *Powers.*

The Directors shall act only as a board and an individual Director shall have no power as such. All corporate powers of the corporation shall be exercised by or under the authority of the Board of Directors and the business and affairs of the corporation shall be controlled by the Board of Directors subject to such limitations as are imposed by law, the articles of incorporation or these Bylaws regarding actions to be authorized or approved by the shareholders. The Board of Directors may by contract or otherwise give general, limited or special power and authority to agents of the corporation to transact any special business requiring such authorization.

Saden agreed that, as directors, neither he nor Smith could unilaterally enter into a management contract. Rather, the articles of incorporation, bylaws, and minutes of annual meetings indicated that they had to take such actions together as board of directors. Smith testified that the arrangement required them " to discuss and ... to come to

agreements together, not acting independently or separately from each other." However Saden repeatedly testified that the parties varied their initial agreement by later verbal agreements, and that they did not operate the business in accordance with the articles of incorporation and bylaws. He said, " Everything about this case is all about verbal agreements...."

For example, Saden testified that he and Smith had a verbal agreement that in the first year of POS's existence, Saden was entitled to all of the profits from the sale of card processing terminals. But Smith testified that he never had a conversation with Saden about his keeping the equipment sales revenue for himself. Both Saden and his adult daughter, Charlyn, received salaries from POS. Saden testified that the board of directors " verbally agreed" to pay the salaries. But Smith

**Page 458**

said they only discussed Charlyn working on commission, not for a salary. Smith testified that he first learned during the course of litigation that POS had been paying Saden and Charlyn salaries, which Smith called " exorbitant." Saden testified that Smith verbally agreed that POS would pay Saden's expenses for attending a trade show. But Smith said that he did not agree to that and that he expected Saden to pay his own expenses to attend the show, just as he did.

POS had a bank account with Klein Bank, which later became Amegy Bank. Initially, POS received its share of card processing fees by direct deposit into this bank account. While Smith testified that from 2001 to September 2008, CRS, Texas exclusively referred its customers to POS for services, Saden testified that he had grown frustrated by Smith's lack of interest and participation in the business. Saden testified that CRS, Texas was not referring business and, therefore, he was generating the business on his own. So Saden began doing business separately as " Precision Payment Company," engaging in exactly the same line of business as POS. Saden created a bank account at Klein Bank in his own name for this purpose.

From that point on, Saden engaged in a course of action that caused revenue from existing and new POS clients to be deposited in his personal bank account at Klein Bank. At trial, Saden did not deny that he had engaged in such actions. He conceded he created fraudulent checks bearing the POS name and his personal checking account number. And he conceded that he diverted money that should have gone to POS's bank account into his own account, falsified the POS records so it would appear that lesser amounts were being deposited into the POS account from bank agents who processed the credit card transactions, and failed to inform Smith of or lied to him about the amount of money that POS was earning. Saden

did not distribute POS revenue equally. For example, Saden testified that in 2002 he paid himself $63,000 and paid Smith only $10,000.

Saden said that, despite his conduct, Smith earned more money than he would have under prior business arrangements. He blamed Smith for not being aware of his wrongful conduct. At trial, Saden was questioned about his " skimming off the top" of the POS accounts:

Q. Did you think that's something that your business partner would want to know?

A. If he wanted to participate and get to know things he could have spent a lot more time involved in the operation, including referring like kind businesses.

Q. So, your position is then hey, if he had gotten more involved he would have caught this theft but shame on him for not getting more involved?

A. He was secretary-treasurer and he certainly didn't have an idea of what was going on in the corporation.

....

Q. You're not telling the ladies and gentlemen of the jury that you told Mr. Smith you were skimming this money off the top, are you?

A. I didn't tell Mr. Smith I was skimming off of the account.

Q. You didn't tell him, hey I'm getting 100 percent over here and I'm going to give 60 percent of that to POS, did you?

A. I can't remember that conversation.

Q. Right. But so you would then decide, to use my example, if you got 50 or 60 in one particular month you would then write a check over to

**Page 459**

POS, put it in their bank account and say 25. Right?

A. They got what they deserved.

Smith testified that he " relied totally" on Saden with respect to his expectations of revenue and growth of POS. Early on, he did not review the company's books. He received monthly checks for what he believed was his portion of the revenue, but he discovered during the course of litigation that Saden never followed the parties' agreement that both directors would be paid equally. He testified that he first learned during the litigation of many of Saden's actions, including his creation of Precision Payment Company and that he had deposited POS money in his

personal account. Smith also first learned in litigation that Saden sold two separate POS account portfolios for far more than he deposited into POS accounts or told Smith (one for $92,000 and the other for $286,000, but in each case the amount actually received by POS was approximately $53,000 to $54,000).

Around July 2008, after Smith had sought but not received additional information about the management and finances of the business, he and Saden, who was also unhappy with the arrangement, discussed ending the business. They met again in September 2008, and Smith asked for an accounting. Saden provided some information, but he did not give Smith " source information" that would have shown which processor deposited which amounts at which times. Smith said, " I think his attitude was like this is all you're going to get. I knew we weren't getting too terribly far with that information. I left with maybe ten pages of printout and that was it."

Smith ultimately sued Saden for, among other things, breach of contract and breach of fiduciary duty. Smith alleged that he was bringing his claims both in his personal capacity and in a derivative capacity as a shareholder of POS. He alleged that Saden breached a fiduciary duty owed to him personally because POS was operated as a partnership, the articles of organization and by-laws of POS vested control of the company in Saden and gave rise to a contractual fiduciary duty, and the circumstances surrounding the creation and operation of POS gave rise to a confidential relationship between Saden and Smith. As to his personal breach of contract claim, Smith alleged that Saden breached his " contractual obligations, and Smith's contractual rights, under the several agreements signed by the parties; including without limitation, the articles of organization and the by-laws of POS."

The case was tried to a jury. At trial, both Saden and Smith testified, among other things, about their history of working together, the formation and operation of POS, and their agreement as to sharing revenue. Smith also presented the testimony of Bill Shields, an accountant who analyzed POS and Precision accounting records, including balance sheets, profit and loss statements, general ledgers, and tax records. The accounting spreadsheets that formed the basis for his testimony were admitted into evidence. Based on information he received from Smith, Shields assumed that the parties' agreement required an equal division of revenues, and his analysis did not credit Saden for expenses which were disputed by Smith. Shields testified that between 2002 and 2008, POS had actual revenue of $3.77 million, and in addition to that, $2.41 million was diverted from POS to Precision. Shields explained his calculations and the spreadsheets that were admitted into evidence at trial. He calculated the amount of money which in his opinion was due to Smith, based on sharing the revenues

but not the disputed expenses, and including revenue diverted to other entities that

**Page 460**

should have accrued to POS. Based on his calculations, Shields testified that Saden owed Smith $941,907. Shields also testified that $941,907 " represents the excess portion of the income that was either received by or directed to the benefit of Saden." He said that $941,907 was " solely" what Smith was entitled to receive.

Shields also testified about the expenses charged to POS. Although POS had gross income of $3.77 million, it turned a total profit of only approximately $4,000 over the relevant years. He explained that the money Saden had paid to himself and family members, including personal living expenses, accounted for the entire difference between the company's revenue and its profit.

Two causes of action against Saden— breach of contract and breach of fiduciary duty— were submitted to the jury. The breach of contract questions asked:

**QUESTION NO. 1**

Did Brian Smith and Charles Saden agree to equally split the revenues, less reasonable and necessary expenses, derived from the business agreed to be conducted by POS?

In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

If your answer to Question No. 1 is " Yes," then answer the following question. Otherwise, do not answer the following question.

**QUESTION NO. 2**

Did Charles Saden fail to comply with the agreement?

....

**QUESTION NO. 4**

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Brian Smith for his damages, if any, that resulted from Charles Saden's failure to comply with the agreement?

Lost profits that are a natural, probable, and foreseeable consequence of Chuck Saden's failure to comply with the agreement.

Answer in dollars and cents if any.

Saden objected to Question No. 1 on the grounds that there was no evidence of reasonable and necessary expenses and there was no definition of reasonable and necessary expenses. The trial court overruled both objections. Neither party objected to questions 2 or 4.

The relevant breach of fiduciary duty questions asked:

**QUESTION NO. 8**

Did Charles Saden comply with his fiduciary duties to Brian Smith?

Because a relationship of trust and confidence existed between them, Charles Saden owed Brian Smith a fiduciary duty. To prove he complied with his duty, Charles Saden must show:

a. The transactions in question were fair and equitable to Brian Smith;

b. Charles Saden made reasonable use of the confidence that Brian Smith placed in him;

c. Charles Saden acted in the utmost good faith and exercised the most scrupulous honesty toward Brian Smith;

d. Charles Saden placed the interests of Brian Smith before his own, did not use the advantage of his position to gain any benefit for himself at the expense of Brian

**Page 461**

Smith, and did not place himself in any position where his self-interest might conflict with his obligations as a fiduciary; and

e. Charles Saden fully and fairly disclosed all important information to Brian Smith concerning the transactions.

....

If your answer to Question No. 8 is " No," then answer the following question. Otherwise do not answer the following question.

**QUESTION NO. 10**

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Brian Smith for his damages, if any, that were proximately caused by Charles Saden's failure to comply with his fiduciary duties to Brian Smith?

" Proximate cause" has two parts:

1. A proximate cause is a substantial factor that in a natural and continuous sequence brings about an event and without which the event would not have occurred; and

2. A proximate cause is foreseeable. " Foreseeable" means that a person using ordinary care would have reasonably anticipated that his acts or failure to act would have caused the event or some similar event.

There may be more than one proximate cause of an event.

Consider the following elements of damages, if any, and none other. You shall not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate for the same loss twice, if any.

Lost profits that are a natural, probable, and foreseeable consequence of Chuck Saden's failure to comply with his fiduciary duties to Brian Smith.

....

If your answer to Question No. 8 is " No," then answer the following question. Otherwise, do not answer the following question.

## QUESTION NO. 11

What was the amount of Charles Saden's profit from the conduct, if any, that you have found to be a breach of Charles Saden's fiduciary duties to Brian Smith?

Smith objected to the omission of separate questions pertaining to his derivative claims for breach of fiduciary duty, and he requested their inclusion. The trial court denied these requests. Saden made the following objections to questions 8, 10, and 11:

Defense counsel: Defendants also object to Question No. 8 in the jury charge. The existence— first of all, defendants object to the inclusion of an informal fiduciary duty because there is no evidence of a confidential relationship that predates the POS transaction and for that reason we don't believe there should be an informal fiduciary duty question.

Court: Overruled.

Defense counsel: To the extent that it is included we do require-we object to the extent there is no language to support or there isn't a definition given to [the] jury that the relationship must have existed prior to and separate from the transaction giving rise to the alleged breach of fiduciary duty.

Court: Overruled.

Defense counsel: And we would like to submit our proposed Question No. 8— actually, 8 should have been with regard to my last question. I apologize, Your Honor.

Court: Well, whatever.

Defense counsel: I'm guessing the last one should have been with regard to this. And, I'll go ahead and on the same basis we object to Question No. 9, 10, 11, 12 again on the basis there is no evidence of written formal fiduciary duty or relationship— confidential relationship of trust.

Court: Overruled, overruled, overruled, overruled.

The jury found that Smith and Saden had an agreement, which only Saden had breached. It also found that Saden did not comply with his fiduciary duties. The jury awarded damages in the following amounts: (1) $941,907 for breach of contract, (2) $393,093 for breach of fiduciary duty, and (3) $941,907 for Saden's profit from the conduct found to be a breach of his fiduciary duties. Smith moved for entry of judgment on the verdict, for a turnover, and for permanent injunctive relief.

The trial court rendered judgment for (1) $941,907 for breach of contract, plus attorney's fees of $465,173.27 (and contingent appellate attorney's fees in the aggregate amount of $125,000) and prejudgment interest in the amount of $91,255.35; (2) $393,093 for breach of fiduciary duty, plus prejudgment interest in the amount of $38,090.24; and (3) $941,907 for equitable disgorgement of profits " found by the jury to have been obtained by [Saden] as a result of his acts of fraud, defalcation and embezzlement while acting and serving in a fiduciary capacity with respect to [Smith]," plus prejudgment interest in the amount of $91,255.35. The judgment also characterized the assets in possession of the receiver as having been " received or obtained as a result of Defendant, Charles R. Saden's acts of fraud, defalcation and embezzlement while acting and serving in a fiduciary capacity to Plaintiff, Brian Smith."

Saden raises four issues on appeal. In his first issue, Saden argues that Smith, in his individual capacity, lacked standing to pursue the claims pleaded against Saden for damages related to POS. Second, Saden contends that Smith should have been required to elect a remedy instead of recovering duplicative damages for lost profits. Third, Saden challenges Smith's recovery for breach of fiduciary duty because no question on the existence of a duty was submitted to the jury and because there was no preexisting special relationship sufficient to support a finding of an informal fiduciary duty. Finally, in his fourth issue Saden asks this court to reform the judgment to eliminate language not supported by any jury finding, specifically the

judgment's reference to fraud, defalcation, and embezzlement.

## A. Smith's standing

Smith's original petition included causes of action for breach of contract and breach of fiduciary duty. Saden challenges Smith's standing as a 50% shareholder of POS to individually recover the company's lost profits pursuant to those claims. As noted above, standing is a component of subject matter jurisdiction, it cannot be waived, and it is never presumed. *See Tex. Ass'n of Bus.,* 852 S.W.2d at 443-44; *Blue,* 34 S.W.3d at 553-54. Smith had standing to assert the causes of action submitted to the jury if he raised " an actual, not merely a hypothetical or generalized grievance." *Brown,* 53 S.W.3d at 302.

Saden relies on *Wingate v. Hajdik,* 795 S.W.2d 717 (Tex.1990), for the proposition that Smith cannot recover personally

**Page 463**

for damages incurred by a corporation of which he is a shareholder. In that case, the Supreme Court of Texas held that " [a] corporate stockholder cannot recover damages personally for a wrong done solely to the corporation, even though he may be injured by that wrong." *Wingate,* 795 S.W.2d at 719. A shareholder may nevertheless recover damages " for wrongs done to him individually" when he pleads and proves that the defendant has violated a duty that he owed the shareholder, which arises from contract or otherwise. *Id.*

Saden filed special exceptions arguing that " the essence of Smith's allegations is to vindicate for wrongs allegedly done to POS, as opposed to wrongs directed at Smith individually." The trial court denied the special exceptions, and Smith later amended his petition, specifically pleading that he was alleging various causes of action— including breach of contract and breach of fiduciary duty— as both individual and derivative claims. Specifically, Smith alleged a claim for a personal breach of contract based on " contractual obligations, and Smith's contractual rights, under the several agreements signed by the parties; including without limitation, the articles of organization and the by-laws of POS." Smith also alleged that Saden breached a fiduciary duty owed to him personally because of the circumstances surrounding the creation and operation of POS which allegedly created a confidential relationship between them.

At trial, there was evidence that Smith and Saden— the sole directors, officers, and shareholders of the corporation— agreed to split the revenues from POS equally. There was also evidence of the factual circumstances of the relationship between Saden and Smith prior to the formation of POS.

At the charge conference, Smith sought to include jury questions on his derivative claims and the court refused his requests. Saden does not challenge Smith's standing to bring a derivative claim, and the only apparent basis for the trial court's failure to separately submit questions on the derivative claims stems from the fact that POS was a closely held corporation. *See* TEX. BUS. ORGS.CODE ANN. § 21.563(a) (West 2012). If justice requires, a court may treat a derivative proceeding brought by a shareholder of a closely held corporation as if it were a direct action brought by the shareholder for the shareholder's own benefit. *Id.* § 21.563(c)(1). Smith met these criteria and therefore the trial court was authorized to act as it did, treating his derivative claim as a direct claim.

We hold that Smith had standing to assert his claims, whether individually or derivatively, and we overrule Saden's first issue.

## B. Breach of fiduciary duty

Saden argues that Smith cannot recover for breach of fiduciary duty because any duty was owed to the corporation, no duty question was submitted to the jury, and there was no pre-existing special relationship to support an informal fiduciary duty.

We again note the special circumstances applicable to a closely held corporation. Smith pleaded his claims both in his individual capacity and also derivatively on behalf of the closely held corporation. The evidence conclusively established that POS was a closely held corporation and that Smith was one of its two 50% shareholders. Accordingly, the trial court was authorized to treat the derivative claims as individual claims. *See id.* Moreover, " a recovery in a direct or derivative proceeding by a shareholder may be paid directly to the plaintiff or to the corporation if necessary to protect the interests of creditors or other shareholders of the corporation."

**Page 464**

*Id.* § 21.563(c)(2); *Swank v. Cunningham,* 258 S.W.3d 647, 665 (Tex.App.-Eastland 2008, pet. denied). Saden devotes his briefing on this issue to the lack of jury findings that a relationship of trust and confidence existed between Saden and Smith before the formation of POS. In his brief, Saden argues about Smith's failure to secure jury findings that there was " a *pre-existing* special or fiduciary relationship." He notes that the trial court denied his motion for directed verdict, in which he argued, " The evidence has shown they had no relationship whatsoever before they met with regard to the POS venture." He also notes his objection to jury

question no. 8 on the basis that there was no evidence of " a confidential relationship that predates the POS transaction."

Question No. 8 presupposed the existence of a fiduciary duty, and asked, " Did Charles Saden comply with his fiduciary duties to Brian Smith?" There is no question that as an officer of POS, Saden owed a fiduciary duty to the corporation as a matter of law. *See, e.g., Int'l Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d 567, 576 (Tex.1963). Because POS was a close corporation and Smith was one of its shareholders, the trial court was authorized to allow Smith to pursue his derivative claim on behalf of POS as if it were his own. *See* TEX. BUS. ORGS.CODE ANN. § 21.563(c)(1) & (2). Smith does not contest that sufficient evidence supports the jury's answer to Question No. 8 regarding breach. Because Smith owed a fiduciary duty as a matter of law, the trial court did not err in submitting this claim to the jury. The jury's finding of a breach of fiduciary duty was supported by the evidence.

In an attempt to avoid the application of section 21.563(c), Saden primarily relies upon *Guerra v. Guerra,* No. 04-10-00271-CV, 2011 WL 3715051 (Tex.App.-San Antonio Aug. 24, 2011, no pet.) (mem. op.), for the proposition that Smith cannot use the provision to obtain an individual recovery. In *Guerra,* a minority shareholder in a family business asserted claims " on her own behalf ... based solely on her individual damages, not on any damage to the corporation." 2011 WL 3715051, at *5. In that circumstance, the court of appeals held that although section 5.14 of the Business Corporation Act (the predecessor to section 21.563) allowed a derivative claim to be " treated by a court as a direct action brought by the shareholder for the shareholder's own benefit," the provision nevertheless " does not allow a shareholder an individual claim." *Guerra,* 2011 WL 3715051, at *5. That reasoning does not apply to this case, in which Smith actually has alleged and demonstrated injury to the corporation, POS.

The other two cases referenced by Saden in this regard are also distinguishable. In *2055 Inc. v. McTague,* No. 05-08-01057-CV, 2009 WL 2506342 (Tex.App.-Dallas Aug. 18, 2009, no pet.), the defendants attempted to use a release signed by an individual to bar that individual's derivative claim asserted on behalf of a corporation of which she was a shareholder. The court of appeals declined to apply article 5.14 to treat the corporation's claims as ones " in reality" filed by the individual shareholder subject to a contractual release— a completely inapposite scenario. *2055 Inc.,* 2009 WL 2506342, at *8.

In *Swank v. Cunningham,* 258 S.W.3d 647 (Tex.App.-Eastland 2008, pet. denied), the court affirmed a summary judgment against two individuals who purported to assert derivative claims on behalf of a corporation on the

ground that evidence had been presented sufficient to disprove that the individuals were shareholders of the subject company, and the individuals failed to come forward with evidence to raise a fact issue as to whether they owned stock

in the company. *Swank,* 258 S.W.3d at 662-64. In an alternative holding, the court suggested that even if the individual claimants had been shareholders, the trial court acted within its discretion by declining to allow them to pursue derivative claims in their individual capacities and for their own benefit because they only claimed to own 40% of the company and the record reflected " substantial and longstanding disputes" between them and the majority shareholder, which would have required that any recovery for the company would have to be paid to the company to protect the majority shareholder's interest. *Id.* at 664-66. The factual circumstances of Smith's pursuit of derivative claims on behalf of POS do not share the characteristics that led the *Swank* court to observe, in dicta, that the trial judge would have acted in his discretion to refuse to authorize individual shareholders to pursue derivative claims. *See* TEX. BUS. ORGS.CODE ANN. § 21.563(c)(1).

Because Saden and Smith are the only shareholders of POS, the injury suffered by the corporation is the injury suffered by Smith as 50% shareholder to the extent it inured to the other 50% shareholder's benefit. Considering that Smith was the only shareholder injured by Saden's wrongful conduct (while Saden himself, as the only other shareholder, benefited from it), the recovery could be paid to Smith directly to protect his interests.

We therefore overrule the challenge to the liability finding on the claim for breach of fiduciary duty.

### C. Election of remedies

Saden argues that the trial court erred in awarding Smith duplicative damages and that Smith was required to elect a remedy. Specifically Saden objects to the cumulative award of three separate measures of profits as actual damages for breach of contract, actual damages for breach of fiduciary duty, and for equitable disgorgement as a further remedy for breach of fiduciary duty. Saden raised this issue in a post-trial motion to modify, correct, or reform the judgment, which the trial court denied. In this context, we review the trial court's judgment for abuse of discretion. *See Beaumont Bank, N.A. v. Buller,* 806 S.W.2d 223, 226 (Tex.1991); *Wagner v. Edlund,* 229 S.W.3d 870, 879 (Tex.App.-Dallas 2007, pet. denied). A trial court abuses its discretion if it acts without reference to guiding rules and principles, or if it fails to follow such guiding rules and principles. *Columbia Rio Grande Healthcare, L.P. v.*

*Hawley,* 284 S.W.3d 851, 856 (Tex.2009); *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241-42 (Tex.1985). " Another way of stating the test is whether the act was arbitrary or unreasonable." *Downer,* 701 S.W.2d at 242.

" A party is generally entitled to sue and to seek damages on alternative theories." *Waite Hill Servs., Inc. v. World Class Metal Works, Inc.,* 959 S.W.2d 182, 184 (Tex.1998); *see also Madison v. Williamson,* 241 S.W.3d 145, 158 (Tex.App.-Houston [1st Dist.] 2007, pet. denied). " If a plaintiff pleads alternate theories of liability, a judgment awarding damages on each alternate theory may be upheld if the theories depend on separate and distinct injuries and if separate and distinct damages findings are made as to each theory." *Madison,* 241 S.W.3d at 158 (citing *Birchfield v. Texarkana Mem'l Hosp.,* 747 S.W.2d 361, 367 (Tex.1987)). A corollary to this principle is the one-satisfaction rule: for one injury there can only be one recovery. *See, e.g., Tony Gullo Motors I, L.P. v. Chapa,* 212 S.W.3d 299, 303 (Tex.2006); *see also Crown Life Ins. Co. v. Casteel,* 22 S.W.3d 378, 390 (Tex.2000); *Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 7 (Tex.1991). When a defendant's

**Page 466**

acts result in a single injury, and the jury returns favorable findings on more than one theory of liability, the plaintiff is entitled to judgment on the theory affording him the greatest relief. *See Birchfield,* 747 S.W.2d at 367; *Madison,* 241 S.W.3d at 158-59.

In order to answer the question of whether an election of remedies was required in this case, it is therefore necessary to carefully review the record to determine whether the claimant supported alternate theories of liability with evidence indicating separate and distinct injuries resulting in separate and distinct damages. In this case, the jury was asked to quantify " profits" in three different questions: in question no. 4 (breach of contract lost-profits damages), in question no. 10 (breach of fiduciary duty lost-profits damages), and in question no. 11 (equitable disgorgement of profits). Questions 4 and 10 specifically instructed the jury to award only " lost profits," if any, defined in each case as the " natural, probable, and foreseeable consequence" of Saden's failure to comply with his contractual or fiduciary duty. While " [r]ecovery for lost profits does not require that the loss be susceptible of exact calculation," the amount of lost profits " must be shown by competent evidence with reasonable certainty." *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992). " As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained." *Id.; see also Natural Gas Pipeline Co. v. Justiss,* 397

S.W.3d 150, 157 (Tex.2012) (" a business owner's conclusory or speculative testimony of lost profits will not support a judgment" ).

At trial, Smith testified about various acts of self-dealing that Saden committed, such as selling POS accounts and keeping some of the money for himself in the Precision account. There were many questions about the sums of money generated as a result of POS business and whether the money was deposited in the POS account or a Precision account, whether the money was split evenly, and whether Saden used the money for his personal use. There were also questions about expenses and what or whether POS expenses were paid by money kept in the Precision account. And Smith was asked about the nature of the injury that he suffered as a result of the actions alleged in this lawsuit. Smith said, " I as a shareholder, owner of POS Card Processing was deprived of any income that I should have received out of the profits that were earned by POS Card Processing, so the company was damaged, and I was damaged." Smith testified that " the reduction of the value to POS" was " was the primary reason" he was " damaged individually."

To prove his damages at trial, Smith presented the testimony of Bill Shields, an accountant who analyzed the records of POS and Precision. Shields relied on certain assumptions in determining the amount of money Saden owed Smith. Basing his analysis on Smith's version of events, he assumed that the men agreed to share the company's revenue equally but did not agree to all of the expenses incurred by Saden and charged to POS. Thus, Shields did not consider as reasonable and necessary business expenses the money that Saden spent on salaries for him and his relatives or the expenses that otherwise personally benefited Saden (such as traveling and meals). Shields included as part of the revenue that should have accrued to POS under the agreement $2.41 million that was diverted from POS to Precision. He testified that based on his analysis, Saden owed Smith " solely" $941,907, explaining that this amount " represents the excess portion of the income

**Page 467**

that was either received by or directed to the benefit of Saden."

As was the case in *Madison v. Williamson,* 241 S.W.3d 145 (Tex.App.-Houston [1st Dist.] 2007, pet. denied), Smith made no attempt in the trial court to distinguish between the damages he suffered as a result of Saden's breach of contract and his breach of fiduciary duty. Instead, Smith presented a unified damages model through the testimony of Shields, who explained that he included the elements of self-dealing that were apparent from the

accounting records in determining the distributions that Smith should have received from POS. There was no attempt to segregate damages attributable to breach of the parties' agreement from any other damages that somehow may have been attributable to separate disloyal acts in breach of Smith's fiduciary duty. Moreover, the evidence at trial did not clearly show two separate injuries in this regard. Rather, it showed generally that Saden diverted revenue to himself and failed to evenly divide what revenue was actually received by POS. The expert testimony indicated that Smith's share of the POS proceeds, which Shields calculated to be $941,907, was effectively the same as the profit Saden wrongfully obtained by breaching his fiduciary duty.

In his appellate brief, Smith contends that the separate awards for breach of contract and breach of fiduciary duty are supported by the record, arguing:

The contract damages were limited to that portion of the fifty percent (50%) of the business profits that were not paid to Smith by Saden, whereas the fiduciary breach damages were, *inter alia,* caused by Smith's [a] failure to secure the best price possible for the POS accounts that he secretly sold; [b] failure to secure commission rates for POS equal to those he secured for himself; [c] sale of POS accounts and equipment;[d] theft of $200,000 in certificates of deposit;[e] use of POS funds to pay personal living expenses for himself and his family; [f] theft of POS funds *after* the appointment of the Receiver; and [g] enriching himself through a series of self-dealing transactions. The damages caused by Saden's breach of his fiduciary duty were different from, and not part of, the contract damages because they were of a nature that they did not cause an unequal division of the profits from the business.

Appellant's Brief at 27-28 (footnotes omitted); *see also* Dissent at 7.

We disagree. First, there is significant overlap between this litany of Saden's misdeeds and the misconduct documented and accounted for in the Shields damages model, which represented " the excess portion of the income that was either received by or directed to the benefit of Saden." For example, Shields's calculations expressly accounted for acts of corporate waste, most significantly including the " use of POS funds to pay personal living expenses for himself and his family" in that his analysis did not treat those expenses as reasonable and necessary corporate expenses, but instead treated $1,379,369 of expenses paid by POS as " Distributions to/for the benefit of C. Saden." Likewise, to the extent that Smith's reference to " enriching himself through a series of self-dealing transactions" is also a reference to the payment of Saden's living expenses with POS funds, as strongly suggested by a

footnote in Smith's brief,[1] that category

also is incorporated into the Shields damages model. Finally in this regard, Smith's reference to the " theft of $200,000 in certificates of deposit" is not further supported or explained with any citation to the record, but it apparently refers to a CD that Saden testified that he purchased from the Precision account with funds that were obtained from the sale of POS accounts. The Shields analysis includes $1,188,846 of distributions from Precision for the benefit of Saden, and while the record evidence does not include detailed individual transactions supporting that figure, it does show total amounts of distributions broken down by year in amounts ranging from $65,061 in 2004 to $397,995 in 2007. There is no evidence to suggest that Saden's purchase of a $200,000 certificate of deposit from Precision funds for his own benefit is not included in Shields's calculation of $1,188,846 of distributions to Saden from Precision.

Second, the record reveals no competent evidence from which a fact finder could determine with reasonable certainty the amount of lost profits separately attributable only to breach of contract or only to breach of fiduciary duty. *See Holt Atherton,* 835 S.W.2d at 84. The only element of damages listed in questions 4 and 10 was " lost profits." The charge instructed the jury to consider that element of damages, " if any, and none other." Neither party objected to the lost-profits language in the charge, and neither party requested a different or additional measure of damages be submitted to the jury.

The jury awarded the full measure of lost profits supported by the accountant's testimony as contract damages: $941,907. It may have been possible to categorize Saden's various bad acts between breaches of contract and other separate breaches of fiduciary duty, and then to quantify lost profits or other damages attributable to each so as to identify separate injuries leading to separate amounts of damages. But as this case was presented, tried, and charged to the jury, the actual evidence of injury and lost profits did not show separate and distinct injuries resulting in separate and distinct lost profits. *See Madison,* 241 S.W.3d at 158. Smith's damages model showed that he suffered one injury: he was deprived of all the money he was due from POS because of the various faithless actions taken in violation of the parties' agreement and Saden's fiduciary duties.

To the extent Smith suggests that other lost profits may have been attributable to other bad acts not addressed by the Shields analysis, his brief has pointed us to no such

evidence in the record, and our own review has found none. Smith's brief points to no evidence of any value— much less a valuation that would satisfy *Holt Atherton* — assigned to the lost profits attributable to Saden's " failure to secure the best price possible for the POS accounts that he secretly sold," " failure to secure commission rates for POS equal to those he secured for himself," " sale of POS accounts and equipment" (other than the purchase of the $200,000 certificate of deposit apparently included in Shields's calculation of distributions from Precision to Saden), or " theft of POS funds *after* the appointment of the Receiver." *See* Appellee's Brief at 28.

In sum, Smith demonstrated his entitlement to a unified recovery for one broadly described injury with one damages model sponsored by accountant Shields. *See id.* Accordingly, Smith failed to justify separate awards for alternate theories of liability, as the theories as presented at trial did not depend on separate and distinct injuries resulting in separate and distinct damages. *See Madison,* 241 S.W.3d at 158. Under such circumstances, allowing the recovery of actual damages for both breach of contract and breach of fiduciary duty violates the one-satisfaction rule, and is therefore error. *See, e.g., Downer,* 701 S.W.2d at 241-42.

We reach a different conclusion with respect to the award of equitable disgorgement of profits. Question no. 11, the basis for the equitable forfeiture award, was predicated on the liability question for breach of fiduciary duty, and it was phrased in terms of the " profit" Saden obtained by his tortious conduct. Nevertheless, equitable forfeiture is distinguishable from an award of actual damages, in that it serves a separate function of protecting fiduciary relationships. *ERI Consulting Eng'rs, Inc. v. Swinnea,* 318 S.W.3d 867, 874 (Tex.2010). Even if a fiduciary does not obtain a benefit by violating his duty, he still may be required to forfeit the right to compensation for his work. *Id.* at 873 (citing *Burrow v. Arce,* 997 S.W.2d 229, 237 (Tex.1999)). Saden did not present any legal challenge to the amount of the equitable disgorgement award, so we express no opinion about the measure of the equitable remedy awarded. Instead, Saden only challenges the award on the basis that it is duplicative of the other awards of damages, in violation of the one-satisfaction rule. We hold that the one-satisfaction rule does not preclude the recovery of both actual damages and the equitable remedy of disgorgement of profits, as these remedies are intended to address separate and distinct injuries. *Cf. ERI Consulting,* 318 S.W.3d at 882 (remanding case for further proceedings on both equitable disgorgement and lost-profits awards).

We sustain Saden's issue in part and hold that on the facts of this case, the trial court erred in rendering judgment that permitted duplicative recovery of actual lost-profit damages for both breach of contract and breach of fiduciary

duty. We overrule Saden's issue to the extent that he argues that the one-satisfaction rule disallows an award of both actual damages and the equitable remedy of disgorgement of profits. Ordinarily we would reform the judgment to effect an election of the remedy that affords the prevailing party the greatest relief. *See, e.g., Star Houston, Inc. v. Shevack,* 886 S.W.2d 414, 423 (Tex.App.-Houston [1st Dist.] 1994), *writ denied,* 907 S.W.2d 452 (Tex.1995) (per curiam). However, this case is complicated by the fact of Saden's bankruptcy and the

## Page 470

bankruptcy court's order of non-dischargeability. Because it is not readily apparent from the appellate record which theory of liability Smith would elect, we will remand to permit Smith to make an election.

### D. Findings of fraud, defalcation, embezzlement

In his fourth issue, Saden argues that the court erred by including recovery and findings on issues that were not submitted to the jury or conclusively established. Specifically, Saden objects to the inclusion of language stating that he committed " acts of fraud, defalcation and embezzlement while acting and serving in a fiduciary capacity." Saden also specifically objects to the following language on page 4 of the trial court's judgment:

The Court finds that all of the business and assets that are currently in the Receiver's possession, custody and control belong to POS, that any such assets that are currently in the Receiver's possession, custody and control belong to POS, that any such assets received or obtained by, or in the name of Defendants Charles R. Saden or Precision Payments Company were received or obtained as a result of Defendant, Charles R. Saden's acts of fraud, defalcation and embezzlement while acting and serving in a fiduciary capacity to Plaintiff, Brian Smith.

Saden's complaint appears to be two-fold, that: (1) the court erred by including in the judgment findings of " fraud, defalcation, and embezzlement" that were not submitted to the jury and that Smith relied upon in the bankruptcy court to argue for an order of non-dischargeability of the debt, and (2) the court erred by making a determination regarding the assets that were then in the Receiver's possession.

An issue must be submitted to the jury when it is (1) raised by the pleadings and the evidence, (2) disputed, and (3) properly requested. *See Cianfichi v. White House Motor Hotel,* 921 S.W.2d 441, 443 (Tex.App.-Houston [1st Dist.] 1996, writ denied); *see also T.O. Stanley Boot Co., Inc. v. Bank of El Paso,* 847 S.W.2d 218, 223 (Tex.1992). Texas Rule of Civil Procedure 279 provides, " Upon appeal all independent grounds of recovery or of defense not

conclusively established under the evidence and no element of which is submitted or requested are waived." TEX.R. CIV. P. 279.

Common-law fraud includes both actual and constructive fraud. *Cotten v. Weatherford Bancshares, Inc.,* 187 S.W.3d 687, 702 (Tex.App.-Fort Worth 2006, pet. denied). " A plaintiff seeking to prevail on claim of actual fraud must prove that (1) the defendant made a material misrepresentation; (2) the defendant knew the representation was false or made the representation recklessly without any knowledge of its truth; (3) the defendant made the representation with the intent that the other party would act on that representation or intended to induce the party's reliance on the representation; and (4) the plaintiff suffered an injury by actively and justifiably relying on that representation." *Exxon Corp. v. Emerald Oil & Gas Co., L.C.,* 348 S.W.3d 194, 217 (Tex.2011). However, constructive fraud is " the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests." *Archer v. Griffith,* 390 S.W.2d 735, 740 (Tex.1964). " Evidence supporting a breach of fiduciary duty may, in appropriate circumstances, support a constructive-fraud finding." *Murphy v. Am. Rice, Inc.,* No. 01-03-01357-CV, 2007 WL 766016, at *10 (Tex.App.-Houston [1st Dist.] Mar. 9, 2007, no pet.); *accord*

**Page 471**

*Flanary v. Mills,* 150 S.W.3d 785, 795 (Tex.App.-Austin 2004, pet. denied).

The Fifth Circuit has defined defalcation, as relevant to the context of a discharge in bankruptcy, as a " willful neglect of fiduciary duty," which need not be accompanied by fraud or embezzlement. *In re Schwager,* 121 F.3d 177, 184-85 (5th Cir.1997); *see also Bullock v. BankChampaign, N.A.,* __ U.S. __, __ - __, 133 S.Ct. 1754, 1758-59, 185 L.Ed.2d 922 (2013) (in the course of holding that " defalcation" as used in 11 U.S.C. § 523(a)(4) requires an intentional wrong, generally observing broad disagreement among legal authorities about the meaning of " defalcation" ); *Balusik v. Kollatschny,* No. 01-99-01342-CV, 2002 WL 1822360, at *4 (Tex.App.-Houston [1st Dist.] Aug. 2, 2002, no pet.) (not designated for publication) (" Defalcation is also defined as ' [l]oosely, the failure to meet an obligation; a nonfraudulent default.' " ).

Embezzlement requires proof that (1) the defendant was the agent of the person or corporation alleged to have been harmed and was charged with the duty of receiving money of his principal, (2) he received money belonging to his principal in the course of his employment, and (3) that he embezzled, misapplied, or converted it to his own use.

*Fellers v. State,* 138 Tex.Crim. 307, 308, 136 S.W.2d 217, 218 (Tex.Crim.App.1940); *see* TEX. PENAL CODE ANN. § 32.45 (West 2011) (misapplication of fiduciary property or property of financial institution).

Smith did not raise in his pleadings the issues of whether Saden committed acts of fraud, defalcation, and embezzlement. Nor did he request a jury question on these issues. Comparing the elements of fraud, defalcation, and embezzlement to the jury charge, we conclude that not all of the elements of fraud, defalcation, and embezzlement were submitted to the jury. Accordingly, we hold that the trial court erred by including this language in the judgment, and we sustain this issue in part.

Finally, we consider Saden's challenge regarding the portion of the judgment concerning the assets in the receiver's possession. The court appointed a receiver in February 2009, and the receiver took possession of POS along with the entities Saden created and used to divert POS revenues. Section 11.403 of the Business Organizations Code provides: " The court appointing a receiver under this section has and shall retain exclusive jurisdiction over the specific property placed in receivership. The court shall determine the rights of the parties in the property or its proceeds." TEX. BUS. ORGS.CODE ANN. § 11.403(c) (West 2012). Here, the judgment noted that the trial court lacked authority to dispose of the property held by the receiver due to the automatic bankruptcy stay and ordered the future delivery of the assets held by the receiver to the bankruptcy trustee.

Saden argues, without citation to authority, that " [t]he jury did not make any findings about POS assets, nor was it asked anything about Precision Payment Company or Hohen-Saden, LLC. The jury was asked about damages, not these issues of ownership or entitlement, and to make any such award or finding here would also be a duplicative recovery." But this particular aspect of the final judgment does not award a duplicative recovery: it defers determination of the ownership of the assets held by the receiver to the bankruptcy court. We hold that the court did not err in doing so.

**Conclusion**

We reverse the trial court's judgment to the extent that it permitted duplicative recovery of damages for breach of contract

**Page 472**

and breach of fiduciary duty and included additional unauthorized findings that Saden committed acts of " fraud," " defalcation," and " embezzlement," and we remand to the trial court to allow Smith to elect a remedy and for

entry of a new judgment, which does not include language purporting to make findings based on fraud, defalcation, or embezzlement.

TERRY JENNINGS, Justice, dissenting.

Because the majority errs in concluding that the trial court, in its judgment, " permitted duplicative recovery of damages and included additional unauthorized findings," I respectfully dissent.

In this case, appellee, Brian Smith, sued appellant, Charles Saden, for breach of contract and breach of fiduciary duty, two separate and distinct causes of action for two separate and distinct injuries and remedies, arising out of Saden's conduct in the operation of POS Card Processing, Inc. (" POS" ), a closely held corporation in which Smith and Saden were the sole shareholders. As noted by the majority, both Smith and Saden each owned 50 percent of the company, were both directors, and were to be paid equally.

In his third issue, Saden argues that the trial court's judgment should be " reformed to require election of one remedy for lost profits" because " the jury was asked to find lost profits on multiple theories of liability" and Smith " did not distinguish his damages among any of these theories, *all of which had the same measure of damages.* " (Emphasis added.) Although Saden generally asserts that " Smith made no attempt to distinguish damages from among any of [the] theories of recovery," he does not challenge the legal or factual sufficiency of the evidence supporting the jury's specific damages findings. Rather, after quoting in his brief questions four, ten, and eleven of the trial court's charge to the jury, Saden makes his complaint that " the jury was asked to find *the same lost profits measure of damages* " and " Smith was allowed to recover a judgment that awarded *all three of these overlapping recoveries for lost profits.* " (Emphasis added.)

In his fifth issue, Saden argues that the trial court's judgment must be " reformed to eliminate findings and recoveries for fraud, defalcation and embezzlement" because these issues " were not submitted to the jury" and recovery on them by Smith has been " waived by omission." Again, Saden does not challenge the sufficiency of the evidence supporting the trial court's conclusions that he, in *breaching his fiduciary duties* owed to Smith, committed fraud, defalcation, and embezzlement.

The majority concludes that in this case " recovery of actual damages for both breach of contract and breach of fiduciary duty violates the one-satisfaction rule," and it holds that the trial court erred in rendering judgment that " permitted duplicative recovery" of damages. It further holds that the trial court erred in including " language" in its judgment about Saden's acts of " fraud, defalcation, and embezzlement."

However, in contrast to Saden's assertions and two of the majority's holdings, the record reveals that (1) the trial court carefully instructed the jury on two different measures of damages on two distinct claims for two distinct injuries, (2) Smith presented evidence that supports the jury's two separate and distinct damages findings, (3) as noted by the majority, the trial court's equitable disgorgement of Saden's profit from his breach of fiduciary duty to Smith did not result in a " damages" award duplicative of the jury's

**Page 473**

awards, and (4) the trial court, in concluding that Saden, in breaching his fiduciary duties to Smith, committed fraud, defalcation, and embezzlement, did so in support of its equitable disgorgement of Saden's profits derived from POS, not in regard to any separate claim upon which it thought Smith might be entitled to recover.

**Breach-of-Contract Damages**

In regard to Smith's breach-of-contract claim, the jury, in response to question one in the trial court's charge, expressly found that Smith and Saden " agree[d] to *equally split the revenues,* less reasonable and necessary expenses, derived from the business agreed to be conducted by POS." (Emphasis added.) And the jury further found that Saden failed to comply with the agreement to equally split with Smith the revenues from POS.

In question four, the trial court instructed the jury that " [l]ost profits are a natural, probable, and foreseeable consequence of ... Saden's *failure to comply with the agreement.* " (Emphasis added.) The trial court expressly asked the jury to measure the lost profits that flowed from Saden's breach of contract. It then asked the jury, " What sum of money, if any, if paid now in cash, would fairly and reasonably compensate ... Smith for his damages, if any, that resulted from ... Saden's *failure to comply with the agreement* ?" (Emphasis added.) And the jury answered, " $941,907."

As noted by the majority, this answer is consistent with the testimony of Smith's expert, Bill Shields, an accountant who reviewed the records of POS. Based on his review of the records and the agreement of Smith and Saden to split the revenue of POS equally, Shields opined that Saden had withheld $941,907 from Smith. Accordingly, the jury reasonably concluded that Saden, in violation of his agreement with Smith, withheld and failed to pay Smith $941,907, Smith's half of the revenues derived from POS. From this answer, it necessarily follows that Saden's half of the revenues of POS also totaled $941,907.

**Breach-of-Fiduciary-Duty Damages**

In regard to Smith's claim against Saden for breach of fiduciary duty, the trial court, in question seven of its charge, defined the term " relationship of trust and confidence," and the jury found that " a relationship of trust and confidence exist[ed] between" Smith and Saden. In question eight, the trial court instructed the jury on fiduciary duties, and the jury found that Saden did not " comply with his fiduciary duties to ... Smith."

In question ten, the trial court instructed the jury that " [l]ost profits are a natural, probable, and foreseeable consequence of ... Saden's *failure to comply with his fiduciary duties to* ... Smith." (Emphasis added.) Here, in contrast to question four, the trial court expressly asked the jury to measure the lost profits that resulted from Saden's breach of fiduciary duties, not those that resulted from his breach of contract. It then asked the jury, " What sum of money, if any, if paid now in cash, would fairly and reasonably compensate ... Smith for his damages, if any, that resulted from ... Saden's *failure to comply with his fiduciary duties* to ... Smith?" (Emphasis added.) And the jury answered, " $393,093" in stark contrast to its answer to question four, which was " $941,907."

Again, Saden does not challenge the sufficiency of the evidence supporting the jury's award of $393,093. He simply assumes that the measure of damages in question four is the same as that in question ten. Based on this assumption, Saden further assumes that the lost profits awarded in answer to question ten are

**Page 474**

duplicative of those awarded in answer to question four. Of course, the important difference in what lost profits the jury was instructed to consider in answering questions four and ten and the substantial difference in the jury's awards in answer to both questions illustrates the fallacy of these assumptions.

Regardless, the majority asserts, first, " there is a significant overlap between [Smith's] litany of Saden's misdeeds and the misconduct documented and accounted for in the Shield's damages model," and, second, " the record reveals no competent evidence from which a fact finder could determine with reasonable certainty the amount of lost profits separately attributable to breach of contract or only to breach of fiduciary duty."

However, as noted by Smith, he presented evidence that the lost profits that resulted from Saden's breach of contract were different from those that resulted from Saden's breach of fiduciary duties. Smith asserts that the lost profits that were " a natural, probable, and foreseeable

consequence of ... Saden's *failure to comply with his fiduciary duties* " included revenue lost by POS due to Smith's failure to secure the best price possible for POS accounts that he secretly sold, failure to secure commission rates for POS equal to those he secured for himself, sale of POS accounts and equipment, theft of $200,000 in certificates of deposit, use of POS funds to pay personal living expenses for himself and his family, theft of POS funds after the appointment of a receiver, and enriching himself through a series of self-dealing transactions. Thus, there is ample evidence in the record from which the jury could have reasonably found that Saden, in breaching his fiduciary duties to Smith, caused Smith damages of $393,093 above and beyond his breach-of-contract damages of $941,907.

Nevertheless, the majority conducts a sua sponte analysis of the evidence and makes a different finding. In support its finding, the majority relies in part on *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80 (Tex.1992). In *Holt,* the Texas Supreme Court did explain that the amount of lost profits must be " shown by competent evidence with reasonable certainty" and " opinions or estimates of lost profits must be based on objective facts, figures or data from which the amount of lost profits can be ascertained." 835 S.W.2d at 84. However, the court further explained that " [r]ecovery for lost profits *does not require that the loss be susceptible of exact calculation.* " *Id.* (emphasis added). And *Holt* is readily distinguishable because (1) Holt specifically argued there was " no evidence supporting the trial court's award of damages for lost profits" and (2) the court held that a conclusory statement about lost income " is not the correct measure of damages" and the testimony was " legally insufficient because it [did] not provide any indication" of how the lost profits were determined. *Id.* at 83-84.

Here the majority, as did the court in *Holt,* engages in a " fact intensive determination" in reaching its finding that Smith did not present reasonably certain evidence of lost profits on his breach-of-fiduciary-duty claim. *See id.* However, as noted above, Saden has not made a no-evidence challenge in this appeal. Thus, the majority, based on its sua sponte review of the evidence, is reversing the trial court's judgment on unassigned error. More important, Smith, as noted above, did present legally-sufficient evidence to support the jury's award of $393,093 for his damages resulting from Saden's breach of fiduciary duties. *See City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex.2005) (" If the evidence at trial would enable reasonable and fair-minded people to differ

**Page 475**

in their conclusions, then [the factfinder] must be allowed

to do so." ).

**Equitable Disgorgement**

It has long been the law in Texas that courts " may fashion equitable remedies such as profit disgorgement and fee forfeiture to remedy a breach of fiduciary duty." *ERI Consulting Eng'rs, Inc. v. Swinnea,* 318 S.W.3d 867, 873 (Tex.2010). And the Texas Supreme Court has clearly explained that " a fiduciary may be *punished* for breaching his duty." *Id.* at 872 (emphasis added). Indeed, " [t]he main purpose of forfeiture is not to compensate an injured principal.... Rather, the central purpose ... is to protect relationships of trust by discouraging ... disloyalty." *Id.* at 872-73 (quoting *Burrow v. Arce,* 997 S.W.2d 229, 238 (Tex.1999)).

A plaintiff need not even establish actual damages in order to receive the equitable remedy of disgorgement, and " even if a fiduciary does not obtain a benefit from a third party by violating his duty, a fiduciary may be required to forfeit the right to compensation for the fiduciary's work." *Id.* at 873 (citing *Burrow,* 997 S.W.2d at 237 (" [A] person who renders service to another in a relationship of trust may be denied compensation for his service if he breaches that trust." )). However, the equitable remedy of forfeiture must " fit the circumstances" presented. *Burrow,* 997 S.W.2d at 241. Here, though, Saden does not assert that the trial court's equitable disgorgement did not fit the circumstances.

Rather, Saden argues only that (1) the trial court's equitable disgorgement constituted a double recovery or " windfall" to Smith because it was based on lost profits and (2) the trial court's judgment must be " reformed to eliminate findings and recoveries for fraud, defalcation and embezzlement" because these issues " were not submitted to the jury" and recovery on them by Smith has been " waived by omission."

In question eleven, the trial court asked the jury, " What was the amount of ... *Saden's profit* from the conduct, if any, that you have found to be a breach of ... Saden's fiduciary duties to ... Smith?" (Emphasis added.) And the jury answered " $941,907." Because this question concerned the issue of the appropriateness of equitable disgorgement, i.e., whether it would " fit the circumstances," a question of equity solely in the province of the trial court, the trial court, did not, as asserted by Saden, instruct the jury to consider any lost profits as it did in answering question ten. Instead, the trial court specifically asked the jury to determine " Saden's profit" from his wrong doing, which equaled not only what he withheld from Smith, but also, necessarily, the profit to which Saden himself was entitled as compensation under their agreement to split equally the revenues derived from

POS.

In question eighteen, which also concerned the issue of the appropriateness of equitable disgorgement and which was predicated on the jury's negative answer to question eight, the trial court defined the terms " malice" and " clear and convincing." It defined malice as " a specific intent" by Saden " to cause substantial injury or harm to" Smith. And eleven jurors expressly found by clear and convincing evidence that " the harm caused by" Saden's breach of fiduciary duty " resulted from malice."

And, as noted above, the trial court, in its judgment, did conclude that " Saden's profit" of $941,907 should be equitably disgorged from him " as a result of his acts of fraud, defalcation and embezzlement while acting and serving in a fiduciary capacity with respect to" Smith. However, these conclusions were apparently made by the trial court to further show that it considered

**Page 476**

Saden's behavior so egregious that Saden should be " punished" by being disgorged of his profit from his wrongful acts. The trial court's conclusions did not at all, as asserted by Saden, concern issues that should have been " submitted to the jury" which Smith " waived by omission."

The bottom line is that the trial court's equitable disgorgement from Saden of " $941,907," which equals his half of the revenues derived from POS, is firmly supported by (1) the jury's finding that Saden profited in the amount of " $941,907" by breaching his fiduciary duties to Smith, (2) the jury's finding by clear and convincing evidence that " the harm caused by" Saden's breach of fiduciary duty " resulted from malice," and (3) the trial court's conclusion that Saden obtained this profit from Smith " as a result of his acts of fraud, defalcation and embezzlement while acting and serving in a fiduciary capacity with respect to" Smith. These findings and conclusion serve to show that the trial court's equitable disgorgement of Saden's compensation " fit the circumstances." *See Burrow,* 997 S.W.2d at 241.

**Conclusion**

In its judgment, the trial court, in accord with the jury's findings, awarded Smith $941,907 on his breach-of-contract claim and $393,093 on his claim for breach of fiduciary duty. And, concluding that Saden, in breaching his fiduciary duties to Smith, had committed " acts of fraud, defalcation and embezzlement," the trial court further awarded Smith $941,907 " in equitable disgorgement of the profits" obtained by Saden. In doing so, the trial court did not permit a " duplicative recovery of damages" or " include[ ] additional unauthorized findings."

It simply awarded Smith separate and distinct damages for his separate and distinct injuries, and it reasonably concluded that based on Saden's egregious conduct, he should further be disgorged of his half of the revenues derived from POS.

Accordingly, I would overrule Saden's third and fifth issues and affirm the true and correct judgment of the trial court.

---------

Notes:

[1] In Smith's appellee's brief, the reference to Saden " enriching himself through a series of self-dealing transactions" is followed by a footnote, which reads:

In fact, Shields, the accounting expert, allowed for $1,600,000 in expenses in computing the contract damages, even though many of those payments were to or for self-dealing transactions for the benefit of Saden and his family (e.g., meals, insurance and utilities including, gas, water, electricity and other expenses). *See* PX 301. Although those payments are not included in Smith's contract damages, but they are tort damages in Smith's breach of fiduciary duty claim, and they far exceed the $393,093.00 found by the jury. *Kinzbach Tool Co. v. Corbett-Wallace Corp.,* 138 Tex. 565, 160 S.W.2d 509, 512-14 (1942). Appellee's Brief at 28 n. 42. Though the source of the $1,600,000 figure is unexplained, to the extent Smith argues that the Shields model did not include payments " for the benefit of Saden and his family (e.g., meals, insurance and utilities including, gas, water, electricity and other expenses)," he plainly misstates the record. The examination and cross-examination of Shields made quite clear that between POS and Precision, Shields determined that Saden " paid himself through either salary, commissions, benefits, personal expenses, home expense, whatever it may be, $2,740,927." Of this amount, the only expenses that Shields treated as legitimate business expenses were commissions and director fees. The Shields damages model accounts for payments made for the benefit of Saden and his family, and it compensates Smith for his injury to the extent the revenues of POS and Precision were not evenly split between him and Saden as a result of such payments.

---------

435 S.W.3d 234 (Tex. 2014)

57 Tex.Sup.Ct.J. 816

LAN/STV, A JOINT VENTURE OF LOCKWOOD, ANDREWS & NEWMAN, INC. AND STV INCORPORATED, PETITIONER,

v.

MARTIN K. EBY CONSTRUCTION COMPANY, INC., RESPONDENT

No. 11-0810

Supreme Court of Texas

June 20, 2014

Argued October 8, 2013

ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS.

For CCE, Inc., Amicus Curiae: Charles R. 'Skip' Watson Jr., Locke Lord LLP, Austin, TX.

For LAN/STV, a joint Venture of Lockwood, Andrews & Newnam Inc., Petitioner: Bradley Wayne Snead, Henry S. Platts Jr., Thomas C. Wright, Wanda McKee Fowler, Wright & Close LLP, Houston, TX.

For Martin E. Eby Construction Company, Inc., Respondent: Daniel J. Davis, Davis Law Firm, Dallas, TX; Jeffery A. Ford, Ford Nassen & Baldwin PC, Dallas, TX; Jeffrey S. Levinger, Levinger PC, Dallas, TX.

### OPINION

Nathan L. Hecht, Chief Justice

In actions for unintentional torts, the common law has long restricted recovery of purely economic damages unaccompanied by injury to the plaintiff or his property[1] -- a doctrine we have referred to as the economic loss rule.[2] The rule serves to provide a more definite limitation on liability than foreseeability can and reflects a preference for allocating some economic risks by contract rather than by law.[3] But the rule is not generally applicable

in every situation; it allows recovery of economic damages in tort, or not, according to its underlying principles.[4] The issue in this case is whether the rule permits a general contractor to recover the increased costs of performing its construction contract with the owner in a tort action against the project architect for negligent misrepresentations -- errors -- in the plans and specifications. We conclude that the economic loss rule does not allow recovery and accordingly reverse the judgment of the court of appeals[5] and render judgment for the architect.

### I

The Dallas Area Rapid Transportation Authority (" DART" ) contracted with LAN/STV to prepare plans, drawings, and specifications for the construction of a light rail transit line from Dallas's downtown West End to the American Airlines Center about a mile away. LAN/STV agreed to " be responsible for the professional quality, technical accuracy, and . . . coordination of all designs, drawings, specifications, and other services furnished", and to be " liable to the Authority . . . for all damages to the Authority caused by [LAN/STV's] negligent performance of any of the services furnished" . DART incorporated LAN/STV's plans into a solicitation for competitive bids to construct the project. Martin K. Eby Construction Company, which had built two other DART light rail projects, one of which was designed by LAN/STV, submitted the low bid on this project, just under $25 million, and was awarded the contract. The contract provided an administrative procedure for Eby to assert contract disputes with DART, including complaints about design problems. Eby and LAN/STV had no contract with each other. Thus, LAN/STV was contractually responsible to DART for the accuracy of the plans, as was DART to Eby, but LAN/STV owed Eby no contractual obligation.[6]

Days after beginning construction, Eby discovered that LAN/STV's plans were full of errors -- about bridge structures, manhole and utility line locations, subsurface soil conditions, an existing retaining wall, and many other aspects of the proposed construction. While Eby expected that, as on any project, 10% of the plans would be changed, it found that 80% of LAN/STV's drawings had to be changed. This disrupted Eby's construction schedule and required additional labor and materials. In all, Eby now calculates it lost nearly $14 million on the project.

Only seven months into what would turn out to be a 25-month job, Eby sued DART for breach of contract in the United States District Court.[7] The court dismissed the case because Eby had not exhausted its administrative

remedies against DART under their contract and Texas law.[8] Eby then invoked DART's contract dispute procedures, claiming $21 million. The hearing officer not only rejected Eby's claim in its entirety, he concluded that DART was entitled to $2.4 million in liquidated damages from Eby. Eby filed an administrative appeal, but, before it was resolved, settled with DART for $4.7 million.

Meanwhile, Eby filed this tort suit against LAN/STV, asserting causes of action for negligence and negligent misrepresentation. After Eby and DART settled, this case proceeded to trial,[9] but only on Eby's claim that LAN/STV negligently misrepresented the work to be done in its error-ridden plans.[10] The jury agreed and assessed Eby's damages for its losses on the project at $5 million, but they also found that the damages were caused by Eby's and DART's negligence as well, and apportioned responsibility 45% to LAN/STV, 40% to DART, and 15% to Eby. The trial court concluded that Eby's $4.7 million settlement with DART should not be credited against the damages found by the jury, but that LAN/STV should be liable only for its apportioned share of the damages. Accordingly, the trial court rendered judgment for Eby for $2.25 million plus interest.

Both LAN/STV and Eby appealed, and following the court of appeals' affirmance,[11] both petitioned for review. We granted both petitions,[12] but as we view the case, we need only address LAN/STV's argument that Eby's recovery for negligent misrepresentation is barred by the economic loss rule.[13] We begin by surveying

**Page 238**

the development of the rule in American law and its status in Texas. We then turn to its application in this case.

## II

### A

The law has long limited the recovery of purely economic damages in an action for negligence. An early example, oft-cited, is Justice Holmes's opinion in *Robins Dry Dock & Repair Co. v. Flint*,[14] a suit by the charterers of a steamship against a dry dock for damages for loss of the use of the vessel from a delay in repairs due to the dry dock's negligence. The Supreme Court held that the charterers could not recover their economic damages from the dry dock, either as third-party beneficiaries of the contract between the owners and the dry dock,[15] or for the dry dock's negligence. Justice Holmes explained:

Of course the contract of the [dry dock] with the owners imposed no immediate obligation upon the [dry dock] to third persons [the charterers] as we already have said, and whether the [dry dock] performed it promptly or with

negligent delay was the business of the owners and of nobody else. . . . [The charterers'] loss arose only through their contract with the owners . . . . [N]o authority need be cited to show that, as a general rule, at least, a tort to the person or property of one man does not make the tort-feasor liable to another merely because the injured person was under a contract with that other unknown to the doer of the wrong. . . . The law does not spread its protection so far.[16]

Nearly sixty years later, Judge Higginbotham observed in *State of Louisiana v. M/V Testbank* that " *Robins* broke no new ground . . . . [T]he prevailing rule [in the United States and England] denied a plaintiff recovery for economic loss if that loss resulted from physical damage to property in which he had no proprietary interest." [17] Judge Higginbotham cited Professor James's 1972 article, *Limitations on Liability for Economic Loss Caused by Negligence: A Pragmatic Appraisal* :

Under the prevailing rule in America, a plaintiff may not recover for his economic loss resulting from bodily harm to another or from physical damage to property in which he has no proprietary interest. Similarly, a plaintiff may not recover for economic loss caused by his reliance on a negligent misrepresentation that was not made directly to him or specifically on his behalf.[18]

" The reasons for this difference in treatment of indirect economic loss and physical damage," Professor James continued, " do not derive from the theory or the logic of tort law" .[19] Economic loss may be no less real than physical injury and just as foreseeable.

**Page 239**

In *Robins*, for example, the charterers' loss of business from the dry dock's negligent delay in repairing the steamship was readily foreseeable, but so would have been the charterers' clients' loss of business, and so on. Justice Holmes' abrupt curtailment of this rippling liability -- " [t]he law does not spread its protection so far" [20] -- could have been achieved by taking a more restrictive view of foreseeability. But, wrote Professor James,

judges who have been unwilling to accept narrow and unrealistic views of what is foreseeable -- or of what a jury may find to be unforeseeable -- remain generally unwilling to allow recovery for indirect economic loss. The explanation for this reluctance, repeated in decisions over the years, is a pragmatic one: the physical consequences of negligence usually have been limited, but the indirect economic repercussions of negligence may be far wider, indeed virtually open-ended. As Cardozo put it in a passage often quoted, liability for these consequences would be " liability in an indeterminate amount for an indeterminate

time to an indeterminate class." [21]

Liability for economic loss directly resulting from physical injury to the claimant or his property -- such as lost wages or medical bills -- is limited by the scope of the injury. Liability for a standalone economic loss is not.[22]

Often, a more appropriate remedy for the victim is to allocate the risk of loss by contract or to cover it through insurance.[23] In Judge Posner's view:

This is simply generalizing to tort law the contract-law rule of *Hadley v. Baxendale* . . . . The point in *Hadley* . . . was that the carrier could not estimate the loss that the customer would incur from a delay in the delivery of the repaired mill shaft to the customer, but the customer could estimate this cost and, therefore, was in a better position to avoid the loss by taking appropriate precautions or by buying insurance.[24]

Thus, for example, " when a defective product purchased in a commercial transaction malfunctions, injuring only the product itself and causing purely economic loss", protection from that kind of harm, the United States Supreme Court has held (in an admiralty case), should be " left entirely to the law of contracts" because " the parties may set the terms of their own agreements." [25] Determining whether a provision

**Page 240**

for recovery of economic loss is better left to contract helps delineate between tort and contract claims. As one commentator has explained:

If there is a convincing rationale for the economic loss rule, it is that the rule performs a critical boundary-line function, separating the law of torts from the law of contracts. More specifically, " [t]he underlying purpose of the economic loss rule is to preserve the distinction between contract and tort theories in circumstances where both theories could apply." [26]

Since Professor James's seminal article, much has been written on the development of the rule limiting recovery of economic damages in tort actions.[27] From our review of the cases and commentary on the subject, we think the principal rationales for the rule are well-summarized by Dean Farnsworth in the recently approved *Restatement (Third) of Torts: Liability for Economic Harm*, which we quote at length:

Economic injuries may be no less important than injuries of other kinds; a pure but severe economic loss might well be worse for a plaintiff than a more modest personal injury, and the difference between economic loss in itself and economic loss resulting from property damage may be negligible from the victim's standpoint. For several reasons, however, courts impose tort liability for economic loss more selectively than liability for other types of harms.

(1). *Indeterminate and disproportionate liability* . Economic losses proliferate more easily than losses of other kinds. Physical forces that cause injury ordinarily spend themselves in predictable ways; their exact courses may be hard to predict, but their lifespan and power to harm are limited. A badly driven car threatens physical harm only to others nearby. Economic harm is not self-limiting in this way. A single negligent utterance can cause economic loss to thousands of people who rely on it, those losses may produce additional losses to those who were relying on the first round of victims, and so on. Consequences of this sort may be at least generally foreseeable to the person who commits the negligent act. Defendants in such cases thus might face liabilities that are indeterminate and out of proportion to their culpability. Those liabilities may in turn create an exaggerated pressure to avoid an activity altogether.

(2). *Deference to contract* . Risks of economic loss tend to be especially well suited to allocation by contract. First, economic injuries caused by negligence often result from a decision by the victim to rely on a defendant's words or acts when entering some sort of transaction -- an investment in a company, the purchase of a house, and so forth. A potential plaintiff making such a decision has a full chance to consider how to manage the risks involved, whether by inspecting the item or investment, obtaining

**Page 241**

insurance against the risk of disappointment, or making a contract that assigns the risk of loss to someone else. Second, money is a complete remedy for an economic injury. Insurance benefits, indemnification by agreement, or other replacements of money payments are just as good as the money lost in a transaction that turns out badly. This fungibility makes those other ways of managing risk -- insurance, indemnity, and the like -- more attractive than they might be to a party facing a prospect of personal injury.

Those same points often will make it hard for a court to know what allocation of responsibility for economic loss would best serve the interests of the parties to a risky situation. A contract that settles responsibility for such a risk will therefore be preferable in most cases to a judicial assignment of liability after harm is done. The contract will better reflect the preferences of the parties and help prevent the need for speculation and litigation later. Contracts also are governed by a body of commercial law that has been developed to address economic loss, and thus will often be better suited for that task than the law of torts. In short,

contracts to manage the risk of economic loss are more often possible, and more often desirable, than contracts to manage risks of other types of injury. As a result, courts generally do not recognize tort liability for economic losses caused by the breach of a contract between the parties, and often restrict the role of tort law in other circumstances in which protection by contract is available.[28]

Thus, the *Restatement* concludes, while there is " no general duty to avoid the unintentional infliction of economic loss" ,[29] the duty may exist when the rationales just stated for limiting recovery are " weak or absent" [30] -- *cessante ratione legis cessat et ipsa lex* .[31]

**B**

The absence of a bright-line rule, and the failure to analyze whether denying tort recovery for an economic loss in a particular kind of situation is justified by the rationales for limiting recovery of such losses, has led to some confusion. In a 1992 article, then-Professor Powers called Texas law on the subject " murky" .[32] One thing certain was that the damage caused by a defective product to itself cannot be recovered in an action for strict products liability,[33] even if there is also personal

injury or injury to other property.[34] Recovery of such damages must be for breach of contract or warranty. It was also fairly clear that one party to a contract cannot recover from another party, in an action for negligence, an economic loss to the subject of the contract.[35]

The *Restatement* now concludes generally that " there is no liability in tort for economic loss caused by negligence in the performance or negotiation of a contract between the parties." [36] It was less clear twenty years ago, and still is today, the extent to which Texas precludes recovery of economic damages in a negligence suit between contractual strangers, notwithstanding the rule's genesis in such cases, like *Robins* . As Professor Powers observed, " [a]lthough cases between contractual strangers are the paradigm of the traditional 'economic loss' rule, no Texas case involving 'strangers' expressly addresses the economic loss rule." [37] Professor Powers noted that this Court had suggested in dicta that purely economic damages are recoverable in a negligence action between contractual strangers but later appeared to have rejected that possibility.[38]

Since then, Texas courts of appeals have uniformly applied the economic loss rule to deny recovery of purely economic losses in actions for negligent performance of services.[39] Professional malpractice

cases are an exception. A client can recover purely economic losses from a negligent lawyer, regardless of whether the lawyer and client have a contract.[40] Lawyer malpractice is actionable as negligence no doubt because agreements regarding legal representation are not required in Texas, except for contingent fees,[41] and until relatively recently have not been the norm. Also, the standards governing legal representation are deeply developed and their application uniform and well-settled. These factors also support negligence actions against other professionals.[42]

Although Texas courts have repeatedly invoked the economic loss rule to disallow recovery of purely economic losses in actions for negligent services not involving professionals, this Court, without citing the rule, has allowed recovery of such losses in an action for negligent misrepresentation, the cause of action in the present case. We first recognized the action, defined by section 552 of the *Restatement (Second) of Torts*,[43] in *Federal Land Bank Association*

*of Tyler v. Sloane*, where we held that prospective borrowers could recover the costs they incurred (but not lost profits) in relying on their lender's negligent misrepresentation to them that their loan application would be approved.[44] Later, in *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests* , we held that while a non-client cannot recover against a lawyer for negligence,[45] a lawyer may be liable for negligent misrepresentation to a non-client, but only in narrow circumstances, " when information is transferred by an attorney to a known party for a known purpose", liability is not expressly limited or disclaimed but invited, and the claimant has " justifiably rel[ied] on a lawyer's representation of material fact", which cannot ordinarily occur in an adversarial context.[46] Most recently, in *Grant Thornton LLP v. Prospect High Income Fund, Ltd*., we held that an accountant may be liable to a strictly limited group of investors who justifiably rely on negligent misrepresentations in a corporate audit report.[47] But we denied the claims in that case because the plaintiffs were merely potential investors with no special relationship to the audited corporation, and given their knowledge of the corporation and the marketplace, their reliance was not justified.[48]

These cases should not be read to suggest that recovery of economic loss is broader for negligent misrepresentation than for negligent performance of services. We agree with the *Restatement* that " [t]he general

theory of liability is the same" for both torts, which is that

[a] plaintiff's reliance alone, even if foreseeable, is not a sufficient basis for recovery; under either [tort] a defendant generally must act with the apparent purpose of providing a basis for the reliance. It may be useful to say that a defendant held liable under either [tort] must " invite reliance" by the plaintiff, so long as the expression is understood to refer to the defendant's apparent purpose and not to a temptation incidentally created by the defendant's words or acts.[49]

And for both torts, whether and how to apply the economic loss rule " does not lend itself to easy answers or broad pronouncements." [50] Rather, as we have already observed, the application of the rule depends

**Page 246**

on an analysis of its rationales in a particular situation.

### III

Eby argues that the economic rule should not apply in this case when it did not bar recovery in our other negligent misrepresentation cases, *Sloane, McCamish*, and *Grant Thornton*. LAN/STV counters that to allow such recovery on construction projects, where relationships are contractual and certainty and predictability in risk allocation are crucial, would be disruptive.

Construction projects operate by agreements among the participants. Typically, those agreements are vertical: the owner contracts with an architect and with a general contractor, the general contractor contracts with subcontractors, a subcontractor may contract with a sub-subcontractor, and so on. The architect does not contract with the general contractor, and the subcontractors do not contract with the architect, the owner, or each other.

We think it beyond argument that one participant on a construction project cannot recover from another -- setting aside the architect for the moment -- for economic loss caused by negligence. If the roofing subcontractor could recover from the foundation subcontractor damages for extra costs incurred or business lost due to the latter's negligent delay of construction, the risk of liability to everyone on the project would be magnified and indeterminate -- the same result Justice Holmes rejected in *Robins*. As the *Restatement* explains:

There is no liability in tort . . . when the owner of a construction project sues a subcontractor for negligence resulting in economic loss; nor is liability found when one subcontractor is sued by another because the negligence of the first drives up the costs of the second. A subcontractor's negligence in either case is viewed just as a failure in the

performance of its obligations to its contractual partner, not as the breach of a duty in tort to other subcontractors on the same job, or to the owner of the project. This way of describing the subcontractor's role is not inevitable in all cases. General rules are favored in this area of the law, however, because their clarity allows parties to do business on a surer footing. In this setting, a rule of no liability is made especially attractive by the number and intricacy of the contracts that define the responsibilities of subcontractors on many construction projects. That web of contracts would be disrupted by tort suits between subcontractors or suits brought against them by a project's owner.[51]

The issues are whether to treat the architect differently and whether to distinguish between an action for negligent performance of services and an action for negligent misrepresentations. On the latter issue, we agree with the *Restatement* : " [b]oth [torts] are based on the [same] logic" and " [t]he general theory of liability is the same" .[52] The economic loss rule should not apply differently to these two tort theories in the same situation.

On the former issue, we diverge from the *Restatement* . We agree that

[t]he plans drawn by the architect are intended to serve as a basis for reliance by the contractor who forms a bid on the

**Page 247**

basis of them and is then hired to carry them out. The architect's plans are analogous to the audit report that an accountant supplies to a client for distribution to potential investors -- a standard case of liability [for negligent misrepresentation].[53]

But we think the contractor's principal reliance must be on the presentation of the plans by the owner, with whom the contractor is to reach an agreement, not the architect, a contractual stranger. The contractor does not choose the architect, or instruct it, or pay it. Under *McCamish*, the contractor could not recover economic damages from the owner's lawyer's negligent drafting of the construction contract. And while there is some analogy between the architect's plans and an accountant's audit report, under *Grant Thornton*, the latter is not an invitation to all investors to rely, but only those to whom it is more specifically directed. Here, the architect's plans are no more an invitation to all potential bidders to rely.

The *Restatement* adds that if allowing recovery against the architect in negligence " is not congenial to the parties, they are free to change it in the contracts that link them." [54] But the parties are just as free to provide for liability by contract that the law does not allow in tort. The

*Restatement* acknowledges this, noting that if the architect is contractually liable to the owner for defects in the plans, and the owner in turn has the same liability to the contractor, the contractor is protected.[55] But the *Restatement* concludes that while this assignment of risk by contract should be encouraged, it jeopardizes unsophisticated parties:

Forbidding tort claims between parties who are indirectly linked by contract would put pressure on them to specify their rights carefully in advance, thus sparing courts the need to inquire into them later. But that incentive is most likely to be noticed by sophisticated parties negotiating large projects, and for them the rule is unlikely to be of great importance. They will negotiate allocations of risk that look similar in the end notwithstanding the rule of tort law in the background. Meanwhile, less sophisticated parties would stand a good chance of being tripped up by a broad rule, as when they fail to provide for indemnification in some direction and inadvertently leave a party who has

**Page 248**

been wronged with no remedy.[56]

We think it more probable that a contractor will assume it must look to its agreement with the owner for damages if the project is not as represented or for any other breach.

Though there remains the possibility that a contractor may not do so, we think the availability of contractual remedies must preclude tort recovery in the situation generally because, as stated above, "clarity allows parties to do business on a surer footing" .[57] "Where contracts might readily have been used to allocate the risk of a loss," the *Restatement* observes, " a duty to avoid the loss is unlikely to be recognized in tort -- not because the economic loss rule applies, but simply because courts prefer, in general, that economic losses be allocated by contract where feasible." [58] We see no reason not to apply the economic loss rule to achieve this end.

Analyzing the economics of the construction site, Professor Powers proposed this result more than twenty years ago, and we quote his analysis at length:

In fact, construction disputes . . . are good candidates for precluding recovery under the " economic loss" rule, because the parties are in a position to protect themselves through bargaining. Though the parties do not necessarily have contracts with each other, they typically all have contracts with the owner, or subcontracts with someone who does have a contract with the owner. If contractors want to be protected, they can insist on that protection from the owner who will get protection from the architect. The

contractors can take less compensation from the owner, so that the owner can in turn compensate the architect for the added risk.

The issue is who will buy business protection insurance. It makes sense to let the parties bargain about this rather than impose a " legal" solution. . . .

There are two additional reasons to decline imposing a general tort duty on architects and engineers. First, imposing the risk of economic loss on the architect requires the architect to pass the cost along to the owner. The owner will then pass the cost along to the various contractors and subcontractors. Different contractors and subcontractors have different susceptibilities to economic loss, but the owner has no way of distinguishing among the various contractors and subcontractors. Some contractors and subcontractors will benefit greatly, some will not. Yet all will pay the price for this protection, not in proportion to their benefit from the protection, but roughly in proportion to the dollar value of their services. This will lead to a cross-subsidization. Contractors and subcontractors who are not subject to losses from delays effectively " pay" for protection that they do not need. In effect, they subsidize other contractors and subcontractors who are more susceptible to this type of loss.

This inequity could be remedied if the owner could determine which contractors and subcontractors benefit most and then charge them more by paying them less. But this would require the owner to be in the business of evaluating contractors' susceptibility to economic loss, which would effectively put the owner in the insurance evaluation business. Individual contractors and subcontractors are in a better position to evaluate their own susceptibility to economic

**Page 249**

loss and determine whether to buy insurance. Thus, fairness and efficiency support leaving these losses on the contractors and subcontractors, who can decide for themselves whether and for how much to insure. I assume this is part of the explanation why current contractual practice does not shift these obligations to the architect.

Second, . . . contracts between owners and supervising architects can vary. Sometimes the supervising architect might be hired for the benefit of the contractors and subcontractors. However, in most cases, the architect is hired either as a neutral arbitrator or, most often, as the agent of the owner. . . . If the architect is supposed to be neutral or to operate as the agent of the owner, negligence principles -- which would be decided by the jury after the fact -- would create a chilling effect on the architect's

neutrality or fiduciary duty to the owner.

This analysis suggests that each situation is different and that courts should use contract principles[,] not tort principles, to determine whether the architect has "contractual" obligations to the contractors and subcontractors.[59]

Finally, the courts are fairly evenly divided over whether to apply the economic loss rule in this situation.[60] We side with those who do.

DART was contractually responsible to Eby for providing accurate plans for the job. Eby agreed to specified remedies for disputes, pursued those remedies (when the federal court would not allow it to sue), and settled its claims for $4.7 million. Had DART chosen to do so, it could have sued LAN/STV for breach of their contract to provide accurate plans. But Eby had no agreement with LAN/STV and was not party to LAN/STV's agreement with DART. Clearly, the economic loss rule barred Eby's subcontractors from recovering

**Page 250**

their own delay damages in negligence claims against LAN/STV. We think Eby should not be treated differently.

\* \* \* \*

The reasons for the economic loss rule support its application in this case to preclude a general contractor from recovering delay damages from the owner's architect. Accordingly, we reverse the judgment of the court of appeals and render judgment that Eby take nothing from LAN/STV.

---------

Notes:

[1] *See, e.g*., Fleming James, Jr., *Limitations on Liability for Economic Loss Caused by Negligence: A Pragmatic Appraisal*, 25 Vand. L. Rev. 43, 43 (1972) ( "Under the prevailing rule in America, a plaintiff may not recover for his economic loss resulting from bodily harm to another or from physical damage to property in which he has no proprietary interest." ).

[2] *See, e.g., Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 415 (Tex. 2011) ( "[P]arties may be barred from recovering in negligence or strict liability for purely economic losses. This is often referred to as 'the economic loss rule.'" (citations omitted)).

[3] *See* Restatement (Third) of Torts: Liability for Economic Harm § 1 cmt. c (Tentative Draft No. 1, 2012) ("

Restatement, T.D. 1" ). Sections 1 through 5 of this draft were approved by the membership of the American Law Institute at the 2012 Annual Meeting, subject to the discussion at the Meeting and to editorial prerogative. Proceedings at 89th Annual Meeting: American Law Institute, 89 A.L.I. Proc. 46-47 (2012). According to the Institute: " Once it is approved by the membership at an Annual Meeting, a Tentative Draft or a Proposed Final Draft represents the most current statement of the American Law Institute's position on the subject and may be cited in opinions or briefs . . . until the official text is published." *Overview, Project Development* , American Law Institute, http://www.ali.org/-index.cfm?fuseaction=projects.main (last visited June 18, 2014). A second draft, Restatement (Third) of Torts: Liability for Economic Harm (Tentative Draft No. 2, 2014) (" Restatement, T.D. 2" ), was approved at the 2014 Annual Meeting. Proceedings at 91st Annual Meeting: American Law Institute, 91 A.L.I. Proc. (2014); *see also Actions Taken at the 91st Annual Meeting* , ALI'S 91st Annual Meeting, http://2014annualmeeting.org/actions-taken/(last visited June 18, 2014). Tentative Draft No. 2 covers the last three sections bearing on the unintentional infliction of economic loss, sections 6 through 8, and seven sections on the law of fraudulent misrepresentation; as the Reporter notes, section 6, on " Negligent Performance of Services", refers to and " is complementary to" section 5, on " Negligent Misrepresentation" . Restatement, T.D. 2, Reporter's Memorandum, at xvii.

[4] *Sharyland*, 354 S.W.3d at 415 ( " '[T]here is not one economic loss rule broadly applicable throughout the field of torts, but rather several more limited rules that govern recovery of economic losses in selected areas of the law.'" ) (quoting Vincent R. Johnson, *The Boundary-Line Function of the Economic Loss Rule* , 66 Wash. & Lee L. Rev. 523, 534-535 (2009)); *see* Restatement, T.D. 1, § 1 cmt. b (" [D]uties of care with respect to economic loss are not general in character; they are recognized in specific circumstances according to the principles stated in Comment c." ). Another scholar also thought there was no single " economic loss rule" but instead a " constellation of somewhat similar doctrines that tend to limit liability" that seemed to work in different ways in different contexts, for not necessarily identical reasons, " with exceptions where the reasons for limiting liability were absent." Oscar S. Gray, *Some Thoughts on " The Economic Loss Rule" and Apportionment*, 48 Ariz. L. Rev. 897, 898 (2006) (" The core concept of this constellation, not quite a 'rule', seems to me to be an inhibition against liability in negligence for economic harm not resulting from bodily injury to the claimant or physical damage to property in which the claimant has a proprietary interest." ) (footnotes omitted).

[5]350 S.W.3d 675 (Tex.App.--Dallas 2011).

[6]Eby does not contend that it was a third-party beneficiary of the LAN/STV-DART contract.

[7]Eby alleged:

In providing voluminous and detailed plans and specifications for Eby's use in preparing a bid price for this competitive bid project, DART was obliged to provide accurate and adequate information which could be reasonably relied upon for developing a competitive bid price. The information provided by DART, and upon which Eby relied, was in fact materially inaccurate and inadequate for performing the work resulting in extraordinary excess costs for performance and denying Eby the ability to perform the work in a productive and profitable fashion.

* * *

DART's failure, through LAN/STV, to provide Eby with adequate and accurate plans and specifications upon which to bid and perform this project, together with the lack of direction and cooperation in resolving the problems encountered due to these inadequacies and refusal to compensate Eby for these inadequacies, constitutes a material breach of contract . . . .

Eby also asserted a claim for misrepresentation, which was determined on appeal to be " just a subset of its breach-of-contract claim." *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 472 (5th Cir. 2004).

[8]The dismissal was affirmed on appeal. *Id*. at 465.

[9]The trial court initially granted LAN/STV summary judgment on its claim of derivative immunity under Tex. Transp. Code § 452.056(d), but the court of appeals reversed. *Martin K. Eby Constr. Co. v. LAN/STV*, 205 S.W.3d 16, 21 (Tex.App.--Dallas 2006, pet. denied).

[10]Eby alleged: " In the course of providing the referenced plans, drawings and specifications, LAN/STV made representations, in a transaction for which it was compensated, where those representations were false, misleading and/or inaccurate and were made with the knowledge that contractors such as Eby would rely upon them."

[11]350 S.W.3d 675 (Tex.App.--Dallas 2011).

[12]56 Tex. S.Ct. J. 277, 2013 Tex. LEXIS 105 (Feb. 15, 2013).

[13]LAN/STV and Eby each complain of the damage award: LAN/STV contends that it is entitled to a credit for Eby's $4.7 million settlement with DART, and Eby argues that the damages found by the jury should not have been reduced by the percentage of responsibility apportioned to DART. LAN/STV also argues that Eby's claim is barred by derivative immunity, that Eby's measure of damages is improper, and that Eby failed to prove all the elements of its negligent misrepresentation claim.

[14]275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927).

[15] *Id*. at 307-308.

[16] *Id*. at 308-309 (citations omitted).

[17]752 F.2d 1019, 1022 (5th Cir. 1985) (en banc).

[18]25 Vand. L. Rev. 43, 43 (1972) (footnotes omitted).

[19] *Id*. at 44. *See also* Oliver Wendell Holmes, the Common Law 1 (Boston, Little Brown & Co., 1881) (" The life of the law has not been logic: it has been experience. The felt necessities of the time, the prevalent moral and political theories, intuitions of public policy, avowed or unconscious, even the prejudices which judges share with their fellow-men, have had a good deal more to do than the syllogism in determining the rules by which men should be governed." ).

[20] *Robins*, 275 U.S. at 309.

[21]James, *supra* note 18, at 45 (footnotes omitted) (quoting *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441, 444 (N.Y. 1931)).

[22] *See* William Powers, Jr. & Margaret Niver, *Negligence, Breach of Contract, and the " Economic Loss" Rule*, 23 Tex. Tech L. Rev. 477, 481 (1992) (" One rationale for precluding recovery of pure economic loss in these cases is a fear that the purely economic consequences of a defendant's negligence are not limited by the normal tort limit on the scope of a negligent defendant's liability, foreseeability on a case-by-case basis." ).

[23] *See id*. at 481-482 (" Another rationale is that plaintiffs are in a better position than defendants to evaluate their own susceptibility to pure economic loss and protect against the economic loss through first-party insurance." ).

[24]Richard A. Posner, *Common-Law Economic Torts: An Economic and Legal Analysis*, 48 Ariz. L. Rev. 735, 739 (2006) (citing *Hadley v. Baxendale*, 9 Exch. 341, 156 Eng. Rep. 145 (1854)).

[25] *East River S.S. Corp. v. Transamerica Delaval, Inc*., 476 U.S. 858, 859, 872-873, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986).

[26]Vincent R. Johnson, *The Boundary-Line Function of the Economic Loss Rule*, 66 Wash. & Lee L. Rev. 523, 546 (2009) (footnotes omitted) (quoting Stewart I. Edelstein,

*Beware the Economic Loss Rule*, Trial, June 2006, at 42, 43 (2006)).

[27] *See, e.g.*, Symposium, *Dan B. Dobbs Conference on Economic Tort Law*, 48 Ariz. L. Rev. 687 (2006); Anita Bernstein, *Keep It Simple: An Explanation of the Rule of No Recovery for Pure Economic Loss*, 48 Ariz. L. Rev. 773, 778 (2006) (citing James, *supra* note 18, at 45-46); Mark P. Gergen, *The Ambit of Negligence Liability for Pure Economic Loss*, 48 Ariz. L. Rev. 749, 764 (2006) (citing James, *supra* note 18, at 44-45); *see also* Jim Wren, *Applying the Economic Loss Rule in Texas*, 64 Baylor L. Rev. 204, 229 (2012) (citing James, *supra* note 18, at 45).

[28] *See* Restatement, T.D. 1, § 1 cmt. c.

[29] *Id*. § 1.

[30] *Id*. § 1 cmt. d.

[31]" When the reason of the law ceases, the law itself also ceases." Black's Law Dictionary App. A 1622 (7th ed. 1999).

[32]Powers, *supra* note 22, at 477. In fairness, Texas does not have a monopoly on the confusion. *See* Johnson, *supra* note 26, at 546 (" The confusing mass of precedent relating to tort liability for economic loss has yet to be disentangled and expressed with the clarity commonly found with respect to other tort law topics." ).

[33]This rule was first stated in *Nobility Homes of Texas, Inc. v. Shivers* : " strict liability does not apply to economic losses." 557 S.W.2d 77, 80 (Tex. 1977). The plaintiff suffered only economic damages -- the difference between what he paid for a rickety mobile home and what it was worth. *Id*. at 78. But his strict products liability claim also failed because the mobile home, though defective, was not unreasonably dangerous. *Id*. at 79-80; *see also McKisson v. Sales Affiliates, Inc*., 416 S.W.2d 787, 788-789 (Tex. 1967) (adopting the strict liability action defined in section 402A of the *Restatement (Second)* of Torts, which provides for damages caused by a defective product that is unreasonably dangerous). Less than a year after the Court issued its unanimous opinion in *Nobility Homes*, the Court could not agree on what had been the basis for that decision. In *Mid Continent Aircraft Corp. v. Curry County Spraying Service, Inc*., the Court held that the decision in *Nobility Homes* had been based on the economic loss rule: " In transactions between a commercial seller and commercial buyer, when no physical injury has occurred to persons or other property, injury to the defective product itself is an economic loss governed by the Uniform Commercial Code." 572 S.W.2d 308, 313 (Tex. 1978). Justice Pope, the author of the Court's opinion in *Nobility Homes*, disagreed: " We did not hold that damages to the product itself

defeated an action for strict liability. . . . The reason that *Nobility* . . . held there was no strict liability case for the product itself was the absence of proof and findings that there was a defect that was unreasonably dangerous that produced the accident." *Id*. at 314-315 (Pope, J., dissenting). In a case decided the same day as *Mid Continent*, the Court reiterated its view of *Nobility Homes*, that when " only the product itself is damaged, such damage constitutes economic loss recoverable only as damages for breach of an implied warranty under the [UCC]." *Signal Oil & Gas Co. v. Universal Oil Prods*., 572 S.W.2d 320, 325 (Tex. 1978). We have since reaffirmed: " The economic loss rule applies when losses from an occurrence arise from failure of a product and the damage or loss is limited to the product itself." *Equistar Chems., L.P. v. Dresser-Rand Co*., 240 S.W.3d 864, 867 (Tex. 2007) (citations omitted) (the Court, however, did not reach the court of appeals' application of the economic loss rule).

[34]In *Signal Oil*, a defective reactor charge heater installed in a refinery's isomax unit ruptured, causing an explosion and fire that damaged the heater itself as well as other property; the refinery company sued for property damage and economic loss based on, *inter alia*, strict liability and implied warranty theories. 572 S.W.2d at 322-323. The Court remanded the breach-of-warranty claim for retrial, but concluded that the strict liability claim failed for failure to obtain a matching causation finding. *Id*. at 324-329, 331. In so doing, however, the Court noted that plaintiff, in alleging that the explosion and fire damaged not only the reactor heater, but also the catalyst, refinery product, other equipment in the unit, and other property in the area, " properly alleged a cause of action in strict liability" -- the Court explained: " Where such collateral property damage exists in addition to damage to the product itself, recovery for such damages are recoverable under Section 402A of the Restatement (Second) of Torts as damage to property or under the Texas Business and Commerce Code, Section 2.715, as consequential damages for a breach of an implied warranty. To the extent that the product itself has become part of the accident risk or the tort by causing collateral property damage, it is properly considered as part of the property damages, rather than as economic loss." *Id*. at 325 (footnote omitted). This language, in context, recognizes only that collateral property damage may be recoverable, and cannot be read as permitting recovery based on a products liability theory for damages to a defective product itself if there is also personal injury or injury to other property. *Cf. Equistar*, 240 S.W.3d at 868 (noting, in holding that Dresser's no-evidence objections failed to preserve a complaint about the jury charge, that " [e]ven if there had been no evidence of a tort duty, there was still no question that Dresser sold the compressor and impellers to Equistar and that implied warranties of merchantability existed at some point as to both" ; the damages questions

existed in the suit independent of the tort issues). The damage to the product is an economic loss recoverable in an action for breach of contract or breach of warranty. *See Murray v. Ford Motor Co.*, 97 S.W.3d 888, 892 (Tex.App.--Dallas 2003, pet. denied) (stating that " [n]o Texas court has applied the *Signal Oil & Gas Co. dicta* [to permit recovery of damages to the product in a strict liability action when accompanied by other injury]" ).

[35]This Court had held in *Jim Walter Homes, Inc. v. Reed* : " When the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone." 711 S.W.2d 617, 618 (Tex. 1986). *See also Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991) (" When the only loss or damage is to the subject matter of the contract, the plaintiff's action is ordinarily on the contract." ). We have repeatedly reaffirmed this rule. *Wansey v. Hole*, 379 S.W.3d 246, 248 (Tex. 2012) (per curiam) (" [A] duty in tort does not lie when the only injury claimed is one for economic damages recoverable under a breach of contract claim." ); *1/2 Price Checks Cashed v. United Auto. Ins. Co.*, 344 S.W.3d 378, 387 (Tex. 2011) (" [U]nder the economic loss rule, we have held that a claim sounds in contract when the only injury is economic loss to the subject of the contract itself." ); *Med. City Dallas, Ltd. v. Carlisle Corp.*, 251 S.W.3d 55, 61 (Tex. 2008) (" 'When the injury is only the economic loss to the subject of a contract itself, the action sounds in contract.'" (quoting *Am. Nat'l Petroleum Co. v. Transcon. Gas Pipe Line Corp.*, 798 S.W.2d 274, 282 (Tex. 1990), and *Jim Walter Homes*, 711 S.W.2d at 618)); *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 12 (Tex. 2007) (" The economic-loss rule . . . generally precludes recovery in tort for economic losses resulting from the failure of a party to perform under a contract." ). These cases have effectively limited *Montgomery Ward & Co. v. Scharrenbeck*, 146 Tex. 153, 204 S.W.2d 508, 510 (Tex. 1947); *see Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 45 (Tex. 1998) (explaining and distinguishing, in a fraudulent inducement suit, *DeLanney* and *Jim Walter Homes* ); *DeLanney*, 809 S.W.2d at 494-495 (in *Scharrenbeck*, the defendant agreed to repair a water heater; in failing to repair the water heater properly, the defendant breached its contract, and, " [i]n burning down plaintiff's home, the defendant breached a common-law duty as well, thereby providing a basis for plaintiff's recovery in tort" ) (citing *Jim Walter Homes* ); *Jim Walter Homes*, 711 S.W.2d at 618 (" The acts of a party may breach duties in tort or contract alone or simultaneously in both." (citing *Scharrenbeck* )).

[36] *See* Restatement, T.D. 1, § 3.

[37]Powers, *supra* note 22, at 482.

[38] *Id*. at 486-487. In *Nobility Homes*, the Court stated: "

Consumers have other remedies for economic loss against persons with whom they are not in privity. One of these remedies is a cause in negligence." 557 S.W.2d at 83. Professor Powers discounted the statement because the Court cited no authority, and because the defendant had not challenged its liability in negligence in this Court, hence the statement was unnecessary for the judgment. Powers, *supra* note 22, at 486-487. In any event, Professor Powers concluded, *Jim Walter Homes* had " laid to rest" any confusion, *id*. at 487, by stating that " [w]hen the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone", 711 S.W.2d at 618. In *Sharyland Water Supply Corp. v. City of Alton*, we agreed, despite the fact that the parties in *Jim Walter Homes* were in privity. 354 S.W.3d 407, 416 n.10 (Tex. 2011).

[39] *Equistar Chems., L.P. v. Dresser-Rand Co.*, 123 S.W.3d 584, 587 (Tex.App.--Houston [14th Dist.] 2003) (" [a]ssuming the compressors themselves are the product, any claim for damage to them had to be brought in a contract or warranty action . . ." ), *overruled on other grounds*, 240 S.W.3d 864, 867 n.2, 868 (Tex. 2007) (because the Court held that Dresser failed to preserve any complaint that the jury charge improperly allowed the jury to find both tort and contract damages by a single answer, the Court " express[ed] no opinion" on the court of appeals' discussion and application of the economic loss rule); *Murray v. Ford Motor Co.*, 97 S.W.3d at 891 (recovery denied for fire damage to negligently constructed vehicle) (" The economic loss rule applies to negligence claims as well as claims for strict liability." ); *Trans-Gulf Corp. v. Performance Aircraft Servs., Inc.*, 82 S.W.3d 691, 695 (Tex.App.--Eastland 2002, no pet.) (recovery denied for negligent repairs to a plane) (" Simply stated, a duty in tort does not lie under the economic loss rule when the only injury claimed is one for economic damages." ); *Coastal Conduit & Ditching, Inc. v. Noram Energy Corp.*, 29 S.W.3d 282, 286, 289-290 (Tex.App.--Houston [14th Dist.] 2000, no pet.) (gas lines operator not liable, for negligently marking and placing its lines, to company excavating for electrical conduits in the absence of a contractual relationship or a claim for personal injury or property damages); *Hou-Tex, Inc. v. Landmark Graphics*, 26 S.W.3d 103, 107 (Tex.App.--Houston [14th Dist.] 2000, no pet.) (seismic survey software developer not liable for negligence to a third-party oil and gas company that suffered only economic loss of drilling a dry well); *Indelco, Inc. v. Hanson Indus. N. Am.-Grove Worldwide*, 967 S.W.2d 931, 932-933 (Tex.App.--Houston [14th Dist.] 1998, pet. denied) (recovery denied for fire damage to negligently designed crane); *see also Hininger v. Case Corp.*, 23 F.3d 124, 127 (5th Cir. 1994) (recovery denied for lost business due to negligently designed combine).

[40] *Belt v. Oppenheimer, Blend, Harrison & Tate, Inc.*, 192 S.W.3d 780, 783 (Tex. 2006) (" Legal malpractice claims sound in tort." ); *Cosgrove v. Grimes*, 774 S.W.2d

662, 664 (Tex. 1989) (" An attorney malpractice action in Texas is based on negligence." ); *Willis v. Maverick*, 760 S.W.2d 642, 644 (Tex. 1988) (" A cause of action for legal malpractice is in the nature of a tort . . . ." ).

[41]Tex. Discip. R. Of Prof'l Conduct 1.04(d).

[42] *See, e.g., Murphy v. Campbell*, 964 S.W.2d 265, 269 (Tex. 1997) (" A plaintiff may obtain full redress [for accounting malpractice] in an action for negligence or breach of contract." ); Tex. Civ. Prac. & Rem. Code § 150.001-.003 (governing negligence suits against " licensed or registered professionals", defined to include " a licensed architect, licensed professional engineer, registered professional land surveyor, registered landscape architect, or any firm in which such licensed or registered professional practices, including but not limited to a corporation, professional corporation, limited liability corporation, partnership, limited liability partnership, sole proprietorship, joint venture, or any other business entity", *id*. § 150.001(1-a)).

[43]Section 552, entitled " Information Negligently Supplied for the Guidance of Others", states:

" (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

" (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

" (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

" (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

" (3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them."

Restatement (Second) of Torts § 552 (1977). Section 5 of the *Restatement (Third) of Torts: Liability for Economic Harm* " repeats § 552 with small changes." Restatement, T.D. 1, § 5 cmt. a.

[44]825 S.W.2d 439, 442-443 (Tex. 1991).

[45] *Barcelo v. Elliott*, 923 S.W.2d 575 (Tex. 1996).

[46]991 S.W.2d 787, 794 (Tex. 1999).

[47]314 S.W.3d 913, 920 (Tex. 2010).

[48] *Id*. at 921, 923-926.

[49] *See* Restatement, T.D. 1, § 5 cmt. a.

[50] *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 419 (Tex. 2011).

[51]Restatement, T.D. 2, § 6 cmt. b (the comment adds: " Allowing a suit against the architect of a project by a party who made a bid in reliance on a defective plan does not create comparable problems." ).

[52]Restatement, T.D. 1, § 5 cmt. a.

[53]Restatement, T.D. 2, § 6 cmt. b.

[54] *Id*.

[55]The *Restatement* posits the following situation in illustration 8 to section 3, borrowed from illustration 9 to section 552 of the *Restatement (Second)* :

City hires Engineer to test soil conditions at a site where it plans to erect a large building. City explains that Engineer's report will be distributed to prospective building contractors for use in estimating their costs. Engineer negligently submits an inaccurate report. Contractor wins the right to perform the construction, having relied on Engineer's report in preparing its bid. Engineer's errors cause Contractor to suffer losses in performing its contract with City. The contracts between Contractor and City, and between City and Engineer, do not preclude a claim by Contractor against Engineer [for negligent performance of services or negligent misrepresentation]. Engineer remains potentially liable to Contractor under either of those [torts].

Restatement, T.D. 1, § 3 cmt. f. But the *Restatement* adds:

Contractor could have insisted that City guarantee the soundness of Engineer's report, and City could have insisted that Engineer indemnify City for claims brought against it by Contractor. In effect, those contracts would have protected Contractor against the risk of errors by Engineer, and would have ensured that Engineer would bear the costs of its negligence.

*Id*.

[56] *Id*. § 3, reporter's note to cmt. f.

[57]Restatement, T.D. 2, § 6 cmt. b.

[58]Restatement, T.D. 1, § 3 cmt. f.

[59]Powers, *supra* note 22, at 521 n.205 (citation omitted).

[60]The following cases apply the economic loss rule: *BRW, Inc. v. Dufficy & Sons, Inc*., 99 P.3d 66 (Colo. 2004); *Hercules & Co., Ltd. v. Shama Restaurant Corp*., 566 A.2d 31 (D.C. 1989); *Fireman's Fund Ins. Co. v. SEC Donohue, Inc*., 176 Ill.2d 160, 679 N.E.2d 1197, 223 Ill.Dec. 424 (1997); *Terracon Consultants Western, Inc. v. Mandalay Resort Grp*., 125 Nev. 66, 206 P.3d 81 (Nev. 2009); *Floor Craft Floor Covering, Inc. v. Parma Cmty. Gen. Hosp. Ass'n*, 54 Ohio St. 3d 1, 560 N.E.2d 206 (Ohio 1990); *SME Indus., Inc. v. Thompson, Ventulett, Stainback and Assocs., Inc*., 2001 UT 54, 28 P.3d 669 (Utah 2001); *Blake Constr. Co., Inc. v. Alley*, 233 Va. 31, 353 S.E.2d 724, 3 Va. Law Rep. 1868 (Va. 1987); *Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist*., 124 Wn.2d 816, 881 P.2d 986 (Wash. 1994); *Excel Constr., Inc. v. HKM Eng'g, Inc*., 2010 WY 34, 228 P.3d 40 (Wyo. 2010).

The following do not: *Sullivan v. Pulte Home Corp*., 232 Ariz. 344, 306 P.3d 1 (Ariz. 2013) (noting that *Donnelly Constr. Co. v. Oberg/Hunt/Gilleland*, 139 Ariz. 184, 677 P.2d 1292 (Ariz. 1984), correctly implied that the economic loss doctrine would not apply to negligence claims by a plaintiff who has no contractual relationship with the defendant (citation omitted)); *A. R. Moyer, Inc. v. Graham*, 285 So.2d 397 (Fla. 1973) (though this case was limited to its facts, the economic loss doctrine was thereafter limited to products liability cases; *see Tiara Condo. Ass'n v. Marsh & McLennan Cos*., 110 So.3d 399 (Fla. 2013)); *Craig v. Everett M. Brooks Co*., 351 Mass. 497, 222 N.E.2d 752 (Mass. 1967); *Prichard Bros., Inc. v. Grady Co*., 428 N.W.2d 391 (Minn. 1988); *Bilt--Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 581 Pa. 454 (Pa. 2005); *Forte Bros., Inc. v. Nat'l Amusement, Inc*., 525 A.2d 1301 (R.I. 1987); *Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc*., 320 S.C. 49, 463 S.E.2d 85 (S.C. 1995); *Eastern Steel v. City of Salem*, 209 W.Va. 392, 549 S.E.2d 266 (W. Va. 2001).

For a survey of case law both ways, *see* Marc Schneier, Annotation, *Tort Liability of Project Architect or Engineer for Economic Damages Suffered by Contractor or Subcontractor*, 61 A.L.R.6th 445 (2011).

---------

**460 S.W.3d 220 (Tex.App.-Austin 2015)**

**Tom Bennett and James B. Bonham Corp., Appellants**

**v.**

**Larry Wayne Grant, Appellee**

**No. 03-11-00669-CV**

**Court of Appeals of Texas, Third District, Austin**

**March 20, 2015**

Petition for review filed by, 07/06/2015

[Copyrighted Material Omitted]

[Copyrighted Material Omitted]

[Copyrighted Material Omitted]

[Copyrighted Material Omitted]

[Copyrighted Material Omitted]

[Copyrighted Material Omitted]

FROM THE DISTRICT COURT OF SAN SABA COUNTY, 33RD JUDICIAL DISTRICT. NO. 8086, HONORABLE GUILFORD L. JONES III, JUDGE PRESIDING.

Reformed and, as Reformed, Affirmed on Motion for Rehearing.

For Appellee: Mr. Don Cruse, Law Office of Don Cruse, Austin, TX.

For Appellant: Mr. D. Todd Smith, Smith Law Group,

P.C., Austin, TX.

Before Chief Justice Rose, Justices Pemberton and Field.

### ON MOTION FOR REHEARING

Scott K. Field, Judge

### OPINION

We withdraw the opinion dated August 13, 2014, and the supplemental opinion and judgment dated September 26, 2014, and substitute the following opinion and judgment in their place. We deny the Appellants' motion for rehearing.

This suit arises from a now infamous feud between neighboring cattle ranchers in San Saba, the details of which have been thoroughly relayed in prior opinions of this Court and the Texas Supreme Court. *See Bennett v. Reynolds*, 242 S.W.3d 866 (Tex.App.--Austin 2007), *rev'd & remanded in part by* 315 S.W.3d 867 (Tex. 2010) ( *Bennett I* ). The feud between cattle ranchers Thomas O. Bennett and Randy Reynolds has many turbulent twists and turns, *see id*., but the gist of the dispute and subject of prior appeals involved allegations that thirteen head of cattle belonging to Reynolds had wandered onto Bennett's ranch, and that instead of returning them in a neighborly fashion, Bennett ordered his ranch hand--Larry Grant--to round up the cattle and sell them at auction. Grant testified that he raised concerns with Bennett that the cattle did not belong to him, but Bennett ignored his concerns.[1] Worried that he could be implicated in cattle theft, Grant purchased a disposable camera and took several photos of the cattle loaded on Bennett's trailer prior to the sale. Within two months of the sale, Grant left his employment with Bennett but kept the secret photos stashed away in a box in his home where they were seemingly forgotten and left undisturbed for almost a year. Reynolds, however, eventually learned of the secret photos after a chance encounter with Grant's brother-in-law and demanded that Grant turn the photos over to the authorities. What happens next is hotly disputed and the subject of litigation between Bennett and his former ranch hand, Grant, which gave rise to this appeal.

After Reynolds attempted to obtain the photos, Grant testified that he was distressed and began drinking beer and smoking marijuana to relieve tension. He then made a series of phone calls to Bennett and Bennett's friend and employee, Don " Ex" Rogers. Grant testified that the

purpose of the calls was to inform Bennett of the pictures and give him an opportunity to "make it right" with Reynolds. Bennett and Rogers' version, however, depicts Grant as calling to try and sell the photographs to Bennett. Grant acknowledged he had some discussion with Rogers about selling the photos to Bennett but testified that they only "joked about it." It was no joke, however, when Grant turned the photos over to law enforcement about a month after these conversations and triggered an extraordinary series of events. First, Bennett was indicted for cattle theft based in part on Grant's testimony and photos. Although ultimately acquitted of the criminal charges, Bennett and his cattle company,

**Page 229**

the James B. Bonham Corporation, were found liable for conversion in a civil suit brought by Reynolds resulting in a judgment of $5,327.11 in actual damages. The actual damages, however, paled in comparison to the combined exemplary damages of $1.25 million awarded amidst allegations that Bennett had willfully sold his neighbor's cattle to settle a score in a long-standing feud and then attempted to cover his actions by--among other allegations--threatening and bribing witnesses, tampering with the photographs Grant had taken to alter the images of the brands on the cattle to look like his own brand, and even attempting to register his neighbor's brand as his own with the district clerk of San Saba County. Such allegations and such a large exemplary damages award are extraordinary by themselves,[2] but it is only half of the story and less than half of the total liability adjudged against Bennett and the Bonham Corporation from these events.

The other half is the subject of this appeal--a $2.28 million judgment awarded to Grant for a successful malicious prosecution claim brought against Bennett and the Bonham Corporation. This claim arose from Bennett's admitted, yet ultimately unsuccessful, campaign to have Grant imprisoned after he turned the photos over to authorities. In this appeal, Bennett and the Bonham Corporation (collectively, Appellants) contest the judgment in Grant's malicious prosecution suit, contending: (1) legally insufficient evidence supported the malicious prosecution claim; (2) legally and factually insufficient evidence supported the $10,703 awarded in compensatory damages; (3) legally insufficient evidence supported the jury's findings allowing for the imposition of exemplary damages over the statutory cap; and (4) the total $2 million exemplary damages award ($1 million against Bennett and $1 million against the Bonham Corporation) violated due process. Individually, the Bonham Corporation raises several arguments challenging its liability in the suit, and Bennett challenges a $269,644.50 sanction. We conclude that the award of exemplary damages failed to comport with due process requirements and required remittitur, but

otherwise uphold the trial court's judgment.

## MALICIOUS PROSECUTION

### A. Background Facts

On the evening of October 4, 2001, telephone records confirm that Grant called and spoke with Bennett for thirteen minutes, but the topic of conversation that evening is hotly disputed by the parties. As previously discussed, Grant testified that he called to inform Bennett about the pictures and to give him an opportunity to "make it right" with Reynolds. Bennett, however, testified that Grant called to try and sell the photos to him for $5,000. What is undisputed, however, is that Bennett waited nearly two years to report his allegations against Grant to the authorities. Indeed, Bennett testified that it was not until after his criminal trial that he decided to report the incident to authorities and acknowledged at trial that his sole "goal" in reporting the incident was to put "Grant in prison . . . for what he's done to me." In furtherance of his goal, Bennett testified he met with law enforcement authorities in four separate counties in an attempt to get Grant indicted for attempted blackmail. After authorities in San Saba County, Llano County, and Coleman County refused to prosecute Grant, Bennett met with the district attorney in Navarro

**Page 230**

County and requested he prosecute the case.

According to the district attorney's testimony, the following events then transpired. After his initial meeting with Bennett, the district attorney believed that if an attempted blackmail had occurred, it was a federal offense and referred the matter to the federal authorities. Unhappy with this outcome, Bennett again approached the district attorney but this time with a new theory--requesting that Grant be prosecuted for attempted theft. The district attorney informed Bennett he could not bring charges for misdemeanor attempted theft because it was barred by the two-year statute of limitations. Undeterred, Bennett then provided the district attorney with new information, alleging--for the first time--that Grant had attempted to extort money from him a second time within the limitations period. The district attorney testified that he was "skeptical" of this new evidence because it "appeared that there was maybe some tailoring of the facts going on to fit the statute." Indeed, in his sworn testimony in this case, Bennett made no mention of a second attempted blackmail by Grant. Rather, he unequivocally testified that all the factual accusations against Grant occurred in a single evening on October 4, 2011. The district attorney further testified that, based on his conversations with Bennett about the case, he formed the impression that Bennett's motive for prosecuting Grant was to gain an advantage in civil

litigation arising from the case. Being " suspicious" of Bennett's new evidence, the district attorney decided to " dig in his heels" and refused to prosecute.

Still undeterred, Bennett met with an attorney who testified that he had represented the Bonham Corporation for over twenty years and that Bennett directed him to research and draft a legal brief advocating that Grant's alleged actions constituted a criminal offense that should be prosecuted. The district attorney testified that it was this brief or another meeting with Bennett that finally was the " catalyst" that prompted him to bring the case to the grand jury. He further testified that it was " rare" for him to bring misdemeanor cases to the grand jury because he himself had the authority to bring misdemeanor charges without grand jury involvement. But, in this case, he finally yielded to Bennett's demands because he did not want to appear " draconian" in his refusal to bring charges. The district attorney may have been finally persuaded to present the case, but the grand jury was not as persuaded and refused to indict Grant.

Frustrated that the grand jury had not indicted Grant, Bennett testified he again met with the same attorney who this time advised him to get a special prosecutor appointed in Navarro County to bring the case before the grand jury a second time. After the attorney explained to him the procedure for appointing a special prosecutor, Bennett testified he had the attorney draft a petition alleging the district attorney had a conflict of interest and accusing him of taking no action in the case.[3] The petition further sought the appointment of Robert Dunn--a local attorney and neighbor of Bennett's--as a special prosecutor for the case. Bennett, who resided and ran a cattle ranch in Navarro County, testified that he then led the effort to circulate and obtain over 250 signatures from Navarro County residents for the petition seeking the appointment of Dunn as special prosecutor for the case. Bennett testified that others helped with the

**Page 231**

 petition but that " it was mostly me . . . I think I done most of it." The district attorney, who was now seeking reelection in a hotly contested race, testified that he was unaware that Bennett was leading this campaign throughout the county until Bennett showed up at his office for a final meeting. Bennett, with the signed petitions in hand, then accused the district attorney of being partial and unfair when he presented Grant's case to the grand jury and demanded that Dunn be appointed special prosecutor in the case. Feeling that Bennett's petition campaign " wasn't helping" his chances of reelection, the district attorney testified that he agreed to the appointment of Dunn as special prosecutor in the case.[4]

Ultimately, Bennett was successful in his goal of getting Grant indicted, as the special prosecutor presented the case for a second time to the grand jury--more than four years after the phone call between Grant and Bennett occurred--but this time obtained indictments for the felony offenses of tampering with a witness and attempted bribery. The special prosecutor testified that in deciding whether to present the case to the grand jury, he interviewed both Bennett and Rogers but exercised independent discretion in ultimately determining whether there was sufficient evidence to prosecute the case. He testified further that he relied on evidence other than Bennett's and Rogers' statements in his decision to prosecute. When asked, however, whether Bennett's and Rogers' statements were " very material to [his] decision to proceed to the grand jury," the special prosecutor acknowledged that the statements were " definitely" very material to his decision. Further, he acknowledged testifying during his deposition that he " would not have presented" the case to the grand jury if he had believed Bennett " was making untrue statements." He also testified that if he believed there had been a " tailoring of the facts" by Bennett--as the Navarro County district attorney believed--that it would have affected his decision to go to the grand jury.[5] Grant maintained throughout trial that both men had lied to the authorities about the alleged blackmail.

Further, some of the evidence Bennett presented to the special prosecutor appears from the record to have differed from the initial evidence presented to the district attorney. First, there is no evidence in the record that Bennett reported to the special prosecutor two incidents of alleged extortion occurring on different dates--as he had to the district attorney. Rather, the special prosecutor testified only as to the alleged misconduct occurring during phone conversations on October 4, 2011, and the indictment alleged only one count--not two--of the charged offenses. Second, Bennett added a new detail to his allegations, contending for the first time that Grant had specifically asked him to pay $5,000 for the pictures. In a previous written statement to the authorities, Bennett did not allege a specified amount in his extortion claims. The Navarro County district attorney also did not recall Bennett telling him this detail, and it would have been material to how he presented the case to the grand jury because

**Page 232**

 the amount of money at issue increased the degree of the offense.[6] *See* Tex. Penal Code § 31.03(e) (value of property involved in theft dictates classification of offense). Finally, the special prosecutor additionally testified that in deciding to prosecute the case, he relied--in part--on a transcript from Bennett purportedly transcribing secretly-taped " conversations" with Grant that substantiated Bennett's claim that Grant had sought $5,000

from him. If this transcript was also given to the district attorney, he made no reference to it in his testimony.

Regarding the transcript, the special prosecutor testified that initially Bennett presented him with a tape recording of "conversations" but that he was unable to understand it because it was "awful garbled." Bennett then gave him a transcript purportedly transcribing the tape. The special prosecutor could not testify as to when the tape was allegedly recorded, but it appears from his testimony that he believed the tape was a recording of the actual telephone conversations reflected on Grant's telephone bill or conversations related directly to those phone records. He further testified that the taped conversations substantiated Bennett's claim that Grant had specifically sought "$5,000" for the pictures. This transcript, however, was destroyed when Grant's record was later expunged. Besides this information, there is no additional information in the record as to what was reflected in the transcript or the tape. Bennett himself testified at trial that he had secretly recorded a conversation with Grant and had presented this tape to law enforcement, but this tape recorded only a single conversation between Grant and Bennett occurring almost a year *prior* to Grant's alleged extortion. As such, there is no mention on the tape of the photographs or a demand for $5,000. Indeed, when the special prosecutor was presented with a transcript of the tape Bennett testified to presenting to other law enforcement, the special prosecutor testified that he had never seen it before, and it was "completely different" than the transcript Bennett had given him.

Bennett's plan to imprison Grant seemed to finally be coming to fruition when the special prosecutor then took this evidence to a second grand jury and succeeded in obtaining two felony indictments, and Grant surrendered himself to authorities. But Bennett's long and hard-fought quest ended nine months later, when both of Grant's indictments were quashed because the charges had been filed past the statute of limitations. Further, the trial court granted Grant's motion to have his arrest and indictments expunged from his record as void. Upon expunction, Grant--who was already being sued by Bennett for slander--added a counterclaim against Bennett and the Bonham Corporation for malicious criminal prosecution.[7] Upon hearing the preceding evidence, the jury found that Bennett and the Bonham Corporation had indeed maliciously prosecuted Grant. They appeal, contending there is insufficient evidence of a malicious prosecution. Appellants' claim requires us to first expound upon the law of malicious prosecution.

### B. Malicious Prosecution

Malicious prosecution is an unusual tort in that it requires the court to

balance society's interest in protecting private persons who report criminal conduct with the individual citizen's interest in being protected against unjustifiable and oppressive litigation of criminal charges. *Browning-Ferris Indus. v. Lieck*, 881 S.W.2d 288, 290-91 (Tex. 1994). In that regard, the Texas Supreme Court has instructed us that the balance between these important interests is maintained by strictly adhering to the defined elements of an action for malicious prosecution and that even a small departure from the exact prerequisites for liability may threaten this delicate balance. *Id*. But, "as with any other cause of action, if the elements of malicious prosecution are proved, liability is established." *Id*. at 291. Those elements are: (1) the commencement of a criminal prosecution against the plaintiff; (2) causation of the action by the defendant; (3) termination of the prosecution in the plaintiff's favor; (4) the plaintiff's innocence; (5) the absence of probable cause for the proceedings; (6) malice in filing the charges; and (7) damages. *Richey v. Brookshire Grocery Co*., 952 S.W.2d 515, 517 (Tex. 1997).

Appellants do not dispute the jury's findings that there was no probable cause to prosecute Grant, that Grant was innocent of the charges, and that Bennett acted with malice in pursuing the charges. Rather, they argue only that there is legally insufficient evidence that Bennett's conduct caused the commencement of a criminal prosecution against Grant. The causation element of malicious prosecution requires evidence that a defendant "initiated" or "procured" a criminal prosecution. *Lieck*, 881 S.W.2d at 292. A person initiates a criminal prosecution if he makes a formal charge to law enforcement authorities. *Id*. Here, there is no evidence in the record that Bennett filed any formal charges; Grant, therefore, relies on procurement. A person "procures" a criminal prosecution "if his actions are enough to cause the prosecution, and but for his actions the prosecution would not have occurred." *Id*. Thus, procurement requires that a person's actions be both a "necessary and a sufficient cause of the criminal prosecution." *Id*. Appellants argue there is no evidence Bennett "procured" Grant's criminal prosecution because the prosecutors involved acted with independent discretion, and their exercise of discretion was a superceding, intervening cause of the prosecution that destroyed his own liability in bringing about the charges. Appellants are correct that generally a person cannot procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another because the independent exercise of discretion destroys the necessary causal link between the defendant and the prosecution. *See id*. There are, however, two important exceptions to this rule where a defendant may still be liable for malicious prosecution because his actions are such that it makes an intelligent exercise of discretion impossible: (1) when a defendant

provides information which he knows is false that causes a criminal prosecution, or (2) when a defendant's conduct was the determining factor in the prosecutor's decision to prosecute. *See id*. at 292--94. We conclude there is legally sufficient evidence to support the jury's finding of causation under both exceptions.

**1. Legally sufficient evidence Bennett procured Grant's prosecutions by providing false information.**

The first exception is when a defendant provides information which he knows is false that causes a criminal prosecution. *See id*. at 293. For this exception, the plaintiff must prove both that the defendant knowingly furnished false information to authorities, and that but for such

**Page 234**

false information, the prosecutor would not have decided to prosecute. *King v. Graham*, 126 S.W.3d 75, 76 (Tex. 2003). The prosecutor's reliance on the false information makes an intelligent exercise of discretion impossible and establishes the causal link necessary to hold the defendant liable for malicious prosecution. *See id*. at 78. But, if the decision to prosecute would have been made with or without the false information, the defendant did not cause the prosecution by supplying false information. A single prosecution may, however, be procured by more than one person. *Lieck*, 881 S.W.2d at 292.

Appellants challenge only the legal sufficiency of the jury's finding that Bennett procured Grant's prosecution. A party challenging the legal sufficiency of the evidence supporting an adverse finding on an issue for which the opposing party bears the burden of proof will prevail if there is a complete absence of evidence of a vital fact or if the evidence offered to prove a vital fact is no more than a scintilla. *See Waste Mgmt. of Tex., Inc. v. Texas Disposal Sys. Landfill, Inc*., 434 S.W.3d 142, 2014 WL 1875637, at *8 (Tex. 2014); *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). More than a scintilla exists when the evidence as a whole rises to a level enabling reasonable and fair-minded people to have different conclusions. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). In conducting a legal-sufficiency review, we consider the evidence in the light most favorable to the judgment, crediting evidence that a reasonable fact finder could have considered favorable and disregarding unfavorable evidence unless the reasonable fact finder could not. *City of Keller*, 168 S.W.3d at 807. We indulge every reasonable inference that supports the jury's findings. *Id*. at 822. Therefore, we must uphold the jury's verdict unless--after viewing the evidence in the light most favorable to the jury's verdict and disregarding contrary evidence unless a reasonable jury could not--there is no more than a scintilla of evidence to support the finding of procurement.

Reviewing the evidence in the light most favorable to the jury's verdict, the Navarro County district attorney believed Bennett's claims were barred by limitations and would never have brought this case before the grand jury but for Bennett changing his story to add an additional claim of extortion occurring within the limitations period. As Grant testified this was a false allegation, we will assume--for purposes of our analysis--that the allegation was false, and there is more than sufficient evidence that the false allegation was the but-for cause of the prosecutor presenting the case to the grand jury. Traditionally, however, the tort of malicious prosecution does not arise until process is issued, an indictment is returned, information filed, or the accused is arrested. *See* Restatement (Second) of Torts § 654 (1977). Here, there is no evidence in the record that any of these events occurred with regard to this first proceeding before the grand jury or that Grant was aware of or suffered damages from this proceeding. Accordingly, the bulk of our analysis must focus on the second presentment of the case to the grand jury by the special prosecutor, which ultimately resulted in two indictments and Grant's arrest.

Viewing the evidence regarding the second grand jury proceeding in the light most favorable to the verdict, we conclude there was more than a scintilla of evidence to support the jury's finding that Bennett procured the prosecution. The special prosecutor acknowledged in his testimony that Bennett's statements were " definitely . . . very material" to his decision to proceed to the grand jury. He further acknowledged

**Page 235**

that if he had believed Bennett's statements were untruthful, then he " would not have presented" the case to the grand jury. Assuming Bennett's statements were false, the special prosecutor's testimony provides more than a scintilla of evidence that Bennett was a necessary and sufficient cause of the prosecution. *Compare King*, 126 S.W.3d at 79 (holding insufficient evidence of causation where " [n]othing in the record shows that the false information was material to the decision to prosecute" ). Further, there was additional evidence that the special prosecutor relied on the transcript that Bennett had given him allegedly transcribing secretly-taped conversations with Grant. From the record, there was sufficient evidence for the jury to infer that Bennett had fabricated this evidence and that it was a material cause of the prosecution, as the special prosecutor testified that the transcript substantiated Bennett's claim that Grant had sought $5,000 from him.

For legal sufficiency review, we consider the evidence in the light most favorable to the judgment,

crediting evidence that a reasonable fact finder could have considered favorable and disregarding unfavorable evidence unless a reasonable fact finder could not. *See City of Keller*, 168 S.W.3d at 827. We note here the special prosecutor testified that--in addition to the information provided by Bennett--he also relied on Grant's sworn testimony from Bennett's prior criminal trial for cattle theft. At that trial, the special prosecutor testified Grant purportedly admitted making a phone call to Rogers seeking money for the pictures but alleged he was only " joking." [8] The special prosecutor testified that in his opinion Grant " tried to cover himself" by alleging that it was a joke, and when asked whether he would have prosecuted based solely on this testimony, he responded: " *I think so*, because the fact is that he admitted making the calls." (emphasis added). When a prosecutor relies on evidence independent of the false information provided by the defendant, the defendant " cannot be said to have caused the prosecution if the [false] information was immaterial to the decision to prosecute." *King*, 126 S.W.3d at 78. The special prosecutor, however, had previously acknowledged that Bennett's evidence was definitely very material to his decision to prosecute and that he would not have presented the case if he had thought Bennett was providing false information.[9]

To the extent there is any conflict in the special prosecutor's testimony as to the cause of the prosecution, causation is generally a question of fact for the jury, *see Rodriguez v. Moerbe*, 963 S.W.2d 808, 818--19 (Tex.App.--San Antonio 1998, pet. denied), and there is more than a scintilla of evidence to support the jury's fact finding

**Page 236**

that Bennett's false information was a necessary and sufficient cause of the prosecution. Further, the jury was entitled to resolve any conflicts in the special prosecutor's testimony and could choose to believe or disbelieve all or part of his testimony. *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986) (jury may " resolve inconsistencies in the testimony of any witness" ); *see also City of Keller*, 168 S.W.3d at 819 ( " Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony. . . . Reviewing courts cannot impose their own opinions to the contrary." ). Consequently, we conclude a reasonable jury could find that the false information provided by Bennett was a necessary and sufficient cause of Grant's prosecution and disregard any contrary evidence. After reviewing the evidence under the appropriate standard, we conclude there is legally sufficient evidence to support the jury's finding that Bennett procured Grant's criminal prosecution by providing false information.

### 2. Legally sufficient evidence Bennett procured

**Grant's prosecution by other improper conduct.**

The second exception in which a defendant may be liable for malicious prosecution is " when his conduct is the determining factor in the prosecutor's decision to prosecute." [10] *See Lieck*, 881 S.W.2d at 294. For this exception to be applicable, it must " appear that [the defendant's] desire to have the proceedings initiated, expressed by direction, request or pressure of any kind, was the determining factor in the official's decision to commence the prosecution." *Id.* (quoting Restatement (Second) Torts § 653 (1977)). The Texas Supreme Court in 1994 adopted this exception set out in the Restatement of Torts. *See id.* We note, however, that the parties have not cited to, and we have not found, any Texas case that has determined what type of conduct would constitute " procurement" under this exception. *See* Michol O'Connor, O'Connor's Texas Causes of Action, ch. 19-A, at 572 (2014) ( " No Texas court has determined what type of conduct, other than providing false information, would constitute procurement." ). After careful review of the record in this case, we conclude this is the rare case where the defendant engaged in such an intentional and systematic abuse of the justice system that there was sufficient evidence his conduct was the determining factor in the prosecution.

As there are no examples under Texas case law, we will draw upon the Restatement itself for guidance. The Restatement provides the following example as illustration of this exception:

A goes to B, a district attorney and informs him that C has committed a battery upon A. A is a political boss to whom B owes his election. A demands that B prosecute C. The battery is one that has created no public disturbance and is therefore an offense for which a public prosecutor would not ordinarily institute proceedings. In compliance

**Page 237**

with A's demand, B files an information against C. A has procured the institution of the proceeding.

Restatement (Second) Torts § 653 (1977). In the example, the defendant procured the prosecution by exerting improper pressure on the district attorney to bring charges that ordinarily would not have been filed. Similarly, in this case, there is legally sufficient evidence in the record that Grant would not have been prosecuted but for Bennett's acknowledged and systematic campaign to improperly influence the proceedings. First, the Navarro County district attorney testified emphatically that although he had the authority to file an information charging Grant with misdemeanor attempted theft, he " dug in his heels" and steadfastly refused to press charges against Grant because of the statute of limitations and because he believed Bennett

had been tailoring the facts to create a chargeable offense. Only after immense pressure from Bennett and some altering of the facts, did the district attorney finally yield and agree to bring the misdemeanor case before the grand jury. He testified, however, that ordinarily he would not have presented this misdemeanor case to the grand jury but only did so because of Bennett's unceasing demands. Like the example in the Restatement, this proceeding before the grand jury would never have occurred but for Bennett exerting such pressure on the district attorney that his desire to have the proceeding commenced was the determining factor in the district attorney's decision to prosecute.

After the grand jury refused to indict, Bennett--undeterred in his goal of having Grant imprisoned--then organized and led an extraordinary petition campaign to put in place a hand-picked special prosecutor to indict Grant. At a time when the district attorney was facing a heavily-contested election, Bennett then came to the district attorney's office with the petitions demanding the appointment of his special prosecutor to the case. Feeling Bennett's petition campaign " wasn't helping" his chances of reelection, the district attorney again yielded to Bennett's demands. Here, like the example in the Restatement, Grant's second prosecution was a proceeding that would have never occurred but for Bennett's exertion of untoward pressure on the district attorney. Undoubtedly, there is more than a scintilla of evidence that Bennett's acknowledged and systematic campaign to improperly influence judicial proceedings was the determining factor in the prosecution.

Accordingly, we conclude there is legally sufficient evidence that Bennett procured Grant's prosecution by either providing false information to authorities or by engaging in such a systematic and untoward campaign to influence judicial proceedings that his conduct was the determining factor in the prosecution.

### CORPORATE LIABILITY

Having found sufficient evidence of Bennett's liability in this suit, we next address Bonham's liability. With regard to Bonham, the jury made several alternate findings imputing corporate liability on Bonham for the malicious prosecution. First, under the malicious prosecution question, the jury found that both Bennett and Bonham--through an agent--had maliciously prosecuted Grant. Second, the jury found that Bennett was acting in his capacity as a vice-principal of Bonham when he maliciously prosecuted Grant. Finally, the jury found that Bonham was responsible for Bennett's conduct under a " reverse-piercing" theory of liability. In two individual issues, Bonham contests its liability, arguing: (1) that it was improperly joined as a party to the suit and (2) there is no

evidence to support the jury's findings of corporate liability.

Page 238

### A. Joinder

In its first individual issue, Bonham contends that it was improperly joined as a party to this suit. A trial court is given a great deal of discretion in matters of joinder, and its decision on such procedural issues will not be disturbed on appeal absent an abuse of discretion. *Varme v. Gordon*, 881 S.W.2d 877, 882 (Tex.App.--Houston [14th Dist.] 1994, writ denied). A trial court abuses its discretion when it has acted in an unreasonable or arbitrary manner, or when it acts without reference to any guiding principle. *Coburn v. Moreland*, 433 S.W.3d 809, 823 (Tex.App.--Austin 2014, no pet.). A trial court's decision on the matter of the joinder of an additional party is " generally based on practical considerations with a view to fair, orderly and timely prosecution and disposal of pending litigation." *Fireman's Fund Ins. Co. v. McDaniel*, 327 S.W.2d 358, 373 (Tex.Civ.App.--Beaumont 1959, no writ).

Bonham's misjoinder claim necessitates a brief review of this case's procedural history. This suit was originally initiated by Bennett--the plaintiff in this suit--filing an original petition suing Grant for slander. In his original answer, Grant asserted a counterclaim against Bennett for intentional infliction of emotional distress. Later, in an amended pleading, Grant added Bonham as an additional counter-defendant to his intentional infliction of emotional distress claim. Upon request of the trial court, Grant then filed a motion seeking leave to include Bonham in the suit. Grant's motion for leave sought to add Bonham as a party to the suit on the grounds that Bonham was Bennett's alter ego, and his claims of intentional infliction of emotional distress against both Bennett and Bonham " arose from the same transaction, occurrence, or series of transactions or occurrences . . . and the questions of law and fact in this case are common to both [Bennett and Bonham]." After a hearing, the trial court granted the motion without stating the grounds for the joinder and ordered Grant to serve Bonham with process. After being served, Bonham answered as a party to the suit without further objection. Later, after Bonham had entered an appearance in the suit, Grant again amended his pleadings to add--after his indictments were expunged--an additional counterclaim against Bennett and Bonham for malicious prosecution. Bonham answered the malicious prosecution claim without objection.

On appeal, however, Bonham contends it was improperly joined in the lawsuit under Texas Rule of Civil Procedure 38. *See* Tex. R. Civ. P. 38. Rule 38 provides that a defendant may bring in a third party to a suit if that person is or may be liable to him or the plaintiff for all or part of

the plaintiff's claim against him. *Id*. A third-party action under Rule 38 is not an independent cause of action but is derivative of the plaintiff's claim. *Id*.; *see In re Seven-O Corp*., 289 S.W.3d 384, 390 (Tex.App.--Waco 2009, orig. proceeding [mand. denied]). Here, we agree with Bonham that Grant's claim asserting an independent cause of action against it for intentional infliction of emotional distress was not a third-party claim as contemplated by Rule 38. Grant did not assert--as Rule 38 requires--that Bonham was liable for all or part of Bennett's slander claim against him. Rather, Grant sought to join Bonham as an additional party to his counterclaim seeking affirmative relief for intentional infliction of emotional distress.

We cannot, however, conclude that Bonham has proven the trial court abused its discretion by allowing the joinder because our rules of civil procedure otherwise permit the joinder of a non-party to a previously filed counterclaim. Texas Rule of Civil Procedure 97

Page 239

 provides that additional persons--other than those made parties to the original action--may be made parties to a counterclaim in accordance with the provisions of Rule 39 (" Joinder of Persons Needed for Just Adjudication" ) and Rule 40 (" Permissive Joinder of Parties" ). *See* Tex. R. Civ. P. 39, 40, 97(f); *see also* Tex. R. Civ. P. 37 (" Before a case is called to trial, additional parties necessary or proper parties to the suit, may be brought in, either by the plaintiff or the defendant upon such terms as the court may prescribe." ). Thus, non-parties must be joined as additional defendants to a counterclaim if in their absence complete relief cannot be afforded among the parties. *See* Tex. R. Civ. P. 39, 97(f). In addition, the trial court has the discretion to permit the joinder of additional defendants to a counterclaim under the permissive joinder provisions of Rule 40. *See* Tex. R. Civ. P. 40 (" All persons may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all of them will arise in the action" ), 97(f) (persons other than those made parties to the original action may be made parties to a counterclaim in accordance with the provisions of Rule 40).[11]

Further, we note that once Bonham entered an appearance in this suit, Grant was entitled to assert his additional counterclaim against Bonham for malicious prosecution without further service of process. *See* Tex. R. Civ. P. 97(b), 124. Under these circumstances, we cannot conclude--nor has Bonham proven--that the trial court abused its discretion by permitting the joinder. *See Varme*, 881 S.W.2d at 883 (" We emphasize that the trial court is given great discretion over joinder questions." ). Accordingly, we overrule Bonham's joinder arguments.[12]

### B. Corporate Liability

In its second individual issue, Bonham contends there is no evidence to support the jury's finding of corporate liability. Corporations can act only through human agents, and when " actions are taken by a vice-principal of a corporation, those acts may be deemed to be the acts of the corporation itself." *See GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 618 (Tex. 1999); *see also Qwest Int'l Commc'ns, Inc. v. AT& T Corp*., 167 S.W.3d 324, 326 (Tex. 2005) (corporation is liable for exemplary damages if it acts with malice through the actions of a vice-principal). A corporation, however, cannot be liable for damages " if the vice-principal's misconduct occurred while he was acting in a personal capacity unrelated to his authority as a corporate vice-principal." *Bennett I*, 315 S.W.3d at 884. A vice-principal of a corporation is a person who " represents the corporation in its corporate capacity, and includes persons who have authority to employ, direct,

Page 240

 and discharge servants of the master, and those to whom a master has confided the management of the whole or a division of his business." *Id*. at 883.

Regarding Bennett's relationship with Bonham, the Texas Supreme Court in *Bennett I* concluded that Bennett was " indisputably a vice-principal of the Bonham Corporation, he was most likely the only vice-principal and the only person whose conduct and decisions could subject the corporation to exemplary damages." *Id*. at 884. In this case, similar evidence was presented that, although Bonham was putatively owned by Bennett's daughters, the daughters had no control over the corporation and received no profits, and Bennett himself exclusively controlled and profited from Bonham. Bennett testified that he did not own a home or a vehicle and did not have a bank account but lived rent-free in a home owned by Bonham, drove Bonham vehicles, and " did whatever [he] wanted to with the corporation bank account." On this record, Bonham concedes that Bennett was indisputably a vice-principal of Bonham. Instead, Bonham argues only that there is insufficient evidence to support the jury's finding that Bennett was acting in his capacity as a vice-principal of Bonham when he maliciously prosecuted Grant.

In its brief, Bonham attempts to distinguish this case from *Bennett I*, in which the Texas Supreme Court found there was " ample evidence" that Bennett was acting in his corporate capacity when he converted Reynolds' cattle using " corporate authority over corporate employees, on corporate land, [and] using corporate equipment." *Id*. at

885. Bonham argues in its brief that in contrast to *Bennett I*, " the instant case does not involve the use of corporate property or the exercise of corporate privileges to accomplish the underlying tort." We conclude, however, that in this case there is, again, more than ample evidence to impart corporate liability on Bonham.

Reviewing the record, Bennett's malicious prosecution of Grant involved several courses of conduct that implicate Bonham. First, Bennett contacted an attorney who had an ongoing attorney-client relationship with Bonham and directed him to research whether Grant's alleged actions constituted a criminal offense. The attorney then drafted a brief based on his legal research advocating that Grant be charged with attempted theft. The brief was sent to the Navarro district attorney and described as a " catalyst" in the district attorney's decision to bring the case before a grand jury. This same attorney was also pivotal in later advising Bennett to seek the appointment of a special prosecutor to the case and then drafted the petition accusing the Navarro County district attorney of bias. The attorney testified at trial that he had an ongoing attorney-client relationship with Bonham since 1982. When asked whether he had ever done any personal work for Bennett, the attorney answered: " I don't remember ever doing anything for Mr. Bennett except a will one time."

Bennett's malicious prosecution of Grant was further accomplished by traveling many miles in a Bonham vehicle to meet with officials in four different counties to have Grant prosecuted. Bennett testified at trial that he did not own a vehicle and acknowledged that he used Bonham vehicles to accomplish this phase of the malicious prosecution. When asked whether he ever used Bonham's vehicles for personal use, Bennett responded " I don't have much personal business." Bennett's lack of personal business was further exemplified when he testified that he directed a Bonham employee to type a transcript of his alleged secretly-taped conversation with Grant. He then testified that he

**Page 241**

presented this typed transcript to law enforcement in his attempts to prosecute Grant. The employee who typed the transcript served as Bonham's corporate representative at trial." [13]

Viewing the foregoing evidence in the light most favorable to the jury's verdict, we conclude there is more than a scintilla of evidence to support the jury's finding that Bennett was acting in his capacity as a vice-principal of Bonham when he maliciously prosecuted Grant.[14] We overrule Bonham's individual issues on appeal.

## DAMAGES

After finding Bennett and the Bonham Corporation maliciously prosecuted Grant, the jury found Grant was entitled to the following damages: $5,000 in mental anguish damages; $60,000 in attorneys' fees incurred defending the malicious prosecution; $1 million in punitive damages awarded against Bennett; and another $1 million in punitive damages awarded against the Bonham Corporation. The trial court's final judgment reduced the award of compensatory damages to $10,703 but awarded Grant, in accordance with the jury's verdict, $2 million in punitive damages. Appellants challenge the entire award. We will begin by reviewing the compensatory damages awarded to Grant, which are comprised of $5,000 for mental anguish damages and $5,703 in attorneys' fees.

### A. Mental Anguish

Appellants first contend there is no evidence to support the trial court's award of $5,000 in mental anguish damages. Although Grant was indicted and arrested as a result of their malicious prosecution, Appellants challenge the mental anguish damages contending there is insufficient evidence Grant suffered the " high degree of mental pain and distress necessary for compensable mental anguish." To support an award of mental anguish damages, there must be both evidence of the existence of compensable mental anguish damages and evidence to justify the amount awarded. *Hancock v. Variyam*, 400 S.W.3d 59, 68 (Tex. 2013). Mental anguish is only compensable if it causes a " substantial disruption in daily routine" or " a high degree of mental pain and distress." *Id.*; *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995).

Regarding Grant's mental anguish damages, Grant testified that--long before his indictment--he " knew Bennett would come after [him]" for turning his photos over to the authorities. Fearful " for [his] life and [his] family," Grant testified he moved four times in an effort to keep his family safe from Bennett. Each time he would move, however, Grant testified that Bennett would show up at depositions with his tape recorder and pencil in hand to record Grant's new address. At one such deposition taken prior to his indictment, Grant testified that he heard Bennett avow that " he would see me go to the penitentiary."

**Page 242**

He further testified that he was aware of other instances when Bennett " had seen that people went to prison" and believed Bennett was " fully capable of seeing that [he] went to prison." After hearing Bennett's testimony that it was his goal to put him in prison, Grant testified he was fearful to leave home and would lock himself in his house to protect his family. When Grant was finally indicted, his

lawyer informed him he had been charged with a felony and was facing prison time. Grant and his mother then drove the three and half hours from Coleman, Texas, where he lived, to Corsicana, Texas, where he had been indicted. Grant surrendered himself to the authorities in Corsicana and was released that day on a surety bond posted by his mother. For the next nine months, the charges remained pending against Grant. Grant testified that he worried how his family would be taken care of if he went to prison and that he was afraid to leave his family alone. He further testified that as a result of worrying about what Bennett was going to do, " I would have bad headaches, weak stomach, couldn't eat, couldn't sleep." Grant additionally testified that the experience affected his mental state as he went from being " a happy-go-lucky" person to feeling like a " completely different person" who struggled with self-esteem and distanced himself from friends and family. Grant's sister confirmed that she noticed a change in Grant's demeanor, testifying that her brother " just closed himself and sequestered himself from everyone."

Based on the foregoing, we conclude there is sufficient evidence to support the jury's finding that Grant suffered the degree of mental pain and distress that will support an award of mental anguish damages and that the award of $5,000 was well within the range supported by the evidence.

### B. Attorneys' Fees

When a defendant has caused attorneys' fees to be incurred in defense of a criminal charge which was maliciously prosecuted, attorneys' fees in defending the prior criminal charge are recoverable in the malicious prosecution suit as damages. *See IBP, Inc. v. Klumpe*, 101 S.W.3d 461, 478 (Tex.App.--Amarillo 2001, pet. denied). Here, Grant was charged with two felonies: attempted bribery and tampering with a witness. In his pleadings and at trial, however, Grant sued for malicious prosecution based on the attempted bribery charge only. With regard to recovering attorneys' fees for the malicious prosecution as damages, Grant's attorney testified at trial that Grant incurred $6,003.19 in attorneys' fees for defending against *both* charges, but that 95% of the work--or $5,703--would have been necessary for defending the attempted bribery charge alone. The jury, however, found Grant incurred $60,000 in reasonable and necessary attorneys' fees defending against the malicious prosecution. The trial court, in accordance with Grant's voluntary remittitur, reduced this amount to $5,703 to conform to the evidence at trial. Appellants nevertheless contend there is insufficient evidence to support the amount of attorneys' fees awarded as damages.

Appellants do not challenge the reasonableness of the fees. Rather, they argue only that a " reasonable fact-finder

could not have . . . allocated 95 percent of the fees incurred on both charges solely to attempted bribery." We disagree. Submitting to the jury an attorney's testimony concerning the percentage of hours relating to specific claims--even a percentage a high as 95%--is sufficient to satisfy a party's burden to segregate its attorneys' fees. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 314 (Tex. 2006)

**Page 243**

(" an opinion would have sufficed stating that, for example, 95 percent of their drafting time would have been necessary even if there had been no [non-recoverable] claim" ). Further, to the extent attorneys' fees " would have been incurred on a recoverable claim alone, they are not disallowed simply because they do double service" with a non-recoverable claim. *See id.* at 313. Grant's indictments were based on the same facts and he asserted the same defense of limitations to both charges. His attorney testified that the legal work performed for both charges was essentially the same, as he drafted the same motions, conducted the same discovery, and attended the same hearings and meetings for both charges. As such, the attorney testified " that 95% of the work that was required on those two charges would've been necessary on just the attempted bribery charge itself alone. . . . I would have done the same work on the attempted bribery charge even if there hadn't been the attempted tampering with a witness charge." As there was sufficient evidence that Grant would have incurred $5,703 in attorneys' fees on the bribery charge alone, we conclude there is sufficient evidence to support the damages award. Finding sufficient evidence to support the award of actual damages, we overrule Appellants' second issue on appeal.

### C. Exemplary Damages Cap

The Texas Civil Practice and Remedies Code limits the maximum amount of exemplary damages a trial court can award. *See* Tex. Civ. Prac. & Rem. Code § 41.008(b). The cap, however, does not apply when a plaintiff seeks recovery of exemplary damages based on certain felony criminal conduct enumerated under the statute, i.e., cap-busting conduct. *Id.* § 41.008(c). One such felony cap-busting exception--defined under Penal Code § 32.46--is when a person, with the intent to defraud or harm any person, by deception causes another to sign or execute any document affecting the pecuniary interest of any person in the amount of $1,500 or more. *Id.* § 41.008(c)(11); *see also* Tex. Penal Code § 32.46. Here, the jury made a cap-busting finding that the Appellants, with the intent to harm Grant, caused another by deception to sign or execute his criminal indictment for attempted bribery, and the indictment affected Grant's pecuniary interest in the amount of $1,500 or more. Appellants contend there is legally insufficient evidence to support this finding because: (1) an

indictment is not a document affecting the pecuniary interest of any person; and (2) there is no evidence Bennett caused anyone to sign the indictment.

### 1. Document Affecting Pecuniary Interest

Appellants first contend that indictments--as a matter of law--are not documents that affect a defendant's pecuniary interest, and therefore Grant cannot qualify for the cap-busting exception. We are not persuaded by Appellants' argument. The term " pecuniary interest" is not defined by the statute; therefore, courts have defined the term using its common meaning of having a " financial stake" in a matter. *See Briones v. State*, 76 S.W.3d 591, 595 (Tex.App.--Corpus Christi 2002, no pet.); *Goldstein v. State*, 803 S.W.2d 777, 791 (Tex.App.--Dallas 1991, pet. ref'd). Therefore, the narrow question presented is whether there is legally sufficient evidence of Grant having a financial stake in the grand jury's indictment.

Appellants contend that Grant had no financial stake because indictments as a whole are excluded from the class of documents that affect pecuniary interests because--unlike a " bank draft, a promissory

**Page 244**

note, [or] a deed" --no monetary interest " flow[s] directly from the document." The statute, however, does not require the complainant to have a pecuniary interest in the document itself. *See Lewis v. State*, No. 05-09-00299-CR, 2010 WL 4400515, at *4 (Tex.App.--Dallas Nov. 8, 2010, pet. ref'd) (not designated for publication). Rather, it requires only that the execution of the document *affect* the pecuniary interest of any person. *See* Tex. Penal Code § 32.46. Further, a complainant is not required under the statute to prove actual pecuniary loss. *See Smith v. State*, 681 S.W.2d 71, 75--76 (Tex.App.--Houston [14th Dist.] 1983), *aff'd*, 722 S.W.2d 408 (Tex.Crim.App. 1986) (offense complete when person causes another to execute document with intent to defraud or harm; there is no requirement to prove resulting harm). Therefore, when a person purposely uses deception to cause a court official to execute a document, the executed document may affect pecuniary interests if it subjects a person to potential financial liability. *See Fisher v. State*, 803 S.W.2d 828, 830 (Tex.App.--Dallas 1991, pet. ref'd) (securing issuance of citation through deception affected pecuniary interests as citation made defendant in suit potentially liable for monetary damages); *Woodley v. State*, No. 08-00-00470-CR, 2003 WL 550298, at *6 (Tex.App.--El Paso 2003, pet. ref'd) (mem. op.) (securing trial court's execution of agreed judgment that had been altered to add new defendant and increase amount of award affected pecuniary interests as defendants faced potential liability

under altered judgment).

Viewing the evidence in the light most favorable to the jury's finding, we conclude there is more than a scintilla of evidence that Grant's pecuniary or financial interests were affected by the indictment, which--on its face--required him to find a means to post a $10,000 bond or face immediate and indefinite imprisonment. He then was required to obtain legal counsel to quash the indictment, incurring an additional $5,703 in attorneys' fees. Further, if convicted of the offense of attempted bribery, Grant faced further potential liability as the offense carried a monetary penalty of up to $10,000. *See* Tex. Penal Code § § 12.34; 15.01; 36.02. Thus, we conclude there is legally sufficient evidence Grant had a financial stake in the indictment, as the execution of the document caused him both immediate financial liability and potential financial liability in the future.

### 2. Causation

Appellants next contend that Bennett cannot be the legal cause of Grant's indictment because (1) the causal link between Bennett's actions and the indictment is too attenuated to satisfy causation requirements under the Penal Code; and (2) it is impossible to prove causation because " grand jury proceedings are secret, so there is no way of knowing which evidence persuaded the grand jury to indict." Criminal liability is predicated on but-for causation but also requires consideration of the foreseeability of the injurious consequences of the defendant's conduct. *Williams v. State*, 235 S.W.3d 742, 764--65 (Tex.Crim.App. 2007). Appellants, relying on the Texas Court of Criminal Appeals' discussion of causation in *Williams v. State*, argue the chain of causation linking Bennett to the indictment is too attenuated to impose criminal responsibility. In *Williams*, the Court found that a mother who left her two daughters in a room with a lit candle under another adult's supervision was not criminally responsible for the children's burning deaths because it was not reasonably foreseeable: (1) that the other adult would forget to blow the candle out before falling asleep; (2) that a sheet or clothing would then fall

**Page 245**

on the burning candle; and (3) that the other adult would not be able to get children out of the house after the fire started. *Id*. In this excerpt from their brief, Appellants argue the following is the but-for causal chain linking Bennett to Grant's indictment in this case:

o *If* Bennett had not asked for a special prosecutor, and

o *If* Bennett had not given the prosecutor the facts he had gathered, and

o *If* the prosecutor had not brought the case to the grand

jury, and possibly,

o *If* the prosecutor had not presented those facts, and, possibly,

o *If* the grand jury had not relied on those facts, and

o *If* the prosecutor had not recommended an indictment or the grand jury had not disregarded the prosecutor's recommendation, and

o *If* at least nine of the grand jurors had not voted to issue the indictment,

o Then Grant never would have been indicted.

Appellants then argue this causal chain is similar to *Williams* because it " is too disconnected from the putative cause to support any finding" of causation. What Appellants fail to account for, however, is that the Court in *Williams* found that causal link insufficient because the events leading to the children's deaths were " *not reasonably foreseeable.*" *Id.* at 765 (emphasis added). The facts of this case are much different. The evidence in this case reflects that Bennett set out on a course of conduct to have Grant indicted and was successful in that endeavor. Indeed, Appellants do not contest the jury's finding that Bennett intended to harm Grant by causing the grand jury to sign his indictment. It is reasonably foreseeable that if Bennett intended to put Grant in prison, then provided evidence that a reasonable juror could infer was fabricated or manipulated, and then led a campaign to have a special prosecutor appointed in the case--all of which is more than adequately supported by the record--the end result of these efforts would be Grant's indictment. It is abundantly apparent that Grant's indictment was the natural, probable and foreseeable consequence of Bennett's actions.

Appellants next contend that " Grant could not have sustained his burden to prove causation because it is impossible to show that Bennett's conduct was necessary for the indictment to issue [given that] grand jury proceedings are secret." First, as we have already discussed, there was sufficient evidence that but for Bennett's aggressive and untoward efforts to improperly influence the criminal justice system, the case would have never been put before the grand jury, not once, but twice. Further, Bennett does not dispute the jury's finding that he used deception to cause the grand jury to execute the indictment. Deception is defined, as " creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe is true." Tex. Penal Code § § 31.01(1)(A), 32.46(d)(1). Here, the special prosecutor testified candidly that he had the following evidence from Bennett--at the time he presented the indictments--from which the jury

found Bennett used deception to create a false impression that was likely to affect the judgment of another: Bennett's statements that Grant had called trying to sell him incriminating photos for $5,000 and a transcript from Bennett--which the jury could have found was fraudulent--purportedly transcribing a secretly-taped conversation with Grant that substantiated Bennett's claim that Grant

had sought $5,000 for the photos. The record further reflects that Bennett testified at the grand jury proceeding but that Grant was not present. In exact accordance with Bennett's evidence, the grand jury's indictment charges that Grant " with the specific intent to commit the offense of bribery, called [Bennett], with the purpose of soliciting a bribe of $5,000."

Under the Penal Code, " a person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." Tex. Penal Code § 6.04. Here, Appellants do not challenge the jury's finding that Bennett used deception to indict Grant, and the allegations in the indictment identically mirror the evidence provided by Bennett. Under this record, viewed in the light most favorable to the jury's finding of causation, there is more than a scintilla of evidence in the record that Bennett's conduct *alone* was sufficient to have caused the indictment and to incur criminal responsibility. *See id.* Having found sufficient evidence to support the jury's cap-busting finding, we overrule Appellants' third issue on appeal.

### D. Constitutionality of Exemplary Damages

Appellants lastly attack the award of exemplary damages, contending the dual $1 million exemplary damages awards against Bennett and the Bonham Corporation violate their federal substantive due process rights. While state law governs the amount properly awarded as exemplary damages, that amount is also subject to an ultimate federal constitutional check for exorbitancy. *Tony Gullo Motors I*, 212 S.W.3d at 307. This is because the Due Process Clause of the Fourteenth Amendment prohibits a state from imposing a " grossly excessive" punishment on a tortfeasor. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). But punitive damages " may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition," and " States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case." *Id.* at 568. "

Only when an award can be categorized as grossly excessive in relation to these interests does it enter the zone of arbitrariness that violates" due process. *Id.*

In this case, the State has a legitimate interest in both punishing individuals who purposely manipulate the legal system to imprison innocent persons and in deterring its repetition. We must therefore determine whether the punitive damages award in this case was grossly excessive in relation to these interests. *See id.* In determining whether an award is excessive, the United States Supreme Court has identified three " guideposts" by which we must assess the constitutionality of the punitive damages award:

1. the degree of reprehensibility of the defendant's misconduct;

2. the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and

3. the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003); *see also Bennett I*, 315 S.W.3d at 873. Whether a punitive damages award passes constitutional muster under this standard is a question of law

**Page 247**

that we review de novo. *Bunton v. Bentley*, 153 S.W.3d 50, 54 (Tex. 2004).

### 1. Reprehensibility of Bennett's Misconduct

The first guidepost, the degree of reprehensibility of the defendant's misconduct, focuses on the " enormity" of the misconduct and is " the most important indicium of the reasonableness of a punitive damages award." *BMW of N. Am.*, 517 U.S. at 575. Punitive damages are not compensation for injury; rather, they operate as private fines intended to punish the defendant and to deter future wrongdoing. *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S.424, 432, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001). Exemplary damages should therefore reflect the " enormity of [the] offense." *BMW of N. Am.*, 517 U.S. at 575. In evaluating the enormity of a person's misconduct, we consider five nonexclusive factors--whether:

1. The harm inflicted was physical rather than economic;

2. The tortious conduct showed an indifference to or reckless disregard for the health or safety of others;

3. The target of the conduct had financial vulnerability;

4. The conduct involved repeated actions, not just an isolated incident; and

5. The harm resulted from intentional malice, trickery, or deceit, as opposed to mere accident.

*State Farm Mut. Auto. Ins.*, 538 U.S. at 419. One of these reprehensibility factors alone " may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Id.*

### a. *Harm resulted from intentional malice, trickery or deceit.*

Appellants concede there is evidence that Grant's indictment resulted from " intentional malice, trickery, or deceit" but argue that none of the other factors weigh in favor of punitive damages. We certainly agree with Appellants that the fifth reprehensibility factor weighs in favor of punitive damages. The jury heard evidence that Bennett's goal was to put Grant in prison to settle a personal vendetta and to influence pending civil litigation, and that he set out on a campaign of legal thuggery--including allegations of lying, tailoring evidence, and even outright fabrication of evidence--to ensure that Grant was imprisoned. When Bennett could not win at this game, the record reflects he decided to change the playing field by exerting political pressure on a district attorney to appoint his own hand-picked special prosecutor to the case.

Further, when considering exemplary damages, we may examine Bennett's misconduct beyond the malicious prosecution itself when it " demonstrates the deliberateness and culpability" of his actions and bears " a nexus to the specific harm suffered" by Grant. *Bennett I*, 315 S.W.3d at 875. Here, Bennett's efforts to manipulate the legal system to imprison Grant were part of a larger escapade designed to thwart justice and abuse the court system. We conclude the following allegations of malfeasance may properly inform the reprehensibility analysis, as they demonstrate the deliberateness, culpability, and motive behind Bennett's actions and relate back to the underlying malicious prosecution:

*Urging Grant to Lie and Attempting to Bribe Him.* Grant testified that, prior to turning his photos over to the authorities, Bennett visited his home and urged him to lie about what he had seen. Grant's sister

**Page 248**

testified that Bennett then attempted to offer Grant a lucrative job under the guise of helping his family after a car accident. She testified Bennett offered that if Grant " can come and help him for a couple of days, he had a job

that he can get $4,000 for . . . a couple of days of work." When Grant had worked for Bennett the previous year, his salary was $1,100 a month. At the time Bennett offered this money, Grant was posed to be the star witness testifying against Bennett in his criminal trial for cattle theft and in Reynolds' civil suit.

*Threatening Grant*. When money was not enough to persuade Grant, there was evidence at trial that Bennett then tried a new tactic to silence Grant. Grant's sister testified that Bennett called her more than 15 times trying to obtain Grant's new contact information. Frustrated that Bennett would not stop calling, the sister provided Bennett with her husband's cell phone number and said it was Grant's number. Bennett testified that he then asked Rogers to call the number. Shortly thereafter, Rogers called the number and reached Grant's brother-in-law. Believing he was speaking to Grant, Rogers then--according to the brother-in-law--demanded that Grant turn over the pictures and threatened " if he didn't get the pictures, that he had a jake-leg lawyer that would obtain them" and " that he was going to take care of [Grant] one way or the other." The brother-in-law testified that he relayed these threats to Grant.

*Litigation Against Grant*. Being unsuccessful in silencing Grant, Bennett then filed this suit alleging Grant had slandered him by saying that he had stolen Reynolds' cattle and sought $50,000 in damages. The jury found against Bennett on his slander claim, finding that Grant's statement that Bennett had stolen from Reynolds was substantially true. In addition to this suit, Bennett filed--the day after Grant's criminal record was expunged--a second civil lawsuit against Grant and others alleging they had conspired to have him indicted for cattle theft. Bennett sought $2 million dollars in compensatory damages, in addition to punitive damages, in that suit.[15]

*Pressuring Grant's Attorney to Resign*. During the course of this litigation, Bennett filed two grievances against Grant's attorney that were dismissed as not alleging professional misconduct. In addition to the grievances, Bennett sued Grant's lawyer, contending he had conspired with Grant and others to have him indicted for cattle theft. The attorney testified that after he was sued by Bennett for $2 million, he was " angry" and " scared" and decided to no longer represent Grant in this suit because " he couldn't do as good a job as somebody that wasn't being sued themselves."

*Tampering With Evidence*. At trial, there were allegations that one of the photos Grant had taken depicted Reynolds' brand on the sold cattle. There were further allegations that Bennett had doctored this photo during his criminal trial to change the incriminating image of his neighbor's brand and conceal his theft. In addition, the San Saba District and County Clerk testified that Bennett attempted to register Reynolds' brand as his own. Finally, during the course of this trial, Bennett--outside the presence of the jury and without permission from the trial court--altered an exhibit depicting a hand-drawn diagram of Reynolds' brand. We conclude these cover-up efforts show culpability and

**Page 249**

deliberateness and sought to extend and exacerbate harm to Grant by discrediting him as a witness and bolstering Bennett's claims in his civil lawsuits against Grant.[16]

**b. *Harm inflicted was not merely an economic injury and showed a reckless disregard for Grant's health and safety.***

Regarding the first and second reprehensibility factors, Appellants argue Grant suffered a purely economic injury and this is not a case involving physical harm warranting a greater award of exemplary damages, and that his actions do not show an indifference to or reckless disregard for Grant's health or safety. We disagree. Malicious prosecution is not a purely economic injury; rather, the Restatement recognizes that a plaintiff may recover for the physical harm caused by reason of his arrest. *See* Restatement (Second) of Torts § 671 (1977). Here, Bennett did not intend to inflict a mere financial injury on Grant; rather, he succeeded in having Grant's actual person seized, held in captivity, and stripped of personal liberties. Appellants further contend that: " Bennett's mere desire that Grant serve prison time does not equate to indifference or reckless disregard for Grant's health or safety. . . . At best, this factor is neutral and therefore carries no weight in the reprehensibility analysis." We are confident that if Bennett himself or any person were arrested and facing a prison sentence in Texas, he would not view his health and safety neutrally affected. *See also id.* (maliciously prosecuted plaintiff may recover for impairment to health sustained from arrest).

**c. *Target of the conduct had financial vulnerability.***

Regarding the third reprehensibility factor, we note that Bennett's actions were further reprehensible because Bennett was aware that Grant and his family were financially vulnerable. Grant testified he first met Bennett because he was desperate for work, and Bennett agreed to hire him as a hand. During the time Grant worked for Bennett, the Bonham Corporation paid him a salary of $1,100 for a full month of work and allowed him to live in a trailer on the property. A salary of $13,200 a year, even when the housing allowance is considered, was hovering on the federal poverty line.[17] Further, Grant's financial situation worsened when his wife and baby were in a major

traffic accident shortly after Grant turned his photos over to the authorities. Grant and others testified that both his wife and baby were hospitalized after the accident, that his wife had been permanently injured, and that Grant had to take a significant amount of time off from work to stay home and care for her. The record reflects that Bennett was fully aware of the car accident and perhaps attempted to use the situation to take advantage of Grant's financial vulnerability by offering him an extremely lucrative job immediately after the accident under the guise of helping Grant's family. Amidst this backdrop of financial vulnerability, Bennett then began his quest to have Grant imprisoned and

**Page 250**

ultimately indicted. Further, Grant's indictment carried a prison sentence of two to ten years' imprisonment. *See* Tex. Penal Code § § 12.34, 15.01, 36.02. Undoubtedly, Bennett's actions threatened to financially ruin Grant and his family.

In sum, we conclude four of the five reprehensibility factors are present in this case and weigh in favor of punitive damages: (1) the harm to Grant resulted from intentional malice, trickery, or deceit; (2) Bennett's malicious prosecution of Grant was not merely an economic injury but resulted in a seizure of Grant's person and loss of physical liberties; (3) Bennett's tortious conduct showed an indifference to and reckless disregard for Grant's health and safety; (4) and his actions threatened to financially ruin Grant. Thus, all but one of the reprehensibility factors weigh in favor of exemplary damages.[18]

**2. Ratio Between Exemplary and Compensatory Damages**

The second and perhaps most commonly cited indicium of an excessive punitive damages award is the ratio between the punitive damages awarded and the actual or potential harm inflicted on the plaintiff. *See BMW of N. Am.*, 517 U.S. at 580. In analyzing this ratio, " the proper inquiry is 'whether there is a reasonable relationship between the punitive damages award and *the harm likely to result* from the defendant's conduct as well as the harm that actually has occurred.'" *Id*. at 581 (quoting *TXO Prod. Corp. v. Alliance Res. Corp*., 509 U.S. 443, 460, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (emphasis in original)). Thus, we are to examine the difference between the punitive damages award and the harm actually suffered and the harm " that would have ensued if the tortious plan had succeeded." *See id*.; see also *TXO Prod*., 509 U.S. at 460. While there is not " a mathematical bright line between the constitutionally acceptable and constitutionally unacceptable [award of exemplary damages] that would fit every case," *see Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 18, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), we have been instructed that " few awards exceeding a single-digit

ratio . . . will satisfy due process" and that an " award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *State Farm Mut. Auto. Ins*., 538 U.S. at 425.

Appellants contend that there is no meaningful distinction between this case and the large punitive damages award the Texas Supreme Court overturned in *Bennett I*, in which the Court found that the ratio of $5,327.11 in actual damages compared to the $250,000 in exemplary damages awarded against Bennett--a ratio of 47:1--and the $1 million exemplary damages awarded against Bonham--a ratio of 188:1--violated due process. *See Bennett I*, 315 S.W.3d at 869. As the U.S. Supreme Court has recognized, however, " a jury imposing a punitive damages award must make a qualitative assessment based on a host of facts and circumstances unique to the particular case before it. Because no two cases are truly identical, meaningful comparisons of such awards

**Page 251**

are difficult to make." *TXO Prod*., 509 U.S. at 458. While this case and *Bennett I* share some nucleus of operative facts, the present case is distinguishable and therefore must be examined on its own facts. In *Bennett I*, the jury found Bennett converted thirteen of his neighbor's cattle and assessed actual damages at the market value of the cattle, $5,327.11. *Bennett I*, 315 S.W.3d at 871. While the Court found that Bennett's malfeasance in attempting to cover-up his initial conversion showed heightened reprehensibility, it concluded:

At heart, though, this is an economic-injury, actual-harm case seeking recovery for the conversion of thirteen head of cattle. Reynolds alleges a broader " criminal escapade" that aimed to ruin him, but the theoretical possibilities of greater harm strike as marginally relevant at best in assessing exemplary damages, absent proof of the likelihood of such harms.

*Id*. at 877.

In striking contrast, Bennett in this case did not merely steal cattle; rather, he attempted to deprive a man of two to ten years of his liberty. *See* Tex. Penal Code § § 12.34, 15.01, 36.02 (sentencing for offense of attempted bribery). While Appellants attempt to equate theft of cattle to the theft of years from a man's life, there is no comparison between the two acts. This is reflected in the reprehensibility analysis, in which we concluded that four of the five reprehensibility factors were present in this case. In contrast, in *Bennett I*, the Texas Supreme Court found that Bennett inflicted a purely economic injury on his neighbor by stealing his cattle and therefore only one of the reprehensibility factors--the harm resulted from intentional

malice, trickery, or deceit--was present. *See Bennett I*, 315 S.W.3d at 877.

Further, and perhaps most important for our discussion, the Texas Supreme Court found that *Bennett I* was an actual-harm case only--meaning that beyond the actual harm suffered by Reynolds from the theft of his cattle, there was only marginal evidence of any other potential harm faced by Reynolds or anyone else as a result of Bennett's conversion. *Id*. Therefore, in *Bennett I*, potential harm was not relevant in the Court's ratio analysis. *See id*. But in this case, the evidence of potential harm is not marginal or speculative; rather, the record conclusively shows that Grant would have been imprisoned for two to ten years if Bennett had succeeded in his illicit scheme. *See* Tex. Penal Code § § 12.34, 15.01, 36.02. In analyzing the exemplary damages ratio in a potential-harm case, the U.S. Supreme Court has unequivocally instructed us that " [i]t is appropriate to consider the magnitude of the *potential harm* that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded." *TXO Prod*., 509 U.S. at 460 (emphasis in original) (holding dramatic disparity between $19,000 compensatory damages award compared to $10 million exemplary damages award did not violate due process " in light of the [millions] potentially at stake" if the defendant " had succeeded in its illicit scheme" ). Thus, U.S. Supreme Court precedent requires us to compare the exemplary damages awarded in this case to both " the harm that has actually occurred" and the potential harm that Grant would have sustained if Bennett's " wrongful plan had succeeded." *See id*.; *see also BMW of N. Am*., 517 U.S. at 581 (" the proper inquiry is whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred" ).

**Page 252**

Appellants stress in their brief the disparity between the dual $1 million punitive damages awarded in this case compared to the $10,703 compensatory damages award. That disparity lessens, however, when we consider the potential prison sentence faced by Grant. Although it is difficult to place a monetary value on the loss a person experiences from losing years of his life to an erroneous prison sentence, the State compensates persons who have been wrongfully convicted to the tune of $80,000 for each year of wrongful imprisonment plus lifetime annuity payments. *See* Tex. Civ. Prac. & Rem. Code § § 103.052 (Lump-Sum Compensation), 103.053 (Annuity Compensation). Thus, if Grant had been wrongfully imprisoned for the minimum sentence of two years' imprisonment, he would have been entitled at a bare minimum to a lump-sum payment of $160,000.[19] And, on the high end of the spectrum, he would have been entitled to

a lump-sum payment of $800,000 for serving the maximum ten-year sentence, plus potential lifetime annuity payments which could potentially push the final award to over $1 million.[20] Although there is no way to precisely put a dollar value on the potential harm in this case, the State's restitution payments reflect the value the Legislature has placed on a year of life lost to wrongful imprisonment and provide a guidepost for the potential damages in this case.

Based on this analysis, we conclude the potential damages in this case can be prudently and rationally valued at a minimum of $160,000. This is the minimum amount Grant would have received from the State if he had been wrongfully convicted of attempted bribery and served the minimum sentence available. When combined with the actual damages, the total actual and potential damages for this case would therefore be at least $170,703. Using these figures, the ratio between the actual and potential harm compared to the dual $1 million exemplary damages awards would be over 5:1 for both Bennett and Bonham. *See BMW of N. Am*., 517 U.S. at 581 (" the proper inquiry is whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred" ). We note that--even with careful consideration of both the actual and potential damages in this case--this ratio likely exceeds constitutional limits. *See State Farm Mut. Auto. Ins*., 538 U.S. at 425 (" award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety" ). As such, this guidepost weighs in favor of reducing the punitive damages award.

### 3. Legislative Penalties for Similar Misconduct

The final guidepost compares the exemplary damages with legislatively authorized civil penalties in comparable cases. This factor fortifies the notion that legislatures make policy and are well positioned to define and deter undesired behavior. *Bennett I*, 315 S.W.3d at 880. Here, we note there is no comparable civil

**Page 253**

penalty for Bennett's conduct. We may, however, also look to criminal penalties that could be imposed, as " the existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action." *State Farm Mut. Auto. Ins*., 538 U.S. at 428. When used to determine the dollar amount of an exemplary damages award, though, the U.S. Supreme Court has cautioned us that criminal penalties have " less utility" than civil penalties. *See id*.; *see also Bennett I*, 315 S.W.3d at 881. In this case, we conclude criminal penalties have some relevance to our discussion, as they demonstrate that Bennett had fair notice that his conduct could subject him to

the following punishment:

o Tampering With or Fabricating Physical Evidence

o 2 to 10 Year Prison Sentence

o $10,000 fine

o Aggravated Perjury Before Grand Jury

o 2 to 10 Year Prison Sentence

o $10,000 fine

o Execution of a Document by Deception

o 180 days to 2 years in State Jail

o $10,000 fine

o Making a False Report to Peace Officer or Law Enforcement Employee

o Up to 180 Days in State Jail

o $2,000 fineo $16,000 fine for committing offense eight times[21]

Thus, Bennett had fair notice of the seriousness with which the State viewed his wrongful conduct, as his actions could subject him to up to $46,000 in monetary fines and four to twenty-two years' incarceration.[22]

Appellants contend in their brief that we should--as we did on remand from *Bennett I* --reduce the exemplary damages award to the comparable criminal fines. In that case, we concluded that the criminal monetary sanction for cattle theft was comparable to the civil offense of conversion and provided an objective basis for setting a constitutionally permissible exemplary damages award. *Bennett v. Reynolds*, No. 03-05-00034-CV, 2010 WL 4670270, at *5 (Tex.App.--Austin Nov. 18, 2010, no pet.) (mem. op.) *supplemented*, 440 S.W.3d 660, 2011 WL 182876 (Tex.App.--Austin 2011, no pet.). In this case, however, there simply is no criminal offense comparable to the civil offense of malicious prosecution. While we can examine specific criminal actions Bennett took in his ultimate effort to maliciously prosecute Grant, none of these offenses take into account that Bennett's ultimate goal was to put Grant in prison.[23] We do, however, conclude that under this record the applicable prison sentences and fines put Bennett on notice that the State has a significant interest in

**Page 254**

deterring this type of conduct and would prosecute and imprison those who attempt to manipulate the criminal justice system for personal gain.

After careful analysis of these three guideposts, we conclude: (1) four of the five reprehensibility factors weigh in favor of punitive damages; (2) potential harm is relevant in evaluating the ratio to exemplary damages, but that even when we consider potential harm, the resulting ratio of 5:1 likely exceeds constitutional boundaries; and (3) there are no comparable civil sanctions, but Bennett was on notice that the State had a significant interest in protecting the integrity of the criminal justice system and would vigorously prosecute, fine, and imprison persons who engaged in such behavior.

Our remaining task is to determine--under the unique facts of this case and these guideposts--what amount of exemplary damages would pass constitutional muster. In this regard, we have been instructed that an award " four times the amount of compensatory damages might be close to the line of constitutional impropriety" and that " [p]ushing exemplary damages to the absolute constitutional limit in a case like this leaves no room for greater punishment in cases involving death, grievous physical injury, financial ruin, or actions that endanger a large segment of the public." *Tony Gullo Motors I*, 212 S.W.3d at 308--310. While we find Bennett's conduct abhorrent, we recognize that his actions did not actually cause any of these enumerated unfortunate circumstances. We do, however, also recognize that the State has a significant interest in punishing and deterring this type of conduct and that Bennett's actions were particularly reprehensible. Weighing these competing concerns, we conclude that a ratio of 3:1 exemplary damages compared to the combined actual and potential damages passes constitutional muster. This results in an award of $512,109 against each defendant (three times the actual and potential damages of $170,703) and reduces the total punitive damages award from $2 million to $1,024,218 ($512,109 against Bonham and $512,109 against Bennett).[24] This award recognizes the potential harm caused by Bennett and Bonham, their reprehensibility, and the State's interest in punishing and deterring, but also leaves room for greater punishment for cases with more egregious injuries.

### SANCTIONS

In addition to the actual and exemplary damages at issue in this suit, Grant alleged Bennett's slander claim against him was frivolous and brought in bad faith for purposes of harassment and sought sanctions. *See* Tex. Civ. Prac. & Rem. Code § 10.001; Tex. R. Civ. P. 13. Bennett originally initiated this suit--as discussed previously--by suing Grant for slander, alleging that Grant's statement that Bennett had stolen Reynolds' cattle was slanderous. The jury found that Grant's statement was substantially true and this finding has not been challenged on appeal. The trial

court granted the request for sanctions and ordered Bennett to pay Grant's attorneys' fees incurred defending the claim in the

## Page 255

amount of $269,644.50, concluding that this amount adequately punished Bennett and fairly compensated Grant for defending against the groundless claim. In his only individual issue, Bennett contends the sanctions award was an abuse of discretion.

We review the trial court's imposition of sanctions for an abuse of discretion. *See Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007). In reviewing the sanctions order, we review the entire record to determine whether the trial court abused its discretion. *American Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006). An appellate court may reverse the trial court's ruling only if the trial court acted without reference to any guiding rules and principles, such that its ruling was arbitrary or unreasonable. *Low*, 221 S.W.3d at 614. At the very least, this requires a showing that the trial court based its order on an incorrect interpretation of the law or a clearly erroneous assessment of the evidence. *Robson v. Gilbreath*, 267 S.W.3d 401, 405 (Tex.App.--Austin 2008, pet. denied). The trial court does not abuse its discretion if it bases its sanctions on conflicting evidence and some evidence supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009).

Here, the trial court's order did not specify the legal basis for the sanctions, so we begin our review by identifying all the potential legal bases for the order. *See Citibank, N.A. v. Estes*, 385 S.W.3d 671, 675 (Tex.App.--Houston [14th Dist.] 2012, no pet.). Chapter 10 of the Civil Practice and Remedies Code, in pertinent part, authorizes a court to sanction a person, a party who represents the person, or both for signing a pleading that was brought for any improper purpose--including to harass, cause unnecessary delay, or needlessly increase the cost of litigation. Tex. Civ. Prac. & Rem. Code § § 10.001, 10.004; *see Mattox v. Grimes Cnty. Comm'rs Court*, 305 S.W.3d 375, 386 (Tex.App.--Houston [14th Dist.] 2010, pet. denied) (" Sanctions under chapter 10 of the Civil Practice and Remedies Code are authorized if the evidence establishes that . . . a pleading or motion was brought for an improper purpose." ). Here, the trial court's order concludes that Bennett filed his slander claim for at least two improper purposes--" to punish a witness who had testified against him in previous lawsuits" and " to subvert a separate trial, [ *Bennett I* ]." The trial court further concluded that Bennett's refusal to nonsuit his slander claim, " substantially increased the burden on this case on the defendant and on the court system" and " required in essence a re-trial of [ *Bennett I* ]." As the trial court made findings that Bennett

filed this suit for improper purposes specifically prohibited by Chapter 10, we conclude the trial court could have relied on Chapter 10 as the legal basis for the award. Further, Bennett has not challenged on appeal the trial court's finding that he filed this suit against Grant for improper purposes. Generally, an appellant must attack all independent bases or grounds that fully support a complained-of ruling or judgment. *See Britton*, 95 S.W.3d at 681. As Bennett has failed to attack this basis that supports the sanctions order, we cannot conclude the trial court's imposition of sanctions was an abuse of discretion.

In addition, Rule 13 similarly authorizes a trial court to sanction a person, a represented party, or both for signing a pleading that is groundless and brought in bad faith or to harass. Tex. R. Civ. P. 13. Pleadings are presumed filed in good faith under Rule 13, and the burden is on the moving party to demonstrate both that the

## Page 256

opposing party's filings: (1) are groundless; and (2) were filed either in bad faith or for the purpose of harassment. *Id*. In determining whether sanctions are appropriate, the trial court must examine the facts available to the litigant and the circumstances existing when the litigant filed the pleading. *Robson*, 267 S.W.3d at 409. Further, under Rule 13, the trial court is required to state in the order the particulars of good cause justifying the sanctions. *See* Tex. R. Civ. P. 13.

The trial court's order here concludes, consistent with a violation of Rule 13, that Bennett's slander claim was " groundless," " part of a plan to harass and intimidate Grant," and brought in " bad faith." [25] As such, we conclude that Rule 13 could have also been the legal basis for the trial court's award. Further, the sanctions order states the particulars of good cause justifying sanctions under Rule 13. First, there are numerous findings in the order that Bennett brought this suit in bad faith and for purposes of harassment, including findings that: (1) Bennett had filed this suit to punish Grant for testifying against him in previous lawsuits; (2) Bennett had " doctored" or " altered" evidence to cover up his conversion of Reynolds' cattle and give grounds to his baseless slander claim against Grant; (3) and that Bennett's true purpose in the suit was not to recover money damages from Grant--who lacked the financial resources to pay an award--but to subvert a separate civil trial, *Bennett I*, and to harass Grant. Bennett does not challenge the legal sufficiency of any of these findings on appeal.

With regard to groundlessness, Bennett pleaded that he had instructed Grant not to sell any cattle that did not belong to him, and therefore, Grant's allegation that he had stolen the cattle was slander. The trial court, however, found in its order that Bennett had converted Reynolds'

cattle and then engaged in a "design to cover up his conversion" that implied "willfulness and bad faith, not inadvertence or an honest mistake." This finding states with particularity the trial court's good cause for concluding the slander claim was groundless--as the trial court found there was no factual basis to support Bennett's pleadings that Reynolds' cattle had been sold accidentally and there was no legal basis for his slander claim because substantial truth is a complete defense to slander. *See id.* ( groundless means no basis in law or fact and not warranted by good faith argument for change of existing law); *see also Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995) ( substantial truth of an alleged defamatory statement is complete defense to slander action). Further, while Bennett testified in support of his allegations, the trial court does not abuse its discretion when there is conflicting evidence that supports its decision, *see Unifund CCR Partners*, 299 S.W.3d at 97, and Bennett has not challenged the legal sufficiency of this finding on appeal. In addition, the trial court finds in its order that Bennett's deceit in covering up his wrongdoing by doctoring or altering evidence, "confirms the groundlessness of the slander claim" and was to "further his attempts to give grounds to his baseless harassment of Grant." As such, we cannot agree with Bennett's contention in his brief that the sanctions order "fails to state good cause for finding groundlessness with the particularity Rule 13 requires."

**Page 257**

Rather, we conclude the sanctions order states with particularity the reasons and circumstances justifying the trial court's finding of good cause to issue sanctions under Rule 13.[26]

Bennett further contends the award of sanctions against him individually was an abuse of discretion because his lawyer signed and filed his pleadings, and "a party should not be sanctioned for its attorney's conduct unless the party is implicated apart from having entrusted its legal representation to counsel." *See Loeffler v. Lytle Indep. Sch. Dist.*, 211 S.W.3d 331, 349--50 (Tex.App.--San Antonio 2006, pet. denied). Again, we disagree. While Bennett's attorneys filed and signed his pleadings, Bennett provided the factual basis for the slander claim and authorized his attorneys to file suit based on those allegations. Further, the trial court made several specific findings that sanctionable conduct was attributable to Bennett himself[27] and that Bennett had brought the slander suit as revenge for Grant testifying against him in previous suits. As such, we cannot conclude the trial court abused its discretion in finding that Bennett was implicated in the sanctionable conduct. Concluding he has failed to prove on appeal that the trial court's award of sanctions was arbitrary or unreasonable, we overrule Bennett's sole individual issue on appeal.[28]

**Page 258**

**CONCLUSION**

This is an unusual case. Malicious prosecution itself is an unusual tort, and it is exceptionally unique under Texas jurisprudence for a defendant to procure a prosecution by both providing false information to authorities and by engaging in such other improper activities that his conduct became the determining factor in the decision to prosecute. Looking to the exemplary damages award, this case is also unique because another exemplary damages award, in *Bennett I*, has already been adjudicated by the Texas Supreme Court and found unconstitutional. The facts and circumstances of this case, however, are vastly different than those in *Bennett I* and justify the imposition of a larger exemplary damages award. This case differs from *Bennett I* --and again is somewhat unique under Texas jurisprudence--because it is a potential-harm case and all but one of the five reprehensibility factors are present. As remitted, we are confident the exemplary damages award passes constitutional muster under current federal standards.[29] Accordingly, we reform the trial court's judgment to award Grant $512,109 in exemplary damages against Bennett and $512,109 in exemplary damages against Bonham. We affirm the trial court's judgment as reformed.

Reformed and, as Reformed, Affirmed on Motion for Rehearing

---------

Notes:

[1]The facts recited herein are taken from the record on appeal.

[2]Indeed, the Texas Supreme Court found the exemplary damages violated due process and remanded the case for remittitur. *See Bennett I*, 315 S.W.3d at 883.

[3]The petition alleged the district attorney had a conflict of interest in the case because he had previously worked for the district attorney's office in Llano County.

[4]Later that year, the district attorney lost his reelection. Almost immediately after starting private practice, Bennett came to the former district attorney's office and retained him as counsel for himself and the Bonham Corporation in two separate lawsuits.

[5]The Navarro County district attorney testified that he had informed the special prosecutor of his belief that there had been some tailoring of the facts by Bennett. The special prosecutor denied this, testifying that "no one had told

[him]" of any manipulation of the facts by Bennett.

[6]Interestingly, the district attorney testified that the amount at issue increased the degree of the offense from a misdemeanor to a felony. The statute of limitations for felony theft is five years, rather than the two year statute of limitations for misdemeanor theft. *See* Tex. Code Crim. Proc. arts. 12.01(4)(A), 12.02.

[7]The jury found against Bennett on his slander claim, which Bennett does not appeal.

[8]The transcript from Grant's sworn testimony is not in the record. Grant advanced the same theory of innocence at this trial. For purposes of the malicious prosecution claim, the jury found Grant innocent of Bennett's allegations.

[9]The special prosecutor also testified that he relied on Rogers' statement that Grant had telephoned him and acknowledged attempting to sell the photos to Bennett. At trial, Bennett testified that Rogers " was in on the efforts to get [Grant] charged." Rogers is described in the record as Bennett's best friend and an employee of the Bonham Corporation. At trial, Grant denied Rogers' accusations, and the jury was free to disbelieve his testimony. The Texas Supreme Court has instructed that " [j]ust as there may be more than one proximate cause of an event, a single prosecution may be procured by more than one person." *Browning-Ferris Indus., Inc. v. Lieck*, 881 S.W.2d 288, 292 (Tex. 1994). The fact that Rogers may also be liable for procuring Grant's prosecution does not negate Bennett's own liability.

[10]Appellants contend this is not a recognized exception under Texas law. We disagree. In accordance with the Restatement of Torts, the Texas Supreme Court has stated that a defendant may procure a prosecution " not only when he gives information he knows is false to a prosecutor, but also when his conduct is the determining factor in the prosecutor's decision to prosecute." *Browning-Ferris Indus., Inc. v. Lieck*, 881 S.W.2d 288, 294 (Tex. 1994) (citing Restatement (Second) of Torts § 653 (1977)); *see also Turner v. Roadway Express, Inc.*, 911 S.W.2d 224, 226 (Tex.App.--Fort Worth 1995, writ denied) (recognizing Texas Supreme Court's holding in *Lieck* that malicious prosecution may occur when either a person gives false information to authorities or when a person's conduct was determining factor in decision to prosecute).

[11]On rehearing, the Appellants contend they had no notice that Grant was seeking to join Bonham under permissive venue. Grant's motion for leave sought to add Bonham as a party to his counterclaim and tracked the language of the permissive joinder rule. *See* Tex. R. Civ. P. 40.

[12]Bonham hints in its brief that " Grant's claims against the Corporation were thinly veiled--yet ultimately successful--efforts to avoid limitations." The statute of limitations issue was not submitted in the jury charge, and Bonham does not assert in an issue on appeal that the evidence conclusively proves Grant's claims were barred by limitations. Nor does Bonham appeal any ruling it sought with sufficient specificity to make the trial court aware of its limitations complaint. We need not address the merits of the limitations issue.

[13]We also note that the Navarro County district attorney testified that he had formed the impression that Bennett was attempting to prosecute Grant in order to influence civil litigation arising from this case. The jury further heard testimony that Grant was the " star witness" in the Reynolds' civil suit against *both* Bonham and Bennett, which eventually resulted in a $1 million punitive damages award against Bonham.

[14]The jury alternatively found that Bonham was liable for Bennett's malicious prosecution of Grant based on agency and reverse-piercing theories. We do not address Bonham's challenges to these findings, as we have already concluded there was sufficient evidence to impart corporate liability on Bonham as a vice-principal.

[15]Grant, Reynolds, and Miller obtained a favorable summary judgment and sanctions against Bennett, Bonham, and their attorney in that suit, which is currently pending on appeal before this Court in *Bennett, Bonham & Paris v. Reynolds*, No. 03-12-00568.

[16]An award of punitive damages for some of these actions has already been awarded against Bennett in *Bennett I. See Bennett I*, 315 S.W.3d at 876. In that suit, however, he was punished for how his actions affected Reynolds. In this suit, the award of punitive damages is to punish Bennett for how these actions affected Grant. *See id*.

[17]Pursuant to federal poverty guidelines in 2001, a person with two dependents was poverty-stricken if his annual income was less than $14,630. *See* http://aspe.hhs.gov/poverty/01poverty.htm.

[18]The remaining reprehensibility factor is whether the defendant's conduct involved repeated actions, not just an isolated incident. For purposes of the reprehensibility analysis, the Texas Supreme Court has found that this factor refers to recidivism and not a course of conduct resulting in a single injury. *See Bennett I*, 315 S.W.3d at 878 n.55. Here, Grant alleges Bennett engaged in a course of conduct resulting in a single injury--his indictment for attempted bribery. There is no evidence in the record that Bennett had engaged in other acts of malicious prosecution

demonstrating recidivism.

[19]Annuity payments would not begin until the first anniversary of this lump-sum payment and would be awarded only if Grant was still living on that date. *See* Tex. Civ. Prac. & Rem. Code § § 103.151(b), 103.154(b).

[20]The annuity payments are somewhat speculative as they are determined by the number of years a person survives after release from prison. *See id*. § 103.154(b). Unlike the lump-sum compensation, the annuity payments do not transfer upon death to the person's estate. *See id*. § § 103.151(a), 103.154(b).

[21]Bennett acknowledged at trial that, in his efforts to prosecute Grant, he spoke with at least eight different law enforcement officials on separate occasions.

[22] *See* Tex. Penal Code § § 32.46 (execution of document by deception), 38.03 (aggravated perjury), 37.09 (evidence tampering), 37.08 (false report).

[23]In truth, for most cases the monetary criminal penalties under the Texas Penal Code have little utility in determining the dollar value of an exemplary damages award. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 428, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). The monetary penalty for *all* felonies in Texas, except for capital felony offenses which do not carry any monetary penalty, is a fine not to exceed $10,000. Tex. Penal Code § § 12.31--.35. There is no variance in the amount of the fine to account for the State's varied interests in preventing and punishing various degrees of reprehensible felony conduct.

[24]When corporate liability is warranted based on the actions of a vice-principal, the Texas Supreme Court has affirmed the propriety of awarding exemplary damages against both the individual vice-principal and his employer. *See Bennett I*, 315 S.W.3d at 869 (affirming exemplary damages awarded against both individual who was corporate principal and corporation itself but remanding because awards were excessive under due process); *see also Qualicare of E. Tex., Inc. v. Runnels*, 863 S.W.2d 220, 224 (Eastland 1993--no writ.) (award of exemplary damages against both employer and vice-principal " is proper and does not impose a double punishment" ).

[25]The trial court also submitted this question to the jury, which concluded that Bennett's suit was groundless and brought in bad faith or for the purpose of harassment. Bennett contends the trial court erred in submitting the sanctions issue to the jury because it was a question of law. Regardless, the sanctions order indicates the trial court made its own findings to support the sanctions order separate from the jury's findings.

[26]On rehearing, Bennett contends for the first time that " Grant never noticed any formal hearing on his request for sanctions." *See* Tex. R. Civ. P. 13 (sanctions may be imposed upon motion or upon court's own initiative, after notice and hearing); Tex. Civ. Prac. & Rem. Code § 10.002--3 (same). The record, however, shows that Bennett's counsel was served with notice of the sanctions hearing. Moreover, " the proper method to preserve [Bennett's] notice complaint was to bring the lack of adequate notice to the attention of the trial court at the hearing, object to the hearing going forward, and/or move for a continuance." *See Low v. Henry*, 221 S.W.3d 609, 618 (Tex. 2007). Bennett additionally complains on rehearing that " Grant never filed a formal motion for sanctions." Bennett failed to raise this issue at the trial court or in his appeal. Grant did plead for attorneys' fees based on Bennett's filing of a groundless claim, and the trial court had submitted a jury question asking whether Bennett's slander claim was groundless and brought in bad faith or for purposes of harassment. The jury answered affirmatively. Grant then moved the court to enter final judgment sanctioning Bennett for filing a groundless claim brought in bad or for purposes of harassment. Prior to the court's sanctions order, Bennett also filed a brief with the court contending that he should not be sanctioned because his claims were not groundless nor brought in bad faith or for purposes of harassment. Thus, on the record, Grant moved the trial court to issue sanctions and Bennett plainly had notice of the grounds on which Grant was seeking sanctions and an opportunity to respond.

[27]The trial court's order provides many instances of Bennett personally implicating himself, including one instance where he--outside the presence of the jury--altered a hand-drawn exhibit depicting Reynolds' brand. When confronted about the alteration, Bennett claimed he was merely highlighting the exhibit so the jury could see it better, and that it was okay because the Judge was in the courtroom when he made the alteration. The trial court notes in its order that " although the Judge was present in the room, such alteration was not observed or sanctioned by anyone, the Court included." In addition to the sanctions expressly authorized by Rule 13 and Chapter 10, the trial court has the inherent power to sanction such bad faith conduct that occurs during the course of litigation. *See Public Util. Comm'n v. Cofer*, 754 S.W.2d 121, 124 (Tex. 1988); *Eichelberger v. Eichelberger*, 582 S.W.2d 395, 398 (Tex. 1979).

[28]We acknowledge that the amount of attorneys' fees awarded as sanctions is significant. Chapter 10 and Rule 13, however, specify that attorneys' fees caused by improper conduct are an appropriate sanction. *See* Tex. Civ. Prac. & Rem. Code § 10.004(c)(3); Tex. R. Civ. P. 13. Bennett has not raised any challenge to the amount of the award on appeal. On rehearing, Bennett contends he is entitled to remand to allow the trial court to reconsider the amount of

the award in light of the Texas Supreme Court's recent opinion in *Nath v. Texas Children's Hospital* . *See* 446 S.W.3d 355, 372 (Tex. 2014) (holding that sanctions were warranted but remand was necessary to determine whether, by litigating for over four years before seeking sanctions, the moving party bore some responsibility for the attorneys' fees it incurred). In *Nath*, however, the sanctioned party preserved error by challenging the excessiveness of the attorneys' fees at the trial court and on appeal. *See* 446 S.W.3d at 361, 364. Here, Bennett did not raise the issue of excessiveness at the trial court nor on appeal. Under these circumstances, we cannot conclude he is entitled to remand under *Nath*.

[29]In response to our opinion issued in this appeal on August 13, 2014, Grant filed with the district court a remittitur reducing his $2 million exemplary damages award against Bennett and Bonham to an award of $512,109 against each defendant. *See* Tex. R. App. P. 46.3.

---------

**600 S.W.2d 887 (Tex.Civ.App.—Houston [14 Dist.] 1980)**

**Georgia BATMANIS, Appellant,**

 **v.**

 **Elizabeth BATMANIS, Appellee.**

**No. B2331.**

**Court of Civil Appeals of Texas, Fourteenth District, Houston**

**April 30, 1980**

 Rehearing Denied May 21, 1980.

 Don E. Kilpatrick, Houston, for appellant.

 Eugene J. Pitman, DeLange, Hudspeth, Pitman & Katz, John J. Toomey, Houston, for appellee.

 Before COULSON, SALAZAR and JUNELL, JJ.

 COULSON, Justice.

 The suit made the basis of this appeal was one to determine the community interest of a widow, Georgia Batmanis (appellant or Mrs. Batmanis), after she had filed her election to take against the will of her deceased husband, Paul Batmanis. Appellee, the respondent below, is Dr. Elizabeth Batmanis, independent executrix of the estate of Paul Batmanis and his daughter born of his first marriage. Paul and Georgia Batmanis had each been previously widowed prior to their marriage on October 25, 1973. After Mr. Batmanis's death on May 22, 1976, his executrix prepared an inventory of his estate. Appellant and appellee could not agree as to which property held at

the time of Mr. Batmanis's death was separate and which was community. This suit resulted.

 Trial was to a jury. After both sides rested, counsel for appellee moved for a peremptory finding that all the real estate involved in the estate was the separate property of the deceased, that six of the bank accounts on the inventory were community property, that the remaining bank accounts were separate property of the deceased, and that certain stock was community property since it was purchased after the marriage and the remainder of the stock was the deceased's separate property. The court sustained the motion as to the real estate, the six community bank accounts, and the stock without objection from counsel for appellant. The court denied the motion as to the remaining bank accounts, and twelve special issues, prepared by counsel for appellee, were approved by the court for submission to the jury. The special issues inquired (1) whether the funds in six certificates of deposit or certificates of savings were on deposit prior to the marriage, (2) whether the deceased had purchased certain certificates of savings during the marriage with checks drawn on his checking account, and (3) whether the deceased had deposited certain dividends and rentals collected by him into his checking account. The jury answered each special issue in the negative. Counsel for appellant moved for judgment on the jury verdict while counsel for appellee moved for judgment notwithstanding the verdict. The judgment non obstante veredicto was entered on October 2, 1979.

 The first point of error urged by Mrs. Batmanis contends that the trial court erred in sustaining appellee's motion for judgment non obstante veredicto because there existed evidence of probative force to support the jury's findings. The argument pertaining to this first point of error makes it clear that appellant's complaint is actually directed only to the following:

Certificate of Savings, San Jacinto Savings Association, No. 48-805692-1

Certificate of Savings, San Jacinto Savings Association, No. 48-002310

Certificate of Savings, Houston First Savings, No. 254418

Certificate of Deposit, Gibraltar Savings Association, No. 7-861388

Certificate of Savings, Benjamin Franklin Savings, No. 48-112813-1

Certificate of Deposit, American Savings & Loan Association, No. 48-021179-7

 If we are to affirm the trial court's granting of appellee's motion for judgment notwithstanding the verdict, we must determine that there was no evidence to sustain the jury's findings that the six certificates of deposit or savings were not on deposit prior to the marriage of appellant and the deceased. In our review we must view all evidence in the light most favorable to the jury findings and indulge every reasonable inference from the evidence to support those findings. All evidence and inferences not supporting the

jury verdict must be disregarded. *Dodd v. Texas Farm Products Co.,* 576 S.W.2d 812 (Tex.1979).

After a thorough review of the evidence concerning the six certificates in dispute, we find that, as a matter of law, they are each directly traceable to certificates held by the deceased prior to the marriage and, therefore, were Mr. Batmanis's separate property. Thus, there was no evidence to support the jury's answers to Special Issues No. 1-6, and the granting of judgment notwithstanding those answers was proper. Appellant's first point of error is overruled.

Appellant's second point of error concerns the overruling of her objections to page 1 of Respondent's Exhibits Number 13 and 14 and the admission of Respondent's Exhibits Number 13 and 14 into evidence.

Page 1 of the complained of exhibits are handwritten summaries of the activity of two certificates of deposit, alleged to be community property, which were manually copied from a visual display on a computer terminal. In each case, the summary is unnecessary to explain the remainder of the exhibit which contains signature cards from the two certificates. The certificates are

**Page 890**

traceable without the summaries, and, thus, the possible inadmissability of the summaries was not calculated to cause and did not cause the rendition of an improper judgment. Any error in the overruling of the objection to the admission of the summaries was, therefore, harmless. Tex.R.Civ.P. 434.

The objection made to the admission of Exhibits 13 and 14 was that the proffered exhibits were copies and, therefore, not the best evidence. It is clear from the record that appellant's objection was in reference to the summaries, page 1 of the exhibits. The accuracy of the reproduction of the signature cards was never disputed. Inasmuch as we have already found the admission of the summaries to have been harmless error, and the accuracy of the reproduction of the remaining pages of the exhibits was never in dispute, those reproductions were admissable under Tex.Rev.Civ.Stat.Ann. art. 3731c (Vernon Supp. 1980). Appellant's second point of error is overruled.

Appellant's third point of error complains that the trial court incorrectly held that the sum of $19,272.33, held in constructive trust for the estate of Erato Batmanis (the deceased first wife of Paul Batmanis) by Paul Batmanis as trustee, be satisfied from community property. The undisputed evidence shows that (1) during the marriage of appellant and Paul Batmanis, Mr. Batmanis collected rents and dividends from real property and shares of stock owned by the estate of Erato Batmanis in the amount of

$19,272.33, (2) the funds were deposited in Mr. Batmanis's checking account, and (3) funds were withdrawn from that bank account and were used to purchase certain certificates of savings and to open certain passbook savings accounts. The total amount contained in these certificates, passbook accounts and the checking account was $41,341.23. Since appellant did not even attempt to distinguish which of this money came from the rents and dividends collected as constructive trustee and which came from other sources, the entire amount will be subject to the trust. *Eaton v. Husted,* 141 Tex. 349, 172 S.W.2d 493 (1943). Where, as here, the trustee invests the trust money in other property, the beneficiaries of the trust may follow the fund into the new investment. *General Ass'n of Davidian S.D.A. v. General Ass'n, Etc.,* 410 S.W.2d 256 (Tex.Civ.App. Waco 1966, writ ref'd n. r. e.). And where, as here, the trustee comingles trust money with his own and money is expended, it will be presumed that his own money is expended first. 410 S.W.2d at 259. Thus, the trial court was correct in holding that the $19,272.33 held in trust for the estate of Erato Batmanis should be recovered from community property, and appellant's third point of error is overruled.

Finally, appellant urges error in the trial court's refusal to allow her interest on her one-half of the community property withheld from her since the date of death of Paul Batmanis. The trial court awarded appellant her one-half of the dividends collected on shares of stock owned by the community. We find that appellant is also entitled to her proportionate share of the interest contracted for in the certificates of savings and passbook account found to be community property. In addition, if it be found that appellant's share of the community was wrongfully withheld from her, she may be entitled to interest as damages. *McKinney v. Nunn,* 82 Tex. 44, 17 S.W. 516 (1891); Tex.Rev.Civ.Stat.Ann. art. 5069-1.01 (Vernon 1971).

It is clearly the law in Texas that interest is allowed as damages for the failure to pay a sum due. *Davidson v. Clearman,* 391 S.W.2d 48 (Tex.1965). Interest attaches whenever it is ascertained that money was due at a particular time and was withheld. *Hayek v. Western Steel Company,* 469 S.W.2d 206 (Tex.Civ.App. Corpus Christi 1971) aff'd, 478 S.W.2d 786 (Tex.1972). If an award is made to appellant for interest as damages, that interest should be at the rate of 6% from the date the amount became due until the date of judgment. *Southline Equipment Co. v. National Marine Service Incorporated,* 598 S.W.2d 340 (Tex.Civ.App. Houston (14 Dist.), 1980).

**Page 891**

We remand to the trial court for further consideration the questions of (1) whether appellant's share of the community was wrongfully withheld from her and (2) the

amount of contractual interest due appellant from the certificates of savings and passbook account found to be community property.

The remainder of the judgment of the trial court is affirmed.

62 S.W.3d 795 (Tex. 2001)

45 Tex.Sup.Ct.J. 141

**R.E. HAASE and PRH Investments, Inc., Petitioners,**

**v.**

**Joseph K. GLAZNER, Respondent.**

No. 00-1076.

Supreme Court of Texas

November 29, 2001

Argued Oct. 19, 2001.

Rehearing Overruled Jan. 17, 2002.

Bradley R. Echols, Gary Shaver, Boon, Shaver, Echols & Coleman, Longview, for Petitioner.

Kenneth L. Ross, Ross Hudgens & Associates, Longview, John R. Mercy Carter & Elliott, Texarkana, for Respondents.

Justice ENOCH delivered the opinion of the Court.

This case requires us to decide whether a party can maintain a claim based on either fraud or fraudulent inducement when that claim is premised on a contract that the Statute of Frauds makes unenforceable. We hold that a plaintiff cannot assert a fraudulent inducement claim in the absence of a contract. We further hold that under the facts of this case, to the extent that Glazner seeks to recover the benefit-of-the-bargain damages related to a contract that is unenforceable under the Statute of Frauds, the Statute bars the fraud claim, but that Glazner's fraud claim for out-of-pocket damages, if any, may survive the Statute of Frauds. We therefore affirm the court of appeals' judgment in part, reverse in part, and render judgment that Glazner take nothing on his fraudulent inducement claim and on his fraud claim to the extent that he seeks benefit-of-the-bargain damages.

Petitioner R.E. Haase owns the Whataburger franchise rights for the City of Longview. In 1992, respondent Joseph K. Glazner went to work for Haase as a manager trainee. By the end of 1992, Glazner had been promoted to supervisor for Haase's five Longview Whataburger restaurants.

Glazner alleges that in 1994, he and Haase entered into a contract in which Haase agreed to allow Glazner to build an additional Whataburger in south Longview, in Haase's franchise area. According to Glazner, Haase promised to help Glazner secure a franchise by guaranteeing the success of Glazner's proposed new restaurant to Whataburger Inc., the corporate franchisor. Glazner further claims that Haase agreed to sell Glazner his restaurants when Haase decided to retire, and that Glazner agreed to sell Haase his proposed restaurant should he ever decide to sell "for some reason." Glazner asserts that the consideration to Haase for this agreement was to be two percent of the net sales from Glazner's new restaurant. Glazner argues that the contract's terms appear in three letters to Whataburger either signed by Haase or incorporated by reference in a letter that Haase signed, along with a proposed cash-flow statement Glazner prepared assuming a payment to Haase of two percent of projected net sales.

In May 1995, Glazner quit working for Haase. He never obtained a Whataburger franchise. The record shows that Whataburger did not grant any new franchises during the time that Glazner worked for Haase. In November 1996, Haase was granted a Whataburger franchise for a south Longview location. He opened a restaurant there in June 1997.

Glazner sued Haase, alleging breach of contract, fraud, fraudulent inducement, and unjust enrichment. Glazner named as defendants both Haase and PRH Investments, Inc., a corporation that Haase and his wife formed, alleging that Haase and PRH were jointly and severally liable and that the corporate veil should be pierced

because Haase had not observed appropriate corporate formalities. Haase moved for summary judgment on the following grounds: 1) the alleged contract is unenforceable because of the Statute of Frauds; [1] 2) the Statute of Frauds bars Glazner's fraud claims; 3) Glazner offered no evidence of a valid contract; 4) there is no cause of action for unjust enrichment; and 5) Glazner offered no evidence to support piercing the corporate veil. The trial court granted summary judgment without specifying the grounds for its decision.

Glazner appealed. The court of appeals upheld the summary judgment on all claims except those for fraud and fraudulent inducement. With respect to the breach of contract claim, the court of appeals noted that there was no dispute that the Statute of Frauds applied to the alleged contract because it was both a promise to answer for another's debt and an agreement that could not be performed within one year. [2] The Court concluded that no

writing existed that satisfied the Statute. [3] Moreover, the court reasoned, the agreement did not satisfy the Statute of Frauds because it was not final. [4] Rather, the letters Glazner relied on showed ongoing negotiations, not a binding agreement. [5] Thus, the court of appeals affirmed summary judgment on the breach of contract claim because there was no enforceable contract. Glazner does not challenge that ruling.

The court of appeals further held that the Statute of Frauds does not bar Glazner's claims for fraud and fraudulent inducement because of this Court's opinion in Formosa Plastics Corporation USA v. Presidio Engineers and Contractors, Inc. [6] Citing Formosa Plastics, the court reasoned that Glazner's fraud and fraudulent inducement claims alleged a breach of legal duties completely independent of those under the alleged contract. [7] Thus, the court of appeals determined that the trial court erred in granting summary judgment on those claims and remanded them to the trial court. [8]

We granted Haase's petition for review. He asserts that the court of appeals erred by permitting Glazner to assert a fraudulent inducement claim when there is no contract, and by holding that the Statute of Frauds does not bar Glazner's fraud claim because of Formosa Plastics. When reviewing a summary judgment under Rule 166a(c), we consider whether the successful movant in the trial court carried its burden to show that there is no genuine issue of material fact and that judgment should be granted as a matter of law. [9] We take all evidence favorable to the nonmovant as true, and we make all reasonable inferences in the nonmovant's favor. [10]

We first consider Haase's contention that the court of appeals erred in concluding that Glazner may assert a fraudulent inducement claim in the absence of a contract. Haase argues that by

**Page 798**

its nature a fraudulent inducement claim presupposes that a party has been induced to enter a contract. When a party has not been induced into a contract, he asserts, there is no detrimental reliance and therefore no fraudulent inducement claim. We agree.

As we observed in Formosa Plastics, "Texas law has long imposed a duty to abstain from inducing another to enter into a contract through the use of fraudulent misrepresentations." [11] Certainly there can be no breach of that duty when one is not induced into a contract. More significantly, proof that a party relied to its detriment on an alleged misrepresentation is an essential element of a fraud claim. [12] Without a binding agreement, there is no detrimental reliance, and thus no fraudulent inducement

claim. That is, when a party has not incurred a contractual obligation, it has not been induced to do anything. At least two courts of appeals have previously reached this conclusion. [13]

Here, the court of appeals concluded that the parties never reached a final agreement; rather, the letters that make up the alleged contract simply evidence ongoing negotiations. [14] Glazner does not challenge this conclusion before us, and it is fatal to his fraudulent inducement claim. Thus, the court of appeals erred when it reversed the summary judgment on Glazner's fraudulent inducement claim.

We next consider Haase's argument that the court of appeals erred in holding that the Statute of Frauds does not bar Glazner's fraud claim because of Formosa Plastics. Haase relies on several opinions from the courts of appeals holding that the Statute of Frauds bars a fraud claim when, as here, the plaintiff seeks to obtain the benefit of an otherwise unenforceable bargain. [15] Glazner counters that Formosa Plastics reaffirmed that tort damages for fraud can be recovered even where the plaintiff suffers only economic loss related to the contract's subject matter. [16] Again, we agree with Haase.

In Formosa Plastics, we concluded that Presidio could bring a fraudulent inducement claim even though its damages consisted only of economic losses related to the performance and subject matter of the parties' contract. [17] Some of our language in that opinion suggests that there is no distinction between a claim for fraud and one for fraudulent inducement. [18] Fraudulent inducement, however, is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof. That is, with a fraudulent inducement claim, the elements of fraud must be established

**Page 799**

as they relate to an agreement between the parties. Formosa Plastics involved a fraudulent inducement claim based on representations contained in the bid packet upon which Presidio based its contract offer, which resulted in a written contract between the parties. Thus, the case was correctly decided as to fraudulent inducement. Although economic losses may be recoverable under either fraud or fraudulent inducement, Formosa Plastics should not be construed to say that fraud and fraudulent inducement are interchangeable with respect to the measure of damages that would be recoverable.

Moreover, nothing in Formosa Plastics prevents the Statute of Frauds from precluding a fraud claim that seeks to recover the benefit of an unenforceable bargain. The

Statute simply was not an issue in that case--neither party argued that the Statute of Frauds had anything to do with enforcing the parties' contract. As a result, in Formosa Plastics we had no occasion to consider the Statute of Frauds' effect on a fraud claim premised on an unenforceable contract.

This Court did, however, consider that question in Nagle v. Nagle. [19] In that case, the plaintiff sued her former husband to enforce his oral promise to convey to her his half-interest in their home. She alleged fraud and sought specific performance or damages from his failure to perform. The jury found for the plaintiff, and the court of appeals affirmed. This Court reversed, because enforcing an oral promise to convey land despite the Statute of Frauds would render the statute meaningless. [20]

, [9] That same reasoning holds true here. If in the face of the Statute of Frauds we permit Glazner's fraud claim to the extent he seeks to recover the benefit of the unenforceable bargain, we deprive the Statute of any effect. The Statute exists to prevent fraud and perjury in certain kinds of transactions by requiring agreements to be set out in a writing signed by the parties. [21] But that purpose is frustrated and the Statute easily circumvented if a party can use a fraud claim essentially to enforce a contract the Statute makes unenforceable. We therefore hold that the Statute of Frauds bars a fraud claim to the extent the plaintiff seeks to recover as damages the benefit of a bargain that cannot otherwise be enforced because it fails to comply with the Statute of Frauds.

But Glazner's fraud claim may not contravene the Statute of Frauds to the extent that he seeks out-of-pocket damages incurred in relying upon Haase's alleged misrepresentations. [22] With respect to such damages, Glazner is not attempting to enforce the otherwise unenforceable contract. Relying on Glazner's deposition testimony, Haase argues that Glazner's only alleged damages are the lost profits from the franchise he never secured. But Glazner's petition is not so limited. Rather, Glazner's petition alleges that he made

**Page 800**

"efforts concerning demographics, decor, potential profits, and location." And the summary judgment record reveals that Glazner hired a surveyor and entered into an earnest-money contract for a site on which he proposed to build his restaurant. These kinds of damages are not part of the benefit of any alleged bargain between the parties.

Haase did not move for summary judgment on the grounds that there was no evidence of damages aside from lost profits. [23] Nor did he move for summary judgment on the grounds that there was no evidence of reasonable

reliance. Consequently, under the circumstances presented here, Glazner's fraud claim may survive Haase's motion for summary judgment to the extent that he seeks to recover these kinds of out-of-pocket damages.

Haase points out that the trial court granted his special exceptions to Glazner's petition and ordered Glazner to replead, specifically stating the maximum amount of damages claimed, the factual basis underlying the alleged material misrepresentations, and the factual and legal basis underlying Haase's alleged common-law and statutory fraud. Glazner never did. Haase asserts that Glazner's failure to replead is grounds for upholding the summary judgment on both the fraud and fraudulent inducement claims, citing our opinion in Friesenhahn v. Ryan. [24] While Haase is correct that summary judgment may be granted when a party is ordered to replead and fails to, [25] we again note that Haase did not move for summary judgment on this ground. We therefore cannot uphold the summary judgment on that basis. [26]

In sum, we hold that a plaintiff cannot assert a fraudulent inducement claim when there is no contract. We further hold that under the facts of this case, to the extent that Glazner seeks to recover the benefit-of-the-bargain damages related to a contract that is unenforceable under the Statute of Frauds, the Statute bars the fraud claim, but that Glazner's fraud claim for out-of-pocket damages, if any, may survive the Statute of Frauds. We therefore reverse the court of appeals' judgment insofar as it remands Glazner's fraudulent inducement claim and his fraud claim for benefit-of-the-bargain damages, and render judgment that Glazner take nothing on those claims. We otherwise affirm the court of appeals' judgment.

---------

Notes:

[1] See TEX. BUS. & COM.CODE § 26.01.

[2] 61 S.W.3d 10, 14; see also TEX. BUS. & COM.CODE §§ 26.01(b)(2), (b)(6).

[3] 61 S.W.3d 10, 14.

[4] Id. at 15.

[5] Id.

[6] 960 S.W.2d 41 (Tex.1998).

[7] 61 S.W.3d at 15 (citing Formosa Plastics, 960 S.W.2d at 52).

[8] Id. at 16.

[9] KPMG Peat Marwick v. Harrison County Hous. Fin. Corp., 988 S.W.2d 746, 748 (Tex.1999).

[10] Id.

[11] 960 S.W.2d at 46.

[12] See Eagle Prop., Ltd. v. Scharbauer, 807 S.W.2d 714, 723 (Tex.1990).

[13] John Wood Group USA, Inc. v. ICO, Inc., 26 S.W.3d 12, 24 (Tex.App.--Houston [1st Dist.] 2000, pet. denied); Coastal Corp. v. Atlantic Richfield Co., 852 S.W.2d 714, 720 (Tex.App.--Corpus Christi 1993, no writ).

[14] 61 S.W.3d at 15.

[15] Flameout Design & Fabrication, Inc. v. Pennzoil Caspian Corp., 994 S.W.2d 830, 837 (Tex.App.--Houston [1st Dist.] 1999, no pet.); Leach v. Conoco, Inc., 892 S.W.2d 954, 960 (Tex.App.--Houston [1st Dist.] 1995, writ dism'd w.o.j.); Collins v. Allied Pharmacy Mgmt., Inc., 871 S.W.2d 929, 936 (Tex.App.--Houston [14th Dist.] 1994, no writ); Webber v. M.W. Kellogg Co., 720 S.W.2d 124, 129 (Tex.App.--Houston [14th Dist.] 1986, writ ref'd n.r.e.).

[16] 960 S.W.2d at 47.

[17] Id.

[18] See, e.g., id. at 44, 46-47.

[19] 633 S.W.2d 796 (Tex.1982).

[20] Id. at 801; see also Wade v. State Nat'l Bank, 379 S.W.2d 717, 720 (Tex.Civ.App.--El Paso 1964, writ ref'd n.r.e.).

[21] See RESTATEMENT (SECOND) OF CONTRACTS § 131 cmt. c (1981); 9 WILLISTON ON CONTRACTS § 21:1 (4th ed.1999); see also Hooks v. Bridgewater, 111 Tex. 122, 229 S.W. 1114, 1116 (1921).

[22] See Carr v. Christie, 970 S.W.2d 620, 625 (Tex.App.--Austin 1998, pet. denied); see also Collins v. McCombs, 511 S.W.2d 745, 747 (Tex.Civ.App.--San Antonio 1974, writ ref'd n.r.e.); General Corp. v. General Motors Corp., 184 F.Supp. 231, 235 (D.Minn.1960); cf. RESTATEMENT (SECOND) OF CONTRACTS § 139 (1981).

[23] See TEX.R. CIV. P. 166a(i).

[24] 960 S.W.2d 656, 658 (Tex.1998).

[25] Id.

[26] See McConnell v. Southside Indep. Sch. Dist., 858 S.W.2d 337, 341 (Tex.1993).

---------

660 S.W.2d 810 (Tex. 1983)

**Maston Nixon CUNNINGHAM, Petitioner,**

**v.**

**PARKDALE BANK et al., Respondents.**

No. C-2024.

Supreme Court of Texas.

November 30, 1983

Charles R. Cunningham, Corpus Christi, for petitioner.

Head & Kendrick, Richard E. Fling, Corpus Christi, for respondents.

BARROW, Justice.

This is an appeal from a personal judgment rendered by the Nueces County Court, sitting in probate, against Maston Nixon Cunningham (Maston), the resigned independent administrator of the Estate of Nancy Nixon Cunningham. The judgment of the probate court was based upon an alleged deficiency in the assets of the estate, which deficiency resulted from two advancements made by Maston to his sister and himself. The court of appeals, with one justice dissenting, affirmed. 650 S.W.2d 484. We hold that the probate court erred in rendering a personal judgment against Maston and, accordingly, reverse the judgments of the lower courts and

remand this proceeding to the probate court.

Nancy Nixon Cunningham died testate on February 14, 1980, but both of the executors named in her will predeceased her. Her three children, who were her only heirs, agreed upon the appointment of her son, Maston, as independent administrator of the estate. See Tex.Prob.Code Ann. § 145(d) (1980). Paul Pearson, III, an attorney, was hired to assist in the administration and distribution of the estate. Eventually, an application to resign and an order accepting same were filed on behalf of Maston. A detailed account of the estate's claims and assets was prepared and filed also. After these documents were filed with the court, notice was posted for the benefit of all interested parties.

The basis for the judgment of the probate court is the advancement, by Maston, of $26,938.79 to himself and $10,668.78 to his sister Nancy. These advancements were properly reflected in the final account filed on behalf of Maston as claims of the estate. No evidentiary hearing was held to consider the propriety of the final account nor was Maston present to submit evidence in support thereof. Rather, the probate court, upon the motion of Mr. Pearson, rendered a personal judgment against Maston for the total sum of $37,607.57. This judgment was rendered in favor of the successor administrator, Parkdale Bank, despite the fact that Parkdale Bank filed no pleadings praying for such a judgment and never assumed the status of a party plaintiff.

In his motion for new trial and in the court of appeals, Maston urged that the judgment of the probate court was void or voidable because there were no pleadings seeking a judgment against him and because no citation was issued to him personally. He also urged there was no basis in law for rendition of the judgment against him because he is entitled to more funds from the distribution of the estate than the amount advanced to him. [1] Both lower courts found no merit in these contentions. The dissenting justice in the court of appeals concluded that the probate court exceeded its jurisdiction in summarily rendering a personal judgment because of the absence of pleadings, notice, opportunity for hearing, and other procedural irregularities. We agree. [2]

The Texas Rules of Civil Procedure govern proceedings in probate matters except in those instances in which a specific provision has been made to the contrary. Tex.R.Civ.P. 2. In Texas, "[a] civil suit in the district or county court shall be commenced by a petition filed in the office of the clerk." Tex.R.Civ.P. 22. "The office of pleadings is to define the issues at trial," *Murray v. O & A Express, Inc.,* 630 S.W.2d 633, 636 (Tex.1982) and to "give the opposing party information sufficient to enable him to prepare a defense." *Roark v. Allen,* 633 S.W.2d 804, 810 (Tex.1982). Also, the judgment of the court must conform to the pleadings of the parties. Tex.R.Civ.P. 301.

The probate court is vested with substantial potential jurisdiction regarding "matters incident to an estate," Tex.Prob.Code Ann. § 5(d) (1980). This jurisdiction is activated and becomes actual jurisdiction over a party only after the filing of a petition the subject matter of which is within the jurisdiction of the court. Hughes v. Atlantic Refining Co., 424

S.W.2d 622, 625 (Tex.1968). Further, a judgment must be supported by the pleadings and, if not so supported, it is erroneous. *City of Fort Worth v. Gause,* 129 Tex. 25, 101

S.W.2d 221, 223 (1937). Thus, a party may not be granted relief in the absence of pleadings to support that relief. *Stoner v. Thompson,* 578 S.W.2d 679, 682 (Tex.1979); Tex.R.Civ.P. 301.

In the instant case, we are unwilling to construe the final account filed by Maston as being sufficient to empower the probate court to render a judgment against Maston in his individual capacity. The final account fails to set forth a plaintiff and defendant, states no cause of action, alleges no statutory basis upon which a personal judgment may be based and, in fact, was prepared for Maston by Mr. Pearson, who currently serves as counsel for Parkdale Bank. To hold that the mere filing of the exhibit and account is sufficient to support the judgment herein rendered would be untenable.

Equally as important as the absence of any pleadings to invoke the jurisdiction of the trial court is the apparent disregard by the court of rudimentary requirements of notice and the right to be heard. Pursuant to Maston's request in his application for discharge, the trial court set a hearing for May 25, 1981. The record is devoid of any evidence that a formal hearing was, in fact, held on that date. The trial court's order adjudging Maston liable for the deficiency was "entered" June 4, 1981. Maston disputes that he was notified of the date on which the actual hearing was held, that he had notice of the court's intention to render judgment against him, or that he had an opportunity to object to such action.

The Probate Code sets forth numerous provisions governing the necessity and sufficiency of notice and citation in probate matters. Tex.Prob.Code Ann. § 33 (1980). We have been directed to no section of the Code that authorizes the action of the trial court in this case. "The general rule is that the legislature in its discretion may prescribe what notice shall be given to a defendant in a suit, subject to the condition that the notice prescribed must conform to the requirement of due process of law. The requirement of due process of law is met if the notice prescribed affords the party a fair opportunity to appear and defend his interests." *Mexia Independent School Dist. v. City of Mexia,* 134 Tex. 95, 133 S.W.2d 118, 121 (1939); *Sgitcovich v. Sgitcovich,* 150 Tex. 398, 241 S.W.2d 142, 146 (1951).

Those sections of the Code that specifically concern personal representatives guilty of misapplication of estate property require that the guilty party be personally served before action may be taken against him. See Tex.Prob.Code Ann. §§ 149C(a)(2), 222(b)(1) (1980). [3] This undoubtedly is based upon the postulate that procedural due process "requires notice that is reasonably calculated to inform parties of proceedings which may directly and adversely affect their legally protected interests." *City of Waco v.*

*Roddey,* 613 S.W.2d 360, 365 (Tex.Civ.App.--Waco 1981, writ dism'd); see also *City of Houston v. Fore,* 412 S.W.2d 35, 39 (Tex.1967); *Martinez v. Texas State Bd. of Medical Examiners,* 476 S.W.2d 400, 405 (Tex.Civ.App.--San Antonio 1972, writ ref'd n.r.e.), cert. denied, 409 U.S. 1020, 93 S.Ct. 463, 34 L.Ed.2d 312 (1972). Similarly, fundamental fairness dictates that a party must be given a reasonable opportunity to be heard on the merits of his case; such an opportunity must be granted at a meaningful time and in a meaningful manner. See *Read v. Gee,* 551 S.W.2d 496, 501 (Tex.Civ.App.--Fort Worth 1977), writ ref'd n.r.e. per curiam, 561 S.W.2d 777 (Tex.1977); accord *Ex Parte Gordon,* 584 S.W.2d 686, 688 (Tex.1979); cf. *Brown v. McLennan County Children's Protective Svs.,* 627 S.W.2d 390 (Tex.1982). Under this record, we conclude that Maston did not have fair notice of the proposed action of the probate court so as to afford him the opportunity to be present and to

## Page 814

explain or defend his actions at the hearing, before judgment against him was rendered. *Cf. Clanton v. Clark,* 639 S.W.2d 929 (Tex.1982).

The probate court erred in rendering a personal judgment against Maston without pleadings, notice, and an opportunity to be heard. The judgments of the lower courts are set aside and the proceedings remanded to the probate court to conclude the administration of the estate.

---------

Notes:

[1] We find it difficult to understand the substitute administrator's vigorous pursuit of this matter. The principal asset of the estate, to-wit, the residence of the deceased, has been sold, the debts paid, and administrator's attorney concedes that there are more than enough funds on hand to satisfy these advancements. Furthermore, there has been no controversy at any time in the proceedings among the heirs. The general purpose of independent administration is to free the independent executor from "the often onerous and expensive judicial supervision" and thereby "to effect the distribution of the estate with a minimum of cost and delay." Corpus Christi Bank and Trust v. Alice National Bank, 444 S.W.2d 632, 634 (Tex.1969).

[2] Both the majority and the dissent in the intermediate court concluded that the probate court had jurisdiction, under Tex.Prob.Code Ann. § 221 (1980), over a resigning independent administrator. This is a question of jurisdiction that we need not today decide.

[3] Parkdale Bank has now filed a suit in district court seeking a personal judgment against Maston for

misapplication of these estate funds.

---------

**679 S.W.2d 163 (Tex.App. —Houston [14 Dist.] 1984)**

**H. Anne WIELGOSZ, Administratrix of the Estate of Stanley F.**

**Wielgosz, Jr., et al., Relators,**

**v.**

**Honorable Richard W. MILLARD, Judge of the 152nd District**

**Court of Harris County, et al., Respondents.**

**No. A14-84-342CV.**

**Court of Appeals of Texas, Fourteenth District, Houston**

**September 27, 1984**

[Copyrighted Material Omitted]

Philip M. Shafer, Houston, for relators.

John Michael Webb, Bruce R. Hardesty, Webb, Zimmerman, Flaum & Suetlik, Houston, for respondents.

Before J. CURTISS BROWN, C.J., and DRAUGHN and CANNON, JJ.

OPINION

J. CURTISS BROWN, Chief Justice.

This is an original mandamus proceeding filed under TEX.REV.CIV.STAT.ANN. art. 1824 (Vernon Supp.1984). Relator, H. Anne Wielgosz, in her individual capacity and as Administratrix of the Estate of Stanley F. Wielgosz, Deceased, seeks the writ to require the Honorable Richard W. Millard, Judge of the 152nd Judicial District Court of Harris County, to vacate his discovery order of April 13, 1984. This order requires Relator to supply documents regarding both the personal and professional financial affairs of Relator and her deceased husband, Stanley Wielgosz, from 1978 to 1983.

We will summarize the facts of this case for clarity. In May 1982, Respondent, Seaboard Surety Company, filed suit in the district court of Harris County against Relator as Administratrix of the Estate of Stanley Wielgosz, Jr.,

Mobile Hydraulic Company, Metro Ford Truck Sales and Allied Cypress Bank. Respondent alleged that Stanley Wielgosz was general manager of Tri-W Rentals, a division of the W.W. Williams Company, [1] from mid-1979 until his death in mid-1981, and that during the time he was employed as general manager he embezzled $176,214 from the Tri-W Rentals division.

In November 1982, Seaboard amended its petition to include Relator as a defendant in her individual capacity, alleging that she conspired with her husband to take the funds and "has continued to conceal the existence of such funds and to convert them to her own use and benefit." Subsequent to this amendment, Relator filed a plea to the jurisdiction in both capacities, alleging that exclusive jurisdiction over the parties was in Harris County Probate Court Number Two where the administration of Stanley Wielgosz's estate was pending. The district court sustained Relator's plea and dismissed the suit against her, both individually and as Administratrix. Respondent then filed an original petition in Probate Court Number Two against Relator, but only in her individual capacity. The probate court sustained Relator's plea to the jurisdiction and dismissed the suit, stating that the cause of action as alleged by Respondent against Relator was not incident to, nor did it pertain to, the Estate of Stanley Wielgosz, Jr. On May 23, 1983, Respondent filed a motion in the district court asking for reinstatement of its suit against Relator, individually. On June 21, 1983, the court set aside the dismissal and ordered the reinstatement of Relator as a defendant, both individually and as Administratrix of her husband's estate. In June 1983, Respondent served Relator with a request for production of documents to which Relator objected. Following a hearing on the matter, Judge Millard ordered production of the documents requested by Respondent. Relator now brings this

mandamus action, complaining of Judge Millard's order.

Relator first argues that the district court has no subject matter jurisdiction over the cause against Relator as Administratrix of her husband's estate or individually because exclusive jurisdiction of this cause rests in the probate court. We find it unnecessary to determine whether the district court would have had jurisdiction over Relator in her capacity as Administratrix. After dismissal in the probate court, Respondent filed its Motion for Rehearing, asking the district court to "rescind, revoke and set aside the Order of Dismissal previously entered in this cause and that the cause of action of Plaintiff against H. Anne Wielgosz, Individually be reinstated and enter its further order that H. Anne Wielgosz, Individually will, henceforth be treated as a

Defendant in this action ...." However, the trial court in reinstating the cause, ordered "H. Anne Wielgosz, Administratrix of the Estate of Stanley F. Wielgosz, Jr. and H. Anne Wielgosz, Individually ... reinstated as party defendants in this cause of action ...."

As a general rule, a trial court may not grant relief which is not supported by the pleadings, and a judgment not supported by the pleadings is improper. *Hubbard v. Lagow,* 576 S.W.2d 163 (Tex.Civ.App.--Austin 1979, writ ref'd n.r.e.); *Crozier v. Horne Children Maintenance and Educational Trust,* 597 S.W.2d 418 (Tex.Civ.App.--San Antonio 1980, writ ref'd n.r.e.); *Harry Hines Medical Center, Ltd. v. Wilson,* 656 S.W.2d 598 (Tex.App.--Dallas 1983, no writ); TEX.R.CIV.P. 301. Since there were no pleadings to support the reinstatement of Relator as Administratrix, the trial court was without authority to enter such an order. In light of this circumstance, we do not find it necessary to further address an issue which calls into question this Court's jurisdiction. It is, therefore, left for us to determine whether the district court has jurisdiction over Relator, individually, in this cause of action. In its Second Amended Original Petition, Respondent alleged the following:

As such, Mrs. Wielgosz knowingly and wrongfully engaged in a conspiracy with her now deceased husband to defraud and conceal from the Plaintiff sums rightfully belonging to it and has continued to conceal the existence of such funds and to convert them to her own use and benefit. The Inventory and Appraisement filed by Mrs. Wielgosz as Administratrix fails to list Wielgosz' community interest in said funds or their proceeds as property of the Wielgosz' estate. It is alleged by Plaintiff that Mrs. Wielgosz does not consider the funds withdrawn from said account as community property and accordingly, those funds must be considered by Mrs. Wielgosz as her separate property. These funds have been converted to the personal benefit of H. Anne Wielgosz by the said H. Anne Wielgosz. Plaintiff herein sues H. Anne Wielgosz for the return of the sums of money wrongfully taken from W.W. Williams Co. by H. Anne Wielgosz and converted to her own benefit which amount is in excess of $176,000.00.

Without addressing the merits of the case, we believe the allegations set out above are sufficient to establish Respondent's right to maintain its cause of action against Relator, individually, in district court, separate and apart from any claims incident to or appertaining to the estate of her deceased husband. Despite the fact the administration of the estate is currently pending in Probate Court Number Two of Harris County, we do not feel the matter before us is exclusively within the province of that court. See *Pullen v. Swanson,* 667 S.W.2d 359 (Tex.App.--Houston [14th Dist.] 1984, writ ref'd n.r.e.); TEX.PROB.CODE ANN. § 5 and § 5A (Vernon 1980).

Relator further argues that even if the district court had jurisdiction to hear the case, she cannot be compelled to produce the documents demanded by Relator because to do so would violate her Fifth Amendment privilege against self-incrimination. We disagree. The Fifth Amendment is not violated solely because certain

**Page 167**

documents, on their face, might be incriminating. The privilege protects a person only against being incriminated by his own compelled testimonial communications. *United States v. Doe,* 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984); *Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). However, this privilege is limited to prohibiting the use of physical or moral compulsion exerted on the person asserting the privilege. Fisher, 425 U.S. at 397, 96 S.Ct. at 1574. If the ingredient of personal compulsion against the accused is lacking there is no such privilege. *Couch v. United States,* 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973). Therefore, documents belonging to or prepared by others are not protected, even if they contain incriminating matters. Fisher, 425 U.S. at 408, 96 S.Ct. at 1579. Further, in United States v. Doe, 104 S.Ct. at 1241-1242, the Supreme Court held that where the preparation of business records is voluntary, a demand for production of such documents does not compel oral testimony nor does it compel a party to "restate, repeat, or affirm the truth of their contents." Id.

The documents sought by Respondent include: (1) documents belonging to or about the deceased; (2) documents prepared by others, such as bank records, invoices, receipts; (3) business records (including corporate and partnership tax returns); and (4) Relator's individual tax returns, personal financial statements, and records of household accounts. In view of the authorities cited above, the first three categories of documents are clearly not privileged, and Relator cannot refuse to produce them based on a claim of self-incrimination.

We must now examine the fourth category set out above which relates to documents prepared personally (or under her immediate supervision) by Relator. In Texas, income tax returns are subject to discovery to the extent of relevancy and materiality by the party seeking discovery and as determined by the court. *Maresca v. Marks,* 362 S.W.2d 299 (Tex.1962); *Crane v. Tunks,* 160 Tex. 182, 328 S.W.2d 434 (1959). However, it is the duty of the trial judge to personally examine the returns and to segregate the relevant from the irrelevant portions of same before making such information available to the moving party. Maresca, 362 S.W.2d at 300-301. The Court in Maresca stated:

The assumption is implicit in the opinions of this court that a trial judge will discriminate in ordering discovery between information disclosed by income tax returns which is relevant and material to the matters in controversy and information which is not. The protection of privacy is of fundamental--indeed, of constitutional--importance. Subjecting federal income tax returns of our citizens to discovery is sustainable only because the pursuit of justice between litigants outweighs protection of their privacy. But sacrifice of the latter should be kept to the minimum, and this requires scrupulous limitation of discovery to information furthering justice between the parties which, in turn, can only be information of relevancy and materiality to the matters in controversy. Id. at 301.

We see no reason to exclude Relator's other personal financial records, such as her financial statements and records of household accounts from similar considerations.

We therefore hold Judge Millard abused his discretion in ordering Relator to produce her entire tax returns, financial statements, and personal household records without examining them and separating the relevant parts from the irrelevant. As stated in Maresca, 362 S.W.2d at 301, it is not this court's function to supervise the trial judge in exercising his discretion in his rulings on relevancy and materiality. However, we should grant extraordinary relief when no discretion has been exercised, as in the case before us.

We feel certain the trial judge will act in a manner consistent with this opinion and that it will be unnecessary for a writ of mandamus to issue at this time. However, in the event he fails to do so, a writ will

**Page 168**

issue to insure compliance with this opinion.

---------

Notes:

[1] ... Seaboard Surety Company brought suit as the insurer of the W.W. WILLIAMS COMPANY.

---------

**708 S.W.2d 930 (Tex.App. —Corpus Christi 1986)**

**Jacqueline MOODY, Appellant,**

**v.**

**Helen Marion PITTS, et al., Appellees.**

**No. 13-85-356-CV.**

**Court of Appeals of Texas, Thirteenth District, Corpus Chritsi**

**April 17, 1986**

[Copyrighted Material Omitted]

J.D. Sherlock, Jr., Austin, for appellant.

Richard Davis, Harlingen, for appellees.

Before NYE, C.J. and KENNEDY and DORSEY, JJ.

OPINION

NYE, Chief Justice.

This case involves the construction of a will. Appellant, Jacqueline Pitts Moody, is the daughter of the testator, Johnny T. Pitts. She brought this action against appellees: Helen Marion Pitts (her mother and the wife of testator), William Terry Pitts (her brother) and his wife, and Geraldine Pitts Floyd (her sister) and her husband. The fourth child of Johnny and Helen Pitts is not a party to this action. Suit was brought to invalidate the testamentary trust created by the will, to declare void conveyances of certain real estate, to impose a constructive trust on appellant's purported share of the transferred real estate, for an accounting, and for the removal of the trustee. Appellant appeals from a take-nothing judgment. We reform and, as reformed, affirm.

Testator executed his will on July 23, 1973, and died September 2, 1976. The will was probated on September 30, 1976. It made a direct bequest to Helen Pitts (his wife) and devised the remainder of his estate (particularly certain real estate) to a trustee (Helen Pitts) in trust for the wife, Helen Pitts, for life with the remainder to their four children. On November 24, 1976, three of the children conveyed their remainder interest in the real property,

which was subject to the trust, to their mother, Helen Pitts. Appellant (Jacqueline Pitts Moody, a daughter) refused to convey her interest to her mother. Between December 1976 and March 1977, Helen Pitts (as trustee, as executor, and as an individual) conveyed several pieces of real property which were part of the corpus of the trust to her son William and his wife and her daughter Geraldine and her husband.

The portions of Johnny T. Pitts' will relevant to this appeal are as follows:

ARTICLE THREE

All of the rest, residue and remainder of the property which I may own at the time of my death, real, personal and mixed, tangible and intangible, ... I give, devise and bequeath to my Trustee, hereinafter named, IN TRUST NEVERTHELESS, for the following uses and purposes:

I. I direct my Trustee to hold, manage, control, invest and reinvest the same, to collect the income therefrom and to pay the net income therefrom to my beloved wife, Helen, so long as she shall live, in monthly or other convenient installments.

II. I further direct that my Trustee may, in her discretion, at any time and from time to time, pay over to or apply for the benefit of my wife so much or all of the principal of the Trust as will, when coupled with the income of the Trust, support her in her accustomed manner of living and pay her medical, dental, hospital and nursing expenses of invalidism. Restoration of principal in case of such invasion shall not be required as a condition of further distribution of income. In determining the amounts of principal to be so disbursed, my Trustee shall take into consideration the other income resources, but not capital resources, of such beneficiary.

III. Upon the death of my beloved wife, Helen, ... I then give, devise and bequeath all of the rest, residue and remainder of my Estate to my children, namely Geraldine Pitts Floyd, ... Johnny T. Pitts, Jr. ... William Terry Pitts ... and Jacqueline Pitts Melton ... in equal shares, per stirpes; ... (Emphasis in the original.)

ARTICLE FOUR

I nominate, constitute and appoint my beloved wife, Helen Marion Pitts, as Independent Executrix and as Trustee, without bond, under this, my Last Will and Testament, and I direct that no other action shall be had in the County Court or other probate court in relation to the

settlement of my Estate than the probating and recording of this, my Will, and return of statutory Inventory, Appraisement and List of Claims of my Estate. In event of the death, resignation, inability or refusal of my said Executrix and Trustee to act in either capacity, I then nominate, constitute and appoint my son, Johnny, and daughter, Jacqueline, to act as Substitute Independent Co-Executors and as Successor Co-Trustees, as the case may be, without bond, and grant such Successors all of the rights, powers and duties of the original fiduciary, without any act of conveyance or transfer....

* * *

* * *

ARTICLE FIVE

No beneficiary of any Trust created hereunder shall have any right to anticipate, alienate, encumber or hypothecate his or her interest in the principal or income of such Trust in any manner, nor shall the interest of any such beneficiary be subject to the claim of his or her creditors, or liable to attachment, garnishment, execution and other process of law. Title to all such principal and income shall remain solely and exclusively in my Trustees until actually distributed by my Trustees to such beneficiary under the terms of the instrument.

I direct that my Executors with respect to my Estate and my Trustees with respect to any Trust herein created shall have, and they are each hereby invested with the administrative powers set forth in Annex A to this, my Will, which is attached hereto, ... which powers may be exercised by my Executors and my Trustees at any time or from time to time as they, in their sole discretion, deem advisable.

* * *

* * *

ANNEX A

To the Last Will and Testament of

Johnny Thomas Pitts

ADMINISTRATIVE POWERS GRANTED TO MY EXECUTOR AND TRUSTEE AND TO THE SUBSTITUTE OR SUBSTITUTES AND THE SUCCESSOR OR SUCCESSORS OF THEM:

* * *

* * *

4. To sell, exchange, assign, transfer, partition, or otherwise dispose of any property, real or personal, of which I may die seized or possessed, or which may at any time form part of my estate or the trust created hereby, at public or private sale, for such purposes and on such terms, including sales on credit, with or without security, in such manner and at such prices as to my fiduciary appears advisable.

* * *

* * *

28. Except as may be otherwise expressly provided in my Will, whenever my fiduciary is required or permitted to divide or distribute my estate or any trust created hereby, to make such division or distribution in money or in kind, or partly in money and partly in kind; to allot different kinds of property among the beneficiaries; and to determine the relative value of the property so allotted, and, in the absence of a showing of bad faith, the valuation assigned by my fiduciary of assets for the purpose of distribution in kind shall be conclusive and binding upon all persons interested in my estate. (Emphasis added.)

Appellant testified that she and the other members of the family had an understanding as to how the real property should be divided among the children. According to appellant, her brother William was to get a one hundred and ninety-nine-acre tract. Geraldine was to get one hundred acres, and their other brother was to get the homesite (approximately 57 acres). Appellant was to get one hundred and eighty acres, consisting of a one hundred and sixty-acre block and a twenty-acre block with a two-story house, in which her sister Geraldine was living at the time of their father's death.

It was appellant's testimony that her mother initially stated that appellant was to get the one hundred eighty acres, but

then retracted because Geraldine wanted the twenty acre portion and two-story house. Appellant felt this was unfair and refused to join her brothers and sister in conveying their remainder interests to their mother. On cross-examination, appellant answered negatively when asked whether she would have objected had her mother conveyed the one hundred eighty acres to her. Appellant answered affirmatively when asked if she understood that her father's will provided for an equal division of the property among the children and did not provide that certain children would receive certain portions of the property.

In its judgment, the trial court ordered that (1) the trust under the will failed due to a merger of legal and equitable titles during the lifetime of Helen Pitts; (2) the will created

a life estate in Helen Pitts by which she was vested with all the powers set forth in Exhibit A of the will; (3) Helen Pitts correctly disposed of the assets of the estate; (4) the conveyances of the real property to William and Geraldine were valid; and (5) Jacqueline Moody retains a one-fourth remainder interest in the estate of her father as it exists at the time of Helen Pitts' death. All other relief was denied, and all costs were adjudged against appellant.

By their sole cross-point, appellees contend that the trial court erred in holding there was a merger of the two estates which resulted in the failure of the testamentary trust because there existed an outstanding equitable interest in the remaindermen that, as a matter of law, prevented a merger of the estates. We agree with appellees and sustain this cross-point.

It is a well-settled principle that where a greater estate and a lesser estate are united in the same person, the estates merge, and the lesser is absorbed by the greater. *Olivas v. Zambrano,* 543 S.W.2d 180, 182 (Tex.Civ.App.--El Paso 1976, no writ); *Cole v. Grigsby,* 35 S.W. 680, 690 (Tex.Civ.App.1894), affirmed, 89 Tex. 223, 35 S.W. 792 (1896); 34 Tex.Jur.3d, Estates § 49 (1984). This rule is applicable to trusts. TEX. PROPERTY CODE § 112.034 (Vernon 1984); see also RESTATEMENT (Second) OF TRUST § 99 (1959). Where one person has both the legal title to the property and the entire beneficial interest, he holds it free of trust. There is no separation of the legal and beneficial interests, and there are no duties to assume or to provide.

It is also plain from the will that Helen Pitts is the life beneficiary under this trust, which is terminated at her death with the remaining corpus to be distributed to the remaindermen (the four children). The children's future interests under this will are vested remainders. Vested remainders are fixed interests with a present right of future enjoyment with only the right of possession postponed until the ending of a particular estate. *Caples v. Ward,* 107 Tex. 341, 179 S.W. 856, 857-58 (1915).

Thus, when the testamentary trust in this case became operative, there existed four persons with vested remainder interests in the residuary estate. Even after three of the children conveyed their remainder interests to their mother, a vested remainder still existed. At no time since the death of the testator has Helen Pitts owned the legal title and all of the equitable interest in all of the trust property. There has been a vested remainderman to whom Helen Pitts has had a duty as trustee, and who can maintain an action against her for her acts as trustee, as evidenced by the instant litigation. See TEX. PROPERTY CODE ANN. §§ 113.151(b) and 111.004(7) (Vernon 1984). The general rule is that courts will not allow a merger to defeat a vested remainder. *Olivas v. Zambiano,* 543 S.W.2d at 182; *Cole v. Grigsby,* 35 S.W. at 690.

Although appellant has argued that a merger resulted, it was her refusal to convey her equitable interest in the property to Helen Pitts that prevented a merger of the legal and equitable titles and ensured the viability of the testamentary trust. We hold that the legal and equitable interests have not completely merged so as to defeat this trust. See *First Church of Christ, Scientist v. Snowden,* 276 S.W.2d 571, 574

**Page 935**

(Tex.Civ.App.--Beaumont 1955, writ ref'd n.r.e.).

Appellant brings eleven points of error to this court. These points are inartfully drafted. We have attempted to determine the substance of the complaints through the statements, authority and arguments under each point. We have discretion in such instances to consider faulty points of error. *Cleaver v. Dresser Industries,* 570 S.W.2d 479, 483 (Tex.Civ.App.--Tyler 1978, writ ref'd n.r.e.); TEX.R.CIV.P. 422, See also Pool v. Ford Motor Co., --- S.W.2d ----, 29 TEX.SUP.CT.J. 301 (April 2, 1986). Essentially, appellant complains of each of the trial court's rulings (with the exception of the ruling that the trust failed due to a merger), and the trial court's refusal to impose a constructive trust on her share of the real property in her father's estate.

In her first five points of error, appellant complains of the trial court's rulings that Helen Pitts acted correctly in disposing of certain real property of the estate. Appellant's interpretation of the will seems to be that Helen Pitts was devised a life estate free of a trust (because of a merger), but the life estate was subject to the spendthrift provision of the trust prohibiting the beneficiary from alienating any trust assets. She specifically argues that Helen Pitts was not devised a life estate with the power to invade the corpus of the trust.

This argument completely ignores the second paragraph of Article Five of the will in which the testator vests the powers delineated in "Annex A" in the executor of the estate and the trustee of the testamentary trust, each position to which he named his wife. In this particular instance, it matters little whether Helen Pitts acted as executor or trustee. She had the same powers under the will and comparable fiduciary duties to the remaindermen whether she acted as trustee or executor.

The primary objective in construing wills and trusts is to determine the intent of the maker. *Corpus Christi National Bank v. Gerdes,* 551 S.W.2d 521, 523 (Tex.Civ.App.--Corpus Christi 1977, writ ref'd n.r.e.). The testator's intent must be ascertained from the four corners of the will. *Farah v. First National Bank of Fort Worth,* 624

S.W.2d 341, 345 (Tex.App.--Fort Worth 1981, writ ref'd n.r.e.). If possible, we are to construe a will in such a way as to give effect to every provision of the will. *Gonzalez v. Gonzalez,* 457 S.W.2d 440, 443 (Tex.Civ.App.--Corpus Christi 1970, writ ref'd n.r.e.). If the language used by the maker of a will or trust is unambiguous, it is unnecessary to construe the instrument. Gerdes, 551 S.W.2d at 523. If the trustee's powers are unambiguously conferred by the instrument, neither the trustee nor the courts can add to or take away from the powers so conferred.

Article Five of the will provides that no beneficiary of the trust may alienate trust property or their interest therein, that title shall remain exclusively in the trustee, and that the trustee shall have the power of sale (through "Annex A"). Helen Pitts conveyed the real property as trustee, as executor, and as an individual.

Based on the language used by the testator, there is no question that he intended his wife to wear three different hats in his testamentary scheme: executor, trustee, and life beneficiary. Clearly, his purpose was to provide for his wife's support "in her accustomed manner of living and [to] pay her medical, dental, hospital and nursing expenses and expenses of invalidism." He provided that she serve as executor and trustee without bond and with no more than minimum court supervision. As trustee, she had broad powers of sale and limited powers of invasion. We hold that the conveyances by Helen Pitts, as trustee, did not violate the spendthrift or other provisions of the testamentary trust.

The result is the same even if the authorization is limited, and only may be for the "purpose of meeting her expenses of life and to pay doctor or hospital bills incurred and necessary," as long as the invasion of principal was for the purposes provided for in the will and not done in bad faith. *Guest v. Bizzell,* 271 S.W.2d 472, 476 (Tex.Civ.App.--Eastland 1954, writ ref'd). The person challenging the exercise of the power

**Page 936**

to invade principal has the burden of showing it was exercised in bad faith or went beyond that authorized. If a life tenant exercises the power of sale, the proceeds of that sale are still part of the estate. The principal still exists, only its form changes. *Edds v. Mitchell,* 143 Tex. 307, 184 S.W.2d 823, 826 (1945). The proceeds of the sale which remain undisposed of at the time of the life tenant's death pass to the remaindermen unless the will provides otherwise.

In the instant case, there is no evidence of how much income, if any, the real property produced before the sales. It is entirely possible that the property did not produce any income. If so, its liquidation would be necessary in order to

provide the life tenant funds for her support. At trial, Helen Pitts was asked if she gave the properties to her son and daughter. She answered: "I sold them." She answered affirmatively when asked if she received any monies for them. When asked where these monies had gone, she answered: "That's what I live off of."

Helen Pitts also testified that she had recently made improvements to her home. She added a garage and bedroom at an approximate cost of $30,000.00. She stated that the addition increased the number of bedrooms in her home from three to four. She was asked if it was her accustomed manner to live in four bedrooms, and she replied: "Well, I'm there by myself. I guess I can just go in any of them I want." It was undisputed that Helen Pitts had four children.

We hold that the testator intended his wife to have the power, as trustee, to convey the real property, and that she has not exceeded the authorizations in the will by so doing. Appellant's first through fifth points of error are overruled.

In her points of error six through ten, appellant complains of the trial court's ruling that appellant, if she survives her mother, retains a one-fourth remainder interest in the estate of Johnny Pitts as it exists at the time of her mother's death. Her argument here seems to be that her interest in the estate was a vested remainder and that it was error for the trial court to require that she survive the life tenant (her mother, the trustee) in order for her interest to vest.

The point at issue is whether appellant's remainder is completely indefeasible. The testator devised, after the death of the life tenant, the remainder of his estate to his four children in equal shares, per stripes. If a remainderman predeceases the life tenant, without issue of his body, the remainder interest would not pass to the remainderman's estate as contended by the appellant. See *Power v. Landram,* 464 S.W.2d 99, 101 (Tex.1970). The remainderman's interest is defeasible in that sense.

Appellant's remainder interest is also defeasible because it is subject to the life estate of Helen Pitts and the powers of sale and invasion of the trustee. The power of sale does not prevent the remainder interest from vesting. *Caples v. Ward,* 179 S.W. at 858. There is no uncertainty as to who will take, only as to the "quantity and value" of the principal left to be taken. Id.

It is true that a life tenant (and a trustee) has a fiduciary duty to the remaindermen not to destroy their remainders except as authorized by the terms of the will. *Maxwell v. Harrell,* 183 S.W.2d 577, 579 (Tex.Civ.App.--Austin 1944, ref'd w.m.). However, Helen Pitts, as trustee, was expressly empowered to sell the property and consume any principal

necessary to maintain her in her accustomed standard of living. Appellant had the burden to bring forth evidence that her mother exceeded her authority. This, she has failed to do. Points of error six through ten are overruled.

In her eleventh point of error, appellant complains of the trial court's refusal to impose a constructive trust on her one-fourth share of the specific real property conveyed. Constructive fraud (necessitating a constructive trust) is defined as a breach of a legal or equitable duty which, regardless of moral guilt, the law considers

**Page 937**

fraudulent because of its tendency to deceive others, violate confidence or injure public interests. *Becknal v. Atwood,* 518 S.W.2d 593, 598 (Tex.Civ.App.--Amarillo 1975, no writ).

The only evidence of any breach of fiduciary duty in this case was the fact that Helen Pitts closed out the trust account and commingled that money with her own funds. If a trustee commingles trust funds with the trustee's own, the entire commingled fund is subject to the trust. *General Association of Davidian Seventh Day Adventists, Inc. v. General Association of Davidian Seventh Day Adventists,* 410 S.W.2d 256, 259 (Tex.Civ.App.--Waco 1966, writ ref'd n.r.e.). When a trustee has commingled funds and has expended funds, the money expended is presumed to be the trustee's own. *Batmanis v. Batmanis,* 600 S.W.2d 887, 890 (Tex.Civ.App.--Houston [14th Dist.] 1980, writ ref'd n.r.e.). Thus, upon Helen Pitts' death, all commingled funds in her bank account, along with any of the trust property not sold or consumed, will be subject to an undivided remainder interest among the children of the testator then surviving. Appellant's interest does not attach to certain specific property, only to the trust corpus, in whatever form, at the life tenant's death. Point of error eleven is overruled.

We reform the judgment of the trial court to hold: (1) that the testamentary trust under the will of Johnny Thomas Pitts did not fail due to a merger of the legal and equitable estates during the lifetime of Helen Marion Pitts; (2) that, under the will of Johnny Thomas Pitts, Helen Marion Pitts was the executor of the estate, life beneficiary of the testamentary trust, and the trustee of the trust, by which she was vested with all the powers set forth in "Annex A" of his will; and (3) that Jacqueline Moody, if she survives Helen Marion Pitts, retains an undivided defeasible vested remainder interest in the estate and testamentary trust of Johnny Thomas Pitts as it may exist at the death of Helen Marion Pitts. As reformed, the judgment of the trial court is affirmed.

**711 S.W.2d 617 (Tex. 1986)**

**JIM WALTER HOMES, INC., Petitioner,**

**v.**

**Ray REED et ux., Respondents.**

No. C-4691.

Supreme Court of Texas.

May 14, 1986

Rehearing Denied July 16, 1986.

Mike Mills, Atlas & Hall, McAllen, for petitioner.

F.I. Gandy, Jr., Corpus Christi, for respondents.

ROBERTSON, Justice.

This case involves whether there is an independent tort to support an award of exemplary damages.

Ray Reed and his wife sued Jim Walter Homes, Inc., seeking damages arising out of the sale and construction of a house. The jury found that Jim Walter Homes, Inc. breached the warranty of good workmanship in the contract and that it was grossly negligent in the supervision of the construction of the house. Our concern is with the award of punitive or exemplary damages.

The jury found actual damages, additional damages as provided under the Deceptive Trade Practices Act, Tex.Bus. & Com.Code § 17.46 (Vernon Supp.1985), exemplary damages and attorney's fees. The trial court awarded actual damages and attorney's fees, disallowed the additional DTPA damages, and remitted a portion of the exemplary damages. The court of appeals modified the judgment of the trial court by awarding DTPA damages only and attorney's fees. In addition the court ordered a remittitur reducing the exemplary damages. 703 S.W.2d 701 at 708.

Although the principles of contract and tort causes of action are well settled, often it is difficult in practice to determine the type of action that is brought. We must look to the substance of the cause of

action and not necessarily the manner in which it was pleaded. *International Printing Pressmen and Ass't Union v. Smith,* 145 Tex. 399, 198 S.W.2d 729 (1946).

The contractual relationship of the parties may create duties under both contract and tort law. *Montgomery Ward & Co. v. Scharrenbeck,* 146 Tex. 153, 204 S.W.2d 508 (1947). The acts of a party may breach duties in tort or contract alone or simultaneously in both. The nature of the injury most often determines which duty or duties are breached. When the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone. *Mid-Continent Aircraft Corp. v. Curry County Spraying Service,* 572 S.W.2d 308, 312 (Tex.1978); *Nobility Homes of Texas, Inc. v. Shivers,* 557 S.W.2d 77 (Tex.1977). The Reeds' injury was that the house they were promised and paid for was not the house they received. This can only be characterized as a breach of contract, and breach of contract cannot support recovery of exemplary damages. *Bellefonte Underwriters Insurance Co. v. Brown,* 704 S.W.2d 742 (1986); *Amoco Production Co. v. Alexander,* 622 S.W.2d 563 (Tex.1981).

The jury found Jim Walter Homes, Inc. to have been grossly negligent in its supervision of construction. Gross negligence is a mental state lower in culpability than intentional or willful acts. *Luna v. North Star Dodge Sales, Inc.,* 667 S.W.2d 115 (Tex.1984). Gross negligence in the breach of contract will not entitle an injured party to exemplary damages because even an intentional breach will not. *Amoco Production Co. v. Alexander,* 622 S.W.2d 563, 571 (Tex.1981); *City Products Corp. v. Berman,* 610 S.W.2d 446, 450 (Tex.1980).

To support an award of exemplary damages in this case, the plaintiff must prove a distinct tortious injury with actual damages. Bellefonte Underwriters Insurance Co. v. Brown, supra; Luna v. North Star Dodge Sales, Inc., supra; City Products Corp. v. Berman, supra. The only issue on actual damages inquired as to the cost of repairing the home to the condition it was represented to be in at the time of sale. Although the Reeds sought recovery for mental anguish in their petition, no issue was submitted on those damages. There were no other injuries found by the jury other than loss of the benefit of the bargain. Therefore, we reverse the court of appeals award of exemplary damages and affirm the remainder of the judgment.

747 S.W.2d 361 (Tex. 1987)

Phillip J. BIRCHFIELD et al., Petitioners,

v.

TEXARKANA MEMORIAL HOSPITAL d/b/a Wadley Hospital et al., Respondents.

No. C-5895.

Supreme Court of Texas.

October 28, 1987

Rehearing Denied April 20, 1988.

Page 362

[Copyrighted Material Omitted]

Page 363

[Copyrighted Material Omitted]

Page 364

Frank L. Branson and Paul N. Gold, Law offices of Frank L. Branson, P.C., Dallas, Prof. J. Hadley Edgar, Texas Tech University, Lubbock, for petitioners.

Victor Hlavinka, Atchley, Russell, Waldrop & Hlavinka, John C. Hawkins, Jr., Texarkana, William A. Eldredge, Jr., Friday, Eldredge and Clark, Little Rock, Ark., for respondents.

WALLACE, Justice.

Kellie Birchfield was born prematurely with a congenitally functionless right eye. Shortly after her release from the hospital, she was diagnosed as having retrolental fibroplasia (RLF) in her left eye and is now totally blind. Her parents, Phillip and Mary Jo Birchfield, individually and as next friends of Kellie, sued Texarkana Memorial Hospital (Wadley) and her three treating physicians, Dr. Jon Hall, Dr. Noel Cowan, and Dr. Betty Lowe. The petition alleged negligence on the part of all four defendants plus a D.T.P.A. action against Wadley under the 1973 version of the Act. Deceptive Trade Practices Act, ch. 143, 1973 TEX. GEN. LAWS at 322-43. The jury answered all issues favorably to the Birchfields. The trial court rendered judgment for actual damages against all defendants and exemplary damages against Wadley, but refused to render judgment on the D.T.P.A. action. The court of appeals

initially affirmed the judgment, 718 S.W.2d 313, but on rehearing, reversed and remanded for trial. 718 S.W.2d at 345. We reverse the judgment of the court of appeals and render judgment for the Birchfields.

As a premature infant, Kellie was administered approximately 400 hours of supplemental oxygen without adequate monitoring of arterial blood gases. This occurred even though a 1971 report published by the American Academy of Pediatrics cautioned the medical community about the danger of RLF in premature infants receiving supplemental oxygen, and advised practitioners to closely monitor arterial blood gases of such infants. In the wake of the report Dr. Lowe predicted at a pediatrics section meeting, attended by a Wadley administrator, that the hospital was "going to have blind babies" unless it acquired the facilities to adequately monitor blood gases. However, during the period from 1971 through 1973 Wadley expended approximately $200 per year for nursery improvements. Kellie was born in August of 1974.

The jury found the individual doctors negligent and Wadley both negligent and grossly negligent in failing to properly treat Kellie. It also found that Wadley had violated the D.T.P.A. by holding out to the Birchfields that the hospital was adequately equipped to handle premature babies when it was not. The damage award was

Page 365

$2,111,500 actual damages against all defendants, jointly and severally, plus $1,200,000 exemplary damages against Wadley.

The issues before us fall within five groups: evidentiary, cumulative error, trial court bias, errors in the jury charge, and failure to award both exemplary and D.T.P.A. treble damages. We will discuss them in that order.

EVIDENTIARY ISSUES

Reference to Other "Blind Babies" and Other RLF Cases.

The court below held that evidence of other RLF cases was inadmissible, and that repeated references to "other blind babies" constituted harmful error. 718 S.W.2d at 341-45. We disagree. Evidence of a defendant's subjective knowledge of the peril created by his conduct is admissible to prove gross negligence. *Williams v. Steves Industries, Inc.,* 699 S.W.2d 570, 573 (Tex.1985). Dr. Lowe's prediction of "blind babies," the lack of remedial action by Wadley and the occurrence of other RLF cases were admissible to show Wadley's conscious indifference to the

peril its conduct created. Wadley did not request an instruction limiting the evidence to that purpose, therefore it waived any complaint to general admission of the evidence. TEX.R.EVID. 105(a). This is some evidence of gross negligence and defeats Wadley's no evidence contention.

Reference to Settlement of Another RLF Case.

Reference to settlement of another case is generally not admissible. TEX.R.EVID. 408. The Birchfields' expert witness made three passing remarks to the settlement. No timely objections to these remarks were made by the defendant and no timely request was made for instruction to the jury to disregard these references. The Birchfields' counsel referred to the settlement during voir dire and upon objection by defendant's counsel the court instructed the jury to disregard the reference. Counsel again referred to the settlement during closing argument and no objection was made nor instruction requested. During voir dire the jury was closely questioned by defendant's counsel about any bias arising from publicity about settlement of another RLF case. In view of the careful voir dire, the volume of testimony, and the full development of the case, we hold that the error was not reasonably calculated to cause and probably did not cause the rendition of an improper judgment. TEX.R.APP.P. 184(b); *Standard Fire Insurance Co. v. Reese,* 584 S.W.2d 835, 839-40 (Tex.1979).

Admissibility of an Expert's Opinion on a Mixed Question of Law and Fact.

The Birchfields' expert witness testified on direct examination that Wadley's conduct constituted "negligence," "gross negligence," and "heedless and reckless conduct," and that certain acts were "proximate causes" of Kellie's blindness. Contrary to the holding of the court of appeals, such testimony is admissible. TEX.R.EVID. 704. Fairness and efficiency dictate that an expert may state an opinion on a mixed question of law and fact as long as the opinion is confined to the relevant issues and is based on proper legal concepts.

Testimony of Expert Based on Conversation with Another Expert.

Ordinarily an expert witness should not be permitted to recount a hearsay conversation with a third person, even if that conversation forms part of the basis of his opinion. TEX.R.EVID. 801, 802. However, in this instance Dr. Eichenwald was invited to err by defendant's counsel telling him to "go right ahead" and explain an apparent inconsistency in his testimony. His explanation was based upon a conversation with another doctor. Also, Dr. Ehrenkranz was permitted to testify as to a telephone conversation with another doctor concerning transfer facilities at Wadley. This testimony was inadmissible but it

was cumulative of other similar evidence and therefore harmless.

Reference to Minutes of Hospital Section Meeting.

In questioning Wadley's administrator, the Birchfields' counsel asked if

**Page 366**

the administrator had reviewed the minutes of the pediatrics section in preparation for his testimony. Such records are privileged from discovery. TEX.REV.CIV.STAT.ANN. art. 4447d(3) (Vernon 1976). In this single reference to the minutes, no mention was made of their contents. We hold that a mere reference to the existence of the minutes was at most harmless error.

Evidence of Financial Condition of the Hospital.

The Birchfields contended that Wadley was grossly negligent in refusing to provide proper facilities to monitor blood gases of premature infants even though they had the financial ability to do so. Evidence of the hospital's financial condition was admissible to show financial ability to provide proper facilities.

Transcript of a Meeting Between Doctors and an Attorney.

The trial court admitted into evidence portions of the transcript of a meeting attended by Dr. Hall, Dr. Lowe and other doctors with an attorney who had represented some of them in a prior lawsuit. The transcript indicated that both doctors were aware of the inadequate facilities at Wadley and it contradicted statements made by the doctors at the trial. The transcript was admissible as admissions by the doctors and its probative value outweighed the danger of undue prejudice and confusion. TEX.R.EVID. 801(e)(2)(A), (B) and 403. Also, no limiting instructions were requested by Wadley, so it waived any objection that the testimony was inadmissible to prove its liability.

CUMULATIVE ERROR AND TRIAL COURT BIAS

The issues in this case were clearly defined, and all theories of all the parties were ably presented to the jury. The record consisted of approximately 4,500 pages. The few minor errors were insignificant when considered in the context of the entire case. We hold that any error did not individually or in the aggregate constitute reversible error.

The court of appeals did not rule on several of the defendants' points of error which assert failure of the trial court to conduct the trial in a fair and impartial manner. Those points are within our jurisdiction so we will rule on them rather than remand them to the court of appeals. *McKelvy v. Barber,* 381 S.W.2d 59, 64 (Tex.1964). Our

review of the record reveals no discernible bias or any suggestion to the jury that the trial court desired a particular result or that it favored the plaintiff.

## ALLEGED ERRORS IN THE COURT'S CHARGE

### The Locality Rule

The charge defined negligence of the hospital as "the doing of that which an ordinary prudent hospital ... in the exercise of ordinary care would not have done under the same or similar circumstances...." (Emphasis added.) Ordinary care was defined as "that degree of care that a hospital of ordinary prudence ... would have exercised under the same or similar circumstances." (Emphasis added.) Negligence and ordinary care of the physicians were similarly defined. These definitions closely parallel those contained in the Texas Pattern Jury Charges. See, 3 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES, PJC 40.01, 40.02. The defendants attacked these definitions because they failed to refer to hospitals and physicians in "this or similar communities," and thus do not reflect the "locality rule." The purpose of the locality rule is to prevent unrealistic comparisons between the standards of practice in communities where resources and facilities might vastly differ. The definitions in the court's charge meet this concern, because the means available to the defendant are part of the pertinent "circumstances." See, *Hood v. Phillips,* 554 S.W.2d 160, 165 (Tex.1977). We hold that these definitions were proper, as did the court below. 718 S.W.2d at 332.

### Purported Comments on the Weight of the Evidence

The Birchfields' Issues one through four were intended to broadly submit

**Page 367**

the questions of negligence and proximate cause. See, TEX.R.CIV.P. 277. The wording of these issues is fully set forth in the court of appeals' opinion. 718 S.W.2d at 329. Issue No. 1 is demonstrative of the form of each of these issues:

Do you find from a preponderance of the evidence that Wadley Hospital ... [was] negligent in the care and treatment of Kellie Lee Birchfield with respect to any of the following which was a proximate cause of her blindness?

Answer "yes" or "no" to each item.

A. As to adequate nursing services _____

* * *

### F. As to charting _____

The defendants assert that the wording of these issues could be construed as indicating the trial court's opinion that one or more of the acts or omissions listed in subdivisions A-F was a proximate cause. We find the comments, if any, were at most incidental, and agree with the court of appeals' analysis and conclusion that the wording of these issues did not likely lead to the rendition of an improper judgment. 718 S.W.2d 330-32. In view of the record, we believe that the jury fully understood that the issue of proximate cause was entrusted to its decision.

## DAMAGES

### D.T.P.A. Damages

The Birchfields challenge the rulings of both the trial court and the court of appeals concerning questions of damages. At trial, the Birchfields secured jury findings that Wadley violated the Deceptive Trade Practices Act, that the Birchfields were adversely affected by that violation, and that Wadley was negligent and grossly negligent. The Birchfields argue that the courts below erred in failing to award both exemplary damages as found by the jury and treble damages under the D.T.P.A. We disagree. This argument overlooks the fact that the jury found that Wadley's deceptive act or practice, as well as each defendants' acts of negligence, were the proximate or producing cause of the same damages. See, *Allstate Ins. Co. v. Kelly,* 680 S.W.2d 595, 606 (Tex.App.--Tyler 1984, writ ref'd N.R.E.) The Birchfields' special issues on damages merely requested the jury to fix a sum of money which would compensate Kellie and her parents, "for the damages proximately resulting from the occurrence in question." In the absence of separate and distinct findings of actual damages on both the acts of negligence and the deceptive acts or practices, an award of exemplary damages and statutory treble damages would be necessarily predicated upon the same findings of actual damages and would amount to a double recovery of punitive damages. Id.

In the alternative, the Birchfields claim that they were entitled to elect whether to recover the exemplary damages as found by the jury or statutory treble damages. In light of our holding that the Birchfields were not entitled to both treble and exemplary damages, they were confronted with a situation where an election would be required. *Kish v. Van Note,* 692 S.W.2d 463, 466-67 (Tex.1985). The court of appeals held that since the Birchfields, before entry of judgment, failed to unequivocally waive the findings on exemplary damages, they had waived their right to complain on appeal that the trial court erred in failing to award treble damages. 718 S.W.2d at 339. We find no support for that proposition. The judgment of the court should be "so framed as to give the party all the relief to

which he may be entitled." TEX.R.CIV.P. 301, (emphasis added). While a formal waiver by the Birchfields would have been in order, it was not a prerequisite to the recovery of all of the damages to which they were lawfully entitled. *Hargrove v. Trinity Universal Insurance Co.,* 152 Tex. 243, 256 S.W.2d 73, 75 (1953). We hold that where the prevailing party fails to elect between alternative measures of damages, the court should utilize the findings affording the greater recovery and render judgment accordingly.

In light of its holding that the Birchfields had waived their complaints as to the trial court's judgment, the court of appeals did

## Page 368

not reach the question of whether the Birchfields were entitled to D.T.P.A. damages under the facts and the applicable version of the Act. 718 S.W.2d at 339. By way of cross-points, Wadley asserts that the Birchfields could recover D.T.P.A. damages even if they hadn't waived their right to do so by failing to elect. Wadley contends that the jury findings do support such a recovery because (1) the D.T.P.A. does apply to health care providers; (2) the jury's verdict purportedly does provide an appropriate factual basis for recovery under the D.T.P.A.; (3) Kellie Birchfield was a "consumer" within the meaning of the act; and (4) there was allegedly no finding of actual damages upon which to predicate an award of treble damages. In the interest of judicial economy, we will address those contentions. McKelvy v. Barber, supra.

According to Wadley, the Legislature never intended that the D.T.P.A. should be applied to physicians and health care providers. As evidence of such intent, Wadley points to the enactment of TEX. REV. CIV. STAT. art. 4590i, § 12.01 (Vernon Supp.1987). However, Wadley concedes that this statute did not become effective until 1977, long after the incidents which gave rise to this suit. We find nothing in the 1973 version of the Act which manifests a legislative intent to exempt health care providers from liability. Accordingly, we find no basis for Wadley's claims of immunity or exemption from D.T.P.A. liability.

We also reject Wadley's contentions that the jury findings were inadequate because they made no inquiry as to any affirmative deceptive act, practice or representation. Under the 1973 version of the Act, a "failure to disclose" could be an adequate factual predicate for a D.T.P.A. violation, provided that the jury found that the failure to disclose was deceptive. *Cobb v. Dunlap,* 656 S.W.2d 550, 552 (Tex.App.--Corpus Christi 1983, writ ref'd n.r.e.). In this case, the jury so found. The jury's verdict thus provides an adequate basis for a recovery under the act.

Equally unpersuasive is Wadley's contention that Kellie

Birchfield was not a consumer within the meaning of the D.T.P.A. A plaintiff establishes her standing as a consumer in terms of her relationship to a transaction, not by a contractual relationship with the defendant. *Flenniken v. Longview Bank & Trust Co.,* 661 S.W.2d 705, 707 (Tex.1983). Wadley sold its goods and services and Kellie Birchfield "acquired" them, regardless of the fact that she obviously did not contract for them.

Finally, we reject Wadley's argument that there was no finding of actual damages resulting from the deceptive act or practice. The jury found that both Kellie and her parents had suffered damages "proximately resulting from the occurrence in question." Wadley argues that the term "occurrence in question" was too vague, and did not limit the jury's attention to the amount of damages resulting from the D.T.P.A. violation. Therefore, Wadley asserts that it would be inappropriate to simply equate the jury's general damage findings with the amount of actual damages caused by its deceptive practice. We disagree. Wadley failed to complain that the damage issues did not specifically relate to the Birchfields' grounds of recovery. *Cf. Wilgus v. Bond,* 730 S.W.2d 670 (Tex.1987). The objection was thereby waived. TEX.R.CIV.P. 274.

Shock/Mental Anguish

The jury awarded Kellie's parents $1,000 each for mental anguish suffered "in the past," and also awarded the same amount for shock and emotional trauma sustained upon learning of her total and permanent blindness. The court of appeals set aside the latter award on the grounds that it constituted a double recovery for the same injury already compensated by the mental anguish award. 718 S.W.2d at 337. We agree. Mental anguish consists of the emotional response of the plaintiff caused by the tortfeasor's conduct. See, *Moore v. Lillebo,* 722 S.W.2d 683, 687 (Tex.1986). On these facts, the "shock and emotional trauma" constituted

## Page 369

part of the past "mental anguish," and the trial court erred in rendering judgment for both shock and mental anguish.

We reverse the judgment of the court of appeals and render judgment as follows:

Kellie Birchfield shall recover $2,077,500 from Texarkana Memorial Hospital, Dr. Jon Hall, Dr. Noel Cowan, and Dr. Betty Lowe, jointly and severally. In addition, Kellie Birchfield shall recover $4,155,000 from Texarkana Memorial Hospital under the D.T.P.A. Phillip and Mary Jo Birchfield shall each recover $16,000 from Texarkana Memorial Hospital, Dr. Jon Hall, Dr. Noel Cowan, and Dr. Betty Lowe, jointly and severally. In

addition, Phillip Birchfield and Mary Jo Birchfield shall each recover $32,000 from Texarkana Memorial Hospital under the D.T.P.A.

**750 S.W.2d 170 (Tex. 1988)**

**SOUTHERN COUNTY MUTUAL INSURANCE COMPANY et al., Petitioners,**

 **v.**

  **FIRST BANK AND TRUST OF GROVES, Texas, Respondent.**

No. C-6628.

Supreme Court of Texas.

May 11, 1988

 Rehearing Denied June 15, 1988.

Daniel D. Clayton, Howard Close, Orgain, Bell and Tucker, Gordon R. Pate and Joe Michael Dodson, Pate & Dodson, Beaumont, for petitioners.

Frank Lamson, Provost, Umphrey, Swearingen & Eddins, Port Arthur, for respondent.

ROBERTSON, Justice.

This is a suit to recover on a temporary insurance policy, commonly known as a binder of insurance. First Bank and Trust of Groves, Texas, as a loss payee on an insurance binder, sued Southern County Mutual Insurance Company, R.O. Williams, Jr., R.O. Williams, Jr., d/b/a Colonial Surplus Underwriters Agency, R.O. Williams Co., Inc., Norman Edwards, Norman Edwards d/b/a Colonial Surplus Underwriters Agency, and Colonial Surplus Underwriters Agency. The Bank sued on alternate theories: (1) that Southern County Mutual was liable pursuant to an insurance binder in effect on the date of loss, or, if Southern County Mutual was not liable, (2) that R.O. Williams and the other five defendants were strictly liable for violations of the Texas Insurance Code. Trial was to the jury which answered all issues against the Bank. The court of appeals reversed and rendered against all of the defendants. 732 S.W.2d 69. We affirm in part and reverse in part.

In 1980, Melvin Kraehnke purchased a new White Auto Car tractor for use as a dump truck. Kraehnke had the tractor insured with State Farm Insurance. The Bank, which financed the purchase, obtained a security interest in any insurance proceeds issued under Kraehnke's tractor coverage. In May of 1982, Kraehnke converted his tractor into an 18-wheeler. State Farm informed Kraehnke that it would not insure a "single-shot" 18-wheeler.

On May 27, 1982, Kraehnke telephoned Charles Tuttle, an agent with the uncontested authority to issue binding insurance, who worked for R.O. Williams Company, regarding the possibility of procuring insurance on his 18-wheeler. Tuttle then checked with the underwriters at R.O. Williams Company to see if an admitted insurance company in Texas would insure a single unit 18-wheeler. Tuttle learned that no Texas companies would write such coverage.

Tuttle then contacted Norman Edwards at Colonial Surplus Underwriters Agency, a surplus lines agency which places coverage with insurance companies not licensed in Texas, to see if there was any surplus insurance available for Kraehnke's tractor. Edwards quoted a rate for the coverage and told Tuttle that the surplus lines carrier would be Southern County Mutual.

Tuttle called Kraehnke and told him the coverage price. Kraehnke agreed to the quoted price, inasmuch as his primary concern was the cost of the coverage as opposed to which company would provide the coverage. That same day, Kraehnke went to Tuttle's office to secure coverage with Southern County Mutual. Tuttle gave Kraehnke a typed binder which provided coverage on the 18-wheeler from May 27, 1982, to June 27, 1982. The binder reflected (1) Kraehnke as the insured, (2) Southern County Mutual as the insurer, (3) Colonial as the insurance agency, and (4) the Bank as loss payee. In exchange for the binder, Kraehnke gave Tuttle approximately $900, which was the quoted first premium.

Some two to three days later, Edwards telephoned Tuttle and told him that he had made a mistake in quoting the price of the policy and that Southern County would not write Kraehnke's coverage for the price Edwards had previously given Tuttle. However, Edwards informed Tuttle that he could secure insurance at the quoted price through Amherst Insurance Company. Tuttle, without notifying Kraehnke, authorized a substitution of insurance companies from Southern County Mutual to Amherst. Tuttle never relayed this information to Kraehnke. In fact, sometime during the week before June 27, 1982, Kraehnke called Tuttle inquiring about receiving his payment book and policy. During this conversation, Tuttle failed to mention the substitution of carriers.

On or about June 29, 1982, R.O. Williams Company executed an extension binder which was in effect from June 27, 1982, until July 27, 1982. Due to a clerical error, the extension binder listed the insurance company as Southern

County Mutual instead of Amherst.

On July 2, 1982, Kraehnke's 18-wheeler was totally destroyed in a collision. Four days later, Kraehnke called R.O. Williams Company and provided information for the proof of loss. It was at this time that the personnel at R.O. Williams discovered the clerical error on the extension binder. Thereafter, the proof of loss was sent to Amherst. Kraehnke first learned that Amherst, and not Southern County Mutual, was his insurance company when an Amherst adjuster telephoned him in order to prepare the proof of loss. Amherst approved Kraehnke's claim and authorized payment.

On September 24, 1982, the Insurance Commissioner of Pennsylvania entered a Suspension Order against Amherst which prohibited the payment of any claims by Amherst without prior written consent of the Insurance Commissioner. Thereafter, on November 10, 1982, the Commonwealth Court of Pennsylvania issued an order declaring Amherst Insurance Company insolvent. Amherst's charter was dissolved and

**Page 172**

the Insurance Commissioner was appointed as liquidator.

In November of 1984, the Bank filed suit against Southern County Mutual alleging that Southern County Mutual was liable on the extension binder which was in effect on July 2, 1982, when Kraehnke's 18-wheeler was destroyed. In the alternative, if no Southern County Mutual binder was found to be in effect on the date of loss, the Bank alleged that R.O. Williams, Jr. and the five other defendants were strictly liable for violating portions of the Texas Insurance Code pertaining to surplus lines coverage. Southern County Mutual filed a cross-action against R.O. Williams, Jr. and the others seeking "indemnity and contribution" in the event that the jury found Southern County Mutual was liable on the extension binder. The case was submitted to the jury on twenty issues, each of which the jury answered against the Bank. The jury did, however, find that the difference in the tractor's market value before and after the collision was $36,000. The trial judge overruled the Bank's Motion for Judgment Notwithstanding the Verdict, and on March 5, 1986, signed the final judgment ordering that the Bank take nothing in its suit against Southern County Mutual, R.O. Williams, Jr. and the other five defendants.

On appeal, the court of appeals, with one justice dissenting, reversed the judgment of the trial court and rendered judgment against all defendants. 732 S.W.2d at 81. The court found that as a matter of law, the extension binder, listing Southern County Mutual as the insurance company, was "legally in full force and effect" on the date

of the loss. Further, the court of appeals found that R.O. Williams, Jr. and the other defendants were strictly liable to the Bank for violating various sections of the Texas Insurance Code. In accordance with its holdings as to liability, the court of appeals held that the Bank was to recover $35,000 (the $36,000 market value of the tractor less the $1,000 deductible in the binder) from Southern County Mutual and $35,000 from R.O. Williams, Jr. and the others. We affirm the court's judgment as to Southern County Mutual but reverse that portion of the judgment imposing liability against R.O. Williams, Jr. and the five other defendants for violations of the Insurance Code.

When Kraehnke left Tuttle's office on May 27, 1982, he had a valid insurance binder with Southern County Mutual. The only action which remained was for R.O. Williams Company to forward Kraehnke a copy of his insurance policy. Therefore, any subsequent changes in insurance companies would have required approval either by Kraehnke or his authorized agent. As stated earlier, the first time Kraehnke learned that Amherst was his new insurance company was when an Amherst adjuster contacted him concerning his proof of loss. Obviously, Kraehnke never authorized a substitution of insurance companies. Therefore, the question then becomes whether Tuttle, as Kraehnke's agent, had the authority to order Edwards to cancel the binder with Southern County Mutual and obtain coverage with Amherst. Southern County Mutual argues that Tuttle had such authority. We disagree.

The crux of Southern County Mutual's argument is that Tuttle, as Kraehnke's agent, had the authority to substitute insurance companies. Thus, Southern County Mutual had the burden of pleading and proving this agency relationship. *Buchoz v. Klein,* 143 Tex. 284, 286, 184 S.W.2d 271, 271 (1944). The Bank was entitled to fair and adequate notice that Southern County Mutual was going to rely upon an agency theory at trial. *Murray v. O & A Express, Inc.,* 630 S.W.2d 633, 636 (Tex.1982); TEX.R.CIV.P. 45.

Southern County Mutual failed to plead that Tuttle was acting as an agent for Kraehnke. In fact, Southern County Mutual first suggested that Tuttle was Kraehnke's agent in its Motion for Directed Verdict. Southern County Mutual thus failed to carry its burden on its theory that Tuttle had the authority to substitute insurance companies without first obtaining Kraehnke's authorization to do so.

In addition to this procedural misstep, this court's holding in Shaller v. Commercial Standard Fire Ins. Co., 158

**Page 173**

Tex. 143, 309 S.W.2d 59 (1958), also leads to the conclusion, on the merits, that Tuttle had not attained the

status of Kraehnke's agent with the authority to cancel the binder with Southern County Mutual and bind Kraehnke with Amherst. In Shaller, one of the issues presented was whether an insurance recording agent, who was employed solely to procure insurance, could act as the insured's agent for the purpose of accepting cancellation of an insurance policy. In holding that such an agency relationship did not exist, we stated that

it is settled law that one who authorizes another to procure insurance for him does not thereby constitute such person his agent to receive notice of cancellation or for the purpose of agreeing to a proposed cancellation of the policy.

Id. at 150, 309 S.W.2d at 64.

In the case before us, Kraehnke contacted Tuttle for the sole purpose of acquiring insurance on his 18-wheeler. Such a limited solicitation by Kraehnke cannot serve as the basis for establishing a broad agency relationship between Kraehnke and Tuttle. See *Alliance Ins. Co. v. Continental Gin Co.,* 285 S.W. 257, 258 (Tex.Comm'n App.1926, judgmt adopted) (holding that insurance agent, authorized only to acquire insurance on property, did not have authority, as insured's agent, to accept cancellation of policy and substitution of carriers).

We therefore conclude that, as a matter of law, a valid Southern County Mutual Insurance binder was in effect on July 2, 1982. Accordingly, we affirm that portion of the court of appeals judgment that (1) Kraehnke had a valid binder with Southern County Mutual and (2) Southern County Mutual was liable to the Bank, as loss payee on Kraehnke's policy, for $35,000.

In both its pleadings and court of appeals brief, the Bank sought relief on two alternative theories. First, the Bank claimed that Southern County Mutual was liable because a valid Southern County Mutual binder was in force on the date of the accident. Alternatively, if no binder was in effect, the Bank claimed that R.O. Williams, Jr. and the other defendants were strictly liable because they had violated selected provisions of the Insurance Code. By framing its grounds of recovery in this manner, the Bank was, in effect, stating that the existence of a Southern County Mutual binder precluded any imposition of strict liability under the Insurance Code. For if Southern County Mutual was liable to the Bank, this meant that R.O. Williams, Jr. and the other defendants had satisfied the Insurance Code requirements that govern the placement of surplus line insurance companies in Texas.

The court of appeals, however, did not view the situation in this manner. After establishing Southern County Mutual's liability under its binder with Kraehnke, the court nevertheless immersed itself into a lengthy discussion of how R.O. Williams, Jr. and the others were strictly liable to the Bank for violating certain provisions of the Insurance Code. Not only did this unnecessary finding of strict liability go further than any relief the Bank requested, it also resulted in an erroneous double recovery for the Bank.

In rendering judgment, the court of appeals stated that

we adjudge and order that the Bank recover, firstly, $35,000. plus interest from date of judgment, from R.O. Williams, Jr., R.O.W., Inc., and Norman Edwards, jointly and severally; secondly, that the Bank recover the same amount from Southern County Mutual Insurance Company; also, jointly and severally against the Appellees.

732 S.W.2d at 81. This language, which exemplifies the entire court of appeals opinion, is ambiguous and reasonably subject to differing interpretations. Indeed, one such interpretation is that the court has authorized the Bank to recover a total of $70,000--$35,000 from Southern County Mutual and $35,000 from the other defendants.

The Bank's pleadings set forth alternative grounds of recovery. The court of appeals, however, rendered a judgment based upon both grounds of recovery pleaded. Not only does this judgment grant an impermissible double recovery to

**Page 174**

the Bank, it fails to conform to the Bank's pleadings. *Cunningham v. Parkdale Bank,* 660 S.W.2d 810, 812 (Tex.1983); TEX.R.CIV.P. 301. We therefore reverse that portion of the court of appeals judgment which finds the other defendants strictly liable and grants the Bank recovery against these individuals. The resulting judgment will correctly reflect Southern County Mutual's liability to the Bank.

Finally, Southern County Mutual alleges that the court of appeals erred in rendering judgment against all defendants because such a judgment foreclosed its cross-action for contribution and indemnity against R.O. Williams, Jr. and the others. We disagree.

Southern County Mutual's cross-action is in the nature of an independent ground of recovery. Therefore, by failing to submit any issues on its cross-action, Southern County Mutual has waived this ground of recovery. TEX.R.CIV.P. 279.

In conclusion, we affirm that portion of the court of appeals judgment stating that a valid Southern County Mutual binder was in effect at the time of Kraehnke's loss. Further, we reverse that portion of the court of appeals judgment which granted the Bank an erroneous double

recovery against these individuals.

**Page 127**

754 S.W.2d 127 (Tex. 1988)

**W.O. BANKSTON NISSAN, INC., Petitioner,**

**v.**

**Kelly Joe WALTERS, Respondent.**

No. C-6531.

Supreme Court of Texas.

May 11, 1988

Rehearing Denied July 13, 1988.

Nathan K. Griffin, Thomas, Neilon & Griffin, P.C., Dallas, for petitioner.

Tom S. McCorkle, McCorkle & Westerburg, P.C., for respondent.

WALLACE, Justice.

This is a Deceptive Trade Practices Act case arising out of the purchase of a pickup truck by Kelly Joe Walters from W.O. Bankston Nissan, Inc. The trial court entered judgment n.o.v. that Walters take nothing. The court of appeals, in an unpublished opinion, reversed the trial court's judgment and rendered judgment on the jury verdict. We reverse the judgment of the court of appeals and affirm the judgment of the trial court.

Walters contacted his friend Buddy Wood, who was a salesman for Bankston, to discuss trading in his 280-ZX for a pickup truck. Walters test drove the pickup in question and agreed to purchase it. He and Wood agreed upon a trade-in value of $7,700 for the 280-ZX. Wood prepared a Workup Sheet which showed the pickup to be a 1982 model. He also prepared an Odometer Statement and a Warranty Sheet, both of which showed the pickup to be a 1981 model. Walters took possession of the pickup and Bankston took possession

**Page 128**

of the 280-ZX and sold it for $7,700, the value agreed upon by Wood and Walters. Bankston then paid off the $5,832.01 balance owed by Walters on the 280-ZX.

Several days later, Walters experienced mechanical difficulty with the pickup and returned it to Bankston, who repaired the problem at no cost. Walters subsequently experienced additional problems with the pickup. During this time, Walters' Credit Union notified him that the truck was a 1981 model, not a 1982 model, and that it would not finance the truck. Walters then demanded that Bankston take back the pickup and return his 280-ZX. He was informed that the 280-ZX had been sold and was offered the difference between the $7,700 agreed value and the loan balance Bankston had paid. Walters refused and filed suit.

The jury found that Bankston represented that the pickup was a 1982 model; that the misrepresentation was a producing cause of actual damages; that the actual damages included loss of the 280-ZX; and that the 280-ZX had a fair market value of $9,800 on the date of the sale. No other damage issues were submitted. Bankston objected to the submission of the above issues, asserting that the issues did not present a proper measure of damages.

The dispositive issue in this case is the correct measure of damages. In a DTPA case, the plaintiff is entitled to actual damages. TEX.BUS. & COMM.CODE § 17.50(b)(1). This court has defined actual damages as those recoverable at common law. *Farrell v. Hunt,* 714 S.W.2d 298, 300 (Tex.1986); *Brown v. American Transfer & Storage Co.,* 601 S.W.2d 931, 939 (Tex.1980). Under common law, there are two measures of damages for misrepresentation: (1) the "out of pocket" measure, which is the "difference between the value of that which was parted with and the value of that which was received"; and (2) the "benefit of the bargain" measure, which is the difference between the value as represented and the value actually received. The DTPA permits a plaintiff to recover either the "out of pocket" or the "benefit of the bargain" damages, whichever is greater. *Leyendecker & Associates, Inc. v. Wechter,* 683 S.W.2d 369, 373 (Tex.1984); *Sobel v. Jenkins,* 477 S.W.2d 863 (Tex.1972); *Chrysler Corp. v. Schuenemann,* 618 S.W.2d 799, 805 (Tex.Civ.App.--Houston [1st Dist.] 1981, writ ref'd n.r.e.); *Smith v. Kinslow,* 598 S.W.2d 910, 912 (Tex.Civ.App.--Dallas 1980, no writ); *Jack Criswell Lincoln-Mercury, Inc. v. Haith,* 590 S.W.2d 616 (Tex.Civ.App.--Houston [1st Dist.] 1979, writ ref'd n.r.e.). See, *Vista Chevrolet, Inc. v. Lewis,* 709 S.W.2d 176 (Tex.1986).

Walters' burden of proof in this case was to show either the difference between the fair market value of the pickup as delivered and the value of the truck as it was represented; or the difference in value between that with which he parted and that which he received. He did neither. Walters had the burden of requesting jury issues on the proper measure of damages. Having failed to do so, his cause of action must fail.

The judgment of the court of appeals is reversed and the judgment of the trial court is affirmed.

ROBERTSON, J., not sitting.

MAUZY, Justice, concurring on Motion For Rehearing.

I concur in the result reached by the majority. I would however like to add that in cases brought under the Deceptive Trade Practices-Consumer Protection Act, Tex.Bus. & Com.Code Ann. § 17.41 et seq. (Vernon 1987), damages are recoverable "to compensate for the actual loss sustained as a result of the defendant's conduct." *Kish v. Van Note,* 692 S.W.2d 463, 466 (Tex.1985). I would further note that under the facts of this case, either an "out of pocket" or "benefit of the bargain" measure of damages was appropriate. Nevertheless, as this court held in Kish, the "out of pocket" and "benefit of the bargain" rules are not the exclusive means of measuring damages in a DTPA action. 692 S.W.2d at 466. The allowable measure of damages may appropriately include related and necessary expenses that are incurred after the deceptive act or practice has become apparent,

**Page 129**

and the measure of damages under either the "out of pocket" or "benefit of the bargain" theory should in no way be read as exclusive.

Chief Justice Phillips joins in this Concurring Opinion on Rehearing.

**787 S.W.2d 348 (Tex. 1990)**

**Alfred MORENO et al., Appellants,**

**v.**

**STERLING DRUG, INC., Appellees.**

**No. C-7744.**

**Supreme Court of Texas.**

**March 28, 1990**

Rehearing Overruled May 9, 1990.

Les Mendelsohn, Randall C. Jackson, Jr., San Antonio, for appellants.

P. Michael Jung, Mark Donheiser, Dallas, for appellees.

OPINION

SPEARS, Justice.

This case is before us upon certified questions from the United States Court of Appeals for the Fifth Circuit. Pursuant to TEX. CONST. art. V § 3-c, we have jurisdiction to answer the following certified questions:

1. Does the "discovery rule" apply to the Texas Statute of Limitations, TEX.CIV.PRAC. & REM.CODE § 16.003(b), in an action brought pursuant to the Texas Wrongful Death and Survival Statutes, TEX.CIV.PRAC. & REM CODE § 71.001 et seq. and § 71.021, respectively?

2. If the discovery rule does not apply to the Texas Statute of Limitations in wrongful death and survival actions, does that statute of limitations as applied to the plaintiffs herein, violate the open courts provision of the Constitution of the State of Texas, TEX. CONST. art. I § 13?

For the reasons stated in this opinion, we answer that the discovery rule does not apply to the wrongful death statute of limitations found in section 16.003(b), and, that section 16.003(b) as applied to the plaintiffs in this case does not violate article I, section 13 of the Texas Constitution.

For clarity, we emphasize that these issues are before

us on certified questions from the Fifth Circuit. This is a very limited procedural device; we answer only the questions certified and nothing more. See Tex.R.App.P. 114. Thus, the whole case is not before this court as it would be in an ordinary appeal.

The essential facts of this case have been certified to this court. On January 21, 1981, Alfred Moreno, Jr., the infant son of Alfred and Emma Moreno, died of Reye's syndrome. On September 19, 1981, Shawna Rae Sloan, the infant daughter of James and Camilla Sloan, died of Reye's syndrome. In the days preceding their deaths,

the infants had been administered doses of Bayer Children's Aspirin, manufactured by Sterling Drug, Inc. Sometime after the deaths of the infants the parents were informed that in some instances the use of aspirin factored into Reye's syndrome deaths. On October 22, 1985, the parents filed separate wrongful death suits against Sterling Drug in state district court. Sterling Drug removed the actions to the United States District Court for the Western District of Texas.

Following removal, Sterling Drug moved for summary judgment in both suits, claiming that the actions were barred by the Texas Wrongful Death Statute of Limitations, TEX.CIV.PRAC. & REM.CODE ANN. § 16.003(b)(Vernon 1986). The federal district court dismissed the suits, citing the recent Fifth Circuit decision of *Tennimon v. Bell Helicopter Textron, Inc.,* 823 F.2d 68 (5th Cir.1987), wherein that court held the discovery rule does not apply to section 16.003(b). The cases were consolidated on appeal, and Moreno and Sloan (collectively "Moreno") moved for certification of the legal questions to this court. A panel of the Fifth Circuit denied the motion to certify and affirmed in an unpublished opinion on the basis of Tennimon. On rehearing and after en banc reconsideration of the certification question, the Fifth Circuit granted the motion to certify.

The first question is whether the "discovery rule" applies to the statute of limitations for actions based on injuries resulting in death. The relevant limitations statute, section 16.003, TEX.CIV.PRAC. & REM.CODE ANN., provides as follows:

(a) A person must bring suit for ... personal injury ... not later than two years after the cause of action accrued.

(b) A person must bring suit not later than two years after the day the cause of action accrues in an action for injury resulting in death. The cause of action accrues on the death

of the injured person.

The only courts to construe section 16.003(b) have found it clear and unambiguous in prescribing an absolute two-year limitation period for bringing a wrongful death case. *Tennimon v. Bell Helicopter Textron, Inc.,* 823 F.2d 68, 73 (5th Cir.1987); *Stiles v. Union Carbide Corp.,* 520 F.Supp. 865, 867 (S.D.Tex.1981). Those decisions, along with a literal reading of section 16.003(b), would suggest that Moreno's wrongful death action is barred because it was brought after the two-year limitations period had expired. Moreno, however, argues that the "discovery" rule should apply to section 16.003(b), because he neither knew nor could have known the cause of his injury within the two-year limitation period. Specifically, he asserts that his suit was timely brought because it was filed within two years of the discovery of the link between aspirin and Reye's syndrome.

Moreno offers a number of arguments for why this court should disregard the plain language of section 16.003(b) and apply the discovery rule to the limitations period for wrongful death actions. First, he points out that this court has applied the discovery rule in determining the limitations period under the statutory predecessor to section 16.003(a), which governs actions for personal injury not resulting in death. Citing Ex parte Pruitt, 551 S.W.2d 706, 709 (Tex.1977) for the proposition that statutes should be read as a whole and construed to give purpose and meaning to every part, Moreno argues that the underlying purpose of section 16.003 is to authorize application of the discovery rule to subparts (a) and (b). Second, Moreno contends that the second sentence of section 16.003(b) only fixes the earliest time the cause of action may accrue and was intended to "save" the cause of action from being barred when more than two years elapse between injury and death. See *DeHarn v. Mexican Nat'l Ry. Co.,* 86 Tex. 68, 23 S.W. 381 (1893). Moreno argues that this court should set the latest date of accrual beyond death (i.e. at discovery of cause of action) because the purpose of section 16.003(b) is to expand the time in which a wrongful death action can be brought. Finally, Moreno maintains that if subparts (a) and (b) are not interpreted consistently it will result in the absurdity of allowing a defendant to be exonerated for conduct which

**Page 351**

kills but held liable for conduct which merely maims. See *Hanebuth v. Bell Helicopter International,* 694 P.2d 143, 147 (Alaska 1984). Moreno argues that this court should avoid this absurdity by construing subpart (b) to allow application of the discovery rule.

We begin our analysis by observing that the primary purpose of section 16.003, as with all limitation statutes, is

to compel the exercise of a right of action within a reasonable time so that the opposing party has a fair opportunity to defend while witnesses are available. *Willis v. Maverick,* 760 S.W.2d 642, 644 (Tex.1988). Section 16.003 embodies a legislative determination of what a "reasonable time" is for bringing both an action for injuries not resulting in death (subpart a), and one for injuries resulting in death (subpart b). Under both subparts (a) and (b), an action must be brought within two years of the date the cause of action "accrues." Only subpart (b), however, goes on to specify that a cause of action "accrues" at a certain time--the date of death. When the legislature employs the term "accrues" without an accompanying definition, the courts must determine when that cause of action accrues and thus when the statute of limitations commences to run. Indeed, on three previous occasions this court has adopted and relied upon the following language from *Fernandi v. Strully,* 35 N.J. 434, 173 A.2d 277, 285 (1961):

[T]he question when a cause of action accrues is a judicial one, and to determine it in any particular case is to establish a general rule of law for a class of cases, which rule must be founded on reason and justice.... In the absence of legislative definition and specification, the ... courts have often been called upon to delineate the statute; they have consciously sought to apply it with due regard to the underlying statutory policy of repose, without, however, permitting unnecessary individual injustices.

Willis, 760 S.W.2d at 644; *Robinson v. Weaver,* 550 S.W.2d 18, 20 (Tex.1977); *Gaddis v. Smith,* 417 S.W.2d 577, 580-81 (Tex.1967).

For purposes of the application of limitation statutes, a cause of action can generally be said to accrue when the wrongful act effects an injury, regardless of when the plaintiff learned of such injury. Robinson, 550 S.W.2d at 19. The discovery rule represents an exception to this general rule of accrual. Id. The discovery rule is a judicially constructed test which is used to determine when a plaintiff's cause of action accrued. *Weaver v. Witt,* 561 S.W.2d 792, 794 (Tex.1977). When applied, the rule operates to toll the running of the period of limitations until the time that the plaintiff discovers, or through the exercise of reasonable care and diligence should discover, the nature of his injury. Id. at 793-94. This court has applied the discovery rule to medical malpractice cases in which the plaintiff did not, and could not, know of the injury at the time it occurred. See *Gaddis v. Smith,* 417 S.W.2d 577, 580 (Tex.1967) (negligence action against physician for leaving sponge in patient's body accrues when patient learns of, or in exercise of reasonable care and diligence, should have learned of presence of sponge); *Hays v. Hall,* 488 S.W.2d 412 (Tex.1972) (action for negligent performance of vasectomy accrues when plaintiff discovers or should have

discovered that he remains fertile). Similarly, this court has applied the discovery rule in a limited number of other cases when the injured party did not, and could not, know of his injury at the time it occurred. See e.g., *Bayouth v. Lion Oil Co.,* 671 S.W.2d 867 (Tex.1984); *Kelley v. Rinkle,* 532 S.W.2d 947 (Tex.1976); *Quinn v. Press,* 135 Tex. 60, 140 S.W.2d 438 (1940). In each of these cases, this court applied the discovery rule to a statute of limitations which left the phrase "accrual" undefined. By contrast, section 16.003(b) specifically defines "accrual" as the date of death. The question here is whether the discovery rule should be applied to a limitations statute which has clearly and unequivocally prescribed that a cause of action accrues upon the occurrence of a specified event. For a number of reasons, we

**Page 352**

hold that it should not. [1]

Plain Meaning of Section 16.003(b).

Moreno's argument that the discovery rule should be applied to section 16.003(b) as a matter of statutory construction ignores the plain language of the statute. Where language in a statute is unambiguous, this court must seek the intent of the legislature as found in the plain and common meaning of the words and terms used. *RepublicBank Dallas, N.A. v. Interkal, Inc.,* 691 S.W.2d 605, 607 (Tex.1985); *Cail v. Service Motors, Inc.,* 660 S.W.2d 814, 815 (Tex.1983). Section 16.003(b) specifically provides that in a wrongful death action "a person must bring suit not later than two years after the day the cause of action accrues" and goes on to fix "accrual" at the injured person's death. The express language of the statute, therefore, evidences the legislative intent to fix the only date of accrual, and not merely the earliest, as Moreno contends. [2]

Moreno's reliance on our decision in DeHarn is also misguided. In DeHarn, this court interpreted the accrual language in TEX.REV.CIV.STAT. art. 3202 (1879), which was the statutory predecessor to section 16.003(b). The opinion describes the reason for Article 3202 as follows:

Since no action could be brought by the relatives of the injured person until death had ensued, and since a great deal of time might elapse between the injury and the death, it was reasonable that the time of death should be taken as the point from which limitation should begin to run.

DeHarn, 23 S.W. at 381-82. Moreno construes this single passage as evidencing a legislative purpose to extend the beginning of the running of the statute beyond the date of death. But Article 3202 was meant solely to prevent the potential anomaly of limitations running before death. Its purpose was not to extend the beginning of the running of the statute beyond the date of death. Nothing in the wording of Article 3202 or our discussion in DeHarn indicates such a purpose. Moreover, to engraft such a purpose on to section 16.003(b) would be to ignore our oft-repeated pronouncement that the "purpose" of all limitation statutes is to compel the exercise of a right of action within a reasonable time so that the opposing party has a fair opportunity to defend while witnesses are available. See e.g., Willis, 760 S.W.2d at 644; Robinson, 550 S.W.2d at 20; *Price v. Estate of Anderson,* 522 S.W.2d 690, 692 (Tex.1975); see also *United States v. Kubrick,* 444 U.S. 111, 117, 100 S.Ct. 352, 356, 62 L.Ed.2d 259 (1979) ("[s]tatutes of limitation ... afford plaintiffs what the legislature deems a reasonable time to present their claims [and] ... protect defendants and courts from having to deal with cases in which the search for truth may be seriously

**Page 353**

impaired by loss of evidence, memory, or disappearance of witnesses.").

The Discovery Rule.

Notwithstanding the plain language of section 16.003(b), Moreno argues that the discovery rule should be applied to the statute because our past decisions have applied the rule to section 16.003(a) involving injuries and, in the interest of consistency, section 16.003(b) should be similarly construed. This argument, however, misconceives both the function of the discovery rule and the power of this court to craft exceptions to legislative enactments.

As we have said, the discovery rule is a judicially conceived exception to statutes of limitation to be used by courts to determine when a cause of action accrues. This court has only applied the rule to "accrual" limitation statutes--i.e. statutes which have failed to define when a cause of action accrues. Because these statutes did not specify a time of "accrual," this court did not violate a specific legislative directive when it interpreted them to allow for application of the discovery rule. Section 16.003(b), however, prescribes an absolute limitations period by expressly specifying that "accrual" is the date of death. Since section 16.003(b) specifies death as the accrual date for wrongful death actions, there is no need for this court to employ the discovery rule--the legislature has completed the task. [3] Furthermore, when faced with other absolute statutes of limitations in which the legislature has specifically defined the date or event which triggers accrual, this court has enforced the literal terms of the statute and refused to engraft a discovery rule. See e.g., *Safeway Stores, Inc. v. Certainteed Corp.,* 710 S.W.2d 544, 546-48 (Tex.1986); *Morrison v. Chan,* 699 S.W.2d 205, 208

(Tex.1985).

Other Jurisdictions.

The overwhelming majority of states construing absolute statutes with similar or identical language to that found in section 16.003(b) have held that the discovery rule does not apply. [4] These courts offer several rationales for refusing to apply the discovery rule, including: (1) that the rule applies only to accrual statutes but not absolute statutes, see, e.g., Presslaff, 403 A.2d at 940; White, 693 P.2d at 692; (2) that the fact of death itself is an event which should trigger any and all relevant inquiry, see, e.g., DeCosse, 319 N.W.2d at 51; (3) that there is a substantial state interest in promoting the prompt settlement of the affairs of the deceased, see, e.g., Cadieux, 593 F.2d at 145; Pastierik, 526 A.2d at 323; and (4) that the clear language of the statute cannot be judicially rewritten under the "guise of statutory construction," see, e.g., Trimper, 501 A.2d at 449; Morano, 420 N.Y.S.2d at 95. In many of these decisions, the factors suggested

**Page 354**

by Moreno--"fairness of result" and "legislative purpose"--were, in fact, considered and weighed by the court.

The only case cited by Moreno that directly supports his position is *Hanebuth v. Bell Helicopter International,* 694 P.2d 143 (Alaska 1984). In Hanebuth, the majority applied the discovery rule to an absolute limitations statute on the basis that failure to do so would result in injustice and would make it more profitable for a tortfeasor to kill rather than scratch a plaintiff. Id. at 146-47. However, as the dissent in Hanebuth points out, the majority reached its decision only after it ignored its own recent and controlling precedent, the plain language of the statute, and the vast majority of decisions to the contrary from other jurisdictions. Id. at 147 (Moore, J., dissenting). We decline to follow Hanebuth for these reasons, and because the decision both relies on distinguishable cases [5] and fails to recognize the distinction between personal injury and death actions. [6]

Summary.

The language used in section 16.003(b) reflects a clear legislative intent to adopt an absolute two-year limitations period for wrongful death actions. The legislature could have either left "accrual" undefined in section 16.003(b) or could have stated that the cause of action accrues "on the death of the injured person or upon discovery of the cause of death "; either route would have allowed the discovery rule to be applied to section 16.003(b). Instead, the statute unambiguously specifies one event--death--and only that

one event as the date upon which the action accrues. By specifying that date, the legislature has foreclosed judicial application of the discovery rule. If we concluded otherwise, we would be disregarding the plain meaning of section 16.003(b), distorting the clear function of the discovery rule, frustrating

**Page 355**

the legitimate purposes of limitation statutes, and ignoring the well-reasoned opinions of most other jurisdictions.

"Open Courts".

Article I, section 13 of the Texas Constitution provides:

All courts shall be open, and every person for an injury done him, and his lands, goods, person or reputation, shall have remedy by due course of law.

This provision, known as the "open courts" provision, is premised upon the rationale that the legislature has no power to make a remedy by due course of law contingent upon an impossible condition. Morrison, 699 S.W.2d at 207; *Nelson v. Krusen,* 678 S.W.2d 918, 921 (Tex.1984). In order to establish an "open courts" violation, a litigant must satisfy a two-part test: first, he must show that he has a well-recognized common-law cause of action that is being restricted; and second, he must show that the restriction is unreasonable or arbitrary when balanced against the purpose and basis of the statute. *Lucas v. United States,* 757 S.W.2d 687, 690 (Tex.1988); *Sax v. Votteler,* 648 S.W.2d 661, 666 (Tex.1983).

Moreno contends that if section 16.003(b) does not provide for application of the discovery rule, it is unconstitutional because he neither discovered, nor could have discovered through the exercise of reasonable diligence, his cause of action within the two-year limitations period. In other words, Moreno contends that section 16.003(b) is unconstitutional because it makes his remedy contingent on an impossible condition, namely, the discovery of the connection between aspirin and Reye's syndrome within two years after his child's death. Moreno argues that the "open courts" provision applies because Texas recognizes a common-law right to assert a wrongful death action. See *Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970). Alternatively, Moreno argues that wrongful death should be accorded common-law status for purposes of review under the "open courts" provision because a death action incorporates common-law elements and because there is no fundamental distinction between a common-law action for non-fatal personal injuries and a statutory action for wrongful death. See *Vassallo v. Nederl-Amerik Stoomy Maats Holland,* 162 Tex. 52, 344 S.W.2d 421, 423 (1961).

Finally, Moreno contends that section 16.003(b) is unreasonable and arbitrary because it denies him a remedy that would have been available to him had his child lived instead of died.

Common-law Requirement.

We first consider the question of whether Moreno is asserting a common-law cause of action. See *Waites v. Sondock,* 561 S.W.2d 772, 774 (Tex.1977); *Lebohm v. City of Galveston,* 154 Tex. 192, 275 S.W.2d 951, 954-55 (1955); *Hanks v. City of Port Arthur,* 121 Tex. 202, 48 S.W.2d 944 (1932). In Hanks, this court applied the "open courts" provision to a municipal ordinance which required notice to a municipality of a defective condition prior to the filing of suit. Essential to this court's holding in that case--that the ordinance violated the "open courts" provision--was a determination that the cause of action at issue, municipal liability, was common law rather than statutory. Implicit in the opinion was a recognition of the distinction between a court's power to apply "open courts" protection to common-law causes of action on the one hand, and statutorily created actions on the other. A common-law cause of action exists without a legislative enactment. As such, article I, section 13 of the Texas Constitution mandates that the courts be open to pursuing such claims. The legislature is not entitled to restrict or abrogate a common-law cause of action without a reasonable basis and without providing an adequate substitute. If, however, a cause of action was not recognized at common law, but was itself created by the legislature, any legislative abrogation of the cause of action would not be a true abrogation of a constitutional right. Rather, the legislature would simply not have granted as extensive a right as it might have. See *Castillo v. Hidalgo County Water Dist. 1,* 771 S.W.2d 633, 636 (Tex.App.--Corpus Christi 1989, no writ) ("Open Courts" provision does not apply to wrongful

**Page 356**

death action, which is a statutory cause of action "that expands the rights of an individual beyond those granted by the common law"); see also *Stout v. Grand Prairie Indep. School Dist.,* 733 S.W.2d 290, 295 (Tex.App.--Dallas 1987, writ ref'd n.r.e.); *Tarrant County Hosp. Dist. v. Ray,* 712 S.W.2d 271, 273 (Tex.App.--Fort Worth 1986, writ ref'd n.r.e.).

This court has repeatedly said there was no recognized common-law cause of action for wrongful death. See Witty, 727 S.W.2d at 505-06; *Duhart v. State,* 610 S.W.2d 740, 742 n. 2 (Tex.1980); *Marmon v. Mustang Aviation, Inc.,* 430 S.W.2d 182, 186 (Tex.1968); *Elliott v. City of Brownwood,* 106 Tex. 292, 166 S.W. 1129 (1914); *Galveston, Harrisburg and San Antonio R.R. Co. v. Le Gierse,* 51 Tex. 189, 199 (1879). Wrongful death causes of

action owe their existence to statutes changing this common-law rule. TEX.CIV.PRAC. & REM.CODE ANN. § 71.002; Duhart, 610 S.W.2d at 742 n. 2; Marmon, 430 S.W.2d at 182. [7] Moreno relies on *Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970) to support his argument that the common law recognized an action for wrongful death. In Moragne, however, while the majority recognized a common-law action for wrongful death in maritime law, it readily acknowledged that no such action existed at common law. 398 U.S. at 382, 384, 90 S.Ct. at 1778, 1779. Similarly, Moreno's argument that a wrongful death action is really a common-law action because it incorporates common-law elements ignores the fact that it is the Wrongful Death Act itself which incorporates and sets forth the "elements" of the cause of action. TEX.CIV.PRAC. & REM.CODE § 71.002(b)(1986). The fact that common-law elements are required is the result of an express statutory provision and does not change the fact that the underlying right to bring the action is statutory. [8]

Summary.

Our most recent open courts decisions have consistently required that the cause

**Page 357**

of action restricted be one that is well defined in the common law. *Lucas v. U.S.,* 757 S.W.2d 687, 690 (Tex.1988); *Nelson v. Krusen,* 678 S.W.2d 918, 922 (Tex.1984). Moreno's constitutional attack on section 16.003(b) is not premised upon restriction of a common-law cause of action, and, therefore, necessarily fails the first prong of the open courts test. See *Castillo v. Hidalgo County Water Dist. 1,* 771 S.W.2d 633, 636 (Tex.App.--Corpus Christi 1989, no writ) (wrongful death action did not exist at common law, and it is only by virtue of statutory authority that such suits can be maintained; therefore, "open courts" provision simply does not apply).

Finally, and notwithstanding the dissent's argument to the contrary, we believe today's decision is entirely reconcilable with our decision in Nelson, 678 S.W.2d at 918. First, Nelson involved limitations on a malpractice action--a well-established common law cause of action. See, e.g., *Sax v. Votteler,* 648 S.W.2d 661, 664-666; *Texas & P. Ry. Co. v. Morin,* 66 Tex. 225, 18 S.W. 503 (1886). Second, because the injury complained of in Nelson did not manifest itself until after limitations had run, the Nelsons had no reason to know of their injury, and thus their ability to bring suit, until after limitations had expired. In the instant case, the injury--i.e. death--was immediately known. Even in those Texas cases which have applied the discovery rule the courts have held that limitations begin to run when the fact of injury is known. See, e.g., *Rascoe v. Anabtawi,*

730 S.W.2d 460, 463 (Tex.App.--Beaumont 1987, no writ) (injury evident and limitations commenced on day plaintiff died); *Love v. Zales Corp.,* 689 S.W.2d 282, 285 (Tex.App.--Eastland 1985, writ ref'd n.r.e.) (discovery rule does not apply in wrongful death cases to toll running of limitations until plaintiff discovers that he has a cause of action); cf. *Coody v. A.H. Robins Co.,* 696 S.W.2d 154, 156 (Tex.App.--San Antonio 1985, no writ) ("The discovery rule speaks only of discovery of the injury [and] does not operate to toll the running of the limitations period until such time as plaintiff discovers all of the elements of a cause of action."); *Otis v. Scientific Atlanta, Inc.,* 612 S.W.2d 665, 666 (Tex.Civ.App.--Dallas 1981, writ ref'd n.r.e.) (limitations run from date injury is discovered, not from date of discovery of responsible party). [9]

For the reasons stated, our answer to the first certified question is that the discovery rule does not apply to TEX.CIV.PRAC. & REM.CODE § 16.003(b). In response to the second certified question, we answer that § 16.003(b), as interpreted, is not inconsistent with and violative of Article I, section 13 of the Texas Constitution. [10]

DOGGETT, J., joined by RAY and MAUZY, JJ., dissenting.

**Page 358**

DOGGETT, Justice, dissenting.

Tortfeasors take heart. Today this court grants you absolution--provided, of course, that you inflict only mortal wounds. Treating our century-old statute of limitations for wrongful death like some Strasbourg goose, the court's opinion crams it full of fictional legislative intent, and then ties to it the baggage of ancient English common law which a number of American courts, including the United States Supreme Court, have rejected as totally lacking in logical or historical justification. In this process, the opinion conveniently ignores or superficially distinguishes opinions from this court. Because I cannot join in this broad grant of a license to kill, I dissent.

Today's decision is irreconcilable with *Nelson v. Krusen,* 678 S.W.2d 918 (Tex.1984), in which this court held unconstitutional a similar "absolute" statute of limitations. Justice Spears, writing for the majority, condemned that statute in no uncertain terms, stating:

The limitation period of [the medical malpractice statute], if applied as written, would require the Nelsons to do the impossible--to sue before they had any reason to know they should sue. Such a result is rightly described as "shocking" and is so absurd and so unjust that it ought not to be possible. *Hays v. Hall,* 488 S.W.2d 412, 414 (Tex.1972);

*Gaddis v. Smith,* 417 S.W.2d 577, 580, 581 (Tex.1967).

678 S.W.2d at 923 (emphasis supplied). Yet today's decision reaches such an equally shocking and unjust result. The limited facts of this case, certified to this court by the Fifth Circuit, are no less compelling than those in Nelson. The Morenos and the Sloans both had infant children who died of Reye's Syndrome after being administered doses of Bayer's Childrens Chewable Aspirin, manufactured by Sterling Drug, Inc. After the death of the infants, the parents were informed that the use of aspirin sometimes contributed to Reye's Syndrome. The only real difference between this case and Nelson is that here the injured parties had the bad luck to die. [1]

**Page 359**

The court's opinion thus provides a perverse incentive for a tortfeasor to kill rather than merely maim.

The asserted rationale to support this untenable result is two-fold. First, the court examines the "plain meaning" of the "unambiguous" limitations statute and concludes that the legislature has intentionally foreclosed application of the discovery rule. This approach directly conflicts with the instruction given to us in the Code Construction Act that "whether or not the statute is considered ambiguous on its face," we must consider both the object sought to be obtained and the consequences of a particular construction. Tex. Gov't Code Ann. § 311.023 (Vernon 1988) (emphasis supplied). [2] We are further mandated that in construing this enactment "a just and reasonable result is intended." Id. § 311.021; see also *Witty v. American General Capital Distributors, Inc.,* 727 S.W.2d 503, 504 (Tex.1987) (the Texas "wrongful death statute is remedial in nature and must be liberally construed ..."). [3] As conceded in Nelson, what the court has achieved in foreclosing the discovery rule is the converse--a totally unjust and unreasonable result. The parents are permanently denied an opportunity to have their claims for the infants' deaths considered on the merits. The court twists the statute to achieve an artificial, but complete bar to these families recovering by requiring that they bring a cause of action before they could reasonably have discovered its existence.

Any careful analysis of the legislative intent and history of Section 16.003(b) contradicts the court's conclusion. An action for wrongful death has been tied to the date of death since the first passage of a death act in Texas and has survived in virtually identical form to this date. [4] Given this background, the legislature cannot be charged with the intent to abolish the discovery rule in wrongful death actions.

**Page 360**

It was not until 1967 that this court recognized the application of the discovery rule in an action for personal injuries. *Gaddis v. Smith,* 417 S.W.2d 577 (Tex.1967). While the 1879 Texas Legislature no doubt had its strong points, it cannot be said that it was sufficiently foresighted to have as its objective the abolition of a doctrine that did not exist in either name or substance until almost a century later. [5]

This court examined the applicable legislative purpose many years ago in *De Harn v. Mexican National Ry.,* 86 Tex. 68, 70, 23 S.W. 381, 381-82 (1893):

The reason of the provision is obvious. Since no cause of action could be brought by the relatives of the injured person until death had ensued, and since a great length of time might elapse between the injury and the death, it is reasonable that the time of the death should be taken as the point from which limitation should begin to run.

The court completely misapplies this case. The question is not whether De Harn deals with the issue of the application of the discovery rule--as stated above, it could not. The issue is rather to determine the general legislative intent in setting the date of death as the commencement point for the running of limitations. As De Harn states in unmistakable terms, that purpose was solely to protect the beneficiaries of one who lingered after receiving a lethal injury; the statute is designed to preserve, not to destroy, a cause of action. The result reached by today's opinion stands in clear contradiction of this legislative objective.

As evidenced by previous decisions of this court, labelling a statute of limitations "absolute" does not, as the opinion asserts, make it impenetrable to tolling principles. For example, in Borderlon v. Peck, 661 S.W.2d 907 (Tex.1983), we tolled an "absolute" statute of limitations on the basis of the common-law doctrine of fraudulent concealment. That doctrine has been held applicable by this court to toll the statute of limitations in actions for wrongful death. *Texas & P. Ry. v. Gay,* 86 Tex. 571, 576, 26 S.W. 599, 614 (Tex.1894). [6]

As a review of the cases cited by the court evidences, tolling of limitations to permit discovery is the rule rather than the exception. See, e.g., *Willis v. Maverick,* 760 S.W.2d 642 (Tex.1988) (discovery rule applicable in legal malpractice action); *Weaver v. Witt,* 561 S.W.2d 792 (Tex.1977) (medical malpractice); *Kelley v. Rinkle,* 532 S.W.2d 947 (Tex.1976) (action for libel of credit reputation). These cases are not limited, as the court's opinion concludes, to tolling limitations until the fact of the injury is known. In Willis, we held that:

[T]he statute of limitations for legal malpractice does not begin to run until the claimant discovers or should have

discovered through the exercise of reasonable care and diligence the facts establishing the elements of his cause of action.

760 S.W.2d at 646 (emphasis supplied). [7] Knowledge of Petitioners' causes of action was not complete upon discovery of the injury (i.e., death) as the opinion suggests;

## Page 361

the element of the causative link between the use of aspirin and Reye's Syndrome was equally critical. [8]

Rather than following the great weight of our own precedent, the court instead relies on two cases in which the court refused to apply the discovery rule. Yet in those cases, unlike here, the legislature had taken more than ample steps to bar application of the rule. In the first of these two cases construing the "absolute" statute of limitations applicable to health care liability claims, this court had before it abundant materials reflecting the legislative intent underlying the Medical Liability and Insurance Improvement Act. *Morrison v. Chan,* 699 S.W.2d 205, 208 (Tex.1985). At the time that limitation provision was passed, the discovery rule was well known to the Texas Legislature. A key legislative objective was to: "reduce excessive frequency and severity of health care liability claims." Tex.Rev.Civ.Stat.Ann. art. 4590i, §§ 1.02(a)(5) and 1.02(b)(1) (Vernon Supp.1989). As evidenced by De Harn, supra, the objective in defining the accrual date for wrongful death as the date of death was to expand and not to contract the cause of action. Unlike the statute applicable to actions for wrongful death, the health care liability limitation provision makes no reference to an "accrual" of a cause of action and disclaims the effect of other laws that would toll the time period for bringing suits, including for minority and other disabilities. The limitations statute for wrongful death is markedly different in this regard; that statute is subject to tolling for minority and other disabilities. Tex.Civ.Prac. & Rem.Code Ann. § 16.001 (Vernon 1986 & Supp.1990).

The other cited case, *Safeway Stores, Inc. v. Certainteed Corp.,* 710 S.W.2d 544 (Tex.1986), is even more persuasive authority to construe the statute before us to permit application of the discovery rule. The issue presented in that case was whether the statute of limitations for breach of warranty ran from the date of the breach or that of discovery. The statute sets the date of accrual and explicitly disclaims the applicability of the discovery rule, providing that a "cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." Tex.Bus. & Comm.Code Ann. § 2.725 (Vernon 1968) (emphasis supplied). Thus, in adopting Section 2.725, the legislature determined that more was needed to bar the discovery rule than just referring to the date of accrual; that rule needed to be

expressly disclaimed. This statute demonstrates an appropriate way to preclude application of the discovery rule. The court ignores the fact that the legislature is quite capable of expressly disclaiming the discovery rule but has not done so in the context of wrongful death.

To support its improbable position the court resorts to case law from other jurisdictions which have little comparability to the Texas statute. Most if not all of these cases appear to involve a limitations provision contained within the wrongful death statute itself and not one, like ours, that is part of a general limitations statute. The courts thus viewed the limitations as a condition upon the right, not merely the remedy, subject to strict construction in derogation of the common law. No such interpretation is applicable in this state. Because the Texas statutes concerning wrongful death and limitations are separate, the latter is procedural rather than a substantive qualification or condition restricting the right to bring an action for death. *Franco v. Allstate Ins. Co.,* 505 S.W.2d 789, 792-93 (Tex.1974).

An approach far superior to that taken by today's opinion is contained in *Hanebuth v. Bell Helicopter International,* 694 P.2d 143, 144 (Alaska 1984). In considering

**Page 362**

a requirement that a wrongful death action be "commenced within two years after the death," that court's considerations tracked the same concerns delineated under Texas law. Echoing Nelson, the Alaskan court applied the discovery rule to comport with principles of "fundamental fairness," to be "consistent with the purposes of the act," and to avoid "unjust and absurd results." 694 P.2d at 146. The court said it was "profoundly unfair to deprive a litigant of his right to bring a lawsuit before he has any reasonable opportunity to do so." Id. at 147. Further, "a tortfeasor whose conduct has been so grievous as to cause death would be exonerated, while another tortfeasor, guilty of the same conduct except for the fortuity that it merely caused injury, would be held responsible." Id. [9] The reasoning of today's opinion in rejecting Hanebuth is insightful. One who is only maimed, we are told at note 5, may be "in need of time to recover before beginning an investigation." Why shouldn't parents whose child has been wrongfully taken from them be in need of time to recover and discover as well? Solely because an insensitive court refuses Texas families that right.

The statute before us for interpretation contains only two sentences:

A person must bring suit not later than two years after the day the cause of action accrues for injury resulting in death.

The cause of action accrues on the death of the injured person.

Tex.Civ.Prac. & Rem.Code Ann. § 16.003(b) (1986). In today's opinion, the court determines from the "plain language" of this minimal statute that the legislature intended to bar the yet-to-be-judicially-created discovery rule even though this statute permits tolling under exceptions not just grounded in statute, such as for minors, but also those judicially-created, such as for fraudulent concealment. I cannot concur in such a complete manipulation of legislative intent.

The second asserted basis for the decision today is its refusal to extend constitutional protection to a cause of action for wrongful death which it conveniently pigeonholes as "wholly statutory." Because it is claimed that the "open courts" provision of article I, section 13 of the Texas Constitution protects only common-law causes of action, the court concludes that it is powerless to review a restriction on the exercise of a statutory wrongful death action. This conclusion is based on two flawed assumptions.

First, the distinction between common law and statutory causes of action for purposes of review under the "open courts" provision is more honored in the breach than the observance. *LeCroy v. Hanlon,* 713 S.W.2d 335 (Tex.1986), authored by Justice Spears, is a prime example. There this court struck as unconstitutional under the "open courts" provision a filing fee that went to state general revenues. The effect of the fee with respect to the individual plaintiff in that case was to bar his filing of suit under the Texas Deceptive Trade Practices Act and the Texas Insurance Code, i.e., wholly statutory causes of action. 713 S.W.2d at 336. For reasons indiscernible, the court in LeCroy was not troubled by today's controlling distinction between common law and statutory causes of action. Yet the failure to apply the discovery rule so as to prohibit completely a family's exercise of its legal rights closes the door to the Texas courts far more permanently than charging the extra forty dollar filing fee rejected in LeCroy. The constitutional guarantee that "[a]ll courts shall be open" to "every person" is a hollow one to families like the Morenos and the Sloans.

Second, this injustice cannot simply be defined away by claiming a wrongful death action is "wholly statutory." While a

**Page 363**

wrongful death action may have once been considered a creature of statute, it has evolved into a complex hybrid--part constitutional, part statutory and part judicially-developed common law. An early decision of this court recognized the multi-faceted nature of a wrongful

death action. While noting the statutory nature of the action, this court nonetheless stated:

In our own state, this right of action is wisely recognized by the organic law, supplemented by guarded legislative provisions enacted for the purposes of securing to the beneficiaries just compensation in a case meriting it....

*Nelson v. Galveston, H. & S.A. Ry.,* 78 Tex. 621, 624, 14 S.W. 1021, 1022 (1890) (emphasis supplied). [10]

Even the most cursory examination of the history of the Texas Wrongful Death Act reveals its tripartite nature. As first adopted in Texas in 1860, the statute was a mere four paragraphs in length, setting out the beneficiaries, the potential defendants (basically providers of public transport) and the basis of the cause of action (negligence or carelessness), permitting the recovery of damages and requiring suit to be brought within one year after death. Law of February 2, 1860, ch. 35, 1860 Tex.Gen.Laws 32. While the statute has been amended several times over the last 129 years, primarily to expand the class of potential defendants and to permit recovery of exemplary damages, it remains a "bare bones" enactment. Over that lengthy time period, many interstices of the statute have been left to the courts to fill, relying on common-law concepts. [11] In fact, writing for the court in *Sanchez v. Schindler,* 651 S.W.2d 249, 252 (Tex.1983), Justice Spears indicated a strong preference for this judicial development of the wrongful death statute. Because of the symbiotic relationship between the common law and statute, an action for wrongful death merits review under the "open courts" provision of article I, section 13 of the Texas Constitution. Labelling this action "statutory" rather than engaging in thoughtful analysis provides a convenient escape mechanism from the Houdini-defying task of reconciling this opinion with Nelson v. Krusen.

A cause of action for wrongful death is also in part constitutionally given. As initially adopted, the Texas Wrongful Death Act made no provision for exemplary damages. To correct this omission, the Texas Constitution of 1869 included a provision permitting recovery of exemplary damages for "homicide, through wilful act, or omission." Tex.Const. art. XVI, § 26, interp. commentary (Vernon 1955). The provision was amended in 1879 to expand the grounds for recovery to include "gross neglect." Id.; see also Demarest, The History of Punitive Damages in Texas, 28 S.Tex.L.J. 535, 540 (1987).

This constitutional right may not be legislatively abolished or restricted. In *Morton Salt Co. v. Wells,* 123 Tex. 151, 70

S.W.2d 409, 410 (1934), the issue presented was whether the plaintiffs in a death action covered by the worker's compensation statute were first required to present a claim for exemplary damages to the Industrial Accident Board prior to recovery in court. This court stated:

We agree with the Court of Civil Appeals that the district court had original jurisdiction, without the presentation of the claim for exemplary damages to the Industrial Accident Board. The cause of action here asserted is one given by the Constitution, and the Legislature was without power to add to or take from the conditions under which, by virtue of the Constitution, it could be maintained, nor did it attempt to do so.

70 S.W.2d at 410. A similar unconditional analysis was employed in *Hanks v. City of Port Arthur,* 121 Tex. 202, 48 S.W.2d 944 (1932), a case cited with frequency in today's opinion. Port Arthur's attempt to preclude liability through its municipal charter by requiring it be notified of a defective condition prior to the occurrence of an injury was held unconstitutional under both the "open courts" provision, article I, section 13 of the Texas Constitution, and article I, section 17, guaranteeing just compensation for a taking of property for public use. 121 Tex. at 206, 48 S.W.2d at 945. In examining the question of whether the charter could condition the constitutional right to bring suit for compensation, this court stated:

The Constitution admits of no such limitation.

When a city violates the Constitution to the damage or injury of a complaining party, a constitutional cause of action arises, and the Legislature is powerless to make provision for a notice of the type here involved. The Constitution, sec. 17, art. 1, having fixed the method by which a city may take or damage private property without liability for tort, the constitutional method is exclusive, and the Legislature is without power to prescribe any other method to accomplish the same purpose.

121 Tex. at 208, 48 S.W.2d at 946 (emphasis supplied). The court is content to ignore this well-entrenched principle of constitutional law. [12]

An exercise in somnambulism, today's opinion merely sleepwalks through the law, reciting the rule that there was no cause of action for death at common law but not engaging in conscious thought. Of the five cases cited as authority for the proposition that there was no action for death at common law, not one of them engages in any in-depth analysis. Only two reference the rule's origin as dictum in Lord Ellenborough's decision in Baker v. Bolton in England in 1808. *Marmon v. Mustang Aviation, Inc.,* 430 S.W.2d 182, 184 n. 4 (Tex.1968); *Galveston, H. & S.A. Ry. v. Le Gierse,* 51 Tex. 189, 198-99 (1879). One commentator

has described the rule as "a magical intoned incantation recited by rote," followed by courts without analysis of the validity of its historical origins or current applicability. S. Speiser, Recovery for Wrongful Death 2d §§ 1:1 and 1:5 (1975). That criticism accurately describes today's opinion and the precedent it cites.

A hard look at this common-law prohibition reveals that it lacks any rational basis and should not be blindly followed by this court. The Baker v. Bolton case was a nisi prius case (i.e., a case tried in the local court before a single judge rather than en banc in the superior court at Westminster) without authority or supporting reasoning for its statement that the common law barred redress for a fatal injury. *Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 382-83, 90 S.Ct. 1772, 1778-79, 26 L.Ed.2d

**Page 365**

339 (1970). [13] Contrary to the importance it later achieved, the decision in Baker v. Bolton went unnoticed by the English courts until 1873. [14] See Malone, The Genesis of Wrongful Death, 17 Stan.L.Rev. 1043, 1059 (1965). In fact, the first court anywhere to treat it as precedent was an American one, Carey v. Berkshire R.R., 55 Mass. (1 Cush.) 475, 48 Am.Dec. 616 (1848), some 40 years after Baker v. Bolton was decided. [15] During that interval, there was no reported opinion denying a wrongful death claim in this country, while several early decisions expressly recognized such a common-law action. Malone, The Genesis of Wrongful Death, supra, at 1066-67; Crofs v. Guthery, 2 Root 90, 1 Am.Dec. 61 (Conn.1794); Ford v. Monroe, 20 Wend. 210 (N.Y.Sup.Ct.1838); *James v. Christy,* 18 Mo. 162 (1853).

This historical timeline suggests that the English common-law prohibition was never truly part of the common law of Texas. In 1840, the Congress of the Republic of Texas enacted a law which adopted the common law of England to the extent consistent with the Constitution and laws of this state. This law has been interpreted by this court to mean the common law of England as "declared by the courts of the different states of the *United States." Grigsby v. Reib,* 105 Tex. 597, 600, 153 S.W. 1124, 1125 (1913) (emphasis supplied). As discussed above, in 1840 the American courts recognized a common-law action for wrongful death.

Building on virtually universal commentary critical of the English common-law rule barring actions for wrongful death [16] and the questionable historical basis for the rule's adoption, the United States Supreme Court in the landmark Moragne decision recognized a common law action for wrongful death in maritime cases. Writing for the unanimous court, Justice Harlan engaged in a scholarly examination of the three asserted justifications of the

common law prohibition and soundly rejected them all. The first, deemed the "sole substantial basis," is the felony-merger doctrine:

According to this doctrine, the common law did not allow civil recovery for an act that constituted both a tort and a felony. The tort was treated as less important than the offense against the Crown, and was merged into, or pre-empted by, the felony. The doctrine found practical justification in the fact that the punishment for the felony was the death of the felon and the forfeiture of his property to the Crown; thus, after the crime had been punished, nothing remained of the felon or his property on which to base a civil action.

**Page 366**

Moragne, 398 U.S. at 381, 90 S.Ct. at 1778 (citations omitted); see also Le Gierse, 51 Tex. at 198-99. The Moragne opinion rejected the applicability of this historical justification in the United States, noting that American law never recognized forfeiture of property as felony punishment. Moragne, 398 U.S. at 384, 90 S.Ct. at 1779. Texas law is in accord; the early laws of the Republic of Texas do not appear to recognize forfeiture, and this sanction was expressly barred by the Texas Constitution of 1876. Tex. Const. art. I, § 21.

The second basis for the rule reviewed in Moragne is the asserted difficulty of computing damages because of a "repugnance ... to setting a price upon human life." Moragne, 398 U.S. at 385, 90 S.Ct. at 1779 (citations omitted). Recognizing that damages are regularly determined in statutory wrongful death actions and such calculation poses no greater difficulty than awarding damages for nonfatal injuries, the Court found this basis of the rule unpersuasive. The third basis is the ancient common-law rule that a personal cause of action did not survive the death of its possessor. The Court noted that rule applies only to the victim's personal claims and has no bearing on whether a dependent should be permitted recovery for the injury he suffers because of the victim's death. Id. at 385, 90 S.Ct. at 1779. The Court then concluded that:

The American courts never made the inquiry whether this particular English rule, bitterly criticized in England, "was applicable to their situation," and it is difficult to imagine on what basis they might have concluded that it was.

Id. at 386, 90 S.Ct. at 1780. [17]

The Moragne decision noted the prevalence of statutes permitting recovery for wrongful death, adopted in all fifty states and by numerous federal statutes, and concluded:

These numerous and broadly applicable statutes, taken

as a whole, make it clear that there is no present public policy against allowing recovery for wrongful death. The statutes evidence a wide rejection by the legislatures of whatever justifications may have once existed for a general refusal to allow such recovery.... The policy thus established has become itself a part of our law, to be given its appropriate weight not only in matters of statutory construction but also those of decisional law.

398 U.S. at 390-91, 90 S.Ct. at 1782. [18] Although this analysis in Moragne was employed in an opinion by Justice Spears to justify extending comparative causation to a products liability action, *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 427 (Tex.1984), today Moragne is curiously limited to its facts.

The facts of the case before us differ vastly from the stagecoach and railway accidents for which, over a century ago, the scope of the wrongful death statute was originally envisioned. We are in an age of more insidious, less obvious causes of death, many of which are simply not discoverable within the two-year limitations period. Thus, not simply the occasional family, but an entire class of families will be deprived of their claims by the court's decision. This deprivation cannot be justified on the traditional ground that these victims "slept on their rights," because they could not have been aware of the basis of their cause of action until after their claims were barred. The opinion thus defies the very purpose of the discovery rule--to prevent legislation from merely affording "a delusive remedy." *Urie v. Thompson,* 337 U.S. 163, 169, 69 S.Ct. 1018, 1024, 93 L.Ed. 1282 (1949).

**Page 367**

The court's opinion can rightly be recorded as one of the most anti-family decisions in recent memory. It says to a wife who has lost a husband, to a child who has lost its parents, to the parents whose lives have been torn apart by the death of a child, your rights are denied; the merits of your claim against a hidden killer will never be considered by a Texas judge and jury. [19]

The goose is fattened and the table set, compliments of today's opinion. Pull up a chair, tortfeasors, and dine on pate de foie gras. You have been absolved from the infliction of lethal wounds, at least in the forum of the Texas courts. I dissent.

RAY and MAUZY, JJ., join in this dissent.

---------

Notes:

[1] Moreno has not argued that the doctrine of fraudulent concealment operates to toll the running of limitations in this case; nor has the Fifth Circuit requested that we address this issue. The doctrine of fraudulent concealment provides that where a defendant is under a duty to make disclosure but fraudulently conceals the existence of a cause of action from the party to whom it belongs, the defendant is estopped from relying on the defense of limitations until the party learns of the right of action or should have learned thereof through the exercise of reasonable diligence. Borderlon v. Peck, 661 S.W.2d 907, 908 (Tex.1983). Because the question of the doctrine's applicability in the present case is not properly before us, we express no opinion on the issue.

[2] A number of other states construing absolute statutes with similar or identical language to that found in section 16.003(b) have held that the clear language of the statute precluded application of the discovery rule. See, e.g., Trimper v. Porter-Hayden, 305 Md. 31, 501 A.2d 446, 449 (1985) (clear language of statute could not be rewritten under the "guise of statutory construction"); Presslaff v. Robins, 168 N.J.Super. 543, 403 A.2d 939, 941 (App.Div.1979) ("The court may not strain on policy grounds to manufacture a signification of the statutory language to achieve a result obviously not intended by the legislature and in direct conflict with the unequivocal proscription in [the statute]."); Morano v. St. Francis Hospital, 100 Misc.2d 621, 420 N.Y.S.2d 92, 95 (N.Y.Sup.Ct.1979) ("The language leaves no room for judicial construction and there are no statutory spaces to be filled."); Cadieux v. International Tel. & Tel. Corp., 593 F.2d 142, 144 (1st Cir.1979) (applying Rhode Island law) ("date of death" cannot be construed to mean "date of discovery of the cause of death").

[3] This is the exact position taken by the court in Stiles v. Union Carbide Corp., 520 F.Supp. 865, 867 (S.D.Tex.1981) ("When the legislature has clearly and unequivocally prescribed that a cause of action accrues on the occurrence of a specified event," the courts have neither the necessity nor the authority to invoke the discovery rule.). A good argument can be made that the legislature has adopted this interpretation by recodifying the statute in 1985 without adding any substantive changes. See Cunningham v. Cunningham, 120 Tex. 491, 40 S.W.2d 46, 51 (1931) ("Nothing is better settled than that the legislature must be regarded as intending statutes, when repeatedly re-enacted, ... to be given that interpretation which has been settled by the courts.").

[4] See, e.g., With v. General Electric Co., 653 P.2d 764 (Colo.App.1982); Farmers Bank & Trust Co. of Bardstown v. Rice, 674 S.W.2d 510, 512 (Ky.1984); Trimper v. Porter-Hayden, 305 Md. 31, 501 A.2d 446, 449 (1985); Szlinis v. Moulded Fiber Glass Cos., 80 Mich.App. 55, 263 N.W.2d 282 (1977); DeCosse v. Armstrong Cork Co., 319 N.W.2d 45 (Minn.1982); Morano v. St. Francis Hospital,

100 Misc.2d 621, 420 N.Y.S.2d 92, 95 (N.Y.Sup.Ct.1979); Cadieux v. Inter. Tel. & Tel. Corp., 593 F.2d 142, 144 (1st Cir.1979) (applying Rhode Island law); Presslaff v. Robins, 168 N.J.Super. 543, 403 A.2d 939, 942 (App.Div.1979); Anthony v. Koppers, 436 A.2d 181, 183 (1981); Pastierik v. Duquesne Light Co., 514 Pa. 517, 526 A.2d 323 (1987); White v. Johns-Manville Corp., 103 Wash.2d 344, 693 P.2d 687, 692 (1985); see also W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser and Keeton on the Law of Torts § 127, at 957 (5th ed. 1984) (noting that majority rule is that limitations in wrongful death actions begin to run on date of death and that courts have rejected applying discovery rule to wrongful death actions).

[5] The few cases relied on by the Hanebuth majority are distinguishable. See Hanebuth, 694 P.2d at 147. In Frederick v. Calbio Pharmaceuticals, 89 Cal.App.3d 49, 152 Cal.Rptr. 292 (1979), the court was interpreting an "accrual" statute and not an "absolute" statute like § 16.003(b). In Myers v. McDonald, 635 P.2d 84 (Utah 1981), the plaintiff did not become aware of the decedent's death until 3 years after it had occurred, whereas in the present case death was known immediately. Indeed, the Myers court expressly distinguished its decision from other decisions holding that limitations begin to run when the fact of death is known even if its cause is not. The decision in Shaughnessy v. Spray, 55 Or.App. 42, 637 P.2d 182 (1981) provides no support because that case was interpreting a statute which required an action to be commenced within 3 years after the occurrence "of the injury causing the death," rather than within 2 years after "death." Finally, it is not so clear that the discovery rule applies to the Illinois absolute statute; the Hanebuth majority omitted cases which have held that it does not, see Greenock v. Rush Presbyterian St. Luke's Med. Center, 65 Ill.App.3d 266, 22 Ill.Dec. 1, 3, 382 N.E.2d 321, 323 (1978), and the Illinois Supreme Court has not yet resolved the conflict.

[6] The Hanebuth decision concludes that it is "absurd" and arbitrary to only allow application of the discovery rule in personal injury cases, and not in wrongful death actions. Yet, application of the discovery rule in personal injury cases is reasonable because the live plaintiff may either be unaware of an injury at the time of its occurrence, or in need of time to recover before beginning an investigation. Neither of these considerations, however, are present in wrongful death actions because survivors are put on immediate notice by the event of death that an investigation into the cause of action must occur to preserve the claim. This definitive notice is what differentiates wrongful death and survival actions from personal injury actions. By disallowing application of the discovery rule to § 16.003(b), our opinion recognizes this distinction and effectuates the state interest in the prompt settlement of a decedent's affairs. See Pastierik v. Duquesne Light Co., 514 Pa. 517, 526 A.2d 323 (1987); Cadieux, 593 F.2d at 144-45.

Moreover, the dissent's argument that the Morenos were unaware of their ability to assert a cause of action is undermined by the fact that the Morenos, after receiving presumptive certificates of death describing Reye's syndrome as the cause of death, hired a "medical expert" who reviewed the file and determined that no medical malpractice had occurred. Faced with similar facts, the United States Supreme Court denied relief to a tardy plaintiff under the Federal Torts Claim Act, stating:

If [the plaintiff] fails to bring suit because he is incompetently or mistakenly told that he does not have a case, we discern no sound reason for visiting the consequences of such error on the defendant by delaying the accrual of the claim until the plaintiff is otherwise informed or himself determines to bring suit, even though more than two years have passed from the plaintiff's discovery of the relevant facts about injury.

United States v. Kubrick, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979).

[7] The common-law not only "denied a tort recovery for injury once the tort victim had died, it also refused to recognize any new and independent cause of action in the victim's dependents or heirs for their own loss at his death." W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser and Keeton on the Law of Torts § 127, at 945 (5th ed. 1984). (citations omitted). This rule denying a common-law right to assert a wrongful death action was confirmed in Baker v. Bolton, 1 Camp. 493, 170 Eng. Reprint 1033 (1808). In response to Baker, the English Parliament, in 1846, enacted "an Act for Compensating the Families of Persons Killed by Accident," otherwise known as Lord Campbell's Act. 9 & 10 Vict., ch. 93 § 2 (1846). See Witty v. American General Distrib., Inc., 727 S.W.2d 503, 504 (Tex.1987) ("Prior the passage of Lord Campbell's Act, there was no statutory or common-law cause of action for wrongful death.") This statute served as the pattern for Texas' first wrongful death statute, enacted in 1860. Tex.Gen.Laws 32; March v. Walker, 48 Tex. 372, 375 (1877); Sanchez v. Schindler, 651 S.W.2d 249, 251 (Tex.1983).

[8] The dissent attempts to establish that Texas recognizes a common law action for wrongful death despite the fact that every reported Texas decision considering the issue has held otherwise. For support, the dissent cites commentary and cases from other jurisdictions which argue that a wrongful death action should be recognized in the common law, and not that it was. The dissent also argues that Texas, in 1840, implicitly adopted two cases from other jurisdictions which recognized the common-law right to assert a wrongful death action. See Crofs v. Guthery, 2 Root 90, 1 Am.Dec. 61 (Conn.1794); Ford v. Monroe, 20 Wend. 210 (N.Y.Sup.Ct.1838). Crofs was decided fourteen years prior to Baker v. Bolton and "could not withstand the

greater weight" of the latter decision, Green, The Texas Death Act, 26 Tex.L.Rev. 133, 136 n. 9 (1947), and Ford apparently recognized the action without comment. Neither Crofs nor Ford, however, was mentioned in Carey v. Berkshire R.R., 55 Mass. (1 Cush.) 475, 48 Am.Dec. 616 (1848), where a leading American jurisdiction, the Supreme Judicial Court of Massachusetts, confirmed the rule set out in Baker v. Bolton (and universally accepted law ever since) that no action existed at common law for wrongful death. See W. Malone, The Genesis of Wrongful Death, 17 Stanford L.Rev. 1043, 1066-68 (1965). Finally, the dissent's argument does not answer the question of why the Texas Legislature would find it necessary to pass a wrongful death act in 1860 if there already was in existence a Texas common-law right to assert such an action. The dissent's approach would suggest that the 1860 act was superfluous. On the contrary, the 1860 act was designed to fulfill the same purpose as Lord Campbell's act: "... to fill the gap in the common law which had been created by the failure of the courts ... to provide a remedy for injuries resulting in death." Green, The Texas Death Act, 26 Tex.L.R. 133, 136 (1947).

[9] The dissent proposes not only that the discovery rule should apply to § 16.003(b), but also that the rule should operate to toll limitations until a plaintiff discovers a specific cause of action against a specific defendant. More specifically, the dissent proposes that courts allow wrongful death claims to be maintained whenever new scientific evidence links a particular disease with exposure to a particular substance, even though the death had occurred years, or even decades, earlier. This approach, however, would effectively "expand ... to infinity the time period during which wrongful death actions could be brought." Pastierik, 526 A.2d at 325. No cause of action would ever accrue until the plaintiff learned or should have learned of that specific cause of action, and no case would be concluded until every potential cause of action was discovered. This approach is also questionable from a public policy standpoint. It is hardly in the public interest "to encourage, literally, the unearthing of wrongful death causes of action long after death has occurred because there is some suspicion that death was caused by a wrongful act." DeCosse, 319 N.W.2d at 52.

[10] Art. 16, § 26 of the Texas Constitution provides as follows:

Every person, corporation, or company, that may commit a homicide, through wilful act, or omission, or gross neglect, shall be responsible, in exemplary damages, to the surviving husband, widow, heirs of his or her body, or such of them as there may be, without regard to any criminal proceeding that may or may not be had in relation to the homicide.

Tex.Const.Ann. art. 16, § 26 (Vernon 1955). The dissent suggests that § 16.003(b) unduly restricts this constitutional right to exemplary damages by placing an "impossible condition" upon the assertion of the underlying statutory wrongful death action, and, therefore, it is unconstitutional, or, at the very least, subject to an "open courts" challenge. This argument fails for two separate reasons.

First, as parents of a deceased child, the Morenos have no constitutional right to recover exemplary damages under art. 16, § 26. See Hofer v. Lavender, 679 S.W.2d 470, 475 (Tex.1984) (Supreme Court has consistently held that class of beneficiaries listed in art. 16, § 26 does not include parents of deceased child). Indeed, even if this court (or the legislature) wanted to broaden the class of persons entitled to recover exemplary damages to include parents of deceased children, we would be without authority to do so. Id.; see also Scoggins v. Southwestern Electric Service Co., 434 S.W.2d 376 (Tex.Civ.App.--Tyler 1968, writ ref'd n.r.e.) (holding that provision in Wrongful Death Act that allowed parents to recover exemplary damages was invalid under art. 16, § 26, since legislature could not enlarge on exemplary damages).

Second, the question of whether § 16.003(b) would operate in other cases to unduly restrict the constitutional right to exemplary damages is not properly before this court because the second certified question only asks whether § 16.003(b) "as applied to the plaintiffs herein violate[s] the open courts provision...." Since it cannot be shown that 16.003(b) violates Moreno's rights under art. 16, § 26, the statute's application to other plaintiffs in other cases is, according to the terms of the certified question, irrelevant. Moreover, this court has repeatedly reaffirmed the rule that if a plaintiff cannot prove the unconstitutionality of a limitations statute as applied to him, the statute will not be struck down merely because it might operate in an unconstitutional manner in another case. See Morrison v. Chan, 699 S.W.2d 205, 207 (Tex.1985); Nelson v. Krusen, 678 S.W.2d 918, 923 (Tex.1984).

[1] Relying upon facts taken from the summary judgment record of the federal district court, rather than those certified by the Fifth Circuit, the court asserts at footnote 6 that even if the discovery rule were applied, the Petitioners' wrongful death actions would still be barred by limitations. If that analysis were correct, the proper disposition of this case would be to return the certified questions to the Fifth Circuit unanswered. Further, the court ignores an affidavit stating that, although the ability to bring suit for medical malpractice against the doctors and the hospitals treating the infant children was investigated and found wanting, no investigation of the possibility of a link between the use of aspirin and Reye's Syndrome (which would serve as a basis of a products liability action) was made at that time. Moreno Record 284-85; Sloan Record 62-63. The facts of

this case are not similar to those in United States v. Kubrick, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979), as the opinion states. In Kubrick, the Court held that the statute of limitations began to run when the plaintiff had knowledge of the injury and its causative link to use of a particular drug.

[2] The opinion cites RepublicBank Dallas, N.A. v. Interkal, Inc., 691 S.W.2d 605, 607 (Tex.1985), for the proposition that rules of statutory construction may not be applied when a statute is unambiguous. That case stands in clear conflict with the dictates of the Code Construction Act, quoted above. Interkal, however, involved interpretation of a statute and not a code provision to which the Code Construction Act is applicable. 691 S.W.2d at 607 n. 1. Nor did the court in Cail v. Service Motors, Inc., 660 S.W.2d 814 (Tex.1983), consider the effect of the Code Construction Act.

[3] Further, "[t]his court has always endeavored to interpret the laws of Texas to avoid inequity." Sanchez v. Schindler, 651 S.W.2d 249, 252 (Tex.1983) (opinion construing Wrongful Death Act by Spears, J.).

[4] That act provided: "The action shall be brought within one year after the death of the deceased." Law of February 2, 1860, ch. 35, § 3, 1860 Tex.Gen.Laws 33. The limitations provision was subsequently moved from the wrongful death act to be included as part of a general limitations statute. Tex.Rev.Civ.Stat.Ann. art. 3202 (Vernon 1879) provided: "There shall be commenced and prosecuted within one year after the cause of action shall have accrued ...: 4. Actions for injuries done to the person of another where death ensued from such injuries; and the cause of action shall be considered as having accrued at the death of the party injured." See also Tex.Rev.Civ.Stat.Ann. art. 3353 (same language). The time for bringing an action for death was later expanded to two years. Law of March 4, 1897, ch. 14, § 1, 1897 Tex.Gen.Laws 12. Other than replacing the plural "injuries" with the singular "injury," the accrual language was unchanged. The statute was amended in 1979 to delete the two-year limitations period for actions for debts and accounts, but the limitations provision for a wrongful death action was not changed. Act of June 13, 1979, ch. 716, § 1, 1979 Tex.Gen.Laws 1768-69; see also Tex.Rev.Civ.Stat.Ann. art. 5526 (Vernon 1958) (repealed 1985). The statute was repealed and codified, with no substantive change intended, as part of the Texas Civil Practice and Remedies Code. Act of June 16, 1985, ch. 959, §§ 1 (new provision), 9 (repealer), and 10 (no substantive change intended).

The court asserts that this reenactment and codification after the decision of Stiles v. Union Carbide Corp., 520 F.Supp. 865 (S.D.Tex.1981), refusing to apply the discovery rule in a wrongful death action, worked a legislative adoption of that interpretation. While the legislature may indeed adopt a judicial interpretation by reenacting a statute, see Robinson v. Central Texas MHMR Center, 780 S.W.2d 169, 170-71 (Tex.1989), that interpretation must be by a court of last resort. See Texas Employer's Ins. Ass'n v. Lightfoot, 139 Tex. 304, 162 S.W.2d 929 (1942). Cunningham v. Cunningham, 120 Tex. 491, 40 S.W.2d 46, 51 (1931), cited in the opinion refers to an "interpretation which has been settled by the courts." The fact that this question has been certified to this court by the Fifth Circuit indicates that there is no well-settled interpretation by the Texas courts.

[5] This situation is fundamentally different from that presented to the court today in Dow Chemical Co. v. Alfaro, 786 S.W.2d 674 (Tex.1990). Unlike the discovery rule, the concept underlying the doctrine of forum non conveniens was in existence and being applied on the date the statute was enacted. That this old concept later acquired a new label--"forum non conveniens"--did not affect the original legislative action in abolishing it.

[6] The court miscomprehends this argument. The question is not whether the doctrine of fraudulent concealment applies to the facts of this case. Rather, the question is whether statutes of limitations labelled "absolute" are subject to common-law tolling principles such as the doctrine of fraudulent concealment and the discovery rule. Our decisions in Borderlon and Gay indicate that they are.

[7] See also Gaddis v. Smith, 417 S.W.2d 577, 581 (Tex.1967) (discovery of the "wrongful act" triggers limitations); Neagle v. Nelson, 685 S.W.2d 11, 12 (Tex.1985) (discovery of the "wrong"). The cases cited in the court's opinion addressed factual situations where the plaintiff was aware of both the injury and its cause. See, e.g., Coody v. A.H. Robins Co., 696 S.W.2d 154, 156 (Tex.App.--San Antonio 1985, no writ) (stating that plaintiff learned of injury and its cause simultaneously); Otis v. Scientific Atlanta, Inc., 612 S.W.2d 665, 666 (Tex.Civ.App.--Dallas 1981, writ ref'd n.r.e.) (plaintiffs do not assert that they did not know the cause of their injury).

[8] In Willis, we concluded that "any burden placed upon an attorney by application of the discovery rule is less onerous than the injustice of denying relief to unknowing victims." 760 S.W.2d at 646. Yet the injury worked in that case was much less severe than the deaths that occurred here allegedly due to distributing a dangerous pharmaceutical product to the Texas public. Surely the burden placed upon the drug manufacturer is equally less onerous than the injustice of denying relief to unknowing families, like the Morenos and the Sloans, whose children have died.

[9] A similar result has been reached as to an Illinois statute requiring that actions be commenced within two years after

death. See Eisenmann v. Cantor Brothers, Inc., 567 F.Supp. 1347 (N.D.Ill.1983) (to deny application of discovery rule would produce absurd result); Matter of Johns-Manville Asbestosis Cases, 511 F.Supp. 1235 (N.D.Ill.1981); Fure v. Sherman Hospital, 64 Ill.App.3d 259, 21 Ill.Dec. 50, 380 N.E.2d 1376 (1978); Praznik v. Sport Aero, Inc., 42 Ill.App.3d 330, 355 N.E.2d 686 (1976).

[10] A number of our sister states have recognized this hybridization to permit application of common-law principles in a wrongful death action. See, e.g., Summerfield v. Superior Court, 144 Ariz. 467, 698 P.2d 712, 718 (1985) (en banc) (the wrongful death "statute and precedent have combined to produce a cause of action with common law attributes"); Hanebuth v. Bell Helicopter Int'l, 694 P.2d 143, 146 (Alaska 1984) (wrongful death statute treated like other common law tort actions, finding discovery rule applies to "absolute" statute of limitations); O'Grady v. Brown, 654 S.W.2d 904, 908, 911 (Mo.1983) (en banc) (wrongful death statute "mends the fabric of the common law" and incorporates common law principles); Haakanson v. Wakefield Seafoods, Inc., 600 P.2d 1087, 1091-92 (Alaska 1979) (no legislative intent to treat wrongful death action different from other common law tort actions, thus limitations statute tolled for minors); Gaudette v. Webb, 362 Mass. 60, 284 N.E.2d 222, 229-30 (1972) (declaring existence of common-law wrongful death action and tolling limitations provision for minors). See also Restatement (Second) of Torts § 925 comment k (1979) (noting trend to "allow ameliorating common-law principles to apply" to wrongful death actions).

[11] See, e.g., Clifton v. Southern Pacific Transp. Co., 709 S.W.2d 636, 640 (Tex.1986) (gross negligence standard of Burk Royalty applied to wrongful death action); Yowell v. Piper Aircraft Corp., 703 S.W.2d 630, 632-33 (Tex.1986) (loss of inheritance damages recoverable in wrongful death action); Sanchez v. Schindler, 651 S.W.2d 249, 252-54 (Tex.1983) (damages for loss of society and mental anguish recoverable). See generally Tex.Civ.Prac. & Rem.Code Ann. §§ 71.001-011 (Vernon 1986 and 1989 Supp.) (extensive annotations).

[12] The majority dismisses the problem of a conflict with the constitutional right to exemplary damages in a wrongful death action on the grounds that no such damages are allowed to a parent for the death of a child. A similar argument in Hanks was found unpersuasive:

It is true that in the case before us the question of taking property in violation of the Constitution is not in issue, but the validity of the charter section may be raised, and, if void for any reason, it cannot be enforced in this case.

121 Tex. at 208-09, 48 S.W.2d at 947.

[13] One commentator has pointed out that Baker v. Bolton was not extensively argued, that the reported opinion is very brief and that the controversial rule was "laid down without either sustaining reasoning or supporting authority." S. Speiser, Recovery for Wrongful Death 2d § 1:2 (1975); see also Smedley, Wrongful Death--Bases of the Common Law Rule, 13 Vand.L.Rev. 605 (1960) (concluding the case was wrongly decided as well as overbroad). Even Dean Prosser has condemned the trial judge in Baker v. Bolton, stating that Lord Ellenborough's "forte was never common sense." W. Prosser, Law of Torts § 127 (4th ed. 1971).

[14] This rule never even made it as far as Scotland; that country recognized a common-law action for wrongful death. Moragne, supra, 398 U.S. at 398 n. 13, 90 S.Ct. at 1786 n. 13.

[15] The Carey case was subsequently overruled by the Massachusetts Supreme Court in Gaudette v. Webb, 362 Mass. 60, 284 N.E.2d 222, 229 (1972).

[16] The common-law prohibition against maintaining an action for wrongful death has been universally denounced by commentators as having no logical or historical basis and as unfairly differentiating between wrongful conduct resulting in mere injury and that resulting in death. See, e.g., F. Pollock, Law of Torts 55 (Landon ed. 1951) (terming rule "barbarous"); Smedley, Wrongful Death--Bases of the Common Law Rules, 13 Vand.L.Rev. 605 (1960) (rule has outlived its usefulness); Holdsworth, The Origin Of the Rule in Baker v. Bolton, 12 Law Q.Rev. 431, 437 (1916) (rule cannot be justified on precedential or technical grounds); F. Tiffany, Death by Wrongful Act § 12 (2d ed. 1913) ("[n]o satisfactory reason for the rule has ever been suggested"); P. Keeton, Prosser and Keeton on Torts § 125 (5th ed. 1984) (criticizing rule on basis that "it was cheaper to kill a person than to injure him").

[17] The compelling logic of Moragne has given rise to state court cases that recognize in some manner a common law action for wrongful death. See, e.g., Haakanson v. Wakefield Seafoods, Inc., 600 P.2d 1087, 1092, n. 11 (Alaska 1979); Gaudette v. Webb, 362 Mass. 60, 284 N.E.2d 222, 229 (1972); see also Restatement (Second) of Torts § 925 comment k (1979).

[18] Accord Pound, Comments on Recent Important Admiralty Cases, 13 NACCA L.J. 188-89 (1954) ("[t]oday we should be thinking of the death statutes as part of the general law"); Panama Railroad Co. v. Rock, 266 U.S. 209, 216, 45 S.Ct. 58, 60, 69 L.Ed. 250 (1924) (Holmes, J., dissenting) (pervasive legislation indicates no public policy bar to common-law cause of action for wrongful death).

[19] We have not been asked by the Fifth Circuit to answer

in this case the question of whether the statute of limitations for wrongful death, interpreted to bar application of the discovery rule, conflicts with our state constitutional due process provision, article I, section 19 of the Texas Constitution. This court in Nelson v. Krusen, while recognizing that the due process and "open courts" provision are not coterminous, specifically left that question unanswered. Nelson, 678 S.W.2d at 921. Another unexplored question is whether the legislative distinction between the quick and the dead passes muster under article I, section 3 of the Texas Constitution, our state guarantee of equal protection, or the federal equivalent, U.S. Const. amend. XIV, § 1.

---------

**Page 313**

**795 S.W.2d 313 (Tex.App. —Houston [1 Dist.] 1990)**

**Donald and Rosie STEVENSON, Appellants,**

**v.**

**Ivan KOUTZAROV, Appellee.**

**No. 01-89-00207-CV.**

**Court of Appeals of Texas, First District, Houston**

**August 23, 1990**

**Page 314**

[Copyrighted Material Omitted]

**Page 315**

Jo Ann Storey, Jacqueline Taylor, Norman Riedmuller, Houston, for appellants.

Lynne Little St. Leger, John F. Nichols, Lynn S. Kuriger, Houston, for appellee.

ON MOTION FOR REHEARING

O'CONNOR, Justice.

This suit, which arises out of a divorce action, is a suit for damages by a husband against his wife's friends. We reverse and remand. On motions for rehearing, we grant appellants' motion for rehearing on point of error nine, deny the remainder of appellants' motion, deny appellee's motion, withdraw our earlier opinion, and substitute the following:

Ivan Koutzarov (the husband) filed for divorce against Maria Arnaldina Koutzarov (the wife). In an amended petition, the husband named Donald and Rosie Stevenson as third-party defendants. The divorce was tried to the court. The case against the Stevensons was tried to a jury, which awarded the husband $2,712,500 in actual and exemplary damages. The final judgment in the case incorporated both the jury's verdict against the Stevensons and

**Page 316**

the court's findings and conclusions in the divorce action.

The Stevensons filed a motion for new trial and for a remittitur. After the trial court granted the motion for new trial, the husband volunteered a remittitur, which the trial court accepted. The trial court then set aside the order for a new trial and reinstated the judgment, less the remittitur. The trial court's final award to the husband against the Stevensons was $965,300 in actual and exemplary damages. The Stevensons appeal from that judgment.

I. Deposition testimony

In their first point of error, the Stevensons claim the trial court erred in admitting the deposition testimony of three witnesses offered by the husband. The Stevensons objected to the depositions because they were not parties when the husband took the depositions. The Stevensons argue they were denied their right to cross-examine the witnesses.

The Stevensons rely on Tex.R.Civ.P. 207(1)(a), which states in part:

At the trial ... a deposition taken in the same proceeding, insofar as admissible under the Texas Rules of Civil Evidence, may be used by any person for any purpose against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof.

(Emphasis added.) The Stevensons cite *Heldt Bros. Trucks v. Silva,* 464 S.W.2d 931, 937 (Tex.Civ.App.--Corpus Christi 1971, no writ), *Elizondo v. Tavarez,* 596 S.W.2d 667, 670 (Tex.Civ.App.--Corpus Christi 1980, writ ref'd n.r.e.), and *Couch v. Mallory,* 638 S.W.2d 179, 181 (Tex.App.--Corpus Christi 1982, writ dism'd), to support their interpretation of rule 207, that the depositions were inadmissible against them.

In Heldt, a corporate defendant complained on appeal that the trial court permitted plaintiff to use depositions that were taken before it was joined as a party. 464 S.W.2d at 937. The Corpus Christi Court of Appeals held that there was no privity between the two defendants. Further, to admit the deposition into evidence would be highly prejudicial to the corporate defendant because it did not have an opportunity to cross-examine the witness. Id. The Heldt court said the corporate defendant should have been afforded an opportunity to cross-examine the witnesses. Id.

In Elizondo, plaintiff sued a doctor in April, and in September, took the deposition of a nurse. 596 S.W.2d at 670. Nine days after taking the deposition, plaintiff added the hospital as a party. At trial, four years later, plaintiff offered the nurse's deposition. Id. at 669. When the hospital objected, the trial court excluded the nurse's deposition against the hospital. On appeal, the Corpus Christi court affirmed and said that plaintiff had the obligation to re-take the deposition after it joined the hospital as a party to the

suit. Id. at 671. See also Couch, 638 S.W.2d at 181 (where, without details, the court restated the rule that a deposition taken before a party is joined is inadmissible against that party). [1]

The Texarkana Court of Appeals' application of the rule is consistent with the Corpus Christi court's interpretation. In *Safeco Ins. Co. v. Gipson,* 619 S.W.2d 275, 278 (Tex.Civ.App.--Texarkana 1981, writ dism'd w.o.j.), after filing suit against Ms. Phillips and her employer, a church, plaintiff deposed Ms. Phillips. About a year later, plaintiff dismissed the church and added Safeco, the insurance carrier for the

**Page 317**

church, as a defendant. At a venue hearing, plaintiff introduced Ms. Phillips' deposition without objection from Safeco. On appeal, the court rejected Safeco's argument that the deposition was hearsay because the attorney for Safeco was present at Ms. Phillips' depositions, as the attorney for the church, and there was a contractual relationship between the church and its insurance carrier.

Applying the principles of these cases, we note that the husband did not re-depose the witnesses after the Stevensons were joined as parties to the suit; the Stevensons did not have a contractual relationship with either the husband or the wife; and, the Stevensons' attorney was not present when the witnesses were deposed. Thus, the Stevensons did not have an opportunity to cross-examine the deponents.

The husband urges that the depositions were admissible pursuant to Tex.R.Civ.P. 207(1)(c), which provides:

If one becomes a party after the deposition is taken and has an interest similar to that of any party described in a. or b. above, the deposition is admissible against him only if he has had a reasonable opportunity, after becoming a party, to redepose the deponent, and has failed to exercise that opportunity.

(Emphasis added.) Section (1)(c) of rule 207 was added in 1988, after the decisions in the above cited cases. Rule 207 now extends the admissibility of depositions to any party with a similar interest. The rule now charges the late parties to redepose the witness if they have a reasonable opportunity.

The husband claims the second amended petition put the Stevensons on notice as early as January 1986 that his claims against them were similar to his claims against the wife. In that pleading, the husband alleged collusion, conspiracy, and secreting funds. The husband argues that the Stevensons had a reasonable opportunity to redepose the deponents, which they did not exercise. The depositions

were filed with the trial court on August 1, 1985. The Stevensons were joined in January 1986, and the case was tried in September 1988.

The husband argues that the Stevensons had constructive notice of the court's file because, with due diligence, the Stevensons could have learned of the depositions on file. We do not need to reach the constructive notice issue because the Stevensons had actual notice that the depositions were on file about three months before trial. On their attorney's billing records, he indicated that his office researched the "use of deposition testimony before the Stevensons were parties." Also, the husband in his deposition on September 16, 1986, told the Stevensons that Singer's deposition had been taken and that Connors was also a person with knowledge of relevant facts.

The Stevensons argue that they had no reason to redepose these witnesses because the witnesses only testified as to "confrontations, harassment, threats and surveillances." The Stevensons assert that this testimony was not relevant to any issue in the case before the additional causes of action were added, 10 days before trial.

Applying rule 207(1)(c) and the cases discussed above, we hold the Stevensons did not have an interest sufficiently similar to the wife to impose a burden on them to depose the witnesses. Thus, the trial court erred in permitting the husband to use the depositions.

We sustain point of error one.

II. The rebutting witness

In point of error two, the Stevensons contend the trial court abused its discretion when it refused to let their witness, Mary Jo Spangler, testify. When the Stevensons offered Spangler as a witness, the trial court ruled she could not testify because she was not listed as a witness in response to discovery requests. When Spangler was offered as a rebuttal witness, the court again refused to allow her to testify. On appeal, the Stevensons contend they offered her testimony to rebut the deposition testimony of the three witnesses.

**Page 318**

When a party offers a witness it did not list in its answers to discovery requests, the trial court should automatically exclude the witness. *Morrow v. H.E.B., Inc.,* 714 S.W.2d 297 (Tex.1986). It is immaterial that the witness' testimony is offered as rebuttal. *Ramos v. Champlin Petroleum Co.,* 750 S.W.2d 873, 876-77 (Tex.App.--Corpus Christi 1988, writ denied); *Walsh v. Mullane,* 725 S.W.2d 263, 264-65 (Tex.App.--Houston [1st Dist.] 1986, writ ref'd n.r.e.). To escape the automatic sanction, the party who wants to call the unidentified

witness must show good cause why the witness was not listed. *Gutierrez v. Dallas Indep. School Dist.,* 729 S.W.2d 691, 694 (Tex.1987). The fact that a party has little or no use at trial for a witness' testimony will not ordinarily excuse his failure to name the witness as a source of relevant facts because the party seeking discovery may have an important use for such testimony. Walsh, 725 S.W.2d at 265.

To prove good cause, the Stevensons argued to the trial court that they did not name Spangler as a witness because they did not know they would need Spangler until the husband amended his pleadings, 10 days before trial. The Stevensons also contend they could not anticipate that the trial court would admit the depositions of the witnesses taken when they were not parties to the suit. For these reasons, the Stevensons claim they did not know they needed Spangler's testimony until trial.

The burden was on the Stevensons to show a good cause for not listing Spangler as a witness. *Yeldell v. Holiday Hills Retirement & Nursing Center, Inc.,* 701 S.W.2d 243, 246-47 (Tex.1985). We hold that the Stevensons proved good cause when they said they did not list Spangler because they had no idea they needed her until the trial court refused to strike the late amendments and permitted the husband to use the three depositions.

We hold that, once the trial court permitted the husband to use the depositions of the three witnesses, the trial court abused its discretion when it refused to permit the Stevensons to call Spangler.

To show the trial court abused its discretion by rejecting Spangler as a witness, the Stevensons must convince us that the trial court's decision was arbitrary and unreasonable. *Simon v. York Crane & Rigging Co.,* 739 S.W.2d 793, 795 (Tex.1987).

To obtain reversal of a judgment based on error in the exclusion of testimony, an appellant must show that the trial court's ruling was in error, and that the error was calculated to cause, and probably did cause, rendition of an improper judgment. TEX.R.APP.P. 81(b)(1); see *Texaco, Inc. v. Pennzoil, Co.,* 729 S.W.2d 768, 837 (Tex.App.--Houston [1st Dist.] 1987, writ ref'd n.r.e.). Unless an appellant can show that the whole case turns on the evidence the court admitted or excluded, it is difficult to prove the ruling on the evidence resulted in reversible error. Id.

We hold that Spangler's testimony was material to rebut the testimony of the three deposition witnesses. The exclusion of her testimony, therefore, was reversible error under TEX.R.APP.P. 81(b)(1).

We sustain point of error two.

III. Statute of limitation

In point of error three, the Stevensons argue that the trial court erred in denying their motion for judgment notwithstanding the verdict (j.n.o.v.) and in rendering judgment for the husband because the causes of action for invasion of privacy, intentional infliction of emotional distress, and conspiracy to invade privacy and inflict emotional distress contained in the third and fourth amended petitions were barred by the statute of limitations. The Stevensons assert that these claims are all governed by the two-year statute of limitations.

Texas Civil Practice & Remedies Code Annotated § 16.003(a) (Vernon 1986) provides:

A person must bring suit for ... personal injury ... not later than two years after the day the cause of action accrues.

Civil conspiracy is governed by the two-year statute of limitations. *Cathey v. First City Bank of Aransas Pass,* 758 S.W.2d 818, 821-22 (Tex.App.--Corpus

**Page 319**

Christi 1988, writ denied). Invasion of privacy is governed also by the two-year statute of limitations. See *Covington v. Houston Post,* 743 S.W.2d 345, 347-48 (Tex.App.--Houston [14th Dist.] 1987, no writ) (held the two-year statute applicable to placing a person in a false light); *Wood v. Hustler Magazine, Inc.,* 736 F.2d 1084, 1087 (5th Cir.1984), cert. denied, 469 U.S. 1107, 105 S.Ct. 783, 83 L.Ed.2d 777 (1985) (applied the two-year statute of limitations to public disclosure of private facts).

No Texas court has decided the statute of limitations for intentional infliction of emotional distress. Generally, a tort-based cause is subject to the two-year statute. *Church v. Ortho Diagnostic Sys., Inc.,* 694 S.W.2d 552, 555-56 (Tex.App.--Corpus Christi 1985, writ ref'd n.r.e.). Thus, the tort of intentional infliction of emotional distress should be governed by the two-year statute of limitations.

The Stevensons complain that the causes of action added in the third and fourth amended petitions filed on August 26 and 28, 1988 were barred by limitations. The husband argues that the two amendments related back to the second amended petition, and therefore, the new claims were not barred by limitations. Texas Civil Practice & Remedies Code Annotated § 16.068 (Vernon 1986) provides:

If a filed pleading relates to a cause of action ... that is not subject to a plea of limitations when the pleading is filed, a subsequent amendment ... that changes the facts or grounds of liability or defense is not subject to a plea of limitations unless the amendment ... is wholly based on a

new, distinct, or different transaction or occurrence.

The supreme court found that the purpose of § 16.068 was to limit the application of the statutes of limitations to amended pleadings. The test is as follows: if the amended pleading does not allege a wholly new, distinct, or different transaction, then it relates back to the original filing, and is not subject to a limitations defense. *Ex parte Goad,* 690 S.W.2d 894, 896 (Tex.1985). Even if the amended petition contains new causes of action, the new causes are not barred by the statute of limitations unless they arise from a wholly different transaction. *Providence Hosp. v. Truly,* 611 S.W.2d 127, 133-34 (Tex.Civ.App.--Waco 1980, writ dism'd).

The husband's third and fourth amended petitions alleged new causes of action. The question is whether these new causes of action were based on new, distinct, and different transactions. The transaction referred to in the husband's second amended petition was "using their own personal banks and bank accounts to launder and hide money." In the husband's fourth amended petition, the transactions were "physical surveillance," "harassing telephone communications," and "harassing physical encroachments." The conspiracy to invade, invasion of privacy, conspiracy to inflict, and intentional infliction of emotional distress causes of action did not arise out of the same transactions between the Stevensons and the wife as did the causes of action in the second amended petition, which joined the Stevensons as parties. Thus, these new causes of action do not relate back to the second amended petition. Each new cause of action alleged in the third and fourth petition must satisfy the two-year statute of limitations.

The jury's answers to the limitations issues establish that all of the conduct comprising these new claims occurred before August 26, 1986. The husband's claims of conspiracy to invade, invasion of privacy, conspiracy to inflict, and intentional infliction of emotional distress, raised for the first time in his third amended petition on August 26, 1988, therefore, are all barred by the statute of limitations.

The husband argues that the new claims were a mere amplification of his claim for mental anguish in the second amended petition. The mental anguish alleged in the second petition was not cited as a transaction or occurrence, but as an element of damage--the "result" of the Stevensons' alleged conduct of conspiring to secret funds and defraud the community estate.

The trial court erred in denying the Stevensons' motion for j.n.o.v. and in rendering judgment for the husband on the claims

of conspiracy to invade, invasion of privacy, conspiracy to inflict, and intentional infliction of emotional distress because these claims were barred by the statute of limitations.

We sustain point of error three. Because our holding is law of the case, we reverse and render judgment in favor of the Stevensons on the claims barred by limitations.

IV. The trial amendment

In point of error four, the Stevensons assert that the trial court abused its discretion in denying their motion for leave to file a trial amendment because the husband did not show the amendment would prejudice him. The husband objected to the inclusion of special issues 11A and 12A in the court's charge to the jury, which related to the accrual of the causes of action. In response, the Stevensons asked to amend their pleadings to include a statute of limitations as an affirmative defense. Although the trial court denied their trial amendment, it submitted the special issues 11A and 12A.

Because their requested questions were submitted to the jury, the Stevensons have no cause for complaint. The objective of the trial amendment was accomplished without the amendment. Thus, any error the trial court may have committed was harmless.

We overrule point of error four.

V. The Stevensons' motion to strike amended pleadings

In point of error five, the Stevensons contend that the trial court abused its discretion in denying their motion to strike the husband's third and fourth amended petitions, filed 10 and eight days, respectively, before trial. The husband responds that the Stevensons did not preserve this error because they did not file a motion for continuance.

The Stevensons were brought into the divorce action by the husband's second amended petition, filed in January 1986. In that petition, the husband asked for damages for the money the Stevensons helped his wife secret and launder. From the five sentences of allegations directed at the Stevensons, the Stevensons estimated the husband sought $30,000 dollars in damages.

After being joined in the suit, the Stevensons deposed the husband. At the husband's deposition, he was asked what kind of claims he intended to pursue against the Stevensons. The husband's counsel interrupted his client to say that the only claims against the Stevensons would be

[B]asically money matters, nothing else. I think we have

claimed conspiracy to defraud kind of stuff. If you are talking about assault or some kind of tortious claim other than what's already in [the pleadings], I am not anticipating that.

Relying on that description of the suit, the Stevensons did not pursue liability or damage issues relating to tortious claims not in the pleadings.

Two and a half years after joining the Stevensons, and just 10 and eight days before trial the husband filed two amended petitions. On Friday, August 26, 1988, at 7:59 p.m., 10 days before trial, the husband filed his third amended petition. In that petition, the husband added causes of action for conversion, invasion of privacy, intentional infliction of emotional distress, and conspiracy to do these acts. In that petition, the husband expanded the earlier five sentences of allegations to 22 pages, and increased the estimated $30,000 damage claim to $2.7 million.

On Sunday, August 28, 1988, at 8:24 a.m., the husband filed the fourth amended petition, adding a cause of action for a lost job opportunity. In that petition, the husband expanded the earlier 22 pages of allegations to 25 pages, and increased the damage claim from $2.7 million to $16.5 million.

The Stevensons, who received notice of the amendments on August 29, seven days before trial, filed a motion to strike the late pleadings. The trial court refused. The Stevensons contend that the late pleadings changed the entire tenor of the suit and the new causes of action required different discovery than that already undertaken.

**Page 321**

The rule that controls the right to amend is rule 63 of the Texas Rules of Civil Procedure, which provides:

Parties may amend their pleadings ... at such time as not to operate as a surprise to the opposite party; provided, that any amendment offered for filing within seven days of the date of trial ... shall be filed only after leave of the judge is obtained, which leave shall be granted by the judge unless there is a showing that such amendment will operate as a surprise of the opposite party.

(Emphasis added.)

There is not, under rule 63, an unlimited right to amend pleadings. A party has a right to amend pleadings eight days or more before trial if the amendment does not "operate as a surprise to the opposite party." Tex.R.Civ.P. 63. If a party files pleadings seven days or less before trial, the pleadings must not operate as a surprise and the party must obtain leave of court. Id. Here, the husband filed his last amended pleading eight days before trial. Thus, the husband did not

need to obtain leave of court. Surprise is the only issue.

We will not disturb a trial court's ruling on refusal to strike the late amended pleadings, unless the complaining party shows that the court abused its discretion. *Hardin v. Hardin,* 597 S.W.2d 347, 349-50 (Tex.1980). Some courts require the party opposing the late amendment to claim surprise and move for a continuance. See, e.g., *Louisiana & Arkansas Ry. v. Blakely,* 773 S.W.2d 595, 597 (Tex.App.--Texarkana 1989, writ denied); *Howard v. Phillips,* 728 S.W.2d 448, 450-51 (Tex.App.--Fort Worth 1987, no writ).

The husband contends the Stevensons were required to file a motion for continuance to preserve the error. The Stevensons contend they were not required to file a motion for continuance, and cite *Hajdik v. Wingate,* 753 S.W.2d 199, 202-204 (Tex.App.--Houston [1st Dist.] 1988), aff'd, 795 S.W.2d 717 (Tex.1990). In Hajdik, we held a trial court abused its discretion when it permitted appellee to amend pleadings on the eve of trial, raising a totally new cause of action. In defense of the trial court, appellee argued that appellant should have filed a motion for continuance to preserve error on appeal. Id. at 203. We held a motion for continuance was only one factor to consider.

The factors we held important in Hajdik were: (1) the amended petition was filed two years after the suit was filed; (2) the amendment was made on the eve of trial; (3) the amendment introduced a totally new cause of action; (4) the late cause of action was not based on recently discovered matters; and (5) the complaining party alleged surprise and that he was not prepared to try the new cause of action. Hajdik, 753 S.W.2d at 204.

The factors present in this case are: (1) the amended petitions were filed more than two years after the Stevensons were added to the suit; (2) the amendments were made 10 and eight days before trial (the Stevensons received them seven days before trial); (3) the amendments introduced five totally new causes of action, increasing liability from an estimated $30,000 to over $16.5 million; (4) the late causes of action were not based on recently discovered matters; and (5) the Stevensons alleged surprise and that they were not prepared to try the new cause of action.

A significant similarity between this case and Hajdik is the short period between filing the amendment and trial: In Hajdik, the plaintiff amended his pleadings within five days before trial. [2] Here, the husband filed the first of the amended pleadings on a Friday evening, after the courthouse had closed, and filed the last of the amended pleadings on a Sunday morning. The Stevensons did not receive notice of the pleadings until seven days before trial.

We hold that, because the two amendments were a wholesale revision of the husband's suit against the Stevensons, the trial court abused its discretion when it denied the motion to strike late pleadings. Accordingly, we sustain point of error five.

**Page 322**

VI. The double recovery

In point of error eight, the Stevensons argue that the trial court erred in denying their motion for j.n.o.v. and motion for new trial, and in rendering a damage judgment for defrauding the community estate and for converting community property because such an award is a double recovery.

Double recoveries are not permitted. *Southern County Mut. Ins. Co. v. First Bank and Trust of Groves,* 750 S.W.2d 170, 173-74 (Tex.1988). When the prevailing party fails to elect between alternative measures of damages, the court should utilize the findings affording the prevailing party the greater recovery and render judgment accordingly. *Birchfield v. Texarkana Memorial Hosp.,* 747 S.W.2d 361, 367 (Tex.1987).

In *American Baler Co. v. SRS Sys., Inc.,* 748 S.W.2d 243, 246 (Tex.App.--Houston [1st Dist.] 1988, writ denied), we held that when the trial court errs in not requiring plaintiff to elect between damages on alternative causes of action, the court of appeals will make the election for him. In such a case, the court will choose the cause of action for which the jury made the highest award. Id.

If the claims of defrauding the community estate and converting community property amounted to a double recovery, the trial court should have granted judgment to the husband only for the greater recovery, not for both. Because the entire case will be retried, we need not decide this issue.

VII. The sufficiency of the evidence

Because we already have sustained points of error that require us to remand, we do not need to address any factual sufficiency points that, if sustained, merely compel retrial. We, therefore, need not address the factual sufficiency challenges in points of error 6, 7, 9, 10, 11, and 12.

We must, however, address the points which, if granted, would compel a rendition of judgment for the Stevensons. Thus, we will consider the challenges to the legal sufficiency of the evidence.

When we review the record, if we find there is more than a scintilla of evidence to support a finding, we must overrule the point of error. *Sherman v. First Nat'l Bank,* 760

S.W.2d 240, 242 (Tex.1988).

A. Fraud

In point of error six, the Stevensons contend the trial court erred in denying their motions for instructed verdict and for j.n.o.v. because there is no evidence of fraud or conspiracy to defraud, because the Stevensons made no misrepresentations of material fact to the husband on which he relied.

The Stevensons sought reimbursement from the husband for expenditures for medical bills, furniture, and cash advances on credit cards made for the wife. Although the copies of the documents were noted as "for Nalda," the wife, the hospital bill was incurred by Rosie Stevenson. Some of the furniture, purchased with community funds, was delivered to the Stevensons' home. Although the Stevensons claimed they advanced $9,300 of $12,100 from credit card advances to the wife, $10,600 of that was deposited back into the Stevensons' personal account within hours or days of the withdrawal.

We find there is more than a scintilla of evidence to support the finding, and we overrule point of error six.

B. Conversion of community property

In point of error seven, the Stevensons contend the trial court erred in denying their motions for instructed verdict and for j.n.o.v. because there is no evidence of conversion or conspiracy to convert, because the husband expressly or implicitly consented to or ratified the taking.

Although Rosie Stevenson was aware of the temporary orders forbidding the sale or other disposal of community property, the Stevensons helped the wife sell a 1977 Cadillac. The buyer testified that he bought the car from Rosie Stevenson, and gave her a cashier's check payable to Rosie Stevenson. Donald Stevenson paid Noff North American movers to move some of the

**Page 323**

Koutzarovs' property to Canada. The husband deposited money in a Canadian bank account in the name of Natasha Gomez da Costa (the wife's child) for tax purposes. The wife withdrew two checks totaling about $30,000 from the account, and with Rosie Stevenson's help, deposited the money in the Stevenson's bank account.

We find there is more than a scintilla of evidence to support the finding and we overrule point of error seven.

C. Conversion of separate property

In point of error nine, the Stevensons assert that the

trial court erred in denying their motion for j.n.o.v. and motion for new trial because there is no evidence of conversion and conspiracy to convert the husband's separate property.

The jury identified certain silver flatware and jewelry as the husband's separate property. The husband kept his separate property in a safety deposit box. During the week of June 25, 1984, the wife removed the jewelry from the safety deposit box.

The husband admits that the only evidence that supports the jury's finding that the Stevensons conspired to convert his separate property is circumstantial. In his brief, the husband claims that he talked to Mrs. Stevenson about the settlement during the week of June 25, the same week the jewelry was removed. The husband claims that the Stevensons' "involvement" with his former wife during the week of June 25 is some evidence that they conspired to convert his separate property. We disagree.

We find there is no evidence to support the finding and we sustain point of error nine.

### D. Damages

In point of error 10, the Stevensons argue that the trial court erred in denying their motion for j.n.o.v. because there is no evidence to support the judgment for $70,100 in damages for conversion and conspiracy to convert the husband's separate property. In point of error 11, the Stevensons argue that the trial court erred in denying their motion for j.n.o.v. because there is no evidence to support judgment for $75,000 in damages for conspiracy to defraud and conspiracy to convert community assets. Both points may well have merit. We need not address them, however, because the entire case will be retried.

## VIII. Summary

We reverse and render judgment as to point of error three, holding that the causes of action for invasion of privacy, intentional infliction of emotional distress, and conspiracy to invade privacy and inflict emotional distress were barred by the statute of limitations. We reverse and render judgment as to point of error nine, holding that there is no evidence to support the finding that the Stevensons converted or conspired to convert the husband's separate property. We reverse the remainder of the judgment and remand the cause for a new trial.

DUGGAN, J., also participating. [3]

---------

Notes:

[1] There are two other cases from the Corpus Christi Court of Appeals that are relevant. In Morehouse v. Brink, 647 S.W.2d 712, 715 (Tex.App.--Corpus Christi 1982, no writ), plaintiff orally deposed a witness before joining defendant Morehouse. After Morehouse was joined, plaintiff re-deposed the witness by written questions. Morehouse had notice of the deposition by written questions, but did not propound questions. The court of appeals held that Morehouse waived his right to cross-examine the witness and his objection to the oral deposition. In Academy Welding v. Carnes, 535 S.W.2d 917, 920 (Tex.Civ.App.--Corpus Christi 1976, no writ), plaintiff deposed a witness before adding Academy Welding as a defendant. At a venue hearing, the trial court permitted the use of the deposition. On appeal, the court reversed, holding that plaintiff was required to re-take the deposition of the witness if it wanted to use it.

[2] The exact date of filing the amended petition in Hajdik is disputed.

[3] Justice Warren participated upon original submission, but not on rehearing. Justice Warren died August 13, 1990.

---------

**809 S.W.2d 493 (Tex. 1991)**

**SOUTHWESTERN BELL TELEPHONE COMPANY, Petitioner,**

**v.**

**Eugene C. DeLANNEY, Respondent.**

No. C-8282.

Supreme Court of Texas.

March 6, 1991

Rehearing Overruled June 19, 1991.

Andrew J. Mytelka, John A. Buckley, Jr., Galveston, Richard Billeaud, Houston, for petitioner.

Anthony P. Griffin, Galveston, for respondent.

OPINION

PHILLIPS, Chief Justice.

We consider whether a cause of action for negligence is stated by an allegation that a telephone company negligently failed to perform its contract to publish a Yellow Pages advertisement. The court of appeals held that the company's failure to perform its contract was a basis for recovery in tort as well as contract, and that the clause limiting the telephone company's liability could not apply to limit tort damages. 762 S.W.2d 772. We reverse the judgment of the court of appeals and render judgment in favor of Bell.

Facts

Eugene DeLanney advertised his real estate business in the Galveston Yellow Pages for several years. For the 1980-1981 directory, he again contracted with Bell for a Yellow Pages advertisement. At this time DeLanney had two business phones, a rotary line and a single line. Prior to publication of the 1980-1981 directory, DeLanney's wife asked Bell to cancel the single line and add a third number to their existing rotary line. The Yellow Pages advertisement was billed to DeLanney's single line. When that line was canceled, DeLanney's Yellow Pages advertisement was automatically deleted from the directory due to Bell's internal procedures.

When the advertisement was not published as promised, DeLanney sued Bell, alleging negligence and violation of the Texas Deceptive Practices--Consumer Protection

Act ("DTPA"), TEX.BUS. & COM.CODE §§ 17.41-17.63. Bell answered and urged by special exception that DeLanney's petition failed to state a cause of action for negligence. No ruling was made on this special exception, and DeLanney proceeded to trial on both claims.

After DeLanney rested his case in chief, Bell moved for a directed verdict on both theories of liability. The trial court granted Bell's motion as to the DTPA claim, but denied it as to negligence. The remaining issues were submitted to a jury.

The jury found that Bell was negligent in omitting DeLanney's advertisement from the Yellow Pages and that such negligence was a proximate cause of damages to DeLanney. The jury assessed these damages at $109,000 for lost profits in the past and $40,000 for lost profits in the future. After ordering a partial remittitur which reduced future lost profits to $21,480, the trial court rendered judgment for DeLanney. Bell appealed.

Breach of Contract or Negligence

The court of appeals, with one justice concurring and one justice dissenting, affirmed. A majority of the court held that Bell's cancellation of DeLanney's Yellow Pages advertisement was correctly submitted as a negligence claim. The dissenting justice argued that because DeLanney sought damages for breach of a duty created under the contract, rather than a duty imposed by law, the claim sounded only in contract. We agree with the dissent.

The majority below relied on *Montgomery Ward & Co. v. Scharrenbeck,* 146 Tex. 153, 157, 204 S.W.2d 508, 510 (1947), where we quoted from 38 AM.JUR. Negligence § 20 (1941) as follows:

Accompanying every contract is a common-law duty to perform with care, skill, reasonable expedience and faithfulness the thing agreed to be done, and a negligent failure to observe any of these conditions is a tort, as well as a breach of the contract.

In Scharrenbeck, the defendant agreed to repair a water heater in plaintiff's home. A short time after repair, the heater ignited the roof, destroying the house and its contents. Although the contract obligated the defendant to put the water heater back in good working order, the law

also implied a duty to the defendant to act with reasonable skill and diligence in making the repairs so as not to injure a person or property by his performance. In failing to repair the water heater properly, the defendant breached its contract. In burning down plaintiff's home, the defendant breached a common-law duty as well, thereby providing a basis for plaintiff's recovery in tort.

The principle recognized in Scharrenbeck has also been recognized by commentators in this area. As one prominent authority has explained: "Tort obligations are in general obligations that are imposed by law--apart from and independent of promises made and therefore apart from the manifested intention of the parties--to avoid injury to others." W. KEETON, D. DOBBS, R. KEETON & D. OWEN, PROSSER AND KEETON ON THE LAW OF TORTS § 92 at 655 (5th Ed.1984) [hereinafter "PROSSER AND KEETON"]. If the defendant's conduct--such as negligently burning down a house--would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claim may also sound in tort. Conversely, if the defendant's conduct--such as failing to publish an advertisement--would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract. [1]

In determining whether the plaintiff may recover on a tort theory, it is also instructive to examine the nature of the plaintiff's loss. When the only loss or damage is to the subject matter of the contract, the plaintiff's action is ordinarily on the contract. See PROSSER AND KEETON at 656; 1 J. EDGAR, JR. & J. SALES, TEXAS TORTS AND REMEDIES § 1.03[b] at 1-36 (1990). We applied this analysis in Jim Walter Homes,

**Page 495**

Inc. v. Reed, 711 S.W.2d 617, 618 (Tex.1986), where we wrote:

The acts of a party may breach duties in tort or contract alone or simultaneously in both. The nature of the injury most often determines which duty or duties are breached. When the injury is only the economic loss to the subject of a contract itself the action sounds in contract alone.

Bell's duty to publish DeLanney's advertisement arose solely from the contract. DeLanney's damages, lost profits, were only for the economic loss caused by Bell's failure to perform. Although DeLanney pleaded his action as one in negligence, he clearly sought to recover the benefit of his bargain with Bell. We hold that Bell's failure to publish the advertisement was not a tort. [2] Under our analysis in Reed, DeLanney's claim was solely in contract.

DeLanney, however, did not request jury questions on breach of contract. Because the jury was asked only questions as to liability resulting from Bell's negligence, DeLanney waived any claim for breach of contract. *Ramos v. Frito-Lay, Inc.,* 784 S.W.2d 667, 668 (Tex.1990) (the plaintiff has the "burden to obtain affirmative answers to jury questions as to the necessary elements of his cause of action") (citing TEX.R.CIV.P. 279).

DeLanney did obtain an affirmative answer to the question whether there was a disparity in bargaining power between the parties in negotiating the Yellow Pages agreement. The court of appeals correctly determined that disparity in bargaining power is irrelevant in a negligence suit. Perhaps the issue was submitted because DeLanney pled that Bell's conduct was unconscionable under the DTPA. Because of his failure to comply with the notice requirements of the DTPA, however, DeLanney's entire cause of action under the DTPA, including any claim of unconscionability, was dismissed by a directed verdict. For this reason, and because DeLanney submitted no contract issues, the jury finding concerning disparity of bargaining power is of no effect.

For the foregoing reasons, the judgment of the court of appeals is reversed, and judgment is rendered that DeLanney take nothing.

GONZALEZ and DOGGETT, JJ., concur.

MAUZY, J., dissents.

GONZALEZ, Justice, concurring.

I agree with the court that Bell's failure to publish the advertisement was not a tort and that it sounded solely in contract. I also agree that DeLanney failed to discharge his burden to obtain affirmative findings to jury questions on the contract. However, I do not fault the court of appeals for its confusion. We have muddled the law of "contorts" and an all encompassing bright line demarcation of what constitutes a tort distinct from breach of contract has proven to be elusive. See generally W. PROSSER & W. KEETON, THE LAW OF TORTS § 1 (5th ed. 1984); see also *American Nat'l Petro. Co. v. Transcontinental Gas Pipe Line Corp.,* 798 S.W.2d 274, 280 (1990) (Gonzalez, J., dissenting).

DeLanney and the court of appeals rely heavily on the statement in *Montgomery Ward & Co. v. Scharrenbeck,* 146 Tex. 153, 157, 204 S.W.2d 508, 510 (1947), that:

Accompanying every contract is a common-law duty to perform with care, skill, reasonable expedience and faithfulness the thing agreed to be done, and a negligent failure to observe any of these conditions

is a tort, as well as a breach of the contract.

Despite this broad language, not every breach of contract accompanied by negligence creates a cause of action in tort. In *International Printing Pressman & Assistants' Union v. Smith,* 145 Tex. 399, 198 S.W.2d 729, 735 (1946), we acknowledged that no single concise rule will define the rights of parties in every situation. We nonetheless wrote:

[G]enerally speaking, "actions in contract and in tort are to be distinguished in that an action in contract is for the breach of a duty arising out of a contract either express or implied, while an action in tort is for a breach of duty imposed by law...." "[I]f the action is not maintainable without pleading and proving the contract, where the gist of the action is the breach of the contract, either by malfeasance or nonfeasance, it is, in substance an action on the contract, whatever may be the form of the pleading." (citations omitted).

Id., 198 S.W.2d at 735. I believe that this formulation comes closer than Scharrenbeck to stating a general rule to distinguish contract from tort and that the broad language in Scharrenbeck must be read in light of the particular circumstances of that case. The opinion in Scharrenbeck is correct in its observation that a contract may be the occasion that brings the parties together, but it is the relationship or situation of the parties that gives rise to a duty in law, the breach of which is a tort. See *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523 (Tex.1990). Had Montgomery Ward repaired the water heater gratuitously, it would have owed Scharrenbeck a duty not to create a dangerous condition. See *Colonial Sav. Ass'n v. Taylor,* 544 S.W.2d 116, 119 (Tex.1976); *Fox v. Dallas Hotel Co.,* 111 Tex. 461, 240 S.W. 517, 520 (1922); RESTATEMENT (SECOND) OF TORTS § 323 (1965). Thus the duty to not create a dangerous condition existed independent of any contractual relationship.

In summary, when a party must prove the contents of its contract and must rely on the duties created therein, the action is "in substance an action on the contract, even though it is denominated an action for negligent performance of the contract." *Bernard Johnson, Inc. v. Continental Constructors, Inc.,* 630 S.W.2d 365, 368 (Tex.App.--Austin 1982, writ ref'd n.r.e.) (emphasis in original).

Bell's Duty

The majority in the court of appeals also suggested that negligence was a proper theory because Bell carelessly deleted DeLanney's advertisement while making changes to his telephone service. In this manner, the court endeavored to connect the omission of the Yellow Pages advertisement to Bell's duty of public service.

The gravamen of DeLanney's complaint, however, was not with his telephone service, which was changed according to request and apparently to his satisfaction. Rather, his complaint was with Bell's failure to publish his advertisement as promised, and this was a matter of private contract. *A-ABC Appliance, Inc. v. Southwestern Bell Tel. Co.,* 670 S.W.2d 733, 735 (Tex.App.--Austin 1984, writ ref'd n.r.e.). Although Bell is a regulated public utility, all of its functions are not in the realm of public service. The "printing, distribution, or sale of advertising in telephone directories" is not a public service function. TEX.REV.CIV.STAT.ANN. art. 1446c, § 3(s) (Vernon Supp.1991).

Limitation of Liability

The connection drawn by the court of appeals between the Yellow Pages advertisement and DeLanney's telephone service also affected the court's view regarding the validity of a limitation of liability clause contained in the contract between Bell and DeLanney. This clause provided:

The applicant agrees that the telephone company shall not be liable for errors in or omissions of the directory advertising beyond the amount paid for the directory advertising omitted in which error occurs for the issue life of the directory involved.

DeLanney argued that the clause was unenforceable and, in the context of DeLanney's

negligence claim, the court of appeals agreed. 762 S.W.2d at 776.

In an apparent attempt to resolve conflicting decisions, the court of appeals suggested that the clause might be enforced to limit a claim for breach of contract, see *Wade v. Southwestern Bell Tel. Co.,* 352 S.W.2d 460 (Tex.Civ.App.--Austin 1961, no writ), but could not be applied to limit liability for negligence. See *Reuben H. Donnelley Corp. v. McKinnon,* 688 S.W.2d 612 (Tex.App.--Corpus Christi 1985, writ ref'd n.r.e.); see also *Helms v. Southwestern Bell Tel. Co.,* 794 F.2d 188 (5th Cir.1986). The conflict between Wade and McKinnon mirrors a larger split of authority regarding the validity of such limitation of liability clauses. See Annotation, Liability of Telephone Company for Mistakes in or Omissions From its Directory, 47 A.L.R. 4th 882 (1986).

McKinnon follows a minority line of cases which refuse to enforce such provisions. See *Morgan v. South*

*Cent. Bell Tel. Co.,* 466 So.2d 107 (Ala.1985); *Allen v. Michigan Bell Tel. Co.,* 61 Mich.App. 62, 232 N.W.2d 302 (1975); *Rozeboom v. Northwestern Bell Tel. Co.,* 358 N.W.2d 241 (S.D.1984); *Discount Fabric House, Inc. v. Wisconsin Tel. Co.,* 117 Wis.2d 587, 345 N.W.2d 417 (1984). The unifying theme of these decisions is that directory advertising is a unique advertising medium inextricably linked to the telephone company's public service function. Thus on the premise of Bell's status as a public utility monopoly, these courts have rejected the limitation of liability as contrary to the public interest or unconscionable.

A larger number of jurisdictions, however, have upheld similar liability limitation clauses for directories. In Helms v. Southwestern Bell Telephone Co., the Fifth Circuit lists decisions from twenty-six states which have upheld similar clauses. Helms, 794 F.2d at 192 n. 9; see generally Annotation, Liability of Telephone Company for Mistakes in or Omissions From its Directory, 47 A.L.R. 4th 882. These decisions have generally recognized Yellow Pages advertising to be a matter of private contract, rather than a public service function. The majority view is compatible with Texas law, which also excludes the sale of advertising in directories from Bell's public service function. TEX.REV.CIV.STAT.ANN. art. 1446c, § 3(s); see also A-ABC Appliance, 670 S.W.2d at 735. I therefore believe that the majority view presents the sounder approach.

Unconscionability

Even though the Yellow Pages is a matter of private contract, DeLanney may still recover the full value of the consequential damages caused by Bell's breach of contract if the clause limiting Bell's liability is unenforceable because a court may deny enforcement of an unconscionable clause or contract. See *Tri-Continental Leasing Corp. v. Burns,* 710 S.W.2d 604, 609 (Tex.App.--Houston [1st Dist.] 1985, writ ref'd n.r.e.) (Levy, J., dissenting); see also *Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154, 159-60 (1951); RESTATEMENT (SECOND) OF CONTRACTS § 208 (1979); TEX.BUS. & COM.CODE ANN. § 2.302 (Tex.UCC) (Vernon 1968). We must consider then whether the clause limiting Bell's liability for errors or omissions to the cost of the Yellow Pages advertising is unconscionable under the circumstances of this case.

DeLanney argues that it is. Because he had no meaningful choice and no bargaining power in the transaction, he contends that his contract with Bell was one of adhesion. Yellow Pages was the only commercial telephone directory in DeLanney's market area at the time. The only way to buy space in this directory was on Bell's terms dictated through a non-negotiable, standardized contract. DeLanney concludes that his inability to negotiate

more favorable terms rendered the limitation of liability clause unenforceable. In support of this argument, he relies on a jury finding that a disparity in bargaining power existed between himself and Bell when the contract was made. [1]

**Page 498**

Bell responds that the validity of the clause limiting liability was not a question of fact for the jury, but one of law for the court. I agree. [2] This is clearly the case under the Uniform Commercial Code. TEX.BUS. & COM.CODE § 2.302 comments 1 & 3 (Tex.UCC) (Vernon 1968); G. WALLACH, THE LAW OF SALES UNDER THE UNIFORM COMMERCIAL CODE p 5.04 at 5-5 (1981); see also RESTATEMENT (SECOND) OF CONTRACTS § 208, comment f (1979). Although the UCC does not expressly apply to service transactions, such as the sale of advertising in the Yellow Pages, the provision pertaining to unconscionability "has been applied to numerous transactions outside the coverage of Article 2 of the Code." J. CALAMARI & J. PERILLO, THE LAW OF CONTRACTS § 9-39 at 420 (3d Ed.1987); see also J. WHITE & R. SUMMERS, THE UNIFORM COMMERCIAL CODE § 4-32 at 200 (3d ed. 1989).

I also agree with Bell that bargaining disparity alone does not establish unconscionability. Comments to the UCC indicate that the principle of unconscionability is "not of disturbance of allocation of risks because of superior bargaining power." TEX.BUS. & COM.CODE ANN. § 2.302 comment 1. A comment to the Restatement provides that a "bargain is not unconscionable merely because the parties to it are unequal in bargaining position, nor even because the inequality results in an allocation of risks to the weaker party." RESTATEMENT (SECOND) OF CONTRACTS § 208 comment d. The Code and Restatement thus agree that a disparity in bargaining power, while relevant, is not the litmus test for unconscionability. See *Wade v. Austin,* 524 S.W.2d 79, 85-86 (Tex.Civ.App.--Texarkana 1975, no writ). Something more must be shown.

How much more is a difficult question, however, because the term unconscionable has no precise legal definition. Courts and commentators have struggled with its meaning. In Wade v. Austin, the court wrote that a determination of unconscionability must be made from "the entire atmosphere in which the agreement was made." Id. at 86. One authority has written that unconscionability cannot be defined because "(i)t is not a concept, but a determination to be made in light of a variety of factors not unifiable into a formula." 1 J. WHITE & R. SUMMERS, UNIFORM COMMERCIAL CODE § 4-3 at 203 (3d ed. 1988) (emphasis in original). The UCC [3] and Restatement [4] recognize the doctrine of unconscionability, but provide

only a rough outline of its meaning.

Although many factors are relevant and no single formula exists, [5] proof of a claim

**Page 499**

of unconscionability begins with two broad questions: (1) How did the parties arrive at the terms in controversy; and (2) Are there legitimate commercial reasons which justify the inclusion of these terms? Mallor, Unconscionability in Contracts Between Merchants, 40 Sw.L.J. 1065, 1072 (1986); 1 J. WHITE & R. SUMMERS, UNIFORM COMMERCIAL CODE, § 4-3, 4-4 (3d ed. 1988); J. CALAMARI & J. PERILLO, THE LAW OF CONTRACTS, § 9-40 (3d.1987); R. HILLMAN, J. MCDONNELL & S. NICKLES, COMMON LAW AND EQUITY UNDER THE UNIFORM COMMERCIAL CODE p 6.02[b-d] (1985); *Williams v. Walker-Thomas Furniture Co.,* 350 F.2d 445 (DC Cir.1965). The first question, often described as the procedural aspect of unconscionability, [6] is concerned with assent and focuses on the facts surrounding the bargaining process. Mallor, Unconscionability in Contracts Between Merchants, 40 Sw.L.J. 1065, 1072 (1986). The second question, often described as the substantive aspect of unconscionability, is concerned with the fairness of the resulting agreement. Id.

DeLanney concentrates on the procedural aspect, emphasizing the absence of any meaningful choice in the bargain. Bell, on the other hand, contends that the provision was nevertheless fair and reasonable under the existing commercial circumstances.

Bell submits that its contract merely sought to reallocate the commercial risk inherent in its business in a reasonable manner. This risk existed because the directory was to run for one year and mistakes could not be corrected during this period. Bell contends that the enormous benefit derived from Yellow Pages advertising by some subscribers when compared to the relatively modest amount charged by Bell, coupled with Bell's inability to mitigate damages, created a business risk it needed to reallocate. This it attempted to do by limiting its liability.

Bell further submits that the clause limiting liability was not one-sided or grossly unfair because it benefitted both parties. It benefitted the subscriber by keeping Yellow Pages rates low in relation to other types of advertising and in relation to the return expected by the subscriber. It benefitted Bell by shielding it from a risk of potential liability which was out of proportion to the consideration charged by Bell. Although it would not negotiate, Bell argues that DeLanney had other suitable advertising alternatives such as newspapers, magazines, direct mail, phone solicitation, the Multiple Listing Service, Board of

Realtors, yard signs, radio and television. After weighing all of the above, I am not convinced that the clause limiting Bell's liability for errors or omissions to the cost of the Yellow Pages advertising is unconscionable.

For the foregoing reasons, I concur with the judgment.

DOGGETT, Justice, concurring.

I concur in the court's judgment but write separately because it should, and could, be based solely upon our holding in *Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617, 618 (Tex.1986). Today's brief writing concerning the nature of torts and contracts unnecessarily adds more confusion than clarity.

**Page 500**

The court does recognize that in some as yet unspecified instances a tort action may lie between contracting parties. It appropriately observes that a tort action may arise based upon a number of relationships that could be created by contract. Although the court offers only one example of a contractual relationship creating duties the breach of which gives rise to actions both in tort and contract, at 497 n. 1 (the relationship between a professional and client), our developing jurisprudence recognizes others. See, e.g., *Viles v. Security Nat'l Ins. Co.,* 788 S.W.2d 566, 567 (Tex.1990) (relationship between insured and insurer). In addition, the court correctly recognizes that the breach of certain common-law duties creates liability in tort; the existence of a contract does not alter those duties.

It is thus incumbent upon the trial courts not to begin and end their inquiry with the contract but to examine the circumstances surrounding the parties' relationship, including any duties imposed by law, in determining whether a tort action may be maintained.

MAUZY, Justice, dissenting.

I respectfully dissent. The contractual relationship creates duties not only under contract law, but under tort law as well. A contract may create the state of things which furnishes the occasion for the tort. *Montgomery Ward & Co. v. Scharrenbeck,* 146 Tex. 153, 157, 204 S.W.2d 508, 510 (1947).

Every contract is accompanied by a duty to perform that contract with care, skill, reasonable expedience and faithfulness. The negligent failure to observe any of the conditions imposed by this duty constitutes a tort. Id. In determining whether the action is one in contract or tort or both, the court must look to the substance of the cause of the action, and not necessarily the manner in which it was pleaded. *Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617, 617-18 (Tex.1986) (citing *International Printing Pressman*

*and Ass't Union v. Smith,* 145 Tex. 399, 198 S.W.2d 729 (1946)). When the injury involves failure to perform a contract and the only loss is that economic loss that is the substance of the contract itself, the action sounds only in contract and not in tort. Jim Walter Homes, 711 S.W.2d at 618.

This case involves more than the mere failure to perform or negligent performance of the Yellow Pages contract. The action of Bell that gave rise to DeLanney's tort cause of action was the negligent performance of its contract to provide telephone service to DeLanney, not the negligent performance of its contract to provide the Yellow Pages advertisement. DeLanney had two contracts with Bell. For several years he had contracted with Bell for Yellow Pages advertisements, and he had already contracted with Bell for a 1980-81 Yellow Pages listing prior to the incident the subject of this lawsuit. In addition to the Yellow Pages advertisement contract, DeLanney had a separate contract with Bell for telephone service. Prior to the publication of the 1980-81 telephone directory, DeLanney contracted to alter his telephone service by canceling his single line and adding a third number to his two-number rotary line. When the alteration of the telephone service was requested, the separate contract for the Yellow Pages advertisement was not modified or even mentioned by either party. Cancellation of the single telephone line, pursuant to the telephone service contract, resulted in the cancellation of the Yellow Pages advertisement because the advertisement was billed to that number. The Yellow Pages advertisement itself was not even contemplated within the telephone service contract. It was the negligent performance of the telephone service contract that the jury found was the proximate cause of DeLanney's damages. [1] Southwestern Bell breached its

**Page 501**

duty to perform the telephone service contract with care, skill and faithfulness. The negligent performance of the telephone service contract caused damages to DeLanney that were unrelated to the subject of the telephone service contract. If Bell had not negligently performed the telephone service contract, DeLanney's advertisement would have been published as it had been in the past.

To confine DeLanney to recovery in contract, when his damages clearly extend beyond the contract itself, is to step back into the days of the common-law forms of action. Originally, forms of action were rigidly prescribed, and a plaintiff had no cause of action unless he could fit his claim "into the form of some existing and recognized writ." W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser and Keeton on the Law of Torts § 6 at 28 (5th ed. 1984); see *Nelson v. Krusen,* 678 S.W.2d 918, 932 (Tex.1984) (Kilgarlin, J., concurring and dissenting). Texas, though,

has never adopted the old forms of action; thus, "it makes no difference in what shape a plaintiff presents his cause of action, the courts will look to the substance of it, and not be controlled by the mere form in which it is set forth." *Rector v. Orange Rice Mill Co.,* 100 Tex. 591, 102 S.W. 402, 403 (1907). The option to proceed in contract or tort is available not to diminish the plaintiff's rights, but rather to afford the plaintiff a suitable remedy. See *Briggs v. Rodriguez,* 236 S.W.2d 510, 514-15 (Tex.Civ.App.--San Antonio 1951, writ ref'd n.r.e.).

"In jurisdictions where the old forms of action have been totally abolished, there should be nothing left of the whole doctrine excepting a few historical echoes." Corbin, Waiver of Tort and Suit in Assumpsit, 19 Yale L.J. 221, 246 (1910). The echo heard from the majority today is out of tune with modern jurisprudence, and wrongly deprives DeLanney of an adequate remedy at law.

This case was correctly tried in the trial court. The jury's verdict formed the basis of the trial court's judgment, which the court of appeals rightly affirmed. I would affirm the judgment of the court of appeals.

---------

Notes:

[1] Of course, some contracts involve special relationships that may give rise to duties enforceable as torts, such as professional malpractice.

[2] Prosser and Keeton suggest seven generalizations as helpful in distinguishing between tort and contract liability. Those which are useful to this case include: (1) obligations imposed by law are tort obligations; (2) misfeasance or negligent affirmative conduct in the performance of a promise generally subjects an actor to tort liability as well as contract liability for physical harm to persons and tangible things; (3) recovery of intangible economic losses is normally determined by contract law; and (4) there is no tort liability for nonfeasance, i.e., for failing to do what one has promised to do in the absence of a duty to act apart from the promise made. PROSSER AND KEETON at 656-57.

[1] The following question was submitted to the jury over Bell's objections:

Do you find from a preponderance of the evidence that there was a disparity of bargaining power between the plaintiff and the defendant in negotiating the contract for Yellow Page advertising.

Instruction: A disparity of bargaining power exists when one party has no real choice in accepting an agreement

limiting the liability of the other party.

The jury found there was a disparity of bargaining power.

[2] Here we are concerned with unconscionability under the common law as distinguished from unconscionability under the DTPA. The DTPA defines "unconscionable action or course of action" and, unlike the common law, makes it an issue of fact for the jury. Tex.Bus. & Com.Code Ann. § 17.45(5); see also Chastain v. Koonce, 700 S.W.2d 579, 582 (Tex.1985).

[3] The comment to UCC section 2.302 provides:

The basic test is whether, in light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract.... The principal is one of the prevention of oppression and unfair surprise ... and not of disturbance of allocation of risks because of superior bargaining power.

Tex.Bus. & Com.Code Ann. § 2.302 comment 1.

[4] A comment to section 208 of the Restatement provides:

The determination that a contract or term is or is not unconscionable is made in the light of its setting, purpose and effect. Relevant factors include weaknesses in the contracting process like those involved in more specific rules as to contractual capacity, fraud, and other invalidating causes; the policy also overlaps with rules which render particular bargains or terms unenforceable on grounds of public policy.

RESTATEMENT (SECOND) OF CONTRACTS § 208 comment a (1979).

[5] The Supreme Court of Kansas has identified ten factors as useful aids in determining unconscionability questions. They are: (1) the use of printed form contracts drawn by the party in the strongest economic position, which establish industry-wide standards offered on a take it or leave it basis; (2) excessive price; (3) a denial of basic rights and remedies to a consumer buyer; (4) the inclusion of penalty clauses; (5) the circumstances surrounding the execution of the contract, including commercial setting; (6) the hiding of disadvantageous clauses in a mass of fine print or in inconspicuous places; (7) phrasing clauses in language that is incomprehensible to a layman or that diverts his attention from the problems they raise; (8) an overall imbalance in the obligations and rights imposed by the bargain; (9) exploitation of the underprivileged, unsophisticated, uneducated, and the illiterate; and (10) inequality of bargaining or economic power. Wille v. Southwestern Bell Tel. Co., 219 Kan. 755, 549 P.2d 903, 906-07 (1976).

[6] As a framework for decision commentators and courts have generally followed the analysis proposed by Professor Arthur Leff. Leff, Unconscionability and the Code--The Emperor's New Clause, 115 U.Pa.L.Rev. 485, 487 (1967). Professor Leff labelled the different types of unconscionability as "substantive" and "procedural," distinguishing the content of the contract from the process by which the allegedly offensive terms found their way into the agreement.

[1] In its answers to the special issues, the jury specifically found Bell to be negligent.

Issue (1)(a) Whether Bell was negligent in failing to inform DeLanney that the installation of a rotary system would cancel the Yellow Pages listing.

Issue (1)(b) Whether Bell was negligent in failing to adequately train and inform its employees that an order to cancel one of the telephone numbers would cancel the Yellow Pages advertisement; and

Issue (1)(c) Whether Bell was negligent in failing to recognize that the automatic cancellation of the Yellow Pages advertisement would occur when the billing procedure was changed.

The jury further found that each of these acts of negligence proximately caused DeLanney's injuries.

---------

811 S.W.2d 913 (Tex. 1991)

TRANSAMERICAN NATURAL GAS CORPORATION, Relator,

v.

Hon. William R. POWELL, Judge of the 80th District Court of

Harris County, Texas, Respondent.

No. C-9294.

Supreme Court of Texas.

June 19, 1991

Page 914

James Kronzer, Don Henderson, Robert V. Holland, Jr., John C. Nabors, Karen Zuckerman, Bill Jones, Kenneth E. McKay and Joe H. Reynolds, Houston, for relator.

Michael C. Feehan, Beverly Arleen Sandifer, G. Byron Sims, Daniel J. Kasprzak, Jonathan C.S. Cox, Ann Ryan Robertson and Donald F. Hawbaker, Houston, for respondent.

OPINION

HECHT, Justice.

In this original mandamus proceeding, TransAmerican Natural Gas Corporation seeks to compel the Hon. William R. Powell, Judge of the 80th District Court, to set aside his orders imposing sanctions for discovery abuse. The district court struck TransAmerican's pleadings, dismissed its action against Toma Steel Supply, Inc., and granted Toma an interlocutory default judgment on its counterclaim against TransAmerican, reserving for trial only the amount of damages due Toma. We conditionally grant the writ of mandamus.

I

The underlying case is a complex, multi-party action arising out of Toma's sale of allegedly defective pipe casing to TransAmerican. TransAmerican withheld payment for the casing, apparently some $2.3 million, and sued Toma in April 1987 for damages allegedly caused by its use. Toma counterclaimed for $52 million damages resulting from TransAmerican's refusal to pay for the casing. Numerous other parties also joined in the litigation.

On July 3, 1988, the district court issued a docket control order pursuant to Rule 166

Page 915

of the Texas Rules of Civil Procedure, which set a discovery cutoff date of April 3, 1989. The order allowed discovery to be conducted beyond that date only upon agreement of the parties.

On March 7, 1989, Toma noticed the deposition of TransAmerican's president, K. Craig Shephard, to take place March 16. Two days later TransAmerican's counsel, who at that time was one of the attorneys in its legal department, telephoned Toma's counsel to inform him that Shephard could not be available on March 16 because of a previously scheduled deposition in another case. When counsel could not agree on another date for Shephard's deposition, TransAmerican filed a motion for protection to quash the deposition notice and postpone the deposition. The motion stated that it would be submitted to the trial court for ruling on March 17. [1] However, the trial court did not rule on the motion on that date.

Beginning April 3, the deadline set by the district court for completion of discovery, the parties' smoldering discovery problem started to flare. On that date, counsel for TransAmerican and Toma agreed that Shephard would be deposed after April 10 on a date to be agreed upon. Despite this understanding, counsel again failed to agree upon a date, and on April 19 Toma noticed Shephard's deposition for May 2 without TransAmerican's consent. On April 20, upon receipt of this second deposition notice, TransAmerican's counsel wrote a letter to Toma's counsel informing him that Shephard would not be available May 2 because, as before, he already had a deposition in another matter scheduled for that day. Toma's counsel replied by letter that he would not agree to reschedule the deposition. On April 27, TransAmerican reset the date for submission of its motion for protection to the trial court for ruling to May 12. By this time, of course, the motion was moot, and it is not apparent why TransAmerican continued to seek a ruling. TransAmerican did not move the trial court to postpone the May 2 deposition.

Also on April 27, Shephard's other deposition scheduled for May 2 was cancelled, leaving him available to be deposed by Toma. However, TransAmerican's counsel did not advise Toma's counsel that Shephard's schedule had changed so that he could be deposed on May 2 after all, nor did Shephard appear on May 2 as noticed. TransAmerican ascribes its failure to produce Shephard for deposition to

miscommunication concerning his schedule changes between attorneys in its legal department. Toma alleges that Shephard's failure to appear was purposeful and part of TransAmerican's intentional obstruction of the discovery process.

On May 8, Toma filed a response to TransAmerican's March 14 motion for protective order, even though it acknowledged that that motion was moot. Toma included in its response, however, a motion for sanctions against TransAmerican based on Shephard's failure to appear at the May 2 deposition. In return, TransAmerican filed its own sanctions motion on May 11, urging that Toma's motion for sanctions was itself an abuse of the discovery process. Toma's and TransAmerican's motions for sanctions both stated that they would be submitted to the court for ruling on May 12, the date set for submission of TransAmerican's original motion for protection.

On May 12, without hearing oral argument, [2] the district court signed an order

**Page 916**

granting Toma's motion for sanctions and striking TransAmerican's pleadings in their entirety. TransAmerican moved for reconsideration, which the district court denied after hearing argument of counsel but refusing to hear any evidence. Based upon his May 12 order striking TransAmerican's pleadings, the district court issued an order on October 6 dismissing TransAmerican's action with prejudice, rendering an interlocutory default judgment against TransAmerican and in favor of Toma on its counterclaim, and setting the case for trial solely on the issue of the damages to be awarded Toma.

TransAmerican sought mandamus relief from the court of appeals to compel the district court to set aside his May 12 and October 6 orders. A divided court of appeals denied TransAmerican leave to file its petition for writ of mandamus in an unpublished per curiam opinion. [3] TransAmerican then moved for leave to file its petition in this Court. We granted the motion in order to review the propriety of the discovery sanctions imposed by the district court.

II

The sanctions imposed by the district court are among those authorized for various discovery abuses under Rule 215 of the Texas Rules of Civil Procedure. The district court did not specify what provision of Rule 215 it relied upon. The portions of the rule applicable to the circumstances here are paragraphs 2(b)(5) and 3. Paragraph 2(b)(5) provides in part:

If a party or an officer ... of a party ... fails to comply with proper discovery requests or to obey an order to provide or permit discovery, ... the court in which the action is pending may, after notice and hearing, make such orders in regard to the failure as are just, and among others the following:

. . . . .

(5) An order striking out pleadings or parts thereof, ... or dismissing with or without prejudice the action or proceedings or any part thereof, or rendering a judgment by default against the disobedient party....

At the time of the district court's rulings, paragraph 3 of Rule 215 stated in part:

If the court finds a party is abusing the discovery process in seeking, making or resisting discovery ..., then the court in which the action is pending may impose any sanction authorized by paragraphs (1), (2), (3), (4), (5), and (8) of paragraph 2b of this rule. Such order of sanction shall be subject to review on appeal from the final judgment. [4]

**Page 917**

Both paragraphs leave the choice of sanctions to the sound discretion of the trial court. *Bodnow Corp. v. City of Hondo,* 721 S.W.2d 839, 840 (Tex.1986). However, paragraph 2(b) explicitly requires that any sanctions imposed be "just". By referring to paragraph 2(b), paragraph 3 incorporates the same requirement. Thus, whether the district court imposed sanctions under paragraph 2(b) or paragraph 3, we consider whether those sanctions were just. [5] See Bodnow, 721 S.W.2d at 840.

In our view, whether an imposition of sanctions is just is measured by two standards. First, a direct relationship must exist between the offensive conduct and the sanction imposed. This means that a just sanction must be directed against the abuse and toward remedying the prejudice caused the innocent party. It also means that the sanction should be visited upon the offender. The trial court must at least attempt to determine whether the offensive conduct is attributable to counsel only, or to the party only, or to both. This we recognize will not be an easy matter in many instances. On the one hand, a lawyer cannot shield his client from sanctions; a party must bear some responsibility for its counsel's discovery abuses when it is or should be aware of counsel's conduct and the violation of discovery rules. On the other hand, a party should not be punished for counsel's conduct in which it is not implicated apart from having entrusted to counsel its legal representation. The point is, the sanctions the trial court imposes must relate directly to the abuse found.

Second, just sanctions must not be excessive. The punishment should fit the crime. A sanction imposed for

discovery abuse should be no more severe than necessary to satisfy its legitimate purposes. It follows that courts must consider the availability of less stringent sanctions and whether such lesser sanctions would fully promote compliance.

These standards set the bounds of permissible sanctions under Rule 215 within which the trial court is to exercise sound discretion. [6] The imposition of very severe sanctions is limited, not only by these standards, but by constitutional due process. The sanctions the district court imposed against TransAmerican are the most devastating

## Page 918

a trial court can assess against a party. When a trial court strikes a party's pleadings and dismisses its action or renders a default judgment against it for abuse of the discovery process, the court adjudicates the party's claims without regard to their merits but based instead upon the parties' conduct of discovery. "[T]here are constitutional limitations upon the power of courts, even in aid of their own valid processes, to dismiss an action without affording a party the opportunity for a hearing on the merits of his cause." *Societe Internationale v. Rogers,* 357 U.S. 197, 209-10, 78 S.Ct. 1087, 1094, 2 L.Ed.2d 1255 (1958), citing *Hammond Packing Co. v. Arkansas,* 212 U.S. 322, 350-51, 29 S.Ct. 370, 379-80, 53 L.Ed. 530 (1909), and *Hovey v. Elliott,* 167 U.S. 409, 17 S.Ct. 841, 42 L.Ed. 215 (1897); accord *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 705-06, 102 S.Ct. 2099, 2105-06, 72 L.Ed.2d 492 (1982). Discovery sanctions cannot be used to adjudicate the merits of a party's claims or defenses unless a party's hindrance of the discovery process justifies a presumption that its claims or defenses lack merit. Insurance Corp. of Ireland, 456 U.S. 694, 705-06, 102 S.Ct. 2099, 2105-06; Rogers, 357 U.S. at 209-10, 78 S.Ct. at 1094; Hammond Packing, 212 U.S. at 350-51, 29 S.Ct. at 379-80. However, if a party refuses to produce material evidence, despite the imposition of lesser sanctions, the court may presume that an asserted claim or defense lacks merit and dispose of it. Insurance Corp. of Ireland, 456 U.S. at 705-06, 102 S.Ct. at 2105-06. Although punishment and deterrence are legitimate purposes for sanctions, *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) (per curiam); *Bodnow Corp. v. City of Hondo,* 721 S.W.2d at 840 they do not justify trial by sanctions, Hammond Packing, 212 U.S. at 350-51, 29 S.Ct. at 379-80; Hovey, 167 U.S. at 413-14, 17 S.Ct. at 843. Sanctions which are so severe as to preclude presentation of the merits of the case should not be assessed absent a party's flagrant bad faith or counsel's callous disregard for the responsibilities of discovery under the rules. See National Hockey League, 427 U.S. at 642-643, 96 S.Ct. at 2780-81.

[7]

In the present case, it is not clear whether TransAmerican or its counsel or both should be faulted for Shephard's failure to attend his deposition. Moreover, there is nothing in the record to indicate that the district court considered imposition of lesser sanctions or that such sanctions would not have been effective. If anything, the record strongly suggests that lesser sanctions should have been utilized and perhaps would have been effective. The district court could have ordered Shephard's deposition for a specific date and punished any failure to comply with that order by contempt or another sanction. He also could have taxed the costs of the deposition against TransAmerican and awarded Toma attorney fees. The range of sanctions available to the district court under Rule 215 is quite broad. The district court dismissed TransAmerican's claims against Toma and rendered default judgment for Toma on its counterclaim solely because, as the record before us establishes, TransAmerican's president failed to present himself for his deposition. [8] Nothing in the

## Page 919

record before us even approaches justification for so severe a sanction. [9]

We recognize that we affirmed a similar sanction in *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241-42 (Tex.1985), cert. denied, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). In that case the trial court struck defendant's answer and rendered a default judgment against it based upon the failure of defendant and his employees to appear for their depositions on three separate occasions without explanation. Even assuming that Downer was correctly decided, the instant case does not show the same pattern of abuse present in Downer. Furthermore, Downer 's approval of the sanction of default judgment was specifically based upon the facts of that case, and the holding in that case is limited to those facts. Rendition of default judgment as a discovery sanction ought to be the exception rather than the rule.

There are cases, of course, when striking pleadings, dismissal, rendition of default and other such extreme sanctions are not only just but necessary. See National Hockey League, 427 U.S. at 642, 96 S.Ct. at 2780. In this case, however, the record before us establishes that the severe sanctions the district court imposed against TransAmerican were manifestly unjust in violation of Rule 215.

III

We next consider whether TransAmerican has an adequate remedy by appeal. If it does, then the writ of

mandamus must be denied. *State v. Walker,* 679 S.W.2d 484, 485 (Tex.1984). Rule 215, paragraph 3 states that orders imposing discovery sanctions "shall be subject to review on appeal from the final judgment." Today we have held in *Braden v. Downey,* 811 S.W.2d 922 (1991), that sanctions should not be imposed in such a way that effective appellate review is thwarted. Whenever a trial court imposes sanctions which have the effect of adjudicating a dispute, whether by striking pleadings, dismissing an action or rendering a default judgment, but which do not result in rendition of an appealable judgment, then the eventual remedy by appeal is inadequate. Specifically, in this case TransAmerican does not have an adequate remedy by appeal because it must suffer a trial limited to the damages claimed by Toma. The entire conduct of the litigation is skewed by the removal of the merits of TransAmerican's position from consideration and the risk that the trial court's sanctions will not be set aside on appeal. Resolution of matters in dispute between the parties will be influenced, if not dictated, by the trial court's determination of the conduct of the parties during discovery. Some award of damages on Toma's counterclaim is likely, leaving TransAmerican with an appeal, not on whether it should have been liable for those damages, but on whether it should have been sanctioned for discovery abuse. This is not an effective appeal.

**Page 920**

We therefore hold that when a trial court imposes discovery sanctions which have the effect of precluding a decision on the merits of a party's claims--such as by striking pleadings, dismissing an action, or rendering default judgment--a party's remedy by eventual appeal is inadequate, unless the sanctions are imposed simultaneously with the rendition of a final, appealable judgment. If such an order of sanctions is not immediately appealable, the party may seek review of the order by petition for writ of mandamus. Although not every such case will warrant issuance of the extraordinary writ, this case does. TransAmerican's remedy by appeal from a final judgment eventually to be rendered in Toma's favor is inadequate.

\* \* \*

Accordingly, we hold that TransAmerican is entitled to the mandamus relief it seeks. We are confident that Judge Powell will vacate his orders of May 12 and October 6, after which he may conduct further proceedings consistent with this opinion. Our writ of mandamus will issue only in the event he fails promptly to comply.

Concurring opinions by GONZALEZ and MAUZY, JJ.

GONZALEZ, Justice concurring.

I concur with the court's opinion and judgment. The sanction in this case was clearly out of proportion to the offense committed by relator and the opinion appropriately disposes of the present controversy. However, neither our rules nor the court have set guidelines for imposing sanctions. They envision a large degree of discretion vested in the trial court and innovation should not be discouraged in attempting to fashion an appropriate sanction. However, trial judges should not be trigger happy. They should first issue orders compelling discovery. In all but the most egregious circumstances, other lesser sanctions should be tried first before imposing the ultimate sanction of the "death penalty" (dismissal of pleadings). Cases should be won or lost on their merits, not on discovery or sanctions gamesmanship. Thus I write separately to offer additional guidance to the bench and bar.

In assessing sanctions under Rule 215 of the Texas Rules of Civil Procedure, the punishment must fit the crime. Furthermore, a sanction should be a function of both the facts presented and the purpose of the rule the court is enforcing. G. JOSEPH, SANCTIONS: THE FEDERAL LAW OF LITIGATION ABUSE § 16 (1989). If this is not clear from the record, the trial court is more apt to be second guessed by the appellate courts.

The Litigation Section of the American Bar Association promulgated the following standards and guidelines to be considered when determining whether to assess sanctions under Federal Rule 11:

a. the good faith or bad faith of the offender;

b. the degree of willfulness, vindictiveness, negligence, or frivolousness involved in the offense;

c. the knowledge, experience, and expertise of the offender;

d. any prior history of sanctionable conduct on the part of the offender;

e. the reasonableness and necessity of the out-of-pocket expenses incurred by the offended person as a result of the misconduct;

f. the nature and extent of prejudice, apart from out-of-pocket expenses, suffered by the offended person as a result of the misconduct;

g. the relative culpability of client and counsel, and the impact on their privileged relationship of an inquiry into that area;

h. the risk of chilling the specific type of litigation

involved;

i. the impact of the sanction on the offender, including the offender's ability to pay a monetary sanction;

j. the impact of the sanction on the offended party, including the offended person's need for compensation;

**Page 921**

k. the relative magnitude of sanction necessary to achieve the goal or goals of the sanction;

l. burdens on the court system attributable to the misconduct, including consumption of judicial time and incurrence of juror fees and other court costs;

m. the degree to which the offended person attempted to mitigate any prejudice suffered by him or her;

n. the degree to which the offended person's own behavior caused the expenses for which recovery is sought.... [1]

American Bar Association, Standards and Guidelines for Practice Under Rule 11 of the Federal Rules of Civil Procedure, reprinted in 121 F.R.D. 101 (1988).

I recognize that Federal Rule 11 is not comparable to Rule 215 of Texas Rules of Civil Procedure and that Federal Rule 11 does not specify the types of sanctions that may be imposed. However, we do not have to re-invent the wheel. In my opinion, the ABA guidelines developed for determining when to assess sanctions under Federal Rule 11 are instructive whenever sanctions are imposed or denied under Texas Rule 215.

As the court notes, the range of sanctions available to a trial court under Rule 215 is quite broad. Some of these sanctions include:

(1) A reprimand of the offender; [2]

(2) Mandatory continuing legal education;

(3) A fine; [3]

(4) An award of reasonable expenses, including reasonable attorney's fees, incurred as a result of the misconduct;

(5) Reference of the matter to the appropriate attorney disciplinary or grievance authority; [4]

(6) An order precluding the introduction of certain evidence;

(7) An order precluding the litigation of certain issues;

(8) An order precluding the litigation of certain claims or defenses;

(9) Dismissal of the action or entry of a

**Page 922**

default judgment. [5]

ABA Standards and Guidelines, 121 F.R.D. at 124.

Sanctions are tools to be used by a court to right a wrong committed by a litigant. Any given sanction should be designed to accomplish that end. Sanctions can be compensatory, punitive or deterrent in nature. See G. JOSEPH, SANCTIONS: THE FEDERAL LAW OF LITIGATION ABUSE § 16 (1989). The court should assess the type of sanction most likely to prevent a recurrence of the offending conduct. The court should also consider the relative culpability of the counsel and client when selecting the appropriate sanction. See, e.g., *Westmoreland v. CBS, Inc.,* 770 F.2d 1168, 1178-79 (D.C.Cir.1985).

The foregoing guidelines are simply suggestions to guide a trial court in its struggle to make the punishment fit the crime.

MAUZY, Justice, concurring.

I concur in the Court's judgment, but write separately to outline the guidelines which I feel are necessary to explain the parameters of our decision today. Whether or not a sanction is appropriate must be determined by the particular facts of the individual case. In order to determine the appropriate sanctions in each case, the trial court should engage in a three-part inquiry. First, the trial court must resolve the question of whether the offending conduct actually constitutes an abuse of the discovery process. Second, the court must determine who is actually responsible for the offensive conduct and the extent of their culpability. Third, the court must determine what sanctions would be appropriate under the circumstances. The trial court should impose sanctions only upon those who actually abuse the discovery process and only in a manner consistent with the goals of deterring such conduct and correcting the resulting injustice. Courts must strike a careful balance in imposing sanctions. On one hand, the trial court should make clear that abuse of the discovery process is reprehensible and completely contrary to the orderly administration of justice. On the other hand, the trial court must avoid rulings that would serve to chill vigorous advocacy. In making its determination as to what sanctions would be appropriate in a particular case, the court should also consider the offending behavior in terms of the duty owed the court system. Attorneys, as officers of the court,

should be held to a higher standard than others. Parties, however, should only be sanctioned for conduct in which they are actually implicated. For example, a party which, by virtue of contract, incapacity or incompetency, or the very nature of the lawsuit, has only limited control of his attorney and the course of litigation, should not be sanctioned for actions over which it had no control. Courts should strive to curb abuses of the judicial process by litigants and their attorneys, and should impose sanctions upon those who abuse the process in order to deter such misconduct. However, trial judges have an obligation, when imposing sanctions, to ensure that the punishment must fit the crime and is imposed only upon the actual offender or offenders.

---------

Notes:

[1] The local rules governing civil cases in Harris County provide: "Motions shall state a date of submission which shall be at least 10 days from filing, except on leave of court. The motion will be submitted to the court for ruling on that date or later." Rule 3.3.2, Local Rules of the Civil Trial Division of the Harris County District Courts (1987). The March 17 submission date stated in TransAmerican's motion was only three days from the date of filing of the motion and the day after the deposition was scheduled.

[2] Rule 3.3.4 of the Local Rules of the Civil Trial Division of the Harris County District Courts (1987) allows any party to request oral argument on a motion if the party "views it as necessary." Neither TransAmerican nor Toma appears to have requested oral argument on any of their motions before May 12.

[3] Because of its brevity, we reproduce the court of appeals' opinion below rather than order it published as we would ordinarily do when granting relief:

OPINION

Relator asks us to order respondent to withdraw his order imposing sanctions. This is a breach of contract case involving the failure of defective casing on gas wells. Relator filed suit against Toma Steel Supply, Inc. Toma filed a counterclaim against relator. Toma filed numerous third party claims against suppliers. Those suppliers have filed cross actions against Toma.

On May 12, 1989, respondent granted Toma's motion for sanctions against relator, striking relator's pleadings for the failure of its president, K. Craig Shephard, to appear for a May 2, 1989, deposition. Relator argues respondent's action constitutes an abuse of discretion.

A writ of mandamus is not properly granted in an ordinary case as relief from sanctions. Street v. Second Court of Appeals, 715 S.W.2d 638, 639-640 (Tex.1986).

The motion for leave is overruled.

PER CURIAM

Motion for leave to file petition for writ of mandamus overruled June 16, 1989, and Opinion filed June 29, 1989.

Panel consists of Chief Justice J. Curtiss Brown and Justices Junell and Draughn.

Do Not Publish. TEX.R.APP.P. 90.

Justice Draughn would grant.

[4] Rule 215, paragraph 3 was amended, effective September 1, 1990, to require that sanctions be imposed only after notice and hearing and only as "appropriate". (Similar amendments were made at the same time in Rule 13, TEX.R.CIV.P.) However, the requirement that sanctions be appropriate was implicit in the rule before the amendment. Koslow's v. Mackie, 796 S.W.2d 700, 703 n. 1 (Tex.1990). In the context of Rule 215, "appropriate" and "just" are equivalent standards.

[5] TransAmerican contends that Toma's notice to take Shephard's deposition on May 2 was not a "proper" discovery request under Rule 215, paragraph 2(b) because it issued after the discovery cutoff date set by Judge Powell. Toma responds that its request was proper because TransAmerican agreed that Shephard could be deposed after the cutoff, as permitted by the district court's scheduling order. TransAmerican answers even if there were a binding agreement to depose Shephard after the cutoff, no date was ever agreed to.

TransAmerican also contends that the hearing required by Rule 215, paragraph 2(b) is an oral hearing, not merely a submission of the issue on written motion and response, and that it was denied such a hearing before the imposition of sanctions. Further, TransAmerican argues that the notice required by Rule 215, paragraph 2(b) is at least ten days' notice, and that Toma's motion for sanctions was filed only four days before the district court ruled on it. Toma responds that TransAmerican did not request an oral hearing, that an oral hearing was not necessary and is not required by the rule, and that in any event, TransAmerican received an oral hearing on its motion to reconsider, thus satisfying any requirement of the rule. Toma also argues that Rule 215, paragraph 2(b), requires only reasonable notice, and that four days' notice to TransAmerican in this case was reasonable because TransAmerican was able to respond fully to the motion before the district court ruled.

Our resolution of the matter before us does not require that

we address these arguments, and we express no view on any of them.

[6] JUSTICE GONZALEZ' concurring opinion sets out guidelines for assessing sanctions which have been identified in the context of applying Rule 11, FED.R.CIV.P. Post, at 920-922. Our analysis of this case does not require us to consider whether those factors or others are appropriate considerations in imposing sanctions. However, we do subscribe to the principle, inherent in the effort to state guidelines, that the trial court's discretion in assessing sanctions must be guided by a reasoned analysis of the purposes sanctions serve and the means of accomplishing those purposes.

[7] National Hockey League cites Rogers but not Hammond Packing, and does not refer to the rule of the latter that discovery sanctions cannot be used to dispose of the merits of a claim or defense unless the offending party's withholding of evidence warrants a presumption that its claim or defense is without merit. Nevertheless, the conduct sanctioned in National Hockey League was so egregious that it clearly would have justified the same ultimate sanctions under Hammond Packing. The Hammond Packing rule is not in doubt. That it has not been abandoned is further demonstrated in Insurance Corp. of Ireland, which came after National Hockey League and reasserted the rule of Hammond Packing.

[8] Toma's motion for sanctions was based solely upon Shephard's failure to attend his deposition. As Toma itself stated in its response to TransAmerican's motion to refile its pleadings after they were struck: "[O]n May 12, 1989, the Court granted [Toma's] Motion for Sanctions against [TransAmerican] for TransAmerican's refusal to agree to a date certain for Mr. Craig Shephard's deposition and for the failure of its President, Mr. Craig Shephard, to appear for a properly noticed deposition on May 2, 1989, and struck TransAmerican's pleadings in their entirety." Notwithstanding this rather clear statement in the trial court, during this mandamus proceeding Toma has suggested that the district court properly sanctioned TransAmerican because it had abused the discovery process on other occasions. TransAmerican disputes Toma's assertions. While the district court would have been entitled to consider a pattern of discovery abuse in imposing sanctions, the record does not reveal the existence of any such pattern, Toma did not complain of one, and the district court does not appear to have found one.

[9] The district court made no findings to support the sanctions imposed. Rule 215 does not require a trial court to make findings before imposing discovery sanctions, and we do not add such a requirement here. We note only that we do not have the benefit of any explanation by the district court for the severity of its ruling. It would obviously be helpful for appellate review of sanctions, especially when severe, to have the benefit of the trial court's findings concerning the conduct which it considered to merit sanctions, and we commend this practice to our trial courts. See Thomas v. Capital Security Services, Inc., 836 F.2d 866, 882-883 (5th Cir.1988). Precisely to what extent findings should be required before sanctions can be imposed, however, we leave for further deliberation in the process of amending the rules of procedure.

[1] The omitted guidelines are specifically tailored to address the concerns of Federal Rule of Civil Procedure 11 and therefore are not appropriate for inclusion in this general discussion of sanctions.

[2] Although this is typically the least serious sanction available, some courts have attempted to use the reprimand as a method of embarrassing the lawyer who has committed the offense. For example the court could require the reprimanded lawyer to provide a certified copy of the reprimand order to the members of his law firm. See Huettig & Schromm, Inc. v. Landscape Contractors Council, 582 F.Supp. 1519, 1522-23 (N.D.Cal.1984), aff'd, 790 F.2d 1421 (9th Cir.1986).

[3] If a monetary fee is imposed, other factors should be considered by the trial court, including:

(1) The time and labor involved;

(2) The novelty and difficulty of the questions involved;

(3) The skill requisite to perform the legal service properly;

(4) The customary fee;

(5) Whether the fee is fixed or contingent;

(6) Time limitations imposed by the client or the circumstances;

(7) The amount involved and the results obtained;

(8) The experience, reputation and ability of the attorneys; and

(9) Awards in similar cases;

ABA Standards and Guidelines, 121 F.R.D. at 125-26.

The authority of a trial judge to assess a monetary fine as a sanction for abuse of the discovery process was disputed in Owens-Corning Fiberglas Corp. v. Caldwell, 807 S.W.2d 413, 415 (Tex.App.--Houston [1st Dist.] 1991, orig. proceeding). The court of appeals held that the trial court had no such authority under rule 215(3). However, in Braden v. Downey, 811 S.W.2d 922 (Tex.1991, orig. proceeding), we held that the trial judge did have such

authority. A few days ago, the United States Supreme Court held that federal courts had inherent power to impose monetary sanctions on a litigant for bad-faith conduct. Chambers v. Nasco, Inc., 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991).

[4] Sanctionable conduct may not necessarily be an ethical violation, however. See Golden Eagle Distrib. Corp. v. Burroughs Corp., 801 F.2d 1531, 1538-39 (9th Cir.1986).

[5] These remedies are essentially equivalent in degree depending on whether the plaintiff or the defendant is the offending party.

---------

827 S.W.2d 87 (Tex.App. —Corpus Christi 1992)

Richard D. LANFEAR, Relator,

v.

Honorable Robert BLACKMON, Presiding Judge of the 117th

District Court of Nueces County, Texas, Respondent.

No. 13-92-038-CV.

Court of Appeals of Texas, Thirteenth District, Corpus Chritsi

March 19, 1992

Page 88

Michael B. Schmidt, Paul Dodson, White, Huseman, Pletcher & Powers, Corpus Christi, for intervenor.

M.W. Meredith, Jr., Robert J. Sigler, Clay E. Coalson, Meredith, Donnell & Abernethy, Corpus Christi, for relator.

Before DORSEY, KENNEDY and SEERDEN, JJ.

OPINION

DORSEY, Justice.

Richard Lanfear, Relator, seeks a writ of mandamus, complaining of two orders by the Honorable Robert Blackmon, presiding judge of the 117th district court. Both orders were sanctions in response to perceived discovery abuses and perjury. The first struck certain defenses and a counterclaim, and awarded attorney's fees. The second had the effect of a default judgment and imposed a constructive trust in favor of the plaintiff, as well as awarding attorney fees. We conditionally grant the writ.

Welton Cox, the real party in interest, filed suit against Lyn Eads seeking an interest in the Malo Sueno oil and gas prospect that Cox claimed they developed together. Cox pleaded that Eads agreed that they would be 50-50 partners in the prospect

Page 89

in exchange for Cox performing land work and obtaining a farmout. Eads' answers to interrogatories disclosed that Eads worked on the project with Richard Lanfear and that Lanfear and Eads were equal partners in the deal. Eads

denied Cox's claim of partnership, and claimed that Cox was only hired to work by the day and that he was paid accordingly.

Shortly after receiving these responses from Eads, Cox sued Lanfear in the same action. Lanfear answered with a general denial, asserted the defense of statute of frauds, and filed a counterclaim alleging that the suit was malicious. Cox sent his first set of interrogatories and admissions to Lanfear on March 12, 1991, which included requests for production of documents.

After Lanfear responded incompletely to the interrogatories, Cox informed him by letter that five of the answers were incomplete and evasive, and that three of the responses to the requests for production were inadequate. Lanfear then supplemented his answers to the interrogatories, expanding his answers somewhat. In his response to one interrogatory, he stated that he never sold, transferred, assigned, conveyed or made a gift of any leasehold, overriding royalty or other similar interest in the Malo Sueno area. He also designated himself as an expert witness.

Cox addressed a second set of interrogatories to Lanfear, restating some of the earlier questions that had not been answered, and requesting information concerning the counterclaim, his net worth, credentials and long distance telephone bills. Lanfear objected to many of these inquiries, and answered some in part.

Cox then filed a motion to compel answers to interrogatories claiming Lanfear's answers were still incomplete. The trial court heard the motion on two separate days which were more than thirty days apart. Lanfear was the only witness to testify at these hearings. The judge indicated at the end of the first part of the hearing that he was troubled by some of Lanfear's responses.

After the first part of the hearing and before the second, Lanfear again supplemented his answers, responding in part that he obtained a critical geological log between July and August, 1989. He also responded concerning his salary and arrangement with Tri-C Resources, an associated oil company involved in the sale or development of the Malo Sueno prospect. He again stated that he had not sold, transferred, assigned or conveyed any leasehold, overriding royalty or other similar interest in the Malo Sueno area.

The trial court found that Lanfear intentionally filed evasive and incomplete answers to Cox's interrogatories and requests for production. It ordered the material requested by Cox produced, and directed that certain enumerated interrogatories be answered. The court ordered relator to

pay $1,500 in attorney's fees, and struck all of Lanfear's defensive pleadings other than his general denial. Lanfear's counterclaim was also struck, and a protective order was granted Lanfear to protect the confidentiality of his maps and data.

After the sanctions were imposed, Lanfear filed a third supplemental response to the interrogatories. In it he acknowledged that he signed a power of attorney in favor of Tri-C Resources. This statement appeared to contradict his previous testimony, given during the second phase of the first sanctions hearing, that he had not transferred or assigned any interest in the Malo Sueno prospect. As a result of this statement, Cox filed a motion for sanctions pursuant to Rule 215, asserting Lanfear's perjury as a reason for sanctions.

A hearing on this motion was held on October 22, 1991. In its order, the judge found that Lanfear answered untruthfully, under oath and during a prior hearing, about the sale of his interest in the Malo Sueno Area for $835,000 through an agent. The court held such conduct to constitute flagrant bad faith in the exercise of Lanfear's discovery responsibilities, and an abuse of discovery under Tex.R.Civ.P. 215. The trial court granted the motion for sanctions, entering an order which had the effect of entering a default against relator. Lanfear was required to pay $10,000.00 in attorney's fees, and the court ordered a

**Page 90**

constructive trust on the amount of money relator was paid for his involvement with the Malo Sueno project.

Relator Lanfear seeks a writ of mandamus compelling Judge Blackmon to withdraw his two orders imposing sanctions. Mandamus will issue to compel the performance of a ministerial act or duty [1], or to correct a clear abuse of discretion [2]. A trial court clearly abuses its discretion "if it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 917 (Tex.1985).

Factual issues decided by the trial court, or other issues in which the judge has discretion, will not be disturbed unless the evidence is such that the court could have reached only the contrary decision. Johnson, 700 S.W.2d at 918. However, a trial court's decisions on matters of law are not afforded the same deference as its factual conclusions. A "clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion, and may result in appellate reversal by extraordinary writ." *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992), citing Joachim, 815 S.W.2d at 240.

In reviewing the propriety of the two sanction orders

complained of by relator, we will limit our review to legal issues, and will assume as correct those factual conclusions found by the court below to support the relief it granted. The issue is whether the factual conclusions found by Judge Blackmon authorize the sanctions imposed by him under the circumstances. In this instance, we will not analyze the court's findings that Lanfear answered untruthfully under oath in the second order, or that he intentionally filed incomplete or evasive answers in the first order imposing sanctions. Rather, we will review whether those findings support the sanctions imposed.

In Transamerican Natural Gas Corp. v. Powell, [3] the Supreme Court set forth in detail the rules to be followed in determining if sanctions were properly imposed for discovery abuse. First, a direct relationship must exist between the offensive conduct and the sanction imposed. Id. at 917. In this regard, the trial court should attempt to determine if the offensive conduct is attributable to the attorney, the party or both. Second, the sanctions must fit the crime; they must not be excessive. Id. at 917. Sanctions which are so severe that they preclude presentation on the merits should not be assessed absent a party's bad faith or counsel's flagrant disregard for the responsibilities of discovery under the rules. Discovery sanctions should not be used to adjudicate the merits of a claim or defense unless a party's obstruction of the discovery process justifies the presumption that the claim or defense lacks merit. Id. at 918.

The first sanctions struck Lanfear's counterclaim and affirmative defense, and charged him with $1500 of Cox's attorney's fees. Lanfear was punished because he intentionally filed incomplete or evasive answers when responding to interrogatories. The order prevented Lanfear from presenting his counterclaim and his affirmative defense of statute of frauds, thereby adjudicating those matters without a hearing on their merits. Transamerican instructs that in order to strike pleadings, the party's obstruction of the discovery process must be so blatant that it justifies the presumption that the claim or defense lacks merit. Transamerican, 811 S.W.2d at 918. Nothing in the record indicates that the trial court made any attempt to determine whether the client or the lawyer was the one at fault. No previous orders compelling discovery or relating to discovery had been entered. That the answers were incomplete or intentionally evasive is not

**Page 91**

such an obstruction of discovery to justify the conclusion that the claim or defense lacked merit without more. The "crime" did not justify the punishment. The trial court abused its discretion by striking Lanfear's pleadings in its first sanction order.

Cox argues that complaints concerning the first sanction order have been waived by the relator. We agree with regard to the payment of attorney's fees and the striking of his counterclaim. In relator's motion, entitled "... Motion for Rehearing of Plaintiff's Motion to Compel and for Sanctions," relator specifically stated that he accepted the rendition of $1,500 in attorney's fees and does not contest the striking of his counterclaim. Relator has waived his complaint on those issues.

However, in that same motion, relator prayed that the trial court modify the order striking relator's statute of frauds defense. This issue has not been waived. Accordingly, the first sanction order is modified, omitting as a sanction the striking of Lanfear's affirmative defenses.

Relator also argues that the trial court abused its discretion by imposing the second sanctions order, which entered a default judgment against him and imposed a constructive trust on the monies he received from his involvement with the Malo Sueno project. The trial court's order recites that the sanctions were imposed because relator answered untruthfully in a prior hearing before the trial court concerning the sale of his interest in the Malo Sueno area. The court found that conduct to be in flagrant bad faith in the exercise of his responsibility for discovery, an abuse of discovery under Rule 215, and a violation of his oath as a witness. The actions of relator in this case are not to be condoned. However, a trial court may not effectively adjudicate the merits of a case based on testimony of a party during a sanctions hearing because he was later impeached on testimony given at that hearing. The witness' credibility should be tested when the case is tried. Otherwise, a trial court could at any time interrupt a trial proceeding if it believed a witness was being untruthful, and simply enter a default against the party procuring that witness for that reason. The statement of relator, whether perjurious or not, does not go to the heart of the controversy here. It did not justify the conclusion that relator's claim lacked merit so that he should be precluded from his day in court.

We do not believe the action of the trial court was justified; the Transamerican factors were not met. There was no showing that lesser sanctions would not have been effective. A "death penalty" sanction is not proper punishment for what was perceived by the court to be perjured testimony.

Mandamus is proper in this instance because the actions of the trial court in this case had the effect of adjudicating relator's case, but did not result in the rendition of an appealable judgment. [4] Transamerican, 811 S.W.2d at 919.

We conditionally grant the writ of mandamus. We presume that the trial court will rescind its orders of August 22, 1991 and October 24, 1991. Mandamus will issue only if the trial court fails to comply.

---------

Notes:

[1] See Wortham v. Walker, 133 Tex. 255, 128 S.W.2d 1138, 1150 (1939).

[2] See Joachim v. Chambers, 815 S.W.2d 234, 237 (Tex.1991).

[3] 811 S.W.2d 913 (Tex.1991).

[4] The order here does not purport to be a final judgment. No language exists indicating that the trial court intended it as such. In fact, the court indicated that it was imposing the trust but was waiting to require the payment of the money until additional matters could be addressed.

---------

841 S.W.2d 844 (Tex. 1992)

CHRYSLER CORPORATION, Relator,

v.

The Honorable Robert BLACKMON, Judge, Respondent.

No. D-1637.

Supreme Court of Texas.

October 14, 1992

Rehearing Overruled Dec. 31, 1992.

Page 845

Ronald B. Brin, Richard W. Crews, Jr., Corpus Christi, Richard A. Salomon, Chicago, Ill., Richard Josephson, Dallas, Travis J. Sales, Houston, Joe R. Greenhill and Bob E. Shannon, Austin, for relator.

David L. Perry, Mikal C. Watts, Corpus Christi, Franklin S. Spears, San Antonio, Charles B. Lord, C.L. Ray, Austin and Elaine Stone, Corpus Christi, for respondent.

OPINION

CORNYN, Justice.

In this product liability suit, Chrysler Corporation seeks a Writ of Mandamus directing the Honorable Robert Blackmon, Judge of the 117th District Court, Nueces County, Texas, to vacate his Order Regarding Plaintiffs' Amended Motion for Sanctions Against Chrysler for Discovery Abuse (Sanctions Order) by which he struck Chrysler's pleadings and rendered a default judgment against Chrysler on all issues of liability for both compensatory and punitive damages. [1] Chrysler claims that the trial court's Sanctions Order violates the standards for the imposition of "death penalty" discovery sanctions, those that terminate the presentation of the merits of a party's claims, that we recently adopted in *Transamerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913 (Tex.1991, orig. proceeding) and *Braden v. Downey,* 811 S.W.2d 922 (Tex.1991, orig. proceeding).

Ambrocio Garcia Jr. was killed on July 26, 1986, when a drunk driver drove across the median and hit Garcia's Dodge Diplomat head-on. Garcia's family filed this wrongful death suit against Chrysler and the estate of the driver, alleging, among other things, that the Dodge Diplomat was defective because it was not crashworthy.

The parties acknowledge that the standards for appellate review of discovery sanctions announced in Transamerican Natural Gas Corp. v. Powell and Braden v. Downey control this proceeding, including a party's right to mandamus relief if a violation of those standards is demonstrated. [2] We consider, then, whether the record demonstrates a violation of those standards.

I.

This record painfully illustrates the problems of modern discovery practice and the attendant expenses and difficulties of judicial administration, at all levels, especially in complex litigation. From April 10, 1989, when the Garcias served Chrysler with their first request for discovery, until August 8, 1991, when the trial court granted a default judgment against Chrysler on liability, the Garcias served five discovery requests on Chrysler. Chrysler served five responses, including objections to those requests. The Garcias filed three Motions to Compel Discovery and for Sanctions, and the parties participated in seven hearings on discovery disputes before three district judges. By the time the Sanctions Order was signed, Chrysler claims to have produced more than 80,000 documents, made 100,000 more available for inspection, and to have spent more than $250,000 in the process. [3] The parties have filed with this court twelve volumes of exhibits, including motions, responses, transcripts of hearings, correspondence, and affidavits, which they ask us to consider in assessing the propriety of the Sanctions Order.

The record reflects that the Garcias first served Chrysler with three discovery requests, including requests for admission, requests for production, and interrogatories,

Page 846

to which Chrysler responded with answers and objections, leading to a hearing on the Motion to Compel Discovery on April 12, 1990. Admirably, the parties settled "probably 70 per cent" of their differences before the hearing, and submitted only the remaining issues for the court's determination. Ultimately, the parties submitted an Agreed Order On Motion to Compel Discovery to the trial court, which it signed on June 13, 1990, resolving all their differences on the Garcias' first, second, and third requests for discovery. The Agreed Order granted no sanctions.

On the same day that the trial court signed the parties'

Agreed Order, the Garcias served Chrysler with Plaintiffs' Second Motion to Compel Discovery, Motion for Sanctions, and Motion for Entry of Order. The court convened a hearing on the Garcias' Second Motion to Compel on August 30, 1990. The "hearing," as it turned out, consisted of an announcement of counsels' agreement that Chrysler would identify a specific discovery request to which it claimed the documents it had produced were responsive; in return, the Garcias would then provide Chrysler with a list of contended deficiencies in Chrysler's production efforts. To this point, the tenor of the parties' relationship appears to have been accurately characterized by one of the Garcias' lawyers when he stated to the trial court that "some of our trouble may be more [of a] communication problem as opposed to an actual production problem."

However, discovery proceedings grew contentious in early 1991. On January 4, 1991, the Garcias filed Plaintiffs' Third Motion to Compel Discovery and Motion for Sanctions in which they complained of Chrysler's alleged failure to adequately respond to nineteen requests for production in Plaintiffs' Second Request for Discovery and three interrogatories contained in Plaintiffs' Third Request for Discovery. In its written response, Chrysler alleged that the Garcias had not pointed out gaps in Chrysler's responses as agreed but instead had responded with a Motion for Sanctions. This resulted in Chrysler's accusation that opposing counsel was trying to set up a sanctions "tort." See William Kilgarlin, Sanction for Discovery Abuse: Is the Cure Worse than the Disease?, 54 TEX.BAR J. 659 (1991); Charles Herring, The Rise of the "Sanctions Tort", Texas Lawyer, Jan. 28, 1991, at 22-23.

The hearing on Plaintiffs' Third Motion to Compel and Motion for Sanctions was held on February 15, 1991. The Garcias accused Chrysler of failing to comply with the Agreed Order, complaining primarily of Chrysler's failure to produce certain M-body crash tests, [4] a crash test index "that we know about that they haven't given us," [5] an organizational chart, and information about Chrysler's document retention policies. [6] The sanctions requested included the striking of Chrysler's pleadings. The Garcias' counsel argued: "[W]hat is needed is punishment and it needs to be rather harsh, it needs to be harsh enough to get people's attention...." A harsh punishment would be appropriate, claimed the Garcias' counsel, because of Chrysler's lying and bad faith.

In response, Chrysler contended that it had produced everything that it was able to produce. For example, it contended that it had produced "some 100 crash test files" but that others, dating back more than six model years, had been destroyed pursuant to its document retention policy. Chrysler claimed that only if a crash test had been produced in other litigation and maintained in a case file would it be retained, but even then, not in the ordinary course of business.

Following a hearing that lasted approximately eight hours and consumed 196 pages of the record, the trial court signed an Order in which he denied Plaintiffs' Motion for Default Judgment, Plaintiffs' Motion to Strike Chrysler's Pleadings, and

## Page 847

Plaintiffs' Motion for Monetary Sanctions. The trial court did, however, order Chrysler to produce by April 1, 1991: (1) the crash test files and results, (2) unedited, computerized records of its entire crash-test index for all M-body type vehicles, and (3) affidavits detailing Chrysler's explanation for all requested documents that it claims were destroyed pursuant to its document retention policy. In the event that Chrysler failed to timely comply with his Order, Judge Dunham conditionally ordered a monetary sanction of $7,500 for each day it failed to do so.

Thereafter, the Garcias served Chrysler with their fourth discovery request. Chrysler's 28-page response raised objections to the request on both general and specific grounds, including the objection that some portions of the fourth request, containing 105 separate items for production, duplicated previous requests.

On March 29, 1991, Chrysler filed a Response to the trial court's Order, asserting that it was in compliance with that Order, and requesting a hearing on April 10, 1991, so that its compliance could be certified to avoid assessment of the $7,500 daily sanction conditionally ordered by Judge Dunham. [7] The hearing of April 10th, however, primarily involved Chrysler's objections to the Garcias' fourth request for discovery and spanned two days and 188 pages of the record. The anticipated hearing on Chrysler's Response to the trial court's Order was deferred until April 26, 1991, to be heard with Plaintiffs' Motion for Sanctions.

At the hearing on the Garcias' Motion for Sanctions on April 26, 1991, the primary concerns were crash test reports and Chrysler's electronic crash-test database. Counsel for the Garcias acknowledged that Chrysler did "provide a lot of stuff to us on April 1st" but stated that he had acquired from other sources [8] indices that referred to 245 M-body crash tests and that he had only received 191 crash test reports. In response, Chrysler claimed that crash test reports were destroyed pursuant to its document retention policy. But this could not be true, the Garcias' attorney retorted, because "some of the allegedly missing reports had been produced to other plaintiffs in other lawsuits during the same time that we've been trying to get them in this case and, therefore, clearly have not been destroyed."

Chrysler's attorney told Judge Blackmon that two other district judges had "already heard these issues." He pointed out that this lawsuit concerned a frontal impact to an M-body style vehicle--not side and rear-end impacts--and that the previous court ordered production was so limited. He also asserted that the difference between the lists of crash tests produced in other cases and those produced here was explained by Chrysler's document retention policy. Finally, he claimed that Chrysler had no way to locate all of the crash tests produced at other times in other lawsuits and should be required to produce only those maintained by Chrysler in the ordinary course of its business.

Ultimately, the trial court overruled all of Chrysler's objections and set the date for Chrysler's compliance with the Garcias' fourth discovery request for May 31, 1991.

On April 16, 1991, the Garcias filed an Amended Motion for Sanctions. [9] Chrysler

**Page 848**

filed a 21-page response specifically denying each of the Garcias' contentions and asserting that the plaintiffs had themselves been guilty of discovery abuse related to Chrysler's discovery requests.

The final hearing on sanctions began on April 26, 1991, and occupies 129 pages of the record. [10] The Garcias' complaints at that time related to Chrysler's alleged failure to produce crash tests, a crash test index, an organizational chart, and certain seatbelt-related documents, and its alleged failure to disclose all other lawsuits involving similar claims. Chrysler's attorney reiterated to the trial court his explanation for the discrepancy between references to crash tests in other lawsuits obtained by the Garcias' counsel and Chrysler's production in this suit:

What we are finding here and what I'm afraid will continue to happen throughout this entire case is that in some engineer's file somewhere at Chrysler Corporation or somewhere else, somebody back

**Page 849**

then may have copied a piece of a crash test, maybe a page, may have made some notes about a crash test, may have actually--may have written a preliminary memo about a crash test that was ongoing that has the same number as one of those crash tests that is on our list of being shredded.

The trial court ultimately took the Motion for Sanctions under advisement. On May 10, 1991, the judge wrote to counsel expressing his opinion that discovery abuse had occurred and requesting their suggestions for appropriate alternative sanctions. Judge Blackmon then expressed his

opinion that striking Chrysler's pleadings was too severe.

Chrysler responded that if sanctions were to be assessed, sanctions providing for an award of expenses, including reasonable attorneys fees, or an award of discovery expenses or court costs, would be appropriate. See TEX.R.CIV.P. 215(2)(b)(8) & (2). On the other hand, the Garcias recommended that the trial court prohibit Chrysler from calling any expert witness whose opinion was based on documents that had not been produced or that a fine of $292,500 be assessed ($7,500 per day for 39 days) for alleged non-compliance with Judge Dunham's Order.

Finally, on August 8, 1991, Judge Blackmon announced his ruling on Plaintiffs' Request for Sanctions. He proceeded to grant the Garcias' request to strike Chrysler's pleadings and ordered that the case proceed to trial on damages alone because, as he said, he could think of no way to "quote divide the baby unquote." The trial court further ordered that Chrysler could not call expert witnesses regarding any aspect of liability at the trial on damages. Chrysler alleges that the Garcias' attorneys prepared the written Sanctions Order, which was signed that same day, without extending Chrysler's counsel an opportunity to review it or to lodge any objection to it before it was signed.

II.

The legitimate purposes of discovery sanctions are threefold: 1) to secure compliance with discovery rules; 2) to deter other litigants from similar misconduct; and 3) to punish violators. *Bodnow Corp. v. City of Hondo,* 721 S.W.2d 839, 840 (Tex.1986). However, discovery sanctions must also be "just." TEX.R.CIV.P. 215(2)(b); Transamerican Natural Gas Corp., 811 S.W.2d at 917. Two factors mark the bounds of the trial court's discretion in order for sanctions to be just: first, a direct relationship between the offensive conduct and the sanction imposed must exist; and second, the sanction imposed must not be excessive. In other words, "the punishment should fit the crime." Id.

A permissible sanction should, therefore, be no more severe than required to satisfy legitimate purposes. This means that a court must consider relatively less stringent sanctions first to determine whether lesser sanctions will fully promote compliance, deterrence, and discourage further abuse. Id.; Braden, 811 S.W.2d at 929.

So, although punishment, deterrence, and securing compliance with our discovery rules continue to be valid reasons to impose sanctions, these considerations alone cannot justify a trial by sanction. Sanctions that by their severity, prevent a decision on the merits of a case cannot be justified "absent a party's flagrant bad faith or counsel's callous disregard for the responsibilities of discovery under

the rules." Transamerican at 918 (citation omitted). Even then, lesser sanctions must first be tested to determine whether they are adequate to secure compliance, deterrence, and punishment of the offender. See id.

III.

We now measure the Sanctions Order by these standards. We conclude, for reasons that follow, that the trial court's actions failed to meet the Transamerican and Braden standards in four ways.

First, there is no direct relationship between the offensive conduct and the sanction imposed. As we stated in Transamerican, the sanction must be directed against the abuse and toward remedying the prejudice caused an innocent party. We do not doubt that a failure to produce documents can prejudice a party's efforts to assert or

**Page 850**

defend a claim. But here, there has simply been no showing that the Garcias are unable to prepare for trial without the additional crash-test reports they seek. Furthermore, the record fails to demonstrate Chrysler's ability to produce the missing crash-test reports. There is no evidence in the record that the missing tests exist or are within Chrysler's possession, custody, or control, either actual or constructive. A party cannot be penalized for failure to produce documents under such circumstances. See TEX.R.CIV.P. 166b(2)(b).

The Garcias also contend that Chrysler failed to disclose all similar lawsuits, pointing to the omission of a single lawsuit. Chrysler explains that this omission occurred because the case was classified on its computer as an "air bag" case, rather than a "seatbelt" case. Once Chrysler was advised that the Garcias considered their request to include this type of suit, it made an additional search and disclosed ten air bag suits in advance of the April 1st deadline. The Garcias have made no showing as to how they have been hindered in their preparation for trial by this omission.

It seems obvious that the Garcias would be prejudiced by the expenditure of attorneys' fees and expenses in pursuing motions to compel discovery and sanctions. However, reimbursement of those expenses would appear to be better calculated to remedy such prejudice than would death penalty sanctions.

Second, striking Chrysler's pleadings and rendering a default judgment on liability is more severe than necessary to satisfy the legitimate purposes of sanctions for discovery abuse. Judge Blackmon himself conceded as much in his letter to counsel of May 10, 1991, requesting alternative sanction proposals. [11]

Third, no lesser sanction was first imposed. Although potentially exposed to a substantial daily fine, such fine was never imposed because there was no judicial determination that Chrysler failed to meet Judge Dunham's deadline for production of the items specified in his Order. Thus, we do not consider the conditional fine to be, as the Garcias argue, an imposition of a required lesser sanction.

Fourth, and perhaps most significantly, death penalty sanctions should not be used to deny a trial on the merits unless the court finds that the sanctioned party's conduct "justifies a presumption that its claims or defenses lack merit" and that "it would be unjust to permit the party to present the substance of that position [which is the subject of the withheld discovery] before the court." Transamerican, 811 S.W.2d at 918; Braden, 811 S.W.2d at 929. This record contains no evidence to justify such a presumption. In fact, the record conclusively refutes any such suggestion. [12] Nor do we find any evidence in the record of flagrant bad faith or counsel's callous disregard for the obligations of discovery.

IV.

In Braden, we held that in the event the trial court chooses to impose a substantial monetary sanction, unless the court defers payment until entry of final judgment, it should make express written findings, after a prompt hearing, articulating the reasons why the award does not impede a resolution of the case on the merits. Braden, 811 S.W.2d at 929 (citing *Thomas v. Capital Security Serv., Inc.,* 836 F.2d 866 (5th Cir.1988)). We also noted the helpfulness of such findings that give the trial court's reasons for imposing severe discovery sanctions in Transamerican, 811

**Page 851**

S.W.2d at 919 n. 9. Since then, courts of appeals have reviewed trial court findings regarding death penalty sanctions in at least two distinct ways. See e.g. *Hartford Accident & Ind. Co. v. Abascal,* 831 S.W.2d 559, 560 (Tex.App.--San Antonio 1992, orig. proceeding); *United States Fid. & Guar. Co. v. Rossa,* 830 S.W.2d 668, 672 (Tex.App.--Waco 1992, writ denied). This case also presents the question of what deference, if any, an appellate court must give such findings. [13]

**Page 852**

At least one court of appeals has gone so far as to order the trial court to make findings of fact and conclusions of law in support of its sanctions order under the Transamerican standard. *Hartford Accident & Ind. Co. v. Abascal,* 831 S.W.2d 559, 560 (Tex.App.--San Antonio 1992, orig. proceeding). In reviewing the trial court's order

for sanctions in Abascal, the court held that the legal presumptions in favor of a judgment following a nonjury trial likewise applied to its review of the order for sanctions on mandamus, and that if any evidence supported the trial court's findings of fact, they were binding on the reviewing court. Id. at 561. Another court of appeals has varied this approach, holding that findings in the discovery context should not be treated like findings of fact made pursuant to Rule 296, which apply to appellate review of nonjury trials on the merits. *Rossa v. United States Fidelity & Guar. Co.,* 830 S.W.2d 668, 672 (Tex.App.--Waco 1992, writ denied).

In Transamerican, we noted merely that trial court findings would be "helpful" in assisting an appellate court in determining "that the trial court exercised its discretion in a reasonable and principled fashion." 811 S.W.2d at 919 n. 9. We did not mention Rule 296. Further, it is apparent that the standard of review articulated by the court of appeals in Abascal is not, in fact an "abuse of discretion" standard that we most recently restated in *Walker v. Packer,* 827 S.W.2d 833, 839-40 (Tex.1992), and which we apply here, but a legal and factual sufficiency standard of review applicable to appeals of nonjury trials. W. Wendell Hall, STANDARDS OF APPELLATE REVIEW IN CIVIL APPEALS, 21 ST. MARY'S L.J. 865, 919-20 (1990). Accordingly, we reject the approach used by the court of appeals in Abascal as incorrect and approve the approach of the court of appeals in Rossa as the correct approach.

Written findings that support the decision to impose such sanctions have at least three salutary effects: 1) such findings aid appellate review, demonstrating that the trial court's discretion was guided by a reasoned analysis of the purposes sanctions serve and the means of accomplishing those purposes according to the Transamerican and Braden standards; (2) such findings help assure the litigants, as well as the judge, that the decision was the product of thoughtful judicial deliberation; and (3) the articulation of the court's analysis enhances the likely deterrent effect of the sanctions order. See *Thomas v. Capital Sec. Servs., Inc.,* 836 F.2d 866, 883 (5th Cir.1988) (citation omitted). But we do not wish to unnecessarily burden our trial courts by requiring them to make written findings in all cases in which death penalty sanctions are imposed. First, the benefit of the trial court's explanation in the record of why it believes death penalty sanctions are justified may be sufficient to guide the appellate court. Second, written findings are not needed in the vast majority of relatively uncomplicated cases or even more complex cases involving only a few issues pertinent to the propriety of death penalty sanctions. We doubt that findings in such cases would meaningfully assist appellate review.

There are even instances when extensive findings in support of a sanctions order cannot be considered helpful to appellate review. This suit falls into that category. Although

the trial court made extensive findings, only two appear pertinent to the Transamerican standards: whether Chrysler's discovery abuse justifies the presumption that its defenses to the suit lack merit; and, whether the conditional monetary sanctions order of March 8, 1991 can be fairly characterized as a lesser sanction. We have reviewed the entire record

**Page 853**

and conclude that it contains no evidence that would justify the presumption of lack of merit of Chrysler's defense; [14] further, we conclude that the conditional monetary sanctions order is not the type of lesser sanction required before the imposition of death penalty sanctions, which we contemplated in Transamerican. We, therefore, hold that the trial court abused its discretion by ordering death penalty sanctions under the circumstances of this case. While trial court findings in a death penalty sanctions case can be helpful in demonstrating how the court's discretion was guided by a reasoned analysis of the purposes sanctions serve and the means of accomplishing those purposes, especially in complex cases where the record is voluminous, such findings must be pertinent to the Transamerican standards and supported by the record. Findings specifically tied to an appropriate legal standard are the only type of findings that can be truly beneficial to appellate review. [15]

\* \* \*

For the reasons we have explained, we trust that the trial court will vacate its Sanctions Order of August 8, 1991. The clerk is instructed to issue the Writ of Mandamus to compel such action only in the event the trial court declines to voluntarily do so.

GONZALEZ, MAUZY, DOGGETT and GAMMAGE, JJ., note their dissent.

---------

Notes:

[1] A trial on damages was scheduled for approximately three months later.

[2] In Transamerican Natural Gas Corp. we held that

when a trial court imposes discovery sanctions which have the effect of precluding a decision on the merits of a party's claims--such as by striking pleadings, dismissing an action, or rendering default judgment--a party's remedy by appeal is inadequate, unless the sanctions are imposed simultaneously with the rendition of a final appealable judgment.

Id. at 920.

[3] At oral argument, Chrysler's attorney claimed that Chrysler had, by that time, produced 100,000 documents and spent in excess of $300,000 responding to the Garcias' discovery requests.

[4] At oral argument Chrysler's attorney claimed to have produced "approximately 250 or [sic] 300" crash tests in this case.

[5] The Garcias' attorney at oral argument claimed that Chrysler had withheld 63 major frontal M-body crash tests.

[6] Pursuant to its document-retention policy, Chrysler claims to have periodically destroyed certain of the requested documents in the ordinary course of its business.

[7] On the day before the hearing on April 10th, the Garcias' counsel transmitted by facsimile a Motion for Sanctions based on alleged misrepresentations made to the trial court at the hearing of February 15, 1991, but the hearing on this Motion was postponed until April 26, 1991.

[8] For example, he acquired a crash-test master index for the years 1962 to 1978 from a 1978 deposition taken in another case. Another time, the Garcias' attorney called Chrysler a "liar" when it claimed that certain crash tests were destroyed, based on the affidavit of a Chicago area paralegal who claims Chrysler produced those tests recently in a case handled by her firm. Chrysler's attorneys later took her deposition to discover that the crash test reports in her file consisted of one page from each of three destroyed test reports and involved a non-M-body type vehicle, which was the subject of the paralegal's firm's case.

[9] The Garcias' Second Amended Motion for Sanctions Against Chrysler for Discovery Abuse is really their fourth such motion. It alleges:

I.

Defendant Chrysler has engaged in a pattern and practice of discovery abuse in this case which includes:

(1) A long history of needless and obstreperous delay;

(2) Needless delay in making discovery required by the Agreed Order of June 13, 1990;

(3) Leading opposing counsel to believe that discovery required by the Agreed Order of June 13, 1990 was completed when, in fact, it had not been completed;

(4) False statements that it had produced all crash tests which it was ordered to produce, when it had not;

(5) Failure to produce crash tests which it claimed had

previously been destroyed when they had not been destroyed;

(6) Making false statements regarding discovery responses to the effect that it does not maintain a master crash test index, when it does maintain such an index;

(7) Making false statements through counsel to the Court that its master crash test index does not reflect whether crash tests reports have been destroyed, when the electronic crash test index which Chrysler maintains does contain such information;

(8) Failure to disclose 14 similar lawsuits responsive to Interrogatories Nos. 26 and 27;

(9) Failure to provide names and addresses of Plaintiffs' counsel and other identifying information regarding similar lawsuits in response to Interrogatories Nos. 26 and 27, notwithstanding Judge Dunham's Order of February 15, 1991;

(10) Failure to produce underlying data for compliance reports relevant to FMVSS 203, 204, and 207, contrary to the agreed production order;

(11) A continuing failure to produce Chrysler's document retention policies pursuant to which responsive documents "may" have been destroyed, and frivolously objecting to requests for their production;

(12) Falsely stating to the Court that it had produced Chrysler's document retention policies, when it had not;

(13) Additional failure to produce all M-body crash tests after being specifically ordered to do so by Judge Dunham's order of February 15, 1991;

(14) Massive failure to produce relevant and critical documents regarding Chrysler's testing of M-body seat belts and steering columns.

II.

Chrysler's conduct in this case constitutes a continuing pattern of discovery abuse which required the imposition of sanctions pursuant to the provisions of Rule 215, Tex.R.Civ.P. Indeed, some of Chrysler's conduct violates Judge Dunham's Order of February 15, 1991, which specifically provided that failure to comply with the Order would result in sanctions of $7,500.00 per day pending full compliance.

[10] By May 31st, Chrysler had produced 11,000 additional documents but asked for and received a 60-day extension at a hearing on June 21, 1991 as well as a limitation on the scope of the Garcias' fourth request for discovery. At the

June 21, 1991 hearing, Judge Blackmon stated:

[I]'ll tell you something that's worrying me about the case, and it does worry me, and one of the reasons I haven't ruled on sanctions per se that I still have on my desk is we probably have already spent five or six days, we should have been trying this lawsuit. And we've had five or six days in pretrial things. Plaintiff is obviously trying to posture the case so he can win the case in pretrial and does not have to try the lawsuit.

I am not in a position to say that lawyers are lying when they make representation in this Court in open court about what their clients can do or not do. I believe those representations are made in all good faith. * * * [I]'m just not convinced that the lawyers here have done bad things and consequently, I'm not convinced that the Defendant here has done evil in--in regard to the discovery. * * * I still don't know what I'm going to do with the sanctions, I just haven't made up my mind. One of you suggested some attorneys' fees and letting these fellas travel up somewhere. I thought that probably was the most reasonable suggestion. The problem is I'm going to have to have a hearing on attorneys fees, and I really don't want to do that. I would like to resolve that matter because I want to get the case to trial and try it.

Between April 26, 1991 to June 21, 1991, Chrysler compiled documents responsive to the Garcias' fourth discovery request. During this period, the Garcias' counsel served on Chrysler two additional requests for discovery.

[11] See supra p. 13.

[12] In Chrysler's Request for Admission No. 6 to the Garcias, it asks them to "Admit that Oscar Garcia was negligent and that such negligence was a proximate cause of the accident on July 26, 1986 between he and Ambrocio Garcia," to which the Garcias responded, "Admitted."

In other words, the Garcias admitted that Chrysler was not the sole cause of the accident, but under Judge Blackmon's sanctions order, Chrysler could contest only the amount of actual and punitive damages assessed, not liability, causation, or Oscar Garcia's comparative responsibility for the death of Ambrocio Garcia. If it had been allowed to try the issue of liability, Chrysler would not have been jointly and severally liable for Ambrocio Garcia's death if a jury assigned 80 per cent or more of the responsibility for Mr. Garcia's death to the drunk driver. See TEX.CIV.PRAC. & REM.CODE § 33.013(b)(1).

[13] Judge Blackmon's Sanctions Order includes the following findings:

### FINDINGS OF FACT

1. The Court finds that Chrysler has engaged in a long-standing, continual, repeated and wilful abuse of the discovery process including, but not limited to, failure to comply with this Court's discovery orders entered on the 13th day of June, 1990, the 8th day of March, 1991, and the 11th day of April, 1991; said discovery abuse includes, but is not limited to, the following conduct:

a. REGARDING THE DISCOVERY ORDER ENTERED HEREIN ON JUNE 13, 1990, the Court finds:

1. Chrysler failed to produce in a reasonably timely manner numerous significant documents ordered produced by such Order;

2. Chrysler made false and misleading representations to the Court and to opposing counsel indicating that it had made full production of documents and was in full compliance with said Order, when it was not;

3. Chrysler made false representations to the Court that it did not maintain a Master Vehicle Crash Test Index, when it, in fact, did;

4. Chrysler failed to truthfully respond to discovery, and responded to discovery in a misleading and incomplete manner so as to conceal information detrimental to its case; and

5. Chrysler's unreasonable delay (more than 10 months) and its continual failure to produce documents it was required to produce under said Order, constitute gross violations of the Agreed Order;

b. REGARDING THE DISCOVERY ORDER ENTERED HEREIN ON MARCH 8, 1991, the Court finds:

1. Chrysler failed to timely and reasonably produce important documents ordered produced by such Order;

2. Chrysler represented to this Court and to opposing counsel that it had made full production of documents and was in full compliance with said Order, when it was not; and

3. Chrysler produced incomplete and redacted portions of documents in direct violation of such Order, and has failed to rectify such violation after being informed of the same;

c. REGARDING THE DISCOVERY ORDER ENTERED HEREIN ON APRIL 11, 1991, the Court finds:

1. Chrysler has failed to comply with the Orders of this Court regarding Request for Production No. 1 of Plaintiffs' Fourth Discovery to Defendant Chrysler, as it has, to this date, failed, refused and neglected to produce the information necessary for Plaintiffs to decipher and

interpret the information contained within the computerized data base produced pursuant to this Court's orders; and

2. Such failure, neglect and refusal to produce the materials referenced in the preceding paragraph continued to this date despite letters from counsel for Plaintiffs requesting certain information which had been ordered to be produced by this Court's orders;

2. The Court finds that Chrysler, by and through its Houston counsel, has made repeated false and misleading statements to the Court and to opposing counsel regarding the status of discovery in this litigation, both in writing and in open court;

3. The Court finds that the imposition of monetary sanctions as included in the Court's Order of March 8, 1991, was ineffective in causing Chrysler to alter its pattern of misconduct; the Court finds that Chrysler has continued to engage in a continuing pattern of misconduct including discovery abuse and violations of this Court's orders following this Court's Order for monetary sanctions;

4. The Court finds that Chrysler is being represented herein by Corpus Christi counsel, Houston counsel and Washington, D.C. "National" counsel; the Court finds from the evidence that Chrysler itself, as well as its counsel, are fully aware of Chrysler's obligations and that the offensive conduct herein is attributable, in large part to Chrysler itself. The Court finds that the offensive conduct is not attributable in any part to Corpus Christi counsel. The Court finds that Chrysler itself, by and through its Discovery Manager Jeffery Podorsek and its National Counsel David Kikel, has been actively involved in the conduct at issue;

5. The Court has considered for almost three and one-half months the availability of less stringent sanctions and whether less stringent sanctions would fully promote compliance by Chrysler with this Court's discovery order; the Court had initially declined to strike Chrysler's pleadings and has been seeking to determine less stringent sanctions which could be expected to obtain proper compliance by Chrysler with this Court's orders and with the discovery rules; the Court notes that substantial monetary sanctions previously imposed herein on Chrysler had not successfully promoted full compliance with this Court's orders and that the pattern of misconduct has continued; the Court, reluctantly, finds that no sanction less stringent than those ordered herein will secure compliance with the Court's orders and applicable rules;

6. The Court finds that the discovery sought is directly, materially and substantially related to the major issues of the case; Chrysler's refusal to comply with the discovery rules and orders of this Court prevent Plaintiffs from preparing their case for trial and preclude a fair trial under applicable law;

7. Although the Court fully recognizes the severity of the sanctions ordered herein, Chrysler's longstanding and flagrant discovery conduct in this case can only be described as a wilful failure to comply with its responsibilities of discovery under our state's Rules of Civil Procedure and orders of this Court. Such a callous disregard for its responsibilities therein will not be tolerated by this Court;

8. Chrysler's lengthy and continuous obstruction of Plaintiffs' discovery efforts clearly justifies the presumption held by this Court that Chrysler believes its defenses to Plaintiffs' allegations lack merit.

[14] See supra at n. 12.

[15] As we have previously stated, the court has appointed various task forces to study and recommend any needed revisions in the Rules of Civil Procedure, including the rules relating to sanctions. See Alvarado v. Farah Mfg. Co., Inc., 830 S.W.2d 911 (Tex.1992). We anticipate that the task forces' recommendations will include proposals relating to trial court findings in death penalty sanctions cases.

---------

856 S.W.2d 725 (Tex. 1993)

GTE COMMUNICATIONS SYSTEMS CORPORATION, Relator,

v.

The Honorable Martha TANNER, Judge, Respondent.

No. D-3089.

Supreme Court of Texas.

June 30, 1993

Ruth Greenfield Malinas, J. Michael Ezzell, Thomas H. Crofts, Jr., San Antonio, for relator.

Rene R. Barrientos, Pat Maloney, Sr., Timothy Patton, San Antonio, for respondent.

OPINION

HECHT, Justice.

In this original mandamus proceeding, relator GTE Communication Systems Corporation, a defendant in pending litigation, seeks review of sanctions imposed against it by the respondent district court. The district court concluded that four of GCSC's amended answers, its motion for summary judgment, and two affidavits in support of the motion were groundless and filed in bad faith, in violation of Rule 13, TEX.R.CIV.P. The district court also concluded that GCSC failed to produce a certain document in response to a discovery request, in violation of Rule 215, TEX.R.CIV.P. As sanctions, the district court struck GCSC's pleadings and ordered it to pay plaintiffs $150,000 in attorney fees. We granted leave to file application for writ of mandamus to review these rulings. For reasons that follow, we conditionally grant the writ.

I

The litigation pending in the district court arises out of the following circumstances. Rene Duran and Jesse Ramirez, Jr. were riding bicycles along the sidewalk outside a grocery store when Duran struck a sharp-edged metal cable which had been stretched across the sidewalk at the level of his neck. Duran was nearly decapitated by the cable and died of his injuries. At the shock of this accident, Ramirez fell from his bicycle and sustained injuries. The cable, which was several feet long, had been made by unwinding the 18"' flexible sheath that protected the cord of electric wires connecting a telephone handset to the body of a pay telephone mounted on the wall outside the grocery store. Police investigating Duran's death obtained information that a young man, the grandson of the proprietor of the grocery store, had stretched the cable across the sidewalk as a prank. Before the young man could be

arrested and charged with murder, he committed suicide.

Duran's estate and survivors, along with Ramirez and his next friends, filed suit claiming that the telephone was unreasonably dangerous as designed, manufactured and distributed, because the metal sheath covering the telephone handset cord could easily be disassembled and stretched into a cable. In their original petition, plaintiffs alleged that defendant ATS Pay Phone Supply, Inc., had manufactured the telephone, and did not name GTE Communication Systems Corporation as a defendant. Subsequently, plaintiffs amended their petition to add GCSC as a defendant, alleging that it was the manufacturer of the telephone. In answer to plaintiffs' allegations, GCSC denied that it had designed, manufactured, marketed, sold or distributed the sheathed cord.

After some discovery had been conducted, GCSC moved for summary judgment on several grounds, including: that it had not designed, manufactured, or marketed the sheathed cord that caused Duran's injuries; that the sheath was not defective; that if the sheath was unreasonably dangerous, it was solely because it had been altered; that the alteration of the sheathed cord which led to plaintiffs' injuries was unforeseeable; and that the criminal conduct involved in stretching the cable across the sidewalk was a new, independent, superseding or intervening cause of plaintiffs' injuries. The first of these grounds was supported by the affidavits of Robert Zimmerman, a long-time employee of GCSC, and Oscar Jiminez, an employee of General Cable Company, a manufacturer of telephone handset cables. Zimmerman's affidavit stated that in manufacturing telephone handsets GCSC had used only sheathed cords made by General Cable, and that if the sheath that injured Duran was not General Cable's, then the handset was not GCSC's. Jiminez' affidavit stated that he had examined the remnants of the sheath that injured Duran and found six distinct differences between those remnants and sheaths manufactured by General Cable. Thus, Jiminez concluded that General Cable had not designed, assembled or distributed the cord involved in the accident.

In response to GCSC's motion for summary judgment, plaintiffs asserted that the identity of the manufacturer of the cord had not been established but was much in dispute. Plaintiffs argued that even if GCSC had not made the cord, it had certainly made the telephone, and that the telephone was defective because the cord was part of it. The trial court denied summary judgment without indicating a specific reason.

Several months later, plaintiffs filed a motion for sanctions requesting that the district court strike GCSC's pleadings and award plaintiffs $150,000 in attorney fees. This motion complained that GCSC's assertions that it was not involved in making and distributing the sheathed cord which injured the plaintiffs had been interposed in bad faith and with knowledge that the assertions were false. The motion also complained that GCSC had failed to produce unspecified documents (actually, as it later developed, a single document) which showed that it knew of the dangers inherent in the cord and could have foreseen the type of accident in which plaintiffs were injured. The motion requested sanctions for discovery abuse and under Rule 13, TEX.R.CIV.P. After an evidentiary hearing the district court granted plaintiffs' motion without indicating the reasons for its ruling.

GCSC petitioned the court of appeals for a writ of mandamus directing the district court to vacate its order. The appeals court conditionally granted its writ, holding that the order did not state "the particulars" of good cause warranting the imposition of sanctions, as required by Rule 13. *GTE Communication Systems Corp. v. Curry,* 819 S.W.2d 652, 653 (Tex.App.--San Antonio 1991, orig. proc.). Immediately after the court of appeals issued its opinion, the district court vacated its original order and, without notice to GCSC, signed a new order prepared by plaintiffs, setting out in 24 paragraphs three reasons for sanctioning GCSC by dismissing its pleadings and assessing $150,000 attorney fees against it.

**Page 728**

One reason the district court gave for imposing sanctions was that GCSC had abused the discovery process by failing to produce a certain memorandum prepared by employees of a corporation, GTE of Florida, Inc., for circulation to several departments within that corporation. GTFL, as it is referred to, and GCSC are separate corporations. It is unclear from the record before us how or even whether they are related. The relevant portion of the memorandum states: "Presently GTFL is using over 5,000 handsets per year for maintenance change out because the armored handset cord has been uncoiled by an excessive pull by the end user. Several of these handset failures have resulted in litigation against GTFL." Plaintiffs obtained this memo from another party in the litigation. To show that

GCSC was aware of the memo and had failed to produce it, plaintiffs offered as their only evidence the testimony of Charles James, president of ATS, the corporation plaintiffs once alleged was the manufacturer of the sheath. James stated that, based upon his experience in the pay telephone industry, it was "totally inconceivable" that GCSC did not have the memo, and GCSC could compel its production from GTFL because the two corporations were affiliated. The district court "credited" James' testimony and "discredited" GCSC's evidence that it was unaware of the memo and that it had no control over GTFL to compel that entity to produce the memo. James also admitted, however, that he had never worked for GCSC or GTFL and did not actually know whether GCSC had ever been in possession of the GTFL memo.

A second reason the district court gave for imposing sanctions was that GCSC had acted in bad faith in asserting in its summary judgment motion that, as a matter of law, plaintiffs' accident was unforeseeable. The court assumed that GCSC knew of the GTFL memo when it filed its motion for summary judgment, and therefore knew of the problems with the sheathed cord. Possessed of this knowledge, the court reasoned, GCSC's assertion that plaintiffs' accident was unforeseeable as a matter of law was groundless and could only have been made in bad faith. Based upon this analysis, the district court concluded that GCSC's summary judgment motion violated Rule 13.

The district court also concluded, as its third reason for sanctions, that GCSC's amended answers, motion for summary judgment and supporting affidavits in which it denied that it had manufactured the sheathed cord were groundless and brought in bad faith, in violation of Rule 13. The court based this conclusion upon the testimony of two experts, one of whom was James. Plaintiffs first developed this testimony after GCSC's motion for summary judgment was denied and offered it at the hearing on the motion for sanctions. Both witnesses testified that they had concluded from examining the sheath that GCSC had manufactured it. At the hearing, GCSC introduced the affidavits that it had filed in support of its motion for summary judgment, in addition to other evidence that it had not manufactured the sheath.

GCSC again sought a writ of mandamus from the court of appeals, but this time the court denied leave to file the petition. GCSC then moved for leave to file its petition in this Court, which we granted. 36 TEX.SUP.CT.J. 686 (April 3, 1993).

II

We first consider whether the district court abused its discretion in sanctioning GCSC for abuse of the discovery process under Rule 215, TEX.R.CIV.P. To answer this

question we must answer two others: did the district court properly find that GCSC had "possession, custody or control" of the GTFL memo within the meaning of Rule 166b(2)(b), TEX.R.CIV.P., such that GCSC should have produced it; and if so, were the sanctions imposed for the failure to produce the memo just. We conclude that both these questions must be answered negatively.

Rule 166b(2)(b), TEX.R.CIV.P., provides in pertinent part:

A person is not required to produce a document or tangible thing unless it is

**Page 729**

within the person's possession, custody or control. Possession, custody or control includes constructive possession such that the person need not have actual physical possession. As long as the person has a superior right to compel the production from a third party (including an agency, authority or representative), the person has possession, custody or control.

The phrase, "possession, custody or control", within the meaning of this rule, includes not only actual physical possession, but constructive possession, and the right to obtain possession from a third party, such as an agent or representative. The right to obtain possession is a legal right based upon the relationship between the party from whom a document is sought and the person who has actual possession of it. For example, in State v. Lowry, 802 S.W.2d 669, 673-674 (Tex.1991), we held that a request for production directed to the Attorney General required production of documents held by all divisions of that office.

A party seeking sanctions has the burden of establishing his right to relief. Thus, when a motion for sanctions asserts that a respondent to a discovery request has failed to produce a document within its possession, custody or control, the movant has the burden to prove the assertion. In this case, plaintiffs failed to meet that burden.

The only evidence plaintiffs offered to show that GCSC had actual possession of the memo was the testimony of Charles James that it was "totally inconceivable" to him that GCSC did not have the memo. James admitted, however, that he had never worked for GCSC and had no personal knowledge of whether GCSC had ever had the GTFL memo. The memo has not been located in GCSC's files, no GCSC employee has acknowledged ever seeing it, and there is no circumstantial evidence that would indicate that GCSC ever had the memo. Under these circumstances, James' testimony is no more than mere surmise.

Likewise, there is no evidence that GCSC had constructive possession of the document or a right to

compel its production. Plaintiffs adduced no evidence regarding the corporate relationship between GTFL and GCSC, or any right of the latter to control the former. In fact, the only testimony regarding control was James' speculation regarding the ability of GCSC's parent to control its subsidiaries, assuming both GCSC and GTFL were subsidiaries of the same parent. There is no evidence that GCSC ever actually did exercise control of any type over GTFL.

As a rule, the district court's resolution of a factual issue is entitled to deference in a mandamus proceeding and should not be set aside unless it is clear from the record that only one decision could have been reached. *Walker v. Packer,* 827 S.W.2d 833, 839-40 (Tex.1992). Here, it is quite clear that from the record before it the district court could not have found that GCSC had possession, custody or control over the GTFL memo within the meaning of Rule 166b(2)(b) such that GCSC should have produced it.

Furthermore, even if GCSC had failed to produce the GTFL memo, the district court's sanction of striking GCSC's pleadings would not have been just, as required by Rule 215, TEX.R.CIV.P. "[J]ust sanctions must not be excessive.... [C]ourts must consider the availability of less stringent sanctions and whether such lesser sanctions would fully promote compliance." *TransAmerican Natural Gas Corporation v. Powell,* 811 S.W.2d 913, 917 (Tex.1991). The record must reflect that the court considered the availability of lesser sanctions. *Otis Elevator Co. v. Parmelee,* 850 S.W.2d 179, 181 (Tex.1993). Case determinative sanctions may be imposed in the first instance only in exceptional cases when they are clearly justified and it is fully apparent that no lesser sanctions would promote compliance with the rules. Here, the order which the district court signed stated that lesser sanctions would have been ineffective, but the court did not explain why, and the record does not indicate why. We give no deference to such unsupported conclusions. *Chrysler Corp. v. Blackmon,* 841 S.W.2d 844, 853 (Tex.1992). We fail to see why any number

**Page 730**

of lesser sanctions, from fines to contempt, would not have promoted compliance with discovery, if there had been abuse here.

The sanctions imposed by the district court precluded GCSC from presenting the merits of its position at trial. Before a court may deprive a party of its right to present the merits of its case because of discovery abuse, it must determine that "a party's hindrance of the discovery process justifies a presumption that its claims or defenses lack merit." TransAmerican, 811 S.W.2d at 918. No such presumption is warranted here. We have concluded that

GCSC did not fail to comply with discovery. Even in the district court's view, GCSC only failure was to produce a single document which states that "several ... handset failures have resulted in litigation" without any indication of the nature of such litigation or whether personal injuries had occurred. Even if GCSC had failed to comply with discovery, there is nothing in the record to justify striking GCSC's pleadings as a consequence.

Accordingly, we conclude that the district court clearly abused its discretion in sanctioning GCSC for an abuse of the discovery process under Rule 215.

## III

We next consider whether the district court abused its discretion in imposing sanctions under Rule 13, TEX.R.CIV.P. Rule 13 states in pertinent part:

The signatures of attorneys or parties constitute a certificate by them that they have read the pleading, motion, or other paper; that to the best of their knowledge, information, and belief formed after reasonable inquiry the instrument is not groundless and brought in bad faith or groundless and brought for the purpose of harassment.... If a pleading, motion or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, after notice and hearing, shall impose an appropriate sanction available under Rule 215-2b, upon the person who signed it, a represented party, or both.

Courts shall presume that pleadings, motions, and other papers are filed in good faith. No sanctions under this rule may be imposed except for good cause, the particulars of which must be stated in the sanction order. "Groundless" for purposes of this rule means no basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law.

The district court sanctioned GCSC for filing amended answers, a motion for summary judgment and the supporting affidavits of Zimmerman and Jiminez, which deny that GCSC was involved in making or distributing the sheathed cord which caused plaintiffs' injuries. By its express language, Rule 13 applies only to pleadings, motions and other papers signed by attorneys. Since the Zimmerman and Jiminez affidavits were not signed by GCSC's attorneys, it was a clear abuse of discretion for the district court to base an imposition of sanctions under Rule 13 on them. The issues, then, are whether the district court abused its discretion GCSC's in concluding that GCSC's amended answers and motion for summary judgment are sanctionable, and in striking GCSC's pleadings.

Such papers cannot serve as a basis for sanctions under that portion of Rule 13 quoted above, and on which the district court relied, unless the papers are "groundless" as defined by the rule. Plaintiffs contend, and the district court concluded, that GCSC's amended answers and summary judgment motion are groundless because there is no basis in fact for GCSC's denial that it was involved in the manufacture or distribution of the sheathed cord which caused plaintiffs' injuries. Plaintiffs make two arguments in support of their contention.

Plaintiffs' first argument is that the evidence establishes as a matter of law that GCSC manufactured the sheathed cord, and that GCSC's denial of this fact was therefore groundless. The evidence in the record before us demonstrates that the identity of the manufacturer of the cord is vigorously disputed, and certainly not established as a matter of law. GCSC's effort

## Page 731

to establish that it was not the manufacturer of the cord was not groundless.

Plaintiffs' second argument is that because, at the very least, a fact question existed regarding GCSC's involvement in the manufacture and distribution of the sheathed cord, GCSC's assertion in its motion for summary judgment that no such fact question existed was groundless. In other words, plaintiffs argue that a party who knows that material facts are in dispute may be sanctioned for moving for summary judgment. While we do not disagree that the filing of a motion for summary judgment may give rise to sanctions under Rule 13, just as the filing of any other pleading or motion, this is not such a case. At the time GCSC filed its motion, the only evidence adduced by the parties indicated that GCSC had not made or distributed the sheathed cord. Indeed, plaintiffs themselves originally pleaded that ATS manufactured the cord, not GCSC. By their own admission, plaintiffs did not develop any evidence to contradict GCSC's assertions until after GCSC's motion was denied. Even if GCSC was not entitled to summary judgment, it cannot be said that its motion had no basis in law or fact.

Thus, the district court clearly abused its discretion in determining that GCSC's assertions were groundless. To impose sanctions under Rule 13, the district court was also required to find that GCSC's assertions were made in bad faith or for the purpose of harassment. Since plaintiffs do not contend, and the district court did not find, that GCSC's assertions were harassing, a finding of bad faith was a prerequisite to sanctions. Rule 13 prescribes that courts presume that papers are filed in good faith. Thus, the burden is on the party moving for sanctions to overcome this presumption. Plaintiffs failed to carry this burden. The only basis the district court gave for finding that GCSC had acted in bad faith was that GCSC had ignored or concealed

evidence that it had been involved in making and distributing the sheathed cord that injured the plaintiffs. As we have seen, however, there is no proof that GCSC, before it moved for summary judgment, was aware of any evidence that it was involved in the manufacture or distribution of the sheathed cord.

Furthermore, a motion for summary judgment asserting that no genuine issue of material fact exists is not proved groundless or in bad faith merely by the filing of a response which raises an issue of fact, even if the response was or could have been anticipated by the movant. Nor is denial of a motion for summary judgment alone grounds for sanctions. Rule 13 does not permit sanctions for every pleading or motion that requests relief which is denied. In this case, the district court abused its discretion in finding that GCSC had acted in bad faith.

The district court also sanctioned GCSC for asserting in its motion for summary judgment that it did not know of any defects in the sheathed cord and could not have foreseen an accident like plaintiffs', when it was aware of the GTFL memo. Since we have determined that there is no evidence that GCSC was aware of the GTFL memo when it filed its motion for summary judgment, and plaintiffs have offered no other evidence of GCSC's knowledge of any defects in the cord, we conclude that such assertions were not groundless or made in bad faith.

Even if GCSC's assertions in its amended answers and motion for summary judgment had been sanctionable, they would not have warranted striking GCSC's pleadings. Rule 13 requires that sanctions imposed be "appropriate", which is the equivalent of "just" under Rule 215. TransAmerican, 811 S.W.2d at 916-17 n. 4. Neither standard allows imposition of excessive sanctions. Moreover, while the due process concerns under the two rules are not completely congruent, case determinative sanctions may not be imposed under either rule unless the violation warrants adjudication of the merits. Even if GCSC had violated Rule 13, there is nothing in the record to suggest that the violation could not have been fully redressed far short of striking GCSC's pleadings.

**Page 732**

Thus, we hold that the district court clearly abused its discretion in imposing sanctions under Rule 13.

IV

Finally, we consider whether GCSC has an adequate remedy by appeal. We have previously held that appeal from the imposition of case determinative, or "death penalty", sanctions is inadequate, unless the sanctions are imposed simultaneously with a final, appealable judgment.

TransAmerican, 811 S.W.2d at 920; Chrysler, 841 S.W.2d at 845 n. 2. For the same reasons expressed in those cases, GCSC has no adequate remedy by appeal in this case, and we exercise our discretion to issue the extraordinary writ.

We have held that an assessment of attorney fees which is not to be paid until final judgment is rendered may be adequately challenged by appeal. *Braden v. Downey,* 811 S.W.2d 922 (Tex.1991). Here, however, where we have concluded in considering case determinative sanctions that the district court clearly abused its discretion in awarding any sanctions at all, there remains no basis for the award of attorney fees.

Accordingly, we conclude that GCSC is entitled to have the district court's sanction order set aside.

* * * * * *

We therefore direct the district court to vacate its orders of November 14, 1991, and June 12, 1992, assessing sanctions and attorney fees. We assume the district court will promptly comply. The writ of mandamus will issue only if it does not.

DOGGETT and SPECTOR, JJ., not sitting.

92 S.W.3d 577 (Tex.App. —Austin 2002)

NORFOLK SOUTHERN RAILWAY COMPANY, Appellant,

v.

James Allen BAILEY, Appellee.

No. 03-02-00097-CV.

Court of Appeals of Texas, Third District, Austin

October 24, 2002

Page 578

[Copyrighted Material Omitted]

Page 579

Leo D. Figueroa, Jackson Walker, LLP, San Antonio, for appellant.

Carla M. Burke, Brent M. Rosenthal, Baron & Budd, PC, Dallas, for appellee.

Before Chief Justice ABOUSSIE, Justices PATTERSON and PURYEAR.

JAN P. PATTERSON, Justice.

In this personal injury action by appellee James Allen Bailey against appellant Norfolk Southern Railway Company, we address whether certain evidentiary rulings by the district court led to the rendition of an improper judgment. In two issues, Norfolk Southern contends that the district court erred in denying its motion to strike part of the testimony of an expert witness and in failing to exclude evidence of Bailey's fear of contracting cancer. [1] Having concluded that the district court acted within its discretion in the evidentiary rulings at issue and, in any event, that the rulings did not lead to the rendition of an improper judgment, we affirm the judgment of the district court.

## FACTUAL AND PROCEDURAL BACKGROUND

Bailey is a seventy-four-year-old man who was exposed to asbestos while working for Norfolk Southern in the 1940s and 1950s. In 1997, Dr. Dennis Darcey diagnosed Bailey with asbestosis with no evidence of impairment, based on a pulmonary test performed around the same time. In July 1998, shortly before the original trial setting, Dr.

Darcey testified in his deposition that Bailey had mild asbestosis with no evidence of impairment.

The case was reset for trial in late 1999 and again in October 2001. In the summer of 2001, Bailey had another pulmonary test, which showed that the asbestosis had progressed to "mild impairment." Bailey produced this pulmonary test to Norfolk Southern in early August 2001, approximately two months before trial. The week before trial began, Dr. Darcey gave a second deposition in which he revised Bailey's diagnosis to asbestosis with mild impairment.

At a hearing before trial, Norfolk Southern moved to strike Dr. Darcey's testimony about his revised diagnosis on the ground that Bailey failed to timely supplement his discovery responses to reflect the change in Dr. Darcey's opinion. The district court denied the motion to strike the testimony with the caveat that "if we were dotting all our i's and crossing our t's, this should have been taken care of in supplementing opinions and mental impressions." The district court concluded that Norfolk Southern would have the opportunity on cross-examination to point out any discrepancies in Dr. Darcey's testimony.

Norfolk Southern also sought to exclude any evidence about Bailey's fear of cancer. As part of its motion in limine, Norfolk Southern requested no mention be made that "Plaintiff or any lay witnesses have been told anything by any expert witness or witnesses concerning any matter." At the pretrial hearing, Norfolk Southern specified that it did not want Bailey or any other witness to testify about what expert witnesses told Bailey concerning his potential for contracting cancer. The district court granted the motion in limine with the modification that Bailey could testify about what Dr. Darcey, his treating physician, had told him, but not about what other experts may have said. Norfolk Southern

Page 580

also challenged the reliability of portions of Dr. Darcey's second deposition, specifically concerning people with asbestosis having an increased risk of cancer. The district court overruled Norfolk Southern's objection to this deposition testimony. The case proceeded to trial.

The jury returned a verdict in favor of Bailey. It found that Bailey had sustained an asbestos-related disease and that Norfolk Southern caused the disease. The jury then awarded Bailey a total of $500,000 in damages ($25,000 for past pain, suffering, and mental anguish; $315,000 for future pain, suffering, and mental anguish; $10,000 for past physical impairment; and $150,000 for future physical

impairment). The district court rendered a final judgment for $428,910.03 in compensatory damages, plus post-judgment interest, after an offset for settlements. Norfolk Southern filed a motion for new trial and motion for remittitur, which the district court denied. Norfolk Southern appeals from the final judgment of the district court.

### ANALYSIS

In two issues, Norfolk Southern contends that the district court erred in evidentiary rulings by (i) failing to strike portions of the testimony of Dr. Darcey because Bailey did not timely supplement his discovery responses to include Dr. Darcey's revised diagnosis and (ii) failing to exclude evidence of Bailey's fear of cancer on the ground that fear of cancer is not recoverable under the Federal Employers' Liability Act ("FELA") if there is no evidence of injury related to fear of the disease.

We apply an abuse of discretion standard to the question of whether a district court erred in an evidentiary ruling. *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex.1995). We may reverse a district court under this standard only when we find that "the court acted in an unreasonable or arbitrary manner," *Beaumont Bank, N.A. v. Buller,* 806 S.W.2d 223, 226 (Tex.1991), or "without regard for any guiding rules or principles." *Owens-Corning Fiberglas Corp. v. Malone,* 972 S.W.2d 35, 43 (Tex.1998) (quoting Alvarado, 897 S.W.2d at 754).

When seeking to reverse a judgment based on an improper evidentiary ruling, a complaining party "need not prove that but for the error a different judgment would necessarily have been rendered, but only that the error probably resulted in an improper judgment." Alvarado, 897 S.W.2d at 753; accord Malone, 972 S.W.2d at 43. To prevail, the party must demonstrate that "the judgment turns on the particular evidence excluded or admitted." Alvarado, 897 S.W.2d at 753-54. We review the entire record to determine whether a party has met this burden. Id. at 754. If any legitimate basis exists to support a district court's evidentiary ruling, then we must uphold the court's decision. Malone, 972 S.W.2d at 43; *State Bar v. Evans,* 774 S.W.2d 656, 658 n. 5 (Tex.1989) (citing McCormick on Evidence § 52, at 131 (3d ed.1984)).

In its first issue, Norfolk Southern argues that the district court erred in denying its motion to strike part of the testimony of Dr. Darcey. In its motion to strike, Norfolk Southern sought to exclude Dr. Darcey's revised diagnosis, changed from "asbestosis with no impairment" to "asbestosis with mild impairment," because Bailey did not timely supplement his discovery responses to reflect the revised diagnosis.

When a party fails to supplement a discovery response in a timely manner, the evidence may be excluded. Tex.R. Civ. P. 193.6(a); see also Alvarado v. Farah Mfg. Co., 830 S.W.2d 911, 914 (Tex.1992)

. The remedy is mandatory and automatic unless the court finds that there was good cause for the failure to amend or supplement, or the failure will not unfairly surprise or prejudice the other party. Tex.R. Civ. P. 193.6(a); *Morrow v. H.E.B., Inc.,* 714 S.W.2d 297, 297-98 (Tex.1986). The burden of establishing good cause or lack of unfair surprise is on the party seeking to introduce the evidence. Tex.R. Civ. P. 193.6(b). The trial court has discretion to determine whether the offering party has met its burden of showing good cause. *Aluminum Co. of Am. v. Bullock,* 870 S.W.2d 2, 3 (Tex.1994). The record must support a finding of good cause or lack of unfair surprise. Tex.R. Civ. P. 193.6(b).

In some instances, the change in an expert's opinion does not require supplementation. For example, an expert may refine calculations or perfect a report up until the time of trial. *Exxon Corp. v. West Tex. Gathering Co.,* 868 S.W.2d 299, 304 (Tex.1993). An expert also may change an opinion without supplementation if the opinion is an "expansion of an already disclosed subject." Navistar Int'l Transp. Corp. v. Crim Truck & Tractor Co., 883 S.W.2d 687, 691 (Tex.App.-Texarkana 1994, writ denied). However, a party may not present a material alteration of an expert's opinion at trial that would constitute a surprise attack. See West Tex. Gathering, 868 S.W.2d at 305. The purpose of requiring timely disclosure of a material change in an expert's opinion is to give the other party an opportunity to prepare a rebuttal. See id. at 304.

Bailey's counsel acknowledged at oral argument that he should have supplemented the discovery responses with Dr. Darcey's revised diagnosis. We agree. It would have been the better practice for Bailey to timely supplement his discovery responses; nevertheless, the record supports the district court's ruling to admit the revised diagnosis.

First, the record shows that Norfolk Southern was not unfairly surprised by the revised diagnosis. Norfolk Southern received a copy of the later pulmonary test in early August 2001, almost two months before trial. It was logical that Dr. Darcey would base his trial testimony on the newer pulmonary test, given that the earlier pulmonary test figured prominently in his original diagnosis. Because asbestosis is a progressive disease, see, e.g., *Robinson v. Global Marine Drilling Co.,* 101 F.3d 35, 36 (5th Cir.1996); *Pustejovsky v. Rapid-American Corp.,* 35 S.W.3d 643, 646 (Tex.2000), it should have been no surprise to Norfolk Southern that Bailey's condition might

worsen between the original diagnosis in early 1997 and the trial over four years later in October 2001. The results of the later pulmonary test were admitted into evidence without objection. Additionally, Norfolk Southern had the opportunity to point out discrepancies in Dr. Darcey's testimony on cross-examination, which was a factor in the district court's ruling.

Second, although we find no cases directly on point about admitting a change in testimony based on the progression of asbestosis, Dr. Darcey's revised diagnosis falls somewhere between a refinement in calculations, see West Tex. Gathering, 868 S.W.2d at 304, and an expansion of an already disclosed subject, see Navistar, 883 S.W.2d at 691, both of which are admissible without the need for supplementation. We therefore conclude that the district court acted within the bounds of its discretion when it denied Norfolk Southern's motion to strike Dr. Darcey's testimony about his revised diagnosis. Even if the district court admitted Dr. Darcey's testimony in error, Norfolk Southern has failed to show how the admission of Dr. Darcey's revised diagnosis led to the rendition

**Page 582**

of an improper judgment, especially in light of other evidence in the record reflecting Bailey's medical impairment. We overrule Norfolk Southern's first issue.

In its second issue, Norfolk Southern argues that the district court erred in denying its motion to exclude evidence about Bailey's fear of getting cancer. Norfolk Southern urges that this evidence should have been excluded because fear of getting cancer is not compensable under the FELA when there is no physical manifestation of injury related to the fear of cancer.

Under the FELA, a person who has no asbestos-related disease cannot recover for fear of a possible future disease. See *Metro-North Commuter R.R. Co. v. Buckley,* 521 U.S. 424, 427, 117 S.Ct. 2113, 138 L.Ed.2d 560 (1997). Texas applies this rule to all asbestos cases, not just those involving the FELA. See *Temple-Inland Forest Prods. Corp. v. Carter,* 993 S.W.2d 88, 94 (Tex.1999). Texas does, however, generally "authorize [ ] recovery of mental anguish damages in virtually all personal injury cases" that include manifestation of a physical injury. *Krishnan v. Sepulveda,* 916 S.W.2d 478, 481 (Tex.1995). Specifically concerning asbestos-related diseases, the United States Court of Appeals for the Fifth Circuit and our sister court in Texarkana have determined that a person who already manifests symptoms of an asbestos-related disease may recover for fear of contracting another asbestos-related disease. See *Gideon v. Johns-Manville Sales Corp.,* 761 F.2d 1129, 1138 (5th Cir.1985) (applying Texas law);

*Fibreboard Corp. v. Pool,* 813 S.W.2d 658, 675 n. 2 (Tex.App.-Texarkana 1991, writ denied), cert. denied, 508 U.S. 909, 113 S.Ct. 2339, 124 L.Ed.2d 250 (1993). The Texas Supreme Court has not decided whether fear of cancer is a compensable element of damage for a person who manifests symptoms of an asbestos-related disease. See Pustejovsky, 35 S.W.3d at 650; Temple-Inland, 993 S.W.2d at 94. Under the current state of the law, then, because Bailey already manifests symptoms of an asbestos-related disease, the district court did not act outside of the bounds of its discretion in admitting the fear-of-cancer evidence. We need not reach this issue, however, because it has not been preserved for our review.

Norfolk Southern argues that it sought to prevent the presentation of fear-of-cancer evidence through a motion to exclude, but the record reflects that the district court ruled on Norfolk Southern's motion in limine. The record contains two instances of Norfolk Southern's efforts to exclude evidence of fear of cancer. First, at the beginning of the pretrial hearing, counsel for Norfolk Southern said that fear of cancer "is something we want to keep from the jury." He explained that "this is something that is going to come up in the motion in limine and with respect to the experts." The district court did not rule on the issue at that time. Second, Norfolk Southern's motion in limine included a request that no mention be made that "Plaintiff or any lay witnesses have been told anything by any expert witness or witnesses concerning any matter" without first approaching the bench. Norfolk Southern specified at the pretrial hearing on the motion in limine that it did not want Bailey or any other witness to testify about what experts told Bailey concerning the possibility of contracting cancer. The district court ruled that Bailey could testify about what his treating doctor, Dr. Darcey, told him but not about what other expert witnesses may have told him concerning the possibility of contracting cancer.

**Page 583**

[2] The record on appeal contains no motion to exclude cancer evidence, nor any order overruling such a motion.

It is well established that denial of a motion in limine is not a final ruling on admission of evidence; a party must object at trial when the testimony is offered to preserve error. Hartford Accident & Indem. Co. v. McCardell, 369 S.W.2d 331, 335 (Tex.1963); see also Tex.R.App. P. 33.1(a)(1). A ruling on a pretrial motion to exclude evidence, however, can be a ruling on the admission of evidence. Huckaby v. A.G. Perry & Son, Inc., 20 S.W.3d 194, 203-204 (Tex.App.-Texarkana 2000, pet. denied). What occurred here was a ruling on a motion in limine, not a final ruling on the evidence. McCardell, 369 S.W.2d at 335. To preserve error after the ruling on its motion in

limine, Norfolk Southern needed to object at trial to the admissibility of fear-of-cancer evidence and obtain a ruling. Id.; see also Tex.R.App. P. 33.1(a).

As Norfolk Southern points out in its brief, the record is replete with references to Bailey's fear of cancer and the possibility that he may contract cancer. What is missing from the record are Norfolk Southern's objections to most of this evidence. Norfolk Southern objected once during Bailey's testimony and received a limiting instruction that the jury consider Bailey's testimony about the possibility of contracting cancer only for Bailey's state of mind, not for the truth that he might contract cancer. Norfolk Southern failed to object, however, to many subsequent references to fear of cancer. "The general rule is that error in the admission of testimony is deemed harmless if the objecting party subsequently permits the same or similar evidence to be introduced without objection." See *Richardson v. Green,* 677 S.W.2d 497, 501 (Tex.1984). Therefore, any error in the admission of fear-of-cancer evidence was harmless because Norfolk Southern failed to object to subsequent references. See id. More importantly, Norfolk Southern has failed to show how the admission of fear-of-cancer evidence led to the rendition of an improper judgment.

Norfolk Southern also failed to preserve error with a sufficient challenge to the jury's broad-form damages findings. At the charge conference, Norfolk Southern did not object to the submission of damages questions in broad form. The jury awarded damages for pain, suffering, and mental anguish that Bailey sustained in the past, and pain, suffering, and mental anguish that Bailey would in all probability sustain in the future. The record substantially supports the jury's damages award, even setting aside the fear-of-cancer evidence. Experts for both Bailey and Norfolk Southern testified that asbestosis is a progressive disease, and Bailey's asbestosis worsened between 1997 and 2001. The jury could have based its award for future damages on the possibility that Bailey's asbestosis would further worsen.

When a damages issue is submitted in broad form, it is difficult to determine the amount that the jury awarded for each element of damages. See *Haryanto v. Saeed,* 860 S.W.2d 913, 921 (Tex.App.-Houston [14th Dist.] 1993, writ denied); *Greater Houston Transp. Co. v. Zrubeck,* 850 S.W.2d 579, 589 (Tex.App.-Corpus Christi 1993, writ denied). Consequently, to successfully challenge a multi-element damage award on appeal, an appellant

**Page 584**

must address all of the elements and show that the evidence is insufficient to support the entire damage award. See *Price v. Short,* 931 S.W.2d 677, 688 (Tex.App.-Dallas 1996, no writ); accord *Brookshire Bros. v. Lewis,* 997 S.W.2d 908,

922 (Tex.App.-Beaumont 1999, pet. denied). "The failure to address an element of damages results in waiver of the sufficiency challenge." Price, 931 S.W.2d at 688. By failing to challenge each element of the damages award, Norfolk Southern has failed to preserve error. We therefore overrule Norfolk Southern's second issue.

**CONCLUSION**

The district court acted within the bounds of its discretion in the evidentiary rulings that Norfolk Southern disputes. Furthermore, the rulings at issue did not lead to the rendition of an improper judgment in this case. Having overruled Norfolk Southern's issues, we affirm the judgment of the district court.

---------

Notes:

[1] At oral argument, Norfolk Southern withdrew a third evidentiary issue from consideration on appeal.

[2] Norfolk Southern argues that it also sought to exclude fear-of-cancer evidence through objections to portions of Dr. Darcey's second deposition. The record shows, however, that it objected to Dr. Darcey testifying about an increased risk of cancer, not about a fear of cancer. The district court overruled Norfolk Southern's objection.

---------

Page 761

970 S.W.2d 761 (Tex.App. —Amarillo 1998)

Vasilios KARAGOUNIS, Appellant,

v.

PROPERTY COMPANY OF AMERICA, Appellee.

No. 07-97-0287-CV.

Court of Appeals of Texas, Seventh District, Amarillo

June 23, 1998

Page 762

Law Offices of Charles Nicholson (Charles Nicholson), San Antonio, for appellant.

Davis & Wilkerson, P.C. (Kelly A. McDonald), San Antonio, for appellee.

Before BOYD, C.J., and QUINN and REAVIS, JJ.

ON MOTION FOR REHEARING

QUINN, Justice.

Vasilios Karagounis ("Karagounis") has moved for rehearing. We deny the motion, withdraw our original opinion dated May 1, 1998, and substitute the following in its stead.

Page 763

Karagounis appeals from a final judgment declaring that he take nothing against Property Company of America ("PCA") and sanctioning Karagounis for initiating in bad faith and pursuing a groundless suit. Though encompassed within two points, he actually presents four issues for review. The first concerns whether Texas Rule of Civil Procedure 13 applied to the proceeding, the second, whether sanctions could issue when a party simply lacked sufficient evidence to support its claim, [1] the third, whether he was afforded proper notice of the sanctions hearing, and fourth, whether the Texas Rules of Civil Procedure prevented the trial court from entering a judgment on the merits. We affirm in part and reverse in part.

Background

Karagounis initiated a suit against PCA and others for damages sustained in a fire at his apartment. The case was set for trial on March 24, 1997. Karagounis appeared in court pro se on that date, announced that he was not ready to proceed because he lacked an attorney, and requested a continuance. [2] Continuance was denied. Nevertheless, trial was postponed until the next day. Karagounis failed to appear when the case was called for trial on the 25th of March. However, the court proceeded to hear PCA's request for sanctions under Rule 13 of the Texas Rules of Civil Procedure. The request had been included in its amended answer filed several weeks earlier. Sanctions were sought because Karagounis' suit was allegedly groundless and initiated in bad faith. After hearing evidence presented by PCA's legal counsel, the trial court entered the aforementioned final judgment.

Karagounis then timely moved for a new trial, contending that he had discovered new evidence and that PCA "had not file [sic] a Counterclaim on February 28th [sic] 1997, as required by TRCP 47, [sic] and 97." When that relief was denied him by written order, he again moved the court to "reconsider new trial." Though colored in a different shade, the grounds alleged therein again involved newly discovered evidence and the impropriety of the court awarding sanctions. That motion too was denied by written order.

Issue One--The Applicability of Rule 13

Under this issue, Karagounis posits that sanctions could not be awarded under Rule 13 of the Texas Rules of Civil Procedure because chapter 10 of the Texas Civil Practice and Remedies Code supplanted the rule. Both deal with the levy of sanctions against litigants who file groundless pleadings in bad faith. Furthermore, the legislation enacting chapter 10 dictates that the provisions of the chapter take effect on September 1, 1995, and that they apply "only to a pleading or motion in a suit commenced on or after that date." TEX. CIV. PRAC. & REM.CODE ANN. § 10.001 historical note (Vernon Supp.1998) [Act of May 18, 1995, 74th Leg., R.S., ch. 137, § 1, 1995 Tex. Gen. Laws 977, 978]. A pleading or motion "in a suit commenced before the effective date ... is governed by the law applicable to the pleading or motion immediately before the effective date ... and that law is continued in effect for that purpose." Id. Since the action from which this appeal arose was initiated after September 1, 1995, concludes Karagounis, Rule 13 had no application. We disagree.

Section 10.006 of the Texas Civil Practice and Remedies Code states that "[n]otwithstanding Section 22.004, Government Code, the supreme court may not amend or adopt rules in conflict with this chapter." From this we glean the legislature's intent. It did not purport to supercede the supreme court's authority to enact rules of

court concerning sanctions. Nor did it purport to negate any rules of court which may also regulate the topic of sanctions. Rather, it prohibited the court from enacting rules which conflict with chapter 10. In other

**Page 764**

words, as long as the court's rules do not conflict with the provisions of the chapter, they can enjoy force and effect. [3] If the legislature intended anything more, it could have so said. Consequently, we overrule this contention. [4]

Issue Two--Sanctions Because a Party Lacks Evidence to Prove a Claim

Under this issue, Karagounis' argument is twofold. Initially, he asserts that sanctions could not issue simply because he failed to present sufficient evidence to support his claim. Then, he suggests that in denying PCA's motion for summary judgment, the trial court implicitly found that his allegations were supported by some evidence. We sustain the argument in part.

Standard of Review

In addressing a request for sanctions under Rule 13 of the Texas Rules of Civil Procedure, the trial court exercises its considered discretion. *Monroe v. Grider,* 884 S.W.2d 811, 816 (Tex.App.--Dallas 1994, writ denied). Given this, we cannot interfere with the decision reached unless we conclude that the trial court's discretion was abused. Id. At the very least, this requires a showing that the court acted arbitrarily or unreasonably, such as when it bases its order on an incorrect interpretation of the law or a clearly erroneous assessment of the evidence. Id. So too can discretion be abused if the procedural mechanisms in place to guide the court's determination are ignored. For instance, if the rule of law requires the court to conduct a hearing and receive evidence before it can make a decision and the court does neither, then the court fails to do those things necessary to enable it to soundly exercise its discretion. The result is an abuse of discretion.

Texas Rule of Civil Procedure 13 dictates that in signing a pleading, motion, or other paper, counsel certifies that he read the document and that the allegations contained in it are, to the best of his knowledge, neither 1) groundless and brought in bad faith or 2) groundless and brought for the purposes of harassment. *Monroe v. Grider,* 884 S.W.2d at 817; *McCain v. NME Hosps., Inc.,* 856 S.W.2d 751, 757 (Tex.App.--Dallas 1993, no writ). This rule serves to "check abuses in the pleading process, i.e. to insure that at the time the challenged pleading was filed the litigant's position was factually well grounded and legally tenable." *Home Owners Funding Corp. v. Scheppler,* 815 S.W.2d 884, 889 (Tex.App.--Corpus Christi 1991, no writ). In other words,

what Rule 13 regulates is the signing and filing of groundless pleadings in bad faith or for purposes of harassment, not the pursuit of an action later determined to be groundless after pleadings were filed. As much is revealed in the rule itself when it declares that "[i]f a pleading, motion or other paper is signed in violation of this rule, the court ... shall impose an appropriate sanction...." TEX.R. CIV. P. 13 (emphasis added). It says nothing about levying sanctions if one pursues an action or pleading thought legitimate when filed but subsequently found baseless. As a result, the circumstances pivotal to the determination of whether sanctions should issue are those in existence at the time the pleading in question was signed and filed. *Monroe v. Grider,* 884 S.W.2d at 817; *Campos v. Ysleta Gen. Hosp., Inc.,* 879 S.W.2d 67, 71 (Tex.App.--El Paso 1994, writ denied); *McCain v. NME Hosps., Inc.,* 856 S.W.2d at 757; *Home Owners Funding Corp. v. Scheppler,* 815 S.W.2d at 889.

Next, since it is presumed that counsel acted in good faith, TEX.R. CIV. P. 13, the burden lies with the movant to prove the criteria prerequisite to recovering sanctions. *GTE Communications Sys. Corp. v. Tanner,* 856 S.W.2d 725, 729 (Tex.1993); *Campos v.*

**Page 765**

*Ysleta Gen. Hosp., Inc.,* 879 S.W.2d at 71. That is, it must establish not only the frivolity of its opponent's claim but also the improper motives underlying the decision to file the suit, motion, or document. This in turn makes it imperative for the trial court to convene and conduct an evidentiary hearing. *Bisby v. Dow Chemical Co.,* 931 S.W.2d 18, 21 (Tex.App.--Houston [1st Dist.] 1996, no writ); *McCain v. NME Hosp., Inc.,* 856 S.W.2d at 757-58; see TEX.R. CIV. P. 13 (stating that the court must provide the litigants "notice and hearing"). "Without hearing evidence on the circumstances surrounding the filing of the pleading and the signer's credibility and motives, the trial court ha[s] no evidence to determine that the appellants or their attorneys filed the pleading in bad faith or to harass." *McCain v. NME Hosps., Inc.,* 856 S.W.2d at 757-58; accord *Bisby v. Dow Chemical Co.,* 931 S.W.2d at 21 (stating the same). Similarly, it is equally imperative that notice of the foregoing hearing be afforded the parties. TEX.R. CIV. P. 13. If one or the other is denied to the litigant against whom sanctions are sought, then it can hardly be said that the litigant received due process before being punished.

Application of the Standard

As to the contention that sanctions were inappropriate because the court denied PCA's motion for summary judgment, we disagree. [5] Simply put, nothing of record indicates that the court ever granted or denied the motion. Given this, we can hardly conclude that the court denied

summary judgment, which in turn, prevents us from inferring that the court implicitly determined that some evidence existed to buttress Karagounis' claim.

As to the contention that sanctions could not issue simply because he failed to present sufficient evidence to support his claim, we interpret it as questioning the legal basis upon which the court acted. As revealed by testimonial evidence at the sanctions hearing, PCA's counsel provided Karagounis' counsel with evidence which allegedly established that the suit was baseless. Yet, Karagounis continued to proceed with the action, rather than dismiss it. To "continue to maintain this suit after the date that we got this information and fully disclosed it to the Plaintiff's lawyer, fully produced all documents necessary to prove it to the Plaintiff through his Attorney," said PCA's counsel, was to act in a manner warranting sanctions. (emphasis added). The court agreed as evinced by its finding "that Plaintiff's continued assertions against Defendant after February 27, 1997 are groundless and brought in bad faith or for the purpose of harassment." (emphasis added). [6] See TEX.R. CIV. P. 13 (obligating the court to state the particular basis upon which sanctions were issued); TEX. CIV. PRAC. & REM.CODE ANN. § 10.005 (requiring the court to describe the conduct which warranted sanctions).

As can be seen from PCA's argument and the court's declaration, Karagounis was not sanctioned for signing and filing a frivolous suit, but for continuing his suit once PCA provided him with evidence which allegedly rebutted his contentions. Yet, Rule 13, by its very words, only encompasses the initiation of a frivolous action for improper motive not the continuation of a suit after it is shown to be baseless. Thus, sanctions could not be levied under Rule 13. And, in doing so, the trial court abused its discretion by misinterpreting Rule 13. Finally, given that sanctions were assessed to punish conduct outside the scope of the rule, we must also conclude that the trial court's error was harmful.

This is not to say that we condone a litigant's conscious decision to further prosecute a claim or defense if same is shown to be groundless prior to trial. Such conduct is as

**Page 766**

reprehensible as knowingly filing a frivolous lawsuit in the first place. But we cannot read into rules or laws that which, by their own terms, is not there. Nevertheless, we would invite the appropriate governing bodies to adopt rules addressing situations like those discussed today. [7]

Issue Three--Failure to Notice Sanctions Hearing

Under this issue, Karagounis posits that sanctions could not be awarded given the court's failure to provide him sufficient prior notice of the hearing. In reviewing this ground, we found that he filed a motion for new trial and to reconsider the order denying new trial. Yet, in neither did he raise the assertion now before us. Nor was it presented to the trial court via any other means. Such was required to preserve it for appeal. [8] TEX.R.APP. P. 33.1(a)(1). Consequently, it has been waived. See *HBA East, Ltd. v. JEA Boxing Co.,* 796 S.W.2d 534, 538-39 (Tex.App.--Houston [1st Dist.] 1990, writ denied), cert. denied, 501 U.S. 1218, 111 S.Ct. 2828, 115 L.Ed.2d 998 (1991) (holding that the appellant waived his claim that he was denied prior notice of the hearing on a motion for default judgment because the issue was not first presented to the trial court).

Issue Four--Judgment Adjudicating the Merits

Under this issue, Karagounis posits that the judgment is defective since the trial court could not rule upon the merits of the case. That is, according to Karagounis, when a party fails to appear for trial, Texas Rule of Civil Procedure 165a restricts the trial court to dismissing the suit as opposed to addressing its merits. See *Tewell v. Tewell,* 599 S.W.2d 351, 354 (Tex.Civ.App.--Corpus Christi 1980, writ ref'd n.r.e.) (stating that dismissal, as opposed to an adjudication on the merits, is the appropriate relief vis-a-vis a suit that has not been diligently prosecuted). Moreover, in ordering that he take nothing against PCA after he failed to appear for trial, Karagounis argues that the court purportedly adjudicated the merits of his claim, which it could not. We overrule the point for several reasons.

First, we need not consider the issue for Karagounis did not include it within his motion for new trial or for reconsideration or otherwise present it first to the trial court. That was a prerequisite. TEX.R.APP. P. 33.1(a)(1); *Smith v. Babcock & Wilcox Constr. Co.,* 915 S.W.2d 22, 26 (Tex.App.--Austin 1994, no writ); *McCain v. NME Hosps., Inc.,* 856 S.W.2d at 755; *Andrews v. ABJ Adjusters, Inc.,* 800 S.W.2d 567, 568-69 (Tex.App.--Houston [14th Dist.] 1990, writ denied). Consequently, the matter has been waived.

Second, even if it were not waived, we find no error. This is so because Karagounis' argument is premised on the mistaken belief that the court entered judgment against him simply because he failed to appear. He ignores the fact that the court had before it, when the cause came to trial, what it considered to be a counterclaim for sanctions. See *New York Underwriters Ins. Co. v. State Farm Mut. Auto. Ins. Co.,* 856 S.W.2d 194, 205 (Tex.App.--Dallas 1993, no writ) (recognizing that a counterclaim for relief under Rule 13 was an appropriate way to obtain sanctions). As previously mentioned, PCA requested such relief since it believed that the suit was groundless and initiated in bad faith or for

purposes of harassment.

Another fact ignored by Karagounis is that the court concluded that his suit was "frivolous"

**Page 767**

and "groundless." More importantly, logic dictates that before the court could have so concluded, it had to have adjudicated his claims. And, having adjudicated them for purposes of awarding sanctions, the court did not err in entering a judgment on the merits rejecting the claims. [9] In sum, the court did not act upon Texas Rule of Civil Procedure 165a. Indeed, the latter was never mentioned by anyone below. It simply adjudicated Karagounis' claims, found them wanting, and entered judgment on that finding.

Accordingly, we reverse that portion of the judgment levying sanctions upon Karagounis and remand that issue for further proceedings. In all other respects, however, the judgment is affirmed.

---------

Notes:

[1] We note that Karagounis' statement and argument of this particular issue is highly abbreviated and obtuse. However, we construe his points of error liberally and consider both the points and related arguments in interpreting them. See Anderson v. Gilbert, 897 S.W.2d 783, 784-85 (Tex.1995) (holding that a party's arguments, and not just the wording of a point of error, should be considered).

[2] Karagounis released his counsel, with approval of the court, shortly before the date on which he was to appear at trial.

[3] Since Karagounis does not argue that Rule 13 and section 10, et seq., of the Civil Practice and Remedies Code conflict, we need not address whether the latter pre-empted the former on that basis.

[4] A motion or counterclaim requesting sanctions for a groundless filing after September 1, 1995 may utilize both Rule 13 and section 10.001. In Alexander v. Alexander, sanctions were requested due to violations of both Rule 13 and section 10.001 for a groundless filing that took place on July 26, 1996. 956 S.W.2d 712 (Tex.App.--Houston [14th Dist.] 1997, pet. denied).

[5] PCA moved for summary judgment on the grounds that it owed no legal duty to Karagounis. Owing no duty to Karagounis, it was argued, PCA could not be held responsible for any injury Karagounis suffered.

[6] The February 27th date referred to by the court did not coincide with any date on which Karagounis signed and filed a pleading or motion. Rather, it was the date on which PCA forwarded Karagounis' information which it thought conclusively disproved his cause of action. By that time, the suit had been pending for some seventeen months.

[7] Rule 11 of the Federal Rules of Civil Procedure addresses this issue:

(b) Representations to Court. By presenting to the court (whether by signing, filing, submitting, or later advocating ) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that ...

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of a new law....

FED.R.CIV.P. 11 (italics added)

[8] Additionally, we note that our reversal of the sanctions moots the issue of notice.

[9] Our conclusion that the trial court erred in awarding sanctions does not affect its finding that the suit was groundless. Again, we found error because the court could not sanction Karagounis for continuing to prosecute a groundless suit. Whether or not the claims were groundless went unaddressed. Nor did Karagounis question the legal or factual sufficiency of the evidence underlying the determination that his claims were frivolous.

---------

**Page 836**

**999 S.W.2d 836 (Tex.App. —Tyler 1999)**

**MARTI WILLIAMS, INDIVIDUALLY AND AS NEXT FRIEND OF**

**MICHAEL WILLIAMS AND LINDA SMILEY, INDIVIDUALLY**

**AND AS NEXT FRIEND OF COURTNEY SMITH, APPELLANTS**

**v.**

**AKZO NOBEL CHEMICALS, INC., F/K/A AKZO CHEMICALS, INC., ET AL., APPELLEES**

**No. 12-97-00295-CV**

**Court of Appeals of Texas, Twelfth District, Tyler**

**June 30, 1999**

APPEAL FROM THE 241ST JUDICIAL DISTRICT COURT OF SMITH COUNTY, TEXAS. Hon. Diane DeVasto, Judge.

**Page 837**

[Copyrighted Material Omitted]

**Page 838**

[Copyrighted Material Omitted]

**Page 839**

Robert W. Buchholz, Dallas, for appellants.

Jeffrey M. Tillotson, Dallas, James M. Garner, New Orleans, Gregory D. Smith, Tyler, F. Walter Conrad, Houston, Don David Martinson, Phillip S. Brown, Diana C Dutton, Dallas, Robert G Newman, San Antonio, Ms. Sally A. Longroy, Dale Gene Markland, William Stephen Boyd, Dallas, for appellees.

Panel consisted of Chief Justice Ramey, Jr. , Justice Worthen, and Justice Hadden.

**Page 840**

TOM B. RAMEY, Jr. Chief Justice.

Appellants[1], brought suit against Appellees[2], a hazardous waste disposal facility and numerous related entities and companies that generate waste sent to the disposal facility. During the discovery process, the trial court dismissed Appellants' claims for failure to comply with a court order. Appellants assert that the trial court erred in entering the order and in dismissing their claims. We reverse the trial court's orders of dismissal and remand the case to the trial court for further proceedings

Appellants filed this lawsuit in October of 1993, alleging that they suffered personal injuries and property damage as a result of continuing exposure to toxic emissions released from the Facility. Both sides served interrogatories and requests for production on the other in mid-1995. Unhappy with Appellants' responses, some of the Appellees filed a motion to compel and for sanctions. However, before the scheduled hearing, the parties came to an agreement and no ruling was obtained on the motion. Because Appellees felt that Appellants did not comply with that agreement, they filed another motion to compel and for sanctions. The result was an agreed order entered March 16, 1996, which ordered Appellants to further respond to discovery within a specified period. The order did not mention sanctions.

The parties continued to spar with discovery requests and objections for several months. In November 1996 many Appellees filed a motion for entry of a case management order ("CMO"). The stated purpose of the order was to narrow the issues, streamline discovery, and weed out meritless claims. The movants also sought to obtain consistent treatment concerning all "companion cases."[3] Movants asked the court to order Appellants to provide affidavits from experts specifying the illness or condition attributable to exposure to substances from the Facility, naming the substances, stating when and how the exposure occurred, naming which Appellee is responsible, and explaining the basis of the expert's opinion. Movants also asked for a stay of discovery. They did not ask for sanctions.

A hearing was held on the motion on December 20, 1996, at which the court heard arguments from both sides. Movants explained that they wanted an order requiring Appellants to produce affidavits supporting the basic elements of their case

**Page 841**

so that Movants could defend against specific allegations. After Appellants have provided that information, Movants asserted, the case should proceed in accordance with the court's normal scheduling order. Appellants argued against entry of the CMO, stating that the appropriate course for Movants was to file special exceptions. While they have

obtained some documents from some Appellees, Appellants argued, those documents are general and incomplete. Appellants asserted that they could not provide the affidavits requested by Movants, with the level of specificity requested, without doing further discovery. The trial court stated on the record that "at this time I'm going to enter the case management order as requested by the Defendants." The court also announced a stay of discovery. The specific terms of the order were not dictated into the record. The court also stated that it would review the affidavits when presented and would consider amendments to the order at that time.

A written CMO was signed on January 15, 1997. That order required Appellants to present, on or before sixty days after the date of the order, affidavits from experts describing the injury or condition suffered by each plaintiff that was caused by exposure to materials from the Facility, identifying the substance that caused the injury, the manner, date, time, duration, and dosage of each incident of exposure and the source of each substance. The order also required the affidavits to include a description of the scientific and medical bases for the expert's opinions. Also included was the decree "that any plaintiff that fails to comply with this order shall have his or her claims dismissed." Finally, the order stayed all discovery as to all parties until thirty days after the submission of the affidavits.

On March 3, 1997, Appellants filed a motion to reconsider the CMO. They claimed that the documents they have are incomplete and not specific. They asserted that certain Appellees can supply them with the information they need to comply with the CMO. Therefore, they requested that the discovery stay be lifted and they be allowed additional time to obtain the required affidavits. Alternatively, if the stay was to remain in place, they requested an additional thirty days to obtain the affidavits.

A hearing was held on the motion to reconsider on April 4, 1997. Appellants argued that they need documents from Appellees showing what was shipped, what specific materials were in the waste stream, their concentrations, when they were shipped, where they were shipped and confirmation that they were received. Appellants claimed they could not provide affidavits in the absence of this information. Appellees asserted that the Facility had made available for review by Appellants over 200,000 documents and Appellants had reviewed and copied a large number of these documents. Further, some defendants had notified Appellants that documents were available for their review but Appellants never made arrangements to review those documents. Finally, Appellees pointed out that Appellants actually reviewed documents produced by other defendants and made some copies of those documents. Even so, Appellants did not provide affidavits concerning their

claims against those defendants. The court invited motions to dismiss for its consideration and delayed ruling on Appellants' pending motion. The court, however, explicitly stated that the discovery stay was still in effect.

Thereafter, Appellees moved the court to dismiss Appellants' claims for failure to comply with the CMO. The court signed motions to dismiss the claims against most defendants on May 12, 13, 15, and 21, 1997. Pursuant to Appellees' request to enter an amended order, the trial court entered amended orders of dismissal on September

## Page 842

9 and 12, 1997, dismissing Appellants' claims against fifty defendants. The amended orders more completely explain the grounds for dismissal against those fifty defendants. The orders state that those dismissals were justified under Texas Rules of Civil Procedure 13, 166, and 215, and the court's inherent power.

Initially, we consider an issue raised by Appellants in their supplemental brief concerning whether the trial court had jurisdiction to enter the amended orders. They assert that, because they filed motions for new trial concerning all of the May dismissal orders, the trial court's plenary jurisdiction ended, at the latest, seventy-five days after May 21, on August 4, 1997. Therefore, they argue, the court did not have jurisdiction when it signed the September orders.

A trial court has plenary jurisdiction over its judgment until it becomes final. *Fruehauf Corp. v. Carrillo,* 848 S.W.2d 83, 84 (Tex. 1993) (per curiam). The trial court also retains continuing control over interlocutory orders and has the power to set those orders aside any time before a final judgment is entered. Id. To be final a judgment must dispose of all issues and parties in a case. *North East Indep. Sch. Dist. v. Aldridge,* 400 S.W.2d 893, 895 (Tex. 1966). Any action taken by the trial court after the expiration of its plenary jurisdiction is a nullity. See *Jackson v. Van Winkle,* 660 S.W.2d 807, 808 (Tex. 1983).

Here, the trial court signed dismissal orders in May disposing of most defendants. However, those orders did not dispose of all defendants. Defendants Eagle-Picher Industries and Atrium Doors and Windows were not included in those orders. Eagle-Picher Industries was non-suited by order dated September 2, 1997, and Atrium Doors and Windows was non-suited on November 3, 1997. Therefore, the May dismissal orders were interlocutory and not final. See Aldridge, 400 S.W.2d at 895. Accordingly, the trial court had jurisdiction to enter the September orders. See Carrillo, 848 S.W.2d at 84. We overrule Appellants' supplemental issue.

We address now Appellants' second issue, which is

dispositive of the case. In their second issue, Appellants contend that the trial court erred in dismissing their claims because death penalty sanctions were not proper. We agree. The trial court's orders rely on rules of civil procedure 13, 166, and 215 and the court's inherent power as justification for the dismissals. We conclude that the dismissals cannot be upheld under any of these grounds.

In order to assist in the disposition of the case, rule 166 permits trial courts to hold pretrial conferences and to enter orders establishing the agreements of the parties as to any of the matters considered which controls the subsequent course of the case up to trial. TEX. R. CIV. P. 166. The trial court has power, implicit under rule 166, to sanction for failing to obey the court's pretrial orders. *Koslow's v. Mackie,* 796 S.W.2d 700, 703 (Tex. 1990). Rule 215 authorizes a trial court to impose sanctions for violations of discovery orders or for abuse of the discovery process. TEX. R. CIV. P. 215.

Imposing an available sanction for a violation of rules 166 or 215 is left to the sound discretion of the trial court. *TransAmerican Nat. Gas Corp. v. Powell,* 811 S.W.2d 913, 917 (Tex. 1991) (orig. proceeding); Koslow's, 796 S.W.2d at 704. An appellate court will set aside the decision only on a showing of a clear abuse of discretion. The test for abuse of discretion is whether the trial court acted without reference to any guiding rules and principles, or whether under all the circumstances of the particular case the trial court's action was arbitrary or unreasonable.

**Page 843**

Koslow's, 796 S.W.2d at 704. The circumstances of the case include the reasons offered and proved or established as a matter of law on the record. Id.

If the sanctions imposed are not just, a trial court abuses its discretion. TransAmerican, 811 S.W.2d at 917. To determine whether sanctions are just we apply a two-prong test. The first prong requires that a direct relationship exist between the offensive conduct and the sanction imposed. Id. Under this prong, the trial court should attempt to determine if the offensive conduct is attributable to the attorney, the party, or both. Id. The second prong requires that the sanctions must be no more severe than necessary to satisfy its legitimate purposes. Id.

A death penalty sanction is any sanction that adjudicates a claim and precludes the presentation of the merits of the case. *Chrysler Corp. v. Blackmon,* 841 S.W.2d 844, 845 (Tex. 1992). Such sanctions should not be assessed absent a party's flagrant bad faith or counsel's callous disregard for the responsibilities of discovery under the rules. Id. at 849. Discovery sanctions should not be used to adjudicate the merits of a claim unless a party's

obstruction of the discovery process justifies the presumption that the claim lacks merit. TransAmerican, 811 S.W.2d at 918. Even then, lesser sanctions should be tested first to determine if they are adequate to secure compliance, deterrence, and punishment of the offender. *Hamill v. Level,* 917 S.W.2d 15, 16 n.1 (Tex. 1996) (per curiam); Chrysler Corp., 841 S.W.2d at 849; *Humphreys v. Meadows,* 938 S.W.2d 750, 752 (Tex. App. - Fort Worth 1996, writ denied). In exceptional situations, determinative sanctions may be imposed in the first instance when they are clearly justified and no lesser sanctions will promote compliance. *GTE Communications Sys. Corp. v. Tanner,* 856 S.W.2d 725, 729 (Tex. 1993) (orig. proceeding).

The trial court has inherent power to sanction to the extent necessary to deter, alleviate, and counteract bad faith abuse of the judicial process. *Metzger v. Sebek,* 892 S.W.2d 20, 51 (Tex. App. - Houston [1st Dist.] 1994, writ denied), cert. denied, 516 U.S. 868, 133 L.Ed. 2d 124, 116 S.Ct. 186 (1995); *Shook v. Gilmore & Tatge Mfg Co.,* 851 S.W.2d 887, 891 (Tex. App.-Waco 1993, writ denied); *Kutch v. Del Mar College,* 831 S.W.2d 506, 509 (Tex. App. - Corpus Christi 1992, no writ). For inherent power to apply, there must be some evidence and factual findings that the conduct complained of significantly interfered with the court's administration of its core functions: hearing evidence, deciding issues of fact raised by the pleadings, deciding questions of law, entering final judgment, and enforcing that judgment. Shook, 851 S.W.2d at 891; Kutch, 831 S.W.2d at 510. However, the rights of litigants may not be infringed by this power. Shook, 851 S.W.2d at 891. Therefore, a sanction imposed pursuant to the court's inherent power must be just and appropriate. Id. The appellate court applies the test set out in TransAmerican to determine whether sanctions imposed under the trial court's inherent power were proper or an abuse of discretion. Shook, 851 S.W.2d at 892; Kutch, 831 S.W.2d at 512.

Initially, we consider the first prong of the TransAmerican test, whether there is a direct relationship between the offensive conduct and the sanction imposed. At the April 4 hearing, the court heard argument by counsel for each side. No evidence was presented. The trial court made no attempt to determine if the offensive conduct is attributable to the parties, the attorneys, or both. Therefore, the trial court could make no determination as to whether there was a direct relationship between the failure to comply with the CMO and the death penalty sanction. The first prong of the TransAmerican test has not been met.

**Page 844**

We turn now to the second prong which requires that the sanctions be no more severe than necessary. As explained above, the Supreme Court requires a trial court to attempt to obtain compliance with its orders by first

ordering sanctions that are not case determinative. Hamill, 917 S.W.2d at 16 n.1; Chrysler Corp., 841 S.W.2d at 849. The trial court was authorized to assess any of several lesser sanctions. Rule 215 provides a partial list including disallowing further discovery, charging discovery expenses to the disobedient party, ordering that certain designated facts shall be taken as established, refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence, or holding the disobedient party in contempt. TEX. R. CIV. P. 215.2(b). Additionally, the trial court may require a party to pay attorney's fees or order other monetary sanctions such as heavy fines. See *Bosnich v. National Cellulose Corp.,* 676 S.W.2d 446, 447-48 (Tex. App. - Houston [1st Dist.] 1984, no writ).

No written orders relating to discovery or compelling discovery had been entered prior to entry of the CMO. The trial judge did not impose any lesser sanctions prior to dismissing Appellants' claims. Even assuming that the CMO should be characterized as an order to compel, entry of an order to compel cannot be construed as a lesser sanction under rule 215. *Westfall Family Farms v. King Ranch,* 852 S.W.2d 587, 592 (Tex. App. - Dallas 1993, writ denied). Although the dismissal orders recite that the trial court considered lesser sanctions, this does not satisfy the requirement that the trial court first impose lesser sanctions before entering death penalty sanctions. See Hamill, 917 S.W.2d at 16 n.1; Chrysler Corp., 841 S.W.2d at 849. Although the CMO included a warning that noncompliance would result in dismissal, neither a threat to sanction, without more, nor the intent to sanction, is a sanction. See TEX. R. CIV. P. 215(2)(b); Chrysler Corp., 841 S.W.2d at 850; *GTE Mobilnet of South Tex. Ltd. Partnership v. Telecell Cellular, Inc.,* 955 S.W.2d 286, 298 (Tex. App. - Houston [1st Dist.] 1997, writ denied) (on reh'g). The CMO is not a sanction. It is an order and a threat. Thus, the trial court did not impose any lesser sanctions before dismissing Appellants' claims in compliance with the general rule.

Appellees direct our attention to *Andras v. Memorial Hospital System,* 888 S.W.2d 567 (Tex. App. - Houston [1st Dist.] 1994, writ denied), to which the trial court cited in its dismissal orders. In Andras, the First District Court of Appeals held that an order to compel coupled with a threat to dismiss for noncompliance is a lesser sanction within the meaning of Chrysler Corporation. Andras, 888 S.W.2d at 573. Because we conclude that the Supreme Court requires that a lesser sanction actually be assessed to further test compliance before imposition of the death penalty, we decline to follow the Andras court in that respect.

Finally, we consider whether this case presents an exceptional situation where determinative sanctions should be imposed in the first instance. Case determinative sanctions would be appropriate here only if clearly justified

and if it is fully apparent that no lesser sanctions would promote compliance with the rules. See Tanner, 856 S.W.2d at 729. Both amended dismissal orders contain the following: "Lesser sanctions would not promote compliance and discourage further abuse. If the threat of "death penalty" sanctions was not enough to promote compliance with the Court's CMO, lesser sanctions would not promote compliance either." We are unpersuaded by the Court's circular logic. Noncompliance in the face of a threat of death penalty sanctions

**Page 845**

cannot justify the failure to impose lesser sanctions in the first instance. There is nothing in the record to indicate that some lesser sanction would not have been effective to promote compliance. See 856 S.W.2d at 729-30.

The sanctions imposed by the trial court precluded Appellants from presenting the merits of their case. Before a court may deprive a party of its right to present the merits of its case because of discovery abuse, it must determine that a party's hindrance of the discovery process justifies a presumption that its claims lack merit. TransAmerican, 811 S.W.2d at 918. No such presumption is warranted here. Appellants did not refuse to provide discovery. That their original answers were incomplete or even intentionally evasive is not such an obstruction of discovery to justify the conclusion that their claims lacked merit without more. *Lanfear v. Blackmon,* 827 S.W.2d 87, 90-91 (Tex. Civ. - Corpus Christi 1992, orig. proceeding). Appellants did not, at any time, refuse to comply with the CMO. They asserted that they were unable to comply without more information and more time. Over fifty defendants were involved. The information Appellants had to sift through was voluminous and of a technical nature. Given these facts, we do not conclude that this was such flagrant bad faith or callous disregard to preclude a trial on the merits. See *Perez v. Murff,* 972 S.W.2d 78, 83 (Tex. App. - Texarkana 1998, writ denied). Appellants' failure to comply with the CMO does not justify the presumption that their claims lack merit. See Hamill, 917 S.W.2d at 16. Accordingly, death penalty sanctions are not justified. See Tanner, 856 S.W.2d at 730.

The trial court imposed no lesser sanctions as required by TransAmerican. It has not been shown that lesser sanctions would have been totally ineffective. See Tanner, 856 S.W.2d at 729. The record does not support a presumption that Appellants' claims lack merit thereby justifying a death penalty sanction. See 856 S.W.2d at 730. We conclude, therefore, that the trial court's imposition of death penalty sanctions was not "just" under the standards set out in TransAmerican. Accordingly, the trial court abused its discretion in entering the dismissal orders pursuant to rules of civil procedure 166 and 215 and the

court's inherent power.

Rule 13 authorizes the imposition of sanctions against an attorney, a represented party, or both, who files pleadings, motions, or other papers that are both groundless and brought in bad faith or to harass. TEX. R. Civ. P. 13. The court may impose any appropriate sanction available under rule 215(2)(b). Id. "Groundless" means without basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law. Id. Before a trial court may impose sanctions under rule 13, it must hold an evidentiary hearing. Id. We set aside the trial court's decision to impose rule 13 sanctions upon a showing of abuse of discretion. *Monroe v. Grider,* 884 S.W.2d 811, 816 (Tex. App. - Dallas 1994, writ denied).

When determining whether rule 13 sanctions are proper, the trial court must examine the circumstances existing when the litigant filed the pleadings. Id. at 817. Courts should presume parties and their counsel file all papers in good faith and the party seeking sanctions must overcome that presumption. Tanner, 856 S.W.2d at 731. Further, the trial court can presume that a plaintiff has investigated his case prior to filing. *McAllister v. Samuels,* 857 S.W.2d 768, 773 (Tex. App. - Houston [14th Dist.] 1993, no writ). The party seeking sanctions has the burden of showing his right to relief. Tanner, 856 S.W.2d at 731. Motions and arguments of counsel are not evidence. McCain v.

### Page 846

NME Hosps., Inc., 856 S.W.2d 751, 757 (Tex. App. - Dallas 1993, no writ).

The dismissal orders stated that the April 4, 1997 hearing was an evidentiary hearing held under rule 13 and Appellants had the opportunity to submit any evidence. Further, according to the dismissal orders, Appellants' lack of compliance with the CMO and the excuses offered by Appellants at the April 4 hearing, demonstrated that Appellants' claims and their pleadings were groundless and brought in bad faith or to harass. The reporter's record of the hearing confirms that no evidence was presented. Without hearing evidence on the circumstances surrounding the filing of the pleading and the signer's credibility and motives, the trial court had no evidence to determine that the Appellants or their attorneys filed the pleading in bad faith or to harass. Further, as evidenced by the language in the dismissal orders, the trial court improperly placed the burden on Appellants to prove good faith. The trial court must presume good faith and Appellees had the burden to prove bad faith or that the claim was brought to harass. Tanner, 856 S.W.2d at 731. Appellees did not meet their burden to prove an element of rule 13. Therefore, the record

does not support the imposition of the ordered sanctions.

Further, rule 13 requires that the sanctions assessed be appropriate. Tanner, 856 S.W.2d at 731. Rule 13's "appropriate" standard is equivalent to rule 215's "just" standard. Id. Thus, to determine whether sanctions imposed for violating rule 13 are appropriate, we employ the same test used to determine whether sanctions imposed by rule 215 are just. Metzger, 892 S.W.2d at 53. As explained above, the sanction employed by the trial court was more severe than authorized and not just. While this Court does not condone filing a lawsuit without first investigating to determine if the plaintiff has a viable case, unless a case meets the requirements of Tanner's exception, it should not be finally concluded without first imposing lesser sanctions to obtain compliance with court orders. Accordingly, the trial court abused its discretion in dismissing Appellants' claims pursuant to rule 13.

We conclude that the trial court was not justified in imposing death penalty sanctions under rules of civil procedure 13, 166, or 215, or under the trial court's inherent power. Accordingly, we sustain Appellants' second issue. Our disposition of Appellants' second issue makes it unnecessary for us to consider Appellants' remaining issues. TEX. R. APP. P. 47.1.

We reverse the trial court's orders of dismissal and remand this cause to the trial court for further proceedings consistent with this opinion.

---------

Notes:

[1]. Marti Williams, individually and as next friend of Michael Williams, and Linda Smiley, individually and as next friend of Courtney Smiley.

[2]. American Ecology Environmental Services Corporation, formerly known as Gibraltar Chemical Resources, Inc. ("the Facility"), American Ecology Corporation, American Ecology Management Corporation, Mobley Environmental Services, Inc., Mobley Company, Inc., David Mobley, James Mobley, Thomas Mobley, Numetco, SSI Mobley, Dixie Chemical Company, Texas Utilities Electric Company, Arco Chemical Company, Houston Lighting & Power Company, Lyondell Petrochemical Company, Motorola, Inc., Philllips 66 Company, Safety-Kleen Corporation, The Sherwin-Williams Company, Texaco, Inc., American Airlines, AnaLab Corporation, Aptus, Inc., Aviall, Inc., Akzo Nobel Chemicals, Inc., Chemical Leaman Tank Lines, Inc., Cedar Chemical Corporation, Chromium Corporation, Devoe & Raynolds, Company, Helena Chemical Company, Hitachi, Semiconductor of America,

Inc., Hoechst Celenese Corporation, Intercontinental Manufacturing Company, International Business Machines, Inc., Laidlaw Environmental Serves (TES), Inc., The Lubrizol Corporation, McDonnell Douglas Corporation, Mobil Oil Corporation, Mobil Chemical Corporation, Phelps Dodge Refining Corporation, Pure Solve, Inc., Rho-Chem, Inc., Sandoz Agro, Inc., Solvent Service Company, Inc., Texas Instruments Incorporated, Texas Electric Cooperatives, Inc., The Valspar Corporation, United States Pollution Control, Inc., and Zoecon Corporation.

[3] At the time, there were also other similar cases pending in other courts involving the same defendants and attorneys, but different plaintiffs.

---------

ACCEPTED
03-15-00409-CV
8022650
THIRD COURT OF APPEALS
AUSTIN, TEXAS
11/30/2015 6:35:13 PM
JEFFREY D. KYLE
CLERK

No. 03-15-00409-CV

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS

11/30/2015 6:35:13 PM

JEFFREY D. KYLE
Clerk

In the Third Court of Appeals
Austin, Texas

**SUSAN ENGLAND**
*Appellant*

**v.**

**JANICE KOLBE, AS GUARDIAN OF THE ESTATE OF EDNA MOON**
*Appellee*

**APPEAL FROM CAUSE NO. 12-0361**
**207TH JUDICIAL DISTRICT COURT OF HAYS COUNTY, TEXAS**
**HON. GARY STEEL, PRESIDING**

**AMENDED CERTIFICATION REGARDING LENGTH OF BRIEF**

TO THE HONORABLE THIRD COURT OF APPEALS:

Susan England (now Susan Lee), the Appellant, files this Amended Certification Regarding the Length of Appellant's Brief based on the following:

1.    On this day, Counsel for Appellant, Susan England (Lee), filed an incorrect certificate regarding the length of Appellant's brief.  Counsel for Appellant notifies the Court that the certification as to the length of Appellant's Brief that was

filed with that brief is incorrect. The correct certification is as follows:

**Counsel for Appellant hereby certifies that the length of the Appellant's Brief filed today as indicated by the word processing system used to generate it, excluding appendices, is not 7,439 words, but is 14,252 words. While not required, this word count includes the caption, table of contents, index of authorities, statement of the case and issues presented, signature block, this certificate, and the certificate of service.**

I apologize for any confusion this may have caused.

> Respectfully submitted,
>
> Law Office of David Junkin
> 15401 RR12, Suite 105
> P.O. Box 2910
> Wimberley, TX 78676
> 512/847-8600
> 512/847-8604 (fax)
> david@junkinlawoffice.com
>
> _____
> David Junkin
> State Bar No. 11058020
> Attorney for Appellant, Susan Lee

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this pleading was served on November 30, 2015, in the manner indicated below and on the following person(s):

**VIA FACSIMILE AND/OR ESERVE**

Jonathan Hull
c/o Reagan Burris, LLC
401 Main Plaza, Suite 200
New Braunfels, TX  78130


_____
David Junkin